Robert A. Sacks (SBN 150146)
(sacksr@sullcrom.com)
Adam S. Paris (SBN 190693)
(parisa@sullcrom.com)
Diane L. McGimsey (SBN 234953)
(mcgimseyd@sullcrom.com)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800

*Attorneys for Plaintiff SVB Financial Group*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SVB FINANCIAL GROUP, | Case No. 5:24-cv-01321 |
| Plaintiff, | **COMPLAINT** |
| v. | Judge: |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Silicon Valley Bank and Silicon Valley Bridge Bank, N.A., | |
| Defendant. | |

Plaintiff SVB Financial Group ("SVBFG") brings this Complaint against Defendant Federal Deposit Insurance Corporation ("FDIC"), as both receiver for Silicon Valley Bank of Santa Clara, California ("FDIC-R1") and receiver for Silicon Valley Bridge Bank, N.A. ("FDIC-R2," collectively, the "FDIC-Rs"), and alleges as follows:

## INTRODUCTION

1.      This action challenges the wrongful denial of SVBFG's administrative claims to recover approximately $1,933,805,708.13 (the "Account Funds") that were on deposit at the former Silicon Valley Bank ("SVB") at the time it was put into receivership, were transferred to Silicon Valley Bridge Bank, N.A. ("Bridge Bank"), and have been illegally taken away and withheld from SVBFG.  (*See* Counts I-IX.)  SVBFG also asserts three Counts for relief unrelated to the deposit claims.  (*See* Counts X, XI, XII.)  These claims were timely asserted in the FDIC-Rs' administrative processes and denied along with the claim to the Account Funds.

2.      SVBFG was the corporate parent of SVB before SVB was placed into receivership. But the deposit claims asserted herein arise solely out of funds SVBFG deposited with SVB as a depositor, pursuant to deposit agreements ("Deposit Agreements"), and held in demand deposit accounts at SVB no differently from SVB's thousands of other depositors.  SVBFG simply seeks the same treatment the FDIC-Rs accorded all of SVB's other depositors.

3.      On Sunday, March 12, 2023, Secretary of the Treasury Janet Yellen exercised her exclusive statutory authority to invoke an emergency systemic risk exception to the "least cost resolution" requirements of the Federal Deposit Insurance Act (the "FDIA"), which were introduced by the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), in order to guarantee **all** deposits of **all** depositors of the former SVB.  "**All** depositors" includes SVBFG, and "**all** deposits" includes the entirety of SVBFG's then-existing deposits at SVB, without limit.  Secretary Yellen made this emergency determination on March 12 because the Board of Directors of the FDIC, the Board of Governors of the Federal Reserve System, and Secretary Yellen uniformly determined, and the President of the United States agreed, that failing to act—and, specifically, failing to fully protect depositors who held large, uninsured deposits at SVB—would have serious adverse effects on the United States economy and its financial stability.

4.      Immediately following Secretary Yellen's determination, FDIC-R1 complied with its obligation to provide SVBFG with full access to its Account Funds.  Specifically, on March 13, 2023, it transferred all of SVBFG's deposits at the former SVB to the newly created Bridge Bank, as it did with the insured and uninsured deposits of all other SVB depositors.

5.      In accordance with FDIC-R1's actions to make all deposits of all SVB depositors available at Bridge Bank starting on March 13, 2023, SVBFG was not required to file an administrative claim to recover its Account Funds after SVB was closed and placed into receivership on March 10, 2023.  Upon becoming receiver for SVB, FDIC-R1 clearly did not intend to require any depositors to file a claim against FDIC-R1, as both FDIC-R1's and -R2's own documentation and contact email address for their administrative claims process—"**NonDepClaims**Dal@FDIC.gov"—make clear.  This was confirmed when FDIC-R1 transferred all of SVB's depositors' funds, including SVBFG's, to Bridge Bank along with those of all other SVB depositors and initially made those funds available to SVBFG without restriction.  Despite the FDIC properly recognizing SVBFG's Account Funds as a deposit at first, the FDIC-Rs, for still undisclosed reasons, interfered with SVBFG's continued access to its Account Funds at Bridge Bank and purported to sweep those funds back to FDIC-R1.  SVBFG properly sought turnover of the Account Funds in an adversary proceeding in its Chapter 11 proceeding in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  Nevertheless, after the FDIC-Rs belatedly insisted that SVBFG, alone among depositors, was required to file an administrative claim, SVBFG filed precautionary protective claims with each of the FDIC-Rs on July 10, 2023, detailing, in over 25 pages, the bases for SVBFG's entitlement to recover on its deposit claim, among other claims.

6.      The FDIC-Rs—which were required by statute to act on SVBFG's claim within 180 days—both waited 179 days, until the last business day prior to the statutory deadline, before providing SVBFG with perfunctory, one-sentence notices that they were denying all of SVBFG's claims—including the account deposit claims—without any further explanation.  FDIC-R1 merely stated that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver due to the receiver's defenses.  All other claims are denied as speculative, unsupportable, or otherwise not

1    proven to the satisfaction of the receiver."  Similarly, FDIC-R2 said that "[t]he deposit claim is

2    denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as

3    receiver for Silicon Valley Bridge Bank.  All other claims are denied as speculative, unsupportable,

4    or otherwise not proven to the satisfaction of the receiver."

5          7.    This language is identical to denial letters issued to other creditors, which has

6    prompted the Bankruptcy Court overseeing SVBFG's bankruptcy case to question whether a "one

7    sentence denial of a claim without explanation of reasons . . . satisfies due process," and to

8    expressly note the repeated Kafkaesque refusal by the FDIC to explain the grounds for its denials

9    of claims.  The relevant statutory provision requires that if a claim is disallowed, the FDIC-Rs

10   must "provide a statement of each reason for the disallowance and the procedure for obtaining

11   agency review or judicial determination." 12 U.S.C. § 1821(d)(8)(B)(ii).  As the Bankruptcy Court

12   presiding over SVBFG's bankruptcy case recently stated (in relation to other SVB creditors who

13   filed FDIC claims), "[o]ne would ordinarily expect an administrative agency that rejects claims

14   that in this case exceed $500 million would explain more than that the claim 'is not proved to the

15   satisfaction of the Receiver.'  The FDIC's denial brings to mind a quote from Kafka:  'And why

16   am I under arrest?'  he then asked.  'That's something we're not allowed to tell you.  Go into your

17   room and wait there.  Proceedings are underway and you'll learn about everything all in good

18   time.' FRANZ KAFKA, THE TRIAL (1914)."

19         8.    SVBFG is not aware of any legitimate basis for the denial of the claims related to

20   the Account Funds, and neither FDIC-R1 nor FDIC-R2 is permitted to supply any additional

21   reasons for the denials not stated in the denial letters.[1]  In particular:

22         a.    There is no dispute over the accuracy of any deposit account statements and

23         the existence of SVBFG's Account Funds;

24         b.    As of March 10, 2023, SVBFG did not have any bounced checks,

25         overdrafts, letters of credit, or charged off or delinquent loans with SVB.  It had not pledged

26

27   ───────────────

28   [1]    The same is true with respect to the denials of SVBFG's non-deposit claims, which similarly provided no bases for the denials and cannot now be supplemented by FDIC-R1 or FDIC-R2.

1   its deposits as collateral for any loan extended by SVB, or acted as a guarantor of any SVB

2   loan, nor had SVB obtained any judgments against SVBFG;

3         c.     As of March 10, 2023, there were no outstanding "covered transactions" (as

4   defined in Section 23A of the Federal Reserve Act, 12 U.S.C. § 371c) between SVBFG (or

5   certain of its affiliates) and SVB;

6         d.     As of March 10, 2023, there was no other agreement between SVBFG and

7   SVB respecting the deposit accounts, much less one under which FDIC-R1 could cancel

8   deposit liabilities owed to SVBFG or convert them into equity; and

9         e.     FDIC-R1 had no other valid basis to deny SVBFG's claims to the Account

10   Funds and has supplied none to this date.

11        9.     As the holder of a valid deposit claim against the FDIC-Rs, SVBFG is entitled to

12   recover the entirety of its Account Funds.  The FDIC-Rs know this.  Immediately following

13   Secretary Yellen's determination, FDIC-R1 complied with its obligation to provide SVBFG with

14   full access to its Account Funds.  SVB then accessed its accounts and withdrew approximately

15   $180 million between March 13 and 16, 2023, using its accounts precisely as it always had—as

16   demand deposit accounts.  However, approximately three days after providing SVBFG with

17   complete and unfettered access to its funds and honoring tens of millions of dollars of transactions

18   in those accounts, FDIC-R1 instructed Bridge Bank, for which FDIC-R2 now acts as receiver,

19   inexplicably, without warning or consent, to cut off SVBFG's access to its Account Funds and to

20   dishonor transactions then in process.

21        10.    The FDIC-Rs' continuing efforts to divest SVBFG of its Account Funds is lawless

22   behavior.  SVBFG therefore seeks the following principal relief:

23         a.     Judgment against FDIC-R1 and FDIC-R2 awarding SVBFG the full amount

24   of its Account Funds, together with lost earnings on those Funds, an amount SVBFG

25   estimates to exceed $100 million (Counts I, II, VIII, IX);

26         b.     A determination that the FDIC-Rs' continuing interference with SVBFG's

27   access to its Account Funds since SVBFG's Chapter 11 filing on March 17, 2023, and their

28   refusal to turn those funds over to SVBFG, violate the automatic stay provisions of 11

U.S.C. § 362(a), and judgment directing turnover of the Account Funds plus all lost earnings on those Account Funds under Section 542 of the Bankruptcy Code (Counts III, IV);

        c.      In the alternative, if it is determined that SVBFG is not entitled to recover the full amount of its Account Funds, a determination that SVBFG is entitled to recover from the FDIC—including each of FDIC-R1 and -R2 in the first instance, as applicable, and from the FDIC in its corporate capacity if there are insufficient funds in the applicable receivership—the distribution to which it is entitled pursuant to Sections 1406 and 681 of the California Financial Code (with respect to FDIC-R1) and Sections 91 and 194 of the National Bank Act (with respect to FDIC-R2), and 12 U.S.C. § 1821(i)(2) (with respect to both FDIC-Rs).  SVBFG directs this claim against each of FDIC-R1 and FDIC-R2 in the alternative because, while the Account Funds were held at Bridge Bank when SVBFG's access was initially frozen, the FDIC-Rs have refused to date to explain whether or when the deposit funds were transferred to FDIC-R1.  SVBFG accordingly pleads these claims as to both FDIC-Rs.  In particular, SVBFG is entitled under California and federal law, as applicable, to a distribution equal to its *pro rata* share of SVB's and Bridge Bank's liquidation value as of the time SVB and Bridge Bank were closed and placed into each respective receivership.  The precise *pro rata* amount will not be known until discovery is complete; however based on currently known facts, SVBFG estimates its recovery will exceed $1.71 billion (Counts V, VI); and

        d.      A determination that SVBFG was not required to file an administrative claim under 12 U.S.C. § 1821(d), which was introduced to the FDIA by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), because (i) SVBFG's claim is one for the amount of a deposit at SVB whose ownership and amount is not in dispute, and because the Treasury Secretary's action bound the FDIC to honor all such deposits in full, and (ii) this amount was transferred from FDIC-R1 to Bridge Bank and the amount on deposit at Bridge Bank when SVBFG's access to its deposits was cut off by Bridge Bank at the instruction of FDIC-R1 is not in dispute, and that, therefore,

SVBFG may pursue the claims asserted in the Adversary Proceeding (defined below) (Count VII).

**SUMMARY**

11.     Secretary Yellen invoked the systemic risk exception two days after SVB was closed by the California Department of Financial Protection and Innovation ("DFPI") on March 10, 2023.  In a joint statement publicly announcing Secretary Yellen's action, the Secretary, Federal Reserve Board Chair Jerome Powell, and FDIC Chairman Martin Gruenberg were all crystal clear as to what Secretary Yellen had done, why she had done so, and the effect of her action:  the Secretary's action, in her own words, was meant to calm uninsured depositors' fears in order to prevent runs on additional commercial banks and to protect the Nation's banking system from possible collapse by "fully protect[ing] **all** depositors" who "[would] have access to **all** of their money starting Monday, March 13."  (*See* Press Release, U.S. Dep't of the Treasury et al., *Joint Statement by Treasury, Federal Reserve, and FDIC* (Mar. 12, 2023) (emphasis added), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.)

12.     Indeed, the systemic risk exception was invoked on Sunday, March 12, 2023, only after initial steps taken by the FDIC failed to calm the market.  In particular, on Friday, March 10, 2023, the FDIC announced its intent to provide uninsured depositors with an advance dividend against their claims for the uninsured amounts of their deposits.  (*See* U.S. Gov't Accountability Off., GAO-23-106736, *Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures* 38 (2023) ("GAO Report").)  When deposit flight, contagion and panic continued, the federal government—at its very highest levels—determined that more drastic measures were needed to mitigate systemic harm.[2]  This culminated in the invocation of the

---

[2]     *See, e.g.*, *Recent Bank Failures and the Federal Regulatory Response: Hearing Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 118th Cong. (Mar. 28, 2023) (statement of Martin J. Gruenberg, Chairman, FDIC), https://www.banking.senate.gov/imo/media/doc/Gruenberg%20Testimony%203-28-23.pdf (describing the events of March 8-12, 2023 and the concerns leading to the systemic risk determination); FDIC, *Options for Deposit Insurance Reform* 12-13 (May 1, 2023), https://www.fdic.gov/analysis/ options-deposit-insurance-reforms/ report/options-deposit-insurance-reform-full.pdf ("The announcement that the uninsured depositors of SVB had not been fully protected reverberated through the financial markets on Friday and into the weekend and precipitated the failure of Signature Bank. . . .  Following these developments, the bank regulatory agencies had significant concerns that uninsured depositors

systemic risk exception to, as the aforementioned joint statement announcing it trumpeted, "fully protect[] **all** depositors" of SVB.  (*See* Press Release, U.S. Dep't of the Treasury et al., *Joint Statement by Treasury, Federal Reserve, and FDIC* (Mar. 12, 2023) (emphasis added), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.)

13.     As a consequence of the Treasury Secretary's decision to invoke the systemic risk exception in this manner, depositors of SVB were (i) not limited to recover only the normal $250,000 FDIC insurance limits and (ii) not required to wait for FDIC-R1 to resolve the former SVB to be paid the full amount of their deposit funds.  All the former SVB depositors had to do to get access to all of their money was to go to the newly created Bridge Bank on Monday morning, access their account, and make a withdrawal.

14.     On March 13, 2023, the FDIC in its corporate capacity ("FDIC-C") publicly announced that the FDIC had implemented Treasury Secretary Yellen's directions.  It:

> transferred **all** deposits—insured and uninsured— . . . to a newly created, full-service FDIC-operated 'bridge bank' in an action designed to protect **all** depositors of Silicon Valley Bank.
>
> . . . .
>
> The transfer of **all** deposits was completed under the systemic risk exception approved yesterday.  **All** depositors of the institution will be made whole . . . .  Any losses to the Deposit Insurance Fund to support uninsured depositors will be recovered by a special assessment on banks, as required by law.

(Press Release, FDIC, *FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa Clara, California* (Mar. 13, 2023) (emphasis added), https://www.fdic.gov/news/press-releases/2023/pr23019.html.)

15.     Thus, as FDIC-C's public statement confirmed, the FDIC transferred **all** deposits of **all** depositors of SVB to Bridge Bank.  All losses attributable to protecting uninsured depositors

would withdraw funds rapidly from other banks. . . .  The Treasury, FDIC, and Federal Reserve agreed that systemic risk determinations for both SVB and Signature Bank were in the public interest."); *see also* GAO Report at 30-31 (explaining that the Federal Reserve Board's analysis in support of invoking the systemic risk exception "noted that extending only partial protection to uninsured depositors would have some beneficial effect, but allowing material losses on these uninsured deposits still would result in significant adverse effects in the financial markets").

1  of SVB, in turn, were to be recouped from assessments on banks whose payments fund the Deposit

2  Insurance Fund, not from depositors of SVB.

3      16.    The transfer of all deposits to Bridge Bank in fact included SVBFG's deposits at

4  SVB.  All approximately $2.1 billion on deposit at SVB was transferred to Bridge Bank and made

5  available to SVBFG on March 13, 2023.  In other words, as of March 13, 2023, SVBFG had access

6  to $2.1 billion that was no longer in accounts at SVB or in FDIC-R1's receivership but rather in

7  SVBFG's account at Bridge Bank.  What FDIC-R1 did do was guarantee those deposits and put

8  all $2.1 billion in a fully usable and functioning *deposit* account at Bridge Bank, a newly chartered

9  institution distinct from SVB and FDIC-R1 that was not in receivership.

10      17.    In most bank failures, the FDIC is not required to provide access to uninsured

11  deposits immediately, and the procedures introduced by FIRREA allow the FDIC-Rs 180 days

12  after the filing of a claim to make a determination on such claim.  12 U.S.C. § 1821(d)(5)(A)(i).

13  Here, however, the transfer of all insured and uninsured SVB deposits to Bridge Bank pursuant to

14  the Treasury Secretary's invocation of the systemic risk exception obviated the need for all former

15  SVB depositors to pursue any administrative claims process under 12 U.S.C. § 1821(d).  Put

16  another way, Secretary Yellen's guarantee of **immediate** "full access" to **all** deposits rendered the

17  regular administrative claims process (if even applicable to depositors in other circumstances)

18  entirely inapplicable to depositors of SVB, including SVBFG.  Indeed, this is evidenced by the

19  fact that as of March 13, 2023, SVBFG and its fellow SVB depositors had unfettered access to all

20  of their deposits in accounts at Bridge Bank and were customers of an active and operating national

21  bank.  As a result, SVBFG had not filed, and had no need to file, any claim to access its deposits.

22      18.    Additional contemporaneous actions by the FDIC-Rs confirm that SVBFG had the

23  rights to fully access its Account Funds without needing to file any administrative claim.  FDIC-R1

24  established a claims process for **non-deposit** claims only, meaning claims of trade creditors, tort

25  claims, and breach of contract claims.  Claim forms for these types of claims were to be emailed

26  to NonDepClaimsDal@fdic.gov, the Dallas office of the FDIC responsible for processing

27  non-deposit claims.  Even though it never provided notice to SVBFG, never provided instructions,

28  and never identified a basis for disparate treatment, and even though it had transferred all of

SVBFG's insured and uninsured deposits to Bridge Bank on March 13, 2023, FDIC-R1 apparently determined that SVBFG should alone among all former SVB depositors be subject to a purported claims process, the purpose and effect of which was intended to justify depriving SVBFG of access to its Account Funds, including by purportedly removing them from an active and operating national bank.

19.    By March 16, 2023, three days after Bridge Bank was established, SVBFG had withdrawn approximately $180 million of its deposit funds to pay ordinary-course obligations and to prepare for its bankruptcy filing.  On that date, FDIC-R1, acting together with Bridge Bank, suddenly and without warning or explanation, cut off SVBFG's access to its funds at Bridge Bank and purported to return them to FDIC-R1.  This was done without notice to, or the knowledge or consent of, SVBFG.

20.    On March 17, 2023, SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

21.    Following SVBFG's bankruptcy filing, the FDIC-Rs continued to impede SVBFG's access to its deposit funds and reversed a $6.2 million payment owed to SVBFG for an intercompany receivable, all of which constitute ongoing, continuing violations of the automatic stay imposed pursuant to 11 U.S.C. § 362.

22.    At the same time, FDIC-R1 continued to make repeated representations to the Bankruptcy Court that SVBFG's Account Funds would be paid *in full pursuant to the invocation of the systemic risk exception* so long as the deposit claims were valid and FDIC-R1 did not have any setoff claims against the Account Funds (which, as discussed further below, FDIC-R1 has failed to allege—let alone prove—to date).  For example:

     a.    In a sworn objection to the Bankruptcy Court filed on March 20, 2023:  "To the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid *in full* through the Deposit Insurance Fund."  (Objection of the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank to Debtor's Motion for Entry of Interim and Final Orders ¶ 16, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. Mar. 20, 2023), ECF No. 33 (emphasis added).)

b.      During oral argument on March 21, 2023:  "And as I said earlier, to the extent the debtor's claim — deposit claim is determined to be valid, to the extent not subject to setoff, it **will be paid by what's called the DIF**, the Deposit Investment Fund, which is **backed by the full faith and credit of the United States**.  So I don't think there's a 345(b) issue."  (Transcript of Hearing on Debtor's Motion for Entry of Interim and Final Orders at 86:21-87:1, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. Apr. 3, 2023), ECF No. 94 (emphasis added); *see also id.* at 57:16-21.)

c.      At the same oral argument, the Bankruptcy Court specifically asked whether "the parent company [was] carved out" from the Government's announcement "that all depositors would be paid in full," to which counsel for FDIC-R1 responded "No." (*Id.* at 56:12-57:2.)

d.      In a May 3, 2023 sworn statement filed in response to a question from the Bankruptcy Court regarding FDIC-R1's basis for setoff:  "To the extent that allowed deposit claims against the SVB receivership estate (including any allowed claim asserted by SVBFG) are not fully satisfied from the SVB receivership assets, **the FDIC will fully protect and satisfy any remaining amount under 12 U.S.C. § 1823(c)(4)(G)**." (Statement of the Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank, Pursuant to the Court's Direction at the April 26, 2023 Hearing, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. May 3, 2023), ECF No. 145 at 5 (emphasis added).) 12 U.S.C. § 1823(c)(4)(G) is the systemic risk exception provision of the FDIA.

23.     On July 9, 2023, SVBFG filed an adversary proceeding in the Bankruptcy Court asserting, among other things, claims against the FDIC-Rs and FDIC-C for violation of the automatic stay by refusing to allow SVBFG to access its Account Funds and for refusing SVBFG's demand that they turn the Account Funds over to SVBFG's estate (the "Adversary Proceeding"). Because the FDIC-Rs asserted that SVBFG was required file a proof of claim in their purported administrative claims processes if it ever wanted access to its Account Funds again, on July 10, 2023, SVBFG filed protective proofs of claim with the FDIC-Rs seeking, among other things, access to its Account Funds that were previously held at SVB and transferred to Bridge Bank

(the "<u>Proofs of Claim</u>").  One month later, the FDIC-Rs moved to dismiss SVBFG's Adversary Proceeding, arguing that the Bankruptcy Court lacked jurisdiction to entertain the claims, which could only be asserted in an action like this one, and only after the FDIC-Rs denied the Proofs of Claim.  The FDIC-Rs also moved the district court to withdraw the reference to the Bankruptcy Court, which motion the district court granted on December 13, 2023.

24.     On January 5, 2024—the last business day before the statutorily mandated 180-day deadline for the FDIC-Rs to notify SVBFG of any determination on its Proofs of Claim (*see* 12 U.S.C. § 1821(d)(5)(A)(i))—FDIC-R1 and FDIC-R2 each sent SVBFG a Notice of Disallowance of Claim ("<u>Notice of Disallowance</u>") with a perfunctory statement that SVBFG's deposit claims, among other claims, were denied.  According to FDIC-R1, the sole asserted basis for denial is that SVBFG's deposit claim was "not proven to the satisfaction of the receiver due to the receiver's defenses." (*See* Ex. 1.)  As for FDIC-R2, apparently ignoring that SVBFG's Account Funds were on deposit at Bridge Bank when SVBFG's access to them was cut off, SVBFG's "deposit claim is denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank." (*See* Ex. 2.)  Thus, despite taking six months, all FDIC-R1 and -R2 were able to muster were cryptic one-line denials with no further explanation.

25.     The FDIC-Rs have never claimed in the Adversary Proceeding, in their Notices of Disallowance, before the Bankruptcy Court, or otherwise, that the Account Funds did not belong to SVBFG or that $1,933,805,708.13 was not the amount of Account Funds remaining in SVBFG's accounts at Bridge Bank (out of the approximately $2.1 billion that was in SVBFG's accounts at SVB when it was placed into receivership on March 10, 2023) at the time that Bridge Bank employees, at the direction of FDIC-R1, cut off SVBFG's access to the accounts on March 16, 2023.  FDIC-R1 alone asserts that it has some as-yet-unidentified and -unspecified "defenses" against SVBFG.  To the extent its unspecified defenses include a purported right to "setoff" against the Account Funds, FDIC-R1 has never identified or articulated a single ground for exercising any "setoff," or filed any claim (or defense) in any amount against SVBFG in any court or proceeding—including a claim in SVBFG's Chapter 11 proceeding, despite the bar date set by the Bankruptcy Court.  The bar date for the FDIC **in any capacity** to file a claim against SVBFG in

its Chapter 11 proceeding passed on September 14, 2023, with no claim having been filed by either of the FDIC-Rs or FDIC-C.

26.     The FDIC-Rs are accordingly liable to SVBFG for the Account Funds for the following reasons.

27.     *First*, the FDIC-Rs have no basis to control, block, or restrict payment of SVBFG's uninsured Account Funds, and therefore, their denial of SVBFG's deposit claims was wrongful. As alleged above, unlike normal situations where payments of uninsured deposits may be limited in the event of a bank closure, here the Treasury Secretary invoked the systemic risk exception to the least-cost resolution provision of the FDIA in order to guarantee payment of all of the uninsured deposits of all SVB depositors. Following that determination, funds were made available to satisfy the full deposit liabilities for all SVB depositors, including SVBFG. The FDIC-Rs have an absolute legal obligation to make the Account Funds available to SVBFG on demand, to be funded as necessary by FDIC-C through the Deposit Insurance Fund. The FDIC-Rs' conduct in denying SVBFG access to its Account Funds, purportedly transferring its Account Funds from Bridge Bank to FDIC-R1 without notice or consent, and after the filing of SVBFG's Chapter 11 petition, in continuing to withhold the Account Funds whether located in FDIC-R1 or FDIC-R2, is both a breach of the agreements governing SVBFG's deposits and unlawful.

28.     *Second,* once the Account Funds were transferred to SVBFG's account at Bridge Bank, they were SVBFG's funds. Bridge Bank had no right to simply refuse to make those funds available to SVBFG, or to deny transactions initiated by SVBFG for which sufficient funds existed, or to take funds from SVBFG's accounts without SVBFG's knowledge or consent and send them to FDIC-R1 merely because FDIC-R1 instructed Bridge Bank to do so. Wholly apart from whether the FDIC was required to obey the Treasury Secretary's systemic risk determination to guarantee all SVB deposits, once the FDIC effectuated its commitment to guarantee SVBFG's deposits by making them available in SVBFG's account at Bridge Bank, it had no basis to reverse that commitment and simply take them away from SVBFG or to purportedly transfer them back to FDIC-R1, thereby attempting to make SVBFG a claimant against an FDIC receivership rather

than a customer of an active national bank.  Doing so was a breach of SVBFG's Deposit Agreements and also unlawful.

29.     *Third*, even if there had never been an invocation of the systemic risk exception by the Treasury Secretary, the FDIC-Rs still have an undisputable obligation under applicable California law and federal law, respectively, to provide SVBFG with at least its *pro rata* share of SVB's liquidation value, calculated as of the date of the respective receiverships.  FDIC-R1 has conceded as much in the Adversary Proceeding, representing that "even if some creditors receive 100% payment on their claims under a purchase and assumption due to FDIC assistance, ***other creditors remain entitled only to the amount they would have received had the bank been liquidated*** . . . ."  (*SVB Fin. Grp.* v. *FDIC*, No. 23-01137-MG (Bankr. S.D.N.Y.) ("<u>Adv. Dkt.</u>"), ECF No. 28 at 21-22 (emphasis added).)  If the FDIC-Rs cannot satisfy this obligation, then FDIC-C must do so.  Satisfaction of this obligation may lead to recovery of SVBFG's Account Funds in full, but at the very minimum, would lead to a recovery in excess of approximately $1.71 billion based on an estimate derived solely from the FDIC's own limited public statements.

30.     *Fourth*, the possibility that FDIC-R1 may in the future assert a claim against SVBFG that FDIC-R1 hypothesizes could give it a right of contractual or common law setoff against SVBFG's assets cannot serve as a basis to withhold any of SVBFG's Account Funds, much less the entirety of those Account Funds, indefinitely.  Beside the fact that the FDIC-Rs have waived any claim of setoff due to their failure to assert it before the bar date imposed by the Bankruptcy Court, and passing that FDIC-R2 could not even plausibly have such a right because Bridge Bank's only relationship with SVBFG is related to its deposit account, and that FDIC-R1 did not and does not have any right against funds at Bridge Bank because of lack of mutuality, the FDIC-Rs' withholding of or preventing access to SVBFG's Account Funds on the basis of a purported right of setoff is wrongful, without either a matured debt or a liquidated claim against SVBFG.

31.     *Fifth*, the FDIC-Rs cannot withhold payment of SVBFG's Account Funds under 12 U.S.C. § 1822(d).  Section 1822(d) permits the FDIC acting in its corporate capacity to withhold payment of insured deposits—*i.e.*, deposits up to the $250,000 insurance limit—to pay for the

1  liability of a depositor to the depository institution.  The FDIC, however, has already paid SVBFG

2  its $250,000 insured deposit.

3      32.    *Finally*, to the extent FDIC-R1 has any "setoff" claim, FDIC-R1 may not resolve it

4  in its own administrative claims process.  FDIC-R1 only has the statutory authority to determine

5  creditor claims **against the receivership**.  12 U.S.C. § 1821(d)(4), (5).  If it had a valid claim or

6  basis to seek recovery against SVBFG, given SVBFG's status as a bankruptcy debtor, the FDIC

7  in each of its capacities was required to file a proof of claim just like any other putative estate

8  creditor in SVBFG's Chapter 11 proceeding for the Bankruptcy Court to adjudicate.  Although

9  each of FDIC-R1, FDIC-R2, and FDIC-C received notice and was invited to file such a claim by

10  the Bankruptcy Court on multiple occasions, each made the deliberate decision **not** to file a claim.

11  The deadline for each to do so expired on September 14, 2023.  Accordingly, FDIC-R1 (or, for

12  that matter, FDIC-R2 or FDIC-C) cannot now assert any "setoff" or recoupment claims, whether

13  presented as a defense or counterclaim.

14      33.    The confiscation and continued deprivation of SVBFG's access to its Account

15  Funds by the FDIC-Rs without any due process was tantamount to theft.  It was contrary not only

16  to the obligations imposed upon the FDIC by the Treasury Secretary's invocation of the systemic

17  risk exception, but also to the FDIC's own repeated public assurances—including specifically to

18  the Bankruptcy Court—that all depositors' funds at Bridge Bank were protected and safe and

19  SVBFG's valid deposit claims would be paid in full in the absence of setoff claims (which have

20  never been asserted).  To this day—almost one year, and two sham administrative proceedings

21  later—the FDIC-Rs have not disclosed why or on what basis SVBFG's Account Funds were

22  withheld and taken.  SVBFG is entitled to judgment against the FDIC-Rs restoring its access to its

23  $1.93 billion deposit as of March 16, 2023, the date its access was taken away, including interim

24  earnings on those funds, or a monetary judgment in the same amount.  Alternatively, SVBFG is

25  entitled to, at the very minimum, a judgment against the FDIC-Rs awarding it its *pro rata* share of

26  SVB's liquidation value attributable to the amount of its approximately $2.1 billion deposit as of

27  the date of the bank's closure minus amounts already received by SVBFG, which SVBFG

28  estimates based on the FDIC's own limited public disclosures to be no less than $1.71 billion.

**JURISDICTION AND VENUE**

34.     This action arises under the laws of the United States, including, without limitation, the FDIA, 12 U.S.C. § 1811 *et seq*., as amended, the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*., and the Takings Clause of the Fifth Amendment to the United States Constitution.  The Court has original "arising under" jurisdiction over the asserted federal law claims pursuant to 28 U.S.C. § 1331.  To the extent this Court determines that SVBFG was required to file an administrative claim pursuant to 12 U.S.C. § 1821(d), this Court has jurisdiction over any *de novo* suit regarding the disallowance of an administrative claim against the FDIC in its capacity as a receiver pursuant to 12 U.S.C. § 1821(d)(6)(A).  To the extent not covered by 12 U.S.C. § 1821(d)(6)(A), the Court has jurisdiction over SVBFG's state law claims pursuant to 28 U.S.C. § 1334(b) because they arise in and/or are related to SVBFG's Chapter 11 case, and pursuant to 28 U.S.C. § 1367, because the state law claims are part of the same case or controversy as the federal claims.

35.     SVBFG files this action without prejudice to its position that it was not required to file an administrative claim under the FDIA with either of the FDIC-Rs to recover its Account Funds, and that the claims asserted in this complaint, including claims under the Bankruptcy Code for turnover of its Account Funds and violation of the automatic stay, can and should be adjudicated in the Adversary Proceeding pending in the Southern District of New York.

36.     Defendants FDIC-R1 and FDIC-R2 are subject to suit in this Court.  Pursuant to 12 U.S.C. § 1819(a), the FDIC has the power to "[t]o sue and be sued."  This Section constitutes a general waiver of sovereign immunity.  Defendants are also subject to suit for the claims asserted herein arising under the Bankruptcy Code pursuant to the express waiver of sovereign immunity for such claims in 11 U.S.C. § 106.

37.     Venue is proper under 28 U.S.C. § 1391(b) and § 1391(e)(1), as the Account Funds were held at SVB, which resided in this District, and following the closure of SVB, the FDIC created Bridge Bank, which also resided in this District, and transferred all uninsured accounts, including SVBFG's accounts, to Bridge Bank.  Venue is also proper under 12 U.S.C. § 1821(d)(6)(A), which provides that, within 60 days of the disallowance of a claim by the FDIC

in its capacity as receiver under 12 U.S.C. § 1821(d)(5)(A)(i), a "claimant may . . . file suit on such claim . . . in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located [*i.e.*, the Northern District of California] or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)."   On their own accord, the FDIC-Rs have construed SVBFG's demand for payment of the Account Funds as a claim under 12 U.S.C. § 1821(d)(5)(A)(i).  On January 5, 2024, each of the FDIC-Rs issued a so-called "determination" to "disallow" SVBFG's deposit claim, among other claims, and this suit has been filed within 60 days thereof.  (*See* Exs. 1 and 2.)

## DIVISIONAL ASSIGNMENT

38.     This action should be assigned to this Court's San Jose Division.  Under Rule 3-2 of this Court's Civil Local Rules, "[a] civil action arises in the county where . . . a substantial part of the property that is the subject of the action is situated," and all civil actions that arise in the County of Santa Clara "shall be assigned to the San Jose Division."

39.     Consistent with the Treasury Secretary's systemic risk determination, on March 13, 2023, FDIC-R1 transferred the approximately $2.1 billion in SVBFG's accounts from SVB to Bridge Bank.  On March 16, however, the FDIC-Rs unexpectedly and unlawfully cut off SVBFG's access to approximately $1.93 billion of SVBFG's remaining funds at Bridge Bank.  Because Bridge Bank, like SVB, is headquartered in the County of Santa Clara, and SVBFG in this action seeks to restore approximately $1.93 billion of its funds at Bridge Bank, a substantial part of the property that is the subject of the action is situated in the County of Santa Clara.  This action therefore arises in the County of Santa Clara and "shall be assigned to the San Jose Division."

## PARTIES

40.     SVBFG is a Delaware corporation having its principal place of business at 387 Park Avenue South, New York, New York 10016.  Prior to the events that led to the seizure of SVB on March 10, 2023, SVBFG was a bank holding company and the ultimate corporate parent of SVB, which was headquartered in Santa Clara, California.  SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District

1   of New York on March 17, 2023, and is operating its businesses and managing its properties as

2   debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3        41.    The FDIC is an agency of the United States government charged by law with,

4   among other duties, administering the FDIA, 12 U.S.C. § 1811 *et seq.*, and the federal bank deposit

5   insurance system.  SVBFG sues the FDIC in this action in its capacities as Receiver for SVB

6   (FDIC-R1) and Receiver for Bridge Bank (FDIC-R2).

7                             **BACKGROUND**

8   **I.**    **Closure of SVB and Appointment of the FDIC as Receiver**

9        42.    From 2000 until March 2023, SVBFG owned SVB and a number of other affiliated

10   businesses, including an investment bank and a private wealth management business.  SVBFG

11   deposited substantially all its funds with SVB.

12        43.    The Account Funds were valid deposits of SVBFG.  SVBFG entered into the

13   Deposit Agreements with SVB, pursuant to which SVBFG was entitled to withdraw available

14   funds at any time.  At all times, SVB treated the funds in the three different deposit accounts as

15   valid deposits of SVBFG.  SVBFG received regular deposit account statements from SVB

16   regarding the three different deposit accounts for years.  During that time, SVBFG made regular

17   deposits into and withdrawals from the different deposit accounts, each of which were duly

18   recognized and executed by SVB.  Further, FDIC-R1 and FDIC-R2 conceded that the Account

19   Funds are valid deposits of SVBFG by allowing SVBFG to withdraw money from its deposit

20   accounts containing the Account Funds between March 13 to 16, 2023, before subsequently

21   improperly preventing further withdrawals.  FDIC-C similarly conceded that the Account Funds

22   were valid deposits of SVBFG when, on October 20, 2023, it sent SVBFG a letter responding to

23   SVBFG's demand to its Account Funds by asserting that, because SVBFG was able to withdraw

24   more than $250,000 from its accounts at Bridge Bank between March 13 and March 15, 2023,

25   "FDIC-C has satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide SVBFG with access

26   to its insured deposits."

27        44.    Based on deposit account statements, as of March 10, 2023, SVBFG had

28   approximately $2.1 billion in three different deposit accounts maintained at SVB.  SVBFG had

full and undisputed title to, and ownership of, these deposits prior to on or about March 10, 2023. The FDIC-Rs have never disputed the accuracy of those deposit account statements and the existence of the SVBFG deposits at SVB as of March 10, 2023, nor would they have any legitimate basis to do so.

45.     The Deposit Agreements permitted SVB to use SVBFG's deposits to setoff debts owed by SVBFG to SVB.  However, as of March 10, 2023, SVBFG had no unsatisfied obligations to SVB against which that contractual setoff provision in the Deposit Agreements could be exercised.  In particular, SVBFG did not have any overdrafts on its deposit accounts.  It had no outstanding letters or credit or open lines of credit.  It had no charged off loans with SVB.  It had not pledged its deposits as collateral for any loan.  It did not have any delinquent loans with SVB. And it was not a guarantor of any loan with SVB.

46.     One of SVBFG's three deposit accounts at SVB was denominated as a Regulation W Account.  That account was used to collateralize transactions between SVBFG (or certain of its affiliates) and SVB that qualified as "covered transactions" under Section 23A of the Federal Reserve Act and the Federal Reserve's Regulation W.  On information and belief, as of March 10, 2023, there were no such covered transactions outstanding for which any balance credited to the Regulation W deposit account could be used as collateral and against which SVB could enforce its rights if the covered transaction was not settled.

47.     As of March 10, 2023, there was no other agreement between SVBFG and SVB pursuant to which SVB was authorized to cancel deposit liabilities it owed to SVBFG or convert them into equity.

48.     On March 10, 2023 (the "Closure Date"), the DFPI issued an order taking possession of SVB.  On the same day, DFPI appointed FDIC-R1 to serve as receiver for SVB.

49.     Typically, when a bank fails, the FDIC pays insurance to depositors up to the insurance limit of $250,000 within a few days after the bank failure, by either making the funds available through an account at another insured bank or by issuing a check to the depositor.  The FDIC acting as receiver for the failed bank then resolves the assets of the failed bank through one or more resolution strategies.  The FDIC acting as receiver is also charged with resolving claims

-18-

against the failed bank, including those for uninsured deposits and paying out claims in accordance with the priority waterfall under the FDIA, pursuant to which deposit liabilities are paid before all other claims other than administrative expenses of the receiver.  *See* 12 U.S.C. § 1821(d)(11)(A). Depositors with uninsured funds may or may not recover those funds in full over time as assets of the failed bank are sold.

50.     Because the FDIC may resolve the failed bank's assets in a number of ways that may impact creditors' recoveries under the waterfall of 12 U.S.C. § 1821(d)(11), the FDIC is **obligated** under federal and state law as applicable to distribute to creditors amounts up to each creditor's *pro rata* portion of the value of the bank as of the date it was placed into receivership. If the FDIC as receiver cannot make such distributions for any reason, the FDIC in its corporate capacity is required to pay depositors up to their *pro rata* liquidation amount out of the Deposit Insurance Fund.  Payments on claims for uninsured deposits, or other obligations of the failed institution, may be distributed by the FDIC as dividends paid prior to the liquidation of all of the failed bank's assets.  According to the FDIC's resolution handbook, "[c]ustomers with uninsured deposits are sometimes issued advance dividends based on the estimated recovery value of the failed institution's assets."

51.     On March 10, 2023, the day that SVB was closed, the FDIC created the Deposit Insurance National Bank of Santa Clara ("DINB") and transferred all insured deposits of SVB to the DINB.  The FDIC announced that:

> All insured depositors will have full access to their insured deposits no later than Monday morning, March 13, 2023.  The FDIC will pay uninsured depositors an advance dividend within the next week. Uninsured depositors will receive a receivership certificate for the remaining amount of their uninsured funds.  As the FDIC sells the assets of Silicon Valley Bank, future dividend payments may be made to uninsured depositors.

(Ex. 3 (Press Release, FDIC, *FDIC Creates a Deposit Insurance National Bank of Santa Clara to Protect Insured Depositors of Silicon Valley Bank*).)  As noted earlier, the above announcement was made **before** the Secretary invoked the systemic risk exception.

52.     Consistent with this announcement, on March 10, 2023, the Board of Directors of the FDIC issued a Resolution authorizing the Director of Complex Institution Supervision &

-19-

Resolution (or her designee) to credit depositors' accounts at the DINB with an estimated insurance deposit paid by the Deposit Insurance Fund, and to approve the payment by FDIC-R1 of an advance dividend of ███ of the amount of each depositor's uninsured deposit(s).  There was no exception to this approach noted for SVBFG, meaning that, based on the FDIC's then-current plan, SVBFG would have received ███ of its $2.1 billion in Account Funds.

## II.     The Systemic Risk Exception

53.     Under the FDIA, the FDIC is required to resolve failed banks by using the method that would be least costly to the Deposit Insurance Fund.  12 U.S.C. § 1823(c)(4).

54.     Congress allowed one exception to this least-cost resolution requirement:  where the Treasury Secretary, acting upon the written recommendation of not less than two-thirds of the members of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System, and after consulting with the President, determines that utilizing the least-cost resolution method "would have serious adverse effects on economic conditions or financial stability," and action or assistance under 12 U.S.C. § 1823(c)(4)(G) "would avoid or mitigate such adverse effect[]," the Treasury Secretary is authorized to invoke the "systemic risk exception" to the least-cost resolution requirement.  12 U.S.C. § 1823(c)(4)(G).

55.     Section 1823(c)(4)(G) does not define the specific form in which a decision to invoke the systemic risk exception must occur.  Rather, the scope of the exception is specifically defined by the Treasury Secretary's determination, invocation, and any instructions on implementation, which follows recommendations from the Boards of the Federal Reserve and the FDIC, and consultation with the President of the United States.  To invoke the systemic risk exception, the Treasury Secretary must determine that using the least-cost resolution method would "have serious adverse effects on economic conditions or financial stability," and that the specific action or assistance being adopted "would avoid or mitigate such adverse effects."  12 U.S.C. §§ 1823(4)(G)(i)(I), (II).  This is because the systemic risk exception is intended to be used only in extraordinary circumstances when the nation's most senior regulatory officials, rather than the ordinary administrators at the FDIC, determine that such invocation is essential to government policy and process given the severity of the situation.  As the sponsor of the FDICIA explained:

> [The] bill makes the situation in the United States more nearly parallel to that in other countries.  It leaves the Federal Reserve Board with its current authority to take appropriate action to prevent a collapse of the financial system.  But it takes such discretion away from the FDIC.  The bill would refocus the FDIC on the narrower task of administering and protecting the deposit insurance fund.

(137 Cong. Rec. 4936 (1991) (statement of Sen. Donald Riegle, Jr.).)

56.    Since 1991, and prior to March 2023, the FDIC and Federal Reserve have recommended five potential emergency actions that would have required a systemic risk determination and invocation of the systemic risk exception to permit such actions to be taken. The Treasury Secretary invoked the systemic risk exception with respect to three of those five recommended actions, each time, in specifically proscribed ways:

a.    In the first instance, in September 2008, the exception was invoked to partially guarantee $312 billion of Wachovia Corporation's ("Wachovia") assets in connection with a potential acquisition of Wachovia by Citigroup, Inc. ("Citigroup"). When Wachovia was purchased by a different banking organization, Wells Fargo & Company, the FDIC assistance that was contemplated pursuant to the systemic risk exception was no longer applicable, and the FDIC was limited to its express statutory authority.

b.    In the second instance, in October 2008, the exception was invoked to authorize the establishment of the Temporary Liquidity Guarantee Program, a market-wide program to guarantee certain debt issued by banks and to guarantee in full non-interest-bearing deposit accounts held at participating banks and thrifts.

c.    In the third instance, in November 2008, the exception was invoked to provide a partial asset guarantee for $306 billion of Citigroup's assets.

III.    **The Treasury Secretary Invokes the Systemic Risk Exception to Guarantee All Uninsured Deposits at SVB.**

57.    The FDIC's March 10, 2023 announcement that it would pay uninsured SVB depositors an advance dividend did not calm the market as intended.  As FDIC-C later explained, "[t]he announcement that the uninsured depositors of Silicon Valley Bank had not been fully protected reverberated through the financial markets on Friday and into the weekend and

1    precipitated the failure of Signature Bank [a second bank unaffiliated with Silicon Valley

2    Bank]. . . .  Following these developments, the bank regulatory agencies had significant concerns

3    that uninsured depositors would withdraw funds rapidly from other banks."  (FDIC, *Options for*

4    *Deposit Insurance Reform* 6-7 (2023), https://www.fdic.gov/analysis/options-deposit-insurance-

5    reforms/report/options-deposit-insurance-reform-section-2.pdf.)

6        58.    Over the weekend of March 11, 2023, the Department of the Treasury, the FDIC,

7    and the Federal Reserve assessed the impact of the closures of SVB and Signature Bank on the

8    American banking system and financial markets.  Although the FDIC has since stated that it could

9    have paid out as much as 90 percent of the uninsured deposits through an advance dividend, the

10   FDIC and the Federal Reserve "found that a least-cost resolution of SVB and Signature Bank

11   would intensify deposit runs and liquidity pressures on other U.S. banks," and that "the failure of

12   the two banks would lead to even greater dislocations in deposit markets."  (Ex. 4 (GAO Report)

13   at 29.)   The Federal Reserve and the FDIC both independently concluded that "preserving

14   unimpaired access to all uninsured deposits for SVB and Signature Bank would help mitigate

15   adverse impacts to financial stability and the economy."  (*Id.* at 30.)

16       59.    Accordingly, on March 12, 2023, the FDIC and the Federal Reserve each

17   unanimously recommended to the Treasury Secretary that she invoke the systemic risk exception

18   to the least-cost resolution provision of the FDIA to protect the national banking system.   The

19   Treasury Secretary concurred that "the losses uninsured depositors would likely have faced under

20   application of the least cost resolution requirements to SVB and Signature had the potential to

21   undermine confidence in U.S. insured depository institutions, which could have consequences for

22   the broader economy," and thus after consultation with the President, she adopted the

23   recommendation and invoked the systemic risk exception under 12 U.S.C. § 1823(c)(4)(G) to

24   guarantee that **all** deposits at SVB—insured and uninsured—would be paid in full, and that

25   depositors would have immediate and uninterrupted access to **all** of their funds.

26       60.    In a joint press release issued on March 12, 2023, the Secretary, Federal Reserve

27   Board Chair Powell, and FDIC Chairman Gruenberg unambiguously assured the American public,

28   in no uncertain terms, and in order to quell the rising panic that had not abated with the FDIC's

initial announcement of an advance dividend, that the invocation of the systemic risk exception for SVB would "fully protect[] **all** depositors" who "[would] have access to **all** of their money starting Monday, March 13." (*See* Joint Press Release, U.S. Dep't of the Treasury et al., *Joint Statement by Treasury, Federal Reserve, and FDIC* (Mar. 12, 2023), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm (emphasis added).)

61.     The Treasury Secretary could have chosen to have the FDIC provide less-than-full protection of all depositors but, on the recommendation of the FDIC and Federal Reserve, did not do so. As the FDIC's own Chairman, Martin Gruenberg, later explained:

> And it's true with an advanced dividend, depositors could get back 90 percent or maybe more of their deposits. I think the judgment was, at the time, that anything less than 100 percent really had the potential to perpetuate and exacerbate the contagion effect. And we had pretty clear evidence of that.

(FDIC Chairman Martin Gruenberg, *Comments at the Systemic Resolution Advisory Committee Meeting* (Dec. 5, 2023).)

62.     In fact, the GAO Report—a report the Comptroller General is required to prepare pursuant to 12 U.S.C. § 1823(c)(4)(G)(iv) and issued in April 2023—noted that the Federal Reserve staff specifically analyzed extending only partial protection of uninsured depositors. The Federal Reserve staff concluded that extending anything less than 100 percent deposit protection would be insufficient to calm the turmoil at the time, as "extending only partial protection to uninsured depositors would have some beneficial effect, but allowing material losses on these uninsured deposits still would result in significant adverse effects in the financial markets." (Ex. 4 at 30-31.)

63.     The invocation of the systemic risk exception to use the Deposit Insurance Fund to pay all deposits of all SVB depositors was a unilateral decision by the United States government that did not require any mutual undertaking by any of the former SVB depositors (including SVBFG).

64.     As a result of the invocation of the systemic risk exception, SVBFG, like all other SVB depositors, was entitled to continued access to all of its deposits through FDIC-R1, Bridge Bank, and later FDIC-R2, to be funded by FDIC-C through the Deposit Insurance Fund to the extent necessary.

-23-

**IV.     The Systemic Risk Exception Invoked on March 12, 2023, Is Consistently and Correctly Described by the Treasury Secretary, the FDIC, and Other Banking Regulators as Applicable to All SVB Depositors and All Deposits.**

65.     Over the ensuing days and months, Secretary Yellen, the FDIC, Chairman Gruenberg, and numerous other senior government officials involved in the invocation and effectuation of the systemic risk exception made at least thirteen separate public statements—including press releases to the American public, testimony to Congress, and other official statements, including to the Bankruptcy Court—confirming that the systemic risk exception covered **all** uninsured deposits of **all** SVB depositors.

66.     On March 13, 2023, the Monday morning after the Treasury Secretary acted to ensure payment of all deposits, the FDIC issued a press release titled "FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa Clara, California."  The release describes the transfer of all insured and uninsured deposits to the newly formed Bridge Bank and states that "[t]he transfer of all the deposits was completed under the systemic risk exception approved yesterday.  All depositors of the institution will be made whole."  (Ex. 5 (Press Release, FDIC, *FDIC Acts to Protect All Depositors of the former Silicon Valley Bank*).)

67.     The March 13, 2023 transfer of all insured and uninsured deposits to Bridge Bank properly included all of SVBFG's deposits, then totaling approximately $2.1 billion.

68.     On March 16, 2023, in a statement before the Senate Committee on Finance, Treasury Secretary Yellen stated that "we worked with the Federal Reserve and FDIC to protect all depositors of the two failed banks.  On Monday morning, customers were able to access all of the money in their deposit accounts so they could make payroll and pay the bills."  No reference was made to any exclusion of SVBFG or any other depositor, and consistent with the Treasury Secretary's statement, on Monday, March 13, 2023, SVBFG was among the depositors able to access all of the money in its deposit accounts at Bridge Bank.

69.     On March 20, 2023, in a sworn objection to the Bankruptcy Court in relation to SVBFG's motion for entry of an order authorizing SVBFG to continue to use its cash management system (the "Cash Management Motion"), counsel for FDIC-R1 stated:  "[t]o the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will

-24-

1    be **paid in full** through the Deposit Insurance Fund." (Objection of the Federal Deposit Insurance

2    Corporation as Receiver for Silicon Valley Bank to Debtor's Motion for Entry of Interim and Final

3    Orders ¶ 16, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. Mar. 20, 2023) ("<u>Ch. 11</u>

4    <u>Case</u>"), ECF No. 33 (emphasis added).) As legal support for its assurances that SVBFG's deposits

5    would be paid in full if valid (which, as alleged *supra*, they are) and subject only to an FDIC-R1

6    setoff claim (which, as described further *infra*, FDIC-R1 has never provided any allegation to

7    support), FDIC-R1 cited its own March 13, 2023 press release. (*See id.* (citing Press Release,

8    FDIC, *FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa Clara,*

9    *California* (Mar. 13, 2023), https://www.fdic.gov/news/press-releases/2023/pr23019.html).)

10        70.    On March 21, 2023, counsel for FDIC-R1 repeated this in a hearing before the

11    Bankruptcy Court on the aforementioned objection, expressly confirming that SVBFG's deposits

12    were included in the Treasury Secretary's guarantee, (Ch. 11 Case Mar. 21, 2023 Hr'g Tr.

13    at 56:12-57:2), and adding that "there was not a specific carve out in the [March 13, 2023] press

14    release for [SVBFG]'s deposits . . . . [T]o the extent [SVBFG]'s claim is allowed and is not subject

15    to set off or has been reduced by amounts that may be entitled to set off, that claim would be paid

16    by the deposit insurance fund. And that deposit insurance fund is backed by the full faith and

17    credit of the United States." (*Id.* at 56:24-57:21.) When the U.S. Trustee, a federal bankruptcy

18    watchdog, stated the U.S. Trustee would only be comfortable with the Bankruptcy Court granting

19    the Cash Management Motion if "any claims relating to the deposits . . . are guaranteed by the

20    FDIC through the full faith and credit of the United States" (*id.* at 85:14-17), counsel for FDIC-R1

21    assured the Bankruptcy Court that "to the extent [SVBFG's] deposit claim is determined to be

22    valid, to the extent not subject to setoff, it will be paid by what's called the DIF, the Deposit

23    [Insurance] Fund, which is backed by the full faith and credit of the United States" (*id.*

24    at 86:21-25). The U.S. Trustee subsequently dropped the objection to the Cash Management

25    Motion, which the Bankruptcy Court thereafter granted.

26        71.    On March 22, 2023, in testimony before the Senate Subcommittee on Financial

27    Services and General Government Appropriations, Secretary Yellen stated, "[w]e took actions to

28    protect all depositors at the two failed institutions and provide additional liquidity for banks."

72.     On March 23, 2023, in a statement before the House Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[t]wo weeks ago, we learned of problems at two banks that could have had significant impacts on the broader banking system and the American economy.  In the days that followed, Treasury worked with the Federal Reserve and the FDIC to take decisive and forceful actions to strengthen public confidence in the U.S. banking system.  We took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks.  This was designed to mitigate risks to the banking system."

73.     On March 28, 2023, in testimony to the Senate Committee on Banking, Housing, and Urban Affairs, FDIC Chairman Gruenberg stated, "[a]fter careful analysis and deliberation, the Boards of the FDIC and the Federal Reserve voted unanimously to recommend, and the Treasury Secretary, in consultation with the President, determined that the FDIC could use emergency systemic risk authorities under the [FDIA] **to fully protect all depositors** in winding down SVB and Signature Bank."  (Emphasis added.)

74.     On the same day, in a statement before the Senate Committee on Banking, Housing, and Urban Affairs, Federal Reserve Vice Chair for Supervision Michael S. Barr stated that "[t]he Federal Reserve, working with the Treasury Department and the Federal Deposit Insurance Corporation (FDIC), took decisive actions . . . [that] demonstrate that we are committed to ensuring that all deposits are safe."

75.     On March 29, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated, "[m]y testimony today will describe the events leading up to the failure of SVB and Signature Bank and the facts and circumstances that prompted the decision to utilize the authority in the [FDIA] to protect all depositors in those banks following these failures."

76.     The statutorily required GAO Report issued in April 2023, which was based on documents and interviews with FDIC, Federal Reserve and Treasury staff, repeatedly reiterated,

1   no fewer than eight times, that the systemic risk invocation guaranteed all uninsured deposits of

2   all depositors of SVB.[3]

3       77.    On May 3, 2023, in a sworn statement submitted to the Bankruptcy Court in

4   response to a question regarding FDIC-R1's purported bases for an assertion of setoff against the

5   SVBFG Account Funds, counsel for FDIC-R1 again confirmed that "[t]o the extent that allowed

6   deposit claims against the SVB receivership estate (including any allowed claim asserted by

7   SVBFG) are not fully satisfied from the SVB receivership assets, **the FDIC will fully protect and**

8   **satisfy any remaining amount under 12 U.S.C. § 1823(c)(4)(G).**"  (Statement of the Federal

9   Deposit Insurance Corporation as Receiver for Silicon Valley Bank Pursuant to the Court's

10   Direction at the April 26, 2023 Hearing (May 3, 2023), Ch. 11 Case, ECF No. 145 at 5 (emphasis

11   added).)

12       78.    On May 11, 2023, Acting Comptroller of the Currency and FDIC Director

13   Michael J. Hsu stated at an FDIC board meeting, "[i]n March, the U.S. government invoked the

14   systemic risk exception to the least cost resolution requirement for failing banks.  **The purpose**

15   **was to protect all depositors, including uninsured depositors, following the failures of Silicon**

16   **Valley Bank (SVB) and Signature Bank.**"  (Emphasis added.)

17       79.    On May 16, 2023, in a statement before the House Committee on Financial

18   Services, FDIC Chairman Gruenberg stated that "[f]ollowing the decision to fully protect all

19   depositors in the resolution of both SVB and Signature Bank, there has been a moderation of

20   

---

21   [3]    *See, e.g.*, Ex. 4 at 28 ("Treasury, FDIC, and the Federal Reserve announced the decisions
to guarantee all deposits of [SVB]."); *id*. at 29 ("By the evening of March 12th, the three agencies

22   jointly announced the systemic risk determinations authorizing FDIC to guarantee all deposits
(including uninsured deposits) of SVB[.]"); *id*. at 30 ("Decision to Insure All Uninsured Deposits

23   at the Two Banks Sought to Avert Financial Contagion and Negative Impact on the Broader
Economy"; "The Federal Reserve and FDIC assessed that preserving unimpaired access to all

24   uninsured deposits for SVB and Signature Bank would help mitigate adverse impacts to financial
stability and the economy.  Treasury concurred with FDIC's and the Federal Reserve's analysis.";

25   "In particular, if all uninsured depositors were largely or fully protected, the adverse effects would
be substantially mitigated."); *id*. at 38 ("Secretary Yellen approved actions enabling FDIC to

26   complete its resolution of SVB and Signature Bank in a manner that fully protected all depositors.";
"FDIC transferred all deposits and substantially all assets of the former SVB to a newly created,

27   full-service FDIC-operated "bridge bank" in an action designed to protect all depositors of SVB.");
*id*. at 39 ("Financial Stability Oversight Council held a meeting in which Treasury, FDIC, and

28   Federal Reserve described their actions in invoking systemic risk exception to insure all depositors
of SVB and Signature Bank.").

1  deposit outflows at the publicly traded banks that were experiencing large outflows in the

2  immediate aftermath of those failures."

3      80.    On May 18, 2023, FDIC Chairman Gruenberg again referred to "the decision to

4  fully protect all depositors in the resolution of both SVB and Signature Bank" in a statement before

5  the Senate Committee on Banking, Housing, and Urban Affairs.

6      81.    On December 5, 2023, during a meeting of the FDIC's Systemic Resolution

7  Advisory Committee, Ryan Tetrick, FDIC Deputy Director for Resolution Readiness, stated that

8  the systemic risk exception "allowed us to protect all depositors of the failed banks, transfer those

9  to fully operational bridge banks, and provide some . . . assurance to the system broadly."

10      82.    As noted above, on the same day, at the same event, FDIC Chairman Gruenberg

11  admitted that had the FDIC elected to pay an advance dividend rather than recommending that the

12  Treasury Secretary invoke the systemic risk exception to protect all uninsured deposits, "depositors

13  could get back 90 percent or maybe more of their deposits," but "the judgment was, at the time,

14  that anything less than 100 percent really had the potential to perpetuate and exacerbate the

15  contagion effect."

16      83.    Also during the December 5, 2023 Systemic Risk Resolution Advisory Committee

17  meeting, Tim Mayopoulos—who served as the Chief Executive Officer of Bridge Bank, and

18  oversaw operations of Bridge Bank beginning on March 13, 2023, when all of SVBFG's Account

19  Funds were transferred to Bridge Bank and made available to SVBFG—described the invocation

20  of the systemic risk exception as "the government's decision to protect all the deposits at SVB,

21  regardless of the nature or size of those deposits."

22      84.    In marked contrast to all of these public pronouncements, representations to the

23  Bankruptcy Court, and sworn testimony, it was not until the FDIC sought in the Adversary

24  Proceeding to defend its seizure of SVBFG's Account Funds that the FDIC in any of its capacities

25  ever once took the position that "all" deposits could mean "less than all."

26

27

28

**V.    The FDIC-Rs Unlawfully Block SVBFG's Access to Its Account Funds.**

85.    The same day that the Treasury Secretary authorized the invocation of the systemic risk exception, the FDIC filed an application with the Office of the Comptroller of the Currency (the "OCC") to establish Bridge Bank, and the OCC approved the application.

86.    Although the FDIC originally contemplated that SVB depositors would receive an immediate advance dividend and a receivership certificate for their uninsured deposits, as a result of the invocation of the systemic risk exception, the FDIC changed course to comply with the Treasury Secretary's action requiring it to honor all uninsured and insured deposits and to do so immediately.  Rather than provide an advance dividend or a receivership certificate to SVBFG or to any other depositor with uninsured account funds, FDIC-R1 transferred all deposits formerly held at SVB—insured and uninsured—to Bridge Bank and FDIC-R1 provided, or provided access to, funds from the Deposit Insurance Fund to satisfy all deposit liabilities.[4]  As a result, all depositors of SVB, including SVBFG, automatically became customers and depositors of Bridge Bank.  At that time, Bridge Bank was not in receivership, and the FDIC-Rs had not placed any holds on SVBFG's accounts.

87.    On March 13, 2023, the FDIC published its own independent press release (*see supra* ¶¶ 14 and 66) stating that its transfer of "all deposits—both insured and uninsured—and substantially all assets of" SVB to Bridge Bank was "an action designed to protect all depositors of [SVB]," and "[d]epositors will have full access to their money beginning this morning, when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities." (Ex. 5.)

88.    When Bridge Bank opened that morning, it announced that all former SVB depositors had "full access to their money," and that all existing and new deposits were protected by the FDIC.  The FDIC reiterated this point in its website FAQs:

---

[4]    The transfer of all former SVB deposits to Bridge Bank was carried out without regard to appropriate formalities.  FDIC-R1 had already transferred all insured SVB deposits to the DINB, which it had established pursuant to a charter from the OCC when it anticipated carrying out a least cost resolution.  The DINB was not insolvent, and its OCC charter still existed.  But the DINB did not transfer any deposits to Bridge Bank.  Rather, upon invocation of the systemic risk exception by the Treasury Secretary, FDIC-R1 transferred all uninsured and insured deposits to Bridge Bank, but FDIC-R1 did not rescind the agreement transferring insured deposits to the DINB until after it purportedly transferred those very deposits to Bridge Bank.

IS MY MONEY SAFE?  **Yes!**  No one lost any money on deposit as a result of the closure of this bank.  All deposits, regardless of dollar amount, were transferred to [Bridge Bank].

(Ex. 6 (FDIC SVB FAQs).)

89.     The transfer of "all deposits" to the newly created, FDIC-operated, Bridge Bank was made pursuant to a Transfer Agreement between FDIC-R1 and Bridge Bank (the "Transfer Agreement") and included the transfer of all deposits as defined in 12 U.S.C. § 1813(l), except accounts identified in SVB's records as "blocked" or "frozen" or were determined by the FDIC should be "blocked" or "frozen" "pursuant to economic or trade restrictions administered or enforced by the United States Treasury Department Office of Foreign Assets Control" (the "Assumed Deposits").   The Transfer Agreement contained no exception for SVBFG's deposits and the Assumed Deposits included the approximately $2,115,958,220 in SVBFG's deposit accounts.  Pursuant to the Transfer Agreement, Bridge Bank agreed "to pay all Assumed Deposits, properly drawn checks, drafts, and withdrawal orders of depositors related to the Assumed Deposits presented for payment," and "to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Assumed Deposit balances due and owing to the depositors of the Failed Bank."  This included adhering to the terms and conditions of the Deposit Agreements.

90.     SVBFG was initially treated like all other depositors of SVB, as was required pursuant to the Treasury Secretary's systemic risk determination.  Following the transfer of its deposits to Bridge Bank, SVBFG could access its accounts in the same manner as any former depositor of SVB and as it had prior to the Closure Date.  On March 15 and 16, 2023, SVBFG successfully initiated eight wire transfers from SVBFG's Account Funds at Bridge Bank, withdrawing approximately $180 million, *i.e.*, monies well in excess of the $250,000 deposit insurance limit.

91.     Then, without explanation or warning, on the evening of March 16, 2023, everything changed.  On March 16, Bridge Bank rejected wire transfers that were properly initiated, in violation of the Deposit Agreements, because FDIC-R1 instructed Bridge Bank to

place a "hold" on SVBFG's accounts at Bridge Bank and to restrict any of the Account Funds from being withdrawn.

92.    The instructions by FDIC-R1 to Bridge Bank to interfere with SVBFG's rights as a Bridge Bank depositor, and the acquiescence by Bridge Bank in those instructions, was a violation of SVBFG's rights under the Deposit Agreements and unlawful.

93.    FDIC-R1 has never identified the basis for those instructions or the authority under which it purported to act, none of which exists or existed.

94.    The Notice of Disallowance suggests that FDIC-R1 made this direction—and continues to exert unlawful control over the Account Funds—to satisfy a hypothetical defensive right to setoff it may assert at some time in the future.  However, Bridge Bank had no actual or even hypothetical right of setoff against SVBFG.  And despite persistent pressure from SVBFG and the Bankruptcy Court, FDIC-R1 has been unable to substantively identify any basis for its alleged right to "setoff" for nearly a year.  For instance, on April 26, 2023, the Bankruptcy Court sought "guidance" on the status of SVBFG's accounts in the FDIC's control.  FDIC-R1 stated that it was "identif[ying] and quantif[ying]" its potential setoff rights.  In response, the Bankruptcy Court directed the FDIC to formally file a pleading identifying the specific basis for its authority over the Account Funds.  On May 3, 2023, the FDIC filed a pleading citing to general rights provided in FIRREA, but provided no substantive insight into the basis for any potential setoff rights against SVBFG.  To this day it has not done so.

95.    FDIC-R1 also directed Bridge Bank to assign SVBFG's deposit accounts and all associated assets and liabilities to FDIC-R1.  Bridge Bank complied with FDIC-R1's instruction. Bridge Bank, however, could not validly transfer SVBFG's deposit accounts to FDIC-R1 without SVBFG's consent.

96.    FDIC-R1's actions were unlawful, including because they violated the terms of the systemic risk exception.  Bridge Bank's compliance with those instructions was also unlawful, including because it violated the Deposit Agreements and amounted to conversion of SVBFG's property.  Neither FDIC-R1 nor Bridge Bank was entitled to take SVBFG's uninsured deposits,

1  which were not assets of FDIC-R1 or Bridge Bank.  And FDIC-R1 violated its own procedures in

2  purporting to call back SVBFG's deposit accounts and placing a hold on those accounts.

3      97.     Neither Bridge Bank nor FDIC-R1 provided SVBFG any notice of these actions,

4  or sought or obtained SVBFG's consent to them.  Indeed, SVBFG was unaware that Bridge Bank

5  had purported to transfer its Account Funds to FDIC-R1 until that purported transfer was disclosed

6  in the context of discovery in the bankruptcy proceeding.[5]

7      98.     Since March 16, 2023, SVBFG has been denied access to any of its Account Funds.

8  Both FDIC-R1 and FDIC-R2 (which was appointed receiver of Bridge Bank following its purchase

9  and assumption transaction with First Citizens as of March 27, 2023) continue to refuse to return

10  any of those funds to SVBFG.

11      99.     SVBFG's Account Funds at Bridge Bank totaled approximately $1.93 billion as of

12  March 16, 2023, when SVBFG's access to them was taken away by Bridge Bank and FDIC-R1.

13  Those funds were contained in three accounts (the "<u>Deposit Accounts</u>").

14

15

16

17

| No. | Description | Account No.[6] | Balance |
|---|---|---|---|
| 1. | Operating Account | *5270 | $  1,771,057,097.76 |
| 2. | Regulation W Account | *0822 | $  143,593,717.97 |
| 3. | SVB Capital Operating Account | *6176 | $  19,154,892.40 |
| Total Deposit Balance | | | $  1,933,805,708.13 |

18

19      100.    SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the

20  early morning of March 17, 2023.

21      101.    Later that same day, at FDIC-R1's direction, Bridge Bank unwound the payment

22  of $6,222,681.93 in intercompany receivables to SVBFG.  At that point, SVBFG had already

23  obtained all rights of a debtor in possession, including its pre-petition rights to recover its deposits

---

[5]     Although Bridge Bank could not validly transfer SVBFG's Account Funds to FDIC-R1 without SVBFG's consent, it is unclear whether the attempted transfer ever occurred.  Thus, when Bridge Bank sold its assets to First Citizens Bank & Trust Company ("<u>First Citizens</u>") several weeks later, the Purchase and Assumption Agreement excluded "[a]ll [d]eposits of SVB's holding company," suggesting that those deposits remained at Bridge Bank.  In any event, all Bridge Bank purported to transfer to FDIC-R1 in response to FDIC-R1's instruction was Bridge Bank's "right, title, and interest" in the Account Funds.  But Bridge Bank did not have any right, title, or interest in SVBFG's funds on deposit superior to SVBFG's and thus had nothing to transfer.

[6]     The last 4 digits of each Bank Account are listed.

as a matter of state and federal law and the benefits and protections of the automatic stay granted by 11 U.S.C. § 362.

102.    On March 27, 2023, the OCC closed Bridge Bank following the purchase and assumption transaction between Bridge Bank and First Citizens, and FDIC-R2 was appointed to act as the receiver for Bridge Bank.  The transfer of deposits from Bridge Bank to First Citizens did not include SVBFG's Account Funds.

103.    On or around April 3, 2023, the FDIC mailed a letter to Bridge Bank depositors informing them that "[a]ll deposits [at SVB] were fully insured" by FDIC-C, and that "the full amount of your deposit was transferred" to First Citizens.[7]

## VI.    SVBFG Commences the Adversary Proceeding Against the FDIC.

104.    On April 14, 2023, counsel for SVBFG sent a letter to counsel for FDIC-R1, requesting that it provide a formal statement of the current status of SVBFG's accounts and any changes in status since March 10, 2023, and asking that FDIC-R1 engage with SVBFG with respect to the use and availability of the Account Funds.  SVBFG never received a response from FDIC-R1 providing the requested information.

105.    On July 9, 2023, SVBFG filed the Adversary Proceeding in the Bankruptcy Court against FDIC-C and the FDIC-Rs, asserting claims against all three for, among other things, turnover of the Account Funds and violation of the automatic stay under the Bankruptcy Code, and a determination that none of the FDIC entities has any right of setoff.

106.    The deadline for FDIC-C, FDIC-R1, and FDIC-R2 to file proofs of claim in the Bankruptcy Court against SVBFG expired on September 14, 2023.  None of them filed any claims. FDIC-R2 has expressly disavowed holding any setoff claims (*see* Adv. Dkt. No. 32 (FDIC-R2 Motion to Dismiss) at 28 ("FDIC-R2 has no right of setoff against the Deposit Account Liabilities nor has it asserted (nor can it) any right of setoff.")), and FDIC-C likewise has never even

---

[7]    The notice established there was no claims process for SVB or Bridge Bank depositors. The notice stated that "[a]ll deposits were fully insured and transferred to FIRST-CITIZENS BANK & TRUST COMPANY, RALEIGH, NC," but "if you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at [First Citizens], you may request a review of the FDIC's determination in the United States District Court where the Failed Institution was located."

suggested that is has any setoff claims.  Only FDIC-R1 has ever suggested it could have a setoff claim against SVBFG's Account Funds—and it continues to do so, notwithstanding its failure to file a proof of claim against SVBFG by the Bankruptcy-Court-ordered deadline to do so.

107.    On August 11, 2023, FDIC-C and the FDIC-Rs moved to dismiss the Adversary Proceeding.  They argued that no federal district or bankruptcy court had subject matter jurisdiction at that point in time, purportedly because (i) SVBFG was required to file administrative claims against each of them under the FDIA as a prerequisite to seeking recovery of its Account Funds, and (ii) litigation may only be brought after they have acted and only in limited courts—in the United States District Court for the Northern District of California against FDIC-C, and in either that court or the United States District Court for the District of Columbia against the FDIC-Rs. SVBFG opposed each of these motions and continues to dispute the positions of each of FDIC-C and the FDIC-Rs.

108.    For the avoidance of doubt, it was and remains SVBFG's position that all the claims asserted in the Adversary Proceeding were properly brought before the Bankruptcy Court, which has subject matter and personal jurisdiction.  Sovereign immunity is waived by statute, and contrary to the position of FDIC, no administrative exhaustion was required for any of the claims SVBFG asserted.  The turnover and automatic stay claims are explicit rights under the Bankruptcy Code and within the Bankruptcy Court's core jurisdiction.  Nevertheless, inasmuch as the FDIC-Rs dispute the jurisdictional bases for the claims made in the Adversary Proceeding, SVBFG re-asserts them here (along with additional claims based on the FDIC-Rs' January 5 Notices of Disallowance), with a full reservation of rights as to its ability to continue to prosecute the Adversary Proceeding.

109.    On the same day it filed its motion to dismiss, FDIC-R1 filed a motion to withdraw the reference in the Bankruptcy Court pursuant to 28 U.S.C. § 157(d).  (Adv. Dkt. No. 30.)  That motion was docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023.  (*SVB Fin. Grp.* v. *FDIC*, No. 23-cv-07218-JPC (S.D.N.Y.) ("S.D.N.Y. Dkt."), ECF No. 1.)  On August 14, 2023, FDIC-C and FDIC-R2 filed non-substantive joinders to FDIC-R1's motion to withdraw the reference.  (*See*

S.D.N.Y. Dkt. Nos. 3, 4.)  On December 13, 2023, Judge Cronan granted the motion to withdraw the reference.  (*See* S.D.N.Y. Dkt. No. 34.)

110.    On January 15, 2024, SVBFG requested that Judge Cronan stay the Adversary Proceeding pending a determination in this then-contemplated action as to whether SVBFG was required to file administrative claims under the FDIA against either of the FDIC-Rs, and in the then-pending separate action brought by SVBFG against FDIC-C (described below) as to whether SVBFG was required to file an administrative claim under the FDIA against FDIC-C.  To the extent it is determined that SVBFG was not required to file an administrative claim against a particular FDIC entity (whether it be FDIC-C, -R1, or -R2), SVBFG should be free to proceed with its claims under the Bankruptcy Code against that entity, including if it chooses to do so in an adversary proceeding in Bankruptcy Court as part of its Chapter 11 case in New York.

111.    On January 25, 2024, Judge Cronan temporarily paused the Adversary Proceeding, adjourning the oral argument on the motions to dismiss *sine die* and requesting an update from the parties regarding related litigation by no later than March 10, 2024.  (*See* S.D.N.Y. Dkt. No. 43.)

**VII.    FDIC-C Decides to Treat SVBFG's Demand for Payment of Uninsured Deposits as a Claim for Insured Deposits Under 12 U.S.C. § 1821(f) and Denies the "Claim."**

112.    On June 26, 2023, before filing the Adversary Proceeding, SVBFG sent a letter to FDIC-C demanding that FDIC-C either pay or restore SVBFG full access to all its uninsured funds. FDIC-C did not respond to, or even acknowledge receipt of, SVBFG's demand until months after it was sent.

113.    On September 19, 2023, FDIC-C sent SVBFG a letter, characterizing "[SVBFG's] June 26, 2023 letter as a timely claim for insurance coverage with respect to a deposit under 12 U.S.C. § 1821(f)," and stating that "FDIC-C is working to provide [SVBFG] a final determination regarding insurance coverage within 30 days of the date of this letter."  Of course, SVBFG did not demand "insurance coverage" in its letter—it demanded that it be restored access to its Account Funds, like other SVB depositors that were given access to their uninsured deposits, pursuant to the invocation of the systemic risk exception.

114.    Notwithstanding FDIC-C's characterization of SVBFG's June 26, 2023 letter as a claim for insurance coverage, it was a demand for payment.  FDIC-C did not have, and does not

have generally, a claims process in place for depositors of a failed bank.  Moreover, and critically here, FDIC-C did not have a claims process in place for SVB deposit claims specifically because no claim for insurance coverage was required to be made by any depositor as a result of the Treasury Secretary's invocation of the systemic risk exception.  FDIC-C was required to make SVBFG's Account Funds available to SVBFG—a legal obligation that the FDIC in all of its capacities has breached without any plausible justification.

115.    On October 20, 2023, FDIC-C sent SVBFG a letter denying SVBFG's supposed "claim" for its Account Funds.  The purported basis of the denial was twofold.  *First*, FDIC-C asserted that because SVBFG was able to withdraw more than $250,000 from its accounts at Bridge Bank between March 13 and March 15, 2023, "FDIC-C has satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide SVBFG with access to its insured deposits."  *Second*, FDIC-C asserted that the Treasury Secretary's invocation of the systemic risk exception did not obligate FDIC-C to follow any particular course of action, but rather authorized FDIC-C to exercise unfettered discretion in determining what actions to take, including whether to pay any uninsured deposit claims, whose claims to pay, and in what amounts.

116.    This is the subject of a separate litigation, referenced here for completeness.  Section 1821(f) of the FDIA is not applicable to SVBFG's demand that FDIC-C pay its Account Funds in accordance with the directive of the Treasury Secretary, including because that Section applies only to claims for payment of insured deposits, *i.e.*, deposits up to the $250,000 deposit insurance limit.  SVBFG is seeking restoration of its uninsured deposits guaranteed by operation of the Treasury Secretary's systemic risk determination.  To protect its rights in the event it is determined that 12 U.S.C. § 1821(f) is applicable as against FDIC-C, on December 19, 2023, SVBFG timely commenced an action in this Court for review of FDIC-C's final denial of the "claim."  That action is currently pending as Case No. 23-cv-06543-BLF before Judge Beth Labson Freeman.

**VIII.    SVBFG Files Protective Claims in the FDIC-Rs' Administrative Proceedings, and the FDIC-Rs Disallow SVBFG's "Deposit and General Unsecured Claims."**

117.    Although SVBFG's claims relating to its Account Funds are core claims under the Bankruptcy Code and are not subject to the FDIA's administrative claims process, because

-36-

FDIC-R1 asserted that SVBFG was required file a proof of claim to pursue recovery of its Account Funds, SVBFG filed protective Proofs of Claim with each of FDIC-R1 and FDIC-R2 on July 10, 2023.  (*See* Exs. 7 and 8.)  Among other things, the protective Proofs of Claim asserted against each of the FDIC-Rs a claim for the Account Funds in the amount of $1,933,805,708.13 plus interest, a conversion-of-property claim for the FDIC-Rs' wrongful exercise of control and custody of the Account Funds, and 19 other unrelated claims.

118.    Both SVBFG's complaint filed in the Adversary Proceeding and the Proofs of Claim state that the Proofs of Claim were being filed without prejudice to SVBFG's positions that the Bankruptcy Court has exclusive jurisdiction to determine the matters subject to the Proofs of Claim and that no proof of claim is required for SVBFG to be paid or provided access to the Account Funds.

119.    On January 5, 2024—the last business day before the statutorily mandated 180-day deadline for each of the FDIC-Rs to notify SVBFG of any determination with respect to its Proofs of Claim—FDIC-R1 and FDIC-R2 each notified SVBFG that it was disallowing the claims.  (*See* Exs. 1 and 2.)  Even though it took six months to issue its determination, the entirety of FDIC-R1's explanation for its denial consists of two sentences:  "The deposit claim is denied as not proven to the satisfaction of the receiver due to the receiver's defenses.  All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver."  Similarly, FDIC-R2's explanation provided only that SVBFG's "deposit claim is denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank," and "[a]ll other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver."

120.    Although FDIC-R1 relies solely on its purported "defenses" in denying SVBFG's "deposit claim" under the FDIA, to date—nearly a year after FDIC-R1 eliminated SVBFG's access to its Account Funds, more than ten months after the Bankruptcy Court ordered the FDIC to identify its specific basis for exercising control over the Account Funds, and more than six months after SVBFG commenced the Adversary Proceeding—FDIC-R1 still has not identified any so-called "defenses."

121.   SVBFG was not required to file a proof of claim with FDIC-R1 or FDIC-R2 to recover its Account Funds.  The Treasury Secretary's action required immediate access and payment of deposit funds without any "claim," as the FDIC's own repeated public statements make clear.   Of course, FDIC-R1 and FDIC-R2 know this:   the FDIC's contact email for its administrative claims process—"NonDepClaimsDal@FDIC.gov"—makes clear that the process is not intended for depositors like SVBFG.  In any event, as alleged above, the FDIC-Rs had and continue to have no lawful basis to withhold SVBFG's Account Funds and are required to make those funds available to SVBFG together with the almost $10 million monthly lost earnings that have been accruing since March 16, 2023.

122.   *First*, pursuant to the Treasury Secretary's systemic risk exception invocation, the FDIC in all of its capacities is required to continue to make SVBFG's Account Funds available to SVBFG.  The after-the-fact contrary positions of the FDIC, which contradict its own public statements, the public statements and testimony of its own Chairman, and the public statements and testimony of the Treasury Secretary, among others, are baseless and in bad faith and should be unequivocally rejected by this Court.

123.   *Second*, even if the Court were to disregard the Treasury Secretary's invocation of the systemic risk exception and the FDIC's repeated confirmations that the Deposit Insurance Fund would be used to make all depositors, including SVBFG, whole, SVBFG is entitled under federal and state law, as applicable, at the very minimum to approximately $1.71 billion as the outstanding minimum *pro rata* distribution of SVB's liquidation value.  *See*, *e.g.*, 12 U.S.C. § 194; Cal. Fin. Code §§ 681, 1406; *see also* 12 U.S.C. § 1821(i).  And if for any reason there are insufficient assets in the receiverships to satisfy this obligation, then FDIC-C is required to provide the mandated distribution from the Deposit Insurance Fund.

124.   The FDIC's minimum distribution obligation to SVBFG may lead to a complete recovery by SVBFG on its Account Funds.  Numerous reports reflect a widespread belief by the market that First Citizens received a generous deal in connection with the purchase and assumption

agreement,[8] and indeed First Citizens' parent company's market capitalization increased by over $4 billion on the day the sale was announced[9]—all of which strongly suggests that there was more value in SVB at the time of its failure than may have been realized by the FDIC based on the actions the FDIC decided to undertake.

125.   Indeed, the FDIC's own limited, publicly available sources regarding SVB's balance sheet at the time it was placed into receivership suggests that there was—at a minimum— an approximately $1.71 billion obligation due and outstanding from the FDIC to SVBFG on the Account Funds.  As FDIC Chairman Gruenberg recently stated, the FDIC could have paid SVB depositors "90 percent or maybe more of their deposits" through an advanced dividend, which represents the FDIC's "**conservative** value estimate of the recoveries that [it will] ultimately make on the bank's assets."  Given this conservative estimate, it is likely that SVBFG and other depositors could have received the full amount of their uninsured deposits had SVB been liquidated rather than placed in receivership.

126.   *Third*, the FDIC-Rs have no legal basis to disallow SVBFG's claim for its Account Funds.  FDIC-R1 stands in the shoes of SVB, which agreed to make SVBFG's deposit funds available on demand.  Similarly, in the Transfer Agreement pursuant to which all SVB deposit accounts were transferred to Bridge Bank, Bridge Bank agreed to discharge the duties and obligations of SVB, which includes the contractual obligation to pay SVBFG's deposit funds on demand.  FDIC-R2, as the successor to Bridge Bank, does not purport to have any rights of setoff against SVBFG, and FDIC-R2 has no right to exercise any alleged rights of setoff on behalf of

---

[8]     *See* Stephen Gandel, et al., *First Citizens Shares Surge After Silicon Valley Bank Deal*, Fin. Times (Mar. 27, 2023), https://www.ft.com/content/70968033-1dbf-4e31-86a9-6271106be1fc; *see also* Joshua Franklin, *First Citizens Makes Huge Gain on Silicon Valley Bank Deal*, Fin. Times (May 10, 2023), https://www.ft.com/content/2df4cea1-1c0c-48b3-8969-95198d497ea4; Editorial, *How the FDIC Rigged the SVB Auction*, Wall St. J. (Apr. 18, 2023), https://www.wsj.com /articles/fdic-nonbanks-silicon-valley-bank-sale-martin-gruenberg-609af47.

[9]     Nasdaq, First Citizens BancShares, Inc. Class A Common Stock (FCNCA):  FCNCA Historical Data, https://www.nasdaq.com/market-activity/stocks/fcnca/historical (reflecting historical share prices of parent company of $582.55 at market close on Friday, March 24, 2023, and $895.61 at market close on Monday, March 27, 2023); FCN First Citizens BancShares, Inc., Annual Report (Form 10-K) (Feb. 24, 2023), https://www.sec.gov/ixviewer /ix.html?doc=/Archives/edgar/data/0000798941/000079894123000017/fcnca-20221231.htm (Parent company had 13,502,747 shares of Class A Common Stock outstanding as of February 17, 2023).

FDIC-R1.  FDIC-R1 cannot exercise common law or contractual setoff against SVBFG's Account Funds, because SVBFG does not have any matured debts owed to FDIC-R1, and FDIC-R1 does not have any valid, cognizable, liquidated claims against SVBFG.  The FDIC-Rs have not even identified or explained any claims they may have against SVBFG that would justify withholding any portion of the Account Funds currently held by either, much less $1.93 billion.  There is no right of setoff for contingent, hypothetical claims.

127.     *Fourth*, FDIC-R1 and FDIC-R2 cannot exercise setoff against any, much less the entirety, of SVBFG's Account Funds under 12 U.S.C. § 1822(d) because, among other reasons, Section 1822(d) provides that the FDIC may only "withhold payment of such portion of the **insured deposit** of any depositor in a depository institution in default."  12 U.S.C. § 1822(d) (emphasis added).  This is but a tiny portion of the $1.93 billion in Account Funds wrongfully withheld from SVBFG.

128.     *Fifth*, even if SVBFG had been required to file a claim with FDIC-R1 or FDIC-R2 to recover its Account Funds, neither FDIC-R1's nor FDIC-R2's administrative claims process is the proper place to adjudicate or effectuate any alleged claim, counterclaim, or defense of offset or recoupment against SVBFG respecting an undisputed $1.93 billion estate asset.  The FDIA only grants the FDIC in its capacity as a receiver the authority to determine (subject to *de novo* review) claims **against the receivership**.  12 U.S.C. § 1821(d)(4), (5).  Only the Bankruptcy Court presiding over SVBFG's Chapter 11 case has the authority to assess, value, and prioritize claims **against SVBFG**.  Seeking to recover by way of a distribution from SVBFG or by retaining amounts owed by the FDIC to SVBFG are functionally the same thing—they reduce the assets in the estate available for other creditors and must be litigated before the Bankruptcy Court.  If the FDIC in any of its capacities believes it has claims against SVBFG—whether asserted as claims, counterclaims, offsets or for recoupment—it was required to identify them and file proofs of claim in SVBFG's Chapter 11 case before the September 14, 2023 government bar date.  None of FDIC-C, FDIC-R1, or FDIC-R2 did so.

129.     *Finally*, the same day FDIC-R1 acted, FDIC-R2 denied SVBFG's claim in a similarly conclusory two-sentence denial.  FDIC-R2 has never provided an explanation for the

basis or authority on which Bridge Bank blocked SVBFG's access to its Account Funds beginning on March 16, 2023; the basis or authority on which it actually purported to remove the Account Funds from SVBFG's accounts—*i.e.*, took an account holder's money without consent from the account holder—and purportedly delivered those funds to FDIC-R1; nor the basis or authority on which it unwound the payment of an intercompany receivable after SVBFG's bankruptcy filing.

## IX.    SVBFG's Non-Deposit Claims Against the FDIC-Rs for Damages to SVBFG Resulting From the FDIC-Rs' and First Citizens' Conduct.

130.    As part of the protective Proofs of Claim that SVBFG filed with the FDIC-Rs on July 10, 2023, SVBFG also sought repayment and damages from the FDIC-Rs for certain payments to which it is entitled under agreements between SVBFG and SVB, and for which the FDIC-Rs are now responsible as successors in interest to SVB and Bridge Bank under 12 U.S.C. § 1821(d)(2)(A).  SVBFG does not contend that these claims (which address matters other than the Account Funds) are governed by the systemic risk exception or that that they were not subject to the FDIC-R's administrative process.  SVBFG now seeks a *de novo* determination of the FDIC-Rs' denials of these claims, which were made without any explanation.

131.    ***Lease Claims***.  At the time it commenced the Chapter 11 bankruptcy proceedings on March 17, 2023, SVBFG was party to certain lease agreements ("Lease Agreements") that were entered into for the sole benefit of SVB.  SVBFG had no operations at any of the relevant lease premises and entered into the lease agreements on behalf of and for the sole benefit of SVB.

132.    SVBFG and SVB entered into an agreement under which SVB and SVBFG agreed to allocate expenses for goods and services based on the extent to which the goods and services are attributable to each entity.  Pursuant to that agreement and SVB and SVBFG's ongoing course of conduct, SVB was responsible to pay and in fact paid for all lease obligations, including rent and any associated costs and expenses incurred under any lease agreement, to the extent that any leased property was used by SVB employees for the benefit of SVB.  If a leased property was used for the benefit of both SVB and SVBFG, SVB agreed to pay an allocation of the rent and all associated costs and expenses based on the percentage use by its employees for the benefit of SVB.

133.    In accordance with these agreements, SVB has paid rent and associated costs and expenses on an approximate monthly basis since the Lease Agreements were entered into on SVB's behalf.

134.    After the Closure Date, Bridge Bank and then First Citizens continued to use these premises, but in or around June 2023, First Citizens informed SVBFG that it was going to vacate several of the leased premises and instructed SVBFG to reject these leases.  SVBFG has paid fees and will incur liabilities in SVBFG's Chapter 11 bankruptcy proceeding associated with the rejection of leases for SVB branch offices or other premises that the FDIC-Rs and/or First Citizens determined to vacate.  As set forth in Schedule 1 hereto, based on currently available information, the damages to SVBFG for the rejection of these leases total between $22,906,000 to $39,232,000.

135.    ***Vendor Claims***.  SVBFG also was a party to certain agreements with vendors (the "Vendors") related to services, goods, and software licensing for the primary benefit of SVB (the "Vendor Contracts").  Pursuant to the expense sharing agreement set forth in Paragraph 132 and SVB and SVBFG's ongoing course of conduct, SVB, as the primary beneficiary, was responsible for the payment of the Vendor Contracts.  After the Closure Date, there were unpaid obligations outstanding in connection with certain of the Vendor Contracts, including expenses associated with the termination of such Vendor Contracts.  This has caused and continues to cause SVBFG to incur administrative expenses in its Chapter 11 proceeding and other damages.  In addition, as set forth in Schedule 2 hereto, with respect to certain Vendor Contracts, SVBFG has incurred and will incur in the future substantial costs totaling between $10,566,000 and $29,071,000 associated with the rejection of the contracts prior to their expiration dates, including contracts that First Citizens has stopped paying, which has resulted in the Vendors seeking early termination damages.  To the extent these amounts are not paid or reimbursed by First Citizens, FDIC-R1 and FDIC-R2 are liable.

136.    ***Employee Claims***.  SVBFG has incurred expenses on behalf of SVB for wages, bonuses, deferred compensation, stock plan compensation, healthcare benefits, retirement plans, and severance that are currently owed to certain SVB employees (the "Employee Claims").  Schedule 3 hereto sets out the Employee Claims that have been filed in SVBFG's Chapter 11

proceeding in the Bankruptcy Court to date, which total between $70,623,000 and $112,842,000. Pursuant to the expense sharing agreement set forth in Paragraph 132 and SVB and SVBFG's ongoing course of conduct, SVB, as the primary beneficiary of the services provided by SVB's own employees, was responsible for the payment of the Employee Claims.

137.   ***Intercompany Receivables***.   Prior to the Closure Date, SVBFG incurred expenses on behalf of SVB for which SVB was contractually required to reimburse SVBFG as intercompany receivables reflected in SVBFG's and SVB's books and records.   On approximately March 17, 2023, Bridge Bank—at the direction of FDIC-R1—reversed or unwound approximately $6,222,681.93 of intercompany receivables owed and previously transferred to SVBFG by SVB. On information and belief, SVB and Bridge Bank have failed to reimburse SVBFG for the unwound $6,222,681.93 intercompany receivables payment as well as additional intercompany receivables owed by SVB or Bridge Bank to SVBFG, in an amount to be determined at trial.

138.   ***Indemnity Claims***.   SVBFG's bylaws provide for the indemnification of all SVBFG's directors and officers.   Prior to the Closure Date, SVBFG's directors each served concurrently as directors of SVB and each of SVBFG's officers was an employee of SVB.   To the extent such persons (or any other officers or employees of SVB) assert indemnification or contribution or similar claims against SVBFG (the "Indemnity Claims"), it in turn asserts claims for reimbursement of such obligations or liabilities against FDIC-R1 and FDIC-R2.   Schedule 3 hereto sets out the Indemnity Claims that have been filed by SVBFG's officers and directors in SVBFG's Chapter 11 proceeding in the Bankruptcy Court to date, which total approximately $1,025,000.

## **CLAIMS FOR RELIEF**

### **Count I**
### **Breach of Contract**
### **(Against Defendants FDIC-R1 and FDIC-R2)**

139.   SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

140.    The Deposit Agreements are valid contracts between SVBFG and SVB that require SVB to make SVBFG's deposits available on demand.  SVBFG has fulfilled its obligations as a depositor under the Deposit Agreements.

141.    On March 12, 2023, Treasury Secretary invoked the systemic risk exception to guarantee all insured and uninsured deposits of SVB.  Thereafter, representatives of the FDIC, including Chairman Gruenberg, Secretary Yellen, and counsel for FDIC-R1, as well as numerous other senior government officials, made statements to the American public, to Congress, and to the Bankruptcy Court confirming that the Treasury Secretary's invocation protected **all** deposits of **all** depositors of SVB.  These statements were made with the intention of avoiding a national banking crisis by convincing SVB stakeholders, including depositors and others, that all deposits of all depositors were 100% safe at Bridge Bank.  SVBFG and SVBFG's stakeholders relied on those statements, as intended by the FDIC and others, and kept SVBFG's uninsured deposits at Bridge Bank after March 13, 2023.

142.    FDIC-Rs had the funds available to satisfy SVBFG's deposit demand, including as a result of the invocation of the systemic risk exception.

143.    The instructions by FDIC-R1 to Bridge Bank to deprive SVBFG of access to its Account Funds and Bridge Bank's compliance with those instructions was improper and unlawful.

144.    FDIC-R1 and FDIC-R2 had no valid basis to reject SVBFG's deposit demands, or to otherwise control, interfere with, or inhibit the payment of SVBFG's Account Funds.

145.    SVBFG has demanded that FDIC-R1 and FDIC-R2 pay to SVBFG the Account Funds, but FDIC-R1 and FDIC-R2 refuse to do so.

146.    FDIC-R1 and FDIC-R2 have wrongfully refused to pay SVBFG any amount.

147.    As a result of FDIC-R1's and FDIC-R2's continued failure to pay SVBFG the amounts to which it is entitled and their continuing efforts to block SVBFG's access to its Account Funds, SVBFG has also been deprived of earnings on those funds, which SVBFG estimates conservatively to be in excess of approximately $10 million per month.

148.    SVBFG has been further damaged, and will continue to be damaged, until such time as SVBFG is paid the full amount of the Account Funds.

149.    Accordingly, SVBFG requests a liquidated judgment for the Account Funds in the amount of $1,933,805,708.13 plus earnings on that amount and an unliquidated judgment for (a) any additional amounts that access to SVBFG's records may show were in SVBFG's Deposit Accounts and have not been returned to SVBFG, and (b) damages from its loss of use of such amounts, including the cost of any debtor in possession financing.

**Count II**
**Estoppel**
**(Against Defendants FDIC-R1 and FDIC-R2)**

150.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

151.    On March 12, 2023, the Treasury Secretary invoked the systemic risk exception to guarantee all insured and uninsured deposits of SVB.  Thereafter, the FDIC, Chairman Gruenberg, Secretary Yellen, and counsel for FDIC-R1, as well as numerous other senior government officials, made statements to the American public, to Congress, and to the Bankruptcy Court confirming that the Treasury Secretary's invocation protected **all** deposits of **all** depositors of SVB with the specific intention of avoiding a national banking crisis that would result if depositors withdrew their funds.  SVBFG reasonably relied on those statements (as did the Bankruptcy Court and the United States Trustee in the bankruptcy proceedings) and SVBFG did not withdraw its funds, just as the FDIC intended.  Instead, SVBFG kept its uninsured deposits at Bridge Bank after March 13, 2023, in reliance on the FDIC's repeated promises and assurances that all deposits would be paid in full.

152.    SVBFG has suffered damages and continues to suffer damages as a result of its reasonable reliance on FDIC-R1's and FDIC-R2's statements that all deposits would be paid in full.  SVBFG has been unable to access its approximately $1.93 billion in deposits for nearly a year as a result of FDIC-R1's and FDIC-R2's blatant refusal to honor the protections that the FDIC and persons authorized to speak for the FDIC in its various capacities, including the FDIC's own Chairman Gruenberg and counsel for FDIC-R1, repeatedly represented would be extended to all depositors, including SVBFG.  As a result of FDIC-R1's and FDIC-R2's continued failure to pay SVBFG the amounts to which it is entitled and their continuing efforts to block SVBFG's access

1   to its Account Funds, SVBFG has also been deprived of earnings on those Funds, which SVBFG

2   estimates conservatively to be in excess of approximately $10 million per month.

3        153.   FDIC-R1 and FDIC-R2 are estopped from disregarding the Treasury Secretary's

4   invocation and determination of the systemic risk exception as it was contemporaneously and

5   repeatedly described as an action to protect all uninsured deposits of SVB, including SVBFG's

6   Account Funds.  To the extent it is FDIC-R1's and FDIC-R2's position that the systemic risk

7   exception does not apply to SVBFG, it is estopped from taking such position based on repeated

8   statements to the contrary.

9
                     **Count III**
**Turnover of the Account Funds Pursuant to Section 542 of the Bankruptcy Code**
10                **(Against Defendants FDIC-R1 and FDIC-R2)**

11        154.   SVBFG re-alleges and incorporates by reference the allegations contained in the

12   foregoing paragraphs as if fully set forth herein.

13        155.   The Account Funds constitute property of SVBFG's estate under Section 541(a) of

14   the Bankruptcy Code.

15        156.   Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an entity

16   that owes a debt that is property of the estate and that is matured, payable on demand, or payable

17   on order, shall pay such debt to, or on the order of, the trustee."

18        157.   The Treasury Secretary, based on the recommendation of FDIC-C and the Federal

19   Reserve, and after consultation with the President, invoked the systemic risk exception to

20   guarantee all deposits, insured and uninsured, at SVB and provided for "full access" to those funds.

21   This includes SVBFG's approximately $2.1 billion in uninsured deposits that existed at the time

22   of the Treasury Secretary's action, and the approximately $1,933,805,708.13 in uninsured Account

23   Funds that remained when SVBFG's access to its Account Funds, then held at Bridge Bank on or

24   about March 16, 2023.

25        158.   FDIC-R1 and FDIC-R2 unlawfully deprived SVBFG of access to its Account

26   Funds.

27        159.   FDIC-R1 and FDIC-R2 continue unlawfully to refuse to provide SVBFG access to

28   its Account Funds.

160.    On January 5, 2024, in response to SVBFG's demand that FDIC-R1 and FDIC-R2 restore SVBFG's access to the Account Funds, FDIC-R1 and FDIC-R2 confirmed in writing that they refuse to do so.

161.    The Account Funds constitute a debt FDIC-R1 and/or FDIC-R2 owe to SVBFG's estate, which is property of the estate and is matured, payable on demand, or payable on order.

162.    SVBFG's Account Funds are therefore subject to turnover pursuant to Section 542 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

163.    Pursuant to Section 542 of the Bankruptcy Code, FDIC-R1 and FDIC-R2 are required to immediately return to SVBFG its Account Funds, including all earnings that were or would have been earned on the Account Funds since the date the Account Funds were blocked or taken.

**Count IV**
**Violation of the Automatic Stay Under Section 362(a) of the Bankruptcy Code**
**(Against Defendants FDIC-R1 and FDIC-R2)**

164.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

165.    The automatic stay of Section 362 of the Bankruptcy Code came into effect automatically by statute immediately upon SVBFG's filing of its voluntary petition for relief under Chapter 11 on March 17, 2023, and FDIC-R1 and FDIC-R2 received notice of the automatic stay.

166.    By refusing to release any of the Account Funds to SVBFG and directing the Bridge Bank to unwind the payment of approximately $6,222,681.93 in intercompany receivables to SVBFG after the stay went into effect on March 17, 2023, and by the Bridge Bank purportedly unwinding the payment of intercompany receivables to SVBFG after the stay went into effect, FDIC-R1 and FDIC-R2 violated, and continue to violate, the automatic stay applicable to SVBFG and its assets wherever located pursuant to Section 362(a) of the Bankruptcy Code.

167.    SVBFG seeks an injunction against FDIC-R1's and FDIC-R2's continued violation of the automatic stay and an order that FDIC-R1 and FDIC-R2 cure their violation of the automatic stay by delivering to SVBFG its Account Funds together with all amounts that were or would have been earned on those Account Funds from and after March 16, 2023.

**Count V**
**Claim under Sections 1406 and 681 of the California Financial Code**
**(Against Defendant FDIC-R1)**

168.   SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

169.   SVBFG asserts this claim in the alternative, without prejudice to Counts I to III, VI, and VIII.

170.   Where a state banking supervisor has appointed the FDIC as receiver of a state-chartered bank, "the rights of depositors and other creditors of [the bank] shall be determined in accordance with the applicable provisions of State law."  12 U.S.C. § 1821(g)(4).

171.   California law authorizes the Commissioner of the DFPI to appoint the FDIC as receiver of a California state-chartered bank and provides that, if the FDIC accepts such appointment, "the rights of customers and other creditors of the insured licensee shall be determined in accordance with the applicable provisions of the laws of [California]."  Cal. Fin. Code §§ 620, 622.

172.   SVB was a California state-chartered bank.  On or about March 10, 2023, the DFPI issued an order taking possession of SVB.  On the same day, DFPI appointed FDIC-R1 to serve as Receiver for SVB.

173.   California law prohibits transfers by a bank when the bank is insolvent or "in contemplation of insolvency" that are taken "with a view to the preference of one creditor over another," Cal. Fin. Code § 1406, and imposes on any receiver of a California state-chartered bank, including FDIC-R1, a requirement to "set[] aside an amount sufficient to pay all customers . . . their *pro rata* shares of the funds then available" before "one or more dividends"—payments on claims for uninsured deposits or other obligations of the failed institution—may be declared and paid, *id.* § 681.

174.   Together, as under materially similar provisions of the National Bank Act, Sections 1406 and 681 of the California Financial Code impose on FDIC-R1 the obligation to provide a ratable distribution to unassumed creditors up to the liquidation value of their claims, calculated as of the date SVB was placed into receivership.

-48-

175.    Accordingly, even if the Treasury Secretary's invocation of the systemic risk exception did not require payment of SVBFG's Account Funds in full, SVBFG is entitled to judgment against FDIC-R1 awarding it the amount of the minimum distribution to which it is entitled under Cal. Fin. Code §§ 1406 and 681.  The precise amount is presently unknown but believed to exceed $1.7 billion.

**Count VI**
**Claim under Sections 91 and 194 of the National Bank Act**
**(Against Defendant FDIC-R2)**

176.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

177.    SVBFG asserts this claim in the alternative, without prejudice to its position that the Treasury Secretary's invocation of the systemic risk exception requires FDIC-R2 to provide SVBFG with access to, or pay SVBFG, its Account Funds in full without reliance on the minimum distribution obligation under federal law, and without prejudice for its claims to the same against FDIC-R1.

178.    Bridge Bank was a federally-chartered bank.  On or about March 27, 2023, following the purchase and assumption transaction with First Citizens, FDIC-R2 was appointed receiver of Bridge Bank.

179.    The National Bank Act prohibits transfers by a bank when the bank is insolvent or "in contemplation thereof" that are taken "with a view to the preference of one creditor over another," 12 U.S.C. § 91, and imposes on any receiver of a federally-chartered bank, including FDIC-R2, a requirement to ratably distribute the assets of a failed bank, *id.* § 194.

180.    Together, Section 91 and 194 of the National Bank Act impose on FDIC-R2 the obligation to provide a ratable distribution to unassumed creditors up to the liquidation value of their claims, calculated as of the date Bridge Bank was placed into receivership.

181.    Accordingly, even if the Treasury Secretary's invocation of the systemic risk exception did not require payment of SVBFG's Account Funds in full, SVBFG is entitled to judgment against FDIC-R2 awarding it the amount of the minimum distribution to which it is

1  entitled under 12 U.S.C. §§ 91 and 194.  The precise amount is presently unknown but believed to

2  exceed $1.7 billion.

3                                            **Count VII**
                          **Declaratory Judgment Under 28 U.S.C. § 2201 *et seq.***
4                              **(Against FDIC-R1 and FDIC-R2)**

5      182.   SVBFG re-alleges and incorporates by reference the allegations contained in the

6  foregoing paragraphs as if fully set forth herein.

7      183.   FDIC-R1 contends that to recover its Account Funds, SVBFG was required to

8  submit a claim to FDIC-R1 through an administrative claims process pursuant to 12 U.S.C.

9  § 1821(d).

10     184.   SVBFG denies that it had any such obligation.

11     185.   FDIC-R2 contends that to recover its Account Funds, SVBFG was required to

12  submit a claim to FDIC-R2 through an administrative claims process pursuant to 12 U.S.C.

13  § 1821(d).

14     186.   SVBFG denies that it had any such obligation.

15     187.   A present and real controversy exists between SVBFG, on the one hand, and each

16  of FDIC-R1 and FDIC-R2 on the other hand, that is ripe for adjudication.

17     188.   If SVBFG is correct, it is not required to seek a *de novo* adjudication of its deposit

18  claim in this Court.  Rather, it has the right to have its entitlement to the Account Funds determined

19  in the Southern District of New York, where the United States Bankruptcy Court is presiding over

20  its Chapter 11 proceeding.

21     189.   Accordingly, SVBFG respectfully requests that the Court declare that (i) to assert

22  its right to recover the Account Funds from FDIC-R1, SVBFG was not required to file an

23  administrative claim with FDIC-R1 pursuant to 12 U.S.C. § 1821(d), and (ii) to assert its right to

24  recover the Account Funds from FDIC-R2, SVBFG was not required to file an administrative

25  claim with FDIC-R2 pursuant to 12 U.S.C. § 1821(d).

26

27

28

**Count VIII**
**Violation of SVBFG's Fifth Amendment Rights Under the United States Constitution**
**(Against Defendants FDIC-R1 and FDIC-R2)**

190.     SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

191.     The Fifth Amendment's Takings Clause under the United States Constitution protects against the government's taking of private property without just compensation.

192.     The Treasury Secretary's invocation of the systemic risk exception to guarantee **all** deposits, insured and uninsured, of **all** depositors of SVB, as jointly announced by the Treasury, FDIC and Federal Reserve on Sunday, March 12, 2023, created a property interest protected by the Takings Clause.

193.     SVBFG has a claim of entitlement to its $1.93 billion Account Funds because the Treasury Secretary's invocation and determination unequivocally guaranteed all deposits of all depositors, including SVBFG and its uninsured deposits, would be paid by the Deposit Insurance Fund.  Consequently, SVBFG's interest in its Account Funds is a protected property interest in a government benefit of which FDIC-R1 and FDIC-R2 cannot deprive SVBFG without just compensation.

194.     Beginning no later than March 16, 2023, Bridge Bank and FDIC-R1 acted to interfere with transactions in SVBFG's deposit accounts at Bridge Bank, to deny SVBFG access to its Account Funds then on deposit at Bridge Bank, and thereafter to transfer SVBFG's Account Funds without authority and without SVBFG's knowledge or consent from Bridge Bank to FDIC-R1.

195.     SVBFG has demanded that the FDIC-Rs restore its access to the Account Funds or pay them to SVBFG, but the FDIC-Rs have refused to do so.

196.     On January 5, 2024, in response to SVBFG's demand that the FDIC-Rs restore SVBFG's access to the Account Funds, the FDIC-Rs confirmed in writing that they would neither provide SVBFG with access to its Account Funds, thereby effectively taking the Account Funds without providing SVBFG with any procedural due process, nor compensate SVBFG for these takings.

197.    The FDIC-Rs' effort to impede the payment of the full amount of the Account Funds to SVBFG without offering any compensation is contrary to the Treasury Secretary's invocation and determination of the systemic risk exception in order to provide full and immediate access to all deposits of all depositors of SVB and does not advance any legitimate government interest.

198.    As a result of the FDIC-Rs' actions and failure to pay just compensation, SVBFG has been damaged and will continue to be damaged until such time as SVBFG is paid the full amount of the Account Funds.

199.    SVBFG respectfully requests that the Court find that the FDIC-Rs' refusal to provide SVBFG with access to its Account Funds without any compensation is unlawful under the Fifth Amendment's Taking Clause, issue injunctive relief prohibiting the FDIC-Rs from continuing to deny SVBFG access to its Account Funds, and award SVBFG just compensation in the amount of $1,933,805,708.13 plus earnings, interest, and other damages on such amounts.

**Count IX**
**Conversion**
**(Against Defendants FDIC-R1 and FDIC-R2)**

200.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

201.    SVBFG has a valid deposit claim for the Account Funds.

202.    The FDIC-Rs have no right or entitlement to hold SVBFG's Account Funds or otherwise impede the payment of the amount of the seized Account Funds to SVBFG.

203.    Among other things, both FDIC-Rs wrongly converted SVBFG's funds when, at FDIC-R1's instruction and without SVBFG's consent or knowledge, Bridge Bank, and in turn FDIC-R2, blocked SVBFG's access to its accounts at Bridge Bank beginning no later than March 16, 2023, and purported to transfer the Account Funds from SVBFG's accounts at Bridge Bank to FDIC-R1, which has wrongfully withheld and refused to return those funds to SVBFG. To the extent the Account Funds were not transferred from Bridge Bank to FDIC-R1, they have been wrongfully withheld by FDIC-R2 at the direction of FDIC-R1.

204.    At the time they did so, both FDIC-R1 and Bridge Bank—which was controlled by the FDIC and acting at the direction of FDIC-R1—knew that the purpose of these actions and their intended consequence was to deprive SVBFG of further access to its Account Funds.

205.    Since that time, FDIC-R1 and FDIC-R2 have continued to deprive SVBFG of access to any of its Account Funds, including by rejecting SVBFG's request to access or be paid the amount of its Account Funds and wrongly denying SVBFG's administrative claims.

206.    The FDIC-Rs' ongoing, wrongful exercise of control over and custody of SVBFG's Account Funds constitutes the wrongful conversion of those Account Funds, for which the FDIC-Rs are liable to SVBFG.

207.    As a result of the foregoing, each of the FDIC-Rs are liable to SVBFG for damages in an amount to be determined at trial, but no less than the amount of the Account Funds plus earnings on those funds since March 16, 2023.

**Count X**
**Breach of Contract**
**(Against Defendant FDIC-R1)**

208.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

209.    SVBFG and SVB entered into an agreement under which SVB and SVBFG agreed to allocate fees and expenses for goods and services based on the extent to which the goods and services are attributable to each entity.

210.    Pursuant to that agreement, SVB was responsible to pay and in fact paid for all lease obligations, including rent and any associated costs and expenses incurred under any Lease Agreement, to the extent that any leased property was used by SVB employees for their benefit.

211.    Pursuant to that agreement, SVB also was responsible to pay and in fact paid for certain Vendor Contracts for services, goods and software licensing for the primary benefit of SVB.

212.    Pursuant to that agreement, SVB also was responsible to pay and in fact paid for wages, bonuses, deferred compensation, stock plan compensation, healthcare benefits, retirement plans, and severance owed to SVB employees.

213.    Pursuant to that agreement, SVB also was responsible to pay and in fact paid for Indemnity Claims asserted by SVBFG's directors, each of whom served concurrently as directors of SVB, and SVBFG's officers, each of whom served concurrently as officers of SVB and who were SVB employees.

214.    By operation of 12 U.S.C. § 1821(d)(2)(A), FDIC-R1 is the successor in interest to all of SVB's contractual liabilities to SVBFG.  On information and belief, FDIC-R1 did not assign to First Citizens its rights or obligations under the Lease Agreements, Vendor Contracts, or any of the employment agreements with SVB employees that are set out in the Employee Claims. FDIC-R1 is therefore responsible for payment of all fees and costs associated with the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims, including any damages or other claims associated with the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims.

215.    Schedules 1, 2, and 3 to this Complaint set out claims associated with the Lease Agreements and Vendor Contracts, Employee Claims, and Indemnity Claims that have been filed to date against SVBFG in its Chapter 11 proceeding in the Bankruptcy Court for which FDIC-R1 is responsible.

216.    FDIC-R1, as SVB's successor in interest, has failed to perform under the agreement between SVB and SVBFG by failing to pay the amounts owed to SVBFG for the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims, and SVBFG has been damaged thereby.

**Count XI**
**Breach of Implied Contract**
**(Against Defendant FDIC-R1)**

217.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

218.    SVBFG asserts this claim in the alternative if it is determined SVBFG did not have a written or oral agreement with SVB that SVB would pay all fees and expenses for goods and services attributable to SVB.

219.     Beginning at or about the time each Lease Agreement, Vendor Contract, or employment agreement set out in the Employee Claims was entered into, SVB paid all fees and expenses for the goods and services provided under such contracts that were attributable to SVB's use of such goods and services.

220.     By their actions and conduct, and under the circumstances, SVBFG, on the one hand, and SVB, on the other hand, agreed that SVB would pay the monthly fees and expenses due under the Lease Agreements and Vendor Contracts for all goods and services provided to SVB, as well as the wages, bonuses, deferred compensation, stock plan compensation, healthcare benefits, retirement plans, and severance owed to SVB employees set out in the Employee Claims.

221.     SVBFG performed all obligations required on its part in accordance with the terms and conditions of the implied-in-fact agreement, except for matters that are excused as a matter of law, excused by breaches of SVB and/or prevented from being performed by SVB.

222.     By operation of 12 U.S.C. § 1821(d)(2)(A), FDIC-R1 is the successor in interest to all of SVB's liabilities and obligations to SVBFG.

223.     FDIC-R1 breached the implied-in-fact agreement by failing to pay its allocation of the contract termination fees under the Lease Agreements and Vendor Contracts and by failing to pay the Employee Claims.

224.     As a result of FDIC-R1's breach of the implied-in-fact contract, SVBFG has suffered harm in the amount of damages the counterparties to the Lease Agreements and Vendor Contracts are seeking for the termination of those agreements and the amount sought in the Employee Claims.

**Count XII**
**Breach of Contract**
**(Against Defendants FDIC-R1 and FDIC-R2)**

225.     SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

226.     SVBFG incurred expenses on behalf of SVB for which SVB was contractually required to reimburse SVBFG pursuant to the terms of SVBFG and SVB's intercompany agreements that SVBFG and SVB validly entered into.

227.    By operation of 12 U.S.C. § 1821(d)(2)(A), FDIC-R1 is the successor in interest to all of SVB's liabilities and obligations to SVBFG, and FDIC-R2 is the successor in interest to all of Bridge Bank's liabilities and obligations to SVBFG.

228.    On approximately March 17, 2023, FDIC-R1 wrongfully directed Bridge Bank to reverse or unwind approximately $6,222,681.93 of intercompany receivables owed and previously transferred to SVBFG by SVB.

229.    On information and belief, FDIC-R1 also has wrongfully failed to pay SVBFG for other additional intercompany receivables owed and owing to SVBFG by SVB.

230.    On information and belief, the FDIC-Rs' actions were a breach of the intercompany agreements that the FDIC-Rs assumed from or are liable as successors to SVB, and SVBFG was damaged thereby in the amount of $6,222,681.93 plus an additional amount to be determined at trial.

231.    Accordingly, SVBFG is entitled to damages in the amount of $6,222,681.93 plus an additional amount to be determined at trial, plus interest thereon.

## PRAYER FOR RELIEF

NOW, THEREFORE, Plaintiff SVBFG prays for judgment and relief against Defendants FDIC-R1 and FDIC-R2 as follows:

a.   Judgment in SVBFG's favor and against both Defendants FDIC-Rs on all causes of action alleged herein;

b.   An order restoring SVBFG's Account Funds, together with all earnings on those funds since SVBFG was deprived of access on March 16, 2023;

c.   An order enjoining the FDIC-Rs and all affiliated entities acting in concert with the FDIC-Rs from refusing to provide SVBFG with access to the Account Funds;

d.   An order pursuant to 28 U.S.C. § 2201 declaring that SVBFG was not required to file an administrative claim under 12 U.S.C. § 1821(d) and that SVBFG may therefore pursue its claims in the Adversary Proceeding;

e.   An order pursuant to 28 U.S.C. § 2201 declaring and holding unlawful and setting aside the FDIC-Rs' disallowance of SVBFG's non-deposit claims under 12 U.S.C. § 1821(d) and requiring the FDIC-Rs to pay to SVBFG the full amounts requested;

f.   An order pursuant to 28 U.S.C. § 2201 declaring SVBFG's claims to be valid and proven against the Deposit Insurance Fund to the extent SVBFG's claims cannot be satisfied by the assets in the FDIC-Rs' receiverships, as applicable;

g.     In the alternative, an award of SVBFG's *pro rata* share of SVB's and Bridge Bank's liquidation value as of the time SVB and Bridge Bank were closed and placed into each respective receivership pursuant to Sections 1406 and 681 of the California Financial Code and Sections 91 and 194 of the National Bank Act, as applicable;

h.     An order pursuant to 28 U.S.C. § 2201 declaring that SVBFG is entitled to indemnification and reimbursement from the FDIC-R for any obligations or liabilities asserted against it that arise out of claims for indemnification or contribution from any officers or employees of SVB;

i.     An award of all fees and costs associated with the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims, including any damages or other claims associated with the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims, in an amount to be determined, plus pre- and post-judgment interest, fees, and costs;

j.     An award of pre- and post-judgment interest to the fullest extent permitted by law;

k.     An award of SVBFG's costs and attorneys' fees as may be permitted by law; and

l.     An award to SVBFG of such other relief as may be just.

Dated:      March 5, 2024

/s/ Robert A. Sacks
Robert A. Sacks (SBN 150146)
Adam S. Paris (SBN 190693)
Diane L. McGimsey (SBN 234953)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800

Sverker K. Hogberg (SBN 244640)
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:  (650) 461-5600
Facsimile:  (650) 461-5700

*Attorneys for Plaintiff SVB Financial Group*

SULLIVAN & CROMWELL LLP

COMPLAINT