# Exhibit 7

Fund Number:  10539

Federal Deposit Insurance Corporation
as Receiver for
**Silicon Valley Bank**
**PROOF OF CLAIM**

1. SSN/Tax ID Number: 91-1962278

2. The undersigned _____ James L. Bromley _____ hereby states that the subject

   Financial Institution, now in liquidation ("Failed Institution"), is indebted

3. to _____ SVB Financial Group _____ ("the Claimant") in the sum of

4. Amount of Claim:  $1,933,805,708.13*

5. Description of Claim

   See attached addendum.

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

| 6. Name James L. Bromley | 7. Title Counsel to SVB Financial Group |
|---|---|

| 8. Signature *James L Bromley /RPS* | 9. Date 7/10/2023 |
|---|---|

10. Firm *(If applicable, complete if filing on behalf of claimant)*
Sullivan & Cromwell LLP

11. Address *(Street, City, State, ZIP Code)*
125 Broad St

12. Telephone
+1 (212) 558-4923

NOTE:  The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

* As set forth in the attached addendum, SVB Financial Group also claims (a) any additional amounts that access to SVB Financial Group's records may show were in SVB Financial Group's Deposit Accounts and have not been returned to SVB Financial Group, and (b) damages from its loss of use of such amounts, including interest on such amounts.

OMB Number: 3064-0143
Expiration Date: 09/30/2023

## Federal Deposit Insurance Corporation
# CLAIMANT VERIFICATION

**INSTRUCTIONS:** Complete this form if you have an unclaimed insured deposit and/or an outstanding dividend check associated with a Failed Financial Institution. Provide a copy of your driver's license and copies of any information that would help us promptly identify your account. Submit forms electronically to Depositorservices@fdic.gov or by mail to the FDIC Claims Department at 600 North Pearl Street, Suite 700, Dallas, TX 75201. (Include all supporting documents at the same time). For questions, contact Depositor Claims Agent at 972-761-2112 or at Depositorservices@fdic.gov.

**NOTE:** FDIC will not collect any personal information about individuals except when specifically and knowingly provided by such individuals. Examples of such information are: name, address, e-mail address, phone number, etc. Your submitted information is for internal use only and will not be distributed to any other parties. We will not sell, rent, or loan any identifiable information regarding clients to any third party. Any information you give us is held with utmost care and security, and will not be used in ways to which you have not consented.

1. Name of Closed Bank or Financial Institution

Silicon Valley Bank

2. City and State of Financial Institution

Santa Clara, CA

3. FDIC Reference Number *(i.e. Account Number, Claimant Number, Receivership Certificate Number, Check Number, etc.)*

Fund: 10539

4. Account Owner Name

SVB Financial Group

5. Name *(If different than Account Owner)*

James L. Bromley

6. Current Mailing Address

125 Broad St

| 7. City | 8. State | 9. Zip Code |
|---|---|---|
| New York | New York | 10004 |

| 10. Telephone | 11. SSN/Tax ID Number | 12. SSN/Tax ID Number (Secondary Owner/Claimant) |
|---|---|---|
| +1 (212) 558-4923 | 91-1962278 | |

13. Email Address

bromleyj@sullcrom.com

I, James L. Bromley                                                           , affirm that I am the Deposit Owner or I am claiming funds on behalf of the Deposit Owner indicated above.

I understand that presenting a false or fraudulent claim, in whole or in part, to the Federal Deposit Insurance Corporation may subject me to criminal and/or civil penalties as provided for in 18 U.S.C. §287 and 31 U.S.C. §3729, respectively.

Based on your (Claimant's) physical location, select the appropriate option below.

○ If executed **outside the United States**: "I declare (and verify) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

☑ If executed **within the United States**, its territories, possessions, or commonwealths: "I declare (and verify) under penalty of perjury that the foregoing is true and correct.

Executed on: 7/10/23        Signature of Account Owner or Claimant: *James L Bromley /RPS*

**ADDENDUM TO PROOF OF CLAIM OF DEBTOR SVB FINANCIAL GROUP
AGAINST THE FEDERAL DEPOSIT INSURANCE CORPORATION,
AS RECEIVER FOR SILICON VALLEY BANK**

SVB Financial Group (the "Debtor") hereby files this proof of claim ("Proof of Claim") with the Federal Deposit Insurance Corporation ("FDIC") as receiver (the "FDIC-R") for Silicon Valley Bank ("SVB") and Silicon Valley Bridge Bank, N.A. ("Bridge Bank").[1]

The Debtor files this Proof of Claim without prejudice to its positions that (i) the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), presiding over the Debtor's chapter 11 case styled *In re SVB Financial Group*, Case No. 23-10367 (MG) (the "Chapter 11 Case"), has exclusive jurisdiction to determine the matters that are the subject of this Proof of Claim (and accordingly the FDIC-R does not have jurisdiction), (ii) the matters to which this Proof of Claim relates involve the FDIC in its corporate agency capacity (the "FDIC-C"), as each of Title 12 of the United States Code, the FDIC-C's actions, and the FDIC-R's own instructions make clear, and, therefore, (iii) no proof of claim is required for the Debtor to be paid the approximately $1.93 billion it had on deposit at SVB and then the Bridge Bank given, among other things, the FDIC's March 12, 2023 invocation of Title 12's "systemic risk exception" pursuant to 12 U.S.C. § 1823(c)(4)(G) and concurrent pronouncement that "**all**" depositors of SVB are entitled to access to their deposit funds in full, and "**all**" would be made whole by the FDIC-C and (iv) the automatic stay under section 362 of the Bankruptcy Code applies and any action by the FDIC-C or the FDIC-R to continue to exercise control over the Debtor's assets will continue to violate that stay. Accordingly, this Proof of Claim is being submitted without prejudice and as a prophylactic measure because the filing deadline is upcoming and the FDIC-R has asserted (wrongly) that the Debtor must file a proof of claim to be paid the amount of

---

[1] Additional claims of the Debtor are presented in separate proofs of claim submitted concurrently.

its deposit funds. Pursuant to section 1821(d) of title 12 of the United States Code, the FDIC-R set July 10, 2023 as the last day to file claims with FDIC-R. The Debtor reserves all rights to amend and/or supplement this Proof of Claim at any time and in any respect, and to assert any and all other claims of whatever kind or nature that it has or may have.

**Background**

1.      The Debtor was formerly the holding company of SVB, a state-chartered bank. Prior to March 10, 2023, the Debtor's primary businesses and operations were comprised of SVB; SVB Capital, a venture capital and credit investment platform that focuses on funds management; and SVB Securities LLC, an investment bank. (ECF No. 21, at pp. 3-5 ¶¶ 6-12.)[2]

2.      On March 10, 2023 (the "Closure Date"), the California Department of Financial Protection and Innovation ("DFPI") issued an order taking possession of SVB, and on the same day DFPI appointed FDIC-R as receiver of SVB. At the time of closing, the FDIC-R "immediately transferred to the [Deposit Insurance National Bank of Santa Clara] all insured deposits of Silicon Valley Bank."

3.      On March 12, 2023, the Secretary of the Treasury, acting on the unanimous written recommendations of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System (the "Federal Reserve"), and after consultation with the President of the United States, authorized application of the systemic risk exception to the least-cost resolution provision of the Federal Deposit Insurance Act. Pursuant to this exception, the FDIC-C guaranteed all deposits at SVB. That same day, Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell and FDIC Chairman Martin J. Gruenberg issued

---

[2] References to ECF are to the docket in the Chapter 11 Case.

a press release announcing the invocation by the Executive Branch of the systemic risk exception to "fully protect[] all depositors" of SVB.

4.      Before the opening of business on March 13, 2023, the FDIC-C announced that "all deposits—both insured and uninsured" of SVB had been transferred to the Bridge Bank and stated that depositors would "have full access to their money beginning this morning [March 13], when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities, including online banking."

5.      The Debtor maintained several significant deposit accounts at SVB (the "Deposit Accounts"), including:  (1) an operating account, with account number ending *5270; (2) a Regulation W account, with account number ending *0822[3]; and (3) an SVB Capital operating account, with account number ending *6176.  (Ex. A, FDIC-R_SVB2004_00171), (Ex. B, FDIC-R_SVB2004_00513-516), (Ex. C, FDIC-R_SVB2004_00535-540), (Ex. D, FDIC-R_SVB2004_00555-561.)  As of the Closing Date, Debtor had approximately $2,115,958,220 in bank deposits at Silicon Valley Bank.

6.      The transfer of all insured and uninsured deposits of SVB to the Bridge Bank included the Debtor's Deposit Accounts.  (Ex. E, FDIC-R_SVB2004_00072-00146.)

7.      For a period of days thereafter, the Debtor was able to access its funds at Bridge Bank, before the FDIC-R improperly interfered with its continued efforts to do so.

8.      Following this improper interference, on March 17, 2023 (the "Petition Date"), the Debtor commenced the Chapter 11 Case.  As further discussed herein, the day immediately

---

[3] A Regulation W account is a "segregated, earmarked deposit account with the member bank that is for the sole purpose of securing credit transactions between the member bank and its affiliates." 12 C.F.R. § 223.14.

prior to the Petition Date, the Debtor's deposit accounts still held approximately $1.93 billion, representing nearly all of the Debtor's monies.

9.    The FDIC-R entered an appearance, and is participating, in the Chapter 11 Case, including by seeking affirmative relief from the Bankruptcy Court.[4]  The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    On or about March 27, 2023, the FDIC-R entered into a Purchase and Assumption Agreement ("P&A Agreement") with First-Citizens Bank & Trust Company ("First Citizens") pursuant to which First Citizens purchased substantially all of Bridge Bank's assets (the "First Citizens Transaction").  First Citizens referred to the acquisition as a financial "home run," announcing a $9.8 billion increase in earnings from the first quarter of the prior year as a direct result of its purchase of SVB's assets.

11.    Under the P&A Agreement, First Citizens acquired approximately $110 billion in assets, deposits of $56 billion and loans of $72 billion.  First Citizens acquired the assets at a discount of approximately $16.45 billion, subject to customary adjustments.

**I.    The Debtor's Deposit Account Claims**

12.    As described above, shortly after SVB was placed into receivership, based on the written recommendations of the Boards of the FDIC-C and the Federal Reserve and in consultation with the President of the United States, the Secretary of the Treasury, authorized application of the "systemic risk exception" under 12 U.S.C. § 1823(c)(4)(G) in order to assure

---

[4]  Notice of Appearance and Request for Notice, *In re SVB Financial Group*, No. 23-10367 (Bank. S.D.N.Y.) (MG) (March 19, 2023) (ECF No. 9); Objection to Motion for Entry of Interim and Final Orders (March 20, 2023) (ECF No. 33); Motion to Authorize and Establish a Tax Refund Escrow Account (May 3, 2023) (ECF No. 146).

the financial markets of the safety of deposits.  Pursuant to that action, the FDIC-C fully

protected "**all**" depositors in the resolution of both SVB and Signature Bank by guaranteeing the

full amount of all insured and uninsured deposits of SVB.

13.     Before the opening of business on March 13, 2023, the FDIC-C announced that

"all deposits—both insured and uninsured" of the former Silicon Valley Bank had been

transferred to the Bridge Bank and that depositors would have "full access to their money

beginning this morning [March 13], when Silicon Valley Bridge Bank, N.A., the bridge bank,

opens and resumes normal banking hours and activities, including online banking."

14.     From March 14 to 16, 2023, the Debtor successfully initiated eight wire transfers

from its Deposit Accounts at Bridge Bank to various external recipients.  (ECF No. 203 ¶¶ 2-3.)

On the evening of March 16, 2023, however, the Bridge Bank began to reject wire transfers that

were previously and properly initiated, because the FDIC-R instructed Bridge Bank to place a

hold on the Deposit Accounts and restrict any monies from being taken out of the Deposit

Accounts.  The FDIC-R also instructed Bridge Bank employees to recall the successful wire

transfers by incorrectly informing the recipient banks that the transfers had been made "in error"

and should be canceled.  (*Id.* ¶ 4.)

15.     The FDIC-R further directed the Bridge Bank to assign the Deposit Accounts and

all associated assets and liabilities to the FDIC-R, and the Bridge Bank complied with the FDIC-

R's instruction.  (ECF No. 41 ¶ 6.; Ex. F, (FDIC_R_SVB2004_00001).)

16.     The balances of the Debtor's Deposit Accounts at the time the Bridge Bank

employees blocked the Debtor's access to its accounts on the instruction of the FDIC-R was

approximately $1,933,805,708.13 (the "Account Funds"):  the operating account ending *5270

had a balance of $1,771,057,097.76; the Regulation W account ending *0822 had a balance of

$143,593,717.97; and the SVB Capital operating account ending *6176 had a balance of $19,154,892.40.  (Ex. D (FDIC-R_SVB2004_00541-578), Ex. B, (FDIC-R_SVB2004_00513-516), Ex. C (FDIC-R_SVB2004_00535-540)).)[5]

17.     The Debtor has demanded that both the FDIC-R and the FDIC-C return the Deposit Account Funds to the Debtor, but both the FDIC-R and the FDIC-C refuse to do so.  The Account Funds do not belong to either the FDIC-R or the FDIC-C, and their conduct in preventing the Account Funds from being delivered to the Debtor is unlawful.

18.     The FDIC-C and the FDIC-R are distinct juridical entities, and the FDIC itself consistently and affirmatively relies on the separateness and distinctiveness of the two entities.

19.     The FDIC-R's interference with the Debtor's access to the Account Funds is improper on many levels, but it is particularly unjustified because the FDIC-C acted to guarantee that the Debtor—like all SVB depositors—would have complete and unfettered access to its own Account Funds.  In making that decision, the FDIC-C exercised the judgment, in which the Federal Reserve concurred, and the Secretary of the Treasury, in consultation with the President of the United States, approved, to impose the cost of guaranteeing all uninsured deposits on the Deposit Insurance Fund through a special assessment on certain of the Nation's banks; the obligation to pay the uninsured deposits and the cost of doing so remains with the FDIC-C, not the FDIC-R.  This distinction is critical for a number of reasons, including the fact that the FDIC-C's obligation is unlimited and unconditional, whereas the FDIC-R's obligation is limited to a payment of a pro-rated portion of its available assets.  Therefore, the FDIC-C acted to

---

[5] The approximately $1,933,805,708.13 figure reflects an intercompany receivable of $6,222,681.93 that was unwound.  (Ex. G, App. E).  Without that transaction having been unwound, the operating account ending *5270 would have had a balance of $1,764,834,415.83; the Regulation W account ending *0822 would have had a balance of $143,593,717.97; and the SVB Capital operating account ending *6176 would have had a balance of $19,154,892.40.

guarantee payment of the insured and uninsured balance in the Debtor's Deposit Accounts (and other depositors' deposit accounts), and the FDIC-R has no plausible right or justification to interfere with the FDIC-C's decision to assure payment of those Account Funds.  At least with respect to insured amounts, the Account Funds are required to be paid "as soon as possible" pursuant to 12 U.S.C. § 1821(f).[6]

20.     The Debtor has demanded that the FDIC-C, pursuant to its obligations under 12 U.S.C. §1821(f) and the terms of its invocation of a systemic risk exception, pay to the Debtor the full amount of its uninsured deposits in the Deposit Accounts.  The FDIC-C has ignored and failed to respond to that demand.

21.     Neither the FDIC-R nor the FDIC-C has a valid basis to control, interfere with, or otherwise inhibit the payment of the Account Funds from the Deposit Insurance Fund.  The Account Funds are not assets of and do not belong to the FDIC-R or the FDIC-C, and the FDIC's actions in preventing the payment of those funds to the Debtor are improper.

22.     The FDIC-R has repeatedly acknowledged in the Chapter 11 Case that (i) it will honor the full amount of the Debtor's deposit claim, subject to any appropriate setoff, and (ii) the obligation to pay the Debtor's Account Funds is an obligation to be paid through the Deposit Insurance Fund, which is an obligation of the FDIC-C.  In its March 20, 2023 Objection to the Debtor's First Day Motion filed with the Bankruptcy Court (ECF No. 33), the FDIC-R stated that, "[t]o the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable

---

[6] The FDIC-R's own claims information makes clear that claims for deposits are not subject to the FDIC-R's administrative process.  The Failed Bank Information for Silicon Valley Bank, Santa Clara, CA, published at www.fdic.gov/resources/resolutions/bank-failures/failed-bank-list/silicon-valley.html, identifies creditors as those who "provided a service or product, leased space, furniture, or equipment" to SVB or Bridge Bank and have not yet been paid.  Even the FDIC-R's contact email for its claims process makes plain that the process is not intended for deposit claims:  NonDepClaimsDal@FDIC.gov.

for setoff), such amount will be paid in full through the Deposit Insurance fund." At a hearing before the Bankruptcy Court the next day, on March 21, 2013, counsel for FDIC-R repeated on the record that "to the extent the debtor's claim is allowed and is not subject to set off or has been reduced by amounts that may be entitled to be set off, that claim would be paid by the deposit insurance fund. And that deposit insurance fund is backed by the full faith and credit of the United States."

23.    Nevertheless, the FDIC-R has acted and continues to act to impede the payment to the Debtor the full amount of its Account Funds based on an assertion that it may have potential claims against the Debtor that would give it a claim to "setoff." Not only does the FDIC-R not have any basis for a "setoff"—including because the uninsured balance of Debtor's Account Funds are obligations the <u>FDIC-C</u> owes to the Debtor pursuant to the invocation of the systemic risk exception and there is no mutuality of obligation to support any setoff—but further, any theoretical basis the FDIC-R may have to "setoff" against the Debtor's Account Funds must be based on claims the FDIC-R has ***against*** the Debtor. That is not a matter for the FDIC-R's own administrative claims process.

24.    The FDIC-R only has the statutory authority to determine creditor claims against the receivership. 12 U.S.C. § 1821(d)(4),(5). Thus, by its express terms the FDIC's administrative claims process does not apply to claims against the Debtor. The FDIC-R's own "Notice to Discovered Claimant to Present Proof of Claim" states that the process applies to "claims against the Failed Institution." The FDIC's information page, "When a Bank Fails – Facts for Depositors, Creditors, and Borrowers" distinguishes between depositors, such as the Debtor, and creditors, which include "all trade creditors, employees, taxing entities, and any other creditors who may be owed money by the failed bank." The FDIC's Failed Bank

Information for Silicon Valley Bank, Santa Clara, CA, in turn, includes a section for "Filing Claims" that is limited to "Creditors" and directs <u>creditors</u> that "provided a service or product, leased space, furniture, or equipment" to Silicon Valley Bank or Bridge Bank and have not been paid to submit a claim.[7]

25.    If the FDIC-R believes it has claims against a third party, it must bring an action to recover on those claims.  Here, given the pending Chapter 11 Case, the FDIC-R must file a proof of claim, and the Bankruptcy Court must adjudicate that claim and authorize any purported right to setoff against the amounts of the Account Funds.  The Bankruptcy Court has exclusive jurisdiction to determine any setoff rights of the FDIC-R to the extent any exist.  The FDIC-R's acts in impeding the payment to the Debtor of the over $1.93 billion that the FDIC committed to pay to the Debtor pursuant to the systemic risk exception is unjustifiable and unlawful, including as in violation of the automatic stay.

26.    In addition, to the extent it has any "setoff" rights against the Debtor, the FDIC-R could at most only withhold payment for which there is mutuality of obligation between the Debtor and the FDIC-R, and only to the extent of a mutual countervailing debt.  For multiple reasons, any purported setoff could not justify the FDIC-R's seizure and continued withholding of more than $1.93 billion of the Debtor's Account Funds.

27.    First, without identification and adjudication of the specific claims no setoff in any amount is permissible because there is no right of setoff for contingent claims.

---

[7] The FDIC-R's administrative claims process for Silicon Valley Bank is also not designed to assess claims from depositors.  The FDIC-R's instructions for filing a claim state: "Claims for insured deposits are claims against the FDIC in its corporate capacity as deposit insurer – not against the Receiver."  The FDIC's Claims Portal states that a depositor does not need to register if "[a]nother bank assumed all of the deposits from your old bank," which is precisely what happened here.  The FDIC-R's contact email for its administrative claims process makes clear that the process is not intended for depositors: "NonDepClaimsDal@FDIC.gov."

28.     Second, the FDIC-R has no basis to control, block, or restrict payment of the Debtor's uninsured Account Funds.  While normally uninsured deposits will not be paid at all, except to the extent the FDIC-R recovers sufficient assets in the receivership to satisfy them in whole or in part, the situation here is very different.  In this case, the Secretary of the Treasury, acting on the unanimous recommendations of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve, and after consultation with the President of the United States, authorized application of the systemic risk exception to the least-cost resolution provision of the Federal Deposit Insurance Act.  Pursuant to this exception, the FDIC-C guaranteed the uninsured deposits of <u>all</u> Silicon Valley Bank depositors, to be paid through the Deposit Insurance Fund.  The FDIC-C decided it would recover any loss to the Deposit Insurance Fund arising from such action through the levy of one or more "special assessments" on insured depository instructions, *see* 12 U.S.C. § 1823(c)(4)(G)(ii), and a program for such assessments was announced by the FDIC-C on May 11, 2023.

29.     This statutory framework provides that, in those instances where a systemic risk exception is invoked to protect uninsured deposits, those amounts are borne by assessing the insured depository institutions.  The FDIC-R thus has no valid legal basis to restrict the FDIC-C from causing the Deposit Insurance Fund to pay to the Debtor the full amount of its uninsured Account Funds, and its continued interference with the Debtor's requests to access its Account Funds, including the affirmative steps it has taken and continues to take to exercise control over the Debtor's Account Funds, is wrongful and unlawful.

30.     By taking steps to restrict the Debtor's access to its Account Funds, interfering with wire transfers, sweeping (or otherwise removing) certain amounts from the Deposit Accounts, and/or directing any of the foregoing, as well as by reason of the Bridge Bank

Transaction and/or the First Citizens Transaction, the FDIC-R has denied the Debtor access to, control of, and use of its Account Funds. As a result, the Debtor has been unable to, among other things, move the Account Funds to another institution, invest the Account Funds, or transfer the Account Funds to interest-bearing accounts. The Debtor has been further damaged, and will continue to be damaged until such time as Debtor is paid the full amount of the Account Funds.

31.     Accordingly, Debtor asserts a liquidated claim for the Account Funds in the amount of $1,933,805,708.13 plus interest and an unliquidated claim for (a) any additional amounts that access to the Debtor's records may show were in the Debtor's Deposit Accounts and have not been returned to Debtor, and (b) damages from its loss of use of such amounts, including interest on such amounts and the cost of any prospective debtor in possession financing.

**II.    Conversion of Debtor's Property**

32.     As explained above, the FDIC-R has no right or entitlement to hold the Debtor's Account Funds, or otherwise to impede the FDIC-C from paying the amount of the seized Account Funds to the Debtor.

33.     The FDIC-R's wrongful exercise of control over and custody of the Debtor's Account Funds constitutes the wrongful conversion of those Account Funds, for which he FDIC-R is liable to the Debtor.

34.     To the extent that the FDIC-C has refused to pay the Debtor with the full amount of the Deposit Accounts or to pay the Debtor the approximately $1,933,805,708 that was in those Accounts when the Debtor's access to the Deposit Accounts was blocked, upon the request or at the behest of the FDIC-R, the FDIC-R's conduct constitutes tortious interference for which the FDIC-R is liable to the Debtor.

## III.    General Reservation of Rights

35.    Prior to the Closure Date, SVB was the custodian of most of the books, records, and other data related to the Debtor's business.  Many of the Debtor's books and records were seized by FDIC-R and transferred to the custody of First Citizens.  Additionally, First Citizens transferred some, or copies of some, of the Debtor's documents and information to the FDIC-R in response to the FDIC-R's requests that it do so.  In either case, these actions have made it difficult for the Debtor to obtain its information for the preparation of this Proof of Claim. Accordingly, the Debtor is in the unique and inequitable position of not being in control of much of the information relating to its former operations and financial affairs, including because the FDIC-R has interfered with and prevented the Debtor from gaining access to, or custody of, its documents and information.

36.    The Debtor is entitled to the return of, and/or access, to its documents and information, and the failure of the FDIC-R to provide those documents and enable that access notwithstanding the Debtor's efforts to obtain it is wrongful.

37.    The Debtor has endeavored to support the claims asserted herein with documentation, where such documentation was reasonably available to the Debtor.  To the extent FDIC-R believes any documentation is missing from this Proof of Claim, it is the result of the FDIC-R's refusal to provide the Debtor with full access to such information.

38.    Given the Debtor's limited access to much of the information relating to this Proof of Claim, the Debtor is still in the process of verifying the accuracy or completeness of all the information.

39.    Accordingly, the Debtor reserves the right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or that it may have, including, but not limited to, interest, costs of collection, the cost of obtaining debtor-

in-possession financing, and other expenses incurred prior to payment in full of the amounts described above.  In addition, as part of the claims reconciliation process to occur in connection with the Debtor's Chapter 11 Case, claims will be asserted against Debtor's estate up until the Bankruptcy Court-ordered bar date, some of which may be properly attributable to Silicon Valley Bank.  The Debtor further reserves its rights to assert any and all claims that arise as a result of such claims against the bankruptcy estate.

40.     The filing of this Proof of Claim shall not be deemed a waiver or release of any claims whatsoever.

41.     The filing of this Proof of Claim shall not be deemed to constitute a waiver of any rights that the Debtor may have against FDIC-R, the FDIC-C or any other entity.

42.     The Debtor reserves all rights to present any and all claims in any forum of competent jurisdiction.

43.     All notices concerning this Proof of Claim should be sent to:

> SVB Financial Group
> 387 Park Ave S.
> New York, NY  10016
> Attn:   William C. Kosturos
>
> -and-
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY  10004
> Attn:   Robert A. Sacks
>        James L. Bromley
>        Adam S. Paris
>        Christian P. Jensen
> Telephone:     (212) 558-4000
> Facsimile:     (212) 558-3588
> Email:  sacksr@sullcrom.com
>        bromleyj@sullcrom.com
>        parisa@sullcrom.com
>        jensenc@sullcrom.com

-13-

1888 Century Park East, Suite 2100
Los Angeles, CA 90067
Attn:   Diane L. McGimsey
Telephone      (310) 712-6600
Facsimile:      (310) 712-8800
Email: mcgimseyd@sullcrom.com

Fund Number: 10539

## Federal Deposit Insurance Corporation
### as Receiver for
### Silicon Valley Bank
## PROOF OF CLAIM

1. SSN/Tax ID Number: 91-1962278

2. The undersigned _____ James L. Bromley _____ hereby states that the subject

   Financial Institution, now in liquidation ("Failed Institution"), is indebted

3. to _____ SVB Financial Group _____ ("the Claimant") in the sum of

4. Amount of Claim:  See attached addendum.

5. Description of Claim

   See attached addendum.

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

| 6. Name | 7. Title |
|---|---|
| James L. Bromley | Counsel to SVB Financial Group |

| 8. Signature | 9. Date |
|---|---|
| *James L. Bromley /RB* | 7/10/2023 |

10. Firm *(If applicable, complete if filing on behalf of claimant)*
Sullivan & Cromwell LLP

11. Address *(Street, City, State, ZIP Code)*
125 Broad St

12. Telephone
+1 (212) 558-4923

NOTE: The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

### ADDENDUM TO PROOF OF CLAIM OF SVB FINANCIAL GROUP AGAINST THE FEDERAL DEPOSIT INSURANCE CORPORATION,  AS RECEIVER FOR SILICON VALLEY BANK AND SILICON VALLEY BRIDGE BANK, N.A.

SVB Financial Group (the "Debtor") hereby files this proof of claim ("Proof of Claim") with the Federal Deposit Insurance Corporation ("FDIC") as receiver (the "FDIC-R") for Silicon Valley Bank ("SVB") and Silicon Valley Bridge Bank, N.A. ("Bridge Bank") (the "FDIC-R").[1]

SVB was the custodian of most of the books, records, and other data related to Debtor's businesses, pursuant to a written intercompany agreement, the Master Intercompany Services Agreement ("MISA"), that defines its obligations as custodian with respect to the Debtor's books, records and other data.  (ECF No. 21, at p. 4 ¶ 9.)  To date, the FDIC-R has refused to provide the Debtor with full access to its books and records, including information that might assist in preparing this Proof of Claim.  In addition, the FDIC has refused to provide the Debtor with access to information sufficient to determine which liabilities of SVB and Bridge Bank were transferred to First Citizens and which liabilities were retained by the FDIC-R.  Accordingly, the Debtor reserves the right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or that it may have, including, but not limited to, interest, costs of collection, the cost of obtaining debtor in possession financing, and other expenses incurred prior to payment in full of the amounts described above.  In addition, as part of the claims reconciliation process to occur in connection with the Debtor's chapter 11 case, *In re SVB Financial Group*, No. 23-10367 (MG) (Bankr. S.D.N.Y.) (the "Chapter 11 Case"), claims will be asserted against Debtor's estate up until the Bankruptcy Court-ordered bar date, some of which may be properly attributable to SVB.  The Debtor further reserves its rights to assert any

---

[1] Additional claims of the Debtor are presented in separate proofs of claim submitted concurrently.

CONFIDENTIAL

and all claims that arise as a result of such claims against the bankruptcy estate.

### Background

1.      The Debtor was formerly the holding company of SVB, a state-chartered bank. Prior to March 10, 2023, the Debtor's primary businesses and operations were comprised of SVB; SVB Capital, a venture capital and credit investment platform that focuses on funds management; and SVB Securities LLC, an investment bank.  (ECF No. 21, at pp. 3-5 ¶¶ 6-12.)[2]  SVB directly employed all personnel providing services to the Debtor via several intercompany services arrangements, including the Master Intercompany Services Agreement, dated as of July 19, 2022 ("MISA").

2.      On March 10, 2023 (the "Closure Date"), the California Department of Financial Protection and Innovation ("DFPI") issued an order taking possession of SVB, and on the same day DFPI appointed FDIC-R as receiver of SVB.  At the time of seizure, the FDIC-R "immediately transferred to the [Deposit Insurance National Bank of Santa Clara] all insured deposits of Silicon Valley Bank."  The FDIC later transferred all deposits and a significant balance of SVB's assets to the Bridge Bank.

3.      On March 17, 2023 (the "Petition Date"), the Debtor filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the chapter 11 case styled *In re SVB Financial Group*, Case No. 23-10367 (Bank. S.D.N.Y.) (MG) (the "Chapter 11 Case").  As further discussed herein, the day immediately prior to the Petition Date, the Debtor's deposit accounts still held approximately $1.93 billion, representing nearly all of the Debtor's monies.

---

[2] References to "ECF" are to the docket in the Chapter 11 Case (defined below).

CONFIDENTIAL

4.      On or about March 27, 2023, the FDIC-R entered into a Purchase and Assumption Agreement ("P&A Agreement") with First-Citizens Bank & Trust Company ("First Citizens") pursuant to which First Citizens purchased substantially all of Bridge Bank's assets (the "First Citizens Transaction").

5.      Under the P&A Agreement, First Citizens acquired approximately $110 billion in assets, deposits of $56 billion and loans of $72 billion.  First Citizens acquired the assets at a discount of approximately $16.45 billion, subject to customary adjustments.

## I.    Dissipation of Silicon Valley Bank's Assets

6.      The FDIC-R caused substantial losses to the receivership and its stakeholders by conducting an expedited auction process for SVB's assets that limited the universe of potential bidders (the "Auction").  According to reports, the FDIC-R initially limited participation in the Auction to banks, of which there were few that were large enough to absorb a bank of SVB's size.[3]  On March 20, 2023, the FDIC-R announced that non-bank financial firms would be permitted to submit bids on the asset portfolios and, in partnership with banks, to submit whole-bank bids.  But even after opening up bids to non-bank firms, the FDIC-R took several actions that placed such firms at a disadvantage, including, according to reports, offering bank bidders, but not non-bank bidders, low-cost financing and loss-share arrangements on SVB's loans. This reduced the time and diligence needed by bank bidders to submit binding bids, to the detriment of non-bank bidders.  And rather than allow non-bank bidders sufficient time to raise private funds and perform adequate diligence, the FDIC-R insisted on closing a deal by the end of

---

[3] *See* WSJ, How the FDIC Rigged the SVB Auction (Apr. 18, 2023), available at
https://www.wsj.com/articles/fdic-nonbanks-silicon-valley-bank-sale-martin-gruenberg-609af47.

**CONFIDENTIAL**

March 26, thereby foreclosing the opportunity to obtain the highest and best bids reasonably available for SVB's assets.

7.    Members of the FDIC's own board have acknowledged the limitations placed on non-banks in the FDIC-R's auction processes and their potential to drive down bid prices. Following the Auction, FDIC board member Jonathan McKernan was quoted as saying that "As a practical matter, nonbanks haven't had a real chance to actually compete against banks in the FDIC's failed bank auctions.  I can't say for sure whether it would have made a difference, but it does raise a real question as to whether a better process would have resulted in a higher price for the assets or perhaps even a different winning bidder."[4]

8.    At the conclusion of its unsuccessful Auction, the FDIC-R entered into the P&A Agreement with First Citizens Bank & Trust Company ("First Citizens"), through which First Citizens acquired $110.1 billion in total assets, $56.5 billion of deposits, and $72.1 billion of existing loans at a discount of $16.45 billion.

9.    As a result of the transaction, which was referred to in the media as a "sweetheart deal," First Citizens reported a more than 30-fold increase in profits for the first three months of 2023, announcing a total net income of $9.5 billion, or $653.64 a share, in the first quarter, up from $264 million, or $16.70 a share, in the same period last year, due to a $9.8 billion gain from the acquisition of SVB's assets.[5]  First Citizens referred to the acquisition as a financial "home run."

---

[4] Bloomberg, FDIC's Busted-Bank Sales Leave Private Equity Firms Empty-Handed (May 11, 2023), available at https://www.bloomberg.com/news/articles/2023-05-11/fdic-s-busted-bank-sales-leave-private-equity-firms-empty-handed.

[5] *E.g.*, Opinion, *The FDIC's Sweetheart Bank Deal for SVB*, Wall Street Journal (March 27, 2023); CNBC, *First Citizens takeover of SVB won't solve the bank run problem*, (March 27, 2023).  *See also*, *FDIC chair takes heat from lawmakers over cut-price deal that gave Silicon Valley Bank to First Citizens: "Maybe we could have been better,"* Fortune (March 31, 2023).

**CONFIDENTIAL**

10.    On information and belief, the assets of SVB sold, less the liabilities assumed, were worth in excess of the price paid by First Citizens, had such assets been liquidated in a prudent and reasonable manner.

11.    The Debtor has been, and may continue to be, damaged as a result.

**II.    Lease Rejection and Related Damages**

12.    The Debtor was party to certain lease agreements that were entered into for the sole benefit of SVB.  The Debtor had no operations at relevant lease premises, but was listed as a party on the leases.  On information and belief, prior to the Closure Date, SVB, as the primary beneficiary, was responsible for paying these lease obligations.  After the Closure Date, however, the Debtor paid fees and will incur liabilities associated with the rejection of at least 13 leases for SVB branch offices that the FDIC-R and/or First Citizens determined to vacate.  The Debtor estimates, based on the information currently available, that the damages for rejection of these leases may reach $22 million.  To the extent these amounts are not paid or reimbursed by First Citizens, the FDIC-R is liable.[6]

13.    The Debtor also understands that First Citizens has not and may not in the future fully remove all furniture, fixtures and equipment at these locations, and that the owners of those properties may pursue additional damages for costs associated with removal of abandoned furniture, fixtures and equipment and cleaning of the lease premises.  To the extent these damages are not paid or reimbursed by First Citizens, the FDIC-R is liable.

---

[6] Ex. A; Exs. A-1-A-13.  To the extent not included in electronic submissions, Exs. A-1 through A-13 will be attached to media included with mailed submissions.

**CONFIDENTIAL**

### III.    Vendor Contract Claims

14.    The Debtor was a party to certain agreements with vendors (the "<u>Vendors</u>") related to services, goods and software licensing for the primary benefit of SVB (the "<u>Vendor Contracts</u>").  On information and belief, prior to the Closure Date, SVB, as the primary beneficiary, was responsible for the payment of Vendor Contracts.  After the Closure Date, First Citizens has paid certain Vendors for outstanding pre- and post-Closing obligations incurred in connection with the Vendor Contracts.  Notwithstanding these payments, there continue to be unpaid obligations outstanding in connection with certain of the Vendor Contracts, including expenses associated with the termination of such Vendor Contracts.  This has caused and may continue to cause Debtor to incur administrative expenses in the Debtor's Chapter 11 Case and other damages.  To the extent these amounts are not paid or reimbursed by First Citizens, the FDIC-R is liable.

15.    In addition, with respect to certain Vendor Contracts, the Debtor has incurred and will incur in the future certain costs associated with the rejection of the contracts prior to their expiration dates, including approximately 489 contracts[7] that First Citizens has indicated it would stop paying on July 1, which may result in the Vendors seeking early termination damages.[8]  To the extent Vendors seek such payments and First Citizens does not pay or reimburse the Debtor, the FDIC-R is liable.

### IV.    Claims by Legacy Employees Approved Post-Petition Date

16.    Former SVB employees have filed claims for certain employee benefits that were approved by the relevant benefit provider after the Petition Date.  Additional such claims may

---

[7] This number is approximate because Debtor has not received copies of many relevant contracts.

[8] Ex. A-14.

-6-

have been made prior to the Closure Date that have not been acted on but may in the future be approved by the relevant benefit provider.  These employees were not employed by the Debtor, so the FDIC-R is responsible for paying these benefits to the extent not assumed by First Citizens.

**V.      Deferred Compensation Claims**

17.      Prior to the Closure Date, the Debtor was the sponsor of certain employee benefit plans, including the SVB Financial Group Deferred Compensation (the "Plan").  Pursuant to the terms of the Plan, liabilities owed to participants are the sole responsibility of the designated "Employer" of such participant.[9]  On information and belief, because all Plan participants were employed by SVB, the FDIC-R is responsible for paying these claims to the extent they are not assumed by First Citizens.  Further, to the extent the Debtor incurs any costs or liabilities associated with deferred compensation claims that were properly the liability of SVB, the FDIC-R is liable to the Debtor for such amounts.

18.      Additionally, certain SVB employees may have received deferred compensation in the form of warrants.  To the extent any liabilities are owed, First Citizens or the FDIC-R is responsible for the payment of those liabilities.

**VI.      Intercompany Agreements**

19.      The Debtor and SVB are party to several intercompany service arrangements, including, without limitation, the MISA, pursuant to which, among other things, SVB employees provided services to the Debtor and served as custodian of the Debtor's books and records.

20.      The Debtor hereby asserts any claims, including, without limitation, any claims for damages, losses, fees, costs, expenses, indemnification, contribution, contributory

---

[9] Ex. B, § 11.3.

-7-

**CONFIDENTIAL**

negligence, advancement, and reimbursement, arising under or relating to the Intercompany Agreements.

## VII.  Intercompany Receivables

21.    Prior to the Closure Date, the Debtor incurred expenses on behalf of SVB, which expenses resulted in intercompany receivables owed by SVB and are reflected in the books and records of the Debtor and SVB.

22.    On approximately March 17, 2023, Bridge Bank reversed or unwound approximately $6,222,681.93 of intercompany receivables owed and previously transferred to the Debtor.[10]

23.    The Debtor continues to investigate claims for additional intercompany receivables and asserts a claim on account of any and all intercompany receivables owed to the Debtor by SVB.

## VIII.  Employee Costs

24.    Prior to the Closure Date, certain SVB employees performed work for the benefit of the Debtor pursuant to the MISA and other intercompany arrangements and the costs of those services were allocated to the Debtor.  Following the Closure Date, First Citizens has improperly attempted to allocate certain employee costs to the Debtor for work performed for the benefit of SVB, not the Debtor, including costs related to SVB branch operations.  To date, First Citizens has attempted to allocate responsibility for approximately $19.1 million in employee and related costs to the Debtor, substantial portions of which appear to be improperly allocated.[11]  The

---

[10] Ex. C, App. E.

[11] Ex. D; Ex. E.

-8-

FDIC-R is responsible for any improperly allocated costs (to the extent not assumed by First Citizens).

## IX.    Tax Allocations

25.    The Debtor and SVB and its subsidiaries are parties to an Amended Tax Allocation Agreement, dated as of January 1, 2016.  Pursuant to the Amended Tax Allocation Agreement,[12] the Debtor and SVB filed consolidated tax returns and all Federal corporate income tax, California franchise tax and certain state income or franchise tax liabilities were paid by the Debtor.  To the extent that SVB would be subject to Federal corporate income tax or California franchise tax if it had filed a separate income or franchise tax return, SVB would then be responsible for paying to the Debtor the sums required by Paragraph VII of the Amended Tax Allocation Agreement.

26.    Prior to the Closure Date, the Debtor paid federal and certain state taxes due and owing by the consolidated tax group.  To the extent SVB and its subsidiaries have not paid the Debtor for (i) all amounts owed under the Amended Tax Allocation Agreement, or (ii) any other taxes paid on behalf of SVB and/or its subsidiaries the Debtor asserts an unliquidated claim against the FDIC-R on account of any and all taxes paid on behalf of SVB and/or its subsidiaries.

27.    In addition, on account of the Debtor's payment of federal, state and local taxes on behalf of SVB and its subsidiaries, the Debtor is, or will be, entitled to tax refunds, the exact amount of which is still being assessed.

28.    In the event the FDIC-R seeks to repudiate the Amended Tax Allocation Agreement, the Debtor asserts a claim for any and all damages or claims that arise from such

---

[12] Ex. F (Tax Sharing Agreement).

CONFIDENTIAL

repudiation (and the Debtor expressly reserves all rights to oppose any such attempt to repudiate the Amended Tax Allocation Agreement).

## X.    Indemnification Claims

29.    The Debtor's bylaws provide for the indemnification of all Debtor directors and officers.  Prior to the Closure Date, the Debtor's directors each served concurrently as directors of SVB and each of Debtor's officers was an employee of SVB.  To the extent such persons (or any other officers or employees of SVB) assert indemnification or contribution or similar claims against the Debtor, the Debtor asserts claims for reimbursement of such obligations or liabilities against the FDIC-R.

## XI.    Avoidance Action Claims

30.    Prior to the commencement of the Debtor's Chapter 11 Case, the Debtor may have made certain transfers to or for the benefit of SVB, which transfers may give rise to claims or causes of action against SVB, and now FDIC-R in its capacity as receiver for SVB.  These transfers may be avoided pursuant to certain claims and causes of action pursuant to chapter 5 of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 542, 544, 547 and 548.

## XII.    Fees, Costs, and Expenses

31.    As a direct result of the actions of the FDIC-R, the Debtor has been forced to incur substantial fees, costs, and expenses, including, without limitation, attorneys' fees, financial and other professional fees, consulting fees, costs, and expenses.  These fees, costs, and expenses relate not only to the Debtor's Chapter 11 Case, but also to the numerous other actions and proceedings that have been, or will be, commenced in connection with the FDIC-R's conduct.  As a result, the Debtor hereby asserts claims for all such fees, costs, and expenses it

-10-

CONFIDENTIAL

incurred on or after the Closure Date and going forward, until such time as those fees, costs, and expenses are paid in full.

## XIII.  Trademark Infringement

32.    While operating Bridge Bank, FDIC used Debtor's trademarks and sold assets to First Citizens in a way that wrongfully implied Bridge Bank had the right to transfer those trademarks to First Citizens.  First Citizens has then proceeded to use said trademarks without Debtor's permission.  To the extent First Citizens is not liable, FDIC and Bridge Bank are liable for trademark infringement.

## XIV.  Interest

33.    The Debtor asserts a claim against the FDIC-R for interest, at a reasonable market rate, on account of amounts owed to the Debtor pursuant to its liquidated claims and any and all contingent and/or unliquidated claims from the Closure Date until receipt of payment.

## XV.  Warrants

34.    The Debtor is a third party beneficiary under various agreements between SVB and its customers pursuant to which SVB received warrants to purchase equity interests in its customers and agreed to sell such warrants to the Debtor in the ordinary course of business at an agreed price.  On information and belief, as of the Petition date, the Debtor had a right to purchase warrants from SVB.  The Debtor asserts claims against the FDIC-R for the value of these warrants and the Debtor's lost opportunity.

## XVI.  Equity Interests

35.    The Debtor owns 100% of the outstanding stock of SVB.  Without waiving any other claim set forth herein, the Debtor hereby asserts a claim, pursuant to 12 U.S.C. § 1821(d)(11)(A)(v), for the right to distribution of all funds, property, or interests remaining

CONFIDENTIAL

after all depositors, creditors, other claimants and administrative expenses of the receivership are paid.

## XVII.  Other Contingent, Unliquidated Claims

36.    The Debtor asserts contingent, unliquidated claims against the FDIC-R to the extent it is obligated or becomes obligated on account of SVB.

## XVIII. Administrative Claims

37.    Claims set forth in this Proof of Claim arising after the Closure Date or that relate to conduct of the FDIC-R are entitled to administrative expense priority under 12 U.S.C. § 1821(d)(11)(A)(i).

## XIX.  General Reservation of Rights

38.    Prior to the Closure Date, SVB was the custodian of most of the books, records, and other data related to the Debtor's business.  Many of the Debtor's books and records were seized by FDIC-R and transferred to the custody of First Citizens.  Additionally, First Citizens transferred some, or copies of some, of the Debtor's documents and information to the FDIC-R in response to the FDIC-R's requests that it do so.  In either case, these actions have made it difficult for the Debtor to obtain its information for the preparation of this Proof of Claim. Accordingly, the Debtor is in the unique and inequitable position of not being in control of, and not having access to, much of the information relating to its former operations and financial affairs, including because the FDIC-R has interfered with and prevented the Debtor from gaining access to, or custody of, its documents and information.  In addition, the FDIC has refused to provide the Debtor with access to information sufficient to determine which liabilities of SVB and Bridge Bank were transferred to First Citizens and which liabilities were retained by the FDIC-R.

**CONFIDENTIAL**

39.     The Debtor is entitled to the return of, and/or access, to its documents and information, and the failure of the FDIC-R to provide those documents and enable that access notwithstanding the Debtor's efforts to obtain it is wrongful.  The FDIC-R is liable to the Debtor for any damages the Debtor may incur as a result of being deprived of access to its documents and information.

40.     The Debtor has endeavored to support the claims asserted herein with documentation, where such documentation was reasonably available to the Debtor.  To the extent FDIC-R believes any documentation is missing from this Proof of Claim, it is the result of the FDIC-R's refusal to provide the Debtor with full access to such information.

41.     Given the Debtor's limited access to much of the information relating to this Proof of Claim, the Debtor is still in the process of verifying the accuracy or completeness of all the information.

42.     Accordingly, the Debtor reserves the right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or that it may have, including, but not limited to, interest, costs of collection, the cost of obtaining debtor-in-possession financing, and other expenses incurred prior to payment in full of the amounts described above.  In addition, as part of the claims reconciliation process to occur in connection with the Debtor's Chapter 11 Case, claims will be asserted against Debtor's estate up until the Bankruptcy Court-ordered bar date, some of which may be properly attributable to Silicon Valley Bank.  The Debtor further reserves its rights to assert any and all claims that arise as a result of such claims against the bankruptcy estate.

43.     The filing of this Proof of Claim shall not be deemed a waiver or release of any claims whatsoever.

-13-

CONFIDENTIAL

44.    The filing of this Proof of Claim shall not be deemed to constitute a waiver of any rights that the Debtor may have against FDIC-R, the FDIC-C or any other entity.

45.    The Debtor reserves all rights to present any and all claims in any forum of competent jurisdiction.

46.    All notices concerning this Proof of Claim should be sent to:

> SVB Financial Group
> 387 Park Ave S.
> New York, NY  10016
> Attn:   William C. Kosturos
>
> -and-
>
> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY  10004
> Attn:   Robert A. Sacks
>              James L. Bromley
>              Adam S. Paris
>              Christian P. Jensen
> Telephone:    (212) 558-4000
> Facsimile:    (212) 558-3588
> Email: sacksr@sullcrom.com
>              bromleyj@sullcrom.com
>              parisa@sullcrom.com
>              jensenc@sullcrom.com
>
> 1888 Century Park East, Suite 2100
> Los Angeles, CA 90067
> Attn:   Diane L. McGimsey
> Telephone    (310) 712-6600
> Facsimile:    (310) 712-8800
> Email: mcgimseyd@sullcrom.com

-14-

CONFIDENTIAL

Fund Number: 10539

## Federal Deposit Insurance Corporation
### as Receiver for
### Silicon Valley Bank
# PROOF OF CLAIM

1. SSN/Tax ID Number: 91-1962278

2. The undersigned _____ James L. Bromley _____ hereby states that the subject

   Financial Institution, now in liquidation ("Failed Institution"), is indebted

3. to _____ SVB Financial Group _____ ("the Claimant") in the sum of

4. Amount of Claim: See attached addendum.

5. Description of Claim

   See attached addendum.

The undersigned further states that no part of said debt has been paid, that the Claimant has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said claim or any part thereof.

| 6. Name | 7. Title |
|---|---|
| James L. Bromley | Counsel to SVB Financial Group |

| 8. Signature | 9. Date |
|---|---|
| *James L. Bromley /JLB* | 7/10/2023 |

10. Firm *(If applicable, complete if filing on behalf of claimant)*
Sullivan & Cromwell LLP

11. Address *(Street, City, State, ZIP Code)*
125 Broad St

12. Telephone
+1 (212) 558-4923

NOTE: The penalty for knowingly making or inviting reliance on a false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than 30 years or both (18 U.S.C. Section 1007).

**ADDENDUM TO PROOF OF CLAIM OF DEBTOR SVB FINANCIAL GROUP
AGAINST THE FEDERAL DEPOSIT INSURANCE CORPORATION,
<u>AS RECEIVER FOR SILICON VALLEY BANK</u>**

SVB Financial Group (the "<u>Debtor</u>") hereby files this proof of claim ("<u>Proof of Claim</u>") with the Federal Deposit Insurance Corporation ("<u>FDIC</u>") as Receiver for Silicon Valley Bank ("<u>SVB</u>") and Silicon Valley Bridge Bank, N.A. ("<u>Bridge Bank</u>") (the "<u>FDIC-R</u>") on behalf of certain participants in the SVB Financial Group Deferred Compensation Plan (the "<u>Plan</u>").

SVB was the custodian of most of the books, records, and other data related to Debtor's businesses, pursuant to a written intercompany agreement, the Master Intercompany Services Agreement ("<u>MISA</u>"), that defines its obligations as custodian with respect to the Debtor's books, records and other data.  (ECF No. 21, at p. 4 ¶ 9.)  To date, the FDIC has refused to provide the Debtor with full access to its books and records, including information relating to this Proof of Claim.  In addition, the FDIC has refused to provide the Debtor with access to information sufficient to determine which liabilities of SVB and Bridge Bank were transferred to First Citizens and which liabilities were retained by the FDIC-R.  Finally, this Proof of Claim concerns claims by a diffuse set of participants in the Plan – the value and breadth of whose claims may be difficult to calculate.  Accordingly, the Debtor reserves the right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature, including but not limited to on behalf of employees or former employees of SVB or Bridge Bank.

## **<u>Background</u>**

1.      The Debtor was formerly the holding company of SVB, a state-chartered bank. Prior to March 10, 2023, the Debtor's primary businesses and operations were comprised of SVB; SVB Capital, a venture capital and credit investment platform that focuses on funds management; and SVB Securities LLC, an investment bank.  (ECF No. 21, at pp. 3-5

¶¶ 6-12.)  SVB directly employed all personnel providing services to the Debtor via several intercompany services arrangements, including MISA.

2.      On March 10, 2023 (the "Closure Date"), SVB was closed on the order of the California Department of Financial Protection and Innovation ("DFPI"), and on the same day DFPI appointed FDIC-R as receiver of SVB.  At the time of closing, the FDIC-R "immediately transferred to the Deposit Insurance National Bank of Santa Clara all insured deposits of Silicon Valley Bank."  The FDIC later transferred all deposits and a significant balance of SVB's assets to Bridge Bank.

3.      On March 17, 2023 (the "Petition Date"), the Debtor filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a voluntary petition for relief under the Bankruptcy Code, *In re SVB Financial Group*, Case No. 23-10367 (MG) (the "Chapter 11 Case").  As further discussed herein, the day immediately prior to the Petition Date, the Debtor's deposit accounts still held approximately $1.93 billion, representing nearly all of the Debtor's monies.

4.      On or about March 27, 2023, the FDIC-R entered into a Purchase and Assumption Agreement ("P&A Agreement") with First-Citizens Bank & Trust Company ("First Citizens") pursuant to which First Citizens purchased substantially all of Bridge Bank's assets (the "First Citizens Transaction").  First Citizens referred to the acquisition as a financial "home run," announcing a $9.8 billion increase in earnings from the first quarter of the prior year as a direct result of its purchase of SVB's assets.

5.      Under the P&A Agreement, First Citizens acquired approximately $110 billion in assets, deposits of $56 billion and loans of $72 billion.  First Citizens acquired the assets at a discount of approximately $16.45 billion, subject to customary adjustments.

## I.    Plan Participants

6.    Prior to the Closure Date, the Debtor was the sponsor of certain employee benefit plans, including the Plan.  Pursuant to the terms of the Plan, liabilities owed to participants may be solely owned by the designated "Employer," of such participant.[1]  On information and belief, all Plan participants were employed by SVB and not SVBFG.  Accordingly, if SVB was the "Employer" of any Plan participant, the FDIC-R may be solely responsible for paying any obligations owed to such participants under the Plan to the extent they were not assumed by First Citizens.

7.    The Debtor, in its capacity as Plan Sponsor, through this filing asserts the rights of the Plan participants for whom SVB was their Employer (as defined in the Plan) to seek preserve the rights of the Plan participants to obtain relief from the receivership, regardless of whether they have personally filed their own proof of claim.

## II.    General Reservation of Rights

8.    Prior to the Closure Date, SVB was the custodian of most of the books, records, and other data related to the Debtor's business.  Many of the Debtor's books and records were seized by FDIC-R and transferred to the custody of First Citizens.  Additionally, First Citizens transferred some, or copies of some, of the Debtor's documents and information to the FDIC-R in response to the FDIC-R's requests that it do so.  In either case, these actions have made it difficult for the Debtor to obtain its information for the preparation of this Proof of Claim.  The Debtor is entitled to the return of, and/or access, to its documents and information, and the failure of the FDIC-R to provide those documents and enable that access notwithstanding the Debtor's efforts to obtain it is wrongful.

---

[1]    *See* Ex. A (the Plan, ¶ 11.3).

9.      The Debtor has endeavored to support the claims asserted herein with documentation, where such documentation was reasonably available to the Debtor.  To the extent FDIC-R believes any documentation is missing from this Proof of Claim, it is the result of the FDIC-R's refusal to provide the Debtor with full access to such information.

10.     Given the Debtor's limited access to much of the information relating to this Proof of Claim, the Debtor is still in the process of verifying the accuracy or completeness of all the information.

11.     Finally, this Proof of Claim concerns claims by a diffuse set of participants in the Plan, the value and breadth of whose claims may be difficult to calculate, and is being asserted to protect the rights of Plan participants to assert claims against the receivership for benefits owed under the Plan.  A list of Plan participants known to the Debtor is identified on Exhibit B.

12.     Debtor reserves the rights of said Plan participants and/or any other current or former SVB employees to file their own claims or to supplement this claim with additional information needed to support the claim.

13.     The filing of this Proof of Claim shall not be deemed a waiver or release of any claims whatsoever by any individual or entity.

14.     The filing of this Proof of Claim shall not be deemed to constitute a waiver of any rights that the Debtor may have against FDIC-R, the FDIC-C or any other entity or individual.

15.     The filing of this Proof of Claim does not affect the right of any Plan participant to file a claim on his or her own behalf.

16.     Any and all claims may be presented in any forum of competent jurisdiction.

17.     All notices concerning this Proof of Claim should be sent to any Plan participants identified by the FDIC-R, including but not limited to the individuals listed on Exhibit B.