# EXHIBIT C

**TRANSFER AGREEMENT**

**(ALL DEPOSITS)**


**by and between**


**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**RECEIVER OF SILICON VALLEY BANK**
**Santa Clara, CA**


**and**


**SILICON VALLEY BRIDGE BANK, NA**

**DATED**


**March 13, 2023**

## TRANSFER AGREEMENT

This Transfer Agreement (the "Agreement"), dated March 13, 2023, is by and between the FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF SILICON VALLEY BANK (the "Receiver"), and SILICON VALLEY BRIDGE BANK, NA (the "Bridge Bank").

## RECITALS

A.  On March 10, 2023, the California Department of Financial Protection and Innovation closed Silicon Valley Bank (the "Failed Bank") pursuant to applicable law and appointed the Corporation as its Receiver.

B.  In accordance with 12 U.S.C. § 1821(n), the Receiver organized the Bridge Bank, which is chartered by the Office of the Comptroller of the Currency as a national bank.

C.  The Receiver desires to transfer certain liabilities, including certain deposit liabilities, and contribute certain assets of the Failed Bank to the Bridge Bank, and the Bridge Bank desires to accept and assume such liabilities and assets in the manner and on the terms and conditions more fully set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the Parties agree as follows:

## AGREEMENT

## ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement have the meanings set forth herein.

**"Acquired Subsidiary"** means any Subsidiary of the Failed Bank that is not a Retained Subsidiary.

**"Advance Dividend"** has the meaning set forth in Section 4.08.

**"Agreement"** has the meaning set forth in the preamble.

**"Asset Recipient"** means any Person that acquires, directly or indirectly, a Failed Bank Record in connection with the transfer of any Transferred Asset or Assumed Liability from the Bridge Bank.

**"Assigning Subs"** has the meaning set forth in Section 6.17.

**"Assumed Deposits"** means the Deposits.

**"Assumed Liabilities"** has the meaning set forth in Section 2.02(a).

**"Bank Closing Date"** means the close of business of the Failed Bank on the date on which the Corporation was appointed Receiver.

**"Bank Premises"** means the bank buildings, facilities, and storage and service facilities, together with any adjacent parking that are owned or leased by the Failed Bank.

**"BDI Rejected Contract Schedule"** has the meaning set forth in Section 2.06(b)(i).

**"Book Value"** means with respect to any Transferred Asset or Assumed Liability, the dollar amount thereof stated on the Failed Bank Records as of the Bank Closing Date, as adjusted by the Receiver, in its discretion, for differences in accounts, suspense items, and unposted debits and credits, as well as for any adjustments, or corrections, as provided in Article III, or setoffs, whether voluntary or involuntary. The Book Value of an Acquired Subsidiary will be determined from the investment in that Subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet for the Failed Bank based on the Equity Method of Accounting. Without limiting the generality of the foregoing, the Book Value of (a) an Assumed Liability and (b) a Loan will reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans), if any, as of the Bank Closing Date and any adjustments related to unearned insurance premiums or protective advances (sums paid by the Failed Bank to protect its lien position or collateral, including sums paid for ad valorem taxes, hazard insurance, credit life insurance, accident and health insurance, and vendor's single interest insurance), as determined by financial reporting purposes.

**"Bridge Bank Response Team"** means employees of the Corporation identified by the Receiver who will work closely with the Bridge Bank to facilitate communication and other interactions between the Receiver and the Bridge Bank.

**"Bridge-Created Records"** means business records created by the Bridge Bank related to Transferred Assets or Assumed Liabilities but excludes any business records benefitting from any attorney-client privilege, attorney-work-product doctrine, or any other cognizable privilege or protection of the Bridge Bank.

**"Bridge FB Records"** means the Failed Bank Records relating to the Transferred Assets and Assumed Liabilities and excludes:

(a) any writings, documents and other items that are protected from discovery by the attorney-client privilege, the attorney-work-product doctrine or any other cognizable privilege or protection of the Failed Bank;

(b) personnel files, pertaining to (i) former employees of the Failed Bank who were no longer employed by the Failed Bank as of the Bank Closing Date, and (ii) employees of the Failed Bank who were employed by the Failed Bank as of the Bank Closing Date and for whom the Receiver is unable to obtain a waiver to release such Failed Bank Records to the Bridge Bank; and

(c) corporate governance records of the Failed Bank.

**"Business Day"** means a day other than a Saturday, Sunday, federal legal holiday, legal holiday under the laws of the State where the Failed Bank is located, or a day on which the Washington, D.C. headquarters of the Corporation is closed.

**"Call Asset/Liability"** has the meaning set forth in Section 2.04.

**"Call Assignment"** means an assignment in the form attached hereto as Exhibit 2.04(c)/2.06.

**"Call Notice"** has the meaning set forth in Section 2.04.

**"Claims"** means any and all actual or potential claims, rights to payment or other relief, demands, obligations, damages, actions and causes of action, suits, controversies, interest, costs, attorneys' fees, expenses, or judgments whatsoever, direct or indirect, in law or in equity, whether known or unknown, now existing or hereafter arising, whether contingent or liquidated, contractual, extra-contractual, non-contractual, statutory, in tort or otherwise, of every kind, nature, and description.

**"Contaminated Property"** means any real property owned, leased, or held by the Failed Bank (a) for which environmental reports exist on the Bank Closing Date that (i) identify environmental concerns or suspected recognized environmental conditions, historical recognized environmental conditions, or controlled recognized environmental conditions, or (ii) state that additional environmental investigation is required or recommended, or (b) that is subject, as of the Bank Closing Date, to any existing, pending or threatened investigation, order, remediation, or Litigation relating to (i) the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or petroleum products, or (ii) the condition of such real property or interest therein owned or held by the Failed Bank which violates any applicable federal, state, or local law or regulation concerning environmental protection or the handling of hazardous substances or petroleum products.

**"Copy"** means a print out, replication, or reproduction of any paper, disk, tape, film, or memory or storage device, whether it is digital, electronic or any other material or object on or in which any words, images, objects, code, or other symbols are written, recorded, or encoded, whether permanent or transitory.

**"Corporation"** means the Federal Deposit Insurance Corporation in its corporate capacity.

**"Covered Records"** means the Off-Site Records, the Custodial FB Records, the Bridge FB Records, and the Bridge-Created Records but excludes all Transferred Bank Records.

**"Custodial FB Records"** means Failed Bank Records that are not Off-Site Records or Bridge FB Records.

**"Data Equipment Lease"** means any agreement pursuant to which the Failed Bank has rights to use Leased Data Management Equipment, excluding Intercompany Obligations.

**"Deposit"** means a deposit as defined in 12 U.S.C. § 1813(l), including outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the Failed Bank Records and excluding the amounts in any account identified on the Failed Bank Records as "blocked" or "frozen," and amounts in any other accounts with respect to which the Corporation determines that the accounts should be "blocked" or "frozen," pursuant to economic or trade restrictions administered or enforced by the United States Treasury Department Office of Foreign Assets Control.

**"Eligible Individuals"** has the meaning set forth in Section 6.11(a).

"**Equity Method of Accounting**" means the carrying value of a bank's investment in a subsidiary is originally recorded at cost but is adjusted periodically to record as income the bank's proportionate share of the subsidiary's earnings or losses and decreased by the amount of cash dividends or similar distributions received from the subsidiary.

"**ERISA**" has the meaning set forth in Section 6.11(a).

"**Failed Bank**" has the meaning set forth in the recitals.

"**Failed Bank Assessment Area**" means the most recent Community Reinvestment Act assessment area of the Failed Bank.

"**Failed Bank Records**" means, with regard to the Failed Bank, records as defined in 12 C.F.R. § 360.11(a)(3), including: (a) trial balances, (b) supporting schedules, (c) federal, state and foreign tax filings of any nature, including supporting ledgers, tax opinions, work papers, (d) other financial statements and related schedules, and (e) the general ledger and subsidiary ledgers and supporting schedules.

"**Fair Market Value**" means "market value" as defined in 12 C.F.R. § 323.2(h) for real property or the market value established by Failed Bank's policies and procedures for other assets, as reasonably determined by the Receiver.

"**FHLB Assets**" means any Federal Home Loan Bank stock, any redemption value of cancelled Federal Home Loan Bank stock held by the Failed Bank as a Federal Home Loan Bank member or non-member, any membership with a Federal Home Loan Bank, and any contract between the Failed Bank and one or more Federal Home Loan Banks governing the terms of any advance, deposit, 12 CFR Part 1268 acquired member asset sales, other residential whole loan sales, residential loan servicing, letter of credit, 12 CFR Part 1291 affordable housing obligations, or 12 CR Part 1292 targeted grant.

"**Filed Proceeding**" means any court action, administrative or regulatory action, suit, appeal or arbitration, which has been filed or commenced, or subsequent appeal or continuation of the proceeding.

"**Health Plan**" means an insurance policy or contract, medical or hospital service agreement, membership or subscription contract, or other arrangement under which health services for individuals are provided or the expenses of such services are paid, to the extent such plan is available to qualified employees at their election.

"**Indemnitees**" means (a) the Bridge Bank, and (b) the directors, officers, employees and agents of the Bridge Bank and its Subsidiaries who were not directors, officers, employees or agents of the Failed Bank or any Subsidiary of the Failed Bank prior to the Bank Closing Date.

"**Intercompany Obligations**" means (a) any due to/due from between the Failed Bank and Acquired Subsidiaries shown on the Failed Bank Records, and (b) any contract, agreement, lease, license, loan agreement, note, guaranty, surety, commitment, or other arrangement, whether secured or unsecured, excluding Qualified Financial Contracts, evidencing the liabilities and obligations (i) between the Failed Bank and one or more Acquired Subsidiaries, or (ii) between the Failed Bank and a third party undertaken by the Failed Bank for the benefit of one or more Acquired Subsidiaries or one or more Acquired Subsidiaries' Subsidiaries.

BDI Transfer Agreement

**"Loans"** has the meaning set forth in Schedule 6.14.

**"Lease"** means (a) any lease, license, occupancy agreement, or other agreement that provides the Failed Bank the right to occupy or use real property or improvements thereon, and (b) any lease, license, occupancy agreement, or other agreement pursuant to which the Failed Bank provides to a third party the right to occupy or use real property or improvements thereon, excluding Intercompany Obligations.

**"Leased Data Management Equipment"** means any equipment, computer hardware, computer software (and the lease or licensing agreements related thereto), computer networking equipment, printers, fax machines, copiers, document scanners, data tape systems, data tapes, DVDs, CDs, flash drives, telecommunications and check processing equipment, ATMs, and any other electronic storage media leased by the Failed Bank as of the Bank Closing Date that is, was, or could have been used by the Failed Bank in connection with data management activities.

**"Litigation"** means any actual, existing, pending, or threatened cause of action, court action, administrative or regulatory action, claim, suit, appeal, proceeding, arbitration, mediation, bankruptcy action, or foreclosure to which the Failed Bank is a party or has rights to assert a claim or defense.

**"Off-Site Records"** means Failed Bank Records that (a) are in the custody of a third-party pursuant to a Service Contract, and (b) are (i) physical records in paper or other analog formats, such as audio or video tapes, or (ii) digital records contained on a portable storage device, such as removable media or external drives, that are not accessible electronically pursuant to the applicable Service Contract.

**"Off-Site Bridge Records"** has the meaning set forth in Section 2.06(c)(i)(3).

**"Optional Contracts"** means Service Contracts, Leases, and Data Equipment Leases, excluding Qualified Financial Contracts that the Failed Bank is a party to and QFC Related Items with respect thereto.

**"Option Effective Date"** means (a) for Retained Optional Contracts, the effective date identified by the Bridge Bank on the Rejected Contracts Schedule that must not be (i) less than thirty (30) days after the delivery of the updated Rejected Contracts Schedule that includes any newly identified Retained Optional Contracts, and (ii) more than thirty (30) days after the expiration of the Option Period, and (b) for Optional Contracts not identified as a Retained Optional Contract, the last day of the Option Period.

**"Option Period"** has the meaning set forth in Section 2.06(b)(i).

**"Parties"** means the Receiver and the Bridge Bank.

**"Person"** means any individual, corporation, partnership, joint venture, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated organization, other form of entity or organization permitted by law, or government or any agency or political subdivision thereof.

**"PII"** means any information about an individual, including (a) any information that can be used to distinguish or trace an individual's identity, such as name, social security number, date and

place of birth, mother's maiden name, or biometric records, (b) any other information that is linked or linkable to an individual, such as medical, educational, financial, or employment information, and (c) all other information identified as personally identifiable information by any applicable statute or regulation.

**"Primary Indemnitor"** means any Person (excluding the Corporation) obligated to indemnify or insure, or otherwise make payments (including payments made resulting from Claims asserted by an Indemnitee) in connection with the Claims covered under Article VIII, including any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

**"Pro Forma Statement"** has the meaning set forth in Section 3.01.

**"Put Asset/Liability"** has the meaning set forth in Section 2.05.

**"Put Assignment"** means an assignment in the form attached hereto as Exhibit 2.04(b)/2.05.

**"Qualified Beneficiaries"** has the meaning set forth in Section 6.11(a).

**"QFC Related Item"** means, with respect to a Qualified Financial Contract, (a) each claim under such Qualified Financial Contract that is described in 12 U.S.C. § 1821(e)(9)(A)(i)(II) or (III) and (b) all property securing or other credit enhancement for such Qualified Financial Contract or any claim described in 12 U.S.C. § 1821(e)(9)(A)(i)(II) or (III) under such Qualified Financial Contract.

**"Qualified Financial Contract"** means a "qualified financial contract" as defined in 12 U.S.C. § 1821(e)(8)(D).

**"Receiver"** has the meaning set forth in the preamble to this Agreement.

**"Retained Assets"** has the meaning set forth in Section 2.03(b).

**"Retained Claims"** means all of the Failed Bank's right, title and interest in and to the following:

(a) any Claims and Litigation against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank arising out of any action or omission of such Person in such capacity, (ii) any financial institution bond, commercial crime policies, directors and officers liability insurance, or any other professional liability insurance policy of the Failed Bank or person employed or retained by the Failed Bank or Subsidiary of the Failed Bank, (iii) any shareholder of the Failed Bank or of any Subsidiary of the Failed Bank, in its capacity as shareholder or (iv) any other Person for any loss arising from a breach of any duty, tortious conduct of any kind whatsoever, violation of any law, or any other wrongdoing (except loss resulting from such Person's failure to pay on a loan made by the Failed Bank or any Subsidiary of the Failed Bank), provided that, for the purposes hereof, the acts, omissions, or other events giving rise to any such Retained Claim occurred on or before the Bank Closing Date, regardless of when any such Claim is discovered and regardless of whether any such Claim is made with respect to a financial institution bond, commercial crime policies, directors' and officers' liability insurance, or any other professional liability insurance or

similar insurance policy of the Failed Bank in force as of the Bank Closing Date, provided further, that notwithstanding the foregoing or any other provision of this Agreement, all QFC Related Items with respect to each Transferred QFC are excluded from "Retained Claims";

(b) any Claims and Litigation relating to any Retained Assets;

(c) criminal restitution, including rights thereto or forfeiture orders; and

(d) all Claims of the Receiver related to avoidable transfers arising under 12 U.S.C. § 1821(d)(17).

**"Retained Liabilities"** has the meaning set forth in <u>Section 2.02(b)</u>.

**"Retained Litigation"** has the meaning set forth in <u>Section 2.02(b)(i)</u>.

**"Retained Optional Contracts"** has the meaning set forth in <u>Section 2.06(b)(i)</u>.

**"Retained QFC"** means a Qualified Financial Contract to which the Failed Bank is a party that is included on <u>Schedule 1.01</u> and, notwithstanding anything in this Agreement to the contrary, all QFC Related Items with respect to such Qualified Financial Contract.

**"Retained Subsidiary"** means the Subsidiaries of the Failed Bank to the extent included on <u>Schedule 1.02</u>.

**"Retention Period"** has the meaning set forth in <u>Section 5.02</u>.

**"Revised Policies"** has the meaning set forth in <u>Schedule 6.14</u>.

**"Secured Obligations"** means liabilities and obligations of every nature or kind, accrued, fixed, absolute, contingent, or otherwise of the Failed Bank, to the extent any such liability or obligation is secured by a mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to (a) a Transferred Asset, or (b) any interest in or right to a Transferred Asset or any portion or proceeds thereof; provided, however, "Secured Obligations" excludes all liabilities and obligations relating to Qualified Financial Contracts.

**"Service Contracts"** means the contracts pursuant to which goods or services are provided to or by the Failed Bank, including bookkeeping operations, data processing, deposit processing, credit, debit and gift card operations, and credit or loan processing services, but excluding Intercompany Obligations, Qualified Financial Contracts, and Data Equipment Leases, Retained Assets, Retained Liabilities, the safe deposit business, the safekeeping business, the trust business, loan servicing contracts pursuant to which the Failed Bank services loans for third parties or a third party services loans for the Failed Bank, MERSCORP, Inc., and Mortgage Electronic Registration Systems, Inc.

**"Serviced Assets"** has the meaning set forth in <u>Schedule 6.14</u>.

**"Servicing Termination Date"** has the meaning set forth in <u>Section 9.13</u>.

**"Settlement Agent"** has the meaning set forth in <u>Section 3.03</u>.

**"Settlement Designee"** has the meaning set forth in <u>Section 3.03</u>.

**"Shared Services"** has the meaning set forth in Section 6.16(a).

**"Subsidiary"** has the meaning set forth in 12 U.S.C. § 1813(w)(4).

**"Supplier"** has the meaning set forth in Section 6.16(a).

**"Supplier Agreement"** has the meaning set forth in Section 6.16(a).

**"Supplier Charges"** has the meaning set forth in Section 6.16(a).

**"Termination Date"** means the earlier of (i) the Bridge Bank loses its status as a "bridge depository institution" pursuant to 12 U.S.C. § 1821(n)(10), and (ii) the time that the Receiver is no longer the sole shareholder of the Bridge Bank.

**"Transferred Assets"** has the meaning set forth in Section 2.03(a).

**"Transferred Bank Records"** means (a) Off-Site Records subject to a Retained Optional Contract as of the Option Effective Date pursuant to Section 2.06(c), (b) certain Custodial FB Records identified by the Receiver as of the time such records are removed from the Bridge Bank's custody pursuant to Section 5.02(a), and (c) certain Custodial FB Records identified by the Receiver as of the time the Receiver notifies the Bridge Bank that such records have been electronically collected and stored by the Receiver.

**"Transferred Litigation"** means all Litigation to the extent that the Failed Bank is a claimant or asserting a claim or counterclaim but excluding the Retained Litigation and Retained Claims.

**"Transferred Optional Contract"** has the meaning set forth in Section 2.06(b)(ii).

**"Transferred QFC"** means a Qualified Financial Contract to which the Failed Bank is a party, excluding the Retained QFCs, and notwithstanding anything in this Agreement to the contrary, all QFC Related Items with respect to such Qualified Financial Contract.

**"Underserved Area"** means a census track designated as an underserved middle-income nonmetropolitan track on the most recent List of Middle-Income Non-Metropolitan Distressed or Underserved Geographies as published by the Federal Financial Institutions Examination Council on its website. A list of any Bank Premises located in an Underserved Area is attached as Schedule 6.15(b).

**"Withdrawal Notice"** has the meaning set forth in Schedule 6.14.

**ARTICLE II**
**TRANSFER OF LIABILITIES AND ASSETS**

**Section 2.01  Effective Date.**     This Agreement is effective as of the Bank Closing Date.

**Section 2.02  Liabilities Assumed by Bridge Bank.**

(a)  Assumed Liabilities.     The Receiver transfers and assigns to the Bridge Bank, and the Bridge Bank accepts and assumes and will pay, perform, and discharge the liabilities and obligations of every nature or kind, accrued, fixed, absolute, contingent, or otherwise of the

Failed Bank under and with respect to the contracts and obligations listed below, excluding the Retained Liabilities (collectively, the "Assumed Liabilities"):

(i)     Assumed Deposits;

(ii)     Secured Obligations; provided that the assumption of any liability pursuant to this Section 2.02(a)(ii) is limited to the Fair Market Value, as of the Bank Closing Date, of the Transferred Assets that secure such Secured Obligations;

(iii)     Intercompany Obligations;

(iv)     Transferred Assets; and

(v)     as listed on Schedule 2.02(a)(which schedule will be finalized in conjunction with the Pro Forma Statement).

(b) Retained Liabilities.     The Receiver retains, and the Bridge Bank has no interest in or liability for, the liabilities and obligations listed below (collectively, the "Retained Liabilities"):

(i)     any (A) Claims or Litigation related to (1) the Retained Assets or any other asset, liability or obligation not assumed by the Bridge Bank pursuant to this Agreement, (2) the Receiver's exercise of any of its statutory powers and rights, or (3) this Agreement; and (B) Litigation to the extent that either the Receiver or the Failed Bank is a defendant or defending a claim or counter-claim (collectively, everything described in (A) and (B), the "Retained Litigation"); and

(ii)     any other obligation or liability not expressly assumed by the Bridge Bank pursuant to Article II.

**Section 2.03   Transfer of Assets and Certain Contracts to the Bridge Bank.**

(a) Transferred.     The Receiver contributes and assigns to the Bridge Bank, and the Bridge Bank accepts and assumes all right, title and interest of the Receiver in and to the Transferred QFCs, the FHLB Assets, and all other rights, assets, and property of all kinds, real and personal, tangible, and intangible and all related Transferred Litigation, Claims, including, without limitation, all Claims relating to Assumed Deposits, rights, interests, and receivables, excluding all right, title, or interest in the Retained Assets and any related rights, interests, and receivables (collectively, the "Transferred Assets").

(b) Retained.     The Receiver retains all of, and the Bridge Bank has no interest in the Claims, rights, assets, and property of all kinds, real or personal, tangible or intangible, and all related rights, interests, and receivables relating to the following, excluding any QFC Related Item with respect to Transferred QFCs (collectively, the "Retained Assets"):

(i)    Retained Subsidiaries and amounts due from, and any other liabilities and obligations of, Retained Subsidiaries to the Failed Bank and any Claims or rights of the Failed Bank against any Retained Subsidiary;

(ii)    Retained Litigation and Retained Claims, and (A) any property, contract or agreement that must be retained in order to continue such Retained Litigation or assert such Retained Claims (to the extent the property, contract or agreement is identified prior to the date that is eighteen (18) months after the Bank Closing Date), and (B) any collateral securing any Retained Litigation;

(iii)    any criminal restitution or forfeiture orders arising out of crimes against the Failed Bank or issued in favor of the Failed Bank or the Receiver;

(iv)    any loan or extension of credit to, or other agreement with or for the benefit of any officer, director, or Person acting as an agent of the Failed Bank or its Subsidiaries or any related Person of any of the foregoing;

(v)    (A) commercial crime policies, financial institution bonds, and any other similar insurance policy of the Failed Bank, (B) property, public liability, fire, extended coverage and any other similar insurance policy of the Failed Bank, (C) bank owned life insurance or any other similar insurance policy of the Failed Bank, and (D) directors' and officers' liability insurance, or any other professional liability insurance or any other similar insurance policy of the Failed Bank, including, in the case of (A) through (D), any premium refunds, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;

(vi)    any tax allocation agreement or other agreement involving the filing of tax returns, tax payments, tax liabilities, or the allocation of tax assets or liabilities among members of the consolidated group in which the Failed Bank is a member, and any legal or equity interest in, or rights to, the Failed Bank's tax attributes, credits, receivables, net operating losses or deductions;

(vii)    Optional Contracts and any collateral securing those obligations;

(viii)    Retained QFCs;

(ix)    any agreement establishing the compensation, benefits or terms of employment for any director, officer or employee or groups thereof;

(x)    [intentionally omitted];

(xi)    any agreement or document establishing a Deposit;

(xii)    Contaminated Property;

(xiii)    goodwill (as such term is defined in the instructions to the report of condition prepared by banks examined by the Corporation in accordance with 12 C.F.R. Part 304.3) and core deposit intangibles; and

(xiv)    assets or contracts listed on Schedule 2.03(b)(which schedule will be finalized in conjunction with the Pro Forma Statement).

**Section 2.04  Receiver's Right to Call Assets and Liabilities.**    Until the later of (i) the date that is six (6) months after the Bank Closing Date, and (ii) two (2) months after the completion of the Pro Forma Statement, the Receiver has the right to request that the Bridge Bank assign to the Receiver any Transferred Asset or any Assumed Liability upon receipt of a notice (a "Call Notice") from the Receiver identifying the Transferred Asset or Assumed Liability to be assigned by the Bridge Bank to the Receiver (a "Call Asset/Liability"). Within ten (10) days after the Bridge Bank's receipt of a Call Notice, the Bridge Bank must (i) deliver an executed Call Assignment, or (ii) if the assignment of the Call Asset/Liability is prohibited, subject to a counterparty consent or otherwise restricted pursuant to law or the terms of the agreements related to the Call Asset/Liability, deliver a notice to the Receiver detailing any applicable restrictions and cooperate with the Receiver in negotiating with the counterparty to facilitate the assignment to the Receiver on terms acceptable to the Receiver. On the date a Call Assignment is executed by the Bridge Bank (i) the Call Assignment for the Call Asset/Liability will be effective, and (ii) the Call Asset/Liability will be a Retained Asset, and Retained Liability, as appropriate. All amounts related to a Call Asset/Liability (i) received by the Bridge Bank after the effective date of its related Call Assignment will belong to the Receiver, and (ii) that remain unpaid after the effective date of its related Call Assignment will be paid by the Receiver. Any payments between the Parties related to a Call Asset/Liability will be made pursuant to Section 3.03.

**Section 2.05  Receiver's Right to Put Assets and Liabilities.**    Until the later of (i) the date that is six (6) months after the Bank Closing Date, and (ii) two (2) months after the completion of the Pro Forma Statement, the Receiver has the right to assign any asset or liabilities identified by the Receiver, excluding Retained Liabilities and claims against the Receiver which are proved to the satisfaction of the Receiver (a "Put Asset/Liability") by delivering a Put Assignment to the Bridge Bank. The Bridge Bank must execute each Put Assignment provided by the Receiver no later than ten (10) days after its receipt thereof. On the date a Put Assignment for a Put Asset/Liability is executed by the Bridge Bank (i) the Put Assignment will be effective, and (ii) the related Put Asset/Liability will be a Transferred Asset or Assumed Liability, as appropriate, under the terms of this Agreement. All amounts related to a Put Asset/Liability (i) received by the Receiver after the effective date of its related Put Assignment will belong to the Bridge Bank, and (ii) that remain unpaid after the effective date of its related Put Assignment will be paid by the Bridge Bank. Any payments between the Parties related to a Put Asset/Liability will be made pursuant to Section 3.03.

**Section 2.06  Bridge Bank's Option on Optional Contracts.**

(a) Performance of Optional Contracts.    The Bridge Bank agrees to comply with the terms of, perform obligations related to, and pay all amounts accruing under the Optional

Contracts, including the timely payment of all rent, taxes, fees, charges, maintenance, utilities, insurance and assessments, that accrue or relate to the period beginning after the Bank Closing Date and ending on the Option Effective Date with regard to each Optional Contract. During the period the Bridge Bank is obligated to perform under the Optional Contracts, the Bridge Bank has all rights and benefits under the Optional Contracts that would have otherwise been available to the Failed Bank.

(b) <u>Option</u>.

(i)    Option; BDI Rejected Contract Schedule.    The Bridge Bank has the option, during the one hundred twenty (120) day period immediately after the Bank Closing Date (the "<u>Option Period</u>"), to assume or reject each Optional Contract from the Receiver. If the Bridge Bank chooses to reject an Optional Contract during the Option Period, the Bridge Bank will prepare and provide the BDI Rejected Contract Schedule, or an update thereto, to the Settlement Agent that reflects every Optional Contract rejected by the Bridge Bank and the applicable Option Effective Date (the "<u>Retained Optional Contracts</u>") each time a Retained Optional Contract is added to the BDI Rejected Contract Schedule. Promptly after the Bank Closing Date, the Settlement Agent will provide to the Bridge Bank the form spreadsheet that the Bridge Bank must use to identify the Retained Optional Contracts (the "<u>BDI Rejected Contract Schedule</u>"). Each rejected Retained Optional Contract will be a Retained Asset and the Bridge Bank will have no further right or obligation in connection with those agreements as of the applicable Option Effective Date.

(ii)    Optional Contracts Assumed.    Notwithstanding anything in this Agreement to the contrary, any Optional Contract not rejected by the Bridge Bank as a Retained Optional Contract will be assumed by the Bridge Bank, and included within the definition of Transferred Assets, as of the Option Effective Date (the "<u>Transferred Optional Contracts</u>").

(iii)    Assignment; Option Effective Date.    The Receiver hereby assigns and the Bridge Bank hereby assumes, without further action by either the Receiver or the Bridge Bank, all of the Receiver's rights, interests, obligations and liabilities of every nature or kind, accrued, fixed, absolute, contingent or otherwise in, under or related to the Transferred Optional Contacts, including amounts accrued or liabilities incurred on or prior to the Bank Closing Date (to the extent such are not Retained Liabilities) as of the Option Effective Date.

(iv)    Settlement.    If there is any liability for amounts due incurred prior to the Bank Closing Date pursuant to any Assumed Optional Contract that is not shown on the Pro Forma Statement, the Receiver will reimburse the Bridge Bank for such amount pursuant to <u>Section 3.03</u>.

(c) <u>Off-Site Records</u>.

    (i)    Identifying Off-Site Bridge Records.   Prior to the expiration of the Option Period, with regard to the Off-Site Records, the Bridge Bank must:

    (1) interview current Bridge Bank employees that were also Failed Bank employees who have knowledge related to the Off-Site Records and provide notes or transcripts of such interviews to the Receiver;

    (2) provide to the Receiver copies of all information available as of the Bank Closing Date related to the contents of the Off-Site Records such as indexes, inventories, or logs;

    (3) identify, to the extent possible, any Failed Bank Records related to the Transferred Assets and the Assumed Liabilities that are included within the Off-Site Records ("Off-Site Bridge Records") and provide a list of those Off-Site Bridge Records to the Receiver;

    (4) certify to the Receiver that, to the Bridge Bank's knowledge based on the information described in Section 2.06(c)(i)(1) and (2), the identified Off-Site Bridge Records comprise all of the Off-Site Records related to the Transferred Assets and Assumed Liabilities; and

    (5) preserve all Off-Site Records subject to Receiver's right to direct the management, custody, and handling of any Off-Site Records that are not Off-Site Bridge Records.

    (ii)    Retained Optional Contracts-Off-Site Bridge Records become Bridge FB Records.   On or before the Option Effective Date for any Service Contract related to the Off-Site Records that Bridge Bank identifies as a Retained Optional Contract pursuant to Section 2.06(b)(i), the Bridge Bank must (1) take custody of the Off-Site Bridge Records, and (2) certify to the Receiver that, to the Bridge Bank's knowledge based on the information shared with the Receiver, the Bridge Bank has taken custody of the Off-Site Bridge Records.  The Off-Site Bridge Records subject to any Retained Optional Contract become Bridge FB Records subject to Article V on the applicable Option Effective Date.

    (iii)    Retained Optional Contracts-Remaining Records are Transferred Records. On the Option Effective Date that a Service Contract related to Off-Site Records becomes a Retained Optional Contract, the Off-Site Records subject to such Retained Optional Contract that are not Off-Site Bridge Records become Transferred Bank Records and the Bridge Bank will have no further obligation with regard to such Transferred Bank Records pursuant to this Agreement.

    (iv)    Transferred Optional Contracts-Off-Site Records.   All Off-Site Records covered by a Transferred Optional Contract become either Bridge FB Records or

Custodial FB Records, as applicable, on the applicable Option Effective Date and are thereafter subject to <u>Article V</u>.

(d) <u>Facilitation – Leases</u>.    The Receiver will facilitate (i) the assumption, assignment, or sublease of any Transferred Optional Contract that is a Lease (if such Lease is not assignable by the Receiver to the Bridge Bank pursuant to <u>Section 2.06(b)(iii)</u>), or (ii) the negotiation of new leases by the Bridge Bank; provided that the Receiver is not obligated to engage in litigation, make payments to the Bridge Bank or to any third party in connection with facilitating any such assumption, assignment, sublease, or negotiation or commit to any obligation to third parties.

(e) <u>Surrender – Leases</u>.    Before the Option Effective Date relating to a Retained Optional Contract that is a Lease, the Bridge Bank will (i) surrender and cease occupancy of any property subject to such Lease, (ii) arrange for the removal of all furniture, equipment and personalty owned, or leased under separate contract by the Bridge Bank and located on the property subject to the such Lease, and (iii) surrender such property in the condition and as required by the Receiver.

(f) <u>Surrender – Leased Data Management Equipment</u>.    Before the Option Effective Date relating to a Retained Optional Contract that is a Data Equipment Lease, the Bridge Bank will relinquish and deliver such Leased Data Management Equipment pursuant to the Receiver's directions. Prior to relinquishing any such Leased Data Management Equipment, the Bridge Bank will, unless otherwise requested by the Receiver, (i) remove all data from such Leased Data Management Equipment in a manner that renders it unrecoverable and is otherwise acceptable to the Receiver, and (ii) certify to the Receiver that the Bridge Bank has performed its obligations under this <u>Section 2.06(f)</u>.

**Section 2.07  <u>Employee Benefit Plans; Health Plans</u>.**

(a) <u>Employee Benefit Plans</u>.    Notwithstanding anything in this Agreement to the contrary, no defined benefit plan or defined contribution plan is a Transferred Asset or Transferred Liability unless and until the Receiver exercises its option to transfer a defined contribution plan to the Bridge Bank pursuant to <u>Section 2.05</u> after the Bank Closing Date.

(b) <u>Health Plan</u>.

(i)    Failed Bank as Sponsor.    If the Failed Bank was the sponsor of a Health Plan, the Receiver contributes and assigns the Health Plan to the Bridge Bank and the Bridge Bank accepts and assumes and agrees to pay, perform and discharge the liabilities and obligations of every nature or kind, accrued, fixed, absolute, contingent or otherwise of the Failed Bank under and with respect to the Health Plan.

(ii)    Bank Holding Company as Sponsor.    If there is a bank holding company that owned the Failed Bank and is the sponsor of a Health Plan, the Bridge Bank may request that the Receiver request that the sponsorship of the Health Plan be assigned to the Bridge Bank. If the bank holding company agrees and the terms and scope of the assignment are acceptable to the Receiver and the Bridge Bank, the Bridge Bank may assume sponsorship of the Health Plan.

**Section 2.08  Manner of Conveyance; Nonrecourse.**    THE CONVEYANCE OF ALL TRANSFERRED ASSETS AND ASSUMED LIABILITIES BY THE RECEIVER TO THE BRIDGE BANK UNDER THIS AGREEMENT IS MADE "AS IS", "WHERE IS", WITHOUT RECOURSE OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

## ARTICLE III
## PRO FORMA, ADJUSTMENTS, AND SETTLEMENT

**Section 3.01  Pro Forma Statement.**    As soon as practicable after the Bank Closing Date, in accordance with the best information then available, the Receiver will provide to the Bridge Bank a pro forma statement (the "Pro Forma Statement"). The Receiver will prepare the Pro Forma Statement, in its discretion, to reflect any adjustments of such liabilities and assets as may be necessary. Such Pro Forma Statement will take into account to the extent possible, among other things, (a) liabilities and assets of a nature similar to those contemplated in Sections 2.02(a) and 2.03(a), respectively, which were carried in the Failed Bank's suspense accounts on the Bank Closing Date, (b) accruals as of the Bank Closing Date for all income related assets and business of the Failed Bank, attributed to the Bridge Bank thereunder, whether or not such accruals were reflected on the Failed Bank Records in the normal course of operations, and (c) adjustments to determine the Book Value of any investment in an Acquired Subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the Equity Method of Accounting, whether or not the Failed Bank used the Equity Method of Accounting for investments in subsidiaries, except that the resulting amount cannot be less than the recorded equity as of the Bank Closing Date as reflected on the Failed Bank Records of the Acquired Subsidiary. Acquired Subsidiaries with negative equity will be restated to $1, pursuant to the Equity Method of Accounting. The Pro Forma Statement will establish the net value of the Transferred Assets, and the Assumed Liabilities that comprise the contribution made by the Receiver to the Bridge Bank pursuant to this Agreement and will be reflected as the Receiver's investment in the Bridge Bank on the Receiver's books.

**Section 3.02  Correction of Errors and Omissions.**

(a) Adjustments to Correct Errors.    If any bookkeeping errors or omissions are discovered in preparing any Pro Forma Statement or in completing the transfers and assumptions contemplated hereby, the Receiver and Bridge Bank agree to correct such errors and omissions, it being understood that, as far as practicable, all adjustments will be made consistent with judgements, methods, policies, or accounting principles used by the Failed Bank in preparing and maintaining the Failed Bank Records, except that adjustments made pursuant to this Section 3.02(a) are not intended to bring the Failed Bank Records into accordance with generally accepted accounting principles.

(b) Adjustments for Liabilities.    If the Receiver discovers at any time subsequent to the Bank Closing Date that any Claim exists against the Failed Bank which is of such a nature that it would have been included in the liabilities assumed under Article II had the existence of such

Claim or the facts giving rise thereto been known as of the Bank Closing Date, the Receiver may, in its discretion, at any time, require that the liability related to such Claim be assumed by the Bridge Bank in a manner consistent with the intent. The Receiver will make appropriate adjustments to the Pro Forma Statement provided by the Receiver to the Bridge Bank pursuant to Section 3.01 as may be necessary.

(c) Other Adjustments.    If the Bridge Bank or the Receiver discovers any errors or omissions as contemplated by Section 3.02(a), the Bridge Bank and the Receiver agree to promptly correct any such errors or omissions, make any payments, and effect any transfers or assumptions as may be necessary to reflect any such correction plus interest.

(d) Adjustments for the Exercise of Call or Put by the Receiver.    If the Receiver exercises a call or put upon assets or liabilities, pursuant to Sections 2.05 or 2.06, the Bridge Bank agrees to promptly adjust any account as of the date of the receipt of the notice.

(e) Informational Tax Reporting.    The Bridge Bank agrees to perform all obligations of the Failed Bank with respect to federal and state income tax informational reporting related to (i) the Transferred Assets and the Assumed Liabilities, (ii) the Retained Assets and the Retained Liabilities, and (iii) any other asset or liability of the Failed Bank.

**Section 3.03  Article II Settlement Process.**

(a) Settlement Designee.    Immediately following the Bank Closing Date, the Receiver will identify a settlement agent to administer payments contemplated by Article II (the "Settlement Agent") and the Bridge Bank must (i) appoint a settlement point of contact (the "Settlement Designee") to work with the Settlement Agent and their designees, and (ii) complete, execute and return to the Settlement Agent the Settlement Designation Form attached as Exhibit 3.03.

(b) Article II Settlement.    The Settlement Agent and Settlement Designee will aggregate the information necessary and cooperate to execute payments of the amounts being tracked, netted and settled between the Receiver and the Bridge Bank pursuant to Article II.

(c) Article II Settlement Policies and Procedures.    The recurring settlement of all amounts due to either Party pursuant to Article II will occur in a manner consistent with policies and procedures provided by the Receiver to the Bridge Bank after the Bank Closing Date. All notices and other communications between the Settlement Agent and the Settlement Designee regarding the settlement of items under Article II pursuant to this Section 3.03 will be handled as required by the policies and procedures provided by the Receiver to the Bridge Bank and will not be subject to the requirements of Section 9.05. The Receiver will complete the settlement of all obligations and liabilities under Article II on or before eighteen (18) months after the Bank Closing Date, unless such time frame is extended by the Receiver pursuant to a notice to the Bridge Bank.

**ARTICLE IV**
**DEPOSITS**

**Section 4.01  Payment of Checks, Drafts, Orders and Deposits.**    Subject to <u>Section 4.06</u>, the Bridge Bank agrees (a) to pay all Assumed Deposits, properly drawn checks, drafts, and withdrawal orders of depositors related to the Assumed Deposits presented for payment, whether drawn on the check or draft forms provided by the Failed Bank or by the Bridge Bank, to the extent that the Assumed Deposit balances to the credit of the respective makers or drawers assumed by the Bridge Bank under this Agreement are sufficient to permit the payment thereof, and (b) to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Assumed Deposit balances due and owing to the depositors of the Failed Bank.

**Section 4.02  Notices Regarding Deposits.**

(a) <u>Notices to Depositors</u>.    Within thirty (30) days after the Bank Closing Date, the Bridge Bank will give notice by mail to each depositor of the Failed Bank of the following, as reflected in the form notice attached as <u>Exhibit 4.02(a)</u>:

      (i)    the assumption of the Assumed Deposits of the Failed Bank;

      (ii)    the procedures to claim Assumed Deposits to this Agreement;

      (iii)    the rate(s) of interest which the Bridge Bank has determined to pay and of each depositor's right to withdraw funds without penalty as provided in <u>Section 4.03</u>; and

      (iv)    if the Bridge Bank proposes to charge fees different from those fees formerly charged by the Failed Bank, the Bridge Bank must include its fee schedule with its mailed notice.

(b) <u>Public Notice</u>.    The Bridge Bank will also publish notice of its assumption of the Assumed Deposits of the Failed Bank, in the form attached as <u>Exhibit 4.02(b)</u>, in a newspaper of general circulation in the county or counties in which the Failed Bank was located.

(c) <u>Approval of Notices and Publications</u>.    The Bridge Bank must obtain approval of the final form of all notices and publications required by this <u>Section 4.02(a) and (b)</u> from the Receiver prior to mailing or publication.

(d) <u>Validation</u>.    The Bridge Bank will provide the Receiver (i) an Affidavit of Publication attesting that it complied with the publication requirements outlined in <u>Section 4.02(b)</u> and (ii) an Affidavit of Mailing (in the form attached as <u>Exhibit 4.02(d)</u>) attesting that it mailed the notice to depositors as required by <u>Section 4.02(a)</u>.

**Section 4.03  Interest on Deposit Liabilities; Withdrawal.**    The Bridge Bank agrees that it will accrue and pay interest on Assumed Deposits, from and after the Bank Closing Date, at a rate(s) it determines; provided, that for non-transaction Deposit liabilities such rate(s) will not be less than the lowest rate offered by the Bridge Bank to its depositors for non-transaction deposit accounts.  The Bridge Bank must permit each depositor to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Assumed Deposit, provided however, that if

such Assumed Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof is subject to the terms of the agreement governing such pledge.

**Section 4.04   Payments of Deposits.**    If any depositor does not accept the obligation of the Bridge Bank to pay the liability of the Failed Bank related to Assumed Deposits and asserts a claim against the Receiver for all or any portion of any such liability, the Bridge Bank agrees to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the liability related to the Assumed Deposit reflected on the books of the Bridge Bank pursuant to Section 6.02(c) after such claim is made. Upon payment by the Bridge Bank to the Receiver of such amount, the Bridge Bank is discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**Section 4.05   Unclaimed Deposits.**

(a) Final Legal Notice.    Fourteen (14) months following the Bank Closing Date, the Bridge Bank will provide the Receiver with a list of all Assumed Deposits (including information regarding the type of account) that have not been claimed by the depositor. The Receiver will review the list and authorize the Bridge Bank to act on behalf of the Receiver to send a Final Legal Notice in the form attached as Exhibit 4.05(a)-1 (the "Final Legal Notice") to the owner(s) of the unclaimed Assumed Deposits. The Bridge Bank will send the Final Legal Notice to the depositors within fifteen (15) days following its receipt of the Receiver's authorization. The Bridge Bank will prepare an Affidavit of Mailing in a form attached as Exhibit 4.05(a)-2 attesting that it complied with the notice requirements outlined in this Section 4.05(a).

(b) Unclaimed Deposits.    If any depositor of the Failed Bank does not claim or arrange to continue such depositor's Assumed Deposits at the Bridge Bank within eighteen (18) months after the Bank Closing Date, the Bridge Bank will, after the end of such eighteen (18) month period, (i) promptly refund to the Receiver the full amount of each such unclaimed Assumed Deposit (without reduction for service charges) pursuant to Section 6.02(c), (ii) provide to the Receiver a schedule of all such refunded Assumed Deposits in a form prescribed by the Receiver, and (iii) assign and convey ownership of the Bridge Bank Records related to the refunded Assumed Deposits and any new records generated or maintained by the Bridge Bank related to the refunded Assumed Deposits to the Receiver. At the time the unclaimed Assumed Deposits are refunded by the Bridge Bank to the Receiver, the refunded Assumed Deposits will no longer be Assumed Deposits, the Failed Bank Records related to such Assumed Deposits become Receiver Bank Records, and the Bridge Bank will provide custody services to the Receiver for the new Receiver Bank Records pursuant to Section 5.01. During such eighteen (18) month period, at the request of the Receiver, the Bridge Bank will promptly provide to the Receiver schedules of unclaimed Assumed Deposits in such form as may be prescribed by the Receiver.

**Section 4.06   Account Holds, Withheld Payment.**    At any time, the Receiver can direct the Bridge Bank to withhold payment of all or any portion of any Assumed Deposit balance. Upon receipt of such direction, the Bridge Bank agrees to hold such Assumed Deposit and will not make any payment out of such deposit balance to or on behalf of the depositor, or to itself,

whether by way of transfer, set-off or otherwise. The Bridge Bank agrees to maintain the "withheld payment" status of any such Assumed Deposit balance until the Receiver provides notice regarding the disposition of such Assumed Deposit balance or the release of the "withheld payment" status. At the direction of the Receiver, the Bridge Bank will return all or the requested portion of such Assumed Deposit balance to the Receiver pursuant to Section 6.02(c) and any such returned deposit will no longer be an Assumed Deposit.  If such Assumed Deposit balance has been paid to the depositor prior to the time the Receiver demands the return of all or a portion of such depositor's Assumed Deposit, the Bridge Bank will not be obligated to return such deposit balance to the Receiver; provided however, the Bridge Bank must reimburse the Receiver for the amount of any Assumed Deposit balance or portion thereof paid by the Bridge Bank in violation of any direction to withhold payment related to such Assumed Deposit, pursuant to Section 6.02(c).

**Section 4.07  Offsets.**    At the direction of the Receiver, the Bridge Bank will adjust loan and account balances related to the Transferred Assets and the Assumed Liabilities, including the Assumed Deposits, as appropriate, to reflect offset rights and adjustments thereto that result from a depositor's exercise of its rights under applicable law and the Receiver's exercise of its rights under 12 U.S.C. § 1822(d) and 1823(e).

**Section 4.08  Advance Dividends.**    Upon receipt of notice from the Receiver after the contribution described in Article II, the Bridge Bank (a) will adjust deposit account balances identified by the Receiver to reflect an advance dividend issued by the Receiver to the depositors that had uninsured deposit balances at the Failed Bank on the Bank Closing Date as verified by the Corporation's deposit insurance determination (an "Advance Dividend"), and (b) assumes the liability to make the Advance Dividend available to the depositors identified by the Receiver. The Receiver will either (i) owe the Bridge Bank as a "due to/due from", or (ii) pay the Bridge Bank in cash or in kind (any in kind payment will be valued for purposes of this Section 4.08 only in the Receiver's reasonable discretion), an amount equal to the Advance Dividends reflected in the deposit account balances adjusted by the Receiver pursuant to this Section 4.08, at the Receiver's discretion.

### ARTICLE V
### FAILED BANK RECORDS

**Section 5.01  Transfer of Failed Bank Records.**    The Receiver transfers all rights and interests, possession, custody, and control of the Bridge FB Records to the Bridge Bank, subject to the Receiver's rights and interests in this Article V. The Bridge Bank acknowledges and agrees that it has custody of the Custodial FB Records, wherever located.

**Section 5.02  Retention of Records.**

(a) Retention Period.    The Bridge Bank agrees to preserve, maintain, and store for the joint benefit of the Receiver, the Corporation, and the Bridge Bank the Custodial FB Records and the Bridge FB Records for six (6) years after the Bank Closing Date or such longer period as required by any applicable law, including 12 U.S.C. § 1821(d)(15)(D) and 12 C.F.R. § 360.11 (the "Retention Period"). The Receiver may direct the Bridge Bank to transfer custody of all or

some portion of the Custodial FB Records to the Receiver, or a third-party at the Receiver's direction.

(b) Transferred Bank Records.    At the time a Custodial FB Record becomes a Transferred Bank Record, the Bridge Bank will have no further obligation with regard to such Transferred Bank Record. The Bridge Bank may request access to the Transferred Bank Records as reasonably necessary to serve legitimate business purposes. The Receiver has no obligation to search the Transferred Bank Records or incur any cost or expense in connection with the Bridge Bank's request.

**Section 5.03   Access, Use and Inspection.**    The Receiver and the Corporation have the right to access, use, and inspect the Covered Records as necessary for the Receiver to satisfy its obligations under all applicable law, as determined by the Receiver in its sole discretion. The Bridge Bank will permit the Receiver and the Corporation such access, use, and inspection without imposing any impediment and without requiring the Receiver or the Corporation to obtain a subpoena or court order to exercise the rights related to the Covered Records provided to the Receiver and the Corporation pursuant to this Article V. The Bridge Bank will permit the Receiver and the Corporation to make extracts from, request Copies of, and to duplicate any Covered Records, in the discretion of the Receiver or the Corporation. The Bridge Bank will provide any requested Copy, duplicate or extract to the Receiver or the Corporation, as appropriate, within five (5) business days after the request unless the Bridge Bank provides a notice to the Receiver pursuant to Section 5.08. The Bridge Bank must preserve, maintain, and store the Custodial FB Records and the Bridge FB Records in the form (e.g., electronic or paper), state, and condition and accessibility existing as of the Bank Failure Date. The Receiver may request an improved accessibility standard as long as such higher standard does not impose an undue burden on or cost to the Bridge Bank. The Bridge Bank will take no action that will impair the existing accessibility of, or ability to search, the Covered Records, unless consented to by Receiver.

**Section 5.04   Subpoenas and Discovery Requests served upon the Bridge Bank.**    The Bridge Bank has the responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Covered Records served upon the Bridge Bank; provided however, if the Receiver determines, in its discretion, that its interests are or could be affected by such disclosure, the Receiver has the right to direct the Bridge Bank not to disclose the Covered Records so long as such non-disclosure is consistent with the Bridge Bank's obligations under law. Within two (2) Business Days after the Bridge Bank's receipt of any subpoena, discovery request, or other similar official inquiry with respect to the Covered Records, the Bridge Bank will provide notice to the Receiver, enclosing a copy of any subpoena, discovery request, or similar official inquiry, and will wait at least ten (10) Business Days after receiving such inquiry before providing a response.

**Section 5.05   Subpoenas and Discovery Requests served upon the Receiver.**    At the Receiver's request and direction, the Bridge Bank will facilitate the Receiver's response to subpoenas and discovery requests and other similar official inquiries served upon the Receiver with respect to the Covered Records. At the Receiver's direction, the Bridge Bank will make a reasonable inquiry and perform a diligent search of the Covered Records in order to satisfy the

Receiver's legal obligations. The Receiver may direct the Bridge Bank to provide documents to the Receiver or to produce documents to third-parties.

Section 5.06 **Privilege.**    The Receiver retains all rights and does not waive the attorney-client privilege, the attorney-work-product doctrine, or any other cognizable privilege or protection of the Failed Bank by transferring the Custodial FB Records to the Bridge Bank. The Bridge Bank must maintain the Custodial FB Records to preserve any existing legal privilege. At its own cost and expense, the Bridge Bank will assert all privileges related to the Covered Records unless the Receiver consents to the waiver of any such privilege.

Section 5.07 **Destruction.**    The Bridge Bank is prohibited from destroying any Custodial FB Records or Bridge FB Records for the duration of the Retention Period unless such records were more than ten (10) years old as of the Bank Closing Date.

Section 5.08 **Costs and Expenses.**    The Bridge Bank is responsible for all costs and expenses related to the Covered Records and the Bridge Bank's performance of its obligations under this Article V, except that the Receiver will bear the cost of any Copies, duplicates, or extracts from the Covered Records requested by the Receiver at the Bridge Bank's actual costs, excluding Bridge Bank employee time. If the costs related to a request from the Receiver are expected to exceed $5,000.00 or if the Bridge Bank intends to retain a third-party contractor to fulfill the Receiver's request, the Bridge Bank must notify the Receiver before incurring any costs and receive the Receiver's consent prior to proceeding. These costs will be paid pursuant to Section 6.02(c).

Section 5.09 **PII; Privacy.**    The Bridge Bank will comply with all laws, regulations, orders, writs, or decrees of any court or governmental authority regarding PII and privacy to the extent they apply to Covered Records.

Section 5.10 **Transfer of Bridge FB Records or Custodial FB Records.**

(a) Bridge FB Records-Bridge Bank Retains Copies.    If the Bridge Bank sells or otherwise intends to transfer any Bridge FB Record to an Asset Recipient, the Receiver may require the Bridge Bank, or the Bridge Bank may choose, to retain copies of such Bridge FB Records in the form (e.g., electronic or paper), state, and condition and accessibility existing prior to such transfer to an Asset Recipient. The Bridge Bank acknowledges that any such copies immediately become Custodial FB Records subject to this Article V. On or before the transfer of any Bridge FB Records to an Asset Recipient where the Receiver requires the Bridge Bank, or the Bridge Bank chooses, to retain copies of the Bridge FB Records that will be transferred to an

Asset Recipient, the Bridge Bank must certify to the Receiver that the Bridge Bank has retained copies of the Bridge FB Records in compliance with this Section 5.10(a).

(b) Custodial FB Records.    The Bridge Bank will not transfer any Custodial FB Records to a third party without the Receiver's consent.

(c) Notices.

(i)    If the Bridge Bank will retain copies of the Bridge FB Records being transferred to an Asset Recipient as provided in Section 5.10(a), the Bridge Bank must notify the Receiver of such transaction and provide a copy of all agreements with the Asset Recipient no less than five (5) days prior to the transfer of any Bridge FB Records to such Asset Recipient.

(ii)    If the Bridge Bank prefers to impose the requirements of this Article V on an Asset Recipient as described in Section 5.10(d), the Bridge Bank must notify the Receiver no less than forty-five (45) days in advance of the transfer of any Bridge FB Records or Custodial FB Records, identifying the nature of the transaction, a summary description of the Bridge FB Records or Custodial FB Records that would be transferred to an Asset Recipient, and the proposed transfer date. If the Receiver (A) exercises its right to require the Bridge Bank to retain copies of the Bridge FB Records identified by the Bridge Bank, or (B) does not consent to the transfer of Custodial FB Records, the Receiver will notify the Bridge Bank of such determination no more than fifteen (15) days after the Receiver's receipt of the Bridge Bank's notice provided pursuant to this Section 5.10(c)(ii).

(d) Obligations Imposed on Transferee.    If (i) the Bridge Bank does not choose to retain, and the Receiver does not require the Bridge Bank to retain, copies of Bridge FB Records being transferred to an Asset Recipient, or (ii) the Receiver consents to the Bridge Bank transferring custody of the Custodial FB Records to an Asset Recipient, the Bridge Bank must require, or cooperate with the Receiver to ensure, that any such Asset Recipient is contractually obligated to the Receiver and the Corporation to perform the obligations of the Bridge Bank set forth in this Article V with regard to any Covered Records transferred to any Asset Recipient. The form of the agreement establishing any Asset Recipient's obligations and the Receiver's and the Corporation's rights related to the Covered Records must be acceptable to the Receiver, in its sole discretion. Prior to the transfer of any Covered Records to an Asset Recipient, the Bridge Bank will provide an original executed version of such agreement to the Receiver.

**ARTICLE VI**
**CONTINUING COOPERATION**

**Section 6.01  Further Assurances.**    The Parties agree that they will, in good faith and using their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect its purposes.

**Section 6.02  Bridge Bank Response Team.**

(a) <u>Identification of Bridge Bank Response Team</u>.    Immediately following the Bank Closing Date, the Receiver will identify the members and roles of the Bridge Bank Response Team to perform the functions described in this <u>Section 6.02</u>.

(b) <u>Engagement</u>.    The Bridge Bank agrees to:

(i)    Continuously engage with the Receiver through the Bridge Bank Response Team;

(ii)    Coordinate its activities with the Bridge Bank Response Team; and

(iii)    Consult with the Bridge Bank Response Team for guidance on which activities would require shareholder consent pursuant to the Bylaws of the Bridge Bank.

(c) <u>Payment Policies and Procedures</u>.

(i)    The Receiver will identify a member of the Bridge Bank Response Team to administer payments and coordinate payments between the Receiver and the Bridge Bank contemplated by this Agreement, excluding <u>Article II and Article III</u>, with the Settlement Designee.

(ii)    The Settlement Agent and Settlement Designee will aggregate the information necessary and cooperate to execute payments of the amounts being tracked, netted and settled between the Receiver and the Bridge Bank pursuant to this Agreement, excluding <u>Article II and Article III</u>.

(iii)    The recurring settlement of all amounts due to either Party pursuant to this Agreement, excluding <u>Article II and Article III</u>, will occur in a manner consistent with policies and procedures provided by the Bridge Bank Response Team to the Bridge Bank after the Bank Closing Date. All notices and other communications between the Bridge Bank Response Team and the Settlement Designee regarding the settlement of items under this Agreement, excluding <u>Article II and Article III</u>, pursuant to this <u>Section 6.02</u> will be handled as required by the policies and procedures provided by the Bridge Bank Response Team to the Bridge Bank and will not be subject to the requirements of <u>Section 9.05</u>.

**Section 6.03  Office Space.**    The Bridge Bank agrees to provide to the Receiver's employees and agents adequate and suitable office space (including parking facilities and vault space), furniture, equipment (including telephones, printers, photocopying machines, computers, and internet access), supplies, utilities (including local telephone service), janitorial service and storage space at the Bank Premises for their use in the discharge of their respective functions with respect to the Failed Bank. The Receiver's employees and agents will have access to the Bank Premises twenty-four hours a day, seven days a week. If the Receiver determines that the space provided by the Bridge Bank is inadequate or unsuitable, the Receiver may relocate to other Bank Premises that are adequate and suitable for the Receiver's purposes. The Receiver

will pay the Bridge Bank its pro-rata share (based on square footage occupied) of (i) the market rental value for the owned Bank Premises occupied by the Receiver, or (ii) the actual rent paid for leased Bank Premises occupied by the Receiver, pursuant to Section 6.02(c).

**Section 6.04  Information.**    The Bridge Bank will provide to the Receiver such other information, including financial statements and computations, relating to the assets, liabilities, Claims and other items of the Failed Bank allocated pursuant to this Agreement, and the Bridge Bank's performance under this Agreement as the Receiver may request from time to time.

**Section 6.05  Access to Information Systems.**    The Receiver will continue to have access to the computing, telecommunications or other digital operating or processing systems, platforms or environments, including computer programs, data, databases, computers, computer libraries, communications equipment, networks and systems of the Failed Bank that are transferred by the Receiver to the Bridge Bank pursuant to Article II; provided that such continued access is subject to the Receiver complying with all reasonable security measures implemented by the Bridge Bank.

**Section 6.06  Cooperation in Investigations and Proceedings.**    In connection with any investigation, proceeding or other matter related in any manner to the Failed Bank or its Subsidiaries, the Bridge Bank will cooperate to the extent reasonably requested by the Receiver.

**Section 6.07  Transfer of Assets and Liabilities.**    The Receiver and the Bridge Bank agree, upon the request of the other Party, to execute, record and deliver, as appropriate any such notices, instruments or documents of conveyance, or undertake any proceedings, as necessary to vest in the appropriate Party its full legal or equitable title in and to the assets, liabilities, obligations, Litigation, and Claims of the Failed Bank as allocated by this Agreement. The Bridge Bank will prepare or obtain any necessary notices, instruments or documents of conveyance (in form and substance satisfactory to the Receiver) necessary to ensure that all Transferred Assets and Assumed Liabilities are transferred to the Bridge Bank in compliance with law and other applicable requirements, and are properly held in the Bridge Bank's name. The Bridge Bank is responsible for delivering all such notices, recording or filing any instruments or documents of conveyance necessary to meet its obligations under this Section 6.07 at its own cost and expense (including, without limitation, any taxes, fees, charges or other amount due by either Party as a result of or in connection with the transfer) within a reasonable time period after the Bank Closing Date. If necessary, the Bridge Bank will take all necessary actions to ensure that any Call Assets/Liabilities are in the name of the Receiver promptly after a Call Option has been exercised.

**Section 6.08  Limited Power of Attorney.**    The Receiver will provide a limited power of attorney to the Bridge Bank, if necessary and in a form acceptable to the Receiver, to enable the Bridge Bank to execute transfer documents on behalf of the Receiver pursuant to Section 6.07, endorse checks, release liens and execute other instruments on behalf of the Receiver as necessary to continue the business of the Failed Bank related to the Transferred Assets, the Assumed Liabilities, and the Serviced Assets as provided for, and limited by, the terms of the limited power of attorney.

**Section 6.09  Verification of Trust Assets.**    If the Transferred Assets include a trust business, the Bridge Bank must verify the assets held by the Bridge Bank in connection with the Failed Bank's trust business within sixty (60) days after the Bank Closing Date.

**Section 6.10  Insurance.**    The Bridge Bank will obtain and maintain insurance coverage acceptable to the Receiver (including public liability, fire, and extended coverage insurance) naming the Bridge Bank as the insured and the Receiver as additional insured, effective from and after the Bank Closing Date, with respect to all Leases and Leased Data Management Equipment subject to the Option Period. The Bridge Bank's obligation to insure and to maintain the Receiver as an additional insured pursuant to this Section 6.10 terminates with regard to each Lease and Leased Data Management Equipment subject to the Option Period on the applicable Option Effective Date.

**Section 6.11  Health Insurance Continuation Coverage.**

(a)  The Bridge Bank agrees to assist the Receiver in offering employees or former employees of the Failed Bank or any of its Subsidiaries who, immediately prior to the Bank Closing Date, were receiving, or were eligible to receive, health insurance coverage or health insurance continuation coverage from the Failed Bank ("Eligible Individuals"), the opportunity to obtain health insurance coverage in the Corporation's Federal Insurance Administration Continuation Coverage Plan that provides health insurance continuation coverage to such Eligible Individuals and other persons who are qualified beneficiaries of the Failed Bank as defined in Section 607 of the Employee Retirement Income Security Act of 1974, as amended (respectively, "qualified beneficiaries" and "ERISA").

(b)  The Bridge Bank will consult with the Receiver and not later than five (5) Business Days after the Bank Closing Date must provide notice to the Receiver of the number (if available), identity (if available) and addresses (if available) of the Eligible Individuals who are qualified beneficiaries of the Failed Bank and for whom a "qualifying event" (as defined in Section 603 of ERISA) has occurred and with respect to whom the Failed Bank's obligations under Part 6 of Subtitle B of Title I of ERISA have not been satisfied in full, and such other information as the Receiver may reasonably require. The Receiver will cooperate with the Bridge Bank in order to permit it to prepare such notice and will provide to the Bridge Bank such data in its possession as may be reasonably required for purposes of preparing such notice.

(c)  The Bridge Bank will take such further action to assist the Receiver in offering the Eligible Individuals who are qualified beneficiaries of the Failed Bank the opportunity to obtain health insurance coverage in the Corporation's Federal Insurance Administration Continuation Coverage Plan as the Receiver may direct. The Bridge Bank will pay all expenses incurred in providing health insurance continuation coverage to any Eligible Individuals who are hired by the Bridge Bank and such employees' qualified beneficiaries, pursuant to Section 6.02(c).

**Section 6.12  Failed Bank Employees.**

(a)  The Bridge Bank is responsible for all salaries and payroll costs for all Failed Bank employees from the Bank Closing Date until the Bridge Bank makes a final determination as to whether it will retain or terminate that employee.

BDI Transfer Agreement

(b) The Bridge Bank will pay all employees 100% of the value of their accrued and unused vacation, leave, paid-time off, and personal days up to an aggregate limit of eighty (80) hours, and the Receiver will reimburse the Bridge Bank for all amounts paid to employees pursuant to this Section 6.12(b) pursuant to Section 6.02(c).

**Section 6.13   Access to and Services of Bridge Employees.**

(a)  The Receiver has the right to require, and the Bridge Bank agrees to provide to the Receiver, access to and the time and services of the officers and employees of the Failed Bank and the Bridge Bank and, to the extent within the control of the Bridge Bank, the services of the officers and employees of any Acquired Subsidiary, to assist the Receiver (i) in its resolution of the Failed Bank and its assets and liabilities, (ii) in all internal and external reporting required by the Receiver, (iii) in the research and preparation of pro forma financial statements (including the Pro Forma Statement), accounting ledgers (general and subsidiary) and supporting schedules, financial statements, securities filings, other filings, valuations or reports related to the Failed Bank or its activities, assets or liabilities, and (iv) in all investigations or audits of or related to the Failed Bank or any Subsidiary and any of their board members, officers, directors, employees, the business activities of any of the foregoing, the assets, liabilities, obligations, and Claims of the Failed Bank allocated by this Agreement, (iv) in its performance under this Agreement, and (v) as requested by the Receiver to otherwise assist the Receiver in its performance of its duties.

(b) If the Receiver uses the services of any Failed Bank or Bridge Bank officer or employee, the Receiver will reimburse the Bridge Bank for the cost of such employee's time pursuant to Section 6.02(c). To be eligible for reimbursement, the Bridge Bank must have the Failed Bank and Bridge Bank officers and employees track the amount of time spent along with a brief description of the work performed and identify the individual representing the Receiver that requested the work.

**Section 6.14   Servicing Receiver Assets.**    At the request of the Receiver, the Bridge Bank will service, administer and collect any Retained Asset, Retained Liability, or other liability or obligation of the Failed Bank that is not assumed by the Bridge Bank, in accordance with the terms of the Interim Servicing Terms attached as Schedule 6.14 to this Agreement and amounts due under the Interim Servicing Agreement will be paid pursuant to Section 6.02(c).

**Section 6.15   Continuation of Banking Business.**

(a) Full Service Banking.    The Bridge Bank will (i) provide full service banking in the Failed Bank Assessment Area for at least ninety (90) days commencing on the first Business Day after the Bank Closing Date and (ii) satisfy applicable regulatory or statutory requirements before it ceases to provide full service banking in the Failed Bank Assessment Area. The Bridge Bank may close or sell any Bank Premises of the Bridge Bank during this period with the prior written consent of the Receiver (which consent may be withheld in Receiver's discretion) and after receipt of all necessary regulatory approvals and satisfaction of applicable regulatory or statutory requirements; provided that the Bridge Bank continues to provide full service banking in the Failed Bank Assessment Area for the period required to comply with this Section 6.15(a).

(b) Bank Premises Located in an Underserved Area.    If any Bank Premises are located in an Underserved Area, the Receiver will not consent to the Bridge Bank's closing or selling such Bank Premises, unless the Bridge Bank provides full service banking at one or more Bank Premises or Bridge Bank branches located within in the same Underserved Area.

**Section 6.16  Shared Services.**

(a)  The Bridge Bank covenants and agrees that the Receiver, upon the Receiver's request, has the right to obtain Shared Services provided pursuant to a Supplier Agreement as provided by this Section 6.16.

(i)    "Supplier" means a provider of Shared Services.

(ii)    "Supplier Agreement" means any (i) Service Contract, or (ii) any contract for goods or services entered into by the Bridge Bank.

(iii)    "Shared Services" means services provided under a Supplier Agreement.

(iv)    "Supplier Charges" means the costs of the Shared Services as determined pursuant to the applicable Supplier Agreement.

(b)  Any Shared Services requested by the Receiver will be provided pursuant to the terms of the applicable Supplier Agreement. The Bridge Bank will require that the Suppliers provide the Receiver and the Bridge Bank with invoices or other evidence of Shared Services requested by the Receiver and the related Supplier Charges from time to time. The Receiver will reimburse the Bridge Bank for the Supplier Charges related to Shared Services requested by the Receiver pursuant to Section 6.02(c).

**Section 6.17  Certain Subsidiary Claims.**    The Bridge Bank agrees to take the actions, as described below, to transfer the Claims and Litigation of certain subsidiaries identified by the Receiver (the "Assigning Subs") against directors and officers, or other defendants arising out of acts, omissions, or other events that occurred before the Bank Closing Date.

(a)  If the Bridge Bank has the authority to enter into the Assignment and Recovery Sharing Agreement on behalf of the Assigning Subs, the Bridge Bank must execute an Assignment and Recovery Sharing Agreement, substantially in the form of Exhibit 6.17, on behalf of each such Subsidiary and deliver the executed agreements to the Receiver within five (5) days after the Bank Closing Date.

(b)  If the Bridge Bank does not have the authority described in Section 6.17(a) but has the authority pursuant to the organizational documents of the Assigning Subs in effect as of the Bank Closing Date to cause such the Assigning Subs to execute the Assignment and Recovery Sharing Agreement, substantially in the form of Exhibit 6.17, the Bridge Bank must cause such Assigning Subs to execute and deliver the Assignment and Recovery Sharing Agreement to the Receiver within five (5) days after the Bank Closing Date or such later date as may be required for the Bridge Bank to exercise its rights to cause such Assigning Subs to take such action.

## ARTICLE VII
## CLAIMS AND TRANSFERRED LITIGATION

**Section 7.01  Substitution in Transferred Litigation.**

(a) No later than thirty (30) days after the Bank Closing Date, the Bridge Bank will notify the court and all counsel of record that the Bridge Bank is the real party-in-interest and the Receiver is no longer the real party-in-interest to Transferred Litigation by virtue of this Agreement. At its sole cost and expense, the Bridge Bank will use its best efforts to cause the removal of the Receiver as a party to the Transferred Litigation and the substitution of the Bridge Bank as the real party-in-interest within sixty (60) days after the Bank Closing Date.

(b) Upon the Bridge Bank's failure to cause such removal and substitution within the stated time period, the Bridge Bank must immediately provide notice to the Receiver, and the Receiver may then elect, at any time, to conduct, dismiss or withdraw from the Transferred Litigation, or to have the Bridge Bank conduct such Transferred Litigation at the Bridge Bank's cost and expense. In any Transferred Litigation in which the Receiver has not been removed as the real party-in-interest, no settlement may be agreed upon by the Bridge Bank without the express prior consent of the Receiver, and such settlement must include an irrevocable and complete waiver and release of any and all Claims against the Receiver in relation to such Transferred Litigation by any Person.

(c) The Bridge Bank will pay all of the judgments, losses, liabilities, costs and expenses incurred by it in connection with the Transferred Litigation and the Bridge Bank's obligations in this Section 7.01, including to all legal fees and expenses and court costs, and will pay or reimburse the Receiver, upon demand, for the Receiver's legal expenses in connection with such Transferred Litigation, including costs and expenses relating to the Receiver's dismissal thereof or withdrawal therefrom. After all amounts due to the Receiver under this Section 7.01 have been paid in full, the Bridge Bank will be entitled to any remaining amounts recovered in the Transferred Litigation.

**Section 7.02  Notice of Claims.**    The Bridge Bank will notify the Receiver of any Claim, or any actual or pending cause of action, claim, suit, or proceeding  (a) against the Bridge Bank or the Receiver related to this Agreement, Retained Assets, Retained Liabilities, Optional Contracts, or other liability or obligation of the Failed Bank that was not assumed by the Bridge Bank, or (b) that, if adversely determined, might materially and adversely affect the business, operations, condition (financial or otherwise) or prospects of the Bridge Bank or the ability of the Bridge Bank to meet its obligations to the Receiver arising under this Agreement or elsewhere. Such notice must include a copy of any notice, subpoena, claim or court filing received by the Bridge Bank.

**Section 7.03  Right to Defend or Settle.**    If the Receiver determines, in its discretion, that its interests are or could be affected by any Claim or suit, the Receiver has the right, in its discretion, to cause or direct the Bridge Bank to defend or settle, at the Bridge Bank's sole cost and expense, any claim or suit asserted or brought by a third party against the Bridge Bank with respect to this Agreement, the Bridge Bank's status, the Receiver, the Receiver's statutory rights,

or any asset, liability, obligation, or Claims related to the Failed Bank. The exercise by the Receiver of any rights under this <u>Section 7.03</u> does not release the Bridge Bank with respect to any of its obligations under this Agreement.

     **Section 7.04**  **Codefendants; Removal.**    If any action at law or in equity is instituted by any Person against the Receiver and the Bridge Bank as codefendants, the Bridge Bank will, at the request of the Receiver, join with the Receiver in removing the action to the United States District Court for the proper district.

**ARTICLE VIII**
**INDEMNIFICATION**

     **Section 8.01**  <u>**Indemnification of Bridge and Indemnitees.**</u>

     (a) <u>Indemnification.</u>    Subject to the limitations and conditions in this <u>Article VIII</u>, the Receiver indemnifies and holds harmless the Indemnitees against (i) any and all costs, losses, liabilities, and expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to <u>Section 8.01(b)</u>, and (ii) any judgments, fines and amounts paid in settlement, actually and reasonably incurred in connection with Claims and Litigation against any Indemnitee based on Retained Assets , Retained Claims, Retained Litigation, any other liability or obligation of the Failed Bank not expressly assumed by the Bridge Bank pursuant to this Agreement, and the actions and inaction of the Failed Bank or the Receiver; provided, however, (y) the Receiver has no obligation to the Indemnitees under this <u>Article VIII</u> for any Claim based on the action or inaction of any Indemnitee (unless such action or inaction occurred as directed by the Receiver pursuant to notice from the Receiver), and (z) nothing in this Agreement will be construed to be an indemnification (1) for losses resulting from a reduction in the value of any Transferred Asset or any Transferred Litigation, (2) of the Failed Bank, (3) of any Subsidiary of the Failed Bank, or (4) of any present or former director, officer, employee or agent of the Failed Bank or any of its Subsidiaries.

     (b) <u>Conditions Precedent to Indemnification.</u>    It is a condition precedent to the obligation of the Receiver to indemnify any Indemnitee pursuant to this <u>Article VIII</u> that such Indemnitee must, with respect to any claim made or threatened against such Indemnitee for which such Indemnitee is or may be entitled to indemnification hereunder:

          (i)    give notice to the Receiver of such Claim within seven (7) calendar days after the Bridge Bank becomes aware of such Claim or a Claim is formally or informally asserted or threatened;

          (ii)    if suit is brought with respect to such Claim, provide notice to the Receiver within five (5) calendar days after receipt of service or notification of such suit and afford to the Receiver the right, which the Receiver may exercise in its discretion, to conduct the investigation, control the defense and effect settlement of such Claim, including the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such Claim, all of which will be at the expense of the Receiver; provided that the Receiver must have notified the Indemnitee claiming

30

indemnification in writing that such Claim is a Claim with respect to which such Indemnitee is entitled to indemnification under this Article VIII;

(iii)    provide to the Receiver such information and cooperation with respect to such Claim as the Receiver may reasonably require;

(iv)    cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such Claim;

(v)    not incur any costs or expenses in connection with any response or suit with respect to such Claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided that the Receiver is not obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

(vi)    not release or settle such Claim or make any payment or admission with respect thereto, unless the Receiver consents thereto; provided that the Receiver is not obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was at the direction of the Receiver; and

(vii)    take such action as the Receiver may reasonably require as necessary to preserve, protect or enforce the rights of the Indemnitee against any Primary Indemnitor.

(c) No Additional Warranty.    Nothing in this Article VIII should be construed or deemed to provide any warranty, assurances or representations with regard to the Transferred Assets or the Assumed Liabilities.

(d) Obligations Supplemental.    The obligations of the Receiver to provide indemnification under this Article VIII are to supplement any amount payable by any Primary Indemnitor to the Indemnitee indemnified under this Article VIII. Consistent with that intent, the Receiver will only make payments pursuant to this Article VIII to the extent not payable by a Primary Indemnitor. If the aggregated payments by the Receiver and all Primary Indemnitors with respect to any Claim subject to the Receiver's indemnification obligations under this Article VIII exceed the amount payable with respect to such Claim, the Bridge Bank must notify the Receiver and reimburse the Receiver any amounts paid by the Receiver that exceed the amount payable.

(e) Subrogation.    Upon payment by the Receiver to any Indemnitee for any claims indemnified by the Receiver under this Article VIII, the Receiver will be subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

**Section 8.02  Indemnification of Receiver and Corporation.**    From and after the Bank Closing Date, the Bridge Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against (a) any and all costs, losses, liabilities, and expenses (including attorneys' fees) incurred by the Receiver, and (b) any judgments, fines, and amounts paid in settlement, actually and reasonably incurred in connection with Claims and Litigation against the Corporation and the Receiver and

their respective directors, officers, employees, and agents, actually and reasonably incurred in connection with any of the following:

(a) Claims based on or related to any Transferred Asset, Transferred Liability or Transferred Litigation; and

(b) Claims based on any Indemnitee's actions and inactions, including any Claims related to any Indemnitee's violation of any law or regulation.

**Section 8.03  Limited Survival of Indemnification.**    The indemnification provided by the Receiver to the Indemnitees pursuant to Section 8.01 and the indemnification provided by the Bridge Bank to the Receiver and the Corporation pursuant to Section 8.02 survive the Termination Date only to the extent that an indemnified party provides a notice of a Filed Proceeding to the appropriate Party and such notice is received on or before the Termination Date. The survival of a Party's indemnification obligation pursuant to this Article VIII is limited to the Filed Proceeding identified in the notice.

<h1 style="text-align:center">ARTICLE IX<br>MISCELLANEOUS</h1>

**Section 9.01  Costs, Fees and Expenses.**    All fees, costs and expenses incurred by a Party in connection with this Agreement (including the performance of the obligations or the exercise of any rights hereunder) will be borne by such Party unless expressly otherwise provided.

**Section 9.02  GOVERNING LAW.**    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER ARE GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA AND, IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK WAS LOCATED.

**Section 9.03  WAIVER OF JURY TRIAL.**    EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ALL RIGHT TO TRIAL BY JURY IN OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

**Section 9.04  References; Business Days; Schedules and Exhibits.**    References in this Agreement to preamble, recitals, Articles, Sections, Schedules and Exhibits are to the preamble, recitals, Articles, Sections, Schedules and Exhibits of this Agreement, respectively. Unless expressly otherwise provided, references to days and months are to calendar days and months, respectively. If a notice or other action is due on a day that is not a Business Day, the due date for such notice or other action is delayed until the next-succeeding Business Day. Headings are for convenient reference and do not affect the meaning. References to the singular include the plural, as the context may require, and vice versa. The words "include", "includes", and

"including" mean "including but not limited to" when used in this Agreement, the Schedules, and Exhibits. The Schedules and Exhibits attached to this Agreement are incorporated into this Agreement, and capitalized terms used therein but not defined therein have the meaning provided in this Agreement.

**Section 9.05  Notice.**    Any notice, request, demand, consent, approval or other communication to a Party under this Agreement is effective when received and must be given in writing and delivered to such Party (with copies as indicated below) by (i) hand (with a signed receipt), or (ii) by nationally recognized and trackable overnight delivery service, at the address set forth below or at such other address as a Party hereafter furnishes by notice to the other Party.

Bridge Bank

> Silicon Valley Bridge Bank, NA
> 3003 Tasman Drive
> Santa Clara, CA  95054

> with a copy to:

> _____
> _____
> _____
> Attn:  General Counsel

Receiver

> Federal Deposit Insurance Corporation, as Receiver of Silicon Valley Bank
> 550 17th Street, NW
> Washington, DC 20429
> Attn:  John Conneely, Director, Division of Complex Institution Supervision and Resolution

> with a copy to:

> Federal Deposit Insurance Corporation, as Receiver of Silicon Valley Bank
> 550 17th Street, NW
> Washington, DC 20429
> Attn:  R. Penfield Starke, Acting Deputy General Counsel, Resolutions and Receiverships

**Section 9.06  Entire Agreement.**    This Agreement embodies the entire agreement of the Parties in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the Parties.

**Section 9.07  Counterparts.**    This Agreement may be executed digitally or by hand, in any number of counterparts, and delivered electronically or physically, each original or electronic

copy thereof will be deemed an original, and all of which when taken together constitute one and the same Agreement.

**Section 9.08  Binding Effect; No Assignment.**    This Agreement is binding upon and inures to the benefit of the Parties. This Agreement is not assignable by either Party without the prior written consent of the other Party, and any other purported assignment will be null and void; notwithstanding the foregoing, the Receiver is permitted to assign its rights and obligations under this Agreement to the Corporation without obtaining the consent of the Bridge Bank.

**Section 9.09  Third-Party Beneficiaries.**    Nothing expressed or referred to in this Agreement is intended or will be construed to give any Person (including any Acquired Subsidiary) other than the Receiver, the Corporation and the Bridge Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the Parties that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver and the Bridge Bank, and the Corporation as an express, third-party beneficiary, and for the benefit of no other Person.

**Section 9.10  Modification.**    No amendment or other modification, rescission or release is effective except pursuant to a written agreement executed by the duly authorized representatives of the Parties.

**Section 9.11  Waiver.**    Each of the Receiver, the Corporation and the Bridge Bank may waive its respective rights or privileges under this Agreement; provided, that such waiver must be in writing; and further provided, that no failure or delay on the part of the Receiver, the Corporation or the Bridge Bank to exercise any right, power or privilege under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Bridge Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

**Section 9.12  Severability.**    If any provision is declared invalid or unenforceable by a court of competent jurisdiction, then, to the extent possible, all remaining provisions remain in full force and effect and are binding upon the Parties.

**Section 9.13  Term of Agreement.**    This Agreement will continue in full force and effect until the Termination Date, after which no Person will have any right or obligation under this Agreement with the exception of the following:  (a) the limited survival of the indemnification, as provided in Section 8.03, and (b) the survival of the Bridge Bank's obligation to perform the servicing obligations, pursuant to the terms of Schedule 6.14, until the earlier of (i) one (1) year after the Termination Date, and (ii) the date all Serviced Assets have been properly and successfully transferred by the Bridge Bank to the Receiver, or a third party at the Receiver's direction.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**as Receiver of Silicon Valley Bank, Santa Clara, CA**



**SILICON VALLEY BRIDGE BANK, NA**

BDI Transfer Agreement

## **<u>SCHEDULE 1.01</u>**

Retained QFCs

None.

## **SCHEDULE 1.02**

Retained Subsidiaries

None.

## SCHEDULE 2.02(a)

Assumed Liabilities





SCHEDULE 2.02(a)
2



SCHEDULE 2.02(a)
3



SCHEDULE 2.02(a)

4



SCHEDULE 2.02(a)

5



SCHEDULE 2.02(a)
6



SCHEDULE 2.02(a)
7



SCHEDULE 2.02(a)
8



SCHEDULE 2.02(a)
9

BDI Transfer Agreement





SCHEDULE 2.02(a)
11



SCHEDULE 2.02(a)
12

## <u>SCHEDULE 2.02(b)</u>

Deposits to be assumed that are not otherwise covered
by the definition of Assumed Deposits


None.

## **<u>SCHEDULE 2.03(b)</u>**

Certain Retained Assets

None.

## SCHEDULE 6.14

Servicing

1.    Subservicing.  The Bridge Bank must subservice, and perform the obligations of the Receiver related to Loans and other assets identified by the Receiver that are Retained Assets on behalf of the Receiver pursuant to the terms of this Schedule 6.14 (the "Serviced Assets"). "Loans" means (i) "consumer loans", "home loans", "loan commitment", "real estate loan", and "small business loan" (each as defined in 12 U.S.C. § ____, (ii) all other loans or extensions of credit, including reverse mortgage loans, participation agreements and interests, revolving lines of credit, home equity lines of credit, commitments to extend credit, lease financing contracts, and student loans, and (iii) all liens, pledges, guarantees, security interests or other collateral, guaranty, or surety related to the items listed in (i) and (ii).

2.    Term.  The Bridge Bank must perform these obligations unless and until the Receiver provides notice to the Bridge Bank withdrawing one or more Serviced Assets from the scope of the Bridge Bank's obligations pursuant to this Schedule 6.14 (each, a "Withdrawal Notice") until the Servicing Termination Date. The Withdrawal Notice will include an effective date that will not be less than thirty (30) days after the Withdrawal Notice is delivered to the Bridge Bank. The Bridge Bank will transfer the Serviced Asset(s) identified in the Withdrawal Notice and all files and records related thereto as required by the Receiver. On the effective date identified by the Receiver in the Withdrawal Notice, "Serviced Assets" will no longer include the asset(s) identified in the Withdrawal Notice.

3.    Servicing Standards.

    a.  The Bridge Bank must service each Serviced Asset in compliance with:

        i.  all law, regulation and guidance applicable to (A) the Serviced Asset, (B) any guaranty of, or related to, the Serviced Asset, and (C) the servicing and performance of the Receiver's and any servicer's obligations related to the Serviced Assets;

        ii.  any express direction provided by the Receiver to the Bridge Bank pursuant to a notice;

        iii.  all contractual obligations binding on the Failed Bank related to (A) the Serviced Asset, (B) any guarantee of, or related to, a Serviced Asset, including servicing agreements, loan sale agreements, pooling agreements, federal agency and government sponsored entity guides, guarantees, guidance, and contracts, and (C) the servicing and performance of the Receiver's obligations related to the Serviced Assets;

    iv.  the policies, procedures, and practices of the Failed Bank with regard to the performance of its obligations related to the Serviced Asset; and

    v.  the commercially reasonable, industry standards for each Serviced Asset.

b.  The Bridge Bank must comply with the standards set forth in <u>Section 3.a</u> of this <u>Schedule 6.14</u> in the following order of priority:  i, ii, iii, iv, and v. If any of the requirements in <u>Section 3.a.i, iii, iv, or v</u> of this <u>Schedule 6.14</u> conflict with each other, the Bridge Bank must provide prompt notice to the Receiver.

c.  The Receiver has the right, in its discretion, to revise the policies, procedures, and practices referenced in <u>Section 3.a.iv</u> of this <u>Schedule 6.14</u> by providing notice to the Bridge Bank (the "<u>Revised Policies</u>"). Any such Revised Policies will be effective upon the Bridge Bank's receipt thereof and will replace, to the extent of the revision, the policies, procedures, and practices of the Failed Bank for purposes of <u>Section 3.a.iv</u> of this <u>Schedule 6.14</u>.

4.    <u>Expected Servicing Activities</u>. The Parties expect the Bridge Bank's performance of its obligations under this <u>Schedule 6.14</u> to include the following:

a.  collecting and recording payments;

b.  reversing payments where there were 'not sufficient funds' in the account;

c.  remitting payments to participants and investors;

d.  sending billing statements to obligors;

e.  sending default notices to obligors;

f.  responding to loan payoff requests;

g.  coordinating lien releases when obligations are satisfied;

h.  monitoring and satisfying, if necessary, ad valorem tax obligations related to, insurance coverage on, and any applicable homeowner dues related to the collateral;

i.  maintaining and administering escrow accounts;

j.  inspecting collateral as required or appropriate;

k.  filing insurance claims and managing the claims process for any applicable insurance coverage pertaining to the Serviced Asset where the Failed Bank is a beneficiary, including but not limited to, title insurance, government guarantees, hazard insurance, private mortgage insurance, etc.;

    l.  filing informational tax reporting for any Serviced Asset, if applicable;

    m.  filing all information and reporting required by any governmental agency or counterparty, and cooperate with all audits and inspections;

    n.  administering loan participations;

    o.  administering and enforcing loan covenants;

    p.  evaluating and processing funding requests, draws and protective advances (including interest reserve) in accordance with existing loan terms/covenants and in conformance with market practice and internally documented policies and procedures;

    q.  adopting and implementing loss mitigation strategies and actions when necessary, including loan renewals, modifications, restructures, settlements, discounted pay-offs, deeds-in-lieu, non-judicial foreclosures, repossessions, and the liquidation of collateral, when necessary and in compliance with existing internal policies and procedures or practices and new programs as may be directed by the Receiver; and

    r.  Performing property preservation, protection and liquidation, as applicable.

5.   <u>Other Obligations</u>.  The Bridge Bank must:

    a.  establish custodial account(s) for funds collected from the Serviced Assets, and remit such funds, net of compensation per Exhibit A, as directed by the Receiver;

    b.  take reasonable steps to obtain all necessary qualifications to comply with law and regulation, to satisfy third-party requirements related to the Serviced Assets or any guarantee related thereto, or to perform the Receiver's obligations related to the Serviced Assets;

    c.  immediately provide whatever notices, file any necessary documents, undertake any other action to comply with law, regulation and guidance applicable to the transfer of the Serviced Assets to the Bridge Bank for subservicing;

    d.  maintain all servicing platforms and IT infrastructure (Data Management Equipment, or DME) necessary for servicing the Serviced Assets. The Bridge Bank may not move any Serviced Asset off of the servicing platform or other system that was used by the Failed Bank for each such Serviced Asset without the prior consent of the Receiver, that must be obtained by the Bridge Bank no less than sixty (60) days prior to the Bridge Bank taking any action. Consent by the Receiver will not be unreasonably withheld;

    e.  provide the Receiver with access to servicing systems, default management systems, and imaging or other electronic systems where information related to the Serviced Assets resides;

SCHEDULE 6.14<br>3

f. provide secure inquiry access to all data related to the Serviced Assets for individuals identified by the Receiver by notice to the Bridge Bank, including remote access, that permits online, real-time inquiries on individual loans and printing results of the inquiries remotely and onsite;

g. employ a sufficient number of qualified staff to fulfill the requirements under this agreement and with the number and qualifications of such employees to be not less than that existing at the Failed Bank on the Bank Closing Date;

h. maintain historic loan data for the Serviced Assets;

i. maintain accurate records of all actions affecting Serviced Assets;

j. maintain credit and collateral files for the Receiver, segregated from the Failed Bank Records;

k. provide ability to monitor, track, and accommodate transactions using cryptocurrency or digital assets;

l. provide access to and ability to obtain loan-level information from Bridge Bank personnel;

m. provide access to and ability to use and download information from Data Management Equipment; and

n. provide other services, operations, or functions, as requested by the Receiver.

6. <u>Transition (Sale and/or Conversion) Requirements</u>.  At the Receiver's request, the Bridge Bank will provide the following services in connection with the marketing, sale and transfer of any Serviced Asset:

a. administrative services related to loan sales, including provision of bidder access to Virtual Data Rooms (VDR) and or other imaged loan file solutions;

b. provision of data on Serviced Assets (including conversion reports and access to imaged loan collateral files);

c. access to employees for purposes of facilitating conversion and supporting sale processes;

d. assist in performing diligence on Serviced Assets;

e. transfer of servicing as directed by FDIC; and

f. cooperate with the Receiver to facilitate orderly transition of assets.

SCHEDULE 6.14

4

7.  <u>Reserved Authority</u>.  The Bridge Bank must obtain consent and direction from the Receiver before taking any of the actions listed below. The Receiver has the right, in its discretion, to undertake these actions directly:

    a.  initiate offensive asset-related litigation, including filing counter-claims, or judicial foreclosures;

    b.  any communication or other actions taken to resolve loan relationships (loans with common obligors) with combined book balances above $25 million;

    c.  fund any loan with an unfunded commitment that as of the date of failure that had an unfunded amount of more than $7.5 million;

    d.  initiate non-judicial foreclosures; and

    e.  any sale or disposition of any Servicing Asset.

8.  <u>Additional Direction and Obligations</u>.  Pursuant to notice provided by the Receiver to the Bridge Bank, the Receiver has the right to, in its discretion, further restrict the Bridge Bank's authority under this agreement, to provide supplemental direction to the Bridge Bank regarding the handling of the Serviced Assets, and to request additional support and services from the Bridge Bank in connection with the Receiver's resolution activities related to the Serviced Assets.

9.  <u>Reporting</u>.  The Receiver may require, in its discretion, the Bridge Bank to provide reports (singular, recurring or intermittent), in a form acceptable to the Receiver, to the Receiver upon request. Such reports may include, but are not limited to, the following information:

    a.  collections and trial balances;

    b.  electronic copies of checks/remittances;

    c.  'not sufficient funds' returns;

    d.  remittances to participants / investors; and

    e.  borrower notices.

10.  <u>Claims and Litigation</u>.  The Bridge Bank must notify the Receiver of any Claims asserted in connection with or related to any Serviced Asset pursuant to <u>Section 7.02</u>.

11.  <u>Remittance and Fees</u>.  All compensation, including fees, remittances, and reimbursements, related to the Bridge Bank's performance of its obligations pursuant to this <u>Schedule 6.14</u> are set forth on <u>Exhibit A</u> to this <u>Schedule 6.14</u>.

12.  <u>Indemnification</u>.  The Parties have provided certain indemnifications, as provided in <u>Article VIII</u>.

## Exhibit A to Schedule 6.14

### Compensation

1. <u>Serviced Asset Compensation</u> – The Receiver will remit, reimburse and compensate the Bridge Bank for servicing Serviced Assets according to the following components:

   a. reimbursement for direct costs incurred by the Bridge Bank to service each Serviced Asset. Direct costs include, but are not limited to, annual regulatory compliance reviews, borrower communications, tax and insurance filings, and other expenses incurred to service each Serviced Asset;

   b. reimbursement of allocated fixed costs incurred by the Bridge Bank to service Serviced Assets. These fixed costs include, but are not limited to, an allocation of the Bridge Bank's lease expenses, Leased Data Management Equipment expenses, and other indirect expenses allocated for servicing Serviced Assets;

   c. reimbursement of allocated variable costs incurred by the Bridge Bank to service Serviced Assets. These include, but are not limited to, an allocation of Bridge Bank employee costs for performing servicing on Serviced Assets;

   d. reimbursement for any pass through expenses incurred in the course of servicing each Serviced Asset. These include, but are not limited to, property taxes, forced place insurance, agency fees, and other pass-through expenses needed to appropriately service each Serviced Asset;

   e. reimbursement of costs incurred for any action taken at the direction of the Receiver pursuant to <u>Sections 5, 6, 8 and 9</u> of <u>Schedule 6.14</u>; and

   f. additional compensation ("<u>Fee</u>") for each Serviced Asset, calculated on a per-asset basis per month.

2. <u>Investor Servicing</u> – If the Receiver require subservicing for retained servicing rights on loans and other assets owned by third parties, the Bridge Bank will be entitled to retain the contractual servicing fees associated with such servicing. The Bridge Bank will not be entitled to receive compensation listed in <u>Section 1</u> of this <u>Exhibit A</u> to <u>Schedule 6.14</u> for this servicing.

3. <u>Compensation Calculation</u> – Within a reasonable period after bank failure, the Bridge Bank will provide to the Receiver an initial calculation of allocated fixed and variable costs and a proposed Fee for each Serviced Asset. The Receiver will have sole discretion to accept or reject this proposal. Thereafter, by the tenth (10th) Business Day of each subsequent calendar month, the Bridge Bank will provide (i) an updated calculation of allocated fixed and variable costs since the first calendar day of the prior month; (ii) a report identifying the count, balance, and type of all Serviced Assets and the aggregate changes in the count,

balance, and type of all Serviced Assets since the first calendar day of the prior month; and (iii) an adjusted Fee for the remaining Serviced Assets..

4. <u>Compensation Invoice</u> – The Bridge Bank will provide an invoice providing an accounting of monies owed by the Receiver to the Bridge Bank for items listed in <u>Sections 1 and 2</u> of this <u>Exhibit A</u> to <u>Schedule 6.14</u>, by the tenth (10th) Business Day of each calendar month.

**<u>SCHEDULE 6.15(b)</u>**

Bank Premises located in Underserved Areas

[To follow.]

**EXHIBIT 2.04(c)/2.06**

Call Assignment

**[Bridge Bank Letterhead]**

_____, ____

The Federal Deposit Insurance Corporation,
  as receiver of **[name of Failed Bank]**
Attn:  Settlement Agent

Re:    Assignment of Assets and Liabilities

Pursuant to the Federal Deposit Insurance Corporation's rights as receiver of **[name of Failed Bank]** (the "Receiver") under the Transfer Agreement (the "Agreement"), dated as of **[date of BDI TA]**, by and between the Receiver and **[name of Bridge Bank]** (the "Bridge Bank"), the Receiver has required the Bridge Bank to assign certain assets and liabilities identified on the attached schedule (the "Requested Assets") to the Receiver.

Pursuant to its obligations under the Agreement, the Bridge Bank hereby assigns, conveys and transfers all of its right, title, and interest in and to, and transfers all obligations and liabilities related to, the Requested Assets to the Receiver, effective as of the date of this letter. Please return a countersigned version of this letter at your convenience.

Sincerely,

**[name of Bridge Bank]**

By:    _____
Name:  _____
Title:   _____

        The Federal Deposit Insurance Corporation, as receiver of **[name of Failed Bank]** accepts and assumes all of the Bridge Bank's right, title, and interest in and to, and assumes all obligations and liabilities related to, the Requested Assets as of the date of this letter.

        The Federal Deposit Insurance Corporation,
        as receiver of **[name of Failed Bank]**

        By:    _____
        Name:  _____
        Title:   _____

EXHIBIT 2.05
1

BDI Transfer Agreement

**EXHIBIT 2.04(b)/2.05**

Put Assignment

**[FDIC Letterhead]**

_____, _____

**[name of Failed Bank]**
Attn:  Settlement Designee

Re:       Assignment of Assets and Liabilities

Pursuant to the Federal Deposit Insurance Corporation's rights as receiver of **[name of Failed Bank]** (the "Receiver") under the Transfer Agreement (the "Agreement"), dated as of **[date of BDI TA]**, by and between the Receiver and **[name of Bridge Bank]** (the "Bridge Bank"), the Receiver hereby contributes, assigns, conveys and transfers all of its right, title, and interest in and to, and transfers all obligations and liabilities related to the assets and liabilities shown on the attached schedule, excluding the Retained Assets (the "Transferred Assets/Liabilities") to the Bridge Bank, effective as of the date the Bridge Bank countersigns this letter.

The Bridge Bank is required to return a countersigned version of this letter to the Receiver on or before ten (10) days after the date of this letter, pursuant to the terms of the Agreement.

Sincerely,

The Federal Deposit Insurance Corporation,
   as receiver of **[name of Failed Bank]**

By:     _____
Name:  _____
Title:    _____

> **[name of Bridge Bank]** accepts and assumes all of the Receiver's right, title, and interest in and to, and assumes all obligations and liabilities related to, the Transferred Assets/Liabilities, effective as of the date the Bridge Bank countersigns this letter.
>
> **[name of Bridge Bank]**          **Date executed:  _____, _____**
>
> By:     _____
> Name:  _____
> Title:    _____

EXHIBIT 2.06
1

**EXHIBIT 3.03**

Settlement Designation Form

**[Bridge Bank letterhead]**

_____, ____

**[Name of Settlement Agent]**

Re:    Designation of Settlement Designee

Dear **[Mr./Ms. _____]**

The employee named below will represent **[name of Bridge Bank]** (the "Bridge Bank") as its Settlement Designee and can authorize settlement transactions as reflected on the Settlement Transaction Forms on behalf of the Bridge Bank. Additionally, this individual is empowered to approve all actions of the Bridge Bank described in Article II and Article III of the Transfer Agreement, dated _____, by and between the Federal Deposit Insurance Corporation as receiver of **[name of failed bank]** and the Bridge Bank (the "Agreement").

_____
(Settlement Designee's Name)

_____
(Bridge Bank's Address)

_____
(Bridge Bank's City, State Zip)

_____
(Telephone – Settlement Designee)

_____
(Email address - Settlement Designee)

The Bridge Bank Settlement Designee will be available to review settlement items regularly with the Settlement Agent (as defined in the Agreement).

**[Name of Bridge Bank]**

By:    _____
Name:  _____
Title:  _____

                          Acceptance by Settlement Designee:

                          By:    _____
                          Name:  _____
                          Title:  _____

EXHIBIT 3.03
1

## <u>EXHIBIT 4.02(a)</u>

Notice to Depositors

**Form to follow.**

EXHIBIT 4.02(a)

1

## **EXHIBIT 4.02(b)**

Form of Public Notice

**Form to follow.**

EXHIBIT 4.02(b)

1

BDI Transfer Agreement

**EXHIBIT 4.02(d)**

Affidavit of Mailing – Notice to Depositors

**AFFIDAVIT OF MAILING**

State of:        _____

County of:      _____

I am employed as a **[title or corporate position]** by **[name of Bridge Bank]**.

I hereby attest that on **[date of mailing]**, I caused a true and correct copy of the Notice to Depositors to all identified deposit holders of **[Failed Bank name]**, **[City, State]**, as required in the Transfer Agreement, to be prepared and mailed via the United States Post Office on behalf of the Federal Deposit Insurance Corporation. A list of the depositors to whom the notice was mailed is attached. This notice was mailed to the last known address of the depositors as reflected on the books and records of the failed bank as of the date of failure.

_____

Name:  _____

Title:  _____


Subscribed and sworn to before me this _____ day of _____, _____.

My Commission Expires:

EXHIBIT 4.02(d)
1

<u>**EXHIBIT 4.05(a)-1**</u>

Final Legal Notice

**Form to follow.**

EXHIBIT 4.05(a)-1

1

**EXHIBIT 4.05(a)-2**

Affidavit of Mailing – Unclaimed Deposits

**AFFIDAVIT OF MAILING**

State of: _____

County of: _____

I am employed as a **[title or corporate position]** by **[name of Bridge Bank]**.

I hereby attest that on **[date of mailing]**, I caused a true and correct copy of the FDIC Final Legal Notice – 15 Month Letter to all identified deposit holders who have not yet claimed their deposit(s) from **[Failed Bank name]**, **[City, State]**, as required in the Transfer Agreement, to be prepared and mailed via the United States Post Office on behalf of the Federal Deposit Insurance Corporation. A list of the depositors to whom the notice was mailed is attached. This notice was mailed to the last known address of the depositors as reflected on the books and records of the failed institution as of the date of failure.

_____

Name: _____

Title: _____

Subscribed and sworn to before me this _____ day of _____, ____.

My Commission Expires:

_____        _____

EXHIBIT 4.01(A)-2
1

**EXHIBIT 6.18**

Assignment and Recovery Sharing Agreement

**ASSIGNMENT AND RECOVERY SHARING AGREEMENT**

THIS ASSIGNMENT AND RECOVERY SHARING AGREEMENT (the "Agreement"), dated _____, 2020, by and between **[NAME OF SUBSIDIARY]**, a _____ corporation with its principal place of business in _____ (the "Assignor"); and the Federal Deposit Insurance Corporation (the "FDIC") as receiver of _____ (the "Receiver"). The Assignor and Receiver may be referred to individually as a "Party" or collectively as the "Parties").

**RECITALS**

WHEREAS, prior to **[DATE OF BANK FAILURE]** (the "Bank Closing Date"), **[NAME OF FAILED BANK]** (the "Failed Bank") was an insured depository institution organized and existing under the laws of _____;

WHEREAS, on the Bank Closing Date, the **[IDENTIFY THE BANK CLOSING AUTHORITY]** closed the Failed Bank and pursuant to 12 U.S.C. § 1821(c) the FDIC was appointed receiver;

WHEREAS, the Receiver succeeded to all rights, titles, powers and privileges of the Failed Bank, including those with respect to Assignor, as a wholly-owned subsidiary of the Failed Bank, in accordance with 12 U.S.C. § 1821(d); and

WHEREAS, Assignor will assign its rights, title, and interest in the Assigned Claims (defined below) to the Receiver, pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and promises contained in this Agreement, and other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Parties agree as follows:

**AGREEMENT**

1. **Definitions.**

**"Assigned Claims"** means all of the Assignor's right, title and interest in and to any Claim and Litigation against or relating to: **[PLFCS will identify either the Persons and/or categories of claims to be assigned, to be inserted depending on the circumstances]**, to the extent that the acts, omissions, or other events giving rise to any such Claim occurred on or before the Bank Closing Date, regardless of when any such Claim is discovered and regardless of whether any such Claim is made with respect to a financial institution or fidelity bond, commercial crime policy, directors' and officers' liability insurance, or any other professional liability insurance or similar insurance policy of Assignor in force as of the Bank Closing Date.

EXHIBIT 6.18
1

**"Books and Records"** means originals or true copies of all of Assignor's books, records, ledgers, files, documents, databases or other data and information in any form or medium and in any location whatsoever.

**"Claim"** means any and all actual or potential claims, rights to payment or other relief, demands, obligations, damages, actions and causes of action, suits, controversies, interest, costs, attorneys' fees, expenses, damages, or judgments whatsoever, direct or indirect, in law or in equity, whether known or unknown, now existing or hereafter arising, whether contingent or liquidated, contractual, extra-contractual, non-contractual, statutory, in tort or otherwise, of every kind, nature, and description.

**"Consideration"** has the meaning set forth in Section 3 of this Agreement.

**"Copy"** means a print out, replication, or reproduction of any paper, disk, tape, film, memory or storage device, whether it is digital, electronic or any other material or object on or in which any words, images, objects, code or other symbols are written, recorded or encoded, whether permanent or transitory.

**"Full Resolution"** means that the Assigned Claims have been fully and finally resolved by settlement, compromise, or final judgment (where appeal has been exhausted or time for appeal has expired) and all proceeds (including interest) due under the settlement, compromise or judgment have been paid to the Receiver, and/or the Receiver has closed out the Assigned Claims.

**"Litigation"** means any actual, existing, pending, or threatened cause of action, court action, administrative or regulatory action, claim, suit, appeal, proceeding, arbitration, mediation, bankruptcy action, or foreclosure to which the Assignor is a party or has rights to assert a claim or defense.

**"Litigation Expenses"** means all of the Receiver's out-of-pocket fees and expenses (including any costs and fees for retained counsel, contractors, vendors, consultants and expert witnesses) incurred in connection with the investigation, litigation and settlement of the Assigned Claims.

**"Net Recovery"** means an amount calculated by deducting the Litigation Expenses from the total amount recovered by the Receiver on the Assigned Claims.

**"Person"** means any individual, corporation, partnership, joint venture, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

**2.  Assignment.**  For good and valuable consideration as set forth in this Agreement, receipt of which is hereby acknowledged by Assignor, Assignor irrevocably and unconditionally transfers and assigns all of its rights, title and interest in the Assigned Claims to the Receiver, which Receiver accepts. In its sole discretion, the Receiver may investigate, prosecute, defend, control, settle or compromise any and all of the Assigned Claims, in the name of Assignor or Receiver. Any settlement or compromise entered into by the Receiver related to the Assigned Claims must

EXHIBIT 6.18
2

include a release of the Assignor to the same extent as the Receiver is released from the Claims and liability by all counterparties to such settlement or compromise, unless the Assignor consents otherwise.

**3.   Consideration; Recovery Sharing.**  The Receiver will pay to the Assignor fifty percent (50%) of any Net Recovery on the Assigned Claims, whether obtained by settlement, compromise or satisfied judgment (the "Consideration"). The Receiver will pay the Consideration to the Assignor within thirty (30) days after Full Resolution of the Assigned Claims; provided, however, that the Receiver in its sole discretion can make interim payment(s) before Full Resolution of the Assigned Claims. The Assignor is not entitled to share in the proceeds of any recovery by the Receiver on any Claim or Litigation that is not an Assigned Claim, including any direct Claim of the Receiver arising out of the failure of the Failed Bank. The Assignor has no liability to the Receiver related to (i) the Receiver's internal expenses, or (ii) for the Litigation Expenses, regardless of whether the Receiver recovers any or all of the Litigation Expenses from the proceeds of the recovery on the Assigned Claims. The Receiver incurs the Litigation Expenses and pursues the Assigned Claims at its own risk.

**4.   Covenant Not To Sue.**  The Assignor warrants and covenants not to bring any Litigation or Claim against any Person arising out of the Assigned Claims and waives its rights to bring any such Litigation or Claim; provided, however, nothing in this Section 4 restricts the Assignor from asserting a Claim or pursuing Litigation against the Receiver to enforce the terms of this Agreement.

**5.   Cooperation**.

a.   Use, Access and Inspection of Assignor Books and Records.  The Receiver has the right to access, use and inspect the Assignor's Books and Records without having to provide a subpoena. The Assignor will permit the Receiver to make extracts from, request Copies of and to duplicate any Books and Records of Assignor, in the sole discretion of the Receiver. The Receiver will bear the cost of obtaining a Copy, duplicate or extract of any Assignor Book and Record at the rate set by 12 C.F.R. Part 309.5(f)(3). Assignor will provide any requested Copy, duplicate or extract to the Receiver within five (5) business days unless otherwise agreed.

b.   Subpoenas and Discovery.  The Receiver has the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Assigned Claims. Assignor agrees to cooperate and assist the Receiver in responding to such subpoenas, requests and inquiries. Within two (2) business days after the Assignor's receipt of any subpoena, discovery request, or other similar official inquiry with respect to the Assigned Claims, Assignor will provide notice to the Receiver, enclosing a copy of any subpoena, discovery request, or similar official inquiry.

b.   Investigations and Proceedings.  In connection with any investigation, proceeding or other matter related in any manner to the Assigned Claims, the Assignor will cooperate to the extent reasonably required by the Receiver, including making witnesses available for deposition, interviews and court proceedings.

**6.   Miscellaneous.**

EXHIBIT 6.18

3

     a.  <u>Governing Law</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER ARE GOVERNED BY AND WILL BE CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA AND, IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF ASSIGNOR IS LOCATED.

     b.  <u>Notices</u>.  Any notice relating to or arising out of this Agreement is effective when received and must be in writing and delivered to such Party (with copies as indicated below) by personal delivery or by nationally recognized and trackable overnight delivery service, at the address set forth below or at such other address as a Party hereafter furnishes by notice hereunder to the other Party.

**Assignor:**

_____

_____

_____

**Copy to:**

_____

_____

_____

**Receiver:**

_____

_____

_____

**Copy to:**

_____

_____

_____

     c.  <u>Entire Agreement; Counterparts</u>.  This Agreement embodies the entire agreement of the Parties in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the Parties. No amendment or other modification, rescission or release is effective except pursuant to a written agreement executed by the duly authorized representatives of the Parties. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, and all of which when taken together constitute one and the same Agreement.

     d.  <u>Binding Effect; Survival; No Third Party Beneficiaries</u>.  This Agreement and the representations and warranties, covenants and agreements herein contained survive execution, delivery and performance of this Agreement and continue in full force and effect until the Assigned Claims are fully resolved and all amounts due hereunder are paid in full. This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and assigns. Nothing expressed or referred to in this Agreement is intended to, or will be

EXHIBIT 6.18
4

construed to, give any Person other than the Receiver and Assignor any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein.

[Signatures on Following Page]

EXHIBIT 6.18
5
BDI Transfer Agreement

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives on the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION,**
**as Receiver of [NAME AND CITY OF FAILED BANK]**

By: _____
Name: _____
Title: _____

**[NAME OF ASSIGNOR]**

By: _____
Name: _____
Title: _____

EXHIBIT 6.18
6
BDI Transfer Agreement