1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Beth Labson Freeman, District Judge

4

5  SVB FINANCIAL GROUP,          )
                                 )
6          Plaintiff,            )
                                 )
7  vs.                           )   Case No. C 24-01321-BLF
                                 )
8  FEDERAL DEPOSIT INSURANCE     )
   CORPORATION, AS RECEIVER FOR  )
9  SILICON VALLEY BANK, et al.,  )
                                 )
10         Defendants.           )
   _____)

11

12                              San Jose, California
                                Thursday, June 13, 2024
13

14  <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND</u>
           <u>RECORDING 11:36 - 12:16 = 40 MINUTES</u>
15

16  <u>APPEARANCES</u>:

17  For Plaintiff:
                           Sullivan & Cromwell, LLP
18                         1888 Century Park East
                           Los Angeles, California 90067
19                   BY:   DIANE L. MCGIMSEY, ESQ.
                           ROBERT A. SACKS, ESQ.
20
    For Defendants:
21                         Reed Smith, LLP
                           599 Lexington Avenue
22                         Suite 22
                           New York, New York 10022
23                   BY:   CASEY D. LAFFEY, ESQ.

24
                 (APPEARANCES CONTINUED ON NEXT PAGE)
25

2

1 | For Defendants:

2 |                                  Reed Smith, LLP
                                     101 Second Street, Suite 1800
                                     San Francisco, California
3 |                                     94105
                             BY:  EMILY F. LYNCH, ESQ.

4 |

5 |                                  Reed Smith, LLP
                                     1201 North Market Street
                                     Suite 1500
6 |                                  Wilmington, Delaware 19901
                             BY:  KURT F. GWYNNE, ESQ.

7 |

8 | Transcribed by:                 Echo Reporting, Inc.
                                    Contracted Court Reporter/
                                    Transcriber
9 |                                  echoreporting@yahoo.com

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

*Echo Reporting, Inc.*

3

1  <u>Thursday, June 13, 2024</u>                              <u>11:36 a.m.</u>

2                   P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4        THE CLERK:  Calling Case 24-1321, SVB Financial

5  Group versus Federal Deposit Insurance Corporation as

6  Receivers of Silicon Valley Bank, et al.

7      Counsel, if you would please state your appearances

8  and, again, begin with Plaintiff and the move to Defendants.

9        MR. SACKS (via Zoom):  Good morning again, your

10 Honor.  Robert Sacks and Diane McGimsey from Sullivan and

11 Cromwell, for the Plaintiff.

12       MR. LAFFEY (via Zoom):  And good morning, your

13 Honor.  It's Casey Laffey and Kurt Gwynne from Reed Smith

14 for the FDIC in its capacity as Receiver for Silicon Valley

15 Bank as well as its capacity as Receiver for Silicon Valley

16 Bridge Bank.

17     I believe Mr. Gwynne is taking the lead today.  I see

18 he is -- oh, there he is.  He's on, but you're muted.  So,

19 good morning, your Honor.

20       MS. LYNCH:  And Emily Lynch, also for the FDICR's,

21 your Honor.

22       THE COURT:  All right.  Good morning.

23     All right.  So, we have not had any case management in

24 this case yet.  So, Mr. Sacks, do these cases just proceed

25 parallel to each other?  They're related, but I didn't

4

1 consolidate them.  I think the issues are different.

2     What's your thinking on it?

3         MR. SACKS:  My thought, your Honor, is that

4 discovery, because there's overlapping discovery --

5         THE COURT:  Um-hmm.

6         MR. SACKS:  -- would be joint.  If a witness is

7 being deposed, it's all the same set of facts.

8         THE COURT:  Okay.

9         MR. SACKS:  I think we would do that in both

10 cases.  And depending upon how your Honor rules on the

11 motions to dismiss in the different cases, whether further

12 coordination -- whether further consolidation would be

13 appropriate could be determined at that time.

14     As you're aware, if the claim against the FDIC

15 Corporate an APA claim, that's a very narrow case and a

16 particular standard of review.  That standard of review is

17 not applicable to the claim against the FDIC Receivers, both

18 sets of Receivers, which are de novo review.  And, so,

19 regardless of whether they prevail on any or all of their

20 motions to dismiss, there will be a case that will be a de

21 novo factual review of the claim in this case.  And whether

22 that should be consolidated for trial with the FDICC I think

23 is largely dependent upon how you rule on the motions to

24 dismiss.  But discovery is clearly -- deposition discovery

25 particularly is clearly one in the same, yeah.

5

1          THE COURT:  Okay.  Mr. Laffey, Mr. Gwynne, do you

2    agree with that?

3          MR. GWYNNE (via Zoom):  Good morning, your Honor.

4    Kurt Gwynne from Reed Smith.  We do not agree with that --

5    this case -- this case is vastly different from the case

6    against FDIC Corporate, and I'd like to take a minute, your

7    Honor, to explain and emphasize the differences between FDIC

8    in its Corporate capacity and FDIC as Receiver and how

9    that's relevant and why these cases are so different.

10         The -- the FDIC as Receiver and the FDIC Corporate or

11   what we call FDICC are separate and distinct entities under

12   the law.

13         THE COURT:  Um-hmm.

14         MR. GWYNNE:  The FDIC insures deposits.  It

15   examines and supervises insured depository institutions,

16   protects consumers, and it administers what's called a

17   Deposit Insurance Fund, something you may hear about later.

18         The FDIC as Receiver, on the other hand, steps into the

19   shoes of failed insured depository institutions or what we

20   call banks, steps into the shoes of the failed banks and

21   acts as the receiver for them.  By doing so, the FDIC as

22   Receiver succeeds to all the failed bank's rights, title and

23   interest to claims, causes of actions and defenses, and it

24   also administers a claims process under Title 12, the way a

25   Bankruptcy Court would do for a corporation or an LLC or a

6

1  partnership.  Banks aren't eligible to file bankruptcy in --

2  under Section 109 of the Bankruptcy Code.

3       Congress instead provided for the resolution and

4  liquidation of banks under Title 12, and the FDIC as

5  Receiver runs that claims process.

6       The FDIC as Receiver also succeeds to the liability of

7  the failed bank for -- for the deposit claims that it has

8  subject to its defenses and in right of setoff.

9       FDIC Corporate does not act as Receiver.  It's not

10 involved in the claims allowance process if the FDIC runs as

11 Receiver.

12      And, so, what does all that mean for purposes of these

13 two actions and why does it make them so different?

14          THE COURT:  Um-hmm.

15          MR. GWYNNE:  The FDIC, since its appointment, the

16 day the bank failed, it was appointed on March 10th of 2023

17 as Receiver.  From that -- the inception of that

18 appointment, it has been, in addition to trying to, you

19 know, gather assets and -- and sell the bank's assets that

20 ultimately were sold to First Citizen's Bank, but the FDIC

21 as Receiver has been investigating causes of action owned by

22 the bank, including causes of action or defenses against the

23 parent company, which is the Plaintiff in this case.

24      The FDIC in doing so has identified several very large

25 defensive setoffs that are going to be -- you know, that

7

1 play a major part in this litigation and in discovery.  And

2 these defensive setoffs have to do with mismanagement of

3 what we call the Hold to Maturity Securities Portfolio,

4 mismanagement of what's called the AFS or Available for

5 Securities Portfolio, including improperly removing hedges

6 that protected against interest rate -- losses when interest

7 rates rise.

8      The parent company caused the bank to remove those

9 hedges which -- and did so because it improved profitability

10 and management compensation, compensation of the D's and

11 O's.  In addition, there were payment of improper dividends

12 when the bank was experiencing financial distress.  In fact,

13 there were management bonuses paid on the very day the bank

14 failed.

15      In addition, the bank had been for years selling

16 warrants below fair market value to the parent company.  And

17 then, lastly, there's also potential issues regarding tax

18 refund claims based on the -- the returns of the bank, you

19 know, the bank's characteristics.

20      So, all of those things, all four or five of those

21 defensive offsets are only involved in this case.  None of

22 those issues are implicated in any way, shape or form in the

23 litigation against FDIC Corporate.

24      So, here we have a 12-count complaint against two

25 Receivers, FDICR-1, which is what the call the Receiver for

8

1 Silicon Valley Bank, and then FDICR-2, the Receiver for

2 Silicon Valley Bridge Bank.

3      So, we have a 12-count complaint.  We've got those five

4 large setoff claims.  The amount of the complaint is the

5 same in both cases.  That's one difference.  I mean, sorry,

6 that's one similarity.  The FDIC Corporate, the Debtor's

7 chasing the same $1.93 billion that it's asserting against

8 the FDIC R's.  But the defensive setoff claims which are

9 those defenses exceeding $5 billion -- and, by the way,

10 we're not seeking an affirmative recovery.  We're just

11 saying whatever the amount is, we've got a lot -- you know,

12 we have $5 billion to set off their $1.93.  That is only an

13 issue in this case.

14      The reason -- and I won't get into the discovery now,

15 the schedules, because I told your Honor I just wanted to

16 explain why -- why the cases are different.  But even the

17 Plaintiff identified 16 legal issues, 21 topics of --

18 general topics of discovery, and 55 individuals.  Your Honor

19 doesn't know this, but they identified 55 individuals in

20 their initial disclosures of people with -- with, you know,

21 relevant information regarding the case.

22      Well, the FDICR's, the Receivers, identified 15 legal

23 issues, six additional discovery topics, and 57 different

24 individuals.  We identified a total of 61, 57 of which were

25 different than the 55 that -- that they identified.

9

1    So, unlike the other case where they're saying, Oh, we
2 may not need a lot of discovery, here we've got, you know,
3 12 counts, 31 general legal issues, 27 general -- broad
4 discovery topics.  And already at the outset of the case,
5 potentially 112 individuals with knowledge of relevant
6 facts.

7    We also have because of our five defensive offsets,
8 expert discovery anticipate on eight -- eight issues,
9 Silicon Valley Bank Financial Group's financial condition,
10 the bank management or mismanagement, the warrant valuation,
11 bank director and officer comp, management of the HTM, the
12 Hold to Maturity Securities Portfolio, management of the
13 AFS, Available for Sale Securities Portfolio, and the
14 removal of the hedges, improper payment of dividends, and
15 damages flowing from all of those offsets.  That's eight
16 issues of which expert testimony will be required that are
17 -- none of -- none of those issues are involved in the FDIC
18 Corporate litigation.

19    So, the civil action that the Plaintiff filed against
20 FDIC Corporate doesn't contain those complexities.  This
21 cause of action against the FDIC -- FDICR's is not a run-of-
22 the-mill civil action.  You know, the amounts at issue are
23 staggering.  The issues are complex.  It involves the
24 invocation of the systemic risk exception in a context in
25 which it has never been evoked before.  So, it also involves

1 matters of first impression.  And of course, I think it's

2 obvious that, you know, these are issues of national -- of

3 national importance.

4          THE COURT:  All right.

5          MR. GWYNNE:  So, from our perspective, whatever

6 goes on in the other litigation with the separate distinct

7 legal entity of FDIC Corporate shouldn't hamper or prejudice

8 the full time to litigate this case appropriately.

9          THE COURT:  All right.

10          MR. GWYNNE:  For those reasons, your Honor, the

11 cases are very different.  Thank you.

12          THE COURT:  I appreciate that.

13     So, what effect and who are the parties to the

14 bankruptcy case that's filed in New York?

15          MR. SACKS:  So, your Honor, if I might, I hope --

16 I didn't realize we were going to argue the case today,

17 but --

18          THE COURT:  We're not arguing the case.  I'm just

19 trying to get -- to understand the -- the scope of it.

20          MR. SACKS:  No.  So bankruptcy has been filed by

21 our client.  Our client is a Debtor.  Silicon Valley Bank

22 Financial Group is the Debtor.  And, so, that's -- that's

23 the Debtor in New York.

24     Whether all these offset claims -- there is a threshold

25 issue that the Bankruptcy Court is going to decide as part

11

1 of whether it confirms the bankruptcy plan as to whether

2 those setoff claims have been waived by the FDIC and/or

3 whether they will be waived by the bankruptcy plan and/or

4 whether they are required to be asserted in the Bankruptcy

5 Court.  That will be decided as part of a confirmation

6 hearing that is scheduled for mid July.  They may be in this

7 case.  They may not be in this case.  Ultimately at the end

8 of the day --

9          THE COURT:  So, that's -- that's the point I was

10 getting at, Mr. Sacks.  This case will be affected by the

11 Bankruptcy Court's rulings.

12          MR. SACKS:  It will be, your Honor, and the effect

13 may be that the case proceeds as Mr. Gwynne says it should,

14 and the effect may be it proceeds as I say it should and Mr.

15 Gwynne appeals a Bankruptcy Court order as he has made clear

16 he would do if the Bankruptcy Court does what the Debtor has

17 asked to be done in Bankruptcy Court.

18          THE COURT:  Okay.

19          MR. SACKS:  So, that is an impact on it.  And,

20 please, I -- I was not suggesting consolidation of the --

21          THE COURT:  No, I know you weren't.

22          MR. SACKS:  -- (Zoom glitch) today, but there are

23 many witnesses who are going to be deposed.  And the idea --

24 on the same exact subject.  So, Mr. Tetra (phonetic), he's

25 an employee.  He's been identified even by the FDICC.  Mr.

12

1   Maraga -- or I'm probably mispronouncing his name.  When
2   these people are deposed, they shouldn't be deposed on the
3   same subjects twice.  That's all I was suggesting at the
4   present time, with the rest to be determined later in the
5   case when the case is more fully formed rather than the sort
6   of rhetoric of Mr. Gwynne and me at this point in time.
7           THE COURT:  Okay.  Well, and that's what I
8   understood you to day.
9           MR. SACKS:  Okay.
10          THE COURT:  So, I -- I want to make clear that for
11  any witnesses who would have testimony to give at deposition
12  common to the two cases, that there be a meet and confer and
13  an understanding.  Those witnesses will be deposed once, and
14  then by leave of Court, if you need additional deposition
15  time in the other case, that you ask for it and it be
16  limited.  But I don't want you to have two separate
17  depositions covering the same topics.  That should -- it
18  should be in everyone's interest to do that.
19          MR. GWYNNE:  And, your Honor, Kurt Gwynne for the
20  record.  I agree with, your Honor, yeah, we should all act,
21  you know, rationally and appropriately, not to unnecessarily
22  burden a witness.  But the -- you know, the issues are
23  markedly different, and --
24          THE COURT:  Sure.
25          MR. GWYNNE:  -- I think if the -- the question is

13

1  going to be whether the depositions are really on the same

2  subject, and that's something counsel's going to -- going to

3  have to coordinate with, and I would also mention that the

4  holding -- the holding company, the Plaintiff in this case,

5  its board of directors overlapped with the board of

6  directors of the bank, Silicon Valley Bank.  In fact, they

7  were the same people.  So, you know, they -- they may be

8  involved in both cases but also may be involved in different

9  issues.  So, we'll have to --

10            THE COURT:  All right.

11            MR. GWYNNE:  -- work that out.

12            THE COURT:  Well, there's a lot more to be done.

13       So, Mr. Sacks, you believe the Bankruptcy Court will

14  make some important rulings this summer?

15            MR. SACKS:  I do, your Honor, one way or another.

16            THE COURT:  Okay.  And, so, I --

17            MR. SACKS:  There is a -- I should say, your

18  Honor, there is a confirmation hearing that is scheduled for

19  the second week of July I believe.

20            THE COURT:  Oh, that's coming right up.

21            MR. SACKS:  I -- second or third week of July.  I

22  -- I apologize.

23            MR. GWYNNE:  Both.

24            MR. SACKS:  Both.  I mean, it's several weeks, but

25  it -- but it will be in July.  It's in July, your Honor.

14

1          THE COURT:  Okay.  So, your motion to dismiss is

2     set for hearing on October 10.  So, certainly, by that time

3     you will have some information from the Bankruptcy Court?

4          MR. SACKS:  Yes, your Honor.  It's Mr. Gwynne's

5     motion to dismiss, of course, but yes.

6          THE COURT:  Yes.  All right.  So, I -- I'd like to

7     set a trial date at this first case management conference,

8     and I had two very different views about when this trial

9     should take place, and I was -- and, so, I'm -- I'm trying

10    to decide what the best course of action is, and it looked

11    to me like the Defense position was the trial should be

12    sometime in the maybe late summer of 2026.  I didn't have a

13    date.  So, I'm guessing.

14         MR. GWYNNE:  Well, your Honor, yeah, we -- we

15    didn't know what your Honor's calendar was, but we --

16         THE COURT:  I understand.

17         MR. GWYNNE:  -- had anticipated -- we had

18    anticipated -- we -- we figured we'd leave it to the Court,

19    but we did anticipate late summer or, you know --

20         THE COURT:  All right.

21         MR. GWYNNE:  -- fall potentially or the winter,

22    depending on your Honor's schedule.

23         THE COURT:  Thank you.  As you heard in the other

24    case, when I look at my calendar, I have to look at actual

25    dates because you're competing with hundreds of other cases.

15

1 So --

2          MR. SACKS:  Your Honor, can I just be heard on one
3 -- one thing related to that?

4          THE COURT:  Sure.

5          MR. SACKS:  And -- and it's part of the reason for
6 the difference in the importance of this, and we think this
7 case should go to trial in 2025, which is a year and a half
8 from now at this point.  And we've tried many very
9 complicated cases with shorter cases than that.

10     The FDIC's position is we are not entitled to recover
11 interest in this case.  And, so -- statutorily, that there
12 is no right to interest here.  And we --

13          THE COURT:  Makes a big difference when you're
14 into the billions.

15          MR. SACKS:  And -- and, so, it's $10 million a
16 month, your Honor, that they -- that we are losing.  So,
17 we've already lost $150 million in this -- by this if we're
18 right.  And we will lose $10 million a month as each month
19 goes on if they are correct in their position.  Now, we've
20 asked for restoration of our deposits as they were with what
21 should have been earned on them in the interim, but they say
22 that's just interest and we're not entitled to it, which is
23 why we believe that the -- that the equities favor a
24 relatively -- we're not asking for an expedited trial date.
25 We're asking for a reasonable trial date, not a leisurely

16

1  trial date.  And if they want to persist with the idea that

2  we lose $10 million a month by virtue of -- of doing

3  nothing, then we should have a relatively timely trial date

4  in this case.

5          THE COURT:  Well --

6          MR. GWYNNE:  Your Honor, may --

7          THE COURT:  -- I agree with --

8          MR. GWYNNE:  -- I respond?

9          THE COURT:  Yes, you should have a reasonable

10  trial date.  There's a lot of work to get done.

11          MR. GWYNNE:  Your Honor, with --

12          MR. SACKS:  Your Honor, I mean, we -- you know, we

13  do -- I mean, so, if there are 20 depositions in this case

14  or even 30 depositions in this case, the idea that those

15  can't be done in six months or something like that, I mean,

16  that's not a difficult chore for large law firms to handle

17  in the ordinary course with an ordinary trial schedule.  I

18  mean, to go to trial at some point 18 months from now is

19  really not an expedited trial, even for the largest of

20  cases, your Honor.

21          THE COURT:  So --

22          MR. GWYNNE:  No.

23          THE COURT:  You know, my -- my case calendar is

24  not as impacted as it used to be.  I used to set cases out

25  three years from the case management conference because

17

1  there were so many cases.  And I'm pleased to say that I've

2  reduced that by a lot.  So I actually can't get this case to

3  trial in the fall of 2025.

4           Mr. Gwynne, did you want to make some comments?

5           MR. GWYNNE:  I -- I did, your Honor.  And the --

6  the Plaintiff in this case is always pushing to rush the

7  schedule when it's not acting -- well, two things I would

8  note.  One is the Plaintiff filed it's claim in the FDIC

9  receivership on the very last day for the claim.  And that's

10 important because the F -- FDIC as Receiver has 180 days to

11 allow or disallow it.  So, they could have taken three

12 months off the -- the time period they're so worried about

13 by filing their claim early.

14      And then, after their claim was disallowed, they filed

15 this litigation in front of your Honor on the very last day

16 they could have.  So, they don't mind taking the time and

17 having delay when they're thinking about things or when

18 they're working on things.  They just want the Government

19 and, you know, the FDIC and your Honor to -- to move at

20 their speed when they're ready.

21      But with respect to the reason they have a shorter

22 schedule than us, there's one important reason for that,

23 your Honor.  They took discovery starting over a year ago in

24 the Bankruptcy Court.  The FDIC as Receivers produced over

25 500 documents to the Plaintiff.  In addition, we -- with our

18

1 consent, in good faith, we agreed to let First Citizens

2 Bank, the ultimate purchaser of the Silicon Valley Bank

3 operations, to produce thousands -- I think hundreds of

4 thousands of documents to the Plaintiff.  So, the Plaintiffs

5 had plenty of documents.  We haven't -- we haven't taken

6 discovery in the Bankruptcy Court because it's always been

7 our view that this Court, your Honor's Court, would be the

8 appropriate venue and jurisdiction.  That Section

9 1821(d)(6)(A) of Title 12, as the Ninth Circuit said in the

10 MTB case, that's not just a venue provision.  It's

11 jurisdictional.  It's subject matter jurisdiction.

12     So, we didn't think we could ever create jurisdiction

13 in the Bankruptcy Court by content because it's subject

14 matter jurisdiction, but the Debtor has repeatedly tried to

15 argue that we've done that.  They keep trying to say we've

16 invoked the Bankruptcy Court process.

17     So, we took no discovery in the Bankruptcy Court.  So,

18 they're way ahead of us.  We waited for the appropriate

19 court.  We repeatedly said in the Bankruptcy Court when they

20 tried to litigate these issues that it doesn't belong there

21 because the Ninth Circuit case law is clear on that, that

22 you got to proceed through the -- the receivership claims

23 until that one's processed, and then you end up in one of

24 two courts, either District of Columbia where your Honor's

25 court, not the Southern District of New York and not the

19

1 Bankruptcy Court.

2     But they took discovery because they weren't worried

3 about the argument of -- of, you know, being sucked into the

4 Bankruptcy Court process.  That's what they want.  And, in

5 addition, your Honor, they tried to use the privilege as a

6 sword to stop us from looking at documents on our own

7 servers that were maintained by Silicon Valley Bank

8 employees, and that's one of the issues we have that --

9         THE COURT:  Yeah.

10         MR. GWYNNE:  -- is very important because it

11 relates to a potential conflict of Sullivan and Cromwell

12 that we think is critical that needs to be resolved at the

13 outset of the litigation because, your Honor, as I

14 mentioned, your Honor, the board of directors, it's the same

15 people, right, the same people.  And Sullivan and Cromwell

16 was at all of the board meetings.  Board meetings are joint,

17 and they're joint every time they -- they were scheduled as

18 joint meetings but, you know, they're joint, of course,

19 because you got same people wearing different hats.

20     Sullivan and Cromwell was at every one of those board

21 meetings.  So, we believe they have confidential information

22 of Silicon Valley Bank, including on the issues that relate

23 to our affirmative defenses.  It concerns us that we would

24 go forward in discovery know now that they've field this

25 litigation and -- and we're -- you know, obviously we'll at

1 some point on at least count one, right, we'll file

2 affirmative defenses and for, in essence, what was our own

3 law firm, Silicon Valley Bank's law firm, to be

4 participating in discovery against Silicon Valley Bank is

5 subject --

6             THE COURT:  If you're suggesting you're going to

7 be bringing a motion to disqualify Sullivan and Cromwell,

8 you better be doing that pretty quick.

9             MR. GWYNNE:  Well, yes, your Honor.  What we would

10 like to do is the 200,000 documents I mentioned --

11             THE COURT:  Yes.

12             MR. GWYNNE:  -- that are on our server, they're

13 claiming a privilege -- a Silicon Valley Bank Financial

14 Group only privilege.  We believe that those documents show

15 joint representation of both Silicon Valley Bank and the

16 Plaintiff.  And, in fact, in -- even in the joint case

17 management statement, the Plaintiff acknowledged that those

18 documents could relate -- could relate, even solely relate

19 to our affirmative defenses.  They say that on page seven in

20 the joint case management statement.

21      But yet they say we can't see them.  We need your Honor

22 to stay discovery generally except on the issues of conflict

23 and -- and let's resolve the privilege issue.

24             THE COURT:  So, you know, that's not -- I'm not

25 going to do it that way.  You do need to work out the

21

1  privilege issues.  You do need to work out this

2  disqualification issue.  But the way we normally do it is

3  you produce the discovery with the privilege log and then

4  you litigate the privilege log.  And this other way I think

5  will stand in the way of producing a lot of documents.

6       Now, I'm going to -- this is important.  I -- I

7  certainly acknowledge that.  If there is a disqualification

8  motion, that -- those take a long time.  Those are

9  complicated motions, but the one thing that works against

10 you is time because the longer this case goes on, the less

11 likely it is that I will grant it.

12      I will be referring all discovery disputes to the

13 Magistrate Judge assigned to the case.  But on this issue, I

14 don't have a motion before me to stay discovery pending the

15 privilege dispute.  So, I'm not ruling on it.  I'm just

16 telling you that's not the way we normally do things.  If

17 you want to bring that motion, of course, I'll consider it.

18 If you want to go ahead with the discovery and bring a

19 discovery dispute to the Magistrate Judge, that works as

20 well.  So, I think that's the best we can do there.

21      On the -- still thinking about the overall schedule,

22 Mr. Gwynne, you've asked for a sizeable increase in the

23 scope of discovery and the number of depositions than the

24 Federal Rules allow.

25          MR. GWYNNE:  Yes, your Honor.

22

1          THE COURT:  I'm not saying that's wrong, but the
2   way I handle that is you have to give me a discovery plan.
3   You have to show why the 10-deposition-limit is not enough
4   and who the other deponents would reasonably be and why
5   they're so important to the case.  So, I'd need to know the
6   top 10.  And if your top 10 are really your bottom 10, it
7   will be really clear to me.  So, I really need you to stack
8   this list of my most important person to my least so that
9   when I -- and it probably will, again, be the Magistrate
10  Judge, but when we limit, if we do, the number of
11  depositions you can take, you've already given us the order
12  in which you need them.  And that's something you need to do
13  some work on it.  I'm not -- I'm not expanding discovery at
14  this point.  We don't need to at this point, and I think
15  much of this can be resolved through meet and confer.

16          And, so, there may be that there are 15 depositions
17  that everyone agrees on and you're asking for a smaller
18  number of additional ones.  I want you to do all of that
19  work before it comes to us.  It's -- I don't know your case
20  well enough to make an intelligent decision.  You also need
21  a lot more work on this until you can do the same.  So, I'll
22  put that back in your hands.

23          I -- I gather you don't have a protective order yet, is
24  that correct?

25          MR. GWYNNE:  Correct.  We do not have a protective

23

1 order.

2          THE COURT:  Has anyone submitted a draft to the

3 other side?

4          MR. GWYNNE:  No, your Honor.  Like the FDIC

5 Corporate, we thought we were getting one from Sullivan.  We

6 have not yet --

7          THE COURT:  Well, when is the first --

8          MR. GWYNNE:  -- received one, but --

9          THE COURT:  -- due?  Who's going to do the first

10 draft?

11          MR. GWYNNE:  What I think might make sense, having

12 heard the other conference, your Honor, is for when -- when

13 the Plaintiff makes comments to that order, sends a copy to

14 us, we'll pick it up at that point, and because ideally, if

15 we have very similar ones, it would -- it would probably

16 work better for your Honor if we had the disputes --

17          THE COURT:  Okay.

18          MR. GWYNNE:  -- in both cases.

19          THE COURT:  Mr. Sacks, do you agree with that on a

20 protective order?

21          MR. SACKS:  That's fine, your Honor.

22          THE COURT:  Okay.  So, I want you to finish a

23 protective order within two weeks of today, and any disputes

24 that remain will go to the Magistrate Judge, but I want --

25 you can't do anything until you have a protective order.

24

1  I'm not going to stay discovery pending a privilege dispute,

2  but I understand discovery can't be turned over without a

3  privilege order.  So, that needs to happen.

4       In terms of my best estimate on the proper time for

5  trial, and I've -- you know, listening to what you've said

6  is -- is really very informative to me.  At this point, I'm

7  going to set your trial on March 23 of 2026.  I think that

8  roughly splits the -- the time difference that you have.  It

9  works into my schedule.  I have no idea how long this trial

10  will be.  I'm not -- I ultimately give you a limit on trial

11  days.  I'm not asking for that now if we don't know what the

12  scope will be.  I'm going to set your final pretrial

13  conference on February 12 of 2026 at 1:30 in the afternoon,

14  and there are a couple of things I want.

15       First of all, I require that you review and comply with

16  my standing orders.  There were some things here that

17  concerned me in FDIC's position regarding briefing.  I -- I

18  have a very specific rule on Daubert motions.  And this is

19  going to cause you to start planning for it.

20       So, there are a few things you need to be aware of.  If

21  you want to challenge at summary judgment an expert relied

22  upon by your opponent, that objection which may be under

23  Daubert, must be contained in the body of your motion or

24  opposition and within the page limits provided to you.

25  That's in our Local Rules.

1    If you want -- if you file a stand-alone <u>Daubert</u> motion

2 along with a summary judgment, I will not consider that for

3 the summary judgment motion because all objections must be

4 contained within the body of the motion or opposition.  But

5 I have another rule that's going to be very important here.

6 I require that all <u>Daubert</u> motions be heard at least 60 days

7 before trial, but I don't reserve that date for you.  So,

8 I'll reserve that date 14 -- up to 14 days before you file

9 the motion.  That means you're filing the <u>Daubert</u> motion

10 about eight months before trial.  And if you're a little

11 late on that and you call for a hearing date and my clerk

12 says nothing's available, it's too bad.  So, I'm telling you

13 that now, almost two years in advance of trial.  That's the

14 rule.

15    Now, I also have page limits, and they are inflexible,

16 because <u>Daubert</u> motions are way overused.  Maximum 25 pages

17 per motion.  Maximum 10 pages per expert.  So, if you

18 challenge one expert, you get 10 pages.  If you challenge 10

19 experts, you get 25 pages.

20    Now, I do have a failsafe for you on the <u>Dauberts</u>,

21 which I hope you won't use in this case because this is

22 going to be complicated, but I make it available in every

23 case.

24    You're welcome to use some of your motions in limine

25 heard at the final pretrial conference as <u>Daubert</u> motions.

26

1  You're limited to five pages per motion and only five
2  motions in limine.  So, if you still want to challenge eight
3  experts, well, you're out of luck because you only get five
4  motions.
5      If you want to challenge five experts in your motion --
6  in your final pretrial conference, I reserve the right to
7  continue the trial date so that I could adequately consider
8  them.  All those things are in play.  I want to make it
9  really clear that you yourselves no service by jamming me in
10 making these important decisions.  It might feel good in
11 jamming your opponent, but presumably I'm the audience and
12 not -- not your opponent.  So, these things are really
13 important, and I -- I just want to make sure you have a fair
14 opportunity to have these issues heard and considered by me,
15 and I think this schedule gives us ample time.
16     I -- I think we're going to know a lot more after the
17 Bankruptcy Court makes rulings.  Maybe the case stays the
18 same.  Maybe it gets smaller, but I want to just put these
19 dates in play.  So, I gave you the trial and final pretrial
20 dates.  I'm going to set the last day I'll hear summary
21 judgment as October 2 of 2025.  That's the hearing date, not
22 the filing date.  I do reserve that date for you.  I only
23 allow one summary judgment motion in the life of the case
24 per side.  And in this case, because it may be that there
25 are cross-motions for summary judgment, if you're both

27

1  filing summary judgments, I require it to be briefed as
2  cross-motions.  That means four briefs and not six.  So,
3  there are essentially -- there's -- the lead motion is
4  filed, and then there's the op/motion of the other party and
5  then two reply briefs.  So, it's too early for you to know
6  what -- what grounds you might have for summary judgment,
7  but -- but I'm going to leave it at that.  We're going to
8  know a lot more after I really get my hands around the
9  issues in the motion to dismiss and that we can see further
10 things.
11     So, that's as much as I think I can do today.  Mr.
12 Sacks, was there anything else you were hoping to accomplish
13 this morning?
14          MR. SACKS:  To accomplish, no, but I -- I have to
15 comment on Mr. Gwynne's discourse on Sullivan and Cromwell's
16 purported conflict, your Honor.
17          THE COURT:  Oh.
18          MR. SACKS:  If they bring that motion, I believe
19 we may ask for sanctions.  We've been litigating with them
20 since March of last year on all of these issues.  They've
21 raised issues with us.  We're a year and a half in -- a year
22 plus into this case at this point on these very same issues.
23 They've had the documents in full since March of last year.
24 If they wanted to raise this issue, they've had ample
25 opportunity in the Bankruptcy Court, in the adversary

28

proceeding in the Bankruptcy Court, in the removal of that
proceeding to the District Court, in our filing of a proof
of claim against them and/or in this case, prior to today.

It was not in their original draft of the case
management conference statement even.  It got thrown in at
the end of that in a second draft of it.  It's tactical.  We
believe it has no merit, and I just didn't want that to go
un -- unresponded to, your Honor.

THE COURT:  All right.  Well, we won't argue that
today.

MR. SACKS:  Thank you.

THE COURT:  There's no motion pending.  So, maybe
there won't be.

MR. GWYNNE:  Your Honor, may I briefly respond on
two points?

THE COURT:  Sure.

MR. GWYNNE:  First of all, with respect to the
Bankruptcy Court, it's always been our view the Bankruptcy
Court has no jurisdiction.  We think that's clear under
sections of Title 12 that I won't get into.  We never filed
a proof of claim in the Bankruptcy Court.  That's important.
They filed a proof of claim -- they meaning the Plaintiff
filed a proof of claim in the receivership process.  That's
where the -- the jurisdiction lies.  That's why we're before
your Honor.

1      Mr. Sacks says that our -- in the joint case management

2  statement that our asserted setoffs are hypothetical,

3  unasserted, and, oh, yeah, basically premature, yet he's

4  saying, Well, they're hypothetical and unasserted because

5  the conflict relates to them.  The conflict, however, is too

6  old to be raised.

7      We didn't raise any of the -- you know, we have -- we

8  didn't file an answer in the Bankruptcy Court or the

9  District Court.  What we did in the Southern District of New

10 York was when they filed a complaint, we filed a motion to

11 dismiss and a motion to withdraw the reference to the

12 District Court.  District Court granted that.  You know, a

13 couple of days before the motion to dismiss, just ended up

14 issuing an order not going forward with that hearing because

15 the Debtor -- the Debtor had said to the Court that, We're

16 going to file -- we'll probably file in the Northern

17 District of California or -- or the District of Columbia.

18 We'll have to file somewhere.  And once we do that, we may

19 not -- you know, we may dismiss this case in the District

20 Court or maybe we'll ask the Court in California if we can

21 go forward here.

22     But the -- the issue -- the conflict issue comes up

23 during the course of the investigation when we're

24 determining what these setoffs are.  Just because they filed

25 a proof of claim doesn't mean right away that the FDIC as

1 Receiver knows, Oh, Sullivan and Cromwell, you know, you

2 have a conflict that's a potentially disabling conflict,

3 because I just want the Court to keep --

4          THE COURT:  Mr. Gwynne, I'm just -- I'm not

5 hearing -- I'm not hearing argument on the motion now.  You

6 know, I appreciate that.  Thank you.  If --

7          MR. GWYNNE:  Understood.  Thank you.

8          THE COURT:  Yeah.  All right.  So, I -- I think we

9 will need further case management, but I don't think it

10 would be productive until after the motion to dismiss.  Do

11 you -- is there any reason to do it sooner?

12          MR. SACKS:  No, your Honor.  I agree.

13          THE COURT:  Okay.  Mr. Gwynne, you agree with

14 that?

15          MR. GWYNNE:  Yes, your Honor.

16          THE COURT:  Okay.  So, when I see you in October,

17 we can talk about where we are in the schedule.  It won't be

18 case management that day.  But then you can just let me know

19 when I can set it for further case management.

20          MR. SACKS:  Very well.

21          MR. GWYNNE:  All right.

22          THE COURT:  Well, I think that takes care of

23 everything.  So, I -- as I mentioned, I'm referring the

24 discovery disputes to the Magistrate Judge.  That will keep

25 the Magistrate Judge busy.

1      So, I do need you to work out the remainder of the case

2  schedule consistent with the trial date, and that's going to

3  be the close of fact discovery and the expert disclosure and

4  -- date and the deadline for expert depositions and reports.

5  So, if you could work on that and submit a stipulation and

6  proposed order to me by -- we've got the 4th of July -- July

7  12 -- I don't need that in any hurry -- that would be great.

8  And if you disagree on those dates, you should expect that

9  at least once I'll be sending it back to you to work on it.

10 I don't like -- these are not things that should be disputed

11 if I -- once I've given you a trial date.  I know you don't

12 agree on trial dates, and I'm glad to work that out, but the

13 rest of this is just the ministerial deadlines, and I think

14 you can take care of that.

15     All right.  Thank you all.  You've educated me well on

16 this case, and I may not see you again until October, but I

17 will be more informed at that point.  So, thank you.

18          MR. GWYNNE:  Thank you, your Honor.

19          MR. SACKS:  Thank you, your Honor.

20          THE COURT:  All right.  Thank you everyone.

21          THE CLERK:  This court is adjourned.

22     (Proceedings adjourned at 12:16 p.m.)

23

24

25

32

## CERTIFICATE OF TRANSCRIBER

    I certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

Echo Reporting, Inc., Transcriber

Monday, June 17, 2024