Robert A. Sacks (SBN 150146)
(sacksr@sullcrom.com)
Adam S. Paris (SBN 190693)
(parisa@sullcrom.com)
Diane L. McGimsey (SBN 234953)
(mcgimseyd@sullcrom.com)
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone:    (310) 712-6600
Facsimile:    (310) 712-8800

Sverker K. Hogberg (SBN 244640)
(hogbergs@sullcrom.com)
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, California 94301
Telephone:    (650) 461-5600
Facsimile:    (650) 461-5700

*Attorneys for Plaintiff SVB Financial Group*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| SVB FINANCIAL GROUP,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Silicon Valley Bank and Silicon Valley Bridge Bank, N.A.,<br><br>Defendant. | Case No.: 5:24-cv-01321-BLF<br><br>**PLAINTIFF SVB FINANCIAL GROUP'S OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANT FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR SILICON VALLEY BANK AND SILICON VALLEY BRIDGE BANK, N.A.**<br><br>The Honorable Beth Labson Freeman |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

FACTUAL ALLEGATIONS ....................................................................................1

    A.    Closure of SVB and Appointment of the FDIC as Receiver ...................1

    B.    Invocation of the Systemic Risk Exception ............................................2

    C.    FDIC-R1's Denial of SVBFG's Access to Account Funds at Bridge Bank............4

    D.    SVBFG's Adversary Proceeding to Recover Its Account Funds ...........5

    E.    FDIC-Rs' Denial of SVBFG's Protective Claims in Their Administrative Claims Processes Set Up for Non-Deposit Claims ...................5

LEGAL STANDARD..............................................................................................6

ARGUMENT .........................................................................................................7

I.    The Court Has Jurisdiction to Hear This Action. ............................................7

    A.    SVBFG Has Exhausted the FIRREA Process. ......................................8

II.    Count I States a Claim for Breach of Contract Against Both FDIC-Rs. ..........10

III.    SVBFG States a Plausible Claim for Promissory Estoppel. ...........................12

    A.    SVBFG May Assert a Promissory Estoppel Claim Against FDIC-Rs. ...............12

    B.    The Complaint Adequately States a Claim for Promissory Estoppel. ...................14

IV.    Count III Adequately Pleads a Turnover Claim. ............................................16

V.    Count IV States a Claim for Violation of the Automatic Stay. .......................18

VI.    Counts V and VI Adequately Plead Claims Entitling SVBFG to a Pro Rata Distribution of the Liquidation Value of SVB and/or Bridge Bank. ................20

    A.    SVBFG Has Adequately Pleaded a Claim Against FDIC-R1 Under Sections 1406 and 681 of the CFC. ..................22

    B.    SVBFG Has Adequately Pleaded a Claim Against FDIC-R2 Under NBA §§ 91 and 194..................24

VII.    SVBFG Plausibly States a Claim for Declaratory Judgment............................26

    A.    SVBFG Has Asserted Multiple Independent Causes of Action. ...........26

    B.    SVBFG's Request for Declaratory Relief Does Not Violate Section 1821(j)..................28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VIII.    SVBFG Has Pleaded Plausible Claims for Breach of Contract in Counts X, XI, and XII. ..................................................................................................28

IX.    SVBFG Has Adequately Pleaded Its Fifth Amendment and Conversion Claims But Voluntarily Withdraws Them. .........................................................29

CONCLUSION ............................................................................................................30

-ii-

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
*Adams* v. *Zimmerman*,
    73 F.3d 1164 (1st Cir. 1996) ................................................................................20

5
*Al-Daiwa, Ltd.* v. *Apparent, Inc.*,
6
    2014 WL 988924 (N.D. Cal. Mar. 10, 2014) ........................................................11

7
*Aliotta* v. *Bair*,
    614 F.3d 556 (D.C. Cir. 2010) ..............................................................................13
8

9
*Alonzo* v. *ACF Prop. Mgmt., Inc.*,
    643 F.2d 578 (9th Cir. 1981) ................................................................................24

10
*Ascom Hasler Mailing Sys., Inc.* v. *U.S. Postal Serv.*,
11
    815 F. Supp. 2d 148 (D.D.C. 2011) ......................................................................13

12
*Battista* v. *FDIC*,
    195 F.3d 1113 (9th Cir. 1999) ..............................................................................11
13

14
*Baum* v. *J-B Weld Co.*,
    2019 WL 6841231 (N.D. Cal. Dec. 16, 2019) ........................................................7

15
*BKWSpokane, LLC* v. *FDIC*,
16
    663 Fed. Appx. 524 (9th Cir. 2016) ................................................................13, 14

17
*Branch* v. *FDIC*,
    825 F. Supp. 384 (D. Mass. 1993) ........................................................20, 24, 25, 26
18

19
*Briskin* v. *Shopify Inc.*,
    2022 WL 1427324 (N.D. Cal. May 5, 2022) ........................................................18

20
*Brookside Assocs.* v. *Rifkin*,
21
    49 F.3d 490 (9th Cir. 1995) ..................................................................................29

22
*In re Brown*,
    2022 WL 4390454 (Bankr. S.D.N.Y. Sept. 22, 2022) ..........................................17
23

24
*In re Calvin*,
    329 B.R. 589 (Bankr. S.D. Tex. 2005) ..................................................................16

25
*Cheng* v. *Speier*,
26
    609 F. Supp. 3d 1046 (N.D. Cal. 2022) ..................................................................6

27
*Citizens State Bank of Lometa* v. *FDIC*,
    946 F.2d 408 (5th Cir. 1991) ..........................................................................21, 25

28

*City of Chicago* v. *Fulton*,
    592 U.S. 154 (2021) ........................................................................................................18

*Clark* v. *FLA Card Services*,
    2010 WL 2232161 (N.D. Cal. June 3, 2010) ..................................................................11

*Collins Dev.* v. *Silver State Bank*,
    2009 U.S. Dist. LEXIS 146433 (D. Nev. Dec. 23, 2009) .............................................10

*In re Comput. Commc'ns, Inc.*,
    824 F.2d 725 (9th Cir. 1987) ..........................................................................................19

*Condus* v. *Howard Sav. Bank*,
    999 F. Supp. 594 (D. Conn. 1998) .................................................................................12

*D-F Fund VIII, LLC* v. *Valley Ranch Development Co.*,
    1999 WL 97929 (N.D. Tex. Feb. 11, 1999) ..................................................................28

*Dababneh* v. *FDIC*,
    971 F.2d 428 (10th Cir. 1992) ........................................................................................25

*Downriver Cmty. Fed. Credit Union* v. *Penn Square Bank*,
    879 F.2d 754 (10th Cir. 1989) ........................................................................................21

*Elec. Const. & Maint. Co.* v. *Maeda Pac. Corp.*,
    764 F.2d 619 (9th Cir. 1985) ............................................................................................7

*Erickson* v. *Pardus*,
    551 U.S. 89 (2007) ............................................................................................................7

*Erie R. Co.* v. *Tompkins*,
    304 U.S. 64 (1938) ..........................................................................................................28

*In re Even St. Prods.*,
    2020 U.S. Dist. LEXIS 141267 (C. D. Cal. Aug. 6, 2020) ...........................................17

*Far W. Fed. Bank* v. *Office of Thrift Supervision-Director*,
    119 F.3d 1358 (9th Cir. 1997) ........................................................................................11

*Farrah* v. *Monterey Transfer & Storage, Inc.*,
    555 F. Supp. 2d 1066 (N.D. Cal. 2008) ...........................................................................7

*FDIC* v. *Hickey*,
    757 F. Supp. 194 (E.D.N.Y. 2010) ................................................................................12

*FDIC* v. *Maxxam, Inc.*,
    523 F.3d 566 (5th Cir. 2008) ..........................................................................................12

*Fed. Hous. Admin., Region No. 4* v. *Burr*,
    309 U.S. 242 (1940) ........................................................................................................13

*Feigel* v. *FDIC*,
   935 F. Supp. 1090 (S.D. Cal. 1996) ........................................................10

*First Empire Bank-N.Y.* v. *FDIC*,
   572 F.2d 1361 (9th Cir. 1978) ...............................................................24

*Gibraltar Fin. Corp.* v. *Fed. Home Loan Bank Bd.*,
   1990 WL 394298 (C.D. Cal. June 15, 1990) ..........................................23

*Golden Pac. Bancorp* v. *FDIC*,
   375 F.3d 196 (2d Cir. 2004).....................................................................23

*Helm* v. *Resol. Tr. Corp.*,
   43 F.3d 1163 (7th Cir. 1995) .....................................................................8

*Hillis Motors, Inc.* v. *Hawaii Auto. Dealers' Ass'n*,
   997 F.2d 581 (9th Cir. 1993) ...................................................................19

*Intercontinental Travel Mktg.* v. *FDIC*,
   45 F.3d 1278 (9th Cir. 1994) ...................................................................10

*Interfirst Bank-Abilene, N.A.* v. *FDIC*,
   777 F.2d 1092 (5th Cir. 1985). ................................................................25

*Jablon* v. *United States*,
   657 F.2d 1064 (9th Cir. 1981) .................................................................13

*Jafari* v. *FDIC*,
   2015 WL 3604443 (S.D. Cal. June 8, 2015)....................................8, 9, 10

*James River Ins. Co.* v. *DCMI*,
   2012 WL 2873763 (N.D. Cal. July 12, 2012)...........................................29

*Kassa* v. *BP W. Coast Prod.*,
   2008 WL 3494677 (N.D. Cal. Aug. 12, 2008) ....................................28, 29

*In re Keese*,
   671 F. Supp. 3d 1053 (C.D. Cal. 2023) ...................................................17

*In re Kids World of Am., Inc.*,
   349 B.R. 152 (Bankr. W.D. Ky. 2006) .....................................................17

*Leite* v. *Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ...................................................................7

*MCorp* v. *Clarke*,
   755 F. Supp. 1402 (N.D. Tex. 1991) ...........................................21, 23, 24

*Murphy* v. *FDIC*,
   1995 WL 125435 (N.D. Cal. Mar. 15, 1995).....................................21, 24

–v–

*Murphy* v. *FDIC*,
38 F.3d 1490 (9th Cir. 1994) (en banc) ....................................................................29

*Nemer* v. *FDIC*,
2010 WL 11549721 (C.D. Cal. Sept. 22, 2010) ..........................................................8

*Owens* v. *Bank of Am., N.A.*,
2013 WL 1820769 (N.D. Cal. Apr. 30, 2013) ...........................................................27

*In re Patriot Coal Corp.*,
631 B.R. 648 (Bankr. E.D. Mo. 2021) ......................................................................17

*In re Process Am., Inc.*,
588 B.R. 82 (Bankr. C.D. Cal. 2018) ........................................................................16

*Radian Ins., Inc.* v. *Deutsche Bank Nat'l Tr. Co.*,
2009 WL 3163557 (E.D. Pa. Oct. 1, 2009)..................................................................8

*Ramirez* v. *Weinberger*,
745 F.2d 1500 (D.C. Cir. 1984) ................................................................................29

*Randy Horn D.D.S., Inc.* v. *High Point Servs., Inc.*,
2013 WL 12114065 (C.D. Cal. Nov. 19, 2013)..........................................................30

*Safe Air for Everyone* v. *Meyer*,
373 F.3d 1035 (9th Cir. 2004) ....................................................................................7

*Santos* v. *Ocwen Loan Servicing, LLC*,
2017 WL 24869 (N.D. Cal. Jan. 3, 2017)..................................................................15

*Securimetrics, Inc.* v. *Hartford Cas. Ins. Co.*,
2005 WL 1712008 (N.D. Cal. July 21, 2005).............................................................29

*Senior Unsecured Creditors' Comm. of First Republic Bank Corp.* v. *FDIC*,
749 F. Supp. 758 (N.D. Tex. 1990) ............................................................................20

*Shankar* v. *United States Dep't of Homeland Sec.*,
2014 WL 523960 (N.D. Cal. Feb. 6, 2014) ...............................................................30

*In re Shapphire Res., LLC*,
2016 WL 320823 (Bankr. C.D. Cal. Jan. 25, 2016) ...................................................27

*Sharpe* v. *FDIC*,
126 F.3d 1147 (9th Cir. 1997) .............................................................................13, 28

*Shroyer* v. *New Cingular Wireless Servs., Inc.*,
622 F.3d 1035 (9th Cir. 2010) ....................................................................................7

*In re Sonoma W. Med. Ctr., Inc.*,
2021 WL 4944089 (Bankr. N.D. Cal. 2021)...............................................................16

*Sullivan-Mestecky* v. *Verizon Commc'ns Inc.*,
    961 F.3d 91 (2d Cir. 2020)......................................................................................15

*Taie* v. *Ten Bridges*,
    2023 WL 8237112 (W.D. Wash. Nov. 28, 2023) ....................................................30

*Telecenter, Inc.* v. *FDIC ex rel. First Com. Bank of Tampa Bay*,
    2015 WL 403186 (M.D. Fla. Jan. 28, 2015)..............................................................9

*Tex. Am. Bancshares, Inc.* v. *Clarke*,
    954 F.2d 329 (5th Cir. 1992) ............................................................................. *passim*

*In re Turner Grain Merch., Inc.*,
    557 B.R. 147 (Bankr. E.D. Ark. 2016) ....................................................................16

*Vereda, Ltda.* v. *United States*,
    271 F.3d 1367 (Fed. Cir. 2001)................................................................................29

*Volges* v. *Resol. Tr. Corp.*,
    32 F.3d 50 (2d Cir. 1994)........................................................................................28

*Waterview Mgmt. Co.* v. *FDIC*,
    257 F. Supp. 2d 31 (D.D.C 2003)............................................................................12

*Wightman* v. *Franchise Tax Bd.*,
    202 Cal. App. 3d 966 (Ct. App. 1988)......................................................................14

*In re WL Homes LLC*,
    471 B.R. 349 (Bankr. D. Del. 2012) ........................................................................15

*Woodbridge Plaza* v. *Bank of Irvine*,
    815 F.2d 538 (9th Cir. 1987) ............................................................................. *passim*

**Statutes**

11 U.S.C. § 362(a)(3)...................................................................................................18

12 U.S.C. § 91 ................................................................................................... *passim*

12 U.S.C. § 194 ................................................................................................. *passim*

12 U.S.C. § 1819(a) ....................................................................................................13

12 U.S.C. § 1821(i) ........................................................................................... *passim*

12 U.S.C. § 1821(d)(6)(A)..............................................................................................8

12 U.S.C. § 1821(d)(9)(A)............................................................................................29

12 U.S.C. § 1821(g)(4) ..........................................................................................21, 23

12 U.S.C. § 1822(d) ....................................................................................................15

12 U.S.C. § 1823(c)(4)(G) ................................................................................................2

12 U.S.C. § 1823(d)(3)(C) ......................................................................................23, 26

12 U.S.C. § 1823(e) ...............................................................................................29

11 U.S.C. 542(b) ...................................................................................................16

California Financial Code § 600 ............................................................................23

California Financial Code § 620 .....................................................................22, 23

California Financial Code § 670 ............................................................................22

California Financial Code § 673 ............................................................................22

California Financial Code § 681 ..........................................................21, 22, 23, 27

California Financial Code § 1406 ........................................................21, 22, 23, 27

**Other Authorities**

15 Cal. Jur. 3d, Counterclaim and Setoff, § 10 (2024) ......................................14

H.R. Rep. No. 95-595 (1977) ................................................................................19

S. Rules Comm., S. Floor Analyses of S.B. 664, 2011-2012 Reg. Sess.
    (Cal. May 17, 2011) ........................................................................................22

1   Plaintiff SVB Financial Group ("SVBFG") submits this Opposition to the Motion to

2   Dismiss (Dkt. No. 33 ("Mot.")) filed by Defendant Federal Deposit Insurance Corporation, as

3   Receiver for Silicon Valley Bank ("FDIC-R1") and as Receiver for Silicon Valley Bridge Bank,

4   N.A. ("FDIC-R2" and together with FDIC-R1, "FDIC-Rs").

5                                    **INTRODUCTION**

6   SVBFG holds a valid deposit claim against FDIC-Rs for $1.93 billion (the "Account

7   Funds"), made a timely claim for those Account Funds, and is entitled to have those Funds restored

8   in their entirety.  Rather than honor that claim—as was done for every other Silicon Valley Bank

9   ("SVB") depositor pursuant to the Treasury Secretary's invocation of the systemic risk exception

10  (the "SRE")—FDIC-Rs seized SVBFG's Account Funds without notice or any proper legal basis

11  to do so and have refused to return the funds for seventeen months and counting.  After seizing

12  SVBFG's deposits, FDIC-Rs then insisted that SVBFG go through their administrative claims

13  process, which was not even intended to handle deposit claims, only to sit on SVBFG's claims

14  until the last possible minute and then summarily deny them.  Notwithstanding their assertions to

15  the contrary, FDIC-Rs are not free to confiscate SVBFG's Account Funds because they believe

16  the Treasury Secretary should have carved SVBFG out of the protection of all SVB depositors

17  through the invocation of the SRE.  Accordingly, FDIC-Rs are liable to SVBFG for breach of

18  contract and promissory estoppel based on their contracts with SVBFG, turnover, violation of the

19  automatic bankruptcy stay, violations of the California Financial Code and the National Bank Act

20  and declaratory judgment.  The allegations in SVBFG's Complaint adequately state these claims

21  against FDIC-Rs, and FDIC-Rs' Motion to Dismiss—which relies on a self-serving narrative of

22  disputed facts and unfounded legal assertions regarding the FDIC's allegedly unbridled discretion

23  to abrogate the Treasury Secretary's SRE invocation to discriminate against SVBFG (and only

24  SVBFG)—should be denied.

25                                **FACTUAL ALLEGATIONS**

26  **A.    Closure of SVB and Appointment of the FDIC as Receiver**

27  SVBFG is the bank holding company that owned SVB.  SVBFG deposited substantially

28  all its funds with SVB, pursuant to various deposit agreements ("Deposit Agreements").  (Compl.

¶¶ 42-43.)  At the time SVB was placed into receivership, SVBFG had approximately $2.1 billion in three different deposit accounts maintained at SVB.  (*Id.* ¶ 44.)

On March 10, 2023, the California Department of Financial Protection and Innovation ("<u>DFPI</u>") took possession of SVB and appointed FDIC-R1 to serve as receiver.  (*Id.* ¶ 48.)  On that same date, in accordance with the standard procedures under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("<u>FIRREA</u>"), the FDIC initially created the Deposit Insurance National Bank of Santa Clara ("<u>DINB</u>") and transferred all insured deposits of SVB to the DINB.  (*Id.* ¶ 51.)  The FDIC then announced that "[a]ll insured depositors will have full access to their *insured* deposits no later than Monday morning, March 13, 2023."  (*Id.* (emphasis added).)  In addition to crediting depositors' accounts at the DINB with the amount of their insured deposits, the FDIC's Board of Directors also approved the payment by FDIC-R1 of an advance dividend of ▇ of each depositor's *uninsured* deposits.  (*Id.* ¶ 52.)  No exception was made for SVBFG.

### B.    Invocation of the Systemic Risk Exception

When the FDIC's actions failed to calm the market, bank regulatory agencies became concerned that uninsured depositors would rapidly withdraw funds from other banks.  (*Id.* ¶ 57.)  Accordingly, on March 12, 2023, the Treasury Secretary, upon the unanimous recommendation of the FDIC and the Federal Reserve and after consultation with the President, determined that "a least-cost resolution of SVB and Signature Bank [a second bank unaffiliated with SVB that failed on March 12, 2023] would intensify deposit runs and liquidity pressure on other U.S. banks," and invoked the SRE under 12 U.S.C. § 1823(c)(4)(G) to guarantee that all deposits at SVB would be paid in full.  (*Id.* ¶¶ 58-59.)  Under the SRE, depositors of SVB were (i) not limited to receiving only up to the $250,000 insurance limit, (ii) not limited to an advance dividend of only a portion of their uninsured deposits, and (iii) not required to wait for FDIC-R1 to resolve the former SVB to be paid in full.  (*Id.* ¶ 13.)

Instead, as announced in a joint press release issued by the Secretary, Federal Reserve Board Chair Powell, and FDIC Chairman Gruenberg on March 12, 2023, "[d]epositors [would] have access to *all* of their money" and would be "fully" protected.  (*Id.* ¶ 60 (emphasis added).)  The next day, the FDIC issued a press release that described the transfer of all insured and

1   uninsured deposits to the newly formed Silicon Valley Bridge Bank, N.A. ("<u>Bridge Bank</u>") and

2   affirmed that "[a]ll depositors of the institution will be made whole." (*Id.* ¶ 66.) The cost of

3   providing full protection to all depositors would be borne by the Deposit Insurance Fund. (*Id.*

4   ¶¶ 14-15, 193.)

5          FDIC-Rs admit that Bridge Bank was organized "[t]o protect both insured and uninsured

6   depositors." (Mot. 3.) In the weeks and months following the invocation of the SRE, Secretary

7   Yellen, as well as FDIC Chair Gruenberg and Federal Reserve Vice Chair Barr, confirmed that the

8   SRE invocation meant that all depositors of SVB were fully guaranteed. (Compl. ¶ 68 ("[W]e

9   worked with the Federal Reserve and FDIC to protect all depositors of the two failed banks."); *id.*

10  ¶¶ 71-75.) The FDIC publicly stated multiple times thereafter that all depositors and deposits—

11  both insured and uninsured—would be fully protected and accessible. (*Id.* ¶¶ 87-88.) Again, no

12  exception to "all" was made for SVBFG, which was one of SVB's five largest depositors.

13         The transfer of "all deposits" to the newly created, FDIC-operated Bridge Bank purportedly

14  was made pursuant to a transfer agreement between FDIC-R1 and Bridge Bank (the "<u>Transfer</u>

15  <u>Agreement</u>") and included the transfer of all deposits as defined in 12 U.S.C. § 1813(l), except

16  accounts that (i) SVB's records identified as "blocked" or "frozen" or (ii) the FDIC determined

17  should be "blocked" or "frozen" "pursuant to economic or trade restrictions administered or

18  enforced by the United States Treasury Department Office of Foreign Assets Control"

19  (the "<u>Assumed Deposits</u>"). (*Id.* ¶ 89.) Yet again, the Transfer Agreement contained no exception

20  for SVBFG's deposits, and the Assumed Deposits included the approximately $2,115,958,220

21  held in SVBFG's deposit accounts. (*Id*.) Pursuant to the Transfer Agreement, Bridge Bank agreed

22  "to pay all Assumed Deposits, properly drawn checks, drafts, and withdrawal orders of depositors

23  related to the Assumed Deposits presented for payment," and "to discharge, in the usual course of

24  conducting a banking business, the duties and obligations of the Failed Bank with respect to the

25  Assumed Deposit balances due and owing to the depositors of the Failed Bank." This meant that

26  Bridge Bank, an institution separate and distinct from FDIC-R1 that was chartered by the Office

27  of the Comptroller of the Currency ("<u>OCC</u>") and operated by FDIC-C, was required to adhere to

28  the terms and conditions of the Deposit Agreements with respect to the payment of deposits. (*Id*.)

**C.    FDIC-R1's Denial of SVBFG's Access to Account Funds at Bridge Bank**

Initially SVBFG was treated like all other former SVB depositors, as it was granted full access to its Account Funds at Bridge Bank and was able to withdraw approximately $180 million of the $2.1 billion it had on deposit.  (*Id.* ¶¶ 19, 90; Mot. 4.)  That in and of itself is clear evidence, notwithstanding FDIC-Rs' contrary position today, that "all" meant all and SVBFG was covered by the Treasury Secretary's systemic risk declaration just like every other SVB depositor.

Then suddenly, without explanation or warning, on March 16, 2023, SVBFG's access to approximately $1.93 billion of its remaining funds at Bridge Bank was cut off, and FDIC-R1 instructed Bridge Bank to assign SVBFG's deposit accounts, as well as all associated assets and liabilities, to FDIC-R1.  (*Id.* ¶ 91, 95.)  Without determining whether this was permitted under the Deposit Agreements or applicable law, Bridge Bank apparently complied with both of these instructions.  (*Id.* ¶¶ 91, 95.)

On March 17, 2023, SVBFG filed a petition for relief under Chapter 11 in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  (*Id.* ¶ 100.)  Later that same day, at FDIC-R1's direction and after the automatic stay came into effect, Bridge Bank unwound a $6.2 million payment owed to SVBFG for an intercompany receivable.  (*Id.* ¶ 101.)

These actions were taken without notice to, or the knowledge or consent of, SVBFG and in contravention of the Treasury Secretary's guarantee of all depositors' account funds.  (*Id.* ¶ 97.)  In fact, SVBFG was unaware that Bridge Bank had purportedly transferred SVBFG's Account Funds to FDIC-R1 until the purported transfer was disclosed in discovery during SVBFG's bankruptcy proceeding.  (*Id.*)

Subsequently, during SVBFG's bankruptcy proceedings, FDIC-R1's counsel told the Bankruptcy Court that the SRE applied to SVBFG's Account Funds.  On March 20, 2023, for example, counsel for FDIC-R1 stated in a sworn objection:  "[t]o the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid ***in full*** through the Deposit Insurance Fund."  (*Id.* ¶ 69 (emphasis added).)  The next day, counsel for FDIC-R1 repeated this in a hearing before the Bankruptcy Court, expressly confirming that SVBFG's deposits were included in the Treasury Secretary's guarantee.  (*Id.* ¶ 70.)

-4-

1    While the Deposit Agreements purportedly permitted SVB to use SVBFG's deposits to set

2    off debts owed by SVBFG to SVB, SVBFG had no unsatisfied obligations as of March 10, 2023,

3    that would permit a setoff (*id.* ¶ 45), and FDIC-Rs have failed to substantively identify any actual

4    setoff right, even after repeated requests by the Bankruptcy Court to do so (*id.* ¶ 94).

5    On March 27, 2023, the OCC closed Bridge Bank to enable the purchase and assumption

6    transaction between Bridge Bank and First Citizens Bank & Trust Company ("First Citizens"),

7    and FDIC-R2 was appointed as receiver for Bridge Bank.  (*Id*. ¶ 102.)  The transfer of deposits

8    from FDIC-R2 to First Citizens expressly excluded SVBFG's Account Funds.  (*Id.*)  Of course,

9    no such exclusion would have been required if, as FDIC-Rs now contend, SVBFG's Account

10   Funds had actually been transferred to FDIC-R1 eleven days earlier and no such accounts existed

11   at FDIC-R2.  (Mot. 4.)

12       **D.    SVBFG's Adversary Proceeding to Recover Its Account Funds**

13   On April 14, 2023, counsel for SVBFG sent a letter to counsel for FDIC-R1, requesting

14   that FDIC-R1 provide a formal statement of the current status of SVBFG's accounts and asking

15   that FDIC-R1 engage with SVBFG with respect to the use and availability of the Account Funds.

16   SVBFG never received a response from FDIC-R1.  (Compl. ¶ 104.)

17   On July 9, 2023, SVBFG filed an adversary proceeding in the Bankruptcy Court

18   (the "Adversary Proceeding") against FDIC-C and both FDIC-Rs, asserting claims for, among

19   other things, turnover of the Account Funds and violation of the automatic stay under the

20   Bankruptcy Code, and a determination that none of the FDIC entities has any right of setoff.  (*Id.*

21   ¶ 105.)  The Adversary Proceeding, which was subsequently withdrawn to the district court, is

22   currently stayed pending further litigation of SVBFG's claims in this action.  (*Id.* ¶¶ 109-111.)

23       **E.    FDIC-Rs' Denial of SVBFG's Protective Claims in Their Administrative
             Claims Processes Set Up for Non-Deposit Claims**

24   Following the closure of SVB, FDIC-R1 set up an administrative claims process for

25   **non-deposit** claims only, meaning claims of trade creditors, tort claims, and breach-of-contract

26   claims.  (*Id*. ¶ 18.)    Claim forms for these types of claims were to be emailed to

27   **NonDepClaimsDal@fdic.gov**.  (*Id.*)  Depositors, on the other hand, were not required to file an

28

1  administrative claim to recover their account funds, but instead were instructed to simply access

2  those funds through their accounts at Bridge Bank. (*Id.* ¶¶ 17-18.) After seizing SVBFG's

3  Account Funds, however, both FDIC-Rs belatedly took the position that SVBFG was required to

4  file a proof of claim through their purported administrative claims process under the Federal

5  Deposit Insurance Act. (*Id.* ¶¶ 18, 23.) Thus, on July 10, 2023, SVBFG filed as a precautionary

6  measure protective proofs of claim (the "Proofs of Claim") with both FDIC-Rs seeking, among

7  other things, access to its Account Funds. (*Id.* ¶¶ 23, 117; Mot. 4.)

8       On the last business day before the statutorily mandated deadline, FDIC-R1 and FDIC-R2

9  each notified SVBFG that SVBFG's claims had been disallowed. (Compl. ¶ 119.) FDIC-R1

10 denied the claim because of "the receiver's defenses," without identifying its purported defenses

11 or any factual basis. (*Id.* ¶¶ 119-120.) FDIC-R1 also failed to explain why it waited 177 days to

12 deny SVBFG's claim if it had determined nine months earlier to seize the Account Funds on

13 account of such defenses. FDIC-R2 denied the deposit claim because "it is not a liability of the

14 FDIC as receiver for Silicon Valley Bridge Bank." (*Id.* ¶ 119.) FDIC-R2 did not provide any

15 explanation for the basis or authority on which Bridge Bank blocked SVBFG's access to its

16 Account Funds beginning on March 16, 2023; the basis or authority on which it purported to

17 remove the Account Funds from SVBFG's accounts and purportedly delivered the liability for

18 those Account Funds to FDIC-R1; nor the basis or authority on which it unwound the payment of

19 an intercompany receivable after SVBFG's bankruptcy filing. (*Id.* ¶ 129.) To this day, SVBFG

20 remains unable to access its Account Funds and is deprived of earnings that have been accruing

21 on those Account Funds, which SVBFG estimates to be in excess of $10 million per month.

22 (*Id.* ¶ 121.)

23                                 **LEGAL STANDARD**

24       "When presented with a motion to dismiss under Rule 12(b)(1) for lack of subject matter

25 jurisdiction, a federal court must first distinguish between a 'facial attack' and a 'factual attack'"

26 on the plaintiff's jurisdictional allegations. *Cheng* v. *Speier*, 609 F. Supp. 3d 1046, 1050 (N.D.

27 Cal. 2022), *aff'd*, 2023 WL 4490352 (9th Cir. July 12, 2023). A facial challenge asserts "that the

28 allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction,"

*Safe Air for Everyone* v. *Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), and requires the court to "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in the plaintiff's favor," *Leite* v. *Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). A factual attack is where the moving party relies on affidavits or other evidence. *Safe Air for Everyone*, 373 F.3d at 1039. In those circumstances, the court "may review evidence beyond the complaint," *id.*, but "absen[t] . . . a full-fledged evidentiary hearing, disputes in the facts pertinent to subject matter are viewed in the light most favorable to the opposing party," *Farrah* v. *Monterey Transfer & Storage, Inc.*, 555 F. Supp. 2d 1066, 1068 (N.D. Cal. 2008).

On a Rule 12(b)(6) motion, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007), and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief," *Shroyer* v. *New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). While courts are not required to accept legal conclusions as true, "the application of the law to the particular facts of the case" is "a mixed question of law and fact," which "is not something that can be determined at the 12(b)(6) stage." *Baum* v. *J-B Weld Co.*, 2019 WL 6841231, at *8 (N.D. Cal. Dec. 16, 2019).

Dismissal under Rule 12(b)(6) is particularly inappropriate where, as here, the complaint raises "novel" legal questions that should be "explored and assayed in the light of actual facts rather than a pleader's suppositions." *Elec. Const. & Maint. Co.* v. *Maeda Pac. Corp.*, 764 F.2d 619, 623 (9th Cir. 1985).

## ARGUMENT

## I.   THE COURT HAS JURISDICTION TO HEAR THIS ACTION.

FDIC-Rs argue that this Court lacks subject matter jurisdiction over every count of the Complaint other than Count I (Breach of Contract). In support of their argument, FDIC-Rs cite 12 U.S.C. § 1821(d)(5) and assume—without explanation—that Counts II, III, V, VI, VII, and VIII are subject to FDIC-Rs' claims process. Building upon this assumption, FDIC-Rs then contend that "SVBFG waived those claims by failing to assert them in the [Proofs of] Claims filed

1  in the FDIC-Rs' claims processes" because district courts have no jurisdiction to hear untimely-

2  filed claims.  (Mot. 8.)  FDIC-Rs are wrong as a matter of law.

3          **A.      SVBFG Has Exhausted the FIRREA Process.**

4          At the outset, it is worth noting that unlike FDIC-C, which in the related case pending

5  before this Court argued that its actions should be reviewed under the Administrative Procedure

6  Act, there is no administrative law issue present here.  Under all circumstances, the actions of

7  FDIC-Rs will be subject to *de novo* review by this Court under 12 U.S.C. § 1821(d)(6)(A).  *See*

8  *Helm* v. *Resol. Tr. Corp.*, 43 F.3d 1163 (7th Cir. 1995); *Nemer* v. *FDIC*, 2010 WL 11549721, at

9  *2 (C.D. Cal. Sept. 22, 2010) ("Congress acknowledged the FDIC may err in its determination of

10  receivership claims and provided claimants with the remedy of *de novo* determination in

11  federal court.").

12         FDIC-Rs take the extraordinary position that, in a matter where SVBFG has (1) sought the

13  recovery of its deposit account funds since the day they were seized by FDIC-Rs in March 2023,

14  and (2) engaged in the administrative process that FDIC-Rs forced SVBFG to utilize, even though

15  the process was by its terms neither designed nor intended to accommodate deposit claims—the

16  email address to which SVBFG was directed is NonDepClaimsDal@fdic.gov (Compl. ¶ 5)—

17  SVBFG has nonetheless failed to exhaust its purported administrative remedies because it did not

18  file this precise Complaint with FDIC-Rs.  This position is incorrect both as a matter of law and

19  fact.

20         Even if applicable, FIRREA does not "limit a plaintiff's district court case to the causes of

21  action alleged during the administrative process."  *Jafari* v. *FDIC*, 2015 WL 3604443, at *3 (S.D.

22  Cal. June 8, 2015).  Rather, "[w]hen determining whether claims have been administratively

23  exhausted, courts look to whether the administratively presented claims provide the FDIC with

24  ***adequate notice*** of the claims raised in the lawsuit."  *Id.* (emphasis added); *see also Radian Ins.,*

25  *Inc.* v. *Deutsche Bank Nat'l Tr. Co.*, 2009 WL 3163557, at *18 (E.D. Pa. Oct. 1, 2009)

26  ("[A]lthough the [proof of claim and the prior complaint it refers to] did not specifically allege a

27  cause of action based on negligence or negligent misrepresentation, the factual allegations in that

28  [prior complaint] did suggest that the IndyMac entities had engaged in negligent behavior.").  For

-8-

1    example, in *Telecenter, Inc.* v. *FDIC ex rel. First Commercial Bank of Tampa Bay*, 2015 WL

2    403186 (M.D. Fla. Jan. 28, 2015), the plaintiff filed a proof of claim seeking the payment of a

3    $100,000 certificate of deposit. *Id.* at *1-2. After the FDIC-R rejected the claim, the plaintiff filed

4    a complaint alleging breach of contract, negligence and conversion. *Id.* at *3. The FDIC-R sought

5    to dismiss the complaint, arguing that the plaintiff had failed to administratively exhaust its claims

6    because the plaintiff's proof of claim did not specifically identify the breach of contract, negligence

7    and conversion claims. *Id.* at *5. The court rejected the FDIC-R's argument, noting that "[t]he

8    FDIC-R has not presented a single case to support its argument that [plaintiff] was required to

9    specify its causes of action in the administrative process," and that plaintiff had satisfied the

10   exhaustion requirement by "advis[ing] the FDIC that it was seeking the amount of the CD,

11   $100,000.00." *Id.* at *6.

12        It is undisputed that SVBFG's proofs of claim "provid[ed] the FDIC[-R] with adequate

13   notice of the claims raised in" Counts II (estoppel), III (turnover), IV (violation of automatic stay),

14   V (California Financial Code violation), VI (National Bank Act claims), VII (declaratory

15   judgment), and VIII (Fifth Amendment violation) of the Complaint. *Jafari*, 2015 WL 3604443, at

16   *3. The proofs of claim make the same allegations that comprise Counts II, III, IV, V, VI, VII,

17   and VIII of the Complaint, alleging that (1) FDIC made numerous public announcements affirming

18   that pursuant to the Treasury Secretary's determination of systemic risk it was guaranteeing all

19   depositors, without excepting SVBFG, full access to their insured and uninsured SVB deposits

20   (Compl. Ex. 7 ("SVBFG Proof of Claim") ¶¶ 3-4, 13); (2) FDIC made SVBFG's Account Funds

21   available until March 16, 2023 (*id.* ¶¶ 13-14); (3) FDIC's counsel acknowledged its obligation to

22   honor the full amount of SVBFG's funds during the Chapter 11 proceeding (*id.* ¶ 22); (4) FDIC

23   suddenly began to reject SVBFG's wire transfers and placed a hold on SVBFG's accounts on the

24   evening of March 16, 2023 (*id.* ¶ 14); (5) SVBFG left approximately $1.96 billion of its deposit

25   funds at Bridge Bank until its access was blocked, purportedly on the instruction of FDIC-R1 but

26   with the involvement of Bridge Bank (*id.* ¶ 16); (6) FDIC-Rs unwound a $6.2 million

27   intercompany receivable post-bankruptcy filing (*id.* ¶ 16 n.5); and (7) SVBFG has demanded that

28   FDIC-Rs and FDIC-C return the Account Funds, but they refuse to do so (*id.* ¶ 17). These

1    allegations are the same as the Complaint's allegations with respect to Counts II, III, IV, V, VI,

2    VII, and VIII. (Compl. ¶¶ 150-99.)

3          Moreover, SVBFG's Proof of Claim asserted that the Bankruptcy Court overseeing

4    SVBFG's Chapter 11 case had exclusive jurisdiction to determine the matters that were the subject

5    of the Proof of Claim (SVBFG Proof of Claim ¶ 25), and SVBFG filed an adversary complaint

6    against FDIC-Rs in the Bankruptcy Court asserting several of the <u>same</u> causes of action asserted

7    here. FDIC-Rs cannot now claim that they did not have "adequate notice of th[ose] claims."

8    *Jafari*, 2015 WL 3604443, at *3.

9          None of the cases relied on by FDIC-Rs warrant a different result. *Intercontinental Travel*

10   *Marketing, Inc.* v. *FDIC*, 45 F.3d 1278 (9th Cir. 1994), concerned whether the district court lacked

11   jurisdiction to hear a claim brought by a plaintiff that did not file an administrative claim until after

12   the deadline to submit administrative claims and after the FDIC had moved for summary judgment

13   on jurisdictional grounds. *Id*. at 1281. *Collins Development* v. *Silver State Bank*, 2009 U.S. Dist.

14   LEXIS 146433 (D. Nev. Dec. 23, 2009), involved whether the FDIC had properly considered

15   plaintiff's administrative claim as an unsecured rather than secured claim. *Id*. at *20-21. And

16   *Feigel* v. *FDIC*, 935 F. Supp. 1090 (S.D. Cal. 1996), addressed only whether the court had

17   jurisdiction to hear a claim where the claimant filed its administrative claim over two years after

18   the claims deadline. *Id*. at 1096. None of these cases address the issue presented here—where the

19   claimant timely filed a proof of claim that gave FDIC-Rs full notice of its claims with supporting

20   facts, and had also filed an Adversary Complaint with the same causes of action.

21   **II.    COUNT I STATES A CLAIM FOR BREACH OF CONTRACT AGAINST**
     **BOTH FDIC-Rs.**
22

23         The Complaint adequately pleads that both FDIC-Rs breached their obligations under the

24   Deposit Agreement, and are liable for prejudgment interest and lost profits. *FDIC-R1* does not

25   contest that the Complaint states a breach of contract claim (Mot. 9), but *FDIC-R2*—as successor

26   to Bridge Bank—argues that it is not bound by the Deposit Agreement and thus could not have

27   breached it (*id.* 8-9). This argument ignores the well-pleaded allegations of the Complaint. The

28   Complaint alleges that (i) SVBFG had $2.1 billion on deposit at Bridge Bank as of March 13,

-10-

1  2023, (ii) those deposits were governed by the Deposit Agreement, (iii) Bridge Bank had an

2  obligation to make SVBFG's account funds available to it on demand and in fact initially honored

3  that obligation, (iv) Bridge Bank could not transfer liability for SVBFG's deposit accounts to

4  FDIC-R1 without SVBFG's consent, and (v) Bridge Bank was involved in the wrongful denial of

5  SVBFG's demand for its account funds, causing SVBFG damages.  (Compl. ¶¶ 19, 67, 89-90, 95,

6  139-49.)  This states a breach of contract claim.  *See Clark* v. *FLA Card Servs.*, 2010 WL 2232161,

7  at *2 (N.D. Cal. June 3, 2010) (holding that allegations were sufficient to state a claim for breach

8  of contract where "Plaintiff has alleged when the contract was formed and the provisions therein

9  that [defendant] allegedly breached"); *Al-Daiwa, Ltd.* v. *Apparent, Inc.*, 2014 WL 988924, at *2

10  (N.D. Cal. Mar. 10, 2014) (holding that a breach of contract claim was sufficiently pleaded where

11  "Plaintiff has alleged that the parties had an agreement, memorialized in purchase orders and

12  invoices, that governed their dealings, that Plaintiff performed, and that Defendants' breach

13  resulted in Plaintiff's damages").  FDIC-R2, as receiver for Bridge Bank, cannot controvert those

14  well-pleaded allegations on a motion to dismiss.

15  FDIC-Rs' argument that the Complaint fails to state a claim for prejudgment interest and

16  damages fares no better.  To begin, SVBFG seeks to be restored to the position it was in when

17  access to its Account Funds was cut off—it is not merely seeking interest on a damages award.

18  Moreover, numerous courts have held that a court may award prejudgment interest against the

19  FDIC when it is acting in its capacity as a receiver.  Citing *Battista* v. *FDIC*, 195 F.3d 1113 (9th

20  Cir. 1999), this Court recently held that the FDIC's "sue-and-be-sued" clause did not waive

21  sovereign immunity with respect to an award of prejudgment interest.  Order Granting in Part and

22  Denying in Part Mot. to Dismiss at 34-35, *SVB Fin. Grp.* v. *FDIC*, No. 23-cv-06543 (N.D. Cal.

23  Aug. 8, 2024) (Dkt. No. 85) ("FDIC-C Order").  The court in *Battista*, in turn, relied on an earlier

24  Ninth Circuit decision, *Far West Federal Bank* v. *Office of Thrift Supervision-Director*, 119 F.3d

25  1358, 1366-67 (9th Cir. 1997), which held that prejudgment interest cannot be awarded against

26  the FDIC because the FDIC "operates as a governmental, regulatory entity, not as a private

27  commercial enterprise." *Far West Federal Bank*, which involved an action by plaintiffs to prevent

28  the FDIC from taking certain regulatory steps inconsistent with the terms of a Conversion

-11-

Agreement (*i.e.*, actions that are unquestionably regulatory in nature), is distinguishable. *Id*. at 1362-63. As the district court in *FDIC* v. *Hickey*, 757 F. Supp. 2d 194 (E.D.N.Y. 2010), explained:

> The court's consideration of the cases cited by FDIC-R leads it to reject the position that FDIC-R may never be held liable for prejudgment interest. While *Battista* was a case in which the FDIC acted as a receiver, *Far West*, the case upon which *Battista* relies in support of the sovereign immunity argument, was a case in which FDIC was named as a defendant on account of its own actions, and not as a receiver. Invoking sovereign immunity to bar the imposition of prejudgment interest in such cases may be supported, but makes less sense where, as here, FDIC-R stands in the shoes of a failed institution.

*Id*. at 197. Other courts similarly have allowed an award of prejudgment interest on claims brought against the FDIC <u>as a receiver</u> standing in for the failed institution. *See, e.g*., *Waterview Mgmt. Co.* v. *FDIC*, 257 F. Supp. 2d 31, 37 (D.D.C 2003) (granting motion for pre- and post-judgment interest against FDIC-R); *Condus* v. *Howard Sav. Bank*, 999 F. Supp. 594, 595 (D. Conn. 1998) (awarding pre-judgment interest to judgment creditors of failed savings bank); *see also FDIC* v. *Maxxam, Inc.*, 523 F.3d 566, 594 (5th Cir. 2008) (upholding award of interest on attorney's fees award against FDIC and suggesting that "if FDIC were acting in its capacity as a receiver, it would not likely be immune from an assessment of prejudgment interest"). FDIC-Rs are liable for prejudgment interest and damages in the same way that SVB and Bridge Bank would have been if they were parties to this case.

## III.  SVBFG STATES A PLAUSIBLE CLAIM FOR PROMISSORY ESTOPPEL.

### A.  SVBFG May Assert a Promissory Estoppel Claim Against FDIC-Rs.

FDIC-Rs cite the Ninth Circuit's opinion in *Jablon* v. *United States*, 657 F.2d 1064 (9th Cir. 1981), for the proposition that promissory estoppel claims may not be made against federal agencies. (Mot. 11-12.) But the court in *Jablon* noted only that it found no "precedent in this circuit" that would allow a claim for promissory estoppel against the United States *absent a waiver of sovereign immunity*. *Jablon*, 657 F.2d at 1069-70. As this Court recognized in its FDIC-C Order, the FDIC has expressly waived sovereign immunity from claims brought against it. (FDIC-C Order at 32.) Under 12 U.S.C. § 1819(a), the FDIC has the power "[t]o sue and be

-12-

1   sued, and complain and defend, by and through its own attorneys, in any court of law or equity,

2   State or Federal."  And in a case decided after *Jablon*—and nowhere cited by FDIC-Rs—the Ninth

3   Circuit specifically held that "[t]he 'sue-and-be-sued' language of 12 U.S.C. § 1819 (Fourth) is a

4   general waiver of sovereign immunity from claims brought against the FDIC."  *Woodbridge Plaza*

5   v. *Bank of Irvine*, 815 F.2d 538, 542-43 (9th Cir. 1987).

6           A waiver of sovereign immunity through a sue-and-be-sued clause renders federal agencies

7   like the FDIC liable to claims of promissory estoppel.  *See Ascom Hasler Mailing Sys., Inc.* v. *U.S.*

8   *Postal Serv.*, 815 F. Supp. 2d 148, 159-60 (D.D.C. 2011) (upholding a promissory estoppel claim

9   against the Postal Service, a federal agency, because the Postal Reorganization Act granted the

10  Postal Service the power to sue and be sued and therefore waived the agency's sovereign immunity

11  from such a claim).  The FDIC possesses identical powers as the powers cited by the court in

12  *Ascom Hasler*.  It is "an independent federal agency," *see, e.g.*, *Aliotta* v. *Bair*, 614 F.3d 556, 558

13  (D.C. Cir. 2010), with the power to "make contracts" and to prescribe bylaws "regulating the

14  manner in which its general business may be conducted, and the privileges granted to it by law

15  may be exercised and enjoyed," 12 U.S.C. § 1819(a); *see also Fed. Hous. Admin., Region No. 4* v.

16  *Burr*, 309 U.S. 242, 245 (1940).  Thus, as this Court held in the FDIC-C Order, "promissory

17  estoppel claims are meant to reach the FDIC."  (*See* FDIC-C Order at 32-33 (relying on *Ascom*

18  *Hasler*, 815 F. Supp. 2d at 159)).

19          FDIC-Rs next argue that under *BKWSpokane, LLC* v. *FDIC*, 663 Fed. Appx. 524, 527 (9th

20  Cir. 2016), "[s]ection 1821(j) prevents courts from granting any equitable relief against the FDIC."

21  (Mot. 12.)  That misrepresents the holding of *BKWSpokane*.  In *BKWSpokane*, plaintiffs asserted

22  promissory estoppel to challenge the FDIC's repudiation of a lease.  663 Fed. App'x at 526-27.

23  After determining that the FDIC's repudiation of the lease was proper under 12 U.S.C.

24  § 1821(e)(2), the Ninth Circuit affirmed dismissal of the promissory estoppel claim because such

25  relief would have conflicted with the FDIC's proper exercise of its authority to repudiate the lease

26  under section 1821(e)(2).  *Id*. at 527.  The Ninth Circuit recognized that "[t]he bar imposed by

27  § 1821(j) does not extend to situations in which the FDIC as receiver asserts authority beyond that

28  granted to it as a receiver," which is what SVBFG alleges here.  *Id*.; *see also Sharpe* v. *FDIC*, 126

-13-

1   F.3d 1147, 1155 (9th Cir. 1997) ("FIRREA does not permit the FDIC to breach contracts at will"

2   as the statute clearly prescribes a mechanism under § 1821(e) for disaffirming or repudiating any

3   contract). By ignoring their express promises and the SRE, FDIC-Rs are acting contrary to their

4   statutorily prescribed powers and functions. Section 1821(j) is thus inapplicable to

5   SVBFG's claims.

### B.   The Complaint Adequately States a Claim for Promissory Estoppel.

7        The Complaint lays out a straightforward claim for promissory estoppel based on the

8   representations of FDIC-Rs and SVBFG's detrimental reliance on those representations.

9        *First*, FDIC-Rs argue that FDIC-C's promises cannot be imputed to FDIC-Rs. (Mot.

10  13.) But FDIC-Rs cannot seriously argue that they can disavow the actions of the Chair or Board

11  of the FDIC as though they are somehow not subject to the Chair and Board's authority. In any

12  event, FDIC-R1 and Bridge Bank here adopted the Treasury Secretary, FDIC-C, and Federal

13  Reserve's guarantee that all depositors would have access to their funds in an announcement when

14  the Bridge Bank opened. (Compl. ¶ 88.) That announcement stated that all former SVB depositors

15  had "full access to their money," and that all existing and new deposits were protected by the

16  FDIC. (*Id.* ¶ 88.) FDIC-R2 subsequently acted in accordance with that promise by granting all

17  depositors access to their funds, including SVBFG. (*Id.* ¶ 90.) On March 21, 2023, FDIC-R1,

18  through its counsel, again reiterated the promise that SVBFG's deposits were subject to the

19  Treasury Secretary's guarantee. (*Id.* ¶ 22.) And by initially providing SVBFG with access to the

20  entirety of the $2.1 billion in its accounts at Bridge Bank, FDIC-R1 and Bridge Bank again

21  reaffirmed their adoption of the guarantee that SVBFG like all other depositors would have access

22  to all of its funds. (*Id.* ¶ 90.) FDIC-Rs' contention that their promise was limited by their

23  unspecified setoff rights is contradicted by SVBFG's allegations (*id.* ¶¶ 25, 45, 91, 106) and also

24  is beside the point. A defense to SVBFG's claim does not mean that SVBFG has failed to properly

25  allege a cause of action. Further, FDIC-Rs cannot exercise a contractual setoff based on

26  contingent, unliquidated claims. *See* 16 Cal. Jur. 3d, Counterclaim and Setoff, § 10 (2024) (Under

27  California law, "[o]rdinarily, when a liability is contingent, and not fixed, it is unavailable as a

28  setoff without the consent of the plaintiff."); *Wightman* v. *Franchise Tax Bd.*, 202 Cal. App. 3d

-14-

966, 981 (1988) ("[U]nliquidated claims are not generally available in law as a setoff."); *In re WL Homes LLC*, 471 B.R. 349, 352 (Bankr. D. Del. 2012) (denying attempt to assert contingent setoff claims under California law). And even if FDIC-Rs could withhold SVBFG's Account Funds pursuant to 12 U.S.C. § 1822(d) without a liquidated setoff claim, section 1822(d) only permits FDIC-Rs to withhold the insured portion of SVBFG's deposits. 12 U.S.C. § 1822(d) ("The Corporation may withhold payment of such portion of the **insured deposit** of any depositor in a depository institution in default." (emphasis added)). Here, SVBFG's claim is for an uninsured deposit guaranteed by the SRE, not a claim for an insured deposit. *See* FDIC-C Order at 12-16.

    *Second*, FDIC-Rs argue that the Treasury Secretary did not guarantee immediate access to all deposits, and instead gave the FDIC discretion to provide assistance as it deems appropriate. (Mot. 13-14.) FDIC-Rs are wrong. As the Court recognized in the FDIC-C Order, SVBFG has plausibly alleged that the Treasury Secretary made the determination to protect all SVB depositors. (*See* FDIC-C Order at 23.) FDIC-Rs arguments also miss the point. The Treasury Secretary, Federal Reserve, and FDIC-C repeatedly announced to the world that *all* deposits of *all* depositors would be protected. (*See, e.g.*, Compl. ¶¶ 65-68.) FDIC-Rs then confirmed and reiterated this promise. (*See, e.g.*, *id*. ¶¶ 69-70.) They cannot now claim that they did not mean what they said, having intended to induce depositors to rely on their statements and not withdraw all their funds from Bridge Bank. (*Id*. ¶¶ 12 & n.2, 151); *see also Santos* v. *Ocwen Loan Servicing, LLC*, 2017 WL 24869, at *3 (N.D. Cal. Jan. 3, 2017) ("The key principle behind promissory estoppel is that 'he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which [that person] acted.'").

    *Third*, the Deposit Agreements do not preclude a promissory estoppel claim. The promises of the Treasury Secretary, FDIC-Rs and FDIC-C extend beyond the terms of the Deposit Agreements because they require the payment of all of SVBFG's uninsured deposits irrespective of the terms of the Deposit Agreements and even if FDIC-Rs' assets alone are not sufficient to cover those deposits. (Compl. ¶¶ 11, 13, 22.) Thus, SVBFG can bring a promissory estoppel claim on these extra-contractual promises. *See Sullivan-Mestecky* v. *Verizon Commc'ns Inc.*, 961

1   F.3d 91, 96-97, 99-102 (2d Cir. 2020) (holding that a promissory estoppel claim could proceed

2   against plan administrator when its representatives made extra-contractual representations about

3   the benefits to which plaintiff was entitled and plaintiff acted in reliance on such representations).

## IV.    COUNT III ADEQUATELY PLEADS A TURNOVER CLAIM.

5        FDIC-Rs argue that the Complaint fails to state a turnover claim under section 542 of the

6   Bankruptcy Code because (1) FDIC-Rs hold no property owned by SVBFG and (2) FDIC-R2 has

7   no liability for SVBFG's deposit claim.  (Mot. 15-16.)  FDIC-Rs are wrong on both arguments.

8        FDIC-Rs argue at length that SVBFG cannot state a turnover claim because title to the

9   funds passed to the bank when the funds were deposited, and what SVBFG really holds is a claim

10  to the funds as a creditor of SVB.  (Mot. 15.)  In support of its argument, FDIC-Rs cite a number

11  of inapposite authorities discussing the general nature of the relationship between a bank depositor

12  and a bank and ignore the plain language of 11 U.S.C. § 542(b), which expressly provides for the

13  turnover of "a debt that is property of the estate."  FDIC-Rs also ignore the plethora of authorities

14  holding that bank deposits are subject to turnover under section 542(b) of the Bankruptcy Code.

15  *See In re Calvin*, 329 B.R. 589, 595-96 (Bankr. S.D. Tex. 2005) ("Because a bank account is a

16  'debt [owed by the bank] that is property of the estate and . . . payable on demand,' the account

17  falls squarely within § 542(b)."); *In re Turner Grain Merch., Inc.*, 557 B.R. 147, 150 (Bankr. E.D.

18  Ark. 2016) ("[B]anks are obligated to turnover account funds to the trustee pursuant to Section

19  542(b)." (collecting cases)).

20       FDIC-Rs next argue that SVBFG has failed to plead a turnover claim because "a turnover

21  action is not appropriate for a disputed contract claim that is not payable on demand."  (Mot. 15.)

22  FDIC-Rs are wrong again.  It does not matter for the purposes of a turnover claim that FDIC-Rs

23  dispute the debt.  Courts in this Circuit have held, and this Court recently agreed, that a disputed

24  debt can be subject to a turnover action.  *E.g.*, *In re Keese*, 671 F. Supp. 3d 1053, 1058 n.1 (C.D.

25  Cal. 2023); *In re Process Am., Inc.*, 588 B.R. 82, 101 (Bankr. C.D. Cal. 2018) ("[Section] 542(b)

26  makes no requirement that the debt be undisputed.  [Defendant]'s authority does not support a

27  finding that a turnover can never involve the return of disputed funds."); *In re Sonoma W. Med.*

28  *Ctr., Inc.*, 2021 WL 4944089, at *7 (Bankr. N.D. Cal. 2021) (adopting the reasoning of *In re*

-16-

*Process Am., Inc.*); FDIC-C Order at 20-21.  FDIC-Rs ignore these recent, in-circuit authorities and instead rely on a single district court's interpretation, *In re Even St. Productions Ltd.*, 2020 U.S. Dist. LEXIS 141267 (C.D. Cal. Aug. 6, 2020), which itself relied on a decades-old out-of-circuit authority that is not binding in this Circuit.

Moreover, there is no dispute as to: (1) SVBFG's proper title of the Account Funds; (2) their amount; (3) that Secretary Yellen invoked the systemic risk exception to guarantee "all deposits" of "all depositors" of SVB; or (4) that the Account Funds were made available to SVBFG in its account at Bridge Bank.  (Compl. ¶¶ 3-4, 14-16, 44.)  The only "dispute" over the turnover claim is the import of the systemic risk exception:  whether, as a matter of law, FDIC-Rs must turn over the Account Funds to SVBFG following Secretary Yellen's determination and, after having done so, whether FDIC-Rs had any right to take those funds back from SVBFG.  This dispute does not convert SVBFG's turnover claim for an undisputed sum into a claim for disputed property for purposes of SVBFG's turnover claim.  *See In re Brown*, 2022 WL 4390454, at *21 (Bankr. S.D.N.Y. Sept. 22, 2022) ("That [defendant] disputes the existence of the debt does not alter the Court's conclusion that the Trustee is entitled to a payment . . . pursuant to section 542(b)."); *In re Patriot Coal Corp.*, 631 B.R. 648, 658 (Bankr. E.D. Mo. 2021) (same); *In re Kids World of Am., Inc.*, 349 B.R. 152, 163 (Bankr. W.D. Ky. 2006) (same).  Here, the Complaint alleges (and FDIC-Rs do not contest) that "[t]here is no dispute over the accuracy of any deposit account statements and the existence of SVBFG's Account Funds" at SVB.  (Compl. ¶ 8.)

Finally, the statutory liability cap of 12 U.S.C. § 1821(i)(2) is inapplicable here and therefore has no impact on SVBFG's turnover claim.  Section 1821(i) applies to the "[v]aluation of claims in default," and establishes a "maximum liability of the Corporation" to "any person having a claim against the receiver or the insured depository institution."  FDIC-Rs argue that this limitation applies here because depositors would have received less than their full deposit value had SVB been liquidated.  (Mot. 16, 21.)  But even if section 1821(i) applied to limit the amount of SVBFG's turnover claim, it would not defeat the claim in its entirety.  In any event, section 1821(i) does not apply here because the full amount of the Account Funds was guaranteed by the invocation of the SRE.  (Compl. ¶¶ 14-16.)  Similarly, FDIC-Rs cannot rely on the timing

-17-

1    provisions of section 1821(d)(10)(A) to defeat SVBFG's turnover claim, because those timing

2    provisions are likewise inapplicable. (Mot. 16.) Pursuant to the SRE, all SVB depositors' account

3    funds were to be made immediately available and paid from the Deposit Insurance Fund.

4    (Compl. ¶¶ 14-17, 27, 59-60, 64.)

5         Therefore, the Account Funds are a debt that is "matured, payable on demand, or payable

6    on order" that is properly subject to turnover under section 542(b).

7    **V.    COUNT IV STATES A CLAIM FOR VIOLATION OF THE AUTOMATIC STAY.**

8         The Complaint states a claim for violation of the automatic stay based on FDIC-Rs'

9    improper reversal of, at minimum, a $6.2 million transaction to SVBFG for intercompany

10   receivables. SVBFG withdraws Court IV to the extent it is based on FDIC-Rs' continued refusal

11   to pay the Account Funds in light of the Court's reasoning in the FDIC-C Order.

12        As an initial matter, FDIC-Rs are wrong that the Complaint lacks plausible allegations as

13   to the intercompany receivable claim. The Complaint alleges that FDIC-R1 on March 17, 2023,

14   reversed a transaction of $6.2 million to SVBFG for intercompany receivables. (Compl. ¶¶ 21,

15   101, 137.) These allegations are sufficiently specific to put FDIC-Rs on notice of the nature of

16   SVBFG's claim against them. *Briskin* v. *Shopify Inc.*, 2022 WL 1427324, at *3 (N.D. Cal. May

17   5, 2022) ("[A] plaintiff's allegations must provide sufficient notice to all of the Defendants as to

18   the nature of the claims being asserted against them, including what conduct is at issue." (internal

19   quotation marks omitted)).

20        FDIC-Rs argue that they did not violate the automatic stay by refusing to pay SVBFG's

21   intercompany receivable, but that argument mischaracterizes the Complaint. (Mot. 17.) The

22   Complaint does not allege that FDIC-Rs merely refused to pay the intercompany receivable; it

23   alleges that FDIC-Rs affirmatively *reversed* the intercompany receivable in SVBFG's account

24   *after* the automatic stay went into effect, reducing SVBFG's account balance by $6,222,681.93.

25   (Compl. ¶¶ 101, 137.) That action is distinguishable from the conduct in *City of Chicago* v. *Fulton*,

26   592 U.S. 154 (2021), where the defendant seized the debtor's property before the automatic stay

27   took effect and then refused to return it. Rather, FDIC-Rs' actions constituted an "act to obtain

28   possession of property of the estate" in violation of section 362(a)(3). There is no reasonable

-18-

dispute that the intercompany receivables payment was "property" after the transaction had been made, and because such property comprised SVBFG's estate after it filed for chapter 11 protections, FDIC-Rs' unilateral repossession of that property was a self-help violation of the automatic stay. *Cf. In re Comput. Commc'ns, Inc.*, 824 F.2d 725, 729-31 (9th Cir. 1987) (holding creditor could not unilaterally terminate contract with debtor because such "self-help and post hoc justification would defeat the purpose of the automatic stay"). As the Ninth Circuit has explained, the scope of the automatic stay is "quite broad" because it is "designed to effect an immediate freeze of the *status quo* by precluding and nullifying post-petition actions, judicial or nonjudicial . . . affecting the property of the estate." *Hillis Motors, Inc.* v. *Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir. 1993) (holding government's dissolution of debtor's corporation constituted a violation of the automatic stay and was thus void *ab initio*). Actions such as FDIC-Rs' reversal of the intercompany receivables illustrate precisely the problem the automatic stay was designed to address: if all creditors could unwind or repossess estate property, then bankruptcy would be nothing more than a frantic race between creditors to reach the debtor's limited assets first, to the detriment of the reorganization and creditors as a whole. *See id.* at 585 (noting that the stay "protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment of all others"); *see also* H.R. Rep. No. 95-595, at 340-42 (1977) ("The purpose of [section 362(a)(3)] is to prevent dismemberment of the estate.").

Finally, FDIC-Rs argue that SVBFG's position "ignores FDIC-R1's defensive setoff rights and the limitation imposed by 12 U.S.C. § 1821(i)(2)." (Mot. 17.) FDIC-Rs do not cite any authority for their argument that they are permitted to violate the automatic stay based on hypothetical, unliquidated setoff rights, which are all of the rights they possessed at the time they seized SVBFG's funds, reversed the intercompany receivable, and repeatedly denied SVBFG's demands for payment. (Compl. ¶¶ 21, 101, 112-15, 137.) Nor do FDIC-Rs explain how section 1821(i)(2)—which in this instance has been rendered irrelevant by the invocation of the SRE—entitles FDIC-Rs to violate the automatic stay. FDIC-Rs argue that "the discretionary financial assistance authorized by the SRE did not change the nature of SVBFG's Deposit Claim"

-19-

1    (Mot. 18), but that is contrary to the well-pleaded allegations, which the Court must accept on

2    this motion.

3    **VI.    COUNTS V AND VI ADEQUATELY PLEAD CLAIMS ENTITLING SVBFG TO
          A PRO RATA DISTRIBUTION OF THE LIQUIDATION VALUE OF SVB
4          AND/OR BRIDGE BANK.**

5          Even if this Court ultimately determines the Treasury Secretary's invocation of the SRE

6    did not require FDIC-Rs to pay all of SVBFG's Account Funds, applicable federal and state

7    banking law require FDIC-Rs to pay SVBFG, at minimum, SVBFG's pro rata share of SVB's

8    liquidation value.  Section 91 of the National Bank Act ("NBA"), which applies to FDIC-R2 as

9    receiver of Bridge Bank, a national bank, "prohibits the transfer of assets after the commission of

10   an act of insolvency made 'with a view to the preference of one creditor to another.'"  *Senior*

11   *Unsecured Creditors' Comm. of First Republic Bank Corp.* v. *FDIC*, 749 F. Supp. 758, 774 (N.D.

12   Tex. 1990).  Section 194 of the NBA provides that once the comptroller has been paid by the

13   receiver, "the comptroller shall make a ratable dividend of the money so paid over to him by such

14   receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of

15   competent jurisdiction."  12 U.S.C. § 194.

16         Courts have held that these two provisions of the NBA require pro-rata distribution of a

17   national bank's assets to its creditors.  *Tex. Am. Bancshares, Inc.* v. *Clarke*, 954 F.2d 329, 337

18   (5th Cir. 1992) ("[A] string of federal cases have cemented the principle that the NBA mandates

19   pro rata payment of claims as of the date of insolvency."); *Branch* v. *FDIC*, 825 F. Supp. 384,

20   412-13 (D. Mass. 1993); *Murphy* v. *FDIC*, 1995 WL 125435, at *1 (N.D. Cal. Mar. 15, 1995)

21   (finding plaintiffs had valid claims against FDIC under 12 U.S.C. §§ 91 and 194).

22         "[W]henever the FDIC acts as receiver and liquidates a failed national bank, it acts subject

23   to the requirements in sections 91 and 194 of the NBA."  *Tex. Am. Bancshares, Inc.*, 954 F.2d at

24   335; *see also Branch*, 825 F. Supp. at 412; *Adams* v. *Zimmerman*, 73 F.3d 1164, 1171 (1st Cir.

25   1996).  Consequently, when the FDIC liquidates a failed national bank, it is obligated to ratably

26   distribute the bank's assets on proven claims, as prescribed by sections 91 and 194.  *Adams*, 73

27   F.3d at 1171 ("The FDIC, as receiver, is authorized to distribute the assets of a failed bank to all

28   creditors on a pro rata basis pursuant to the National Bank Act at 12 U.S.C. §§ 91 and 194, and the

-20-

1    FIRREA at 12 U.S.C. § 1821(i)(2).”); *Citizens State Bank of Lometa* v. *FDIC*, 946 F.2d 408, 411

2    (5th Cir. 1991) (“As receiver . . . , FDIC is responsible for marshalling the bank’s assets and

3    distributing them ratably.”); *MCorp* v. *Clarke*, 755 F. Supp. 1402, 1411 (N.D. Tex. 1991) (noting

4    that sections 91 and 194 of the NBA impose upon the FDIC and comptroller “the duty to treat

5    creditors fairly and ratably”); *Downriver Cmty. Fed. Credit Union* v. *Penn Square Bank*, 879 F.2d

6    754, 762 (10th Cir. 1989) (“The receiver is charged with the duty of securing equal justice to all

7    its creditors . . . under a law which sternly forbids preferences.”).

8        Sections 1406 and 681 of the California Financial Code (“<u>CFC</u>”), which apply to

9    FDIC-R1’s receivership of SVB because SVB was a state-chartered bank, impose on the FDIC the

10   same obligations as sections 91 and 194 of the NBA.  *See* 12 U.S.C. § 1821(g)(4) (providing that

11   if the FDIC is appointed as receiver by a state supervisory authority, “the rights of depositors and

12   other creditors of any State depository institution shall be determined in accordance with the

13   applicable provisions of State law”).  Section 1406 of the CFC, like section 91 of the NBA,

14   prohibits California-chartered banks from making preferential payments to creditors following an

15   act of insolvency.  CFC § 1406(c).  Section 681 of the CFC, like section 194 of the NBA, imposes

16   a ratable distribution requirement on any receiver of a California state-chartered bank.  *Id.* § 681.

17   Together, these provisions impose on the FDIC the same obligation to make a ratable distribution

18   to unassumed creditors as sections 91 and 194 of the NBA.  *See Woodbridge Plaza*, 815 F.2d at

19   541-42 (finding that former section 3119 of the CFC, the predecessor to section 681, is

20   “substantially similar” to section 194 of the NBA and prohibits a receiver from favoring some

21   creditors over others and leaving insufficient assets to allow distributions to unassumed creditors),

22   *superseded by statute on other grounds*, Pub. L. No. 101-73, 103 Stat. 183; *see also Tex. Am.*

23   *Bancshares*, 954 F.2d at 337 (describing *Woodbridge Plaza* as “extending the principle [that there

24   is a ratability requirement imposed on the FDIC as receiver] to state banks of which the FDIC is

25   appointed receiver”).

26       FDIC-Rs’ arguments that the minimum distribution requirements under the National Bank

27   Act and the California Financial Code do not apply are meritless.

28

### A.    SVBFG Has Adequately Pleaded a Claim Against FDIC-R1 Under Sections 1406 and 681 of the CFC.

*First*, FDIC-R1 argues that SVBFG fails to state a minimum distribution claim because section 1406 does not provide any right of payment.  FDIC-R1 misconstrues SVBFG's claim and the applicable authorities.  Rather than relying solely on section 1406, SVBFG pleads that sections 1406 and 681 together afford creditors a right to payment.  *See Woodbridge Plaza*, 815 F.2d at 541 (recognizing claim under substantially identical predecessor provisions to sections 1406 and 681); *see also* Compl. ¶¶ 173, 174.

*Second*, FDIC-R1's contention that section 681 applies only to "uninsured" licensees rests on a misunderstanding of California law.  Section 681 appears in Division 1, Chapter 7, Article 4 of the CFC, which is titled "liquidation of an uninsured licensee."  Article 4 was introduced with SB 664 in 2011, which reorganized various provisions of the CFC.  As explained by multiple committee reports on SB 664, the bill simply "renumber[ed] the sections of the Financial Code" to reflect a reorganization effort by the DFPI.  The contents of the CFC were "unchanged."  *See, e.g.*, S. Rules Comm., S. Floor Analyses of S.B. 664, 2011-2012 Reg. Sess., at 2-3 (Cal. May 17, 2011) ("This reorganization makes no substantive changes; it merely orders the code sections more logically, and is intended to be easier for licensees to follow and for DFI to administer.").  Thus, the reordering of section 681 did not substantively change its scope from its predecessor, section 3119, which appeared in Article 1 "Liquidation by the Commissioner" and is identical to section 681 other than that it replaced references to terms "bank" and "depositors," respectively, with "licensee" and "customers."  Moreover, the text of section 681 does not limit its application to uninsured licensees, whereas other provisions within Article 4 do.  *See* CFC § 670 ("[u]pon taking possession of the property and business of a licensee that does not have federal deposit or share insurance . . . "); *id.* § 673 ("[w]ithin six months after taking possession of the property and business of any licensee that does not have federal deposit or share insurance . . . ").

*Third*, FDIC-R1's argument that section 681 does not apply because it only applies to dividends paid by "the commissioner" likewise misinterprets California law.  Under CFC section 620, the Commissioner of the DFPI may appoint the FDIC to act as receiver for a California-chartered bank.  *Id.* § 620.  In such circumstances, the FDIC has "the powers conferred

-22-

on the commissioner pursuant to this chapter." *Id.*; *see also id.* § 600 ("Federal Insurance Agency" includes the FDIC). Section 681 falls within the same "chapter" as section 620 and therefore applies to the FDIC when, as here, it is acting as a receiver for a California-chartered bank.

*Fourth*, FDIC-Rs fail to explain how sections 1406 and 681 are inconsistent with, and therefore preempted by, federal law. As described above, the CFC provisions are substantially analogous to the federal distribution scheme contemplated under the NBA, which, as discussed below, is not superseded by or in conflict with section 1821(i)(2). Indeed, 12 U.S.C. § 1821(g)(4) expressly provides that FDIC-R1 must comply with applicable state laws.

*Finally*, FDIC-R1's argument that there is no private right of action for violations of sections 1406 and 681 and, therefore, SVBFG has no remedy is wrong. In *Woodbridge Plaza*, the Ninth Circuit recognized plaintiff's claim for declaratory relief based on a violation of the CFC's minimum distribution requirements. 815 F.2d at 542. In addition, SVBFG has adequately alleged that FDIC-R1 breached its fiduciary duties to SVBFG by violating sections 1406 and 681. *See* 12 U.S.C. § 1823(d)(3)(C) (recognizing that the FDIC-R acts "*subject to*" fiduciary duties and obligations owed to "claimants against the insured depository institution in receivership" (emphasis added)); *Golden Pac. Bancorp* v. *FDIC*, 375 F.3d 196, 201 (2d Cir. 2004) ("It is undisputed that, as a receiver, the FDIC owes a fiduciary duty to the Bank's creditors and to Bancorp."); *MCorp*, 755 F. Supp. at 1421 ("The receiver of a failed national bank owes a fiduciary duty to its creditors to treat them with strict impartiality."); *Gibraltar Fin. Corp.* v. *Fed. Home Loan Bank Bd.*, 1990 WL 394298, at *2 (C.D. Cal. June 15, 1990) (noting that "case law, and common sense, indicate[]" that fiduciary duties arise "where a governmental agency has assumed control of the day-to-day operations of a financial institution and has therefore ventured beyond its normal regulatory or supervisory role"). Section 1821(g)(4) expressly incorporates state law and provides that SVBFG's rights as a depositor "shall be determined in accordance with the applicable provisions of State law"—here, the CFC. Accordingly, SVBFG has a right of action that springs not from the CFC itself, but rather from FDIC-R1's duties and obligations as receiver of SVB. Whether the CFC expressly authorizes a private right of action is irrelevant. For the same

-23-

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
CASE NO. 5:24-CV-01321-BLF

1    reason, FDIC-R1's authorities holding that the CFC does not create a private right of action with

2    respect to different sections of the CFC do not help FDIC-R1's argument.

3        **B.**    **SVBFG Has Adequately Pleaded a Claim Against FDIC-R2 Under NBA §§ 91 and 194.**

4            FDIC-R2's arguments against the application of sections 91 and 194 of the NBA are

5    equally unconvincing.  *First*, FDIC-R2 argues that SVBFG has failed to state a claim because

6    section 91 does not create a private right of action.  (Mot. 20.)  SVBFG's claim is not based on

7    section 91 alone.  Rather, NBA §§ 91 and 194 together create a right to ratable distribution of a

8    closed bank's assets.  FDIC-R2 also ignores the multiple authorities that have recognized causes

9    of action based on violations of sections 91 and 194.  *E.g.*, *First Empire Bank-N.Y.* v. *FDIC*, 572

10   F.2d 1361, 1369-1371 (9th Cir. 1978) (recognizing claims under section 91 and 194 of the NBA),

11   *superseded by statute on other grounds*, Pub. L. No. 101-73, 103 Stat. 183; *Murphy*, 1995 WL

12   125435, at *1 (same); *Branch*, 825 F. Supp. at 412-15 (same); *cf. Woodbridge Plaza*, 815 F.2d at

13   541 (finding cause of action under substantively identical provisions of CFC).

14           In addition, FDIC-R2's violation of sections 91 and 194 constitutes a breach of fiduciary

15   duty, which gives rise to a cause of action, regardless of whether the NBA itself provides a private

16   right of action.  *See Tex. Am. Bancshares, Inc.*, 954 F.2d at 334 (noting sections 91 and 194

17   "impose on a national bank receiver the duty to make ratable dividends and avoid preferences");

18   *MCorp*, 755 F. Supp. at 1411 (noting the NBA imposes upon the FDIC and comptroller "the duty

19   to treat creditors fairly and ratably"); *Alonzo* v. *ACF Prop. Mgmt., Inc.*, 643 F.2d 578, 579 (9th

20   Cir. 1981) ("a motion to dismiss for failure to state a claim should not be granted unless it appears

21   to a certainty that plaintiff would be entitled to no relief under any state of facts which could

22   be proven.").

23           *Second*, FDIC-R2 argues—without citing a single authority—that section 194 "is

24   inapplicable because it merely requires the Comptroller of the Currency to make a ratable dividend

25   'of the money so paid over to him by such receiver'" and section 12 U.S.C. § 1821(d)(10)(A) gives

26   FDIC-Rs complete discretion to determine what to pay to the Comptroller.  (Mot. 21.)  To the

27   contrary, "[t]his duty to ratably distribute . . . has been delegated to FDIC-R, which is charged to

28

-24-

distribute receivership assets 'in conformity with the provisions of law relating to the liquidation of closed national banks.'" *Dababneh* v. *FDIC*, 971 F.2d 428, 432 (10th Cir. 1992) (quoting 12 U.S.C. § 1821(d)(12)(B)).   Moreover, FDIC-R2 ignores the multiple authorities holding that section 194 imposes obligations directly on the FDIC as receiver, acting as the "administrative agent of the Comptroller of the Currency." *Citizens State Bank of Lometa*, 946 F.2d at 411; *Tex. Am. Bancshares, Inc.*, 954 F.2d at 335 (noting NBA § 194 "impose[s] a requirement of ratable payments to creditors . . . to the extent of the assets of the failed bank").   And SVBFG's claims are plausible because they (1) existed before insolvency, (2) are for a sum certain, and (3) were filed within the timeframe established by FDIC-R.  *See Interfirst Bank-Abilene, N.A.* v. *FDIC*, 777 F.2d 1092, 1094 (5th Cir. 1985).   FDIC-R2 does not argue otherwise.

*Third*, section 1821(i)(2) did not supersede section 194's ratable distribution requirement. As the court in *Branch* explained, with the enactment of FIRREA in 1989, Congress limited "the FDIC's maximum liability under [NBA § 194] to any person having a claim against the receiver or the failed bank to the amount that claimant would have received had the FDIC simply liquidated the assets and liabilities of the bank." *Branch*, 825 F. Supp. at 413-14.   Section 1821(i)(2) overruled prior cases holding that the FDIC was required to make ratable payments to creditors *above* the liquidation value of their claims, even if that meant dipping into the FDIC's own pockets. *Id.* at 412-14.  But section 1821(i)(2) did not relieve the FDIC of its obligation under the NBA to make ratable distributions to creditors *up to* the liquidation value of their claims.   In *Branch*, the district court considered whether the FDIC violated sections 91 and 194 by allegedly structuring certain purchase and assumption transactions so that the plaintiff would receive less than the liquidation value of its claims.   The court first examined the requirements of sections 91 and 194 pre-FIRREA, noting that courts had consistently "found that the NBA prevents the FDIC from structuring a purchase and assumption transaction so that some creditors receive one hundred percent while others receive only the liquidation value of their claims or some lesser amount." *Id*. at 413-14.  The court then assessed the impact of section 1821(i), added by FIRREA, which "limits the FDIC's maximum liability under section 194 to any person having a claim against the receiver or the failed bank to the amount that claimant would have received had the FDIC simply liquidated

-25-

the assets and liabilities of the bank." *Id*. at 414-15. While the district court recognized that section 1821(i)(2) relieved the FDIC of its former obligation to pay unassumed creditors "over and above the liquidation value of their claims," the court held that "it does not relieve the FDIC of its duty under sections 91 and 194 of the NBA to provide a ratable distribution to such creditors up to the liquidation value of their claims." *Id*. Consequently, even after the enactment of section 1821(i), SVBFG may still maintain an action against FDIC-R2 under sections 91 and 194 of the NBA for a ratable distribution up to the liquidation value of Bridge Bank, regardless of the amount of assets remaining in the receivership following the sale of Bridge Bank's assets to First Citizens. *See Tex. Am. Bancshares, Inc.*, 954 F.2d at 335 (section 194 "impose[s] a requirement of ratable payments to creditors, but only to the extent of the assets of the failed bank").

*Finally*, FDIC-R2's argument that SVBFG has no right of distribution in the Bridge Bank receivership ignores the allegations in the Complaint. Although FDIC-R2 purported to transfer SVBFG's Account Funds to FDIC-R1, FDIC-R2's purported transfer of SVBFG's Account Funds to FDIC-R1 does not absolve FDIC-R2 of the obligations imposed upon it by the NBA and 12 U.S.C. § 1823(d)(3)(C). *See Branch*, 825 F. Supp. at 410-411. In addition, there is a question whether such transfer was legally permissible and therefore whether it was legally effective, as well as whether any transfer absolved Bridge Bank of its liability to SVBFG for the $1.93 billion in deposits that were undeniably in SVBFG's accounts at Bridge Bank. And Bridge Bank's express exclusion of SVBFG's Account Funds from the transfer to First Citizens Bank creates an inference that SVBFG's Account Funds remained at Bridge Bank at the time it was placed into receivership, thus entitling SVBFG to a distribution from FDIC-R2.

## VII.    SVBFG PLAUSIBLY STATES A CLAIM FOR DECLARATORY JUDGMENT.

SVBFG has asserted multiple, independent causes of action, any one of which would support a claim for declaratory judgment, and, contrary to FDIC-Rs' assertions, SVBFG's request for declaratory relief does not violate section 1821(j).

### A.    SVBFG Has Asserted Multiple Independent Causes of Action.

FDIC-R argues that SVBFG cannot assert a claim for declaratory relief because the Declaratory Judgment Act ("DJA") "does not provide an independent cause of action." (Mot.

-26-

21-22.)  Although the DJA does not provide an affirmative cause of action where none otherwise exists, SVBFG has asserted multiple, independent causes of action tied to FDIC-Rs' unlawful withholding of SVBFG's Account Funds, including promissory estoppel, breach of contract, turnover, and violation of the CFC and NBA.  SVBFG may therefore assert a claim for declaratory relief under the DJA on the basis of such causes of action.  *See* FDIC-C Order at 34 ("[E]very request made under the declaratory judgment claim is for relief that SVBFG would get through one of its other claims . . . .  Accordingly, the Court will not dismiss SVBFG's claims on this basis."); *see also Owens* v. *Bank of Am., N.A.*, 2013 WL 1820769, at *6 (N.D. Cal. Apr. 30, 2013) (concluding declaratory relief was appropriate where plaintiff adequately pleaded causes of action for breach of contract and promissory estoppel); *In re Shapphire Res., LLC*, 2016 WL 320823, at *14 (Bankr. C.D. Cal. Jan. 25, 2016) (concluding debtor was entitled to declaratory relief under DJA on basis of turnover claim).  As noted above, the Ninth Circuit has also recognized a claim for declaratory relief based on a violation of CFC sections 1406 and 681.  *Woodbridge*, 815 F.2d at 542.

FDIC-Rs next argue that the relief sought by SVBFG "is moot or would be merely advisory" because SVBFG already submitted claims against FDIC-Rs and "[t]he proper time for SVBFG to have obtained declaratory relief would have been before SVBFG submitted the Claims to the FDIC-Rs."  (Mot. 22.)  FDIC-Rs cite no authority to support this argument.  And because FDIC-Rs have consistently contended that SVBFG needed to submit an administrative claim before filing claims against FDIC-Rs in this Court (Compl. ¶¶ 5, 23, 107), they cannot now argue that SVBFG has waived its claims by doing the precise thing that FDIC-Rs insist was required.

Finally, FDIC-Rs miss the point in arguing that SVBFG's request for declaratory judgment fails because FDIC-Rs' claims process is "exclusive" and "mandatory."  (Mot. 22.)  FDIC-Rs cannot contest on a motion to dismiss the well-pleaded allegations that their claims process— whether mandatory or otherwise—did not apply to SVB depositors as a result of the invocation of the SRE.  (Compl. ¶¶ 17-18, 121.)

**B.     SVBFG's Request for Declaratory Relief Does Not Violate Section 1821(j).**

FDIC-Rs rely on *D-F Fund VIII, LLC* v. *Valley Ranch Development Co.*, 1999 WL 97929 (N.D. Tex. Feb. 11, 1999), to argue that SVBFG's request for declaratory relief violates section 1821(j) of FIRREA because it is a "thinly-veiled attempt to 'restrain or affect the exercise of powers or functions of' the FDIC-Rs' [sic] to administer the Claims that SVBFG submitted to the FIRREA claims processes." (Mot. 24.)  In *D-F Fund*, the court found that section 1821(j) prohibited the court from granting the defendant's counterclaim for declaratory relief on the basis that the request, which was for "a declaration that the repurchase option [was] valid and enforceable and that title to the property be conveyed to [the defendant]," was "akin to a request for *injunctive relief*." *Id.* at *5 (emphasis added).  *D-F Fund* is inapposite because SVBFG's requested declaration—that  SVBFG was not required to file an administrative claim with the FDIC in order to assert its right to recover its deposits—is not akin to an injunction at all.  *See Sharpe*, 126 F.3d at 1154 (referring to section 1821(j) as "an anti-injunction section"); *Volges* v. *Resol. Tr. Corp.*, 32 F.3d 50, 51-52 (2d Cir. 1994) (same).

**VIII.   SVBFG HAS PLEADED PLAUSIBLE CLAIMS FOR BREACH OF CONTRACT IN COUNTS X, XI, AND XII.**

Finally, FDIC-Rs argue that SVBFG has failed to state claims for breach of contract in Counts X, XI, and XII, and that these claims must be supported by a written agreement, else they are barred by 12 U.S.C. §§ 1821(d)(9)(A) and 1823(e).  FDIC-Rs again are mistaken.

*First*, in federal courts, federal procedural rules apply, *see Erie R. Co.* v. *Tompkins*, 304 U.S. 64 (1938), so the relevant pleading standard for this case is Federal Rule of Civil Procedure 8, which requires "only that the defendant have notice of the contract alleged to be breached." *Kassa* v. *BP W. Coast Prod.*, 2008 WL 3494677, at *4 (N.D. Cal. Aug. 12, 2008) (rejecting defendant's argument to apply California pleading standards, including requirement to append a written contract, because the case was governed by federal procedural rules).  There is no requirement to append the written contract or make allegations of breach concerning specific contract provisions.  (*Contra* Mot. 28.)  Rather, Rule 8 requires only that the Complaint put FDIC-Rs on notice of the contract alleged to be breached.  *Kassa*, 2008 WL 3494677, at *4.

-28-

1  FDIC-Rs are on notice of a contract alleged to be breached if the plaintiff "plead[s] the

2  'legal effect' of the contract." *Securimetrics, Inc.* v. *Hartford Cas. Ins. Co.*, 2005 WL 1712008, at

3  *2 (N.D. Cal. July 21, 2005).  In this case, this low bar is clearly satisfied (and, indeed, FDIC-Rs

4  do not seriously contend that they are not on notice of the claims against them).  *See id.* at *1;

5  *James River Ins. Co.* v. *DCMI*, 2012 WL 2873763, at *3 (N.D. Cal. July 12, 2012) (Plaintiffs

6  adequately alleged breach of contract where they alleged simply that they "had a written or verbal

7  contract" under which they "assisted [defendant] with completing applications for insurance.").

8  *Second*, 12 U.S.C. § 1823(e) is not applicable to these claims because it applies only to

9  *assets* of a failed financial institution, not to *liabilities* of the institution.  *Murphy* v. *FDIC*, 38 F.3d

10  1490, 1500-01 (9th Cir. 1994) (en banc) ("The statute protects against inflated assets.  It does not

11  operate on liabilities.").  The central purpose of section 1823(e) is to limit "secret agreement[s]

12  implicating the value of an asset of the bank" because such uncertainty about the ability of the

13  receiver to collect on its receivables would undermine the efficiency of the receivership.  *Brookside*

14  *Assocs.* v. *Rifkin*, 49 F.3d 490, 495 (9th Cir. 1995).  The claims in Counts X, XI, and XII are for

15  FDIC-Rs' *liabilities* under Lease Agreements, Vendor Contracts, Employee Claims, Indemnity

16  Claims, and obligations for intercompany receivables—not *assets*.  For that reason, section 1823(e)

17  does not apply to Counts X, XI, and XII, and accordingly, section 1821(d)(9)(A) (which

18  incorporates the requirements of section 1823(e) concerning contracts impacting the value of

19  banks' assets) also does not apply.  *See* 12 U.S.C. § 1821(d)(9)(A) (providing that claims that do

20  not "meet the requirements set forth in section 1823(e)," which concern only contracts for claims

21  against the assets of a bank, shall not form the basis of a claim against the receiver).

22  **IX.    SVBFG HAS ADEQUATELY PLEADED ITS FIFTH AMENDMENT AND
        CONVERSION CLAIMS BUT VOLUNTARILY WITHDRAWS THEM.**

23

24  FDIC-Rs argue that SVBFG's Fifth Amendment takings claim must be dismissed because

25  the Court of Federal Claims has exclusive jurisdiction of the claim.  There are exceptions to the

26  Court of Federal Claims' presumptive jurisdiction over takings claims arising out of the Tucker

27  Act that may be applicable here.  *See, e.g.*, *Ramirez* v. *Weinberger*, 745 F.2d 1500, 1527 (D.C.

28  Cir. 1984); *Vereda, Ltda.* v. *United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001).  But to conserve

-29-

1   this Court's time and resources, SVBFG voluntarily withdraws its claim for violation of the

2   Takings Clause against FDIC-Rs under Count VIII.

3         FDIC-Rs' arguments for dismissal of SVBFG's conversion claim also fail.  California law

4   is clear that "funds in a specific named bank account may be sufficiently 'identifiable' to support

5   a conversion claim."  *Randy Horn D.D.S., Inc.* v. *High Point Servs., Inc.*, 2013 WL 12114065, at

6   *7 (C.D. Cal. Nov. 19, 2013) (citing *Pilch* v. *Milikin*, 200 Cal. App. 2d 212, 224 (1962)).  There

7   can be no dispute that SVBFG's Account Funds are sufficiently identifiable to support a

8   conversion claim.  As explained in the Complaint, FDIC-R *already identified* SVBFG's accounts

9   on March 16, 2023, when, without any explanation, it called back each of SVBFG's accounts from

10   Bridge Bank and placed holds on them.  (Compl. ¶¶ 19, 91.)  Moreover, FDIC-Rs do not have a

11   right to possess the Account Funds.  Courts have found that deposit accounts may be converted if

12   the defendant is under an obligation to treat specific funds in a particular manner and fails to do

13   so.  *See e.g.*, *Taie* v. *Ten Bridges*, 2023 WL 8237112, at *4 (W.D. Wash. Nov. 28, 2023) ("Money

14   may be the subject of conversion if the party charged with conversion . . . had an obligation, which

15   it failed to honor, to return the specific money to the party claiming it.").  Finally, FDIC-Rs argue

16   that the United States, rather than the FDIC, is the appropriate defendant for Plaintiffs' FTCA

17   claim.  Because SVBFG's FTCA claim is otherwise cognizable, this Court may permit SVBFG to

18   substitute the United States as the defendant for SVBFG's conversion claim.  *See Shankar* v.

19   *United States Dep't of Homeland Sec.*, 2014 WL 523960, at *8 (N.D. Cal. Feb. 6, 2014).  However,

20   in order to avoid further delays of this action, and because SVBFG has pleaded numerous other

21   viable causes of action with respect to FDIC-Rs' seizure of its Account Funds, SVBFG will

22   voluntarily dismiss its claim for conversion.

23                      **CONCLUSION**

24         For the foregoing reasons, the Court should deny FDIC-Rs' Motion to Dismiss.

25

26

27

28

-30-

1    Dated:    August 12, 2024                    Respectfully submitted,

2                                                 /s/ Robert A. Sacks

3                                                 Robert A. Sacks
                                                  Adam S. Paris
4                                                 Diane L. McGimsey
                                                  **SULLIVAN & CROMWELL LLP**
5                                                 1888 Century Park East
                                                  Los Angeles, California 90067
6                                                 Telephone:     (310) 712-6600
                                                  Facsimile:     (310) 712-8800

7                                                 Sverker K. Hogberg
                                                  **SULLIVAN & CROMWELL LLP**
8                                                 550 Hamilton Avenue
                                                  Palo Alto, California 94301
9                                                 Telephone:     (650) 461-5600
                                                  Facsimile:     (650) 461-5700

10

11                                               *Attorneys for Plaintiff SVB Financial Group*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-31-