1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Virginia K. DeMarchi, Magistrate Judge

4

5    SVB FINANCIAL GROUP,            )
                                     )
6             Plaintiff,             )
                                     )
7    vs.                            )   No. C 24-01321-BLF
                                     )
8    FEDERAL DEPOSIT INSURANCE       )
     CORPORATION, AS RECEIVER        )
9    FOR SILICON VALLEY BANK,        )
     et al.,                         )
10                                   )
              Defendants.            )
11   _____)

12

                                     San Jose, California
13                                   Tuesday, September 17, 2024

14

     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
15         RECORDING 10:32 - 11:49 = 1 HOUR, 17 MINUTES

16   APPEARANCES:

17   For Plaintiff:
                                Sullivan & Cromwell, LLP
18                              1888 Century Park East
                                Los Angeles, California 90067
19                         BY:  ROBERT A. SACKS, ESQ.
                                DIANE L. MCGIMSEY, ESQ.
20                              ADAM S. PARIS, ESQ.

21   For Defendants:
                                Bailey Glasser, LLP
22                              1055 Thomas Jefferson Street,
                                 Northwest
23                              Suite 540
                                Washington DC 20007
24                         BY:  STEPHEN P. SORENSON, ESQ.

25              (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
 1  For Defendants:
 2                              Reed Smith, LLP
                                599 Lexington Avenue
                                Suite 22
 3                              New York, New York 10022
                          BY:   CASEY D. LAFFEY, ESQ.
 4
                                Reed Smith, LLP
 5                              101 Second Street, Suite 1800
                                San Francisco, California
 6                                94105
                          BY:   EMILY F. LYNCH, ESQ.
 7
    Transcribed by:              Echo Reporting, Inc.
 8                              Contracted Court Reporter/
                                Transcriber
 9                              echoreporting@yahoo.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

1   Tuesday, September 17, 2024                    10:32 a.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4           THE CLERK:  Calling the next matter, 24CV01321BLF,

5   SVB Financial Group versus Federal Deposit Insurance

6   Corporation, as Receiver for Silicon Valley Bank, et al., on

7   for discovery hearing.

8       If the parties could state their appearances, please,

9   beginning with Plaintiff's Counsel.

10          MR. SACKS:  Good morning, your Honor.  Robert

11  Sacks from Sullivan and Cromwell for the Plaintiff.

12          THE COURT:  Okay.  Good morning.

13          MS. MCGIMSEY:  Good morning, your Honor.  Diane

14  McGimsey from Sullivan and Cromwell for the Plaintiff.

15          THE COURT:  Good morning.

16          MR. PARIS:  And good morning, your Honor.  Adam

17  Paris from Sullivan and Cromwell, also for the Plaintiff.

18          THE COURT:  Okay.  Good morning.

19          MR. SORENSON:  Good morning, your Honor.  Stephen

20  Sorenson from Bailey Glasser on behalf of the FDIC as

21  Receiver for Silicon Valley Bank.

22          THE COURT:  Good morning.

23          MR. SORENSON:  Good morning.

24          MR. LAFFEY:  Good morning, your Honor.  Casey

25  Laffey and Emily Lynch from Reed Smith, also on behalf of

4

1 the FDIC as Receiver for Silicon Valley Bank.

2          THE COURT:  Okay.  Good morning.

3      This dispute concerns SVBFG's privilege claims

4 regarding documents that I understand are currently in the

5 possession of -- well, were in the possession of SBV --

6 sorry, SVB and are now in the possession of the FDICR1.

7 Have I got that right?

8          MR. SORENSON:  Yes.

9          THE COURT:  Okay.  Let me know if I confuse things

10 here.

11     I am frankly struggling with the framework that's

12 appropriate to resolve this case because both parties seem

13 to be taking a categorical approach to this dispute.  There

14 may be 24 million documents or maybe only 400,000 documents,

15 I don't know, but it's not usually the way a privilege

16 dispute is resolved.  Normally, there's fact-specific

17 inquiries where the party claiming the privilege has to

18 identify the privilege holder, the nature of the privilege,

19 assert some sort of -- disclose some minimum amount of

20 information about the privilege claimed in order for it to

21 be assessed, and here I'm being asked to make a categorical

22 decision without even knowing what the documents are or who

23 the privilege holder may be for a given document.  And so

24 I'm not sure how I'm supposed to do that, unless this is the

25 rare case where those kinds of categorical decisions can be

5

1  made.

2      And so I have some questions.  And let me start with

3  the FDIC Receiver, because if these are documents that are

4  in the FDIC's possession right now, I would like to just

5  begin with a basic question of what are these documents?

6          MR. SORENSON:  These are the documents -- when the

7  FDIC took over as Receiver, under their mandate, they have

8  to collect all of the systems of the bank.  So they

9  collected all the e-mail, e-mail custodians, laptops, hard

10  copy documents -- so they tried to collect all of the -- all

11  of the bank records.

12          THE COURT:  Every document in SVB's possession,

13  that's what these documents are?

14          MR. SORENSON:  They -- the ones we're talking

15  about here are a subset of those.  So --

16          THE COURT:  Okay.  So what's the subset?

17          MR. SORENSON:  The subset is -- it is 24 million

18  documents, mostly electronic documents, e-mails from

19  selected custodians.  There may be other electronic

20  documents, but these are, for the most part, the e-mails of

21  the former Silicon Valley Bank -- Silicon Valley Bank

22  Financial Group employees.  And just for -- I guess for --

23  just for simplification, I would call it the bank.  We call

24  it the bank and the holding company because it gets

25  confusing, but --

6

1          THE COURT:  Okay.  That's fine.  But these are
2  bank and holding company employees?
3          MR. SORENSON:  Just bank --
4          THE COURT:  Just bank employees.
5          MR. SORENSON:  -- the holding company did not have
6  employees.
7          THE COURT:  Okay.  So just bank employees.
8          MR. SORENSON:  Only the bank did.
9          THE COURT:  Okay.  And so they're principally 24
10 million e-mails?
11         MR. SORENSON:  Well, 24 million documents.  I
12 can't say they're all e-mails, but --
13         THE COURT:  Okay.
14         MR. SORENSON:  -- I think a vast majority are
15 e-mail communications with attachments and the like.
16         THE COURT:  Okay.  And do they cover a period of
17 time, certain subject matter, or is this the entirety of an
18 e-mail -- for example, e-mail custodian's files?
19         MR. SORENSON:  My understanding is it's the entire
20 e-mail, that they would go to the laptop and take
21 everything.  So however long -- I don't know what the
22 document retention policy was or what people's practices
23 was, but I understand it's the entire e-mail box of, for
24 example, the CEO, the CFO, the General Counsel.
25         THE COURT:  Uh-huh.  Okay.  Now, for purposes of

1  the litigation -- this litigation -- I'm not worried about

2  any other litigation for the moment.  But for this

3  litigation, it's -- is it fair to say that the parties do

4  not need all 24 million documents in order to litigate this

5  case?

6          MR. SORENSON:  That's correct.

7          THE COURT:  Okay.  So is there a subset of

8  relevant documents about which it might make sense to fight

9  about privilege, and could we get there?  And if so, how can

10  we get there?

11          MR. SORENSON:  I'm afraid, your Honor, I don't

12  think there is a way to get there.  And I think the reason

13  is because of the way that the holding company structured

14  the organization.  So you had the holding company and the

15  bank.  The bank was wholly owned by the holding company.

16  And unlike other large banks, which had separate boards of

17  directors, this bank did not.  Everything was commingled.

18  And so when the bank board and the holding company board

19  met, they met jointly.  They did everything jointly.  They

20  got all of their advice jointly, the minutes were joint, all

21  the meeting materials were joint.  So it's impossible to

22  untangle what is -- you know, what is a privilege of the

23  holding company and the bank.  So our position is that

24  anything relating to the bank is subject to a joint

25  privilege.

1          THE COURT:  Uh-huh.

2          MR. SORENSON:  Now, the -- my colleagues have

3    said, "Well, there's a holding company only privilege."  We

4    don't see any basis for that --

5          THE COURT:  Okay.

6          MR. SORENSON:  -- we actually have never seen an

7    engagement letter.  But to answer your question --

8          THE COURT:  Yeah.

9          MR. SORENSON:  -- I think there's a way of

10   excluding certain documents.

11     So our position is that with respect to anything

12   relating to the bank, its balance sheet and the issues in

13   this case, which are the governance of the bank, the

14   investment strategy of the bank, all of that is relevant for

15   this case.  What we know is not going to be relevant for

16   this case is they had a small number -- the holding company

17   had a small number of subsidiaries.

18          THE COURT:  Uh-huh.

19          MR. SORENSON:  The bank represent 98-percent of

20   the bank -- of the holding company's assets.  So two-percent

21   was in, like, Silicon Valley Bank Venture Group or whatever.

22   We agree, those are not going to be relevant.  So if

23   there's --

24          THE COURT:  And can you distinguish those?  Like

25   -- so here's -- I have this mental picture that's forming

1  of, you know, things in nice little tidy file folders.  I'm

2  sure that's not the case, but, you know, there will be some

3  things that just aren't privileged because they're just

4  operational.  There are some things that are going to be

5  totally irrelevant to the litigation because they just don't

6  matter, either because they relate to subsidiaries that

7  don't matter or because they're just not relevant to any

8  issues in dispute.  And my hope was -- is that we could just

9  carve out those things using normal ESI discovery

10 techniques, whether that's search terms or what have you, so

11 that we get to a universe of documents that might be

12 relevant, and then we can figure out what to do about how to

13 parse out the privilege issues.

14     So that was the question I meant to ask you, is to try

15 to get to that notion and whether that's a fruitful effort

16 here.  And I -- so I'm not sure if you were answering that

17 question or a different question?

18         MR. SORENSON:  Yes.  I don't think it's going to

19 be a fruitful effort because, I mean, we both have all the

20 documents now, and so --

21         THE COURT:  All of them?  Okay.

22         MR. SORENSON:  All of them.

23         THE COURT:  Okay.

24         MR. SORENSON:  We both -- we all have the same

25 documents.

10

1          THE COURT:  Okay.

2          MR. SORENSON:  And, in fact, the documents have

3 the same identifier.  So when they were -- the FDIC turned

4 them over to the holding company, they have the same

5 document ID.  So we're all working from the same documents

6 at this point.

7          THE COURT:  Okay.  Well, that's progress.

8          MR. SORENSON:  That's great.  It is progress.

9          THE COURT:  Okay.

10          MR. SORENSON:  And the only question is, you know,

11 can we access them?  And the holding company's position is,

12 "No, you can't look at" --  their position last year was,

13 "You can't look at a single document of the CEO until we go

14 in and review and decide whether there's a holding company

15 only privilege as to any of those documents."

16          THE COURT:  Okay.  So is this a custodian specific

17 problem?  In other words, there are certain custodians whose

18 files are the subject of a dispute about privilege, but

19 other things, like -- I don't know, the -- you know, just

20 the operational documents of the bank, how it conducted its

21 business, are really not a problem.

22          MR. SORENSON:  It's not custodian specific

23 because, initially, the holding company took the position --

24 they gave us a long list of people -- it was basically every

25 officer of the bank -- and said, "Do not look at any of

11

1 their e-mails because we think there might be exclusive

2 holding company privileged documents.  And if you do, we're

3 going to seek sanctions."  So that's what we were dealing

4 with for the last year.

5      In the meantime, they have reviewed some and released

6 some documents.  But here we are a year later, and we still

7 have four million documents we, the FDIC -- that we cannot

8 look at.

9           THE COURT:  Okay.

10           MR. SORENSON:  I'm sorry, I'm not answering your

11 question --

12           THE COURT:  No, that's okay.

13           MR. SORENSON:  -- but I think it's difficult to.

14           THE COURT:  You just said the word four million,

15 which is different than 24 million.  So do you -- so is the

16 -- is this dispute at most, and it's a lot, concerning four

17 million documents that are associated with particular

18 custodians?

19           MR. SORENSON:  Close.  It's a little more than the

20 four.  So what happened was, they went through this process

21 -- there were 26 million to start, more or less.

22           THE COURT:  Okay.

23           MR. SORENSON:  And then 22 million have been since

24 released to the FDIC.

25           THE COURT:  Okay.

12

1        MR. SORENSON:  So we have -- you know, we have the

2   ability to look at 22 million.

3        THE COURT:  Oh --

4        MR. SORENSON:  They have the ability to look at 26

5   million.  So four million have still not -- they have still

6   taken the position that, "Don't look at those or you might

7   be disqualified or we might seek sanctions."  So we've got

8   four million.  And then there's another category of things

9   which they say are privileged, and that, as I understand it,

10  is four to 500,000 documents.

11       THE COURT:  Okay.

12       MR. SORENSON:  They have said -- the holding

13  company has gone through and said, "We believe there's a

14  holding company only privilege."  And they've never produced

15  a log or anything.  They've just told us, "We've been

16  through it, and we've identified four or 500,000."  So we're

17  talking about maybe 4.5 million documents.

18       THE COURT:  And -- okay.  So on the -- let's just

19  start with the -- or pause a moment on the four to 500,000

20  that are alleged to -- or you understand are holding company

21  only privilege.  There's a claim to that effect.  Are those

22  specific custodians, or do you know which those documents

23  are?

24       MR. SORENSON:  We have no idea, your Honor.

25       THE COURT:  Well, you have to be able to know,

13

1 because you can look at 22 million, but not the others,

2 right?  So you must be able to know which are in the "don't

3 look" pile, even if you can't actually look at them, right?

4           MR. SORENSON:  Well, not exactly, because the way

5 the -- out of an abundance of caution, the FDIC has a clean

6 team that can see all the documents.

7           THE COURT:  Oh.

8           MR. SORENSON:  And what gets over to my team is,

9 we only see -- we have no -- we don't see any of the other

10 documents.

11           THE COURT:  Okay.

12           MR. SORENSON:  We only see documents that have

13 been released.  So we can't -- we don't know -- we don't

14 know who the custodians are, and we have -- we think they're

15 probably, you know, the General Counsel and others, but we

16 don't know because we've never seen a description of the

17 documents or, you know, whose documents they are.

18           THE COURT:  So you can see the custodians and all

19 the details for the 22 million documents?

20           MR. SORENSON:  Correct.

21           THE COURT:  And you can probably -- since you know

22 who the executives were, you can tell who's missing?

23           MR. SORENSON:  Correct.

24           THE COURT:  Okay.

25           MR. SORENSON:  And we have identified -- that's

14

1  actually a good point.  We have identified one missing

2  custodian, the Deputy General Counsel --

3          THE COURT:  Okay.

4          MR. SORENSON:  -- for the bank.  At least as I

5  checked this morning, her documents have still not been

6  released to us.

7          THE COURT:  Uh-huh.

8          MR. SORENSON:  And she was the Deputy General

9  Counsel to the bank.  She was present at every board meeting

10 as the secretary.  So we believe her -- her e-mails are very

11 relevant to our case, but we don't have access to those.

12 But that -- she is the only one that I'm aware of that we've

13 identified specifically as missing, like, completely.  No

14 documents.

15         THE COURT:  Okay.  You mentioned also -- okay.  So

16 then there's the four million as to which there's been no

17 position taken, but are still being -- the position taken is

18 that you can't look at them yet, right?  So four million are

19 still under review, to your understanding, on behalf of the

20 FDIC?

21         MR. SORENSON:  Yes.

22         THE COURT:  Okay.  So -- okay.  Being reviewed by

23 the holding company.  All right.

24     You mentioned a clean team.  I do have some experience

25 in the criminal law context of, you know, the team approach

1  the U.S. attorney's office sometimes takes.  This is by

2  agreement of the parties, there's a clean team?

3          MR. SORENSON:  There was, back -- this was set up

4  last year and -- when the holding company asserted this

5  privilege, the FDIC, I mean, at the time was just starting

6  its investigation.  And so they basically said, "You can't

7  look at any documents."  And so the FDIC said, "Well, we're

8  not waive -- we don't believe these are privileged.  We

9  reserve our rights.  But we'll agree to go through this

10  process."  And under -- they had the impression, the FDIC,

11  that this was going to be a fast process and that documents

12  would come out quickly.  Here we are a year later, we're

13  still, you know, four million documents to go.

14      And so each side had a clean team.  So the holding

15  company clean team would look at them and release them, and

16  the FDIC clean team -- I actually don't -- I'm not even sure

17  -- I have no contact with them, so I'm not sure what they

18  do.

19          THE COURT:  But what's the process supposed to be?

20  Does -- because I could imagine if those parties have clean

21  teams, then each clean team can say, "We think these are not

22  privileged.  Can we" -- on the FDIC side.

23          MR. SORENSON:  Yes.

24          THE COURT:  "We think these are not privileged.

25  Can we disclose them to, like, the litigating team?"  Is

1   that what's going on?

2           MR. SORENSON:  Well, it has hasn't gone on that

3   way yet, your Honor, because -- given the threats of

4   disqualification, I was even concerned about having

5   conversations with the clean team or even learning, you

6   know, what --

7           THE COURT:  No, no.  They would not have that

8   conversation with you.  They would have that conversation

9   with the clean team on the --

10          MR. SORENSON:  Oh.

11          THE COURT:  -- holding company side.  So I'm not

12  sure what --

13          MR. SORENSON:  Yeah, those have been ongoing, I

14  believe.

15          THE COURT:  Okay.  Well, I'm going to ask the

16  holding company folks what they think the process is.  But

17  one of the thoughts I had is, is there a way for some subset

18  of clean teams to communicate with each other about things

19  that could be released versus not released, to crystallize

20  what the disputes are?  And I was really excited to hear

21  that those structures existed, but maybe they're not being

22  used in that way.  So maybe we can explore that further.

23  Okay.

24          MR. SORENSON:  Your Honor, could I just make one

25  point about the clean team?

1          THE COURT:  Please go ahead.

2          MR. SORENSON:  The clean team process has been

3  going on for a long time, and we have a schedule in this

4  case where we're supposed to finish document discovery by

5  the end of January and fact discovery by early April.  And

6  given the process of clean team, we're never going to be

7  able to meet that if we don't deal with the privilege issue.

8          THE COURT:  Yeah.  But I can't deal with the

9  privilege issue in a vacuum, either.  And right now, I have

10  a vacuum.  Honestly, I just -- I don't -- I mean, maybe

11  we'll get -- maybe there's not a vacuum.  Maybe there are

12  categories, but I need to -- I have a few more questions, so

13  -- and I'll ask these -- I'll give the holding company an

14  opportunity to respond as well.

15      But the way that this dispute is presented is that the

16  FDIC has the documents, and then there was effectively a

17  clawback.  What is the authority that you understand the

18  holding company is relying on for the clawback?  Is it just

19  502(b)?  Is it an agreement?  Is it -- I didn't look at the

20  protective order.  If we have one, I probably signed it.

21  But is there a 502(d) order?  What is the nature of the

22  clawback authority?

23          MR. SORENSON:  I believe it was -- I mean, the man

24  came in the context of bankruptcy, and I think the holding

25  company's position was that that was some -- that was --

18

1  they had property rights to that as -- you know, as the

2  estate for the holding company.

3  　　　　　THE COURT:  I mean, the -- this is another thing

4  that was a little bit mysterious in the papers, which is,

5  privilege is not -- I mean, there's, like, who has ownership

6  of the documents, which is, I guess, a concept.  But

7  privilege is separate.  Privilege is not about ownership.

8  It's about a particular relationship and whether the

9  communication is within the scope of that relationship and

10  not waived.  So I wasn't really -- and maybe this is a

11  question for the holding company -- wasn't really helpful to

12  me to talk about this in terms of who owns the documents.

13  　　　Confidentiality is necessary, but not sufficient, for

14  privilege.  So also, that discussion was -- seemed a little

15  bit off.  If there is a privilege claim, it has to meet

16  certain requirements.  And if it doesn't, there's no

17  privilege.  So I'm not entirely sure -- again, the framing

18  of the dispute before me is a little puzzling.

19  　　　So the clawback was initiated in the bankruptcy court,

20  not as part of the discovery process in this proceeding?

21  　　　　　MR. SORENSON:  Correct.

22  　　　　　THE COURT:  Okay.  Has the bankruptcy court made

23  any determinations about that issue?

24  　　　　　MR. SORENSON:  The -- I don't think any of that

25  bear on what we're talking about here.

19

1        THE COURT:  Yeah.  Is there an order?  Is there a
2  protective order that says how the clawback is supposed to
3  be managed?  Do they have the Federal Rules of Evidence 502
4  in bankruptcy?

5        MR. SORENSON:  Yeah.

6        THE COURT:  I'm revealing my ignorance about what
7  happens in bankruptcy court.

8        MR. SORENSON:  Yeah.  Okay.  Let me just confirm
9  with my counsel.  He was closer to it --

10        THE COURT:  Sure.  Please feel free.

11        MR. SORENSON:  -- because I was not part of the
12  bankruptcy.

13        THE COURT:  Yeah.

14        MR. SORENSON:  I don't know, but it was not raised
15  as part of the bankruptcy.  I think -- and my understanding
16  was there were discussions over time after -- holding
17  company declared bankruptcy soon after the receivership.

18        THE COURT:  Okay.

19        MR. SORENSON:  And then there were discussions,
20  and, eventually, the FDIC turned over the 26 million
21  documents to the holding company.

22        THE COURT:  Okay.

23        MR. SORENSON:  But --

24        THE COURT:  So let me just ask a really high-level
25  question, which is, how would the FDIC -- if I'm to treat

20

1  this in a categorical way -- you've already alluded to joint

2  privilege.  What is the question I need to resolve, framed

3  in a categorical way?  Like, how would you pose that

4  question?

5          MR. SORENSON:  Sure.  I would say -- I mean, the

6  question is -- your Honor, it's really a question of who was

7  the client here?  And in this case, we believe that the

8  facts -- the undisputed facts even show that they operated

9  as one client, that is the holding company and the bank

10  never differentiated.  So whenever they had meetings, the

11  General Counsel, who, you know, is a lawyer for the bank and

12  the holding company, he came and would give advice to both

13  of them.  He didn't come in and say, "Okay.  We're going to

14  have a separate meeting for the holding company, a separate

15  meeting for the bank."  They never did that.  He just came

16  in and gave advice.  And it was the same legal department.

17  The holding company did not have a legal department.  All

18  the officers were the same.  So, in effect, they were alter

19  egos of each other.  They just ignored those corporate

20  forms.  And in that context, it really becomes a single

21  client.

22          THE COURT:  So -- okay.  So we have the client,

23  and you say it's a single client or, I think if I read your

24  papers correctly, joint client?

25          MR. SORENSON:  Joint, yes.

21

1          THE COURT:  Who's the lawyer?  The legal
2  department -- the in-house shared legal department or some
3  other lawyer?
4          MR. SORENSON:  Both the in-house legal department
5  as well as outside counsel.  For example, Sullivan and
6  Cromwell was outside counsel.
7          THE COURT:  So this is where I feel like the
8  categorical approach starts breaking down, because if it's
9  the case that, as to all four million documents or all 400
10 to 500,000 documents, this is true, I'm not sure if that's
11 undisputed, right?  So how do I determine whether that's
12 undisputed or not?  If it extends beyond the in-house legal
13 department to outside counsel, outside counsel for what
14 purpose or purposes?  You know, those are the questions that
15 usually need to be addressed and can't be resolved
16 categorically.  But you think that is possible to resolve
17 here?
18         MR. SORENSON:  I do.  And not just because of the
19 joint client, but the question -- and this is really a
20 question of law for your Honor -- is, was there an
21 attorney/client relationship between the bank and its
22 in-house lawyers and certain outside lawyers like Sullivan
23 and Cromwell?  And what we've heard from the holding company
24 is they say, "Ah, no, no, no, we only represented the
25 holding company.  We did not represent the bank.  Even

22

1  though we came to board meetings of the bank, we did not

2  represent the bank."

3      Now, what Sullivan and Cromwell or what even the

4  lawyers' thought doesn't really matter.  What matters is

5  what the people receiving the legal advice believed.  And so

6  a director in this case, who was a director of both the bank

7  and the holding company, came to a meeting of both -- it was

8  a joint meeting.  It was clear in the minutes, this is a

9  joint meeting -- and got legal advice from attorneys,

10 in-house counsel, outside counsel.

11      THE COURT:  Uh-huh.

12      MR. SORENSON:  What would he reasonably think or

13 he or she reasonably think?  That they had a lawyer there as

14 a bank board member, because no one came in -- you'll see --

15 I mean, you won't see, but the board minutes don't say -- at

16 the beginning, you know, the lawyers don't say, "Hey, we're

17 here only for the holding company.  We're not giving you

18 advice."  They don't say that anywhere.  So in that

19 circumstance, if a reasonable person in that director or

20 officer position of the bank thought that they were getting

21 legal advice, either from in-house counsel, outside counsel

22 like Sullivan and Cromwell, an attorney/client relationship

23 is created.  And that's the sort of related --

24      THE COURT:  Yeah.

25      MR. SORENSON:  -- issue to the joint client.  It's

1  just two ways to get to the same place.

2       THE COURT:  Usually, I have a factual record for

3  those determinations.  I have somebody's declaration or

4  something.  And it's usually either advice specific, like

5  legal advice as to the subject matter, "I felt I was client

6  of whoever," or document specific.  So this is why I am a

7  little bit troubled by this.

8       Let me ask another sort of foundational question.  And

9  I'm sorry that you all have to be patient, but I'll have the

10  same questions for you on the holding company side, but what

11  law applies?  State law?  Federal law?  I dug around in the

12  case law a little bit and they're -- like, to my surprise,

13  it sounds like state law applies here, in which case nobody

14  has briefed California law really on this requirement or

15  this idea of -- and I'll just -- maybe jumping ahead, but,

16  you know, if it's California law and we have Evidence Code

17  -- California Evidence Code 950 and 954 defining a

18  confidential communication, there's this concept of, you can

19  be, you know, the client, and then you can have someone else

20  there who is there -- who is present to further the interest

21  of the client in the consultation, in which case there is no

22  disruption of the privilege.

23       Nobody has really briefed the nuances of that in this

24  circumstance, and I wonder if that needs to happen for me to

25  resolve this dispute, depending -- you know, if it's board

24

1  meetings or e-mail communications or what have -- whatever

2  the circumstances are -- and we're talking about California

3  law.  California has some nuances that are different from,

4  you know, federal common law.  So you agree it's --

5  California law applies here?

6          MR. SORENSON:  Yes, I believe it does.

7          THE COURT:  Okay.

8          MR. SORENSON:  I don't believe that issue --

9  briefing would be helpful because it's -- it covers every --

10 for example, every single board meeting was a joint board

11 meeting, and every single meeting, the officers and

12 directors were identical -- came to the meeting to discuss

13 both holding company and bank issues, had counsel present,

14 got advice -- it's all mixed up.

15     Now, we have specific topics in this case, in

16 particular corporate governance --

17         THE COURT:  Uh-huh.

18         MR. SORENSON:  -- that we believe -- and if we

19 have the opportunity to present some evidence --

20         THE COURT:  Uh-huh.

21         MR. SORENSON:  -- that show that these directors

22 of the bank were getting advice from lawyers, in-house

23 lawyers, outside lawyers, in their capacity as bank

24 directors and that we're entitled to any advice relating to

25 that, which, up to now, we have not --

1          THE COURT:  But will that take care of everything,
2  though?  So it could be -- because, you know, there's the
3  four million, and then there's the 400 to 500,000, and
4  you've told me there's e-mails of custodians, which is sort
5  of a bigger set -- you know, set of materials than board
6  meeting minutes or e-mails about board meeting minutes.
7        So do you just -- are you just really interested in the
8  board meeting minutes?  Are those being withheld?  What --
9          MR. SORENSON:  Those have not been withheld.
10          THE COURT:  Oh, okay.
11          MR. SORENSON:  And that's -- the only reason we
12  know anything about legal advice is because we've seen board
13  minutes that reference legal advice.  For example, we know
14  that Sullivan and Cromwell each year would come in and
15  evaluate the bank board and give them advice about how they
16  should govern themselves.  That's going to be an issue in
17  this case.  And that's just a very concrete thing that we
18  believe we're entitled to know what outside lawyers were
19  telling the bank about whether its directors were satisfying
20  their fiduciary duties.  That's going to be an issue in our
21  case.  And right now, the holding company's perspective is,
22  "No, you don't get to see that advice because we believe the
23  privilege belongs only to the holding company."
24          THE COURT:  Well, that is a dispute -- that is a
25  more discreet dispute that I could resolve, I suspect.  So

26

1  if it's -- okay.  That -- this is an example of a kind of

2  dispute where the issues could be joined, if it's, you know,

3  that kind of specific thing.  I'm not sure I can do that on

4  the record that I have right now.  But let me just kind of

5  follow this argument about, you know, what the role of the

6  FDIC as Receiver is right now and what rights it has,

7  because one of the things that is cited to me is the statute

8  1821(d)(2)(A), the successor provision, does privileges mean

9  or include attorney/client privilege when it says that the

10  Receiver succeeds to all rights, titles, powers, and

11  privileges of the insured depository institution?  So if

12  there is a joint privilege, FDIC is now the holder of that

13  joint privilege?

14          MR. SORENSON:  I would say that is correct.  If

15  there's a joint privilege, we stand in the shoes of the bank

16  for all purposes.  I don't think --

17          THE COURT:  And that's not disputed.

18          MR. SORENSON:  Well, I don't know.

19          THE COURT:  Or is it?

20          MR. SORENSON:  I don't know if it's disputed that

21  -- when -- we do stand in the shoes of the bank.

22          MR. SACKS:  It's not, your Honor.

23          THE COURT:  It's not disputed?

24          MR. SACKS:  No.

25          THE COURT:  Okay.  All right.  So then maybe what

27

1  I'm understanding is there is a category of stuff for which

2  there is asserted to be no joint privilege but an exclusive

3  privilege by the holding company.  Is that fair to say,

4  holding company folks?

5          MR. SACKS:  Correct.

6          THE COURT:  Okay.  All right.

7      How do I figure out which -- how do I test that

8  assertion?  I'm going to ask both sides this question, but

9  if there's a -- this group of four to 500,000 documents that

10 are claimed to be the exclusive privilege of the holding

11 company, not ever a joint privilege, I assume their argument

12 would be then, well, you disclose them to a third party then

13 outside the scope of the attorney/client privilege, and

14 there's a waiver.  That's your part two argument.

15         MR. SORENSON:  Correct.

16         THE COURT:  Okay.  So how would I -- what is an

17 efficient way for me to actually test that in a concrete

18 way?  Would I need to see an example of the documents, in-

19 camera perhaps, if these are among things you haven't been

20 permitted to access except via your clean team.  What would

21 be an efficient way to resolve that?  And you can confer.

22 Please take your time.

23         MR. SORENSON:  I guess one thing that we had

24 proposed to the holding company, which they rejected, was

25 the idea of a clawback, that -- we have the documents, they

1 have the documents, and that we both be able to look at

2 them, preserving all claims of privilege and the right to

3 claw documents back.  So that would be one thing we propose

4 as a way through this.

5         THE COURT:  So --

6         MR. SORENSON:  And if there's dispute about that,

7 we can come back to your Honor.

8         THE COURT:  Well, that was kind of where I was

9 going with the clean team issue, and you said, "Well, that's

10 going to take too long," so maybe we don't prioritize --

11    Anyway, I'm going to ask the holding company folks some

12 questions, but I do want to give you an opportunity to just

13 -- if I've missed something or overlooked something you

14 think is sort of essential here, please let me know.  I'll

15 give you that chance before I go to the holding company.

16         MR. SORENSON:  I guess, as my colleague notes,

17 that, you know, the clean team is not really involved in

18 this matter, and in order to move this case forward, like,

19 we really -- we, the team litigating this case, really needs

20 access to those documents.  And it's just having the clean

21 team in the middle of it, and a clean team that's really not

22 knowledgeable about, you know, what the issues are in this

23 case, we -- I don't see that being a way to work through

24 this in a timely fashion so that we can meet the Court's

25 schedule.

1        THE COURT:  Why couldn't the clean team be
2   educated about what the issues are in this case, and then
3   have a process where the dispute happens -- where you're
4   insulated until it's resolved?  That's what I had in mind is
5   that the clean team on your side identifies documents that
6   are relevant and responsive to your needs in the case,
7   innate of your setoff and whatever the -- else the issues
8   are, corporate governance, investment strategy, those
9   things, says to its counterpart, the clean team over at the
10  holding company, "We think these need to be disclosed."  If
11  there's a dispute about that, I need a privilege log or I
12  need some other indication of what the basis for the
13  privilege is, and then I resolve it.  But you're insulated -
14  - the litigation team is insulated, but the clean team is
15  kind of -- try to crystallize the dispute.  Is that not -- I
16  mean, I know you -- everybody thinks that this needs to have
17  happened yesterday, but here we are, right?  Is that not a
18  possible approach?
19        MR. SORENSON:  It's certainly a possible approach.
20  It's just -- it has not worked that well so far because
21  we're --
22        THE COURT:  Okay.
23        MR. SORENSON:  -- you know, it's really been a
24  very, very slow process.  I mean, it's -- we -- it's taken
25  over a year to get documents released.  So I just -- I don't

30

1  think it's a way to get -- you know, for us to get through

2  discovery in this case in a timely way.

3          THE COURT:  Okay.  So your proposed solution is

4  just make them turn everything over?

5          MR. SORENSON:  We're asking that we have the right

6  to review it.  I mean, we would say subject to a --

7          THE COURT:  The litigation team has a right to

8  review it.

9          MR. SORENSON:  Has to review it subject to, you

10 know, clawback rights and, right, for anyone, either side.

11 Like, their view is that we might have an exclusive

12 privilege to some things, but that neither party is waiving

13 the right to claim privilege and have something excluded in

14 this litigation.

15         THE COURT:  Okay.  Okay.  Thank you.

16    Let me turn now to SVBFG.  I'm going to call you the

17 holding company because that makes more sense.

18    First of all, why does the holding company believe that

19 the bankruptcy court should resolve this dispute?

20         MR. SACKS:  So, your Honor, can I just before I

21 answer that question --

22         THE COURT:  Uh-huh.

23         MR. SACKS:  -- give you -- Mr. Sorenson is a

24 newcomer to this.  We've been dealing with it for 18 months,

25 and there's some things that are incorrect --

1          THE COURT:  That's fine.

2          MR. SACKS:  -- just as a factual matter.  And

3  maybe I can correct them, and then I'll answer your

4  question.

5          THE COURT:  Well, if you want to do it that way,

6  sure.

7          MR. SACKS:   I'll do it however -- whatever you

8  prefer.

9          THE COURT:  Your first point in the summary of

10 dispute --

11         MR. SACKS:  Okay.

12         THE COURT:  -- was the bankruptcy court should be

13 handling this issue.

14         MR. SACKS:  Okay.  Okay.  I'll answer that -- I'll

15 answer that question.  The question here involves the

16 privileges and property of the bankruptcy estate.  This

17 issue could have been resolved.  It's a dispute over whether

18 these documents are privilege to the bankruptcy estate and

19 whether they belong to the bankruptcy estate.  Two different

20 issues, as your Honor -- but related to one another in part.

21 They could have been resolved on motion by the bankruptcy

22 court in March of 2023, in April of 2023, or any time since.

23 The FDIC has studiously avoided the bankruptcy court and not

24 wanted to go there.

25     This action wasn't brought until March of this year.

32

The issues they're raising don't relate specifically to this
dispute.  Indeed, there are no discovery requests to which
these documents specifically relate.  But why are they the
bankruptcy court?  Because they involve the property of the
estate, which is a bankruptcy matter, and it's specifically
with the -- in the ambit of the bankruptcy court's
jurisdiction, and it's also subject to the bankruptcy
court's confirmation order expressly retaining jurisdiction
over property of the estate and privileges of the estate.
So that's why it goes to the bankruptcy court.  The question
is not specific to this litigation, but a generalized
position that the FDIC has that all of the documents that
were on the server of the bank when the bank failed, which
was a subsidiary, but they were there pursuant to
intercompany agreements, belong to them, not to us, and are
not privileged.  That's why it goes to the bankruptcy court.

            THE COURT:  I don't understand the argument that's
in the briefing, at least, and -- or your argument right now
that the bankruptcy court has exclusive jurisdiction and
that I can't resolve this as a discovery dispute as Judge
Freeman I think expects me to do.

            MR. SACKS:  You may resolve a discovery dispute as
it relates specifically to this case, but there is -- this
is not a discovery dispute that relates to this case.  This
is a generalized dispute, which is, are all of the documents

33

1 -- 24 million documents --

2         THE COURT:  Uh-huh.

3         MR. SACKS:  -- the property -- an unprivileged

4 property of the bank as opposed to the holding company?

5 They're not.  Are these documents that are responsive to

6 request number six that asked for documents relating to X,

7 Y, and Z, properly privileged or not?

8         THE COURT:  Uh-huh.

9         MR. SACKS:  And that's what should be resolved.

10 This is not a Rule 37 motion.  They don't cite any authority

11 for your Honor to look at these issues.  This is not -- we

12 haven't withheld anything pursuant to a discovery request in

13 this case.

14         THE COURT:  That's because all of the documents

15 are in their possession right now.

16         MR. SACKS:  No, your Honor.  No.  Again --

17         THE COURT:  That's what I understood.

18         MR. SACKS:  Let me --

19         THE COURT:  So maybe that's one of the things that

20 you would like to correct.

21         MR. SACKS:  Let me go to the facts now.  So it's

22 not correct that the dispute involves 24 million documents.

23 There were 24 million documents.  They have access to

24 23,700,000 of those documents, approximately.

25         THE COURT:  Okay.

34

1          MR. SACKS:  There are only 300,000 documents that

2  remain in dispute.  We haven't --

3          THE COURT:  Wait, I'm sorry, 300,000 documents

4  that remain in dispute or that haven't been reviewed yet and

5  are potentially in dispute?

6          MR. SACKS:  The latter.  The latter.

7          THE COURT:  Haven't been reviewed yet?

8          MR. SACKS:  They're in the process of review,

9  three hundred --

10          THE COURT:  Oh, so not four million.  It's 300-

11  something thousand?

12          MR. SACKS:  Three hundred thousand documents that

13  we have possession of that are e-mail electronic

14  documents --

15          THE COURT:  Okay.

16          MR. SACKS:  -- that we are reviewing.  They know

17  the custodians.  There are 45-ish custodians.  We've

18  identified them for them --

19          THE COURT:  Okay.

20          MR. SACKS:  -- who those documents relate to.

21  They relate to internal lawyers who provided services to the

22  holding company and to the bank, some of them, and to other

23  subsidiaries of the --

24          THE COURT:  Uh-huh.

25          MR. SACKS:  -- holding company, such as the

35

1  securities firm and --

2          THE COURT:  The other subsidiaries.  Okay.

3          MR. SACKS:  -- the other subsidiaries, not the

4  bank.

5          THE COURT:  Okay.

6          MR. SACKS:  Okay.  Now, the way to deal with those

7  -- which we are reviewing them, and we are basically saying

8  here that we have no claim of privilege over these, these,

9  these, as we get through them.  We have not asserted a claim

10 of privilege specifically as to any specific document at

11 this point.  So we're talking about 300,000 and reducing as

12 we are now.

13         THE COURT:  Can I just pause you there to make

14 sure I have a --

15         MR. SACKS:  Yes.

16         THE COURT:  -- so these are 300,000 that are still

17 under review.  But is there a separate collection of four to

18 500,000 where the holding company has said you can -- we've

19 reviewed and you can't see these?

20         MR. SACKS:  No.  No, your Honor.

21         THE COURT:  Well, that's really interesting,

22 because that is --

23         MR. SACKS:  There are none.

24         THE COURT:  -- very different.

25         MR. SACKS:  Now, the only ones that remain are the

36

1  ones that we are in the process of reviewing to

2  de-designate, if you will, and give them to them.  So of the

3  24 million, they've got all except 300,000 today.

4        THE COURT:  And no privilege claim has been made?

5        MR. SACKS:  That's correct.  We are -- well, no.

6  We've said that these may have privilege, but no specific

7  claim on any specific documents.

8        THE COURT:  "May" meaning the 300,000 still under

9  review?

10        MR. SACKS:  Under review.  As to the remainder, no

11  privilege claim as to the -- I'm giving you rough numbers.

12        THE COURT:  Yeah, I understand.

13        MR. SACKS:  As to the 23 plus million, no claim of

14  privileges to any of those documents.  They have them all --

15        THE COURT:  Okay.  And so as to --

16        MR. SACKS:  -- and are free to review them all.

17        THE COURT:  As to the three -- and there's no --

18  you've made that clear, there's been a communication between

19  Counsel about which ones are available to review and which

20  aren't?

21        MR. SACKS:  Yes, your Honor.

22        THE COURT:  Okay.

23        MR. SACKS:  And these -- my two colleagues here

24  are directly involved in that process, if you want --

25        THE COURT:  Well, before you all leave today --

37

1          MR. SACKS:  Uh-huh.

2          THE COURT:  -- I'm going to make you talk to each

3   other about that particular issue to make sure there is no

4   disagreement.  We're all here.  This side can tell this side

5   exactly which documents are available to be reviewed and

6   which aren't, okay?  So that there's no ambiguity when

7   you're still here in the building.  There's no reason for

8   anybody to have any -- okay.  So now let's talk about the --

9          MR. SACKS:  We have not been dealing with Mr.

10  Sorenson and his firm.  We've been dealing with Mr. Laffey

11  and his firm.

12          THE COURT:  Well, you can talk to Mr. Laffey then.

13          MR. SACKS:  I don't think Mr. Laffey -- well, I'll

14  let him speak --

15          THE COURT:  You can talk --

16          MR. SACKS:  -- but I don't think --

17          THE COURT:  I'm going to order you to talk to each

18  other before you leave the building to this point --

19          MR. SACKS:  So --

20          THE COURT:  -- so there is no ambiguity.  Okay.

21          MR. SACKS:  So, your Honor asked --

22          THE COURT:  Wait just a minute.

23          MR. SACKS:  Your Honor asked for how to deal with

24  -- what's an efficient way to deal with it --

25          THE COURT:  Yeah.

1      MR. SACKS:  -- as it relates to this case.  I

2 would offer you several alternatives for how --

3      THE COURT:  Okay.

4      MR. SACKS:  -- to deal with it as it relates to

5 this case.

6    First, in the context of specific discovery requests,

7 if we withhold any of those documents from them, they'll be

8 identified specifically and you can make a determination of

9 privilege in the ordinary course the way people normally do

10 under Rule 37.

11    Second, we have told them that if they give us search

12 terms, we will run those search terms over those remaining

13 documents right away and promptly look at the ones that hit

14 on those terms and tell them if any of those -- give -- tell

15 them if any of those are documents over which we believe we

16 have a claim of holding company privilege.  They've not

17 taken us up on that.  It remains an offer if they want to do

18 it.  The last time, for other documents we ran search terms

19 on, I believe we got them an answer and the documents in

20 three days?

21      MS. MCGIMSEY:  Two days.

22      MR. SACKS:  Two days.  So if they want to do that,

23 we've offered that to them, not -- and that will cut down

24 again, because, presumably, they have search terms that they

25 think would be relevant to this case.

39

1          THE COURT:  Uh-huh.

2          MR. SACKS:  And we will do that as a priority item

3    rather than just going through methodically the 300,000

4    documents.

5          THE COURT:  And before you get onto your next

6    suggestion, on the search term issue, is that contingent on

7    there being a document -- so here -- my understanding is,

8    the FDIC folks say, "Why would we serve document requests

9    when these are documents that we believe we should control

10   in the first instance?"  So my question, without resolving

11   that issue, is your proposal about using search terms to

12   sort of figure out what's relevant to the case contingent on

13   the service of document requests by the FDIC Receivers to

14   the holding company?

15         MR. SACKS:  I think they have to be relevant to

16   this case -- search terms that are relevant to document

17   requests for claims in this case.  And, your Honor, I should

18   go one more step back.

19         THE COURT:  Okay.

20         MR. SACKS:  None of these documents are relevant

21   to the claims we've asserted in this case.

22         THE COURT:  No, I understand.

23         MR. SACKS:  Our case doesn't depend on any of this

24   stuff.  They have not asserted any counter claims.

25         THE COURT:  Because they haven't answered yet.

1        MR. SACKS:  They have not.  And we have asked them

2 to please identify for us what the counterclaims are.  If

3 you looked at the record, I don't know if you did, Judge

4 Freeman --

5        THE COURT:  I looked at part of it, yeah.

6        MR. SACKS:  -- okay -- she struck their statement

7 of claims.

8        THE COURT:  Right.

9        MR. SACKS:  We have, in discovery request, asked

10 them to identify the counterclaims they intend to bring so

11 we can define the relevance of discovery here.  And they've

12 said, "It's premature, and we're not going to do it."  So at

13 the -- they served those yesterday.  In response to an

14 interrogatory, they served us an objection and said, "It's

15 premature, and we're not going to do it.  Now, we'll tell

16 you when we serve our answer."  Well, they can't really have

17 it both ways.  If you want to determine what's relevant

18 discovery to this case, tell us what your counter -- what

19 your setoff claims are going to be so we can assess whether

20 that's a proper request.

21        THE COURT:  I mean, I understand your point, and

22 I'm really very interested in if we can sort of cabin the

23 work that everybody needs to do by focusing on what's

24 relevant to the case.  But given the procedural posture

25 where your motion to dismiss isn't being heard until

41

1  October, sometime mid-October, and then it will be resolved,

2  and then there'll be, potentially, an answer and affirmative

3  defenses pled or counterclaims pled -- I mean, Judge Freeman

4  is not waiting for all of that to happen in terms of

5  discovery.

6          MR. SACKS:  I understand.

7          THE COURT:  So what I'm wondering is, you know, in

8  terms of -- there seems to be a dispute about whether, as

9  the successor to SVB, these documents -- and I'm just going

10 to focus on the 300,000 that have been not allowed to be

11 looked at -- whether these documents are, in fact, in their

12 possession, custody, and control as an -- as a matter of

13 operation of that statute.  And it sounded like you had a

14 different view of that.

15         MR. SACKS:  No, I do and I don't.

16         THE COURT:  Uh-huh.

17         MR. SACKS:  So they possess -- they have them

18 physically -- and by the way, they've breached a contract by

19 not returning documents to us.  But the determination of

20 whether they have a right to review them is a fact-specific

21 determination.

22         THE COURT:  Uh-huh.

23         MR. SACKS:  The question of, when advice was given

24 or communications had, were those holding company

25 communications or were those bank communications?  There

42

were intercompany agreements pursuant to which the same

server was used, but there were requirements that bank

personnel review documents solely for purposes of performing

services that they were engaged to perform for the holding

company and maintain confidentiality of it.

So the fact that documents that belonged to the holding

company were on bank servers pursuant to intercompany

agreements is not something that your Honor can determine in

a vacuum.  You need the factual context --

THE COURT:  Uh-huh.

MR. SACKS:  -- and understanding of all of that.

So I think we're running far afield.  As well, they should

be determined in the context of documents that are relevant

to the issues in this case, not documents in the abstract.

If they want to bring a claim, they can bring it in

bankruptcy court.  They could presumably file a lawsuit to,

say, seek a declaratory judgment, "These are my documents,

not your documents, and there is no privilege applicable to

them."  They haven't done any of that.

THE COURT:  Yeah.  Okay.

MR. SACKS:  But what's not relevant is to ask for

all of the company's documents on any subject relating to

not just the bank, but anything else, and ask for a

categorical determination in this court relating to a

dispute that has four corners to it and is specifically

43

1  defined.

2          THE COURT:  So do you agree that state law applies

3  to the question of privilege?

4          MR. SACKS:  I believe that the California law is

5  applicable to the question of privilege --

6          THE COURT:  Uh-huh.

7          MR. SACKS:  -- in most -- in probably most

8  instances.  It's possible there could be some documents in

9  there that reflect privilege given in another state by a

10  lawyer admitted in another state to a subsidiary that's

11  located in another state, but I think, by and large, we're

12  dealing with California law.

13          THE COURT:  So for these 300,000 documents that

14  are potentially privileged and are still under review --

15          MR. SACKS:  Yes.

16          THE COURT:  -- what is the thesis about why the

17  privilege might apply, if it does?

18          MR. SACKS:  Oh, because, for example, the General

19  Counsel.  General Counsel served as General Counsel of the

20  holding company and also General Counsel of the bank and

21  General Counsel of other subsidiaries.  There were matters

22  that related to, for example, securities disclosures.

23          THE COURT:  Uh-huh.

24          MR. SACKS:  The holding -- that's a matter for the

25  holding company.  It had public shareholders.

44

1          THE COURT:  Uh-huh.

2          MR. SACKS:  It made public filings.  If the

3  General Counsel of the bank advised on securities

4  disclosures, that's a matter within the scope of the -- a

5  privilege of the holding company, not a bank privilege,

6  okay?

7          THE COURT:  Okay.

8          MR. SACKS:  That's a -- that's an example --

9          THE COURT:  Yes.

10          MR. SACKS:  -- of a matter that would be there.

11  It depends upon what the specific matter is on which advice

12  was given.

13          THE COURT:  Okay.  Okay.

14          MR. SACKS:  There are many things that are joint,

15  your Honor.

16          THE COURT:  All right.  Let me just pause you

17  there.  Let's just take that example.

18          MR. SACKS:  Yes.

19          THE COURT:  So the advice was given on the

20  securities matter --

21          MR. SACKS:  Uh-huh.

22          THE COURT:  -- but it was given to people who were

23  not exclusive to the holding company.  It was given to the

24  bank.

25          MR. SACKS:  Correct.

1          THE COURT:  The bank had access.  Okay.  So just
2  maybe --
3          MR. SACKS:  I'll bear with you for a minute, yes.
4          THE COURT:  -- and maybe you want to quibble with
5  that, right?  But privilege log is not like work product.
6  Unless you establish the provision applies in California
7  Evidence Code 954, that that SVB participant was there to
8  further the interest of the holding company, there's
9  disclosure outside the scope of the privilege, right?
10          MR. SACKS:  No, your Honor.
11          THE COURT:  And that could be the thesis that I
12  would be asked to test.
13          MR. SACKS:  It could be a thesis you're asked to
14  test, but we have a different view of it.
15          THE COURT:  Uh-huh.
16          MR. SACKS:  So the -- let's assume it's given to
17  the CEO.
18          THE COURT:  Okay.
19          MR. SACKS:  The CEO acts as the CEO of the holding
20  company and the CEO of the bank.  When he's getting
21  information about the company's security disclosures, he's
22  acting as CEO of the holding company.
23          THE COURT:  Uh-huh.
24          MR. SACKS:  People wear different hats, and courts
25  recognize -- the Supreme Court recognizes that corporate

46

1 executives, who can be common to parents and subsidiaries,

2 act in the interest of the entity in which they are acting.

3 They can wear different hats, and they -- they take off one

4 hat and put on another.  It's a concept that's recognized,

5 the Supreme Court in the <u>Bestfoods</u> case.  I think we cited

6 it to your Honor.  But there are many cases that do that.

7 So you're going to have to determine.  That's not a waiver

8 of privilege because the same individual is also CEO of the

9 bank because he was CEO of the holding company.

10          THE COURT:  Uh-huh.

11          MR. SACKS:  The matter on which he was receiving

12 legal advice related to a holding company matter.  He could

13 have received legal advice relating to a SVB securities

14 matter too at that point in time.  That would be a privilege

15 that would be -- would belong, under those circumstances, to

16 the securities.

17          THE COURT:  And what about a situation where there

18 was someone who was not an executive of both companies, but

19 was merely an employee of SVB --

20          MR. SACKS:  It would --

21          THE COURT:  -- party to the same communications?

22          MR. SACKS:  It would depend, because, again, there

23 were intercompany agreements that gave SVB employees access

24 to things pursuant to a contract by which they performed

25 services for the holding company.

1           THE COURT:  So then I would have to assess whether

2   that access was not just to do the services what -- but was

3   further to the interest --

4           MR. SACKS:  Standard privilege.

5           THE COURT:  Okay.

6           MR. SACKS:  Standard privilege analysis --

7           THE COURT:  All right.

8           MR. SACKS:  -- which is why -- but, your Honor --

9           THE COURT:  Yeah.

10           MR. SACKS:  -- there may be -- the documents --

11   when we get through these 300, we may be talking about a de

12   minimis number of documents here.

13           THE COURT:  Great.  That would be awesome.

14           MR. SACKS:  And that's why --

15           THE COURT:  And when will you get through the 300

16   that's currently --

17           MR. SACKS:  Well, they're still going through --

18   it's 300,000.

19           THE COURT:  Three hundred thousand.

20           MR. SACKS:   If they would give us privilege -- if

21   they would give us search terms so we could prioritize it,

22   that would assist us in getting through it much, much

23   faster.

24           THE COURT:  But you've been going at this for a

25   while.  So what's your pace?  So given what you know about

48

1  the 300,000, how long will it take to get through the review

2  on this?

3           MR. SACKS:  That's beyond my paygrade.

4           THE COURT:  All right.

5           MR. SACKS:  Ms. McGimsey is going to have to

6  answer that.

7           THE COURT:  I'm happy to hear from Ms. McGimsey.

8           MS. MCGIMSEY:  I don't know that I could answer

9  that question, your Honor.  I think it depends on what the

10 scope of relevant information is -- information that's

11 relevant to this case, because we all know, and I think

12 everyone would agree, that it's not 300,000.  I think it's

13 probably closer to -- if you ran search terms, closer to

14 10,000, in which case we could get through those in probably

15 a month's --

16          MR. SACKS:  A month.

17          MS. MCGIMSEY:  A month's time --

18          THE COURT:  Okay.

19          MS. MCGIMSEY:  -- right?

20          THE COURT:  So you have already reviewed, I don't

21 know, 20-something million, and it took you a year?

22          MR. SACKS:  But we didn't review the -- those were

23 not all reviewed.

24          THE COURT:  Okay.

25          MR. SACKS:  They involved people.  They were given

49

1  pursuant to a callback arrangement because they didn't

2  involve -- the ones that are left are the directors and the

3  senior officers --

4          THE COURT:  Okay.

5          MR. SACKS:  -- and the internal lawyers.

6          THE COURT:  It's custodian specific, the ones that

7  are -- okay -- the ones that everyone would most like to

8  see.

9          MR. SACKS:  And I --

10          THE COURT:  Okay.  So I don't want us to put our

11  heads in the sand.  You all have been litigating this case

12  vociferously for a long time, both here and other places.

13  Not just this case, but other related cases.  Everybody

14  knows what is relevant to claim and an anticipated defense

15  or counterclaim.  I'm confident.  I don't know.  But you all

16  do.  There should be no reason why you all can't come up

17  with a way to facilitate the privilege review so that you're

18  focusing on, as Ms. McGimsey says, the most relevant

19  documents.  I don't think there's any reason to insist upon

20  a discovery request in order for that happen -- to happen,

21  but there needs to be some articulation and a conference

22  between the parties about what that is.  And I would suggest

23  proposal search terms as a good way to get through ESI.  If

24  the e-mails or whatever they are are in an environment, I

25  hope they are, where search terms can be implied, because

1  you're suggesting search terms, I would expect that would be

2  a really efficient way.  And there's -- you know, I stopped

3  practicing before all the fancy tech happened, in terms of

4  using, you know, predictive analytics to figure out what --

5  how to prioritize things.  But you can do these things now

6  really efficiently.  So I know I cut you off, Mr. --

7              MR. SACKS:  -- Sacks.

8              THE COURT:  -- Mr. Sacks, before you were done

9  explaining to me all the ways you thought this could work.

10  If there are more, I would like to hear from you.  But I'm

11  going to require the parties to do something.  And if the

12  FDIC wants to dispute that it's only 300,000, I'll hear

13  about that.  But if it's only 300,000.  And that is a small

14  pile in the scope of things.  That is a small pile.  And you

15  all can get through that, and you can do it efficiently.

16      So please continue, Mr. Sacks.

17              MR. SACKS:  No, I think the two alternative ways

18  to address that issue are either through formal discovery

19  request to which we respond, or we -- if they give us some

20  search terms, we'll run the search terms, prioritize those

21  documents, and get back to them quickly on them --

22              THE COURT:  Okay.

23              MR. SACKS:  -- on that remaining group of

24  documents.

25              THE COURT:  And then what?  So then there's, let's

51

1  say, 10,000, for example, that you are going to assert your

2  privilege claim.  You're going to need to do something so

3  that I can test those claims.

4             MR. SACKS:  A hundred-percent agree, your Honor.

5  When --

6             THE COURT:  Privilege log, is that --

7             MR. SACKS:  -- assuming that -- I don't know.

8  We're never going to have 10,000 --

9             THE COURT:  Okay.  Whatever it is.

10             MR. SACKS:  -- documents that we're going to --

11             THE COURT:  Maybe 10,000 you need to review.

12  Okay.

13      So whatever it is that you're going to have that you're

14  going to assert this privilege claim over, you're going to

15  need to do a log, right?

16             MR. SACKS:  Assuming they're on documents relevant

17  to this case, yes.

18             THE COURT:  Well, we're going to -- we're going to

19  have -- what I'm shooting for is a process that I'm going to

20  make you all do, may be a little bit unusual because this is

21  a somewhat unusual circumstance, at least in my experience.

22  So -- but that -- I think this is a -- this is a plan.  This

23  has a structure.  Anything else you would like to say?  I'm

24  looking for a practical solution, because, frankly, that's

25  what Judge Freeman expects here is that we have a practical

52

1  solution to get the matters reviewed.  So if there is a

2  dispute about privilege, I'm actually in a position to

3  resolve it because I'm not in a position to resolve it right

4  now, unfortunately.

5          MR. SACKS:  Okay.

6          THE COURT:  I will also say to both parties that

7  often, privilege disputes, especially ones that require

8  evidentiary support in order to make or rebut a claim of

9  privilege or to assert waiver, my expedited procedure is

10 often insufficient.  And so I do allow people to brief those

11 matters with regularly noticed motions.  But then I do

12 expect you to do what you need to do.  I will expect the

13 supporting declaration, and I will expect the briefing on

14 the applicable law, that kind of thing.  I mean, it won't

15 just be a -- you know, 1500 words, right?  So that's an

16 option we can discuss.  But let me just close out --

17         MR. SACKS:  Your Honor --

18         THE COURT:  -- this argument by inviting, yeah,

19 Mr. Sacks to say anything else.

20         MR. SACKS:  No, I don't -- I understand what

21 you're saying, and, you know, I understand that if we want

22 to withhold documents in this case that are properly subject

23 to discovery in this case, we have to support it with

24 appropriate privilege log.

25         THE COURT:  Uh-huh.

53

 1          MR. SACKS:  I mean, there's no dispute that we

 2 haven't gotten those discovery requests --

 3          THE COURT:  Okay.

 4          MR. SACKS:  -- and review at this point.  So

 5 that's part of the reason this is premature in addition to

 6 being overbroad.  But we understand the requirements to

 7 establish a privilege.

 8          THE COURT:  Uh-huh.

 9          MR. SACKS:  We (audio glitch) here for a long

10 time.

11          THE COURT:  Yeah.  But how long do you think it

12 would take to do a privilege log?  I guess you don't know

13 how many there will be, but, you know, let's say --

14          MR. SACKS:  I have no idea how long, how many

15 documents it's going to be dependent on, how many get spit

16 out.  And the answer is that most privilege logs now are

17 pre-populated in part by the --

18          THE COURT:  Yeah, your fancy software.  Okay.

19          MR. SACKS:  -- the software.  And so it's going to

20 be entirely dependent upon what gets spit out and a second-

21 level review by people who are going to really determine

22 what to withhold or not withhold.  I mean --

23          THE COURT:  Do you have an ESI order or any order

24 that governs how you're going to handle -- I should have

25 looked, but I did not.  But do you have something that's

54

1  already negotiated and entered?

2          MR. SACKS:  I guess it's being negotiated.

3      Do we have it (indiscernible)?

4          THE COURT:  Oh, it's not submitted to me yet?

5  Okay.

6          MR. SACKS:  Oh, it's in -- we have one in the

7  related C case.  So I assume this one is going to bear a

8  strong resemblance to it.

9          THE COURT:  Okay.

10          MR. SACKS:  We suggest that we just use the same

11  one.  They wanted to --

12          THE COURT:  Okay.

13          MR. SACKS:  -- change it a little bit.

14          THE COURT:  Fine.  We shouldn't delay on that so

15  that there's no hold up.  Okay.  All right.

16          MR. SACKS:  It's not going to be a long --

17          THE COURT:  Yeah.

18          MR. SACKS:  -- a long time coming.

19          THE COURT:  Great.  Okay.

20      Anything else from the holding company before I turn

21  back to the FDIC?

22          MR. SACKS:  I don't think so, your Honor.

23          THE COURT:  Okay.  Back to you.

24          MR. SORENSON:  Thank you, your Honor.

25      Yeah.  I mean, what he -- what my colleague just said

55

1  is kind of breaking news to me.  I did -- the last meet and
2  confer that I was on with my colleagues, they told me four,
3  500,000 privileged documents.  So if they're now telling me
4  there aren't four, 500,000, that's great.  I'm happy about
5  that.
6            THE COURT:  Well, Mr. Laffey, is this your part of
7  the show?  Is it 300,000 that are to be reviewed and nothing
8  else has been withheld as privilege?
9            MR. LAFFEY:  I think what might be helpful, your
10 Honor, is for them to give us the doc ID numbers of what
11 they think is the final realm of documents that they have to
12 review for potential privilege, because in addition to the
13 three, 400 they've mentioned today, the last meet and
14 confer, they said there was approximately one million Teams
15 chat documents that they also were insisting if we review,
16 we could be disqualified from reviewing.
17     So my understanding was it wasn't just three, 400,000.
18 If that's the case, they should identify the doc ID numbers
19 and say we're free to review the rest of the realm of the
20 universe.  And I think that since they're asserting this
21 privilege over documents that we've had, even pre-lawsuit,
22 pre-receivership, they need to hurry up and assert the
23 privilege and give us the log very quickly.  They've had 18
24 months to do that, and they haven't, your Honor.
25            THE COURT:  Okay.  All right.

1    So here's what I'm thinking.  There does need to be,
2  and maybe it can't be done here, but I hope it can, some
3  clarity about what can be reviewed and what remains to be
4  considered before being reviewed.  So whatever it is --
5      Ms. McGimsey, did you want to address that point?
6          MS. MCGIMSEY:  Yes.  They've been -- as we have
7  de-designated documents -- every time that our team
8  de-designates documents, they send the FDICR's counsel -- I
9  think they're dealing principally with the counsel from the
10 clean team -- a list of document IDs that can be released.
11         THE COURT:  Okay.
12         MS. MCGIMSEY:  So the FDICR actually has all of
13 those doc IDs, but we're happy to put those together again
14 so that Counsel here can have a copy of that as well.
15         THE COURT:  What I would really like -- and tell
16 me if this is unduly burdensome, because I'm not about
17 creating more burden, I'm just looking for clarity --
18 document IDs that can be reviewed, document IDs that can't
19 because they're still under consideration.  And you say they
20 know who the custodians are because you've given them a
21 list.  Just tell them who the custodians are for the ones
22 that they can't look at.
23     If you do that and it's only 300,000, then I will order
24 something else to happen.  And that's -- I'm going to get
25 back to the FDIC about the -- what the something else is.

 1      But, Ms. McGimsey, is that something that you can do?

 2           MS. MCGIMSEY:  Yes.  That's information that we've

 3  already provided them, so it's very easy for us to put it

 4  together again.

 5           THE COURT:  Excellent.

 6           MS. MCGIMSEY:  I do, just for a moment, want to

 7  address the issue with the Teams chats.  There are a large

 8  number of Teams chats that nobody has -- I shouldn't say

 9  nobody has reviewed.  The FDICR actually has access to a

10  very significant number of those chats that have been put

11  into production form, rolled up into transcripts for

12  purposes of certain regulatory productions that have been

13  made.

14           THE COURT:  Uh-huh.

15           MS. MCGIMSEY:  For purposes of this sort of

16  separate document dispute, we were provided with a

17  significant number of messages, but they were not collected

18  in a manner that enables you to review them and search them

19  for privilege.  Our team -- our technical team has been

20  meeting and conferring with the FDICR's technical team.  I

21  think the last they had a conversation was on August 30th,

22  and the FDICR's technical team was supposed to come back

23  with further information so that those could be processed in

24  a way that they could be reviewed.  But we committed during

25  our call of lead counsel that we would be able to release

58

1   those very quickly, because those chats, in large part, have

2   already been reviewed for purposes of these other regulatory

3   productions, and the number of documents being withheld for

4   privilege is very small.  And we -- I can't tell you how

5   many of those would be withheld for a holdco only privilege.

6          THE COURT:  Uh-huh.

7          MS. MCGIMSEY:  But we have a technical issue,

8   which is that in order to look at a chat message and assert

9   privilege -- you can look at individual messages.  They need

10  to be processed in a way so you can look at a conversation.

11         THE COURT:  Uh-huh.

12         MS. MCGIMSEY:  And we don't have the tools from

13  the FDICR yet to be able to do that.

14         THE COURT:  But you're expecting to get those?

15         MS. MCGIMSEY:  We hope so.

16         THE COURT:  Okay.

17         MS. MCGIMSEY:  And once we get those, we can

18  commit to a date certain and a very quick one --

19         THE COURT:  Okay.

20         MS. MCGIMSEY:  -- by which we'll be able to

21  release messages and then tee up any disputes, if there are

22  any, over anything that we would assert a holdco only

23  privilege.

24         THE COURT:  And these Team chats currently, I

25  understand, don't have doc IDs.

1          MS. MCGIMSEY:  I don't believe that they've been

2   provided to us in a way that we could roll them up and then

3   just give them back a document ID that would allow them to

4   identify what is privileged and what's not.

5          THE COURT:  Okay.

6          MS. MCGIMSEY:  What I'm told is there's an

7   identifier that links them together that we need in order to

8   put them in a conversation, so you can see the whole --

9          THE COURT:  Right.

10          MS. MCGIMSEY:  -- conversation to assert

11   privilege, and we don't have that identifier.

12          THE COURT:  Right.  But just -- this is a -- just

13   a really just basic question, which is, when we're talking

14   about doc IDs and how many doc IDs, these Team chats are not

15   part of that group?

16          MS. MCGIMSEY:  They are not.

17          THE COURT:  Okay.  Just clear -- okay.  But there

18   is a path forward to get them reviewed, and you will be

19   prepared to provide a date certain once you have the

20   transcripts or the linking information?

21          MS. MCGIMSEY:  Correct.  Once we have the linking

22   information, our team can put together the documents in

23   transcripts, which will actually, your Honor, facilitate the

24   FDICR's review for purposes of this case and other cases --

25          THE COURT:  Okay.

1           MS. MCGIMSEY:  -- because they're not really

2   usable to anybody until they're put into transcript form.

3           THE COURT:  Okay.

4           MS. MCGIMSEY:  So as soon as we have that

5   technical information from the FDICR's technical team,

6   assuming that they have it, because they have to be

7   collected in a certain way, then we'll be able to

8   expeditiously review.  And, again, we can commit to a date

9   certain on a very quick time line for those chats.

10          THE COURT:  Okay.

11      So, Mr. Laffey, is that making sense to you?

12          MR. LAFFEY:  I mean, obviously, we continue to

13  have an issue with us having these records for a long time,

14  including pre-failure, them claiming there's some privilege

15  to assert, and now we have to wait for them to make requests

16  for more technical information so they can review and find

17  out if they believe there's a privilege, and then we have to

18  go through more delay today.

19          THE COURT:  Okay.  Let me ask a better question.

20  Do you -- does it make sense to you that once -- that

21  there's linking information that the FDICR has that it can

22  provide to the holding company so that they can do the

23  review that they want to review -- what -- that they want to

24  do and then can give you a date certain.  Do you have that

25  technical information, and when can it be provided?

1          MR. LAFFEY:  I would need -- I would need more

2     specifics of what exactly they need from the FDIC, and

3     we're, of course, happy to inquire as to whether that can

4     be --

5          THE COURT:  Okay.

6          MR. LAFFEY:  -- quickly provided.  And then we

7     would hope that they will expedite their review and logging

8     on their end, because, again, this has been going on --

9          THE COURT:  Yes.

10         MR. LAFFEY:  -- for 18 months.

11         THE COURT:  I understand.  And you're here today,

12    and we're trying to figure it out.  Okay.

13         MR. LAFFEY:  Thank you, your Honor.

14         THE COURT:  So Team chats is a sort of separate

15    bucket.  But as to everything else, we're going to get

16    clarity on how much remains to be reviewed, and then the

17    next step.

18       So is there -- so we need to get to some sort of

19    definition of the -- descriptive definition of the relevant

20    universe.  Their claims, your defenses, and/or counterclaims

21    that you hope to assert, you know, so what does the FDICR

22    think is the best way to get that out there?

23         MR. SORENSON:  Well, your Honor, earlier, you were

24    talking about is there a way we can narrow it.  And I think

25    there is a -- actually very narrow dispute that currently is

62

1  ripe and that you could decide with just a little bit of
2  evidence and briefing.  And that is that -- as I understand
3  the holding company's position is, their position is that
4  when lawyers went to a joint board meeting of the board and
5  the holding company and gave advice, that advice was only to
6  the holding company and "you have no right to know what that
7  advice is."
8       And so we take the opposite view, which is you --
9  lawyers, inside lawyers, outside lawyers, you came to a
10 joint board meeting giving advice to the board of the bank
11 and including advice about the corporate governance of the
12 bank.  So we would say that we are entitled to any
13 communication or -- relating to corporate governance that
14 was provided at a joint board meeting.  That's a very --
15          THE COURT:  You already have the board meeting
16 minutes?
17          MR. SORENSON:  Excuse me?
18          THE COURT:  You already have the board meeting
19 minutes?
20          MR. SORENSON:  We do.  We do.
21          THE COURT:  So have they withheld the
22 communications that you're describing?
23          MR. SORENSON:  Well, they -- board minutes are
24 very summary -- in a very summary fashion.
25          THE COURT:  So have they withheld the

63

1  communications about that that you're describing?

2         MR. SORENSON:  We believe so.  And I'm more

3  thinking forward to when we go to a deposition and we go to

4  ask a question about, "Well, what was discussed?  What did

5  Sullivan and Cromwell suggest that you do in terms of

6  corporate governance?" there's going to be an objection

7  because they're going to say privilege.

8         THE COURT:  Uh-huh.

9         MR. SORENSON:  But we just don't know what

10  documents there are.  We see small -- we see references to

11  someone from -- outside counsel from Sullivan and Cromwell

12  doing each year an evaluation of each bank board member --

13         THE COURT:  Right.

14         MR. SORENSON:  -- and making recommendations.

15         THE COURT:  Okay.

16         MR. SORENSON:  And that's a very specific thing

17  that we need for our claim, and we believe we could brief

18  and submit evidence that --

19         THE COURT:  Okay.  So I -- that's noted.  But I

20  just got done talking with the holding company, and they say

21  that, so far, they have not withheld anything on privilege

22  grounds.  They're just still reviewing the 300,000

23  documents.

24      So if that's a true statement, my goal is to get that

25  review completed so that we know exactly what's being

64

1  withheld.  Maybe they won't withhold the things that you're
2  asking for once they complete their review, and I'm inviting
3  you to help them prioritize their review.  So if there is a
4  custodian's e-mail or there's a subject matter or there are
5  search terms, I will make them do that first and produce a
6  privilege log on a rolling basis.  But it -- what's the
7  "it"?  We need to define the universe of relevant stuff
8  first?  How can we best do that?

9          MR. SORENSON:  Your Honor, I guess I would have to
10 -- because I'm just learning today that they claim they
11 haven't held anything back.  So if it's true that we have
12 access to all the e-mails of the in-house counsel, general
13 counsels, and -- that really does change things.  But that
14 was not my understanding.

15         THE COURT:  Well --

16         MR. SORENSON:  So I think we need to meet and
17 confer.

18         THE COURT:  Let me be clear.

19         MR. SORENSON:  Yes.

20         THE COURT:  It's not that they haven't held
21 anything back.  They're currently holding 300,000-something
22 documents because they haven't finished reviewing them.  But
23 of the material they've reviewed, they have not yet asserted
24 a claim of privilege.

25     Did I get that right, holding company?

65

1        MR. SACKS:  Correct.

2        THE COURT:  So everything else has been provided

3  to you free of any privilege, or maybe, you know, it's a

4  joint privilege so you have access to it.  I don't know what

5  the details are.

6        MR. SACKS:  Yeah, some of them would be joint

7  privilege, your Honor, but --

8        THE COURT:  So not to be disclosed publicly to

9  outside of the privilege holders, and I don't understand

10 that anyone has any intention of doing that right now.  That

11 would be a different issue.

12     So it seems to me that the place where we should put

13 our effort is trying to focus on the things that you really

14 need and want.  And you've described one category of thing.

15 I don't know if that can be defined by custodian or subject

16 matter or terms, but I really would like a proposal from you

17 all.

18     I don't feel compelled to insist that you serve a

19 document request for them.  But if there's an interrogatory

20 that invites you to describe what it is that you're after,

21 either by articulating your anticipated defenses or

22 counterclaims, you could do it that way.  You could rely on

23 the statement of decision that has been stricken for the

24 purposes for which you wanted to file it.  I understand.

25 But maybe it's useful for discovery in defining the

66

1  boundaries.  And then there's no reason why you can't engage
2  in a search term exercise, I don't think, "For this
3  custodian, search these files using these terms, and then
4  prioritize your review on everything that hits."  This is,
5  like, normal ESI, you know, techniques.  Why not use those
6  to get what you want as soon as possible?
7            MR. SORENSON:  Well, I mean, your Honor,
8  practically, we already have the documents, so it's just a
9  question -- but still --
10           THE COURT:  Yeah.
11           MR. SORENSON:  But I guess if they're going to
12 tell us that at a date certain they're going to give us a
13 privilege log with the only thing they're claiming
14 privilege, then if we could -- if that date is soon enough,
15 then that is a workable solution.
16           THE COURT:  That's what I'm hoping.
17           MR. SORENSON:  Okay.  Yeah.
18           THE COURT:  That's what I'm hoping.  So we can
19 quick -- because right now, I don't have a dispute that I
20 can decide.  It's not presented to me in a -- sufficiently
21 concrete way.  But you can't get to the privilege log on
22 300,000 documents quickly, necessarily.  So that's why I'm
23 suggesting, is there a way to ask for what you want in a way
24 that will allow them to prioritize their review?
25           MR. SACKS:  Search terms, your Honor.

67

1          THE COURT:  Search terms, yes.

2          MR. SACKS:  Let them give us search terms, and we

3  will prioritize those.

4          THE COURT:  So maybe they don't even have to

5  articulate their theories.  They can just say, "Search on

6  these terms."  And as long as they're not

7  ridiculous --

8          MR. SACKS:  Yeah, I mean, they -- yeah, I mean --

9          THE COURT:  Here's the problem --

10          MR. SACKS:  -- the search terms have to be

11  reasonable, but I don't know -- I don't understand why they

12  won't identify their theory, so we at least have the right -

13  - I mean, the normal course --

14          THE COURT:  Here's a practical problem.

15          MR. SACKS:  Yeah.

16          THE COURT:  Sorry to interrupt, but we're getting

17  -- we --

18          MR. SACKS:  Yeah.

19          THE COURT:  -- you all have been here a while.  If

20  you come to me because you can't agree on the search terms

21  to apply, I'm going to say, "What is this relevant to?"

22  See, if -- somebody is going to have to tell me why it

23  matters, right?  So why it matters to a claim or an

24  anticipated defense or a counterclaim.  So I -- you know, I

25  am -- I'm not trying to upset the apple cart in terms of the

1  orderly process on the pleadings, but I am trying to solve

2  this problem, and I think I could use that help to solve the

3  problem is to have an articulation.  I tried to glean it

4  from the bankruptcy order that we retrieved, the bankruptcy

5  order on this offset issue that got issued and, you know,

6  other things in the case.  But I'm not going to know the

7  case well enough to do that justice, so you're going to need

8  to tell me.  So why not tell them and say, "These are the

9  search terms we need applied to these custodians."  And if

10  you know the custodians, you can be very effective in

11  prioritizing what you need.  And maybe there's a whole pile

12  of things that don't matter and they don't need to review.

13  And then we can get to this privilege -- you know, resolve

14  the privilege dispute more efficiently.

15          MR. SACKS:  Yes, that makes sense to us, your

16  Honor.

17          THE COURT:  Okay.  Just a moment.  Let me get --

18  let me get Mr. Sorensen's reaction first.

19          MR. SORENSON:  Yes, your Honor.  I think that is a

20  way forward.  And there's no mystery.  We -- there were in

21  the initial disclosures what the affirmative defenses are --

22          THE COURT:  Okay.

23          MR. SORENSON:  -- so -- and --

24          THE COURT:  So it shouldn't be hard --

25          MR. SORENSON:  No, it shouldn't.

69

1          THE COURT:  -- to sort say, "These and/or these,
2  but not this."
3          MR. SORENSON:  We could come up with --
4          THE COURT:  Okay.
5          MR. SORENSON:  -- some search terms.  And if we
6  really are down to 300,000 documents --
7          THE COURT:  Yeah.
8          MR. SORENSON:  -- and we apply search terms and we
9  can get to a privilege log quickly, yes --
10          THE COURT:  Yes.
11          MR. SORENSON:  -- that's perfectly fine with the
12  FDIC.
13          THE COURT:  Okay.  Well, the last 45 minutes has
14  not been a waste of time.  You've made some progress.
15      Okay.  So my plan is to issue an order telling you what
16  to do in terms of, like, clarifying the state of play.  And
17  then I want to have a process by which you all implement
18  this search term effort, how -- and report back to me, so I
19  can kind of keep track of what's going on.
20      How long do you need to make a proposal on the FDIC
21  Receiver side and confer about it?  Since you want to move
22  fast, how long do you need to make a proposal about search
23  terms and custodians and what needs to be searched for?
24          MR. SORENSON:  By Friday.
25          THE COURT:  By Friday.  Okay.

70

1      And then how long would you need to react on the

2  holding company side?

3          MR. SACKS:  I think we would have to get a count

4  as to how many documents that pulls in off the 300,000, and

5  then have a meet and confer, presumably at the end of the

6  following week.

7          THE COURT:  Okay.  So let me look at the calendar

8  here.  Can you go -- can you all jointly report back to the

9  Court on September 30th?  That's a Monday.  So that's a

10  little less than two weeks  Or do you need maybe October

11  1st?  Do you need two weeks to sort of do your respective

12  investigations and report back?  And I just need to know,

13  you know, we -- here's a -- here's an approach we have.

14  We've agreed or we disagree.  This is my proposal.  This is

15  my proposal.  Competing -- I don't want massive briefing.  I

16  want brief proposal about how to resolve any dispute that

17  you have.  And I'll outline for you what -- a little more

18  clearly what the direction is.  But that's what I -- I'm

19  trying to help you all move it along.

20      So do you think reporting back in two weeks is doable?

21          MR. SORENSON:  Yes.

22          MR. SACKS:  Yes.

23          THE COURT:  Okay.  And if you need more time

24  because you're having a productive conversation, just do a

25  stipulation saying, "We're going to report back, you know,

71

1 in, you know, 20 days or so," whatever it is, okay?  Just

2 let me know.  But I'm -- I want to make sure this gets

3 moving.  Okay.  So October 1st.

4     All right.  And that's not to say that there may not be

5 some discreet disputes that you could already raise with me,

6 but I am hopeful that because everybody knows the law that

7 there will be fewer disagreements than you might fear once

8 we kind of get down to it.  So that's what I'm hoping.  So I

9 would prefer to have one -- if I'm going to have briefing on

10 something, just one event, after you've done the search and

11 review and there's a privilege log generated, okay?  That's

12 my preference.  But that's a little bit farther afield.

13 Okay.  Anything else?

14          MR. SACKS:  One issue, your Honor.

15          THE COURT:  Sure.

16          MR. SACKS:  Mr. Sorenson says we all know what

17 their setoff claims are going to be.  That's not the case.

18 We wouldn't --

19          THE COURT:  Maybe I said that.  I don't know --

20          MR. SACKS:  No, he just said it a minute ago.

21          THE COURT:  Okay.

22          MR. SACKS:  And I -- we wouldn't have served the

23 interrogatory we did that they wouldn't answer if we did

24 know that, because the thing -- the document that got

25 stricken said, "Here are specific claims and any other claim

72

1  we might decide to think of under any circumstances, et

2  cetera."  If the scope of what we're dealing with are the

3  items that are specifically spelled out in that document

4  that was stricken, we can live with that.

5         THE COURT:  Okay.

6         MR. SACKS:  But if there are other things, they

7  need to identify them for us --

8         THE COURT:  Yeah.

9         MR. SACKS:  -- so we can determine some sense of

10 relevance.

11        THE COURT:  Here's the problem, they may not know

12 what they don't know.

13        MR. SACKS:  Oh.

14        THE COURT:  So they may not know what it is that

15 is relevant to the case because they haven't been able to

16 look at all the documents that they think they ought to be

17 able to look at.

18        MR. SACKS:  They know because they have all the

19 board minutes.

20        THE COURT:  Okay.

21        MR. SACKS:  And so topically, they know the answer

22 to that.

23        THE COURT:  I'm not going to get into that

24 dispute.  I'm going to be very -- how shall I put it -- very

25 solicitous of search terms that make sense.  I'm just going

73

1    to put it that way.

2            MR. SACKS:  Well --

3            THE COURT:  Solicitous of search terms that make

4    some sense --

5            MR. SACKS:  Well, that's --

6            THE COURT:  -- without requiring precise

7    definition of an affirmative defense or a counterclaim.

8            MR. SACKS:  I understand that.  So the way those

9    things are identified are not with specificity --

10           THE COURT:  Okay.

11           MR. SACKS:  -- in the sense of evidentiary.  We

12   have claims based upon the mismanagement.  We have claims

13   based upon the transfer of warrants to the holding company.

14   We have claims based upon the payment of the dividend.

15   They're topical in that sense.

16           THE COURT:  Uh-huh, great.

17           MR. SACKS:  So we know what they are.

18           THE COURT:  Great.

19           MR. SACKS:  If there are any other topics that are

20   not --

21           THE COURT:  Okay.

22           MR. SACKS:  -- topically identified, your Honor

23   couldn't determine relevance if it's --

24           THE COURT:  I would expect you to confer about

25   that.  And, you know, you may not know all of your defenses

74

1  and counterclaims, fine, and whether you're allowed to amend

2  or -- if you haven't even asserted them yet.  So we're --

3  you're not even at the point of amendment.  But that's not

4  my problem right now.  So I'm just -- I'm really just trying

5  to get through the privilege pile --

6           MR. SACKS:  Yeah --

7           THE COURT:  -- my potentially privilege pile.

8           MR. SACKS:  -- their setoff defense is not

9  counterclaim --

10           THE COURT:  Whatever they are.

11           MR. SACKS:  They've been very clear they're not

12  asserting counterclaims --

13           THE COURT:  Okay.

14           MR. SACKS:  -- that they're setoff defense.

15           THE COURT:  Very well.  Somebody said

16  counterclaim, and I ran with it.  But if it's appropriately

17  described as a setoff defense -- I saw in the bankruptcy

18  there was a major distinction on that point, so -- the

19  bankruptcy order.  So I don't mean to put words in anyone's

20  mouth here.  Okay.

21           MR. SACKS:  Very well.

22           THE COURT:  Anything else for today --

23           MR. SACKS:  No.

24           THE COURT:  -- from either side?

25           MR. SORENSON:  No, thank you.

75

 1          THE COURT:  Okay.  And I will issue an order just

 2    kind of giving you direction.  But I hope you all don't wait

 3    for that order, and please do start providing the

 4    information that you can to clarify where things stand,

 5    okay?

 6        Thank you all very much for your time.  I appreciate

 7    it.

 8          MR. SORENSON:  Thank you.

 9          MR. SACKS:  Thank you.

10          THE CLERK:  The court is concluded.

11        (Proceedings adjourned at 11:49 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

76

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17      Echo Reporting, Inc., Transcriber

18          Monday, September 23, 2024

19

20

21

22

23

24

25

*Echo Reporting, Inc.*