UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SVB Financial Group, ) | |
| ) | |
| Plaintiff, ) | 5:24-cv-01321-BLF |
| ) | |
| v. ) | San Jose, California |
| ) | October 10, 2024 |
| Federal Deposit Insurance ) | 10:00 a.m. |
| Corporation, as Receiver for ) | |
| Silicon Valley Bank and ) | |
| Silicon Valley Bridge Bank, ) | |
| N.A., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**BEFORE:  THE HONORABLE BETH LABSON FREEMAN, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**MOTION TO DISMISS**</u>

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                        A P P E A R A N C E S

 2   (Appearances via Zoom platform)

 3   For the Plaintiff:

 4         SULLIVAN & CROMWELL, LLP
           By:  Richard Sacks, Esq.
 5              Diane McGimsey, Esq.
           1888 Century Park East, 21st Floor
 6         Los Angeles, California  90067-1725

 7   For the Defendant:

 8         REED SMITH, LLP
           By:  Kurt F. Gwynne, Esq.
 9         1201 North Market Street, Suite 1500
           Wilmington, Delaware  19901
10

11         REED SMITH, LLP
           By:  Casey D. Laffey, Esq.
12         599 Lexington Avenue, Suite 22
           New York, New York 10022
13

14         REED SMITH, LLP
           By:  Emily Frances Lynch, Esq.
15         101 Second Street, Suite 1800
           San Francisco, California 94105
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2    (The proceedings started at 9:42 a.m.)

 3              COURTROOM DEPUTY:  Calling case 24-1321, SVB

 4    Financial Group versus Federal Deposit Insurance Corporation

 5    as Receiver for Silicon Valley Bank, et al.

 6              Counsel, please state your appearances.

 7              THE COURT:  Our court reporter is remote, and so the

 8    microphones will be that much more important.

 9              MR. SACKS:  Robert Sacks with Sullivan & Cromwell

10    for the plaintiff, Your Honor.

11              MS. McGIMSEY:  Good morning, Your Honor, Diane

12    McGimsey form Sullivan & Cromwell for the plaintiffs.

13              MR. GYWNNE:  Good morning, Your Honor, Kurt Gwynne

14    from Reed Smith along with my colleagues, Casey Laffey and

15    Emily Lynch, on behalf of the FDIC as Receiver for Silicon

16    Valley Bank, which we'll refer to as FDIC-R1, and on behalf of

17    the FDIC as Receiver for Silicon Valley Bridge Bank, which

18    we'll refer to as FDIC-R2.  Thank you, your Honor.

19              THE COURT:  Good morning.

20              MR. GWYNNE:  Morning.

21              THE COURT:  All right.  It's a little hard to know

22    where to begin when the motion is so massive, but that's okay.

23    We get to bring all the issues that you want.

24              I don't want to just walk through all twelve issues

25    here.  Let me just say -- maybe just short circuit some of our
```

1    argument.  I am not inclined to grant the motion on lack of

2    subject matter jurisdiction.  I think that the claim itself

3    generally put FDIC on notice of the nature of these claims and

4    that that is sufficient.  So I'm inclined to deny that under

5    the *Jafari* case.

6            Then we get to a lot of the small -- the individual

7    claims.  I'm not going to go through all the detail on the

8    breach of contract claims.  It does appear to me that

9    prejudgment interest and lost profits are not available all

10   under the estoppel argument.

11           I didn't -- we talked about estoppel in the *FDIC*

12   *Corporation* case, but I didn't get to these issues and so this

13   is new.  I can grant on the Motion to Dismiss on estoppel so I

14   do want to hear argument on that.

15           I'm inclined to grant the motion on the turnover

16   claim.  I don't think that kind of injunction -- injunctive

17   relief is allowed on your 1821(j).

18           On the violation of the automatic stay, the

19   transaction involved in that 6.2 million dollars is a little

20   bit difficult to understand, but it looks like money was

21   literally in transit.  It was brought back.  It was virtually

22   in the pockets and then taken back out.  So I'm inclined to

23   deny the motion on the violation of the automatic stay.

24           On the National Banking Act and the California

25   Financial Code, I don't actually think there's a private right

1  of action and although the plaintiff argues that the case --

2  the claim is really a breach of fiduciary duty showing duties

3  under those statutes, unfortunately I don't think the word

4  "fiduciary duty" appears in the amended complaint at all; and

5  so that may be a new theory, but it's not one I'm looking at

6  today.  So I think that as pled those claims are going to

7  probably go and I would be granting the motion.

8           And then the -- these are tricky claims, V, VI and

9  VII on their title breach of contract but these are on the

10 lease vendor payments.  They're not adequately pled as a --

11 under California law -- substantive law.

12          I don't know the terms of the contract that were

13 breached, and although maybe attaching the complete contract

14 isn't required under federal law, I still need to know what

15 the breach was and I don't and I don't think under -- under

16 the statute we're dealing with here in the F-I-R-R-E-A that an

17 oral contract is going to be actionable now.

18          So I don't think these survive, but I may be willing

19 to give leave to amend to allege a written contract.  I have a

20 suspicion maybe there isn't one, and so it's been alleged

21 generally hoping you find something; but maybe I'm mistaken on

22 that since we've been at this for a while, but you can tell me

23 whether it's in your back pocket and you'd be glad to allege

24 it or you want to think about it.

25          I didn't cover all the claims because some of them

1  are just so gnarly.  The first breach of contract claim,

2  there's a very, I think, tricky issue on what statement of the

3  Secretary of the Treasury and FDIC can be attributed to and

4  considered adopted by the Receiver and I -- I'm concerned that

5  this is -- that the claim to reach the Receiver has

6  incorporated too much of the Secretary's conduct and FDIC's

7  conduct as we know from the press release, which you know gave

8  me some heartburn in the last time around.

9          I'm not -- I'm really struggling with that on a

10 guarantee being imposed on the Receiver and in terms of the --

11 there's a whole argument that plaintiff makes about Bridge

12 Bank could not transfer its deposit account to FDIC-R1 without

13 the plaintiff's consent.  I don't actually have any authority

14 from that so I need a little bit of help with that, and we

15 have some other problems with these contracts, the Deposit

16 Agreement and the Transfer Agreement and who the parties are

17 to them.

18         So I'm not sure that the breach of contract reaches

19 FDIC-R2 because it's not a party, but I'm trying to grasp all

20 the details that are necessary for these claims, and I may

21 have made a real mash out of these.  So, Mr. Gwynne, I'm sorry

22 for that.  You'll straighten me out.  There's a lot packed in

23 here, and I wanted to give you some of my thoughts and so now

24 we actually have quite a bit of time.

25         What I'd like to do is give each of you a solid

 1   thirty minutes to make a presentation and then we'll have --

 2   there will be time for me to interrupt you so we can really

 3   try to work through all of this.  So let me start with the

 4   defense.  It's your motion.

 5           MR. GWYNNE:  Good morning, Your Honor, Kurt Gwynne

 6   from Reed Smith on behalf of the defendants.

 7           I'll start with the 12(b)(1) jurisdictional bases

 8   for dismissal, and I'll start first with the issue that Your

 9   Honor referred to as the *Jafari* case issue which deals with

10   exhaustion.

11           The Ninth Circuit does consider the FIRREA claims to

12   be jurisdictional and recognizes that if a claim has not been

13   exhausted in the FIRREA claims process, that that provision

14   1821(d)(13)(D) strips courts of jurisdiction to hear claims.

15   That jurisdictional bar applies to legal theories not

16   exhausted in the FIRREA claims process.

17           Here the plaintiff asserted only three legal

18   theories, three causes of actions in its proofs of claim in

19   the FIRREA process.

20           First, it alleged breach of the Deposit Agreements.

21   Second, it alleged conversion; and, third, the plaintiff

22   asserted that the FDIC-Rs violated the automatic stay by

23   withholding or failing to pay their disputed deposit claim.

24           The plaintiff has said that it will voluntarily

25   dismiss its conversion claim and its automatic stay claim with

1    respect to the non-payments of the deposit claim.

2        So the only remaining claim that's in the complaint

3    before Your Honor that was actually asserted in the FIRREA

4    claims process is a breach of contract claim.

5        However, in the complaint, the plaintiff asserted

6    six additional claims.  Count II for estoppel, Count III for

7    Turnover, Count V of the California Financial Code, Count VI

8    under the National Banking Act, Count VII for declaratory

9    judgment, and Count 8 Fifth Amendment takings clause.

10        None of those causes of action were included in the

11    FIRREA proof of claim, and only not weren't those causes of

12    action included in the FIRREA proof of claim, the plaintiff

13    didn't even refer to or mention the statutory bases for any of

14    those claims.

15        The plaintiff never mentioned the National Banking

16    Act generally, Section 91 of the National Banking Act, Section

17    194 of the National Banking Act, the California Financial

18    Code, Section 1406 of the California Financial Code, Section

19    681, the US Constitution, the Fifth Amendment or the takings

20    clause --

21        THE COURT:  We don't need to deal with the claims

22    they're withdrawing.

23        MR. GWYNNE:  Well, Your Honor, I'm just pointing out

24    -- yes, you're right, Your Honor, but those are things that

25    were not asserted.  The Declaratory Judgment Act, you know,

28 U.S.C. 2201, that was not cited in the FIRREA proofs --
proof of claim, nor was the 542 turnover account.

The plaintiff also asserts a new non-statutory
action for promissory estoppel and, yes, just like with
respect to the statutory claims, the FIRREA proof of claim
does not even mention the words "estoppel," let alone
"promissory estoppel."

Now, the plaintiff shrugs off it never mentioned any
of these causes of action or the bases for them and, yet,
argues the Court nevertheless has jurisdiction under the
*Jafari* case.

The plaintiff relies on dicta in *Jafari* where the
Court did say, as the plaintiff asserts, that FIRREA does not
limit a plaintiff's district court case through the causes of
action alleged in the administrative process.

On Page 9 of *Jafari*, however, the Court's actual
holding was that the plaintiff had exhausted the
administrative claims in the FIRREA process because it
asserted that, quote, "same factual predicate and included the
same causes of action," closed quote, in both the FIRREA
proofs of claim and the complaint before the Court.

In fact, the only difference in the complaint in the
District Court as compared to the FIRREA proof of claim in
*Jafari* was one fact.  There was a payment that was made to the
Receivers, but that payment was made after the proof of claim

 1   was filed.  So, of course, that couldn't have even been in the

 2   proof of claim.

 3           Now, the majority of courts, like the District of

 4   Columbia, in the *Westberg* decision that we cite, hold that

 5   where a complaint alleges entirely new legal theories,

 6   different than those reflected in the FIRREA proof of claim,

 7   the Court lacks subject jurisdiction -- subject matter

 8   jurisdiction to consider those claims.

 9           For example, in *Aljaf Associates*, the Eastern

10   District of Pennsylvania recognize that giving notice of a

11   breach of contract claim doesn't give notice of a fraud claim.

12           In *Barnes v. FDIC*, a 2018 Northern District of

13   Illinois decision, the Court held that the FIRREA proof of

14   claim did not give notice of causes of action for constructive

15   trust, unfair trade practices, abuse of power or fraud because

16   the proof of claim in the FIRREA process did not even mention

17   those causes of action.

18           The Court also noted that it likely lacked

19   jurisdiction to hear some other claims that it described as

20   unintelligible because the claimant did not cite to most, if

21   not all, of the statutes upon which that claim was based.

22           THE COURT:  I'm just going to stop you for a second

23   because it's kind of interesting because the claims you're

24   concerned about may be the very ones I'm planning to dismiss

25   on other grounds.

1          So in case it doesn't go away by the lack of subject

2    matter jurisdiction because you agree that a breach of

3    contract claim was asserted --

4          MR. GWYNNE:  Yes.

5          THE COURT:  We've got a number of breach of contract

6    claims.

7          MR. GWYNNE:  Correct.  What we believe, Your Honor,

8    is the only cause of action that should survive is Count I

9    against the FDIC-R1 only and minus the prejudgment interest in

10   lost earnings; but, yes, there will be a case remaining.

11         THE COURT:  So you're saying there was no claim

12   against FDIC-R2 in the other breach of contract claims?

13         MR. GWYNNE:  No, no, Your Honor.

14         THE COURT:  Oh.

15         MR. GWYNNE:  I'm just saying those claims fail for

16   other reasons.

17         THE COURT:  You believe those claims fail?

18         MR. GWYNNE:  Yes, we believe those claims fail for

19   reasons, Your Honor --

20         THE COURT:  Set aside for a moment the subject

21   matter jurisdiction.  You would agree that all of the alleged

22   breach of contract claims would remain?

23         MR. GWYNNE:  Yes.

24         THE COURT:  Okay.  And then you -- so I mentioned

25   that for other reasons I may be dismissing the promissory

1    estoppel, the National Banking Act, the California Financial

2    Code claim and the turnover claim.  You mentioned the

3    automatic stay claim.

4            Are you suggesting that the FDIC can violate the

5    Bankruptcy Act and there's no redress to that other than

6    bringing a claim?  Isn't that interesting.

7            MR. GWYNNE:  Well, Your Honor, that goes to the

8    jurisdictional bar of 1821(j).

9            THE COURT:  Yeah.

10           MR. GWYNNE:  I'm happy to address that if you want

11   now or I could finish on --

12           THE COURT:  Let's finish this.  You know, this

13   becomes a relatively small argument given where I'm headed

14   anyway.

15           MR. GWYNNE:  Yes, I agree.  It's important and also

16   relevant to the scope of discovery, I think, you know, which

17   issues are ultimately in the case and what are not in the

18   case.

19           THE COURT:  Clearly.

20           MR. GWYNNE:  So I'll just -- I'll wrap up quickly

21   then with respect to *Jafari* because what I do want to point

22   out, even the minority view espoused by the plaintiff, those

23   courts do not allow a plaintiff to assert new causes of action

24   based on new facts and the complaint that was filed here

25   actually differs dramatically from the -- the 58-page

complaint here differs dramatically from the 14-page addendum
attached to the proof of claim in the FIRREA process.

The plaintiff makes the following new averments
before Your Honor:  That the Secretary instructed the FDIC-Rs
to pay or mandated the plaintiff's deposit, that the FDIC-Rs
were required to obey the alleged mandate from the Secretary
and that the FDIC-Rs are estopped from disregarding the
Treasury Secretary's instruction, that the FDIC-Rs are
obligated to pay the uninsured deposit claims on demand.  That
wasn't even alleged in the proof of claim in the FIRREA
process.

And the statement that the FDIC-R1 at least
guaranteed the plaintiff's deposit claim, that was not
included in the FIRREA proof of claim process.  The allegation
that the FDIC-R2 made statements that they don't even
identify, but they say the FDIC-R2 made statements that all
deposits would be paid in full, each of those averments is
central to all the new allegations that they added; but
they're irrelevant to the breach of contract claims, which is
what they had asserted before.

When you read the actual addendum to the proof of
claim, it's clear their claims and their theory was much
different.  They actually alleged that the FDIC seek a loan
other than the 1.93 billion because it was uninsured deposits,
and their only beef with the FDIC-Rs was that they allegedly

1   interfered with the FDIC's payment.

2           For example, on Page 19 -- I'm sorry, in Paragraph

3   19 on the proof of claim addendum the plaintiff asserted that

4   the obligation to pay the uninsured deposits quote "remains

5   with the FDIC-C, not the FDIC-R," closed quote; and then in

6   Paragraph 23 in the proof of claim addendum the plaintiff

7   argued that the FDIC-Rs couldn't exercise settlement rights

8   because mutuality was lacking, and they said there was no

9   mutuality because the FDIC-Rs didn't owe them the uninsured

10  deposit balance.

11          So all -- this whole argument and causes of action

12  against the FDIC-Rs based on them having some primary

13  obligation to pay the FDI -- sorry, the uninsured deposit is

14  completely new in what's before Your Honor.

15          So even if you look at the minority view in the

16  cases that they espouse, Your Honor, there's no court -- they

17  can't cite a single court that says you can totally change

18  your theories.  You can allege a whole bunch of new averments

19  and you can assert new causes of action and that's okay; and

20  if that were okay, Your Honor, if the plaintiff were right,

21  then the jurisdictional bar of the administrative exhaustion

22  requirement in 1821(d)(13)(D) would really be useless

23  surpluses.

24          So for those reasons, Your Honor, we think that

25  there's a lack of jurisdiction over Counts II, III, V, VI and

 1   VII; but Your Honor asked about the jurisdictional bar under

 2   1821(j) which also is something that precludes the promissory

 3   estoppel and turnover claims that Your Honor had already

 4   indicated an inclination to dismiss, but it also is relevant

 5   to certain requests in the plaintiff's prayer for relief.

 6         They have one prayer for relief.  It's not entirely

 7   clear what they're seeking under which of the causes of

 8   action.

 9         THE COURT:  What's interesting, I didn't think the

10   kind of equitable relief that the plaintiff was claiming on a

11   promissory estoppel claim was the kind of injunction and

12   mandate that 1821(j) addressed.

13         I do agree with you on the turnover claim, but what

14   they really want is a declaration of the law that the claims

15   process doesn't apply and that -- that, to me, is distinctly

16   different than what 821(j) is addressing.

17         MR. GWYNNE:  I agree with you wholeheartedly, Your

18   Honor.

19         THE COURT:  Okay.

20         MR. GWYNNE:  Wholeheartedly.  We still think that

21   claim should be dismissed for other reasons, but I believe

22   with Your Honor's statement there wholeheartedly.

23         THE COURT:  Okay.

24         MR. GWYNNE:  So with respect to 1821(j) that says,

25   quote, "No court may take any action to restrain or affect the

1    exercise or powers or functions of the FDIC as Receiver."

2         In 2015 in *Deutsche Bank* the Ninth Circuit

3    acknowledged that that section imposes another jurisdictional

4    bar.  The jurisdictional bar applies to more than just

5    injunctive relief, as the plaintiff alleges.  It applies to

6    anything that affects the FDIC's exercise.

7         THE COURT:  So maybe I was mistaken that -- on the

8    effect of 821(j) on the automatic stay, because that is like

9    the turnover claim in regard to the specific 6.2 million.  So

10   I -- it's troubling to me that the automatic stay is such an

11   important part of the bankruptcy proceedings that it troubled

12   me to think that that just wouldn't apply to the Receiver.

13        MR. GWYNNE:  The automatic stay, I believe, does

14   apply to the Receiver, Your Honor, and there is authority to

15   that effect, from the Ninth Circuit; but, No. 1, there's not a

16   violation of the stay for the same reasons Your Honor

17   concluded with respect to the deposit claims.  So maybe I

18   should mention that -- just mention that right now.

19        Count IV the plaintiff has indicated we'll

20   voluntarily dismiss a portion of the claim where we're -- on

21   the grounds that we didn't pay them on demand the 1.93 billion

22   dollar deposit claim.

23        The plaintiff, however, is clinging to its alleged

24   state violation claim through this mysterious 6.2 million

25   dollar intercompany claim that was quote "reversed" closed

1    quote; but for the same reasons that Your Honor concluded that

2    the Supreme Court decision in *Bolton* required dismissal of the

3    claim in the FDIC-C matter because just withholding payment of

4    a debt doesn't violate the stay is the exact same reason that

5    requires dismissal of the plaintiff's claim for non-payment of

6    the 6.2 million dollar intercompany claim.

7          Now, the plaintiff tries to distinguish the reversal

8    of the intercompany receivable from the non-payment of the

9    deposit claim --

10         THE COURT:  Yes.

11         MR. GWYNNE:  -- by claiming that the reversal

12   somehow gave the FDIC-Rs possession of some of their property,

13   which is why I think Your Honor was saying it sounded like

14   some money shifted hands.

15         They're talking about a book entry, Your Honor.

16   That's what they're alleging.  It was reversed in some book

17   entry.  There was no money that changed hands.  They even go

18   so far as to refer to it as a unilateral repossession of a

19   intercompany receivable.  They don't say "the money."  They

20   say "the receivable."  In other words, they're saying we owe

21   them money.  So how do we repossess a debt of our own

22   allegedly to them?

23         It doesn't make sense.  They're using those terms

24   because they're trying to get around what Your Honor held with

25   respect to *Bolton* already.  No property was seized or

```
 1   repossessed on the alleged reversal of the intercompany loan,

 2   and the fact that there's no substantive, meaningful

 3   distinction between the 6.2 million dollar intercompany

 4   receivable claim and the 1.93 billion dollar you didn't pay me

 5   stay violation claim is evidenced by the plaintiff's admission

 6   in Footnote 5 on Page 6 of the FIRREA proof of claim that the

 7   6.2 million is, in fact, part of the 1.93 billion.

 8           So they may try to distinguish it, but they

 9   acknowledge it's really one in the same.  The refusal to pay

10   the purported intercompany receivable doesn't violate the stay

11   any more than the refusal to pay the rest of the 1.93 billion.

12           THE COURT:  Well, refusal to pay and taking back

13   something that's already been paid --

14           MR. GWYNNE:  Agree, but they do not allege something

15   was paid and taken back.  They do not allege that.  What they

16   allege, it's somewhat -- I agree, it's hard to tell it's so

17   sparse.

18           THE COURT:  We're dealing with banking, and we're

19   not dealing with bags of money that they carried into the

20   office and put on the desk.

21           MR. GWYNNE:  Right.

22           THE COURT:  It's all book entries.

23           MR. GWYNNE:  Correct, Your Honor, but the

24   non-payment of the debt -- they're not saying the debt was

25   ever paid, okay.
```

1    They're saying that there was an acknowledgment of

2    this debt that then was not acknowledged, was quote

3    "reversed."  There was -- there was no money to change hands.

4    They don't allege it --

5         THE COURT:  I will hear from Mr. Sacks on that.

6         MR. GWYNNE:  Yes.

7         THE COURT:  That's not how I understood it.  There

8    was -- if I hand you a check, it's just a piece of paper that

9    you've got to then negotiate with the bank, but I paid you --

10        MR. GWYNNE:  Correct.

11        THE COURT:  -- and I'm deemed to have paid you.

12        MR. GWYNNE:  Agreed.

13        THE COURT:  So that's why I'm not really sure what

14   distinction you're drawing here.

15        MR. GWYNNE:  Your Honor, what I'm saying -- and

16   maybe neither of us is exactly sure what's being alleged

17   because the second basis for dismissal was that the

18   allegations are so opaque they don't even say what the basis

19   for the intercompany claim is.

20        THE COURT:  Right.  Well, I have a real -- I have a

21   lot of problems on those breach of contract claims.  So I

22   think we're going to be seeing them again in another iteration

23   but I -- and maybe that will help us on these other arguments

24   that you're making.

25        MR. GWYNNE:  So, Your Honor, back to 1821(j), if I

1    may.   The 1821(j) is important because it -- it precludes not

2    just injunctive relief, but any equitable relief; and the

3    Ninth Circuit said that in *BKWSpokane -- Spokane LLC* case in

4    2016.

5             Now, the plaintiffs point out that was an

6    unpublished Ninth Circuit decision but, you know, in 1991 in

7    *Rosa vs. Resolution Trust Corp.* the Ninth Circuit rejected a

8    plaintiff's argument very similar to the plaintiff's argument

9    here that 1821(j) only applies if the Receiver operates in a

10   legal manner, and this gets to the question I think Your Honor

11   answered.

12            If the Receiver is allegedly violating the law, does

13   1821(j) still apply?  The Court found that there was no such

14   limitation in the language of 1821(j).  There's no language in

15   the statute that says that only applies the Receiver operates

16   in a legal manner, and the Court noted that the plaintiff's

17   argument would undermine the purpose of the statute, which is

18   to permit the Receiver to liquidate a failed bank without

19   court or administrative agency intervention.

20            Now, the plaintiff relies upon *Sharpe*, another Ninth

21   Circuit decision where the Ninth Circuit included that where

22   the Receiver had acted beyond its authority that Section

23   1821(j), you know, would not apply.

24            The plaintiff relies upon that to say that's what

25   happened here.  Well, that -- that's wrong and their reliance

1    upon *Sharpe* is -- is misplaced for a number of reasons.

2            Here what they allege as the acting beyond the

3    authority is they say two things.  The FDIC-Rs ignored their

4    own promises, which is not true, and the systemic risk

5    exception instruction from the FDIC -- I'm sorry, from the

6    Secretary was supposedly ignored, and because those things

7    were ignored they were acting beyond their authority to act as

8    Receivers.

9            As I'll discuss later on another issue, the FDIC-Rs

10   didn't make any inconsistent promises; but whether or not they

11   made any promises, or inconsistent ones, they were clearly

12   acting within the powers that Congress conferred upon them

13   when doing so.

14           Congress granted the Receivers the full power to

15   liquidate a failed bank, and those powers include under

16   1821(d)(3) through (11) the powers to require the filing of

17   proofs of claim to review the proofs of claim, to allow or

18   disallow the proofs of claim and to determine when to make

19   payments on them.

20           This Court has jurisdiction under 1821(d)(6) to hear

21   plaintiff's action to determine its claim for, you know, its

22   breach of contract claim under Count I; but no court has

23   jurisdiction to interfere or affect the exercise of the

24   Receiver's continued powers including the decision as to when

25   to make payments.

1          Now, with respect to the *Sharpe* case and the

2     language in the *Sharpe* case about when the Receiver acted

3     beyond its authority, I don't think there's any acting beyond

4     the authority here for the reasons I just mentioned; but it's

5     also important to recognize that *Sharpe* is limited to expect.

6     The Ninth Circuit in multiple opinions, not just one, but two

7     or three, called it an unusual case and one of the reasons it

8     was unusual is because the plaintiffs in that case were not

9     creditors or depositors of the failed bank.

10         In *Deutsche Bank* the Ninth Circuit said that *Sharpe*

11    does not entitle the plaintiff to a constructive trust or

12    other equitable relief where the plaintiff is a depositor or

13    creditor that's seeking payment of sums due under a contract.

14    Here the plaintiff is a depositor, as it acknowledges, and is

15    seeking to recover amounts owed under the agreement.

16         In *Sahni*, another Ninth Circuit case from 1996, the

17    Court held that 1821(j) insulates the actions of the Receiver

18    from restraint even where the Receiver is alleged quote "to

19    have violated state law and equitable remedies are available,"

20    closed quote.

21         So the assertion that there's some broad proposition

22    that if a Receiver's acting inconsistent with, you know, law

23    that there's a basis to get an injunction against them is

24    incorrect; and the Court need look no further than the

25    *BWKSpokane*, the *Rosa*, the *Deutsche* and the *Sahni* cases to

```
 1   understand that the plaintiff's reliance on the general sue
 2   and be sued language in 1819 cannot override or render
 3   surplusage the more specific prohibition in 1821(j).
 4           So for those jurisdictional reasons under 1821(j),
 5   as well as the exhaustion argument, the estoppel and turnover
 6   claims fail but so, too, does -- I want to mention this in
 7   particular.
 8           There are numerous requests for relief in the prayer
 9   for relief that it's unclear to what claim they relate to, but
10   they seek equitable relief and they're barred by 1821(j).
11           One example --
12           THE COURT:  I think the prayer for relief isn't the
13   point.
14           MR. GWYNNE:  Okay.
15           THE COURT:  I don't think it's -- I think it's kind
16   of meaningless to focus on that to actually strike it.
17           MR. GWYNNE:  Okay.
18           THE COURT:  I need to see where we're headed.
19           MR. GWYNNE:  Well, I'll move on to the 12(b)(6)
20   arguments, then, Your Honor --
21           THE COURT:  Okay.
22           MR. GWYNNE:  -- and I'll start with Count I.
23           Count I is a breach of contract claim.  The
24   contracts at issue are the Deposit Agreements.  The only party
25   to the Deposit Agreements were the plaintiff and Silicon
```

1  Valley Bank for which FDIC-R1 alone is the Receiver.  The
2  plaintiff, however, alleges that both FDIC-R1 and FDIC-R2
3  breached the Deposit Agreements.  Plaintiff has no claim
4  against FDIC-R2 because it is not and never was a party to
5  that agreement.
6        Now, the plaintiff relies upon the Transfer
7  Agreement; and as Your Honor mentioned in your initial
8  comments, they said, well, the liability for the plaintiff's
9  deposit claim could not be transferred by the Bridge Bank back
10  to FDIC-R1 without their consent.
11        There's absolutely no basis for that, Your Honor.
12  In fact, it's contrary to the Transfer Agreement.  The
13  Transfer Agreement is only an agreement between FDIC-R1 and
14  Bridge Bank, and Bridge Bank agreed between itself and FDIC-R1
15  to assume the plaintiff's deposit liability; but the plaintiff
16  cannot assert that Bridge Bank or FDIC-R2 was ever liable to
17  the plaintiff under the Transfer Agreement because it's not a
18  party to it.  It's also not a third-party beneficiary.
19        Section 9.09 precludes third-party beneficiaries and
20  Judge Glenn already ruled on this on August 2nd in the
21  Bankruptcy Court.  So there's no basis there, Your Honor.
22  They could do whatever they wanted under the transfer
23  agreement even if they didn't transfer the claim back.  If
24  that liability were still with FDIC-R2, it wouldn't give the
25  plaintiff a claim against them.  It would give FDIC-R1 a claim

1   against FDIC-R2.

2          So, you know, their arguments there, they really

3   make no sense.  I won't get into the rescission because I

4   think Your Honor's already declined to dismiss that claim.

5          With respect to the prejudgment interest and lost

6   profits, I'll just mention *Battista*, which Your Honor's

7   familiar with from the prior decision.  I think the

8   plaintiff's asking you to ignore it.

9          THE COURT:  The Ninth Circuit certainly doesn't.

10          MR. GWYNNE:  I'll move on to Count II, Your Honor.

11          Count II, I note the Ninth Circuit has noted

12   long-standing tradition against estopping the Government, and

13   one easy way to dismiss that count is the fact that there's a

14   Deposit Agreement that covers the subject matter, the Deposit

15   Agreement -- the Deposit Agreements that govern the

16   relationship between the plaintiff and FDIC are one with

17   respect to the plaintiff's deposit account; and in the *KFC*

18   court case the Ninth Circuit said promissory estopple's not

19   intended -- were designed to give a party a second bite at the

20   apple if it can't prove its breach of contract claims, but

21   there are many other reasons the promissory estoppel claim

22   fails.

23          One of the things I want to mention that's really

24   important is the only relevant statements that are made here,

25   the only ones that could be relevant are within a four-day

time period from March 12th through March 16th because March
12th is when the systemic risk exception was invoked and March
16th is when the plaintiff's access to its funds was, by its
own admission, cut off.

So the -- there's only two representations that the
plaintiff alleges happen -- or two statements that the
plaintiff alleges happened within that four-day window.  The
first was a joint interagency press release dated March 12th.
The second is the FDIC-C's press release on the next day,
March 13th.

The plaintiff alleges that those press releases
required that all deposits would be transferred to Bridge Bank
and that all depositors would have full access to their
deposits when Bridge Bank opened on March 13th.

So what does plaintiff allege actually happened
during that four-day period?  In Paragraph 4 of the Complaint
the plaintiff alleges its accounts were initially transferred
to Bridge Bank.

In Paragraph 9 of the Complaint plaintiff alleges
that it had full access to its account and withdrew 180
million between March 13th and March 16th, and in its own
words was using its account quote "precisely as it always had
as a demand deposit account."

On Paragraph 4 of its opposition to the Motion to
Dismiss they again admit that they had quote "full" closed

1    quote access to the withdrawals.

2          So exactly what happened in the press release is --

3    exactly what they say the press releases required did happen.

4    The account was transferred and they had full access.  There

5    was no guarantee of a lifelong commitment for them to have

6    full access.  There was no guarantee for three hours, three

7    days, three months, three years.

8          There also was no statement that any defenses to

9    their claims were being waived.  There was no statement in the

10   press releases that FDIC-R1 would not exercise its right under

11   the transfer agreement to call back the deposit account

12   liability.

13         Now, if they -- if a promissory estoppel claim has

14   to be based on a clear unambiguous promise that's not it; and

15   it's, by the way, not even entirely clear if the press

16   releases could benefit the plaintiff.  It's certainly true --

17   and I admitted this in Bankruptcy Court and I'll say the same

18   thing here today.  There was no specific carve-out in the

19   press releases for the plaintiff's deposit, but there is

20   language in there that says there's no protection for

21   creditors and unsecured creditors; and as I said in the

22   Bankruptcy Court there, too, I understand that could be

23   interpreted to mean there's no protection for a shareholder in

24   its capacity as the shareholder.

25         THE COURT:  Sure.

```
 1            MR. GWYNNE:  So it doesn't necessarily mean there's
 2    no protection for a shareholder depositor, but from the
 3    standpoint of whether you could base a promissory estoppel
 4    claim on that, Your Honor, I think it's far from something
 5    that could be called a clear, unambiguous promise.
 6            The Secretary does not direct the FDIC-Rs.  That's
 7    another reason why --
 8            THE COURT:  So that's an issue we've talked about.
 9            MR. GWYNNE:  Yes.
10            THE COURT:  It's a thorny issue.
11            MR. GWYNNE:  Yes.
12            THE COURT:  We talked about it in regard to the
13    corporation.
14            MR. GWYNNE:  Yes.
15            THE COURT:  In regard to the Receiver, it -- I think
16    it may be different in regard to the Receiver.
17            MR. GWYNNE:  I totally agree.
18            THE COURT:  Yeah.
19            MR. GWYNNE:  One of the things I was going to say,
20    Your Honor, we're not asking you -- you don't have to do
21    anything different with respect to your decision with respect
22    to the FDIC-C.  It's based on different provisions and what
23    other action meant under 1823(c)(4)(G).
24            Here we have specific provision that deals solely
25    with the Receivers, and that provision 1821(c)(3)(C) applies
```

```
1   when the Receiver is liquidating an estate chartered bank.
2   1821(c)(2)(C) would apply if the Receiver were liquidating a
3   federally chartered bank, but that provision applies solely to
4   the FDIC when it's acting as a Receiver; and it expressly says
5   that the FDIC as Receiver, quote, "shall not be subject to the
6   direction or supervision of any other agency or department of
7   the United States," closed quote, in the exercise of its
8   rights or powers.
9           And the interesting thing about that statutory grant
10  of independence is that it's very broad and it specifically
11  says no agency or deposit --
12          THE COURT:  In your briefing it was made broader.
13          MR. GWYNNE:  Exactly.  And the irony of them saying
14  that the FDIC-R is bound by a mandate from the Treasury
15  Secretary is that the prior version of this -- prior iteration
16  of this language specifically said that the Receiver was not
17  subject to the direction or supervision of the Secretary of
18  the Treasury or the Comptroller of Currency.
19          THE COURT:  I'm just looking at the clock, and I'm
20  going to cut you off at 10:30 --
21          MR. GWYNNE:  Okay.
22          THE COURT:  -- no matter where you are in your
23  discussion.
24          MR. GWYNNE:  Understood, Your Honor.  I will heed
25  that warning.
```

1          FDIC-C statements also can't be imputed to FDIC-Rs.

2    Not only has the Ninth Circuit and Your Honor acknowledged

3    that, but in the addendum to the proof of claim the plaintiffs

4    acknowledge that the FDIC-Rs and the FDIC-C are separate

5    jurisdictional entities.

6          Let's look at the FDIC-R1's own statements because

7    they also talk about statements that FDIC-R1's counsel -- at

8    least one of their statements which was made by me --

9          THE COURT:  Your argument is that those all happened

10    outside?

11          MR. GWYNNE:  All happened outside -- all happened

12    outside of the argument; and, Your Honor, if it's promissory

13    estoppel, right, you have to have reasonable reliance and

14    damages.

15          The basis for their damages they say is they left

16    their money in there and didn't move it out.  Their access was

17    denied on the 16th.  They couldn't move their money out

18    thereafter.  So they can't say they relied on anything said

19    later or that they were damaged by.  They can only use that

20    four-day window.

21          But the statements that were made, Your Honor, are

22    entirely consistent with what we're saying today, which is

23    that to the extent, if any, that they have a claim after

24    setoff rates are exercised and after application of

25    $1821(i)(2)$, the cap on liability, that their claim, you know,

1    would be paid.

2            There's nothing in those statements that supports

3    their assertion that the FDIC-Rs agreed to pay them right away

4    immediately without exercise of rights of setoff or the cap

5    imposed by 1821(i)(2).

6            The 542 count, Your Honor, I think you already said

7    you're inclined to dismiss it.  The only thing I would mention

8    in addition to the 1821(j) argument is that a claim to fall

9    within that statute -- there are two arguments.

10           One Your Honor rejected in the FDIC-C litigation,

11   which was the claim doesn't have to be undisputed.  Your Honor

12   sided with the recent cases saying that, but the claim also

13   has to be payable on demand and there's nothing payable on

14   demand even if Your Honor tomorrow were to say, "You're going

15   to give plaintiff the claim in the amount of X dollars."

16           The FDIC-Rs have the authority under 1821(d)(10) to

17   determine when to make payments on the allowed claims.  So

18   there's nothing here that's payable, quote, "on demand," which

19   is the statutory requirement.

20           THE COURT:  So you suggested -- you stated outright

21   in your reply brief that 1821(j) would -- would not apply

22   because this is not -- or are you saying this would apply

23   because this is equitable relief?

24           MR. GWYNNE:  Correct.

25           THE COURT:  You believe this is equitable relief?

```
 1              MR. GWYNNE:  I do, Your Honor.

 2              THE COURT:  Okay.  You didn't -- that was a new

 3    argument.  I don't think you raised that in your opening

 4    brief, but that would be an additional ground?

 5              MR. GWYNNE:  Yes, Your Honor, and I would say this:

 6    If that is -- an additional ground was not raised in our

 7    original brief, it is a jurisdictional matter.  Therefore, it

 8    could be, you know, raised at any time although we would have

 9    -- or should have raised it in our initial briefing.

10              I think I addressed the rest of that looking at my

11    time here.  I skip to Count V, which is the CFC in Count VI,

12    the NBA claims.  Your Honor indicated there's no private right

13    of action --

14              THE COURT:  If Mr. Sacks wants, I may give him the

15    opportunity to allege breach of fiduciary duty.  I don't know

16    that there is a fiduciary duty, but it's clearly not alleged

17    as a breach of fiduciary duty.

18              MR. GWYNNE:  Agreed.

19              THE COURT:  Okay, we can move on.

20              MR. GWYNNE:  With respect to the declaratory

21    judgment claim, Your Honor, as you indicated, I think at

22    least -- there was some inconsistency between what they asked

23    for in this claim versus the prayer for relief, but if we're

24    ignoring the prayer for relief and focus just on this claim, I

25    agree with Your Honor they don't ask for anything that's
```

1    barred in this count by 1821(j); but what they do ask for is

2    relief they're not entitled to because it's moot.

3            The plaintiff is saying, "Well, we didn't need to

4    submit our claims to the FIRREA claims process," but they did.

5    They filed the claims.  The claims have been disallowed.

6            THE COURT:  Well, but it would go -- it would go to

7    all of the theories and facts that you argue have been waived.

8    So there's no waiver if the claims procedure doesn't apply.

9            MR. GWYNNE:  That would be correct.

10           THE COURT:  So this is not moot at all.

11           MR. GWYNNE:  Not with respect to that jurisdictional

12   issue, that's correct.

13           The merits of this claim, Your Honor, it also should

14   be dismissed on the merits because the 1821(d)(13)(D)

15   exhaustion requirement that we talked about earlier, that

16   applies to any claims against Silicon Valley Bank, the Bridge

17   Bank or the FDIC-Rs; and under the plain language of the

18   statute it applies to all claims, quote, "for payment from the

19   assets of any depository institution."

20           It also applies to, quote, "any claim related to any

21   act or omission of the corporation as a Receiver."  If the

22   plaintiff's not seeking payment from the assets of Silicon

23   Valley Bank or the FDIC-Rs, then I'm not sure what we're doing

24   here.

25           THE COURT:  The FDIC-Rs have no access to the

1  Deposit Insurance Fund; isn't that right?

2           MR. GWYNNE:  They have no -- right, direct access.

3  FDIC-C is in charge over that.

4           THE COURT:  Right.  And so when it was determined

5  that all deposits would be available, putting aside plaintiffs

6  here, that used -- that tapped into the Deposit Insurance

7  Fund?

8           MR. GWYNNE:  Well, that would require tapping into

9  the Deposit Insurance Fund.

10           THE COURT:  Okay.  It's my understanding -- and I

11  just want to know if I'm correct -- that the Receiver cannot

12  satisfy a request for payment by dipping into the Insurance

13  Fund?

14           MR. GWYNNE:  Right, the Receiver doesn't have

15  authority on its own to tap into the insurance fund.

16           THE COURT:  It's the actual assets of the failed

17  bank?

18           MR. GWYNNE:  Yes.  But to be clear, when you look at

19  the language of the statute where it says it applies to claims

20  against the assets of the failed institution, it includes

21  assets which the corporation -- quote, "including assets which

22  the corporation may require from itself as such receiver."

23           What that's referring to is money that once the

24  systemic risk exception is invoked, that FDIC-R can go to

25  FDIC-C and say, "Can you provide funds from the Deposit

1    Insurance Fund"?  So a claim that does relate to asking for

2    the failed bank's assets or anything that could have been

3    obtained.

4            THE COURT:  Got it.

5            The last claims, I think, are properly lumped

6    together, the breach of contract claims against FDIC-R2,

7    Claims X, XI and XII, these are the may be written and may be

8    applied to bad contracts?

9            MR. GWYNNE:  Yeah, and I'll just be real quick on

10   this because, one, Your Honor said you're cutting me off and,

11   two, you're inclined to dismiss them anyway.

12           One of the things that was really, I thought,

13   bizarre with respect to these claims is the plaintiff is suing

14   the FDIC-Rs for claims for reimbursement against claims

15   against the bankruptcy estate that the plaintiff has not paid,

16   denies liability for and describes as unliquidated and

17   undetermined.

18           So how in the world can the FDIC-Rs be responsible

19   for obligations to reimburse them for debts that they don't

20   even admit -- they haven't paid and they don't admit they owe

21   them?

22           THE COURT:  Is this limited to the 6.2 million?

23           MR. GWYNNE:  No, Your Honor.

24           THE COURT:  It's not, okay.  Thank you.

25           MR. GWYNNE:  And that's all I have, Your Honor, and

```
 1    apparently that's all the time I have so thank you.
 2              MR. SACKS:  Good morning, Your Honor.
 3              THE COURT:  Good morning.
 4              MR. SACKS:  I'm not sure where to start, Your Honor.
 5              There's a laundry list of things here and hopefully
 6    I will get through the things.  I want to focus on the issues
 7    of concern to you rather than just marching through and
 8    repeating things, but let me start with -- why don't I start
 9    with the FDIC-R2 just to get that out of the way right away.
10              THE COURT:  Okay.
11              MR. SACKS:  Their claim is -- first of all, I mean,
12    they -- putting aside that they want to limit it to breach of
13    contract -- and, by the way, our complaint -- our
14    administrative claim doesn't plead any real causes of
15    action -- legal causes of action.  It pleads the fact and
16    alleges they acted unlawfully.  They plucked out breach of
17    contract, but I think that's because they just want to limit
18    it in that way, but I'll get to that in a minute.
19              As to the FDIC-R2, they ignore the well-pleaded
20    allegations of the complaint, Your Honor.  If you were to
21    believe the ground they're asking you to dismiss on, there is
22    no contract between us and the Bridge Bank.  FDIC-R2 is Bridge
23    Bank.
24              THE COURT:  Yes.
25              MR. SACKS:  Our money was at the Bridge Bank on
```

```
 1   Monday, the 13th of March.  We get an account at Bridge Bank.
 2   I say "we."  SVBFG, I apologize.  I don't really mean "we."
 3   My client had an account at the Bridge Bank.  It had money at
 4   the Bridge Bank.  Well, what governed that account at Bridge
 5   Bank?
 6               (Interruption.)
 7               MR. SACKS:  What governed that?  Was there no
 8   agreement?  Was there no contract?  Was the money just there?
 9   They had the right unilaterally to just take it because we
10   had --
11               THE COURT:  The Transfer Agreement, wasn't it?
12               MR. SACKS:  No, it was not the Transfer Agreement,
13   Your Honor.  What it is is the Deposit Agreement.  It's the
14   Deposit Agreement they attached to their Motion to Dismiss
15   because what happened was they transferred our accounts, and
16   if you look at Exhibit B, I believe it is, to Mr. Mayorga's
17   declaration which he put in -- that's the mistake that they
18   make.
19               We're not relying on the Transfer Agreement for this
20   claim.  We're relying on the fact that our deposits were
21   transferred.  They were at that account -- were at the Bridge
22   Bank.
23               THE COURT:  They were subject to the Deposit
24   Agreement?
25               MR. SACKS:  Well, no, once -- I understand that the
```

1    FDIC -- so we don't plead the Deposit Agreement -- the

2    Transfer Agreement in our complaint, Your Honor.  It's a

3    Motion to Dismiss, and the meaning and impact of that will be

4    determined at trial -- through the course of discovery and if

5    necessary at trial including what they actually did in

6    response to it, but it was transferred to them and on that

7    day, on Monday the 13th, we had an account.

8              We had an account that had 2.1 billion dollars in it

9    on Monday the 13th, and we withdrew money from that account,

10   but what governed that account?  Well, they assigned that

11   account.  So our rights, not their rights, our rights against

12   Bridge Bank, a federally chartered banking institution, were

13   governed by the Deposit Agreement.

14             If you look at the Deposit Agreement, it refers and

15   transfers assignments that they have the right to transfer

16   their rights and delegate their duties under the Deposit

17   Agreement.  So what the FDIC -- as it relates to us, the

18   depositor.

19             What happens is they transfer their rights and

20   duties under the Deposit Agreement to Bridge Bank, and our

21   Deposit Agreement governs our deposit at Bridge Bank.  Under

22   our Deposit Agreement if we have cash in the account, we have

23   the right to withdraw it.

24             So on Monday the 13th Bridge Bank became our

25   relationship.  Section B.  It's on Page 11 of 50.  "Our

1  relationship with you will be that of debtor and creditor.  In

2  other words, we owe you the amount of your deposit subject to

3  the terms of the Deposit Agreement."

4          On Monday, the 13th of March, Bridge Bank owed to

5  SVBFG the amount of its deposits subject to the terms of its

6  Deposit Agreement, and nobody disputes that 2.1 billion

7  dollars went in and that there was 1.93 approximately when we

8  were interfering.

9          Whatever the issues are between the FDIC-R1 and

10 Bridge Bank, which they say is between them, that doesn't

11 concern us.  What concerns us is the fact that on Monday --

12         THE COURT:  So the Deposit Agreement is not an

13 agreement between the plaintiff and FDIC-R2 or Bridge Bank?

14         MR. SACKS:  They are the -- Bridge Bank is the

15 successor to that Deposit Agreement by virtue of the fact that

16 they --

17         THE COURT:  But your client is not a party to the

18 deposit?

19         MR. SACKS:  Yes, our client is.  The Deposit

20 Agreement, which is attached here, is between our client,

21 SVBFG and SVB, the bank that failed, the bank that went into

22 receivership.

23         So when our account was trans -- it gets complicated

24 because the FDIC acts in three zillion different categories

25 like, you know, a multi-headed monster; but let's assume

1    hypothetically they were permitted to and they did.   They

2    transferred -- the SVB transferred our account to First

3    Citizens Bank.   First Citizens Bank would be bound by the

4    terms of our Deposit Agreement for our account unless and

5    until they amended that Deposit Agreement.

6            That didn't happen here.   So the argument, Your

7    Honor, is against the FDIC-R2, Bridge Bank here.   We had money

8    on deposit.   It was governed by our Deposit Agreement, the

9    very same Deposit Agreement that governed the account while it

10   was --

11           THE COURT:   I'm really struggling with this because

12   I thought that the defendant had argued that your client was

13   not a party to the Deposit Agreement.

14           MR. SACKS:   We're not a party to their Transfer

15   Agreement, their internal FDIC Transfer Agreement.

16           THE COURT:   But Count I deals with a Deposit

17   Agreement, that I understand.

18           MR. SACKS:   Yes, and we are a party to that and they

19   make that clear by what they attach to Mr. Mayorga's

20   declaration.   Exhibit A is the signatures for our -- at least

21   some of our accounts that say they're governed by the Deposit

22   Agreement, and then they attach the Deposit Agreement.   So

23   that's what's governs our accounts, and that's what governs

24   those accounts when they are transferred.

25           So if we had an entitlement to the money, which we

1    allege based upon the fact that the limited $250,000 --

2            THE COURT:  So I'm looking at the reply --

3            MR. SACKS:  Yes.

4            THE COURT:  -- and on Page 2 FDIC-R argues that the

5    plaintiff fails to identify any contract to which both the

6    plaintiff and Bridge Bank or R2 are parties.

7            I didn't make that up.  I mean, you agree --

8            MR. SACKS:  No, no, no, but by operation of law,

9    Your Honor -- we didn't sign a new Deposit Agreement with

10   Bridge Bank.  The Deposit Agreement that exists with SVB that

11   governs by law the transfer.

12           THE COURT:  Mr. Gwynne's argument -- what contract

13   are you alleging has been breached?

14           MR. SACKS:  The contract that is at Exhibit --

15           THE COURT:  Exhibit B?

16           MR. SACKS:  Exhibit B, that's correct.

17           THE COURT:  You're telling me that your -- that by

18   reason of a different Deposit Agreement between Silicon Valley

19   Bank and Silicon Valley Bank Financial Group, that this

20   document from 2020 -- that's what this is --

21           MR. SACKS:  This is the agreement that governed

22   our --

23           THE COURT:  -- R2 steps into the shoes of Silicon

24   Valley Bank for this agreement?

25           MR. SACKS:  That's correct.

```
 1              THE COURT:  Okay.
 2              MR. SACKS:  And they do it under the terms of that
 3  agreement by accepting the deposits that were transferred to
 4  them by the Receiver R1, that's correct.
 5              THE COURT:  Okay.
 6              MR. SACKS:  They're successors to that agreement.
 7  There has to be an agreement that governs our deposits, Your
 8  Honor.  I mean, it's not --
 9              THE COURT:  I'm just trying to understand the
10  argument made by defendant.
11              MR. SACKS:  Yes, but they're mis -- we are not
12  relying on the terms of their internal Transfer Agreement,
13  which we were not parties to, we never saw, they never
14  discussed with us, we never saw; but once the money was
15  deposited in our account and we had that account at Bridge
16  Bank, it was governed by the terms of this deposit --
17  continued to be governed by the terms of this but Bridge
18  Bank --
19              THE COURT:  So you're just saying that the defendant
20  was just wrong in its briefing --
21              MR. SACKS:  Correct.
22              THE COURT:  -- which then talks about the Transfer
23  Agreement.
24              MR. SACKS:  Transfer Agreement's not relevant, not
25  relevant to this, Your Honor.  However it happened, Bridge
```

1    Bank succeeded to our account, it's there.

2            The issues in the Transfer Agreement are between the

3    FDIC-R1 and Bridge Bank, whether they did or didn't have the

4    right to ask that the money be transferred back to them or

5    not.  That will be determined in the case.  Whether they did

6    it will be determined in the case.

7            We allege that there are uncertainties as to what

8    actually happened and whether it was or was not transferred

9    back based on the facts alleged in this case, but

10   unequivocally we have the same breach of contract claim

11   against R2.

12           Remember, Your Honor, the money was at R2, all

13   right?  That's where we were accessing our money when it was

14   taken away from us or whoever you want to -- whatever terms

15   you want to use to describe that, okay?  So that's -- that's

16   what we are alleging on that.  I will move on.

17           THE COURT:  I think you need to address the subject

18   matter jurisdiction issue.  Mr. Gwynne's given me a very

19   strong argument on why I should not rely on what he calls

20   dicta in the *Jafari* case.

21           MR. SACKS:  I think, Your Honor, he's wrong on that.

22   I think the *Jafari* case sets forth the basic proposition --

23   and it's not just the *Jafari* case.  There's several other of

24   them.  There's the *Telecenter* case, which we also cite, and

25   then there is another case we cite, *Radian*, which describes

 1  the fact that even though no quote -- where somebody did

 2  actually plead causes of action but they didn't plead a

 3  negligence cause of action, the Court found that it was

 4  embodied within the substantive allegations.

 5          The purpose of this -- if you look at it, this is a

 6  claim that says, "Give a brief description of your claim."

 7  It's not a -- it's not intended to be a judicial pleading.

 8  There's no requirement that you have a judicial pleading.

 9  There's no requirement, Your Honor, that you plead legal

10  causes of action at all.  You're supposed to give them a

11  factual basis for your claim.

12          In our particular case -- I mean, our claim goes

13  well beyond what's required to support all the claims we've

14  now pleaded here in challenging their denial of our claim,

15  which, of course, they don't address anything.

16          Their denial of our claim, "Your claim was denied

17  because it wasn't proved to our satisfaction."  They don't --

18          THE COURT:  I'd like to issue orders like that.

19          MR. SACKS:  Wouldn't it be great if everyone could

20  issue orders like that?  That will come back when we talk

21  about 1821(j) because they seem to believe they are the king

22  and are accountable to no one because they can do whatever

23  they want as long as they're doing it while they're a

24  Receiver, whether it's authorized or not.  1821(j) prevents

25  any court from supervising and making sure they're actually

1  staying in their lane.  I'll come back to that in a minute,

2  but this is another example of that.

3          We plead very broad facts, Your Honor.  It's not

4  required to be a judicial pleading.  We plead the counts --

5  the amounts, the amounts in the accounts.  We plead the facts.

6  We plead when the accounts were taken away from us, how they

7  were taken away from us.

8          We plead with specificity the promises that were

9  made by the Chair of the FDIC which they now seek to disavow

10  as not being binding on the FDIC-R; but we'll address that in

11  a minute as well, Your Honor.

12          We address the actions that they took as being

13  improper, as being unlawful in this and that they were

14  prohibited from moving it.  We talk about all their promises.

15  We talk about the First Citizens acquisition.  We talk about

16  how they were acting in excess of their statutory authority.

17  We reference the violation of the automatic stay.  We say

18  we're entitled to 1.9 billion dollars and we demand the return

19  of our funds.  We reference the involvement of both R1 -- of

20  Bridge Bank and R1.

21          We more than adequately allege our claims.  They

22  know exactly what they are in this circumstance.  We could

23  have alleged this complaint and we would have gotten the same

24  one-sentence denial --

25          THE COURT:  That's the problem.

1          MR. SACKS:  -- of that and they're not -- we've been

2     litigating with them over this issue from day one and fighting

3     over it within the Bankruptcy Court, which went on

4     simultaneously while this claim was there.

5          There is nothing missing from it.  If you had to

6     plead a legal claim -- they refer to this word's different,

7     that word's different.  Yeah, we've pleaded something in the

8     court where we have to meet the requirements of Federal Court

9     of pleading a claim, but that's not the requirements of filing

10    an administrative claim.  It's to give them appropriate notice

11    of what we're claiming and why, and we do it in spades in this

12    particular case, Your Honor.  So I think their jurisdiction

13    argument should be summarily -- should be denied, let's put it

14    that way.

15          Let me go on -- let's see, what is -- what's the --

16          THE COURT:  We need to talk about estoppel.

17          MR. SACKS:  Yeah, let me talk about estoppel a

18    little bit.  I'm not going to raise for estoppel purposes any

19    of the issues you've already adjudicated in the context of the

20    FDIC-C because they raised -- even though it wasn't the focus

21    today, they, of course, reargued them all in their motion; but

22    let's focus on the additional arguments here.

23          In particular, the essence of their argument seems

24    to be that the statements of the FDIC generally and the Chair

25    of the FDIC somehow are not attributable to the FDIC-R even

1   though they discuss and describe and represent what the FDIC-R
2   is going to do.

3          Now, the FDIC-R for sue and be sued purposes is a
4   separate entity, but it's part of the FDIC.  It's not its own
5   independent entity reporting up to an independent person.  It
6   reports to the FDIC.  It reports to the Board of the FDIC.
7   Mr. Gruenberg is the boss of the FDIC-R even though it's
8   accounting in one capacity as opposed to the other.

9          The notion that his statements publicly, which are
10  the basis, along with Secretary -- they adopt the Secretary of
11  the Treasury's statements, which are the basis for the
12  estoppel claim are somehow not the FDIC-R and somebody had to
13  get out there and say, "On behalf of the FDIC-R, I am telling
14  you that we will do X, Y and Z."

15         His statements are what the FDIC is gonna do and
16  that includes the FDIC-R, and if you look at the statements as
17  alleged and as attached to our complaint, for example -- if
18  you look at Exhibit -- I think it's 5 and 6 where we attach
19  the statement from Monday where the FDIC makes its
20  statement -- it's a statement by the FDIC-C.

21         Sure, the FDIC corporate is doing it in a way, but
22  it incorporates what the FDIC-R is doing.  It talks about the
23  transfer, which is being carried out by the FDIC-R.  The
24  promise is a promise of what the FDIC is going to do.

25         The FDIC is going to transfer the money, make it all

1    available.  The mechanics of how that happened -- and that's

2    what we're talking about.  The mechanics is the C does certain

3    things and the R does other things, but the promise is a

4    promise on behalf of the FDIC as an institution, including the

5    FDIC-R.

6            These statements were adopted by them and included

7    on their website.  You can go look at it on the resolution

8    website.  So it's not like this is some third party.  It's the

9    Chair of the FDIC and the FDIC itself.

10           In addition, as we have in Exhibit 6, it's

11   frequently asked questions about the resolution, about what

12   the FDIC-R is doing.  All your money is gonna be there.  So

13   this notion that they can disavow --

14           THE COURT:  So I actually read the defendant's

15   argument as they didn't disavow it.  They made the deposits

16   available and, in fact, were available.  You took advantage up

17   to 180 million, but they also exercised their rights under the

18   Transfer Agreement to call back.

19           MR. SACKS:  But we don't believe they don't have

20   those rights -- so, Your Honor, but then they -- let's

21   hypothetically for a moment say they did.  We dispute whether

22   they did or didn't at the moment.  They purported to.  I don't

23   think they did.  I'm not sure that they actually did.  I don't

24   think they did, but let's assume they took our deposit.

25           It was a Bridge Bank, and they took it and moved it

back to -- transferred it to the R1.  What does that mean?  We
have an account at R1.

Well, they haven't honored that.  We made the claim
for it.  It's not like our account went poof.  What's the
basis -- base on this for taking this money away?  The money
-- I say "money" but, you know, the debt, the account had to
be at R2 or R1.  It didn't go into the ether and disappear,
but that appears to be what happened here, right?

If they -- if it was transferred back, the account
was transferred back, then we have the same claim against R1.
The question is where's our money -- where is the account?
And that's an issue that's going to be resolved, Your Honor,
in discovery in this case, in discovery in the other case, the
movement of the account back and forth and back and forth.

And, in fact, that's relevant because it's critical
to what you've heard today while they have some other
arguments, but they're relying on their setoff claims -- the
as yet unarticulated setoff claims, but we kind of know where
they're headed on those claims at this point in time.

Well, there are defenses to those claims including
lack of mutuality.  R2, or Bridge Bank, has no mutuality with
us for damages.  That's why they moved the money back -- or
before they moved it back because they wanted to create
mutuality, but they can't recreate mutuality because under the
bankruptcy code if you make a transfer within a certain period

1    of time for purposes of creating a setoff it's invalid; and so

2    those are issues that we are going to litigate here, Your

3    Honor, but wherever it is there is an account -- there should

4    be an account that has 1.9 billion dollars in it for us.

5           And if that's at SVB -- or R1, it's at R1; and if

6    it's at Bridge Bank, it's now R2 because they did not transfer

7    that money to First Citizens and that's -- we've alleged that

8    in our complaint and that's another, again, a factual issue.

9           We're on a Motion to Dismiss, Your Honor.  Where's

10   the money?  Was it actually transferred back?  Well, if it was

11   transferred back, why does the Bridge Bank transfer to First

12   Citizens exclude the accounts of the holding company?  There's

13   an express exclusion and we plead that in our complaint.

14          So that's one of the issues, Your Honor, that's

15   gonna have to be resolved here; but, again, we're here on a

16   Motion to Dismiss.  So -- again, the statements that are at

17   issue here are the same statements that were at issue in the C

18   case.

19          The argument that they're not binding or part of R

20   because it's somehow different than the C is not a valid

21   argument, Your Honor.  When Mr. Gruenberg speaks and said the

22   FDIC will, the FDIC is going to protect all depositors, the

23   FDIC protected all depositors by moving accounts to --

24   transferring them to Bridge Bank, acts taken by the FDIC-R.

25          Speaking on behalf of the FDIC is an organization

1   even though he is the Chair of the Board and would be regarded

2   generally as the FDIC-C, but he's speaking on behalf of the

3   FDIC and they're bound by that and they know they're bound by

4   it and they adopted it and --

5           THE COURT:  There's also the section that no other

6   government agency can have any control over the C.

7           MR. SACKS:  I understand that section, Your Honor,

8   and we're not arguing that the Secretary of the Treasury is --

9   so -- so the Government -- Mr. Gruenberg, obviously, has

10  control because he's the Chair of the FDIC.

11          If you're talking about the Secretary of the

12  Treasury, they're talking about the only authority that was

13  granted to the FDIC, whether it be C or R, was the authority

14  granted by the systemic risk exception.

15          I'm not saying and we don't argue that the Secretary

16  of the Treasury once doing what she did had the authority to

17  direct the actions on a day-to-day basis of what they do.  The

18  only thing they were authorized by the systemic risk was to

19  guarantee the deposits.

20          They couldn't, for example, under the systemic risk

21  exception that was adopted here say, you know, "We don't like

22  that.  We changed our mind.  We don't like that idea.  Instead

23  of doing that, we're going to give credit support to First

24  Citizens for purposes of transferring access."

25          THE COURT:  Actually, that's what the FDIC argues is

1    that -- they may agree to guarantee, but it wasn't because the

2    Secretary told them to.

3          MR. SACKS:  Well, okay, but the question is -- and

4    that gets into the issues that we talked about, and we

5    understand those aren't going to be resolved today; but the

6    answer to that is:  What is the impact of what happens when

7    the Secretary of the Treasury adopts systemic risk and so on?

8          But that has nothing to do here with this notion

9    that she can't direct them, because she's not directing.

10   That's not what's being done.  The question is:  What is the

11   authorization for what they do, and what she did was authorize

12   an exception to the prohibitions that otherwise would exist

13   under FIRREA as to what they can do.

14         That's -- that's that issue, Your Honor.  We think

15   that we properly plead a claim for promissory estoppel.  The

16   only real difference here is that they claim they're not bound

17   by the Secretary of the Treasury and we clearly believe that

18   they are.

19         On turnover Your Honor, 1821(j) again, this goes --

20   and I'll be very brief on it.  It goes to the question of what

21   their limits are.  The idea that a Court can't require the

22   FDIC-R to act within its authorized powers is wrong.  What

23   1821(j) does and we -- you know, there are several Ninth

24   Circuit cases.  It's not just *Sharpe*.  It's also the

25   *BKWSpokane* case, both cited, made clear -- and there's another

 1  case.  The name is escaping me at the moment but basically say

 2  if -- this provision doesn't give the FDIC authority to be

 3  lawless.

 4        They have to act within the scope of their

 5  authority, and we're not seeking to prevent the FDIC from

 6  exercising their authority.  The claim here is they are

 7  accounting beyond their authority, and they're doing things

 8  that are unauthorized.

 9        So, for example -- well, that's the claim, Your

10  Honor.  1821(j) prevents the Court from saying "you shouldn't

11  do that," even when they're authorized to do it; but what our

12  claim here is you're not authorized to do it and the Court is

13  permitted to enter an order.

14        As to the other aspect of the turnover claim here,

15  Your Honor, your problem with the claim as we originally

16  pleaded against the FDIC-C was that they didn't have -- we

17  didn't properly plead they were in control of the money.

18        Well, here we have absolutely pleaded that the

19  FDIC-R1 and the FDIC-R2, a successor to Bridge Bank, were in

20  control of the money in this particular instance.  They had it

21  and they did it -- nothing that they argue goes to the

22  turnover claim itself, the basic claim that we had an account,

23  the amount was in it, it's undisputed.  It's an account

24  debtor/creditor relationship.  It's under 542 of the

25  bankruptcy code, all that.  There's no dispute.

1          What they seem to be saying is you can't resolve

2     that because we have a different claim on different subject

3     that we want to use to set off against that liability we may

4     have.  We have to.

5          So on that issue, that doesn't defeat the turnover

6     claim.  That has to do with whether -- assuming we're correct

7     and we're entitled to an order of turnover, there's a

8     countervailing claim that can be asserted to reduce the amount

9     of turnover.

10          THE COURT:  Possibly it all comes out in the wash.

11          MR. SACKS:  It comes out in the wash, but it's

12     important because it doesn't go to a dispute about the

13     turnover claim.  It's a different issue.

14          Whether they have a claim against us for aiding and

15     abetting someone's breach of fiduciary duty on a different

16     subject has nothing to do with the money in the account and

17     the obligation to turn it over.

18          Let me just address the minimum distribution, if I

19     might, Your Honor, and then I'll -- then I'll shut up.

20          There are a legion of cases that talk about private

21     rights of action and we've cited them.  I mean, *Texas American*

22     *Bancshares*, *Branch*, *Murphy*, *Adams*, *Citizens State Bank of*

23     *Lometa*, *Ascom*, *Downriver County* -- or *Community*, *Woodbridge*

24     *Plaza*, *First Empire Bank of New York*.

25          All of those cases recognize a right of action to

1   buy a creditor to enforce the minimum distribution requirement

2   that is imposed upon the FDIC when it's acting as a Receiver.

3   It arises either under state law or federal law depending on

4   whether it's a federal bank or a state bank.

5           THE COURT:  The defendant's argument that there was

6   no private right of action, your claim incorporated the state

7   and federal law under the rubric of a breach of fiduciary

8   duty.  That's what you are --

9           MR. SACKS:  That was the second argument.  We first

10  claim we have a right of action on this and we believe we do.

11  Your Honor, if we don't have a right of action, how does it

12  get enforced?  Where do all these cases come from that are

13  enforcing that right of action brought by creditors who claim

14  they have been discriminated against?

15          There are tons of them and, you know, they can do a

16  *Cort v. Ash* analysis until they are blue in the face, but for

17  whatever reason the courts have recognized that this is

18  something that the creditor who is adversely affected has a

19  right to bring; and it's critical because this is a minimum

20  amount that we are entitled to.

21          Now, I'm not addressing whether they have a right of

22  setoff or don't have a right of setoff in this, but as it

23  relates to the assets of this institution we're entitled to a

24  minimum amount that is a minimum amount based upon the assets

25  of the receivership proportionally at the time, and they've

1    done things to affect that.

2         They say, "Well, who's to say we're not going to

3    give that to you?"  Well, if they want to submit they're going

4    to, we'll shut up and we'll go away -- subject to the right of

5    setoff, we'll shut up and we don't have to fight about this

6    claim; but why do we think they're not going to give it to us?

7         One, because they've distributed money to every

8    other depositor and not to us.  Two, they've transferred any

9    other deposits to First Citizens Bank but not ours; and,

10   three, they've told us they're not paying us a nickel.

11        So what are we -- why do we think we're not getting

12   it, because that's what they've said to us thus far; but we

13   have a right to and the ability to assert that claim, Your

14   Honor.

15        I understand your ruling on the last three causes of

16   action.  I'm not sure what we can plead.  I understand they

17   are fairly sparsely pleaded I guess I would say.  I'm not --

18        THE COURT:  Are you willing to just concede them and

19   move on?

20        MR. SACKS:  I'd like to at least have the ability to

21   see if we can find some -- I don't think we have any documents

22   that can support them, Your Honor, and while I believe --

23        THE COURT:  So I'm not going to let you amend on a

24   contract because it's not allowed, but if you want to allege a

25   written contract and you can tell me what the contract is,

1    identify the contract, what was breached, I suppose I can let
2    you do that.
3         MR. SACKS:  Okay.  I don't know that I'm going to be
4    able to so I don't need a long period of time.  If we don't
5    find it, we don't find it.  I understand they're in there for
6    various reasons but...
7         THE COURT:  So shuffling back to the totality of
8    this complaint --
9         MR. SACKS:  Yes.
10        THE COURT:  -- it is useful to narrow the pleadings
11   and get rid of some of the junk.  Now, thank you for -- you've
12   been very candid in your papers.  The conversion claim, the
13   Fifth Amendment claim, they had some problems.  You just left
14   them on the cutting room floor.  I really appreciate that.
15   You've conceded some other pieces of claims and that's very
16   helpful.
17        I'm looking here to understand the core of the
18   claims and let you go forward on that, and so there are a lot
19   of little things here that are kind of getting in the way of
20   you asking me --
21        MR. SACKS:  Your Honor, I --
22        THE COURT:  -- to turn over the automatic stay
23   claim.  I'm afraid those are just noise.
24        MR. SACKS:  So, Your Honor, I don't disagree with
25   you.  Let me be very blunt about what our claim is.  Our claim

1    is that we are entitled to 1.93 billion dollars because what

2    was done was the systemic risk was used to guarantee

3    everybody.  They believe and -- they believe they have rights

4    of settlement.  We believe they do not.

5                THE COURT:  But you're willing to fight it?

6                MR. SACKS:  I'm willing to fight whether they have

7    them, and if the Court finds that they do have them then -- on

8    the merits of them but -- and so to me 99 percent of this is

9    not relevant -- we don't really have to do any of this

10   difficult stuff having to do with the Secretary -- I mean,

11   going out to depose the Secretary of the Treasury and the

12   Chair of the FDIC and all that.

13               If what we're doing is fighting about whether they

14   have a right of setoff and what that right of setoff is and,

15   as Mr. Gwynne represented to the Bankruptcy Court that our

16   money was subject to the right of setoff, which we disagree

17   with, protected by the full faith in credit and we were not

18   excepted from that but what they're doing is try to hold our

19   money, while we think that was wrong, I mean, let's just get

20   into that and determine and fight their right of setoff.

21               But they don't seem to be -- and we don't have to

22   worry about the rest of it here; but they don't seem to be

23   willing to concede that first point, Your Honor, and then we

24   didn't have to worry about any of these causes of action,

25   breach of contract, this, that or anything else and we could

 1    do that.

 2              Your Honor, the one -- I forgot one thing and let me

 3    just give it to you.  On the interest point, we obviously

 4    adhere to your ruling on interest previously.  We know -- we

 5    know what you said, but there is a case we cited, cited for a

 6    different purpose, *First Empire Bank* 572 F.2d 1361 in which

 7    the Ninth Circuit allows interest against the FDIC in a

 8    capacity where they basically -- it was a minimum

 9    distributional claim just by happenstance where they allowed

10    it because what should have been done should have been done

11    earlier; and I believe that saying if our accounts, which

12    still should be there and still should be accruing and if

13    we're entitled to be restored to our accounts and they should

14    have been -- I mean, it's technically interest, because that's

15    what accrues, but it's not interest on an award; but if we're

16    restored, I believe it's equivalent to what the Ninth Circuit

17    allowed in *Empire Bank*.

18              THE COURT:  Did you cite that case?

19              MR. SACKS:  We did.  It's in our brief.  572 F.2nd

20    1361 at 1372.  We actually cited it for a different purpose,

21    but we did cite the case.

22              THE COURT:  Well, I'll take a look at it.

23              MR. SACKS:  Okay.  Thank you, your Honor.

24              THE COURT:  All right.

25              MR. SACKS:  But anyway, in terms of narrowing

1  focusing this, I don't disagree with you that a lot of the sor

2  of legal theories are complicating things in a lot of way and,

3  really, what this case is going to ultimately come down to at

4  the end of it is very little about us and more -- or very

5  little about these issues that we're fighting about now in our

6  complaint and more a fight about whether they have a right of

7  setoff, whether they lost that right of setoff through

8  transfers or through the bankruptcy and whether they have to

9  prove any unliquidated claims that they would have if they are

10  proper setoff monies in the first place.

11            THE COURT:  Okay, thank you.

12            MR. SACKS:  Thank you, your Honor.

13            MR. GWYNNE:  Your Honor, may I respond briefly?

14            THE COURT:  Yes, and there's ample time to respond.

15            I just want to finish the thread of Mr. Sack's

16  comments here.  I'm not expecting you to give up any of your

17  arguments here, and eventually you will answer this complaint

18  or the next iteration; but I really think once the answer is

19  filed to whatever operative complaint there is, I think this

20  conversation I've just had with Mr. Sacks is really important

21  to moving this case on and not getting weighed down by the

22  noise.

23            So I know you didn't write the complaint.  You

24  didn't create the noise, but Mr. Sacks, I think, makes some

25  important points about the parties' understanding the most

 1  efficient way as to how to move forward on the core of the

 2  claim, and your client plays an integral role in that.

 3          So your first job is to persuade me to knock these

 4  things out so that it's done and, in fact, that is my job on a

 5  Motion to Dismiss.  So that's what I'll do, but if some of

 6  these claims hang on and they're still getting in the way, I'm

 7  expecting that the two of you are going to be able to have a

 8  productive conversation about whether it makes sense to

 9  actually go forward on the claims.

10          MR. GWYNNE:  Understood, Your Honor.

11          And to be clear, we have not asked the Court to

12  dismiss Count I against the FDIC-R1 except with respect to

13  prejudgment interest and lost profit.  So we know there's some

14  things going to be going forward.  Frankly, always have been

15  the belief that's really the only claim.  It's the claim that

16  they had.  It is subject to two things set off in 1821(i)(2),

17  the cap on liability; but we've always felt like that should

18  be the focus, not all the other noise.

19          The first thing I'd like to respond to, Your Honor,

20  is the argument that Transfer Agreement's irrelevant.  What's

21  relevant is the Deposit Agreement is Mr. Sack's argument, that

22  the Transfer Agreement's not relevant, the Deposit Agreement

23  is.

24          The Deposit Agreement was never assigned to Bridge

25  Bank.  So Bridge Bank is not a party to it, right?  The two

 1    original parties are Silicon Valley Bank and the plaintiff and

 2    then FDIC-R --

 3              THE COURT:  Let me just --

 4              MR. GWYNNE:  Sure.

 5              THE COURT:  You're saying this Deposit Agreement,

 6    Exhibit B, was never assigned to Bridge Bank?

 7              MR. GWYNNE:  Correct.

 8              THE COURT:  So how could that be?  The money was

 9    transferred.

10              MR. GWYNNE:  Well -- and, Your Honor, that's sort of

11    another fiction of Mr. Sack's and, in fact, Judge Glenn at the

12    very first hearing when the debtor kept talking about their

13    funds, their funds, and they had 2.1 billion of funds at one

14    point.

15              When you deposit money in a bank, all you have is a

16    claim against the bank.  So there wasn't money in a drawer

17    that was moving back and forth.  There's a liability on the

18    books.  What was transferred to Bridge Bank was the liability.

19    A better way to think of the Transfer Agreement is that Bridge

20    Bank assumed the liability on the deposit account, but that

21    assumption of liability was as between Bridge Bank and

22    FDIC-R1.

23              In other words, FDIC-R1 remained the party to the

24    Deposit Agreement.  FDIC-R1 succeeded to that liability when

25    it became the Receiver for Silicon Valley Bank.  The Deposit

```
 1    Agreement was never assigned to Bridge Bank.
 2              THE COURT:  This is all information that I can't
 3    glean from the complaint and I can't even grasp.  I was
 4    looking through the Deposit Agreement just to understand who
 5    the parties to it were, and it's SVB and SVB Financial Group.
 6    Those are the parties.
 7              MR. GWYNNE:  Correct.
 8              THE COURT:  And that's what's alleged and Mr. Sacks
 9    makes the clear argument that the Receiver stepped into the
10    shoes of Silicon Valley Bank, and that's the end of the story.
11              MR. GWYNNE:  Right, FDIC-R1 succeeds to that
12    liability as the Receiver.  FDIC-R2 was never the Receiver for
13    SVB.
14              THE COURT:  So you're saying that R2 is -- so on
15    this breach of contract claim you agree that the claim can go
16    forward against R1?
17              MR. GWYNNE:  Yes.
18              THE COURT:  And so this is only whether I were to
19    cap R2 --
20              MR. GWYNNE:  Correct.
21              THE COURT:  -- as the successor to Bridge Bank?
22              MR. GWYNNE:  Yes, Your Honor, right, which is a
23    separate institution.  SVB, Silicon Valley Bank, was a
24    California chartered bank.  Silicon Valley Bridge Bank NA was
25    a federally chartered bank.  Different receivers, different
```

 1   entities, different liabilities; but under Section 2.03 of the
 2   Transfer Agreement, 2.03(b)(ix) -- I'm sorry, romanette xi.
 3   It's Exhibit C.
 4          THE COURT:  Oh, Exhibit C?
 5          MR. GWYNNE:  Yes, it's the Transfer Agreement.
 6          THE COURT:  Now you're in the Transfer Agreement?
 7          MR. GWYNNE:  Yeah, that's what I'm talking -- that's
 8   what I'm talking about.
 9          THE COURT:  I thought we were talking about the
10   Deposit Agreement?
11          MR. GWYNNE:  Well, no, no -- we were talking about
12   the Deposit Agreement.  What I'm saying, Your Honor, is the
13   Deposit -- I'm now moving to the Transfer Agreement --
14          THE COURT:  Okay.
15          MR. GWYNNE:  -- because the Deposit -- what I'm
16   trying to show you is the Deposit Agreement, despite what
17   Mr. Sacks was saying, was never assigned to Bridge Bank.
18          Bridge Bank never became a party to it.  Therefore,
19   FDIC-R2 was never a party to it, was never liable under it.
20   The Transfer Agreement is to transfer liability to Bridge
21   Bank --
22          THE COURT:  Okay.
23          MR. GWYNNE:  -- liability on the deposit account,
24   but not the actual Deposit Agreement.  2.03(b)(vi) makes it
25   clear that any agreement or a document establishing a deposit

1    is retained.  That's being retained by FDIC-R1.  That's not
2    transferred to Bridge Bank, and this is all consistent with
3    the bank, Your Honor.

4        The only agreement between Bridge Bank and FDIC-R1
5    was that Bridge Bank was gonna pay a liability that FDIC-R1
6    was liable for because FDIC-R1 is a party to the Deposit
7    Agreement.  It's liable for it, but Bridge Bank is saying,
8    "Yes, I'll agree to assume that liability and pay it, but I'm
9    not taking the contract."

10        Mr. Sack's argument about trying to create mutuality
11    and mutuality didn't exist, I don't know how many courts we're
12    going to litigate this in front of.  Judge Klein already
13    resolved that issue.  In his opinion on Page 28 through 36 he
14    cites the *Colonial Bank* court case that we've cited in our
15    confirmation hearing, and he agrees that FDIC-R1 was always
16    liable; and the reason it was always liable, Your Honor, is
17    because it was the party to the Deposit Agreement.

18        It never transferred the Deposit Agreement.  It
19    remained liable under it and, therefore, mutuality always
20    existed.  The fact that the Bridge Bank assumed liability was
21    recalled doesn't change the fact that FDIC-R1 is liable,
22    always has been on account of any obligation of Silicon Valley
23    Bank.

24        With respect to *Woodbridge* and the private cause of
25    action I want to mention something that's important here, and

1  that's that Mr. Sacks mentions Northern District of Texas

2  case.  I don't know if he mentioned *First Republic-Bank*, but

3  that's 1749 F.Supp 758 at Page 773 where the Court recognized

4  one year after FIRREA was enacted, so this is 1990, and three

5  years after *Woodbridge* was decided -- that was a 1987 case --

6  the Northern District of Texas recognized that with the

7  enactment of Section 1821(i)(2), Congress repealed former

8  Section 11(d) of the FDIA, the Federal Deposit Insurance Act,

9  which subjected the FDIC to the ratable distribution

10 requirements of the National Banking Act and thereby quote

11 "effectively overruled prior inconsistent judicial decisions

12 including *Woodbridge*," closed quote.

13        Now, interestingly, the plaintiff, they recognize

14 that *Woodbridge* was then superseded by statute because they

15 say it in their case, but they say on other grounds; but if

16 you read that case it's superseded.

17        THE COURT:  Give me the name of it, please.

18        MR. GWYNNE:  *First Republic-Bank* -- and

19 Republic-Bank is all together one word and then *Corp*.  It's

20 749 F.Supp 758 at Page 773 in particular.

21        There's also a District of Puerto Rico case from

22 October 21, 2010, *Rivera-Polanco*, 2010 US Dist. Lexis 112452

23 at Page 5.

24        The assertion that Mr. Sacks is making to Your Honor

25 where he's saying that, no, these statements, these press

1   releases, now we're saying they were on behalf of FDIC-R,

2   that's an allegation that was not made in the original -- the

3   proofs of claim that were filed with the receivership.

4           So this is what I'm talking about when I say not

5   only are they new causes of action, but they're new facts; and

6   if you look at Paragraph 13 in the proof of claim addendum,

7   you'll see very clearly that the plaintiff asserts that the

8   press release was made by FDIC-C.

9           So you can't assert a set of facts in a proof of

10  claim before and then come to District Court, which is

11  supposed to deal with it in that claim and totally change your

12  theories and add new facts to fit your theories.

13          I think I'm done, Your Honor, but may I have one

14  moment to --

15          THE COURT:  Yes.

16          (Counsel confer.)

17          MR. GWYNNE:  Thank you, your Honor.

18          Just briefly, my colleague wants me to remind the

19  Court of argument we made that when you have an agreement that

20  is applicable, like the Deposit Agreement, that you can't have

21  a promissory estoppel claim; and that is something I think we

22  can deal with in our briefings.

23          THE COURT:  Yes.

24          MR. GWYNNE:  Thank you for your time, Your Honor.

25          THE COURT:  All righty.  I think we've come -- I

1  think we've beat this horse into the ground.  I've got a lot

2  of work to do on this.  It's not a simple matter to deal with

3  and it -- this is only the first time through this case and so

4  I will -- I will generously consider leave to amend where I

5  really think it's possible on a breach of contract claim,

6  those last ones.

7          I think Mr. Sacks has told me what I need to know.

8  He would like one more chance to check it out, but I know you

9  will not produce a new claim if you don't have a basis for it.

10         All right.  I understand that you're going to meet

11  with Judge DeMarchi.  I'm sure everyone wants a short break,

12  and on that discovery dispute I urge you to work that out with

13  her.  I think that's in everyone's best interest.  Thank you

14  for the excellent argument and the really well-drafted brief.

15  They're very helpful to me, thank you.

16         MR. SACKS:  Thank you, your Honor.

17         COURTROOM DEPUTY:  Court is adjourned.

18  *(Whereupon the proceedings adjourned at 11:22 a.m.)*

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATION

 2

 3              I, TERI VERES, do hereby certify that I am duly

 4    appointed and qualified to act as Official Court Reporter for

 5    the United States District Court for the District of Arizona.

 6              I FURTHER CERTIFY that the foregoing pages

 7    constitute a full, true, and accurate transcript of all of

 8    that portion of the proceedings contained herein, had in the

 9    above-entitled cause on the date specified therein, and that

10    said transcript was prepared under my direction and control.

11              DATED at Phoenix, Arizona, this 10th of

12    October, 2024.

13
                                    ____s/Teri Veres____
14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT