1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Beth Labson Freeman, District Judge

4

5    SVB FINANCIAL GROUP,            )
                                     )
6              Plaintiff,            )
                                     )
7    vs.                            )    Case No. C 24-01321-BLF
                                     )
8    FEDERAL DEPOSIT INSURANCE       )
     CORPORATION, AS RECEIVER FOR    )
9    SILICON VALLEY BANK, et al.,    )
                                     )
10             Defendants.           )
     _____)

11

12                                  San Jose, California
                                     Thursday, October 10, 2024
13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 11:30 - 12:21 = 51 MINUTES
15

16   APPEARANCES:

17   For Plaintiff:
                            Sullivan & Cromwell, LLP
18                          1888 Century Park East
                            Suite 2100
19                          Los Angeles, California 90067
                    BY:   DIANE LEE MCGIMSEY, ESQ.
20                  BY:   ADAM S. PARIS, ESQ.

21   For Defendants:
                            Reed Smith, LLP
22                          101 Second Street
                            Suite 1800
23                          San Francisco, California
                             94105
24                  BY:   EMILY F. LYNCH, ESQ.

25            (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
 1  For Defendants:
 2                              Bailey Glasser
                                1055 Thomas Jefferson
                                Suite 540
 3                              Washington, D.C. 20007
                           BY:  STEPHEN SORENSEN, ESQ.
 4                         BY:  MICHAEL L. SHENKMAN, ESQ.

 5  Transcribed by:             Echo Reporting, Inc.
                                Contracted Court Reporter/
 6                              Transcriber
                                echoreporting@yahoo.com
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   <u>Thursday, October 10, 2024</u>                    <u>11:30 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  Court is now in session, the Honorable

5   Virginia K. DeMarchi presiding.  Calling Case 24-CV-01321-

6   BLF, SVB Financial Group versus Federal Deposit Insurance

7   Corporation, as Receiver for Silicon Valley Bank, et al., on

8   for status conference via Zoom.

9       If the parties could state their appearances, please,

10  beginning with Plaintiff's counsel.

11         MR. PARIS (via Zoom):  Good morning, your Honor.

12  Adam Paris of Sullivan and Cromwell, here for Plaintiff

13  SVBFG.

14         THE COURT:  Good morning.

15         MS. MCGIMSEY (via Zoom):  Good morning, your

16  Honor.  Diane McGimsey, also from Sullivan and Cromwell for

17  Plaintiff SVBFG.

18         THE COURT:  Good morning.

19      All right.  For Defendants.

20         MR. SORENSEN (via Zoom):  Good morning, your

21  Honor.  Stephen Sorensen (Zoom glitch), as Receiver for

22  Silicon Valley Bank.

23         THE COURT:  Okay.  And you were frozen there a

24  little bit Mr. Sorensen.  I'm -- hopefully we got all (Zoom

25  glitch).  I'm not sure if that's on the Court's end or your

4

1  end.

2          MR. SORENSEN:  I'm sorry.  My apologies.  Can you

3  hear me now?

4          THE COURT:  Yeah.  Seems okay.

5          MR. SORENSEN:  Okay.

6          THE COURT:  All right.  Who else for the FDICR?

7          MR. SHENKMAN (via Zoom):  Michael Shenkman also

8  from Bailey and Glasser, for FDICR-1.

9          THE COURT:  Okay.  Good morning.

10          MS. LYNCH (via Zoom):  Emily Lynch from Reed Smith

11  -- sorry -- from Reed Smith for FDICR-1 and FDICR-2.

12          THE COURT:  Okay.  Good morning.

13      And I know you all have had -- or some subset of you

14  have had a busy morning before Judge Freeman.  So, the focus

15  of our proceeding today is to see if we can reset on this

16  discovery issue in light of the correspondence I received

17  from -- I'm going to call it the Holding Company.  That

18  seemed to work well at our last proceeding.

19      And, so -- so, let's try this again.  So, let me just

20  set the stage by saying that the Court, me, I'm focused on

21  the question of how best to get to the point of being able

22  to resolve claims of exclusive privilege, and that's really

23  my only goal.  I'm not worried about who owns the documents,

24  whether there's a breach of contract occurred in terms of

25  giving the documents back.  I'm really trying to prioritize

5

1  the review of documents that are claimed to be exclusive
2  privilege so we can resolve that, and I sent you off to come
3  up with a plan for prioritizing, and I got something like
4  seven different proposals.
5       So -- so, then I issued my order and, blah.  Okay.  So,
6  in the letter dated October 7th that I got from Sullivan and
7  Cromwell, you know, I was a little bit surprised by it
8  because the first -- the first statement that caught my
9  attention was in the first paragraph, It is not possible for
10 SVBFG to meet the requirement that it review and prepare a
11 detailed privilege log of 10,000 reserve documents per week
12 because there are too many people who would be required to
13 do that.
14      I did not order the Holding Company to prepare a
15 privilege log of 10,000 documents per week.  What I ordered
16 or I thought I ordered was review for exclusive privilege at
17 that pace.  And, so, you know, it occurred to me that maybe
18 I didn't appreciate or now that you've sort of dug into it,
19 the -- the predictions about the effort that would need to
20 be undertaken to just review, not log but review, is -- is
21 greater than what I had understood from our hearing, and I
22 went back and looked at the transcript, and at our hearing,
23 we -- again, the focus of the discussion was about using
24 search terms to prioritize the exclusive privilege review,
25 and Mr. Sacks I believe told me that his expectation was

6

1 that when we get through the 300,000 or so documents that
2 remain for review, we'd be talking about a di minimus number
3 of documents that would require to be logged for exclusive
4 privilege, and I believe Ms. McGimsey had maybe a less
5 sanguine assessment of both the pace of review and the
6 extent of exclusive privilege, but, you know, that was my
7 operating assumption is that we're really talking about a
8 pretty small number of documents that would be subject to a
9 claim of exclusive privilege and that the remainder might be
10 privileged but it would be joint privilege or, you know,
11 confidential or something else.
12     So -- so, that was kind of -- that was why I was
13 surprised.  But, so, in approaching the -- the -- the
14 current status of this dispute, I think it's important to
15 distinguish between review for exclusive privilege and what
16 the Holding Company would actually be required to log.
17     So, for example, if it's burdensome to log for
18 exclusive privilege because there's going to be exclusive
19 privilege claims about claims that -- documents that are not
20 relevant to anything in the case.  Okay.  Well, we can talk
21 about that burden, but I would like to distinguish that from
22 the burden of actually reviewing the documents for exclusive
23 privilege, the pace of that review.
24     So -- so, that was -- that was -- the -- those were the
25 concerns that I -- I had and why I thought it would be

7

1  useful to have this discussion.  Let me just pause there and

2  get an update from the parties about where you are in your

3  discussions, because I know I sent you back to talk further.

4       So, let me ask -- I don't know if it's Mr. Paris or Ms.

5  McGimsey who's going to speak on behalf of the Holding

6  Company.

7            MR. PARIS:  Since my microphone's open, your

8  Honor, this is Adam Paris.

9            THE COURT:  Yes.  Okay.  Great.

10           MR. PARIS:  I'll -- I'll take a shot at it and --

11           THE COURT:  Okay.

12           MR. PARIS:  -- Ms. McGimsey -- if I misstate

13  something, I'm sure she'll let me know.

14       So -- so, we've spent the better part of the last two

15  days, your Honor, meeting and conferring.  I think, without

16  getting too far out over my skis -- and certainly Mr.

17  Sorensen or Mr. Shenkman will correct me if I am -- we seem

18  to have arrived at a structure that is mutually agreeable to

19  the parties in terms of how at least to take an initial cut

20  at dealing with this question of exclusive privilege in a

21  way that will satisfy the FDIC on one side and -- and get

22  them the information they need on a timely basis and also be

23  less burdensome to -- to our client, you know, and make it

24  at least practical.

25       We're not quite there yet.  You know, we -- we had a

8

1  meet and confer yesterday morning for about 90 minutes, and

2  it was very -- it was very helpful.

3          THE COURT:  Okay.

4          MR. PARIS:  And we've exchanged proposals over the

5  course of yesterday afternoon and this morning up until

6  about an hour ago.  Like I said, I think we're there.

7      There is one open point that we just need to sort of

8  figure out.  We -- I would want to make sure on behalf of my

9  client -- and I'll go into the details for both in a second,

10  your Honor, but just to -- just to give you a heads up, I

11  would want to make sure that on behalf of our client that

12  there's no prejudice, in other words, that both parties

13  preserved their rights under your order.  They have the

14  right to seek enforcement of it.  We would have the right to

15  take it to Judge Freeman on an appeal, right, if this

16  process that we've arrived at doesn't work, doesn't work to

17  the satisfaction of one of the two parties.

18      So, that's the only item that's still open that I would

19  look to Mr. Sorensen and Mr. Shenkman to -- to discuss about

20  and -- and potentially your Honor as well.

21          THE COURT:  Okay.

22          MR. PARIS:  But subject to that, subject

23  essentially to a nonwaiver agreement, you know, under Rule

24  72 and for them under your order, what we've essentially

25  landed on is their clean team -- they will give directions

9

1  to their clean team essentially about what they want the

2  clean team to do, right. They don't need to tell us what

3  that is. You know, Mr. Sorensen could say, We would like

4  you to look for X, Y or Z or topic A, B, C. You know, some

5  of it was outlined in their letter, of course. They'll do

6  that. They'll give that direction. It will be, as Mr.

7  Sorensen calls it, a one-way direction. The clean team --

8  the FDICR's clean team will then do its -- do its work and

9  spit out documents to us at a -- at 1500 documents a week

10 clip.

11      So, they'll go through, you know, the materials.

12 They'll identify ones that are -- you know, sort of

13 correspond to Mr. Sorensen and Mr. Shenkman's instructions,

14 and then the only other open point is they'll -- they'll

15 deliver them to us, and then we can go through -- we, SVBFG,

16 will then go through the 1500 and say we think this is

17 privileged, we think this is not privileged, you know, we

18 think this is Hold Co. only privilege. You know, we'll give

19 our, you know, perspective on those documents. And anything

20 that's either joint privileged, you know, not privileged,

21 you know, not responsive, again, assuming it's not

22 privileged to us, would be immediately released to the FDIC

23 -- FDICR-1.

24          THE COURT:  Okay.

25          MR. PARIS:  And then we would write in -- we would

10

1  sort of have a pre-populated log, your Honor, of the

2  documents already that would have, you know, sort of our

3  perspective on it, and if then Mr. Sorensen and Mr. Shenkman

4  disagreed with an assertion of Hold Co. only privilege as to

5  some specific document or documents on that, we would figure

6  out a process to bring that to your Honor for resolution.

7  We haven't figured out that mechanism yet.  That would

8  obviously involve, you know, input from your Honor because

9  we wouldn't want to do something that -- that you don't

10 appreciate and -- and don't agree with, but that would be

11 sort of the basic -- the basic process.  And then we would

12 do that, you know, through a week-by-week, 1500 documents a

13 week.  We would continue to work through the ones that are

14 obviously of -- of principal priority to -- to Mr. Sorensen

15 and Mr. Shenkman since those are the ones that, you know,

16 they've sort of, you know, instructed the clean team to --

17 to try to identify.

18         THE COURT:  Okay.  Thank you.  Let me just ask a

19 point of clarification.  Then I'll get Mr. Sorensen's take

20 on the -- the almost agreement.

21     So, when you get to the point, meaning when the Holding

22 Company gets to the point of saying, We think a particular

23 document has -- is subject to an exclusive privilege,

24 privilege exclusive to the Holding Company, is a -- is a log

25 entry generated at that time or only after there is some

11

1 sort of, you know, back and forth between, I don't know, the

2 respective clean teams?

3          MR. PARIS:  Yeah.

4          THE COURT:  Is the idea there's a log sort of

5 generated automatically?

6          MR. PARIS:  Our contemplation is we would generate

7 it at the time.

8          THE COURT:  Okay.

9          MR. PARIS:  So, in other words, the would -- so,

10 just to meat on the bones, your Honor, they would -- you

11 know, the proposal that Ms McGimsey sent to Mr. Shenkman

12 would have them delivering us the first slug of 1500

13 documents if they could do it on this Sunday.  Okay.  And by

14 the following Monday, we would tell them, Of course 1500,

15 here are the ones you can -- here are the ones released,

16 either because they are jointly privileged, not privileged,

17 you know, nonresponsive and nonprivileged, whatever.  We

18 don't care, right.  Those are all yours.  So, pretend that's

19 like, I don't now, 1400 of them released, and they would get

20 a log of here are the remaining 100, with the assertion of

21 Hold Co. privilege, and here is the basis.

22          THE COURT:  Right.

23          MR. PARIS:  And we would identify document by

24 document --

25          THE COURT:  Okay.

12

1        MR. PARIS:  -- what the basis is for the assertion

2   of the privilege.

3        THE COURT:  And --

4        MR. PARIS:  Like I said, we need to figure out

5   then sort of what to do with that.

6        THE COURT:  Okay.

7        MR. PARIS:  All right.  Then we'll have 100

8   documents that Mr. Sorensen and Mr. Shenkman want to see and

9   we're asserting privilege over and we'll --

10        THE COURT:  Right.

11        MR. PARIS:  -- need to figure out, okay, what --

12   what comes next, but that --

13        THE COURT:  Okay.

14        MR. PARIS:  -- would be the process.

15        THE COURT:  Okay.  And we can talk about that on

16   this call or later if you wish, but -- but that's helpful.

17   And you're only logging exclusive privilege claims, not

18   joint privilege claims, not other -- just exclusive

19   privilege claims?

20        MR. PARIS:  That would be sort of yes and no.  The

21   answer is for purposes of this exercise --

22        THE COURT:  Right.  Exactly.

23        MR. PARIS:  -- yes.  And, now, again, it is

24   important, right, if -- if there's a document that's joint

25   privileged, right, that's privileged to both our --

13

1          THE COURT:  Right.

2          MR. PARIS:  -- clients, no one -- no one client

3  can waive a joint privilege, right.  So --

4          THE COURT:  Of course.

5          MR. PARIS:  So, there'll be some identification,

6  right, your Honor --

7          THE COURT:  Okay.

8          MR. PARIS:  -- of the joint privilege.  But the

9  only point I expect there to be a dispute over will be in an

10 instance where there's essentially agreement that there's a

11 privilege but a disagreement as to who -- you know, who's

12 the -- who's the client, right.

13         THE COURT:  Right.

14         MR. PARIS:  So, there'd be if you only have rights

15 to that privilege or is it jointly privileged because if

16 it's jointly privileged, obviously, the FDICR is entitled to

17 see it.

18         THE COURT:  Okay.  Yes.  And I -- I respect that,

19 and my only reason for asking is I just don't want there to

20 be a delay in the review.  I'm sensitive to the remark in

21 the letter that I received from Mr. Sacks saying, you know,

22 this would be really really burdensome, and I want to reduce

23 that burden as much as possible.  But, of course, I respect

24 the parties, you know, if it's efficient, to record your

25 call on those kind of joint privileged documents, of course,

14

1  by all means.  Let's just not slow this process down.

2          MR. PARIS:  Right.

3          THE COURT:  And the last question for you, Mr.

4  Paris, is that I wasn't entirely clear, and maybe I'll find

5  out from Mr. Sorensen, about what the concern is about

6  nonwaiver, preserving rights.  I mean, as far as I'm

7  concerned, you know, nobody ever waives their rights unless

8  you're worried about the timing.  If that's the concern,

9  then let me just say this.  If the parties come up with an

10 agreement on how to do this that is different from my order

11 that I issued last week, great.  I will bless it.

12         And I would expect that if issues arise and

13 somebody figures out that whatever they thought was the

14 right subset of documents to look at, oh, now, they've

15 decided that there's some additional custodian or chunk of

16 documents they need and things evolve, okay.  I would expect

17 there to be a reasonable sort of accommodation of that or at

18 least discussion, and a dispute would be brought to me.  So

19 -- so, that's how I would approach it.

20     So, I want to just -- I want to just assure you all

21 that I'm not wedded to what I did just because I did it.  If

22 you can agree on a process, that's great.

23         MR. PARIS:  I very much appreciate that, your

24 Honor.  I'm sure Mr. Sorensen does too.  The -- the point

25 was really purely a technical one.  I'm sure Mr. Sorensen --

15

1   I mean, they'll speak for themselves.  I'm sure they are

2   largely in agreement with your order.

3           THE COURT:  Okay.

4           MR. PARIS:  So, they wouldn't want to waive the

5   ability to seek enforcement of that I would --

6           THE COURT:  I see.

7           MR. PARIS:  -- suspect, in the event that this

8   process turns out to be a flop for some reason.

9           THE COURT:  I see.  I see.

10          MR. PARIS:  And on the other hand, you know, Rule

11  72 has a 14-day --

12          THE COURT:  Yes.

13          MR. PARIS:  -- appeal deadline in it.  I wouldn't

14  want to waive my ability to take issue with your order, only

15  because we obviously have a principal disagreement there

16  which I won't --

17          THE COURT:  Of course.

18          MR. PARIS:  -- reargue, right.

19          THE COURT:  Okay.

20          MR. PARIS:  But we want to make sure we have that

21  preserved also.  So, it's really just a -- you know, we

22  would just want to freeze everybody's rights while we --

23  while we --

24          THE COURT:  I understand.

25          MR. PARIS:  -- start to step through this week-by-

16

1  week process.

2       THE COURT:  Okay.  Well, let's -- let's talk about

3  the substance of what's under discussion about how this will

4  be conducted, and let me ask Mr. Sorensen, what's your take

5  on -- on the proposal?

6       MR. SORENSEN:  Yes.  Thank you, your Honor.  I

7  think Mr. Shenkman is -- has been much closer to this and is

8  more knowledgeable.

9       THE COURT:  Oh, okay.

10      MR. SORENSEN:  So, I'm going to defer to him and

11  let him speak about the -- the proposal.  I guess I would

12  just throw out there, you know, the reason we ended up here

13  is we obviously had a disagreement about how to approach

14  this.  We appeared before your Honor.  We still couldn't

15  resolve it.  The one -- you know, early on we had suggested

16  the most practical solution here, which happens all the time

17  is -- is a clawback.  You know, that doesn't put a burden on

18  them and, you know, that would basically eliminate all of

19  this back and forth.  It would completely eliminate the

20  burden to them.  And, you know, we would be able to look at

21  the documents, and they would have the right to claw back

22  any document that was Hold Co. only privilege.

23     So, that is -- that is an alternative and seems to us

24  the most practical alternative and one that reduces the

25  burden on them.  But --

17

1          THE COURT:  Okay.  Well, let me -- let me hear

2  about what progress you've made and discussion you've --

3          MR. SORENSEN:  Sounds good.

4          THE COURT:  -- made to the agreed approach to

5  this, if I may (Zoom glitch).

6          MR. SORENSEN:  Sure.  Sure.

7          MR. SHENKMAN:  Judge DeMarchi, let me start with

8  the -- the good news I think --

9          THE COURT:  Yes.

10          MR. SHENKMAN:  -- which is the appreciation to Ms.

11  McGimsey and Mr. Paris for the -- for the conversation

12  yesterday and -- and to be at the point following your --

13  your order where we're looking at release of some of the

14  documents and logging of any exclusive privilege claims

15  relatively soon.  And, so, that's a definite step forward.

16          THE COURT:  Um-hmm.

17          MR. SHENKMAN:  With -- with appreciation for their

18  -- their time yesterday and the correspondence, I think

19  we're not -- not quite as close as -- as Mr. Pris describes,

20  not for any reason that is a fatal problem here but just in

21  terms of the -- of the timing.

22      Even during the -- the hearing that was taking place on

23  the motion to dismiss, we were clearing up some details of

24  their most recent proposal, which we worried were going to

25  make it impossible to come to agreement.  Now, I appreciate

18

1  a lot the additional information they provided that, you

2  know, there may be something to -- to work out here.  That

3  requires us to go back and have more conversation with our

4  -- our client in order to do that since the blast exchanges

5  just over the -- the last hour, that there is some promise

6  there.

7           THE COURT:  Um-hmm.

8           MR. SHENKMAN:  One issue that we did not get to

9  and I -- I think I need to be sure on behalf of the client

10 to say we're just not there yet is the -- the number of

11 1500, and maybe it would be helpful to use some of this time

12 with you to talk about what is a reasonable number to go

13 through.  I mean, Mr. Sorensen mentioned what my client's

14 position -- what our client's position has -- has been since

15 the outset here.  I understand, of course, Ms. McGimsey and

16 Mr. Paris have been working this issue for a log time, but

17 we still have a universe of 300 and some thousand documents

18 that hasn't changed since September 20th and that we -- we

19 need to find a way to get through in the available period of

20 time.

21    Giving us more control over how to work through and

22 prioritize those documents is unambiguously helpful, and we

23 appreciate the conversation about that.

24           THE COURT:  Um-hmm.

25           MR. SHENKMAN:  But -- but going to a -- a rate of

19

1   1500 is probably not going to be plausible that was the

2   content of their most recent --

3           THE COURT:  And -- and plausible not -- because

4   it's too fast for you or not fast enough?

5           MR. SHENKMAN:  Not fast enough.

6           THE COURT:  Okay.  Well -- okay.  So, let me just

7   -- let me just understand.  At this point in time, had the

8   -- you know, before the -- the letter I received from

9   Sullivan and Cromwell, had the FDIC proposed search terms

10  and a prioritized list of custodians?  So -- and the reason

11  I'm asking that is because maybe the universe that we're

12  really talking about in terms of what would need to be

13  prioritized, review, and/or subject to at the outside,

14  logging, is a smaller number than 300,000.  That's what I

15  was hoping.

16          MR. SHENKMAN:  Yeah.  I mean, it -- it might be.

17          THE COURT:  Okay.

18          MR. SHENKMAN:  I mean, just, so, structurally, we

19  have an -- an asymmetry of information where SVBFG has some

20  information about what's in the documents both from working

21  with them and also from being party to the creation of -- of

22  a significant number of them, and Mr. Sorensen and I do not

23  know anything about what's in them, and also because, as

24  counsel to SVBFG, you know, Sullivan and Cromwell was deeply

25  involved.  There's some --

20

1          THE COURT:  Yeah.

2          MR. SHENKMAN:  -- potential --

3          THE COURT:  Okay.  I just -- really, it was a very

4 basic question is like have we gotten to the point where

5 it's a smaller number now.

6          MR. PARIS:  The answer to your question, your

7 Honor, if I may jump in.

8          THE COURT:  Yes.

9          MR. PARIS:  This is Mr. Paris --

10          THE COURT:  Yes.

11          MR. PARIS:  -- is when we ran the search terms --

12 and Ms. McGimsey did it.  She can speak to it specifically.

13          THE COURT:  Okay.  Great.

14          MR. PARIS:  But when we ran their search terms

15 over the custodians, they identified it had worked it down

16 to roughly 30,000 documents.

17          THE COURT:  Excellent.

18          MR. PARIS:  Right.  So --

19          THE COURT:  Awesome.

20          MR. PARIS:  -- we -- we thought that was actually

21 quite a bit of progress.

22          THE COURT:  That was great.

23          MR. PARIS:  Absolutely.

24          THE COURT:  And these are the search terms that

25 Mr. Shenkman and Mr. Sorensen, that your client -- that you

21

1  proposed on behalf of your client in light of my order?

2          MR. PARIS:  Pursuant to your order, your Honor,

3  they --

4          THE COURT:  Okay.

5          MR. PARIS:  -- delivered them to us.  We ran them

6  over the -- over the dataset, and that's what it spit out.

7  There was one term that was a little wonky.  I know Ms.

8  McGimsey could speak to that.  So --

9          THE COURT:  Okay.

10          MR. PARIS:  -- we thought it maybe missed stuff

11  that they actually want.  So --

12          THE COURT:  Okay.

13          MR. PARIS:  -- you know, allowing for that.  But

14  it's something like 30,000 --

15          THE COURT:  Okay.

16          MR. PARIS:  -- unique documents as I recall.

17          THE COURT:  Which --

18          MR. PARIS:  (Zoom glitch.)

19          THE COURT:  Yeah.  Okay.  Go ahead, Ms. McGimsey.

20          MS. MCGIMSEY:  Sorry.  It's about 30,000

21  obviously.  That's without attachments.  But the -- the sort

22  of principal population is just under 30,000.

23          THE COURT:  Okay.  So, and the reason I was asking

24  about that is because I -- I think it's -- it's great if the

25  FDICR clean team can have some firsthand control about the

22

1  review, because not only does that relieve some burden but
2  also you can use your own search terms on the document
3  collection.  So, you know, 30,000 dollars -- 30,000 dollars
4  -- 30,000 documents sounds like a very very manageable
5  number for a request to the Holding Company to conduct an
6  exclusive review.  That sounds very manageable.  It's very
7  close to their 25,000 number.  And -- and, so, if what --
8  what the parties are really disputing is the pace at which
9  the Holding Company will turn around the review, I -- I do
10 think I -- I want to spend some time talking about that.
11      So, Mr. Shenkman, I don't want to put words in your
12 mouth, but is that really the essential dispute that remains
13 between the parties is the pace of review?
14          MR. SHENKMAN:  Yes.  We need to reserve sort of a
15 little bit of detail in what's feasible with our clients and
16 with what the clean team can do, but -- but, yes, I think
17 both the pace and the question of how to deal with the total
18 universe of documents if needed in the --
19          THE COURT:  Yeah.
20          MR. SHENKMAN:  -- time --
21          THE COURT:  Yeah.  So, I mean, because, you know,
22 as you could see, one of the things that I did to just try
23 to like cut through all of the multiple proposals was to say
24 if the search terms hit on, you know, X, divide that by how
25 many weeks remain, and that's what you have to get through,

1  and I didn't really have a good sense of what were the right

2  search terms that were what you were disputing.  But if the

3  search terms hit on 30,000 dollars -- 30,000 documents, at

4  least as an initial tranche for review, it seems to me like

5  we could very quickly get to the point where at least I have

6  some basis to start making decisions about exclusive

7  privilege, which then could inform the remainder of what you

8  all do, and that's really why in my initial order I had

9  hoped to sort of see where things stand in about a month by

10  having you all do a status report.  That was my -- my goal

11  is to see how things went.

12      So, I -- I do feel that it is appropriate for the

13  Holding Company to devote resources to this project of

14  exclusive -- review for exclusive privilege.  And I -- I do

15  think 1500 per week is -- it's even less than the 5,000 per

16  week that you all proposed.  So, I don't understand that

17  part, and --

18          MS. MCGIMSEY:  May I speak to that, your Honor?

19          THE COURT:  Yes.

20          MS. MCGIMSEY:  So, there -- there was a difference

21  -- when we're talking about the 5,000 a week, when you're

22  looking at a population of 250 or 300 thousand, the reason

23  why that review is going to go much more quickly is because

24  there's a lot of junk in there.  There's going to be stuff

25  that's -- although this has been through a process where

1  these things have been designated as potentially privileged,

2  there's going to be stuff that's not privileged.  We all

3  know there's going to be stuff that's easier.  There's going

4  to be stuff that you can restrict, you know, by dates and

5  things like that.  And, so, the review will go much more

6  quickly.

7       In the initial tranches -- so, what -- the proposal

8  here contemplates that the FDIC is going to use its clean

9  team based on the letter that Mr. Sorensen provided to us

10  after our initial conference and pursuant to your Judge's

11  order, to identify what they think are the most important

12  documents.  And, you know, our expectation is that those are

13  also likely going to be the hardest documents.

14       So, that -- that issue is dictating -- will dictate a

15  slower review, and where we got the 1500 from was from the

16  FDIC's original proposal.  I think they had proposed --

17  we're basically proposing a week to do those -- do that

18  review and log the documents and also log relevance and

19  joint sort of information if -- you know, because I think

20  that's useful to the parties, so that when we bring

21  something to you, the parties can narrow it hopefully to

22  something that's actually about this case, so we don't have

23  two disputes rather than one.  But also, you know, we're --

24  they asked for I think a three-day turnaround, and we asked

25  for a slightly longer turnaround, and part of that also is

25

1  based on an understanding of the documents.  Part of what we
2  have been doing since the bank was closed, of course, is
3  responding to many subpoenas.  We actually -- the -- the
4  Holding Company's actually been working hand in hand with
5  the FDIC to respond to -- to duplicate or mirror subpoenas
6  that have been sent to both of us, and our team has been
7  reviewing documents on the FDIC's behalf, and -- and I can
8  tell you I've heard a lot about board packets that are 200
9  pages long.  You know, when I ask about how many documents
10 were reviewed today and somebody says 20, that's because
11 some of the materials in here are just going to be very
12 long.

13     I think once we get through the first couple of
14 tranches, you know, and the FDIC is targeting the stuff
15 that's less important to them, it's likely that it's going
16 to go a lot faster.  And, so, what we had proposed -- I
17 mean, Mr. Paris didn't get into all of the specifics, but we
18 basically proposed just a two-week process to start so that
19 the FDIC could get something right away.  You know, your
20 order contemplated something by the 21st.  They would have
21 something by the 21st.  It would be based on the clean
22 team's identification of the most important documents.  We
23 would do that again for another week, and then during that
24 time period, the parties would discuss the parameters to get
25 through the rest of that 30,000'ish or whatever the

26

1  population is because I do believe that we can commit to

2  something that is a higher number of review and probably, I

3  would think, even double that once we've spent a couple of

4  weeks understanding this is what the documents are, these

5  are what the judgment calls are, and you can instruct a team

6  so that they're making consistent -- consistent calls across

7  the board.

8      So, I think it's just a matter of needing a little bit

9  of ramp-up time, and then we can really start expediting how

10 we get through these documents.

11         THE COURT:  Okay.  I -- I appreciate the remarks

12 about needing to ramp up a team.  However, I -- I'm also

13 sensitive to the point that was made at our last hearing,

14 which is this is not a new problem.  This is a problem that

15 has been pending for a year.  And, so -- and, certainly, to

16 the extent that the documents that might be subject to an

17 exclusive privilege claim are documents for which outside

18 counsel, including Sullivan and Cromwell, is the provider of

19 the legal advice that's subject to the communication, there

20 are efficiencies that I would expect to be brought to bear

21 in identifying those things.  The question is is the

22 communication providing -- seeking or providing privileged

23 advice, privileged information to the Holding Company only.

24 That's it.  That is the only thing that I care about for

25 purposes of resolving this dispute.  That's the only thing

27

1  for my purposes that needs to be logged, and I really just

2  want to emphasize that other considerations in the case

3  should really take a back seat at least as to these 30,000

4  or whatever it is that -- that the parties agree is the

5  universe of things for prioritizing.  And I'm really glad

6  it's 30,000 and not 256,000 or whatever it was with the

7  initial search terms.

8      So -- so, I'm just -- you know, I'm -- I'm sympathetic,

9  Ms. McGimsey, but this is going to have to ramp up and ramp

10 up quickly.  So, maybe you need a little bit of time to just

11 see what the pace can be, but -- but the pace will need to

12 be faster if you're going to meet Judge Freeman's schedule.

13 It's just -- yeah.

14      MS. MCGIMSEY:  We understand, your Honor, and

15 commit to you, we can (Zoom glitch) you know, committed to

16 the FDIC that it will absolutely ramp up.  I mean, it just

17 takes -- the documents -- as an example, we ran the search

18 terms that were provided to us pursuant to your order.  The

19 documents aren't even like in a review database yet because

20 they have to get, you know, moved and processed, and, you

21 know, there's just a lot of mechanics.

22      THE COURT:  Yeah.

23      MS. MCGIMSEY:  And, so, the first couple of weeks

24 there is (Zoom glitch) for time that's involved, but if --

25 if, you know, your Honor and the FDIC would prefer that we

1  be able to take the 30,000 number and build into our

2  proposal something that gets us all the way out to the

3  30,000, you know, in advance of the deadlines, starting, you

4  know, with just only two weeks we've proposed of 1500 a

5  week --

6              THE COURT:  Okay.

7              MS. MCGIMSEY:  -- we're -- we're happy to do that.

8              THE COURT:  Yeah.  I mean, it may be that we need

9  to have another status conference in two weeks or something

10  -- you know, three weeks, something like that, something

11  more prompt.  I was just, again, reflecting.  I literally

12  reread the transcript of our entire very lengthy hearing in

13  September, and, you know, I understood that when a request

14  was made previously, it was -- it was represented to me that

15  the turnaround was a couple of days, a couple of day.  So,

16  you know, I -- my expectations are high that these things

17  can be done efficiently and quickly with the sophisticated

18  e-discovery tools that you all have at your disposal and the

19  long time that the Holding Company and its counsel has had

20  with these documents and its knowledge of the collection and

21  the custodians, and I don't know who has access to the

22  custodians, but to the extent the Holding Company has access

23  to the custodians and can ask questions -- I don't know if

24  that's the case.

25              MR. PARIS:  Yeah, part of our problem, your Honor

29

1  -- this is Adam Paris again for the record -- is that we

2  don't.  I mean --

3             THE COURT:  No, no, no, Holding Company.

4             MR. PARIS:  No, the Holding Company.  We -- we are

5  -- all these people are scattered to the winds, your Honor.

6  They -- they work at First Citizens or they work at other

7  banks or, you know, they're sitting on the beach somewhere.

8  You know, they're not really -- you know, they don't have --

9  we don't have any more access to them, let's put it that

10 way, than the FDICR-1 --

11            THE COURT:  Okay.

12            MR. PARIS:  -- does.

13            THE COURT:  All right.  All right.  So -- so, that

14 may not be a useful tool at all.  But -- but, again, my --

15 my -- I'm really very pleased that you all have talked.

16 Don't get me wrong.  I'm not trying to create dissension and

17 -- and problems where there isn't one.  I would really like

18 for you to agree on a process, and it may be reasonable to

19 allow, you know, a two-week trial period to see how it goes,

20 to see if the review can get ramped up and then revisit.

21     But let me just turn back to Mr Shenkman and -- and

22 make sure that I have an understanding of what the concerns

23 are that might still be standing in the way of an agreement.

24            MR. SHENKMAN:  Judge, I mean, I -- I think you

25 certainly have a good handle on it.  I do think need to put

30

1 the marker in that 1500 seems too slow.

2         THE COURT:  Um-hmm.

3         MR. SHENKMAN:  We did discuss that following the

4 September 7th -- 17th hearing for a very slow trial period,

5 but al -- although it was in the Holding Company's proposal

6 yesterday, it's hard for us to imagine a scenario where that

7 works, 1500 a week, even at a ramp up, because we're still

8 at the point where we don't have a single log privilege

9 claim for documents that are being withheld from us on

10 privilege.

11         THE COURT:  Okay.  So, how quickly -- and maybe

12 this is the part you need to check with your client on --

13 how quickly can the FDICR clean team identify documents for

14 review?  From your perspective, is it we've identified

15 30,000, there you go, or is it something else more nuanced?

16         MR. SHENKMAN:  I mean, I -- I think there's --

17 there's both a cost and a timing question on that.  We -- in

18 making that proposal a few weeks ago, we knew that the clean

19 team could come up with some set of documents, a small set,

20 that -- that were relevant pretty quickly, but we -- we

21 really haven't gotten further than that about the clean team

22 mechanics.  We also have the search term body, as you point

23 out, of -- of 30,000 to work with.  So, there's -- rate I

24 think is the hardest question for us to deal with here.

25 Sullivan and Cromwell's a big firm.  Ten thousand seems a

31

1 lot closer to us than 1500 does.  We -- we took your

2 directive to the question of how do we make this more

3 efficient for everybody.

4          THE COURT:  Um-hmm.

5          MR. SHENKMAN:  But I wouldn't want to leave the

6 hearing with the sense that 1500 is plausible because, even

7 realizing that not every one of the 300,000 documents is

8 relevant to this case, I think some significant body of them

9 may be, and -- and we got to get -- get started.

10          THE COURT:  Okay.  Well, yes.

11          MR. PARIS:  Your Honor, this is Adam Paris.

12          THE COURT:  Yes.

13          MR. PARIS:  If I can, quickly.  I mean, I -- I

14 just don't like -- I mean, again, we're -- we're kicking and

15 screaming on this, your Honor, only because we -- we don't

16 want to be ordered to do something or commit to do something

17 that we fall down on.

18     Okay.  The fact is, like Ms. McGimsey said, we may be

19 able to go much faster once everything is truly and well and

20 truly underway.

21          THE COURT:  Yeah.

22          MR. PARIS:  But it's not quite as simple as your

23 Honor has articulated in saying, Hey, look, is there a

24 privilege here and is it Hold Co.  You know, I can't teach a

25 computer to distinguish in a case -- you know, to Mr.

32

1 Sorensen's point, this is why he thinks everything is joint
2 privileged if, if it's privileged at all, where you have
3 essentially complete overlap between the parties, and -- and
4 someone really needs to spend time with the document, right,
5 with the advice that's being delivered, to understand who
6 the appropriate client is there, where they're not going to
7 be saying in the email, your Honor, this is for Hold Co.,
8 this is for bank, this is for both of you, right.  I'm just
9 -- I'm just putting that out there so that your Honor
10 understands.  I know it's been a few years probably since
11 you've had to do this, but you've done this, right.  So, you
12 know how hard --
13          THE COURT:  Yes.  No, I've --
14          MR. PARIS:  -- privilege review is, right.
15          THE COURT:  I understand that.
16          MR. PARIS:  Right.  So, that's my only --
17          THE COURT:  Okay.
18          MR. PARIS:  That's my concern.  I'm sorry, but
19 just to wrap it up.
20          THE COURT:  All right.
21          MR. PARIS:  So, but once we're into it and once
22 we're through, we may be able to move quite a bit faster,
23 you know, but if we're starting with the hardest documents,
24 the ones that the FDICR clean team says, Okay, these are the
25 direct privilege ones that we think are joint and we think

1 are not Hold Co., we're going to have to spend some time

2 with it, and that's not the type of thing you can offload

3 to, you know, some second year associate.

4          THE COURT:  I really hope that the prioritization

5 is not -- is based on relevance in the first instance.

6          MR. PARIS:  Of course.

7          THE COURT:  That's the useful thing.  So -- so,

8 but Mr. Shenkman, you know, I -- I feel like there's some --

9 so, and this is maybe not what you're saying, but your folks

10 on the clean team need to be able to identify the documents

11 in the first instance.  So, if there's a question about

12 whether you can even do the 1500 per week pace, well, then

13 -- then you sort of have a mutually -- a mutual practical

14 problem of just like what is humanly possible that

15 knowledgeable attorneys on both sides can actually identify

16 what needs to be reviewed.

17     It seems to me that search terms are the key to

18 narrowing the universe for prioritization, and if you've

19 done that to the tune of 30,000 and within that 30,000, the

20 FDICR is able to say do this 1500, this -- whatever it is,

21 do these first, do this custodian first, do things that hit

22 on this term first, like, you can -- you can tell your

23 people -- you can control that.  You have control over that,

24 about which ones to say do these first in the queue and

25 then, you know, the pace should just be as quickly as it can

34

1  be, and we will revisit this issue maybe, maybe -- that's a

2  process -- we'll revisit this issue in a couple of weeks to

3  see how it's going.  But I -- I really like the idea, and I

4  appreciate that the parties agreed on the -- or are maybe

5  going to agree on this, of giving FDICR control over the --

6  the order, what gets reviewed and the order in which it gets

7  reviewed, because that -- that allows you to actually, as

8  you go through it, sort of adjust your priorities.  You

9  know, as you go through and you get documents released and

10 you -- you see things, you can say, Ah, okay.  Well, this is

11 -- you know, this is what we'd like to see sooner rather

12 than later.  So, I think it's a very important feature.

13      Okay.  Let me -- let me pause there and -- do you just

14 need some more time to see if you can reach agreement?

15            MR. SHENKMAN:  Judge, I mean, I think it is

16 certainly worth us continuing to talk to see if there's

17 something we can agree on.  Knowing that we're not in a

18 position now to commit the clean team, you know, I don't

19 know if this is a place we could get, but Mr. Sorensen

20 introduced the idea at the outset of having us just look at

21 the documents subject to clawback --

22            THE COURT:  Yeah.  There's --

23            MR. SHENKMAN:  -- when it's --

24            THE COURT:  -- no need --

25            MR. SHENKMAN:  -- getting close to that.

1        THE COURT:  I'm sorry.  You know, this was an

2   argument that was raised in the last hearing.  I'm not

3   trying to go back and redo the last hearing.

4        MR. SHENKMAN:  Okay.

5        THE COURT:  That's not what this is about.  So,

6   forgive me for cutting that off, but I really --

7        MR. SHENKMAN:  Understood.  Understood.

8        THE COURT:  I'm not sure that I -- that that's an

9   appropriate thing to do in this situation.  I don't have a

10  502(d) order in front of me.  We -- the fighting over

11  502(b), and then I just -- you know, I'd rather not

12  introduce additional complexity.

13       MR. SHENKMAN:  I understand.

14       THE COURT:  Especially if we're talking about

15  30,000 documents.  That is so doable, and whether it's, you

16  know -- you know, two months or three months, you know, it's

17  still doable, right.

18       MR. PARIS:  We -- we agree -- this is Adam Paris

19  again.  We agree with your Honor.  We do.

20       THE COURT:  Okay.  All right.  Well, let me -- let

21  me finish up with Mr. Shenkman and just -- and just say --

22  let me just ask a more precise question maybe.

23       MR. SHENKMAN:  Yes.

24       THE COURT:  How long do you need to confer with

25  your client about things like what can the clean team do and

1 pace and -- and those kinds of things?

2        MR. SHENKMAN:  I mean, if the question of what we

3 can ask the clean team to do perhaps tomorrow.  But I do

4 think on the question of pace, when we were having

5 conversations prior to the joint status report, we were

6 talking about 5,000 documents a week.

7        THE COURT:  Yes.

8        MR. SHENKMAN:  And so, even though it may be

9 helpful to us -- we hope it will be helpful to us to select

10 the documents, 1500 is a pretty slow pace.  And just

11 thinking about baseline, if 10,000 is too many, you know, we

12 want to set our -- our -- all of our shared expectations

13 about what we're going to try to get to in the -- in the

14 right range.

15        THE COURT:  Okay.  But you may need some trial

16 period to have that happen I think is what your colleagues

17 on the other side are saying.  My order actually

18 contemplated that you needed kind of a two-week initial

19 window to get ramped up, both parties.  We've kind of blown

20 past almost a week of that, but, you know -- you know, I'm

21 sure that -- I hope that the Holding Company is not just

22 like stopping all work and that you're continuing to do

23 whatever you would otherwise be doing in the absence of my

24 order or in compliance with my order, as you indicated in

25 the letter.  But -- but I am -- I -- I want you all to see

1  if -- you know the documents the best.  You know them better
2  than me.  You know what the issues are.  I would like to see
3  if you can reach agreement, and I know that -- because I
4  listened, that Judge Freeman encouraged you to do exactly
5  that.  So -- so -- or at least work it out with my
6  assistance.
7      So, I'm prepared to give you a little bit more time,
8  not a lot of time but a little bit more time to get closure
9  on this.  I will hold my order in abeyance if that's
10  helpful, but only for a short amount of time because I -- we
11  really need to press forward, and this can't continue to
12  linger.  So, is that helpful to your process for me to do
13  that and ask for an update on -- let's see.  It's a holiday
14  weekend, at least for the federal government -- on the -- an
15  update on the 15th?  You're going to give me an update on
16  the 15th anyway about a couple of things, but I could hold
17  the earlier part of my order in abeyance.
18          MR. SHENKMAN:  Judge, I mean, we think the October
19  21st first return date is essential.
20          THE COURT:  Okay.
21          MR. SHENKMAN:  And, so, I'd be really reluctant to
22  -- to do that.  To your question -- and perhaps it's worth
23  talking about now -- our understanding as of yesterday is
24  that the work has not continued on the 302,000 documents,
25  that the Holding Company has -- has put the time into --

38

into other things, and we'd want to make sure going from
this hearing there's absolutely no miscommunication about
where our priorities are and the need to get release of some
of these documents and see some claims of exclusive
privilege if the Holding Company is going to make them.

            MR. PARIS:  Okay.  I don't -- I don't know what's
going on, Mr. Shenkman --

            THE COURT:  Mr. --

            MS. MCGIMSEY:  Adam, let me -- let me address
that, please, because I -- I really do need to correct that
misstatement, and we informed Mr. Shenkman yesterday that
actually we have released both custodial documents and other
documents.  As you, I think, just referred to in our October
15th update, there's a couple of other sets of documents
that are at issue.  We've released another I think 6,000
custodial documents, as well as over 100,000 other files
that are reflected on Sharepoint sites and these sort of
file share sites that are at issue.  We -- we learned just
yesterday for the first time from Mr. Shenkman that the FDIC
would prefer for us to focus first on the custodial
documents.  We'd actually asked them to prioritize for us,
and if there were certain things relating to Sharepoint SVB
Financial Group subsidiaries that we didn't need to look at
now, to please let us know.  So, I -- I assume they're going
to respond to us in writing on that, but -- but now they've

39

1  informed us that they want us to focus on the custodial

2  documents first.  So, we're going to do that.  But we have,

3  in fact, been reviewing both sets of documents and have

4  released a very significant number of documents since we

5  last saw you.

6            THE COURT:  Okay.  Let me just clarify on the --

7  just the emails, so, the custodial emails, leaving aside the

8  other tranches of documents that are noncustodial, what is

9  the current universe of documents to be reviewed for

10  exclusive privilege claims, approximately?

11            MS. MCGIMSEY:  It's now just under 300,000.  I

12  don't have all the math in front of me, but -- but the

13  release was about 6,000 documents.

14            MR. PARIS:  Right.  Last time we were with your

15  Honor, it was 302,000, and we released 6,879, including

16  families --

17            THE COURT:  Okay.

18            MR. PARIS:  -- in the last three weeks.

19            THE COURT:  And have there been any claims of

20  exclusive privilege asserted based on the review that has

21  been done in the last, you know, two weeks?

22            MR. PARIS:  No.  Those have been all released.

23            THE COURT:  Right.  But --

24            MR. PARIS:  Those have been released.

25            THE COURT:  But -- right.  So, the concept is, as

40

1 you go through, you say release, release, and then

2 privilege, release, release, privilege.  Have there been any

3 exclusive privilege documents identified based on the

4 review --

5          MS. MCGIMSEY:  There --

6          THE COURT:  -- like, to be logged, you know?

7          MS. MCGIMSEY:  There have not, but I think --

8 well, I don't -- without getting too sort of into the weeds,

9 I think we talked about this during our hearing.  You know,

10 our focus has been trying to identify things that we can

11 just release as quickly as possible.

12          THE COURT:  Got it.  All right.

13          MS. MCGIMSEY:  And, rather than focusing on let's

14 target SVBFG privileged documents, we've been saying, let's

15 target joint privileged or not privileged and get those out.

16          THE COURT:  Okay.  Okay.  So, I understand that.

17 Thank you for clarifying.

18     All right.  I -- subject to anything else that anyone

19 wants to say today, I am prepared to just -- I want to hear

20 from you again on -- on Tuesday, the 15th, not only as to

21 the things I've already directed you to hear -- to tell me

22 about on the 15th but just on the status of the process for

23 expediting, prioritizing review of the custodial documents

24 for privilege?  I'd like to -- I'd like to let you finish

25 your discussions about this because I -- I do think that you

41

1 have made progress, even if you're not quite there.  Okay.
2 And just keeping in mind the goal, as I said before, I do
3 think there's a difference between logging.  I do not want
4 anyone to have to log for exclusive privilege documents that
5 are irrelevant to this case.  That -- that's -- that's good.
6 That's a good thing to be able to agree on if we can agree
7 on that, but there does need to be review for exclusive
8 privilege in a prioritized way, and let's -- let's use
9 search terms if that's helpful.  Let's use the -- the
10 judgment of the FDICR clean team if that's helpful.  A
11 combination of those things may be the most efficient way to
12 get through it, and I appreciate the parties' efforts in
13 trying to -- to get there.
14     So, Mr. Shenkman, let me just come back to you.  Is
15 there anything else that -- that you need to address with
16 me?
17         MR. SHENKMAN:  No, Judge.  I mean, we're -- we're
18 happy to continue to work on it.  I do -- the -- the October
19 21st date is important, and how we get there with something
20 substantial, I understand hearing that from you too.
21         THE COURT:  Yeah.  Well, I -- I'm not -- I'm not
22 going to throw out my order.  My order's still there.  I
23 guess, you know, the clock is ticking.  So, October 6th was
24 when I issued it.  And, so, you'd have 14 days until the
25 20th.  But I really hope that, you know, that we can address

42

1  the practical problems that I understand now that the

2  Holding Company has identified about just the capabilities

3  of review, the pace of -- that can be accomplished, but I

4  did want to -- I felt the need to clarify that the logging

5  -- my expectation about logging is not every document.  It's

6  only those for which there is an exclusive privilege claim.

7  And I would like to get to a point where we can have a --

8  not maybe a complete logging of everything, but at least

9  here is a -- here's a -- you know, some -- some entries that

10  we can at least have a -- a briefing on about the privilege

11  issue, you know, not at the very end of discovery but

12  sufficiently in advance so that whatever I can do can inform

13  your decisions or at least can give you something else to

14  appeal to Judge Freeman if you wish.  So, that's -- that's

15  my goal.  And, so, I'd like to be able to have a process by

16  which we -- we do that, and that's why I asked for that

17  status report on November 12th.

18       So, in considering how you might come up with an agreed

19  resolution, if there's a different date, an earlier date,

20  you know, that's -- that's my goal, is to try to get you all

21  to a point where I have something concrete to deal with.

22       Okay.  Well, let me just put it this way.  I will ask

23  for a status report on the custodial document procedures for

24  review on October 15th as well.  If you all think you need

25  some different timing for that, let me know, but my goal is

43

1  very practical here, and it -- it -- it always has been.

2  So, thank you.

3           MR. SHENKMAN:  Judge, may -- may I just ask, so

4  that we -- we don't have the issue going forward, for Hold

5  Co. to transmit the released documents in the same format

6  following your September 20th order?  I mean, it would be

7  helpful to know when --

8           THE COURT:  If I -- I'm sorry.  What do you want?

9           MR. SHENKMAN:  I'm sorry.  Your September 17th

10 order, you had Hold Co. send a list of the -- the documents

11 that were released that we were permitted to view as the

12 FDIC, and also a list of -- that is document ID's that were

13 still being held in the reserve documents.

14          THE COURT:  Are you talking about paragraph three

15 of my October 6th order?

16          MR. SHENKMAN:  Uh --

17          THE COURT:  So, under the custodial documents,

18 paragraph three, where it says:

19               "Beginning October 21st and on

20               every Monday or Tuesday thereafter,

21               shall identify for those documents

22               reviewed the documents that you may have

23               access to and the documents for which

24               there's an exclusive privilege claim

25               together with a log"?

44

1          MR. SHENKMAN:  Yes, Judge, but -- but Hold Co. has

2   just told us in this call about the 6,879 documents.  So, I

3   -- I understand that's in the procedure.  Going forward, I

4   want to make sure that we get that list for what Hold Co.

5   has just told us has been released so that we're working

6   from the same population.

7          THE COURT:  Okay.  I'm not sure what you want me

8   to order.  I mean, I'm not changing my order right now, and

9   Ms. McGimsey says and Mr. Paris says that they're prepared

10  to release or have released documents to -- you can

11  certainly tell them sooner rather than later what the

12  document IDs are, but I didn't want this to be -- I mean,

13  you all can agree to do it on a daily basis, but I'm trying

14  to just set some, you know, kind of regular reporting to

15  each other about what can be reviewed.

16       So, are you asking me to change my order?  I'm not

17  withdrawing it.  So, I don't understand what your -- what

18  the problem is?

19          MR. SHENKMAN:  No, Judge --

20          MS. MCGIMSEY:  Your Honor, if I might -- sorry to

21  interrupt.  I think the issue is is that we were -- we were

22  ordered originally to provide the full list to Mr. Sorensen

23  and Mr. Shenkman, to the FDIC but through litigation, which

24  we did.  We have been dealing with the clean team for many

25  months because the clean team has the documents.  So,

45

1 normally when we release documents, we release them to the

2 FDIC through the clean team.

3        THE COURT:  Oh.

4        MS. MCGIMSEY:  And then they do -- I don't know

5 what they do with it, but -- but they -- the clean team is

6 the one that has the ability to release documents to

7 litigation counsel and that controls everything.  And, so, I

8 think Mr. Shenkman is just asking that if we provide

9 information to the clean team releasing documents, that we

10 provide the duplicate information to litigation counsel as

11 well rather than them having to get it from their client,

12 and that's fine from us.  That's fine for us.

13        THE COURT:  Oh, okay.  I'm sorry.  I did not

14 appreciate that that was what you were asking.  But I mean,

15 of course, you all should do whatever is the most efficient.

16 So, and if the documents are being released, like, of

17 course, tell litigation counsel.  I mean, yeah.  Okay.

18        MR. SHENKMAN:  Thank you to the Court and to Ms.

19 McGimsey.

20        THE COURT:  Okay.  Great.

21    Anything else for today?

22        MR. PARIS:  Thing here, your Honor.  Thank you.

23        THE COURT:  Okay.  Good.  Well, thank you all very

24 much.  I -- I know it's been a long day for you all.  I will

25 issue just a very brief order with that, you know, please

1  report back on October 5th deadline that we just discussed,

2  and then I will wait to see.  And you can let me know if you

3  think a further status conference would be helpful.  Okay.

4              ALL:  Thank you, your Honor.

5              THE COURT:  The matter is concluded.

6          (Proceedings adjourned at 12:21 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

CERTIFICATE OF TRANSCRIBER

1

2

3     I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9     I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17         Echo Reporting, Inc., Transcriber

18             Tuesday, October 29, 2024

19

20

21

22

23

24

25