Raymond A. Cardozo, Esq. (Bar No. 173263)
Emily F. Lynch, Esq. (Bar No. 324055)
**REED SMITH LLP**
101 Second Street, Suite 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
E-mail: rcardozo@reedsmith.com
E-mail: elynch@reedsmith.com

Kurt F. Gwynne, Esq. (admitted *pro hac vice*)
Casey D. Laffey, Esq. (admitted *pro hac vice*)
**REED SMITH LLP**
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Email: kgwynne@reedsmith.com
E-mail: claffey@reedsmith.com

Derek J. Baker, Esq. (admitted *pro hac vice*)
**REED SMITH LLP**
Three Logan Square,
Suite 3100, 1717 Arch Street,
Philadelphia, PA 19103
Telephone: (215) 851-8100
Email: dbaker@reedsmith.com

Stephen Sorensen (SBN 199408)
**BAILEY GLASSER LLP**
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
Phone: 202-463-2101
Email: ssorensen@baileyglasser.com

Lawrence H. Heftman (admitted pro hac vice)
David C. Giles (admitted pro hac vice)
**ARENTFOX SCHIFF LLP**
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: 312-258-5500
Email: lawrence.heftman@afslaw.com
        david.giles@afslaw.com

*Counsel to the Federal Deposit Insurance Corporation,
as Receiver for Silicon Valley Bank, and the
Federal Deposit Insurance Corporation, as
Receiver for Silicon Valley Bridge Bank, N.A.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| SVB FINANCIAL GROUP, | Case No.: 5:24-cv-01321-BLF |
| Plaintiff, | **FDIC-R1'S AND FDIC-R2'S ANSWER AND AFFIRMATIVE DEFENSES TO SVB FINANCIAL GROUP'S COMPLAINT** |
| v. | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Silicon Valley Bank and Silicon Valley Bridge Bank, N.A. | Judge: Hon. Beth Labson Freeman Action Filed: March 5, 2024 |
| Defendant. | |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Defendant Federal Deposit Insurance Corporation ("<u>FDIC</u>"), in its capacity as Receiver for Silicon Valley Bank ("<u>FDIC-R1</u>") and Silicon Valley Bridge Bank, N.A. ("<u>FDIC-R2</u>" and together, the "<u>FDIC-Rs</u>"), by and through their undersigned counsel, hereby respond to Plaintiff SVB Financial Group's ("<u>SVBFG</u>") Complaint [D.I. 1] as follows:

Each paragraph of this Answer and Affirmative Defenses (the "<u>Answer</u>") constitutes the FDIC-Rs' Answer to the same numbered paragraph of the Complaint. The FDIC-Rs deny each and every allegation, averment, statement, and/or assertion of the Complaint not specifically admitted in this Answer. The FDIC-Rs reserve the right to amend or supplement this Answer, including the affirmative defenses contained herein as discovery and the action progress.

Footnotes in the Complaint do not constitute allegations to which a response is required. To the extent a response is deemed required to purported allegations in any footnote, such allegations are denied.

## INTRODUCTION

1. This action challenges the wrongful denial of SVBFG's administrative claims to recover approximately $1,933,805,708.13 (the "<u>Account Funds</u>") that were on deposit at the former Silicon Valley Bank ("<u>SVB</u>") at the time it was put into receivership, were transferred to Silicon Valley Bridge Bank, N.A. ("<u>Bridge Bank</u>"), and have been illegally taken away and withheld from SVBFG. (See Counts I-IX.) SVBFG also asserts three Counts for relief unrelated to the deposit claims. (See Counts X, XI, XII.) These claims were timely asserted in the FDIC-Rs' administrative processes and denied along with the claim to the Account Funds.

**ANSWER:** The first and second sentences of paragraph 1 of the Complaint constitute a summary of the Complaint (which is a document that speaks for itself) and certain legal conclusions, to which no response is required. To the extent a response is required, the FDIC-Rs deny the allegations in paragraph 1 of the Complaint, including because the denial of SVBFG's administrative claims were not "wrongful," nothing was "illegally taken away and withheld from SVBFG," under 12 U.S.C. § 1821(d)(5)(E), no court has jurisdiction to review the disallowance of an administrative claim filed with the FDIC-Rs, and SVBFG is not entitled to the relief sought in the Complaint. By way of further response, the FDIC-Rs deny the allegations in this paragraph to the extent that SVBFG purports

to characterize or describe any deposit liability that may have been reflected on the books and records of SVB on the date SVB was closed, including but not limited to the purported "Account Funds," as something other than a debt obligation owed to SVBFG.  By way of further response, the FDIC-Rs admit that, on November 29, 2024, the Court entered an *Order Granting in Part and Denying in Part Defendants' Motion to Dismiss* [D.I. 108] (the "Order") dismissing (a) Count I without leave to amend with respect to SVBFG's requests for prejudgment interest and lost earnings; (b) Count IV as to the FDIC-Rs' continued refusal to pay the Account Funds; (c) Counts V and VI without leave to amend; (d) Counts VIII and IX without leave to amend; and (e) Counts X, XI, and XII with leave to amend. The FDIC-Rs admit that SVBFG filed Proofs of Claim in their administrative claims processes and that the FDIC-Rs subsequently disallowed the claims.  The FDIC-Rs deny that SVBFG timely asserted each of the claims in the Complaint in the FDIC-Rs' administrative claims processes.

2.    SVBFG was the corporate parent of SVB before SVB was placed into receivership. But the deposit claims asserted herein arise solely out of funds SVBFG deposited with SVB as a depositor, pursuant to deposit agreements ("Deposit Agreements"), and held in demand deposit accounts at SVB no differently from SVB's thousands of other depositors. SVBFG simply seeks the same treatment the FDIC-Rs accorded all of SVB's other depositors.

**ANSWER:** Admitted that SVBFG was the corporate parent of SVB before SVB was closed and the FDIC was appointed as its receiver.  The second and third sentences of paragraph 2 constitute a summary of the Complaint (which is a document that speaks for itself) and certain legal conclusions, to which no response is required.  To the extent a response is required, the FDIC-Rs deny that SVBFG is entitled to the relief sought in the Complaint and deny the allegations of the second and third sentences of paragraph 2 of the Complaint.  The FDIC-Rs admit that SVBFG had deposit accounts at SVB but deny that SVBFG "simply seeks the same treatment" accorded to all other depositors.

3.    On Sunday, March 12, 2023, Secretary of the Treasury Janet Yellen exercised her exclusive statutory authority to invoke an emergency systemic risk exception to the "least cost resolution" requirements of the Federal Deposit Insurance Act (the "FDIA"), which were introduced by the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), in order to guarantee all deposits of all depositors of the former SVB. "All depositors" includes SVBFG, and "all

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

deposits" includes the entirety of SVBFG's then-existing deposits at SVB, without limit. Secretary Yellen made this emergency determination on March 12 because the Board of Directors of the FDIC, the Board of Governors of the Federal Reserve System, and Secretary Yellen uniformly determined, and the President of the United States agreed, that failing to act—and, specifically, failing to fully protect depositors who held large, uninsured deposits at SVB—would have serious adverse effects on the United States economy and its financial stability.

**ANSWER:** The allegations in paragraph 3 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs admit that Secretary Yellen, upon the recommendation of the FDIC's Board of Directors and the Board of Governors of the Federal Reserve System, and after consultation with the President, authorized the FDIC's application of the systemic risk exception on March 12, 2023. The FDIC-Rs respectfully refer the Court to the Secretary's invocation of the systemic risk exception for its full and complete terms, and deny the allegations in paragraph 3 of the Complaint to the extent inconsistent therewith.

4.      Immediately following Secretary Yellen's determination, FDIC-R1 complied with its obligation to provide SVBFG with full access to its Account Funds. Specifically, on March 13, 2023, it transferred all of SVBFG's deposits at the former SVB to the newly created Bridge Bank, as it did with the insured and uninsured deposits of all other SVB depositors.

**ANSWER:** The allegations in first sentence of paragraph 4 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs deny they had any obligation to provide unfettered access to all deposits based upon the invocation of the systemic risk exception, and deny that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). FDIC-R1 admits that SVBFG initially withdrew funds on account of its deposit accounts. The FDIC-Rs admit that FDIC-R1 facilitated the transfer of SVBFG's insured and uninsured deposit liabilities from SVB to Bridge Bank on March 13, 2023, but denies the remaining allegations in this paragraph.

5.      In accordance with FDIC-R1's actions to make all deposits of all SVB depositors available at Bridge Bank starting on March 13, 2023, SVBFG was not required to file an administrative

– 4 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

claim to recover its Account Funds after SVB was closed and placed into receivership on March 10, 2023. Upon becoming receiver for SVB, FDIC-R1 clearly did not intend to require any depositors to file a claim against FDIC-R1, as both FDIC-R1's and -R2's own documentation and contact email address for their administrative claims process— "NonDepClaimsDal@FDIC.gov"—make clear. This was confirmed when FDIC-R1 transferred all of SVB's depositors' funds, including SVBFG's, to Bridge Bank along with those of all other SVB depositors and initially made those funds available to SVBFG without restriction. Despite the FDIC properly recognizing SVBFG's Account Funds as a deposit at first, the FDIC-Rs, for still undisclosed reasons, interfered with SVBFG's continued access to its Account Funds at Bridge Bank and purported to sweep those funds back to FDIC-R1. SVBFG properly sought turnover of the Account Funds in an adversary proceeding in its Chapter 11 proceeding in the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Nevertheless, after the FDIC-Rs belatedly insisted that SVBFG, alone among depositors, was required to file an administrative claim, SVBFG filed precautionary protective claims with each of the FDIC-Rs on July 10, 2023, detailing, in over 25 pages, the bases for SVBFG's entitlement to recover on its deposit claim, among other claims.

**ANSWER:** The allegations in paragraph 5 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs admit that FDIC-R1 transferred most of SVB's deposit liabilities, including SVBFG's, to Bridge Bank. Further, the FDIC-Rs admit that SVBFG's right to demand payment from Bridge Bank was initially available to it, that SVBFG filed Proofs of Claim with the FDIC-Rs on July 10, 2023 (just prior to expiration of the claims bar date), and that SVBFG commenced an adversary proceeding in the Bankruptcy Court. The remaining allegations in paragraph 5 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

6.       The FDIC-Rs—which were required by statute to act on SVBFG's claim within 180 days—both waited 179 days, until the last business day prior to the statutory deadline, before providing SVBFG with perfunctory, one-sentence notices that they were denying all of SVBFG's claims— including the account deposit claims—without any further explanation. FDIC-R1 merely stated that

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

"[t]he deposit claim is denied as not proven to the satisfaction of the receiver due to the receiver's defenses. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver." Similarly, FDIC-R2 said that "[t]he deposit claim is denied as not proven to the satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank. All other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver."

**ANSWER:** The allegations in the first sentence of paragraph 6 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs admit that the Notices of Disallowance were provided to SVBFG 179 days after SVBFG filed its Proofs of Claim, but the remaining allegations in the first sentence of paragraph 6 are denied. The FDIC-Rs respectfully refer the Court to the Notices of Disallowance for their full and complete terms, and deny the allegations in the second and third sentences of paragraph 6 of the Complaint to the extent inconsistent therewith.

7.     This language is identical to denial letters issued to other creditors, which has prompted the Bankruptcy Court overseeing SVBFG's bankruptcy case to question whether a "one sentence denial of a claim without explanation of reasons . . . satisfies due process," and to expressly note the repeated Kafkaesque refusal by the FDIC to explain the grounds for its denials of claims. The relevant statutory provision requires that if a claim is disallowed, the FDIC-Rs must "provide a statement of each reason for the disallowance and the procedure for obtaining agency review or judicial determination." 12 U.S.C. § 1821(d)(8)(B)(ii). As the Bankruptcy Court presiding over SVBFG's bankruptcy case recently stated (in relation to other SVB creditors who filed FDIC claims), "[o]ne would ordinarily expect an administrative agency that rejects claims that in this case exceed $500 million would explain more than that the claim 'is not proved to the satisfaction of the Receiver.' The FDIC's denial brings to mind a quote from Kafka: 'And why am I under arrest?' he then asked. 'That's something we're not allowed to tell you. Go into your room and wait there. Proceedings are underway and you'll learn about everything all in good time.' FRANZ KAFKA, THE TRIAL (1914)."

**ANSWER:** The FDIC-Rs deny that the language in the denial letters is identical to denial letters to other unsecured claimants. The FDIC-Rs lack sufficient knowledge and information to form

– 6 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

a belief regarding the truth of the allegations contained in the rest of the first sentence of paragraph 7 of the Complaint and the FDIC-Rs therefore deny such allegations.  The allegations of paragraph 7 of the Complaint also consist of legal conclusions to which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer the Court to the full text of 12 U.S.C. § 1821(d)(8)(B)(ii) and the Bankruptcy Court's *Memorandum Opinion and Order Dismissing Chapter 15 Petition* for their full and complete terms, and deny the allegations in paragraph 7 of the Complaint to the extent inconsistent therewith.  Further answering, the FDIC-Rs state that under 12 U.S.C. § 1821(d)(5)(E), no court has jurisdiction to review the disallowance of an administrative claim filed with the FDIC-Rs and therefore SVBFG's contentions about the Notices of Disallowance are irrelevant.

8.    SVBFG is not aware of any legitimate basis for the denial of the claims related to the Account Funds, and neither FDIC-R1 nor FDIC-R2 is permitted to supply any additional reasons for the denials not stated in the denial letters.[1] In particular:

a.    There is no dispute over the accuracy of any deposit account statements and the existence of SVBFG's Account Funds;

b.    As of March 10, 2023, SVBFG did not have any bounced checks, overdrafts, letters of credit, or charged off or delinquent loans with SVB. It had not pledged its deposits as collateral for any loan extended by SVB, or acted as a guarantor of any SVB loan, nor had SVB obtained any judgments against SVBFG;

c.    As of March 10, 2023, there were no outstanding "covered transactions" (as defined in Section 23A of the Federal Reserve Act, 12 U.S.C. § 371c) between SVBFG (or certain of its affiliates) and SVB;

d.    As of March 10, 2023, there was no other agreement between SVBFG and SVB respecting the deposit accounts, much less one under which FDIC-R1 could cancel deposit liabilities owed to SVBFG or convert them into equity; and

e.    FDIC-R1 had no other valid basis to deny SVBFG's claims to the Account

---

[1] The same is true with respect to the denials of SVBFG's non-deposit claims, which similarly provided no bases for the denials and cannot now be supplemented by FDIC-R1 or FDIC-R2.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   Funds and has supplied none to this date.

2   **ANSWER:** The FDIC-Rs lack sufficient knowledge or information to form a belief regarding

3   the truth of the allegations in the preamble of paragraph 8 of the Complaint regarding SVBFG's

4   awareness and therefore they are denied.  The remaining allegations in the preamble and the allegations

5   in subparagraphs (a) and (c)-(e) of paragraph 8 of the Complaint consist of legal conclusions to which

6   no response is required.  To the extent a response is required, the allegations in subparagraphs (a) and

7   (c)-(e) are denied.  Further answering, the FDIC-Rs refer the Court to paragraph 2 of the Complaint

8   which belies the allegation in subparagraph (d) that there was no other agreement between SVBFG

9   and SVB with respect to the deposit accounts.   The FDIC-Rs lack sufficient knowledge and

10  information to form a belief regarding the truth of the allegations contained in subparagraph (b) of

11  paragraph 8 of the Complaint and therefore they are denied.  Further answering, the FDIC-Rs deny

12  the allegation in paragraph 8 of the Complaint that the "Account Funds" constitute anything different

13  than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed

14  by 12 U.S.C. § 1821(i)(2).

15      9.      As the holder of a valid deposit claim against the FDIC-Rs, SVBFG is entitled to

16  recover the entirety of its Account Funds.  The FDIC-Rs know this.  Immediately following Secretary

17  Yellen's determination, FDIC-R1 complied with its obligation to provide SVBFG with full access to

18  its Account Funds. SVB then accessed its accounts and withdrew approximately $180 million between

19  March 13 and 16, 2023, using its accounts precisely as it always had—as demand deposit accounts.

20  However, approximately three days after providing SVBFG with complete and unfettered access to

21  its funds and honoring tens of millions of dollars of transactions in those accounts, FDIC-R1 instructed

22  Bridge Bank, for which FDIC-R2 now acts as receiver, inexplicably, without warning or consent, to

23  cut off SVBFG's access to its Account Funds and to dishonor transactions then in process.

24      **ANSWER:** The allegations in the first and third sentences of paragraph 9 of the Complaint

25  consist of legal conclusions to which no response is required.  To the extent a response is required, the

26  allegations in the first and third sentences of paragraph 9 of the Complaint are denied, including the

27  allegation that the "Account Funds" constitute anything different than an uninsured liability claim,

28  subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  The

– 8 –

allegations in the second sentence of paragraph 9 are denied.  The FDIC-Rs admit that SVBFG withdrew approximately $180 million on account of their deposit accounts between March 13 and 16, 2023.  The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the remaining allegations contained in the fourth sentence of paragraph 9 of the Complaint and therefore deny them.  The allegations in the fourth sentence of paragraph 9 of the Complaint are legal conclusions to the extent SVBFG alleges SVB characterizes its accounts "as demand deposit accounts," to which no response is required.  The FDIC-Rs admit that, on March 15, 2023, FDIC-R1 exercised its right under the Transfer Agreement to call SVBFG's deposit liabilities back from Bridge Bank.  The remaining allegations in the fifth sentence of paragraph 9 of the Complaint are denied.

10.    The FDIC-Rs' continuing efforts to divest SVBFG of its Account Funds is lawless behavior. SVBFG therefore seeks the following principal relief:

a.    Judgment against FDIC-R1 and FDIC-R2 awarding SVBFG the full amount of its Account Funds, together with lost earnings on those Funds, an amount SVBFG estimates to exceed $100 million (Counts I, II, VIII, IX);

b.    A determination that the FDIC-Rs' continuing interference with SVBFG's access to its Account Funds since SVBFG's Chapter 11 filing on March 17, 2023, and their refusal to turn those funds over to SVBFG, violate the automatic stay provisions of 11 U.S.C. § 362(a), and judgment directing turnover of the Account Funds plus all lost earnings on those Account Funds under Section 542 of the Bankruptcy Code (Counts III, IV);

c.    In the alternative, if it is determined that SVBFG is not entitled to recover the full amount of its Account Funds, a determination that SVBFG is entitled to recover from the FDIC—including each of FDIC-R1 and -R2 in the first instance, as applicable, and from the FDIC in its corporate capacity if there are insufficient funds in the applicable receivership— the distribution to which it is entitled pursuant to Sections 1406 and 681 of the California Financial Code (with respect to FDIC-R1) and Sections 91 and 194 of the National Bank Act (with respect to FDIC-R2), and 12 U.S.C. § 1821(i)(2) (with respect to both FDIC-Rs). SVBFG directs this claim against each of FDIC-R1 and FDIC-R2 in the alternative because, while the Account Funds were held at Bridge Bank when SVBFG's access was initially frozen, the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

FDIC-Rs have refused to date to explain whether or when the deposit funds were transferred to FDIC-R1. SVBFG accordingly pleads these claims as to both FDIC-Rs. In particular, SVBFG is entitled under California and federal law, as applicable, to a distribution equal to its *pro rata* share of SVB's and Bridge Bank's liquidation value as of the time SVB and Bridge Bank were closed and placed into each respective receivership. The precise *pro rata* amount will not be known until discovery is complete; however based on currently known facts, SVBFG estimates its recovery will exceed $1.71 billion (Counts V, VI); and

       d.    A determination that SVBFG was not required to file an administrative claim under 12 U.S.C. § 1821(d), which was introduced to the FDIA by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("<u>FIRREA</u>"), because (i) SVBFG's claim is one for the amount of a deposit at SVB whose ownership and amount is not in dispute, and because the Treasury Secretary's action bound the FDIC to honor all such deposits in full, and (ii) this amount was transferred from FDIC-R1 to Bridge Bank and the amount on deposit at Bridge Bank when SVBFG's access to its deposits was cut off by Bridge Bank at the instruction of FDIC-R1 is not in dispute, and that, therefore, SVBFG may pursue the claims asserted in the Adversary Proceeding (defined below) (Count VII).

**ANSWER:** The allegations in paragraph 10 of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  The FDIC-Rs deny that SVBFG is entitled to any of the relief requested in paragraph 10.  By way of further response, the FDIC-Rs admit that the Court entered the Order dismissing (a) Count I without leave to amend with respect to SVBFG's requests for prejudgment interest and lost earnings; (b) Count IV as to the FDIC-Rs' continued refusal to pay the Account Funds; (c) Counts V and VI without leave to amend; (d) Counts VIII and IX without leave to amend; and (e) Counts X, XI, and XII with leave to amend.

## SUMMARY

11.    Secretary Yellen invoked the systemic risk exception two days after SVB was closed

– 10 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

by the California Department of Financial Protection and Innovation ("DFPI") on March 10, 2023. In a joint statement publicly announcing Secretary Yellen's action, the Secretary, Federal Reserve Board Chair Jerome Powell, and FDIC Chairman Martin Gruenberg were all crystal clear as to what Secretary Yellen had done, why she had done so, and the effect of her action: the Secretary's action, in her own words, was meant to calm uninsured depositors' fears in order to prevent runs on additional commercial banks and to protect the Nation's banking system from possible collapse by "fully protect[ing] **all** depositors" who "[would] have access to **all** of their money starting Monday, March 13." (*See* Press Release, U.S. Dep't of the Treasury et al., *Joint Statement by Treasury, Federal Reserve, and FDIC* (Mar. 12, 2023) (emphasis added), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.)

**ANSWER:** The FDIC-Rs admit that Secretary Yellen authorized the FDIC's application of the systemic risk exception on March 12, 2023, two days after SVB was closed by the California Department of Financial Protection and Innovation.  The FDIC-Rs respectfully refer the Court to the referenced press release (which is a document that speaks for itself) for its full and complete terms, and deny the allegations in paragraph 11 of the Complaint to the extent inconsistent therewith.  The referenced press release also includes the following omitted language: "Shareholders and certain unsecured debtholders will not be protected."  The FDIC-Rs deny the remaining allegations in paragraph 11 of the Complaint.

12.    Indeed, the systemic risk exception was invoked on Sunday, March 12, 2023, only after initial steps taken by the FDIC failed to calm the market. In particular, on Friday, March 10, 2023, the FDIC announced its intent to provide uninsured depositors with an advance dividend against their claims for the uninsured amounts of their deposits. (See U.S. Gov't Accountability Off., GAO-23-106736, *Bank Regulation: Preliminary Review of Agency Actions Related to March 2023 Bank Failures 38* (2023) ("GAO Report").)  When deposit flight, contagion and panic continued, the federal government—at its very highest levels—determined that more drastic measures were needed to mitigate systemic harm.[2] This culminated in the invocation of the systemic risk exception to, as the

---

[2] *See, e.g.*, *Recent Bank Failures and the Federal Regulatory Response: Hearing Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 118th Cong. (Mar. 28, 2023) (statement of Martin J. Gruenberg, Chairman, FDIC),

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

aforementioned joint statement announcing it trumpeted, "fully protect[] **all** depositors" of SVB. (*See* Press Release, U.S. Dep't of the Treasury et al., *Joint Statement by Treasury, Federal Reserve, and FDIC* (Mar. 12, 2023) (emphasis added), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.)

**ANSWER:** The FDIC-Rs admit that Secretary Yellen authorized the FDIC's application of the systemic risk exception on March 12, 2023.  The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the remaining allegations in the first sentence of paragraph 12 and they are therefore denied.  The FDIC-Rs respectfully refer the Court to the full text of the GAO Report for its full and complete terms, and deny the allegations in the second sentence of paragraph 12 to the extent inconsistent therewith.  The FDIC-Rs respectfully refer the Court to the referenced press release for its full and complete terms, and deny any allegations in paragraph 12 of the Complaint to the extent inconsistent therewith.  The referenced press release also includes the following omitted language: "Shareholders and certain unsecured debtholders will not be protected." The FDIC-Rs deny SVBFG's characterization of the Government's actions in the third sentence of paragraph 12 of the Complaint.  The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations in the third sentence of paragraph 12 regarding the bases of the Government's actions and therefore such allegations are denied.

13.    As a consequence of the Treasury Secretary's decision to invoke the systemic risk exception in this manner, depositors of SVB were (i) not limited to recover only the normal $250,000 FDIC insurance limits and (ii) not required to wait for FDIC-R1 to resolve the former SVB to be paid the full amount of their deposit funds. All the former SVB depositors had to do to get access to all of

---

https://www.banking.senate.gov/imo/media/doc/ Gruenberg%20Testimony%203-28-23.pdf (describing the events of March 8-12, 2023 and the concerns leading to the systemic risk determination); FDIC, *Options for Deposit Insurance Reform* 12-13 (May 1, 2023), https://www.fdic.gov/analysis/ options-deposit-insurance-reforms/ report/options-deposit-insurance-reform-full.pdf ("The announcement that the uninsured depositors of SVB had not been fully protected reverberated through the financial markets on Friday and into the weekend and precipitated the failure of Signature Bank. . . . Following these developments, the bank regulatory agencies had significant concerns that uninsured depositors would withdraw funds rapidly from other banks. . . . The Treasury, FDIC, and Federal Reserve agreed that systemic risk determinations for both SVB and Signature Bank were in the public interest."); *see also* GAO Report at 30-31 (explaining that the Federal Reserve Board's analysis in support of invoking the systemic risk exception "noted that extending only partial protection to uninsured depositors would have some beneficial effect, but allowing material losses on these uninsured deposits still would result in significant adverse effects in the financial markets").

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  their money was to go to the newly created Bridge Bank on Monday morning, access their account,

2  and make a withdrawal.

3     **ANSWER:** The allegations in paragraph 13 consist of legal conclusions to which no response

4  is required.  To the extent a response is required, the allegations in paragraph 13 are denied.

5     14.    On March 13, 2023, the FDIC in its corporate capacity ("FDIC-C") publicly announced

6  that the FDIC had implemented Treasury Secretary Yellen's directions. It:

7        transferred **all** deposits—insured and uninsured— . . . to a newly created, full-service
8        FDIC-operated 'bridge bank' in an action designed to protect all depositors of Silicon
         Valley Bank.

9        . . . .

10       The transfer of **all** deposits was completed under the systemic risk exception approved
         yesterday. **All** depositors of the institution will be made whole . . . . Any losses to the
11       Deposit Insurance Fund to support uninsured depositors will be recovered by a special
         assessment on banks, as required by law.

12

13  (Press Release, FDIC, *FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa*

14  *Clara, California* (Mar. 13, 2023) (emphasis added), https://www.fdic.gov/news/press-

15  releases/2023/pr23019.html.)

16     **ANSWER:** The FDIC-Rs deny that the Secretary directed (or had the authority to direct) the

17  FDIC to do anything in furtherance of the systemic risk exception.  The FDIC-Rs respectfully refer

18  the Court to the referenced press release (which is a document that speaks for itself) for its full and

19  complete terms, and deny any remaining allegations in paragraph 14 to the extent inconsistent

20  therewith.

21     15.    Thus, as FDIC-C's public statement confirmed, the FDIC transferred all deposits of all

22  depositors of SVB to Bridge Bank. All losses attributable to protecting uninsured depositors of SVB,

23  in turn, were to be recouped from assessments on banks whose payments fund the Deposit Insurance

24  Fund, not from depositors of SVB.

25     **ANSWER:** Admitted that FDIC-R1 facilitated the transfer of most of the insured and

26  uninsured deposit liabilities from SVB to Bridge Bank.  The remaining allegations in paragraph 15 are

27  denied as legal conclusions to which no response is required, and therefore they are denied.  To the

28  extent that the remaining allegations are factual allegations, they are denied.

16.    The transfer of all deposits to Bridge Bank in fact included SVBFG's deposits at SVB. All approximately $2.1 billion on deposit at SVB was transferred to Bridge Bank and made available to SVBFG on March 13, 2023. In other words, as of March 13, 2023, SVBFG had access to $2.1 billion that was no longer in accounts at SVB or in FDIC-R1's receivership but rather in SVBFG's account at Bridge Bank. What FDIC-R1 did do was guarantee those deposits and put all $2.1 billion in a fully usable and functioning *deposit* account at Bridge Bank, a newly chartered institution distinct from SVB and FDIC-R1 that was not in receivership.

**ANSWER:** Admitted that FDIC-R1 transferred most of SVB's deposit liabilities to Bridge Bank under a Transfer Agreement, which were accessible at Bridge Bank on March 13, 2023, subject to limitations and FDIC-R1's rights under the Transfer Agreement.  The FDIC-Rs deny that SVBFG's deposit account liability was no longer an obligation of FDIC-R1's receivership, that FDIC-R1 guaranteed "those deposits," and that "$2.1 billion was put . . . in [an] account" at Bridge Bank.  The remaining allegations in paragraph 16 consist of legal conclusions to which no response is required. To the extent a response is required, the remaining allegations in paragraph 16 are denied.

17.    In most bank failures, the FDIC is not required to provide access to uninsured deposits immediately, and the procedures introduced by FIRREA allow the FDIC-Rs 180 days after the filing of a claim to make a determination on such claim. 12 U.S.C. § 1821(d)(5)(A)(i). Here, however, the transfer of all insured and uninsured SVB deposits to Bridge Bank pursuant to the Treasury Secretary's invocation of the systemic risk exception obviated the need for all former SVB depositors to pursue any administrative claims process under 12 U.S.C. § 1821(d).  Put another way, Secretary Yellen's guarantee of **immediate** "full access" to **all** deposits rendered the regular administrative claims process (if even applicable to depositors in other circumstances) entirely inapplicable to depositors of SVB, including SVBFG. Indeed, this is evidenced by the fact that as of March 13, 2023, SVBFG and its fellow SVB depositors had unfettered access to all of their deposits in accounts at Bridge Bank and were customers of an active and operating national bank. As a result, SVBFG had not filed, and had no need to file, any claim to access its deposits.

**ANSWER:** The allegations in paragraph 17 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 17 are denied.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 14 –

18.    Additional contemporaneous actions by the FDIC-Rs confirm that SVBFG had the rights to fully access its Account Funds without needing to file any administrative claim. FDIC-R1 established a claims process for non-deposit claims only, meaning claims of trade creditors, tort claims, and breach of contract claims. Claim forms for these types of claims were to be emailed to NonDepClaimsDal@fdic.gov, the Dallas office of the FDIC responsible for processing non-deposit claims. Even though it never provided notice to SVBFG, never provided instructions, and never identified a basis for disparate treatment, and even though it had transferred all of SVBFG's insured and uninsured deposits to Bridge Bank on March 13, 2023, FDIC-R1 apparently determined that SVBFG should alone among all former SVB depositors be subject to a purported claims process, the purpose and effect of which was intended to justify depriving SVBFG of access to its Account Funds, including by purportedly removing them from an active and operating national bank.

**ANSWER:** The allegations in the first, second, and fourth sentences of paragraph 18 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the first, second, and fourth sentences of paragraph 18 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  The allegations in the third sentence of paragraph 18 are denied.

19.    By March 16, 2023, three days after Bridge Bank was established, SVBFG had withdrawn approximately $180 million of its deposit funds to pay ordinary-course obligations and to prepare for its bankruptcy filing. On that date, FDIC-R1, acting together with Bridge Bank, suddenly and without warning or explanation, cut off SVBFG's access to its funds at Bridge Bank and purported to return them to FDIC-R1. This was done without notice to, or the knowledge or consent of, SVBFG.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first sentence of paragraph 19 and therefore they are denied. The allegations contained in the second sentence of this paragraph are denied.  The FDIC-Rs deny the remaining allegations of this paragraph.

20.    On March 17, 2023, SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**ANSWER:** Admitted.

21.    Following SVBFG's bankruptcy filing, the FDIC-Rs continued to impede SVBFG's access to its deposit funds and reversed a $6.2 million payment owed to SVBFG for an intercompany receivable, all of which constitute ongoing, continuing violations of the automatic stay imposed pursuant to 11 U.S.C. § 362.

**ANSWER:** The allegations in paragraph 21 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 21 are denied.

22.    At the same time, FDIC-R1 continued to make repeated representations to the Bankruptcy Court that SVBFG's Account Funds would be paid *in full pursuant to the invocation of the systemic risk exception* so long as the deposit claims were valid and FDIC-R1 did not have any setoff claims against the Account Funds (which, as discussed further below, FDIC-R1 has failed to allege—let alone prove—to date). For example:

a.    In a sworn objection to the Bankruptcy Court filed on March 20, 2023: "To the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid *in full* through the Deposit Insurance Fund." (Objection of the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank to Debtor's Motion for Entry of Interim and Final Orders ¶ 16, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. Mar. 20, 2023), ECF No. 33 (emphasis added).)

b.    During oral argument on March 21, 2023: "And as I said earlier, to the extent the debtor's claim — deposit claim is determined to be valid, to the extent not subject to setoff, it *will be paid by what's called the DIF*, the Deposit Investment Fund, which is *backed by the full faith and credit of the United States*. So I don't think there's a 345(b) issue." (Transcript of Hearing on Debtor's Motion for Entry of Interim and Final Orders at 86:21-87:1, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. Apr. 3, 2023), ECF No. 94 (emphasis added); *see also id.* at 57:16-21.)

c.    At the same oral argument, the Bankruptcy Court specifically asked whether "the parent company [was] carved out" from the Government's announcement "that all depositors would be paid in full," to which counsel for FDIC-R1 responded "No." (*Id.* at 56:12-57:2.)

d.    In a May 3, 2023 sworn statement filed in response to a question from the Bankruptcy

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 16 –

Court regarding FDIC-R1's basis for setoff: "To the extent that allowed deposit claims against the SVB receivership estate (including any allowed claim asserted by SVBFG) are not fully satisfied from the SVB receivership assets, ***the FDIC will fully protect and satisfy any remaining amount under 12 U.S.C. § 1823(c)(4)(G)***." (Statement of the Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank, Pursuant to the Court's Direction at the April 26, 2023 Hearing, *In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. May 3, 2023), ECF No. 145 at 5 (emphasis added).) 12 U.S.C. § 1823(c)(4)(G) is the systemic risk exception provision of the FDIA.

**ANSWER:** The FDIC-Rs respectfully refer the Court to FDIC-R1's March 20, 2023 Objection for its full and complete terms. The FDIC-Rs also respectfully refer the Court to the transcript of the March 21, 2023 hearing for its full and complete terms. The FDIC-Rs also respectfully refer the Court to the Statement of FDIC-R1 for its full and complete terms. The FDIC-Rs deny that the objection and statement were "sworn." To the extent SVBFG purports to characterize or describe the contents of the Objection of FDIC-R1, the transcript of the March 21, 2023, hearing, and the Statement of FDIC-R1, the FDIC-Rs respectfully refer the Court to the full text of those documents for their full and complete terms, and deny the remaining allegations in paragraph 22 to the extent inconsistent therewith. The remaining allegations in paragraph 22 also consist of legal conclusions to the extent SVBFG alleges that its "Account Funds" would be paid in full "pursuant to the invocation of the systemic risk exception," to which no response is required. To the extent a response is required, the allegations in paragraph 22 are denied. Moreover, SVBFG had no "Account Funds:" it had only a claim against FDIC-R1 on account of SVBFG's claim for payment of uninsured deposit liabilities, which, in accordance with the deposit agreements, California law, and other applicable law, were and remain subject to setoff rights and other defenses.

23.    On July 9, 2023, SVBFG filed an adversary proceeding in the Bankruptcy Court asserting, among other things, claims against the FDIC-Rs and FDIC-C for violation of the automatic stay by refusing to allow SVBFG to access its Account Funds and for refusing SVBFG's demand that they turn the Account Funds over to SVBFG's estate (the "Adversary Proceeding"). Because the FDIC-Rs asserted that SVBFG was required file a proof of claim in their purported administrative claims processes if it ever wanted access to its Account Funds again, on July 10, 2023, SVBFG filed

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

protective proofs of claim with the FDIC-Rs seeking, among other things, access to its Account Funds that were previously held at SVB and transferred to Bridge Bank (the "Proofs of Claim"). One month later, the FDIC-Rs moved to dismiss SVBFG's Adversary Proceeding, arguing that the Bankruptcy Court lacked jurisdiction to entertain the claims, which could only be asserted in an action like this one, and only after the FDIC-Rs denied the Proofs of Claim. The FDIC-Rs also moved the district court to withdraw the reference to the Bankruptcy Court, which motion the district court granted on December 13, 2023.

**ANSWER:** Admitted that (i) SVBFG filed an adversary proceeding in the Bankruptcy Court against the FDIC-C and the FDIC-Rs on July 9, 2023; (ii) SVBFG filed Proofs of Claim with the FDIC-Rs on July 10, 2023; (iii) the FDIC-Rs moved to dismiss the Adversary Proceeding; and (iv) the FDIC-Rs moved to withdraw the reference to the Bankruptcy Court, which relief was subsequently granted by Judge Cronan. The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the remaining allegations contained in paragraph 23 of the Complaint and therefore they are denied. To the extent SVBFG seeks to characterize and summarize the Adversary Proceeding, motions filed therein, and the Proofs of Claim, the FDIC-Rs respectfully refer the Court to those documents for their full and complete terms, and deny the remaining allegations in paragraph 23 of the Complaint to the extent inconsistent therewith. The remaining allegations in paragraph 23 of the Complaint constitute legal conclusions, to which no response is required. To the extent a response is required, the FDIC-Rs deny that SVBFG is entitled to the relief sought in the Adversary Proceeding, which Adversary Proceeding was dismissed without prejudice on October 28, 2024, and deny the remaining allegations of paragraph 23, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

24. On January 5, 2024—the last business day before the statutorily mandated 180-day deadline for the FDIC-Rs to notify SVBFG of any determination on its Proofs of Claim (*see* 12 U.S.C. § 1821(d)(5)(A)(i))—FDIC-R1 and FDIC-R2 each sent SVBFG a Notice of Disallowance of Claim ("Notice of Disallowance") with a perfunctory statement that SVBFG's deposit claims, among other claims, were denied. According to FDIC-R1, the sole asserted basis for denial is that SVBFG's deposit

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    claim was "not proven to the satisfaction of the receiver due to the receiver's defenses." (*See* Ex. 1.)

2    As for FDIC-R2, apparently ignoring that SVBFG's Account Funds were on deposit at Bridge Bank

3    when SVBFG's access to them was cut off, SVBFG's "deposit claim is denied as not proven to the

4    satisfaction of the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge

5    Bank." (*See* Ex. 2.)  Thus, despite taking six months, all FDIC-R1 and -R2 were able to muster were

6    cryptic one-line denials with no further explanation.

7        **ANSWER:** Admitted that the FDIC-Rs sent Notices of Disallowance to SVBFG on January

8    5, 2024.  The remaining allegations in the first sentence of paragraph 24 consist of legal conclusions

9    to which no response is required.  To the extent a response is required, the remaining allegations in

10   the first sentence of paragraph 24 are denied.  The FDIC-Rs respectfully refer the Court to the Notices

11   of Disallowance (which are documents that speak for themselves) for their full and complete terms,

12   and deny the remaining allegations in the second and third sentences of paragraph 24 to the extent

13   inconsistent therewith.  The FDIC-Rs deny that SVBFG had any "Account Funds" as SVBFG merely

14   had a deposit liability claim against FDIC-R1.  The remaining allegations in paragraph 24 are denied.

15   Further answering, the FDIC-Rs state that under 12 U.S.C. § 1821(d)(5)(E), no court has jurisdiction

16   to review the disallowance of an administrative claim filed with the FDIC-Rs and therefore SVBFG's

17   contentions about the Notices of Disallowance are irrelevant.

18       25.    The FDIC-Rs have never claimed in the Adversary Proceeding, in their Notices of

19   Disallowance, before the Bankruptcy Court, or otherwise, that the Account Funds did not belong to

20   SVBFG or that $1,933,805,708.13 was not the amount of Account Funds remaining in SVBFG's

21   accounts at Bridge Bank (out of the approximately $2.1 billion that was in SVBFG's accounts at SVB

22   when it was placed into receivership on March 10, 2023) at the time that Bridge Bank employees, at

23   the direction of FDIC-R1, cut off SVBFG's access to the accounts on March 16, 2023. FDIC-R1 alone

24   asserts that it has some as-yet-unidentified and -unspecified "defenses" against SVBFG. To the extent

25   its unspecified defenses include a purported right to "setoff" against the Account Funds, FDIC-R1 has

26   never identified or articulated a single ground for exercising any "setoff," or filed any claim (or

27   defense) in any amount against SVBFG in any court or proceeding—including a claim in SVBFG's

28   Chapter 11 proceeding, despite the bar date set by the Bankruptcy Court. The bar date for the FDIC

**in any capacity** to file a claim against SVBFG in its Chapter 11 proceeding passed on September 14, 2023, with no claim having been filed by either of the FDIC-Rs or FDIC-C.

**ANSWER:** The allegations in the first sentence of paragraph 25 of the Complaint are denied. The allegations in the second sentence of paragraph 25 are denied, except that the FDIC-Rs admit that FDIC-R1 did not file a proof of claim in SVBFG's Chapter 11 proceeding. The FDIC-Rs herein assert their defenses, including their right to setoff. The allegations in the third sentence of paragraph 25 are admitted, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

26. The FDIC-Rs are accordingly liable to SVBFG for the Account Funds for the following reasons.

**ANSWER:** Denied. Further answering, the FDIC-Rs deny that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

27. *First*, the FDIC-Rs have no basis to control, block, or restrict payment of SVBFG's uninsured Account Funds, and therefore, their denial of SVBFG's deposit claims was wrongful. As alleged above, unlike normal situations where payments of uninsured deposits may be limited in the event of a bank closure, here the Treasury Secretary invoked the systemic risk exception to the least-cost resolution provision of the FDIA in order to guarantee payment of all of the uninsured deposits of all SVB depositors. Following that determination, funds were made available to satisfy the full deposit liabilities for all SVB depositors, including SVBFG. The FDIC-Rs have an absolute legal obligation to make the Account Funds available to SVBFG on demand, to be funded as necessary by FDIC-C through the Deposit Insurance Fund. The FDIC-Rs' conduct in denying SVBFG access to its Account Funds, purportedly transferring its Account Funds from Bridge Bank to FDIC-R1 without notice or consent, and after the filing of SVBFG's Chapter 11 petition, in continuing to withhold the Account Funds whether located in FDIC-R1 or FDIC-R2, is both a breach of the agreements governing SVBFG's deposits and unlawful.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**ANSWER:** The allegations in the first, fourth, and fifth sentences of paragraph 27 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first, fourth, and fifth sentences of paragraph 27 are denied. The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the second sentence of paragraph 27 of the Complaint and therefore they are denied. The allegations in the third sentence of paragraph 27 are denied. To the extent any further response is required to the allegations in paragraph 27, those allegations are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

28. *Second*, once the Account Funds were transferred to SVBFG's account at Bridge Bank, they were SVBFG's funds. Bridge Bank had no right to simply refuse to make those funds available to SVBFG, or to deny transactions initiated by SVBFG for which sufficient funds existed, or to take funds from SVBFG's accounts without SVBFG's knowledge or consent and send them to FDIC-R1 merely because FDIC-R1 instructed Bridge Bank to do so. Wholly apart from whether the FDIC was required to obey the Treasury Secretary's systemic risk determination to guarantee all SVB deposits, once the FDIC effectuated its commitment to guarantee SVBFG's deposits by making them available in SVBFG's account at Bridge Bank, it had no basis to reverse that commitment and simply take them away from SVBFG or to purportedly transfer them back to FDIC-R1, thereby attempting to make SVBFG a claimant against an FDIC receivership rather than a customer of an active national bank. Doing so was a breach of SVBFG's Deposit Agreements and also unlawful.

**ANSWER:** The allegations in paragraph 28 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 28 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

29. *Third*, even if there had never been an invocation of the systemic risk exception by the Treasury Secretary, the FDIC-Rs still have an undisputable obligation under applicable California law and federal law, respectively, to provide SVBFG with at least its pro rata share of SVB's liquidation

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

value, calculated as of the date of the respective receiverships. FDIC-R1 has conceded as much in the Adversary Proceeding, representing that "even if some creditors receive 100% payment on their claims under a purchase and assumption due to FDIC assistance, *other creditors remain entitled only to the amount they would have received had the bank been liquidated* . . . ." (*SVB Fin. Grp. v. FDIC*, No. 23-01137-MG (Bankr. S.D.N.Y.) ("Adv. Dkt."), ECF No. 28 at 21-22 (emphasis added).) If the FDIC-Rs cannot satisfy this obligation, then FDIC-C must do so. Satisfaction of this obligation may lead to recovery of SVBFG's Account Funds in full, but at the very minimum, would lead to a recovery in excess of approximately $1.71 billion based on an estimate derived solely from the FDIC's own limited public statements.

**ANSWER:** The allegations in the first, third, and fourth sentences in paragraph 29 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first, third, and fourth sentences of paragraph 29 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). To the extent SVBFG purports to characterize or describe the contents of the Memorandum of Law, the FDIC-Rs respectfully refer the Court to the full text of the Memorandum of Law for its full and complete terms, and deny the remaining allegations in the second sentence of paragraph 29 to the extent inconsistent therewith.

30.    *Fourth*, the possibility that FDIC-R1 may in the future assert a claim against SVBFG that FDIC-R1 hypothesizes could give it a right of contractual or common law setoff against SVBFG's assets cannot serve as a basis to withhold any of SVBFG's Account Funds, much less the entirety of those Account Funds, indefinitely. Beside the fact that the FDIC-Rs have waived any claim of setoff due to their failure to assert it before the bar date imposed by the Bankruptcy Court, and passing that FDIC-R2 could not even plausibly have such a right because Bridge Bank's only relationship with SVBFG is related to its deposit account, and that FDIC-R1 did not and does not have any right against funds at Bridge Bank because of lack of mutuality, the FDIC-Rs' withholding of or preventing access to SVBFG's Account Funds on the basis of a purported right of setoff is wrongful, without either a matured debt or a liquidated claim against SVBFG.

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**ANSWER:** The allegations in paragraph 30 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  The FDIC-Rs herein assert their defenses and setoff rights.

31.     *Fifth*, the FDIC-Rs cannot withhold payment of SVBFG's Account Funds under 12 U.S.C. § 1822(d). Section 1822(d) permits the FDIC acting in its corporate capacity to withhold payment of insured deposits—*i.e.*, deposits up to the $250,000 insurance limit—to pay for the liability of a depositor to the depository institution. The FDIC, however, has already paid SVBFG its $250,000 insured deposit.

**ANSWER:** The allegations in the first and second sentences of paragraph 31 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the first and second sentences of this paragraph are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  The allegations in the third sentence of paragraph 31 are admitted.

32.     *Finally*, to the extent FDIC-R1 has any "setoff" claim, FDIC-R1 may not resolve it in its own administrative claims process. FDIC-R1 only has the statutory authority to determine creditor claims **against the receivership**. 12 U.S.C. § 1821(d)(4), (5). If it had a valid claim or basis to seek recovery against SVBFG, given SVBFG's status as a bankruptcy debtor, the FDIC in each of its capacities was required to file a proof of claim just like any other putative estate creditor in SVBFG's Chapter 11 proceeding for the Bankruptcy Court to adjudicate. Although each of FDIC-R1, FDIC-R2, and FDIC-C received notice and was invited to file such a claim by the Bankruptcy Court on multiple occasions, each made the deliberate decision not to file a claim. The deadline for each to do so expired on September 14, 2023. Accordingly, FDIC-R1 (or, for that matter, FDIC-R2 or FDIC-C) cannot now assert any "setoff" or recoupment claims, whether presented as a defense or counterclaim.

**ANSWER:** Admitted that the FDIC-Rs did not file a proof of claim in SVBFG's Chapter 11 proceeding and that the bar date for filing such proof of claim was September 14, 2023.  The remaining

– 23 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

allegations in paragraph 32 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the remaining allegations in paragraph 32 are denied. The FDIC-Rs herein assert their defenses and setoff rights.

33. The confiscation and continued deprivation of SVBFG's access to its Account Funds by the FDIC-Rs without any due process was tantamount to theft. It was contrary not only to the obligations imposed upon the FDIC by the Treasury Secretary's invocation of the systemic risk exception, but also to the FDIC's own repeated public assurances—including specifically to the Bankruptcy Court—that all depositors' funds at Bridge Bank were protected and safe and SVBFG's valid deposit claims would be paid in full in the absence of setoff claims (which have never been asserted). To this day—almost one year, and two sham administrative proceedings later—the FDIC-Rs have not disclosed why or on what basis SVBFG's Account Funds were withheld and taken. SVBFG is entitled to judgment against the FDIC-Rs restoring its access to its $1.93 billion deposit as of March 16, 2023, the date its access was taken away, including interim earnings on those funds, or a monetary judgment in the same amount. Alternatively, SVBFG is entitled to, at the very minimum, a judgment against the FDIC-Rs awarding it its *pro rata* share of SVB's liquidation value attributable to the amount of its approximately $2.1 billion deposit as of the date of the bank's closure minus amounts already received by SVBFG, which SVBFG estimates based on the FDIC's own limited public disclosures to be no less than $1.71 billion.

**ANSWER:** The allegations in the first sentence of paragraph 33 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first sentence of paragraph 33 are denied. The remaining allegations in paragraph 33 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). The FDIC-Rs herein assert their defenses and setoff rights.

## JURISDICTION AND VENUE

34. This action arises under the laws of the United States, including, without limitation, the FDIA, 12 U.S.C. § 1811 *et seq.*, as amended, the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, and the Takings Clause of the Fifth Amendment to the United States Constitution. The Court has

– 24 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

original "arising under" jurisdiction over the asserted federal law claims pursuant to 28 U.S.C. § 1331. To the extent this Court determines that SVBFG was required to file an administrative claim pursuant to 12 U.S.C. § 1821(d), this Court has jurisdiction over any de novo suit regarding the disallowance of an administrative claim against the FDIC in its capacity as a receiver pursuant to 12 U.S.C. § 1821(d)(6)(A). To the extent not covered by 12 U.S.C. § 1821(d)(6)(A), the Court has jurisdiction over SVBFG's state law claims pursuant to 28 U.S.C. § 1334(b) because they arise in and/or are related to SVBFG's Chapter 11 case, and pursuant to 28 U.S.C. § 1367, because the state law claims are part of the same case or controversy as the federal claims.

**ANSWER:** The allegations in paragraph 34 consist of legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs deny that the Court has subject matter jurisdiction over Counts II, III, and VII pursuant to 12 U.S.C. §§ 1821(d)(13)(D) and (j).

35.    SVBFG files this action without prejudice to its position that it was not required to file an administrative claim under the FDIA with either of the FDIC-Rs to recover its Account Funds, and that the claims asserted in this complaint, including claims under the Bankruptcy Code for turnover of its Account Funds and violation of the automatic stay, can and should be adjudicated in the Adversary Proceeding pending in the Southern District of New York.

**ANSWER:** The allegations in paragraph 35 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). By way of further response, SVBFG voluntarily dismissed the Adversary Proceeding.

36.    Defendants FDIC-R1 and FDIC-R2 are subject to suit in this Court. Pursuant to 12 U.S.C. § 1819(a), the FDIC has the power to "[t]o sue and be sued." This Section constitutes a general waiver of sovereign immunity. Defendants are also subject to suit for the claims asserted herein arising under the Bankruptcy Code pursuant to the express waiver of sovereign immunity for such claims in 11 U.S.C. § 106.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**ANSWER:** The allegations in paragraph 36 consist of legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs deny that they have waived sovereign immunity with respect to Count II and that 11 U.S.C. § 106 is applicable.

37.    Venue is proper under 28 U.S.C. § 1391(b) and § 1391(e)(1), as the Account Funds were held at SVB, which resided in this District, and following the closure of SVB, the FDIC created Bridge Bank, which also resided in this District, and transferred all uninsured accounts, including SVBFG's accounts, to Bridge Bank. Venue is also proper under 12 U.S.C. § 1821(d)(6)(A), which provides that, within 60 days of the disallowance of a claim by the FDIC in its capacity as receiver under 12 U.S.C. § 1821(d)(5)(A)(i), a "claimant may . . . file suit on such claim . . . in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located [*i.e.*, the Northern District of California] or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)." On their own accord, the FDIC-Rs have construed SVBFG's demand for payment of the Account Funds as a claim under 12 U.S.C. § 1821(d)(5)(A)(i). On January 5, 2024, each of the FDIC-Rs issued a so-called "determination" to "disallow" SVBFG's deposit claim, among other claims, and this suit has been filed within 60 days thereof. (*See* Exs. 1 and 2.)

**ANSWER:** The allegations in first and second sentences of paragraph 37 consist of legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs admit that venue is proper under 28 U.S.C. §§ 1391(b), (e)(1) and that this Court is an appropriate court under 12 U.S.C. § 1821(d)(6)(A) (a jurisdictional provision), as applicable, but deny the allegation that the "Account Funds" constitute anything different than an uninsured deposit liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). The FDIC-Rs admit that SVBFG's demand for payment is a claim under 12 U.S.C. § 1821(d)(5)(A)(i), but deny the remaining allegations in the third sentence of paragraph 37 because there are no Account Funds. To the extent SVBFG purports to characterize or describe the contents of the Notices of Disallowance, the FDIC-Rs respectfully refer the Court to the full text of the Notices of Disallowance for their full and complete terms, and deny the allegations in the fourth sentence of paragraph 37 to the extent inconsistent therewith.

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**DIVISIONAL ASSIGNMENT**

38.    This action should be assigned to this Court's San Jose Division. Under Rule 3-2 of this Court's Civil Local Rules, "[a] civil action arises in the county where . . . a substantial part of the property that is the subject of the action is situated," and all civil actions that arise in the County of Santa Clara "shall be assigned to the San Jose Division."

**ANSWER:** The allegations in paragraph 38 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 38 are admitted.

39.    Consistent with the Treasury Secretary's systemic risk determination, on March 13, 2023, FDIC-R1 transferred the approximately $2.1 billion in SVBFG's accounts from SVB to Bridge Bank. On March 16, however, the FDIC-Rs unexpectedly and unlawfully cut off SVBFG's access to approximately $1.93 billion of SVBFG's remaining funds at Bridge Bank.  Because Bridge Bank, like SVB, is headquartered in the County of Santa Clara, and SVBFG in this action seeks to restore approximately $1.93 billion of its funds at Bridge Bank, a substantial part of the property that is the subject of the action is situated in the County of Santa Clara. This action therefore arises in the County of Santa Clara and "shall be assigned to the San Jose Division."

**ANSWER:** The FDIC-Rs admit the allegation in the first sentence of paragraph 39 of the Complaint that FDIC-R1 transferred SVBFG's deposit account liabilities to Bridge Bank on March 13, 2023.  The remaining allegations in paragraph 39 are legal conclusions to which no response is required.  To the extent a response is required, such allegations are denied.  By way of further response, the allegations in paragraph 39 regarding SVBFG's "remaining funds" are denied because SVBFG has only a deposit liability claim.

**PARTIES**

40.    SVBFG is a Delaware corporation having its principal place of business at 387 Park Avenue South, New York, New York 10016. Prior to the events that led to the seizure of SVB on March 10, 2023, SVBFG was a bank holding company and the ultimate corporate parent of SVB, which was headquartered in Santa Clara, California.  SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York on March 17, 2023, and is operating its businesses and managing its properties as debtor in

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2        **ANSWER:** The FDIC-Rs admit that SVBFG was the corporate parent of SVB.  The FDIC-Rs

3    further admit that SVBFG filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code in the

4    United States Bankruptcy Court for the Southern District of New York on March 17, 2023.  The FDIC-

5    Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations

6    regarding the address of SVBFG's principal place of business contained in the first sentence of

7    paragraph 40 and therefore they are denied.  The allegations in the third sentence of paragraph 40

8    consist of legal conclusions to the extent they allege SVBFG "is operating its businesses and managing

9    its properties as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code,"

10    to which no response is required.  The remaining allegations in paragraph 40 are denied.

11        41.    The FDIC is an agency of the United States government charged by law with, among

12    other duties, administering the FDIA, 12 U.S.C. § 1811 *et seq.*, and the federal bank deposit insurance

13    system. SVBFG sues the FDIC in this action in its capacities as Receiver for SVB (FDIC-R1) and

14    Receiver for Bridge Bank (FDIC-R2).

15        **ANSWER:** Admitted.

16                                **BACKGROUND**

17    I.    **Closure of SVB and Appointment of the FDIC as Receiver**

18        42.    From 2000 until March 2023, SVBFG owned SVB and a number of other affiliated

19    businesses, including an investment bank and a private wealth management business.  SVBFG

20    deposited substantially all its funds with SVB.

21        **ANSWER:** The FDIC-Rs admit that SVBFG owned SVB from 2000 through March 2023.

22    The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the

23    remaining allegations contained in paragraph 42 of the Complaint and they are therefore denied.

24        43.    The Account Funds were valid deposits of SVBFG.  SVBFG entered into the Deposit

25    Agreements with SVB, pursuant to which SVBFG was entitled to withdraw available funds at any

26    time. At all times, SVB treated the funds in the three different deposit accounts as valid deposits of

27    SVBFG. SVBFG received regular deposit account statements from SVB regarding the three different

28    deposit accounts for years. During that time, SVBFG made regular deposits into and withdrawals from

1   the different deposit accounts, each of which were duly recognized and executed by SVB. Further,

2   FDIC-R1 and FDIC-R2 conceded that the Account Funds are valid deposits of SVBFG by allowing

3   SVBFG to withdraw money from its deposit accounts containing the Account Funds between March

4   13 to 16, 2023, before subsequently improperly preventing further withdrawals. FDIC-C similarly

5   conceded that the Account Funds were valid deposits of SVBFG when, on October 20, 2023, it sent

6   SVBFG a letter responding to SVBFG's demand to its Account Funds by asserting that, because

7   SVBFG was able to withdraw more than $250,000 from its accounts at Bridge Bank between March

8   13 and March 15, 2023, "FDIC-C has satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide

9   SVBFG with access to its insured deposits."

10  **ANSWER:** SVBFG does not define the term "valid" as used throughout paragraph 43 of the

11  Complaint and, therefore, the FDIC-Rs lack sufficient knowledge and information to form a belief

12  regarding the truth of the allegations contained in the first, third, and fourth sentences of paragraph 43

13  of the Complaint and they are therefore denied.  To the extent the allegations in the first, third, and

14  fourth sentences of paragraph 43 consist of legal conclusions, no response is required.  To the extent

15  a response is required, the allegations are denied.  To the extent SVBFG attempts to summarize,

16  characterize, or otherwise describe the contents of the Deposit Agreement, the FDIC-Rs respectfully

17  refer the Court to the full text of the Deposit Agreement for its full and complete terms, and deny the

18  allegations in the second sentence of paragraph 43 to the extent inconsistent therewith.  SVBFG does

19  not define the term "duly recognized and executed by SVB" as used in the fifth sentence of paragraph

20  43 and, therefore, the FDIC-Rs lack sufficient knowledge and information to form a belief regarding

21  the truth of the allegations contained in the fifth sentence of paragraph 43 of the Complaint and they

22  are therefore denied.  The allegations in the sixth sentence of paragraph 43 consist of legal conclusions

23  to which no response is required.  To the extent a response is required, the allegations in the sixth

24  sentence of this paragraph are denied.  The FDIC-Rs further lack sufficient knowledge and information

25  to form a belief regarding the truth of the allegations contained in the seventh sentence of paragraph

26  43 of the Complaint and they are therefore denied.  The FDIC-Rs deny all characterizations in

27  paragraph 43 of "Account Funds"  because there were no funds owned by SVBFG, which merely has

28  a deposit liability *claim*.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

44.     Based on deposit account statements, as of March 10, 2023, SVBFG had approximately $2.1 billion in three different deposit accounts maintained at SVB. SVBFG had full and undisputed title to, and ownership of, these deposits prior to on or about March 10, 2023. The FDIC-Rs have never disputed the accuracy of those deposit account statements and the existence of the SVBFG deposits at SVB as of March 10, 2023, nor would they have any legitimate basis to do so.

**ANSWER:** To the extent SVBFG attempts to summarize, characterize, or otherwise describe the contents of deposit account statements, the FDIC-Rs respectfully refer the Court to the full text of those documents for their full and complete terms, and deny the allegations in the first sentence of paragraph 44 of the Complaint to the extent inconsistent therewith.  The allegations in the second and third sentences of paragraph 44 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the second and third sentences of this paragraph are denied.  The FDIC-Rs deny all characterizations in paragraph 44 of "Account Funds" because there were no funds owned by SVBFG, which merely has a deposit liability *claim*.

45.     The Deposit Agreements permitted SVB to use SVBFG's deposits to setoff debts owed by SVBFG to SVB. However, as of March 10, 2023, SVBFG had no unsatisfied obligations to SVB against which that contractual setoff provision in the Deposit Agreements could be exercised. In particular, SVBFG did not have any overdrafts on its deposit accounts. It had no outstanding letters or credit or open lines of credit. It had no charged off loans with SVB. It had not pledged its deposits as collateral for any loan. It did not have any delinquent loans with SVB. And it was not a guarantor of any loan with SVB.

**ANSWER:** The FDIC-Rs admit the Deposit Agreements provided for contractual setoff defenses, but otherwise, to the extent SVBFG attempts to summarize, characterize, or otherwise describe the contents of the Deposit Agreements, the FDIC-Rs respectfully refer the Court to the full text of the Deposit Agreements for their full and complete terms, and deny the allegations in the first sentence of paragraph 45 to the extent inconsistent therewith.  The allegations in the first and second sentences of paragraph 45 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the first and second sentences of this paragraph are denied.  The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 30 –

allegations contained in the third, fourth, fifth, sixth, seventh, and eighth sentences of paragraph 45 of the Complaint and they are therefore denied.

46.    One of SVBFG's three deposit accounts at SVB was denominated as a Regulation W Account. That account was used to collateralize transactions between SVBFG (or certain of its affiliates) and SVB that qualified as "covered transactions" under Section 23A of the Federal Reserve Act and the Federal Reserve's Regulation W. On information and belief, as of March 10, 2023, there were no such covered transactions outstanding for which any balance credited to the Regulation W deposit account could be used as collateral and against which SVB could enforce its rights if the covered transaction was not settled.

**ANSWER:** The allegations contained in the first sentence of paragraph 46 are admitted.  The allegations in the second sentence of paragraph 46 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the second sentence of paragraph 46 are denied.  The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the third sentence of paragraph 46 of the Complaint and therefore they are denied.

47.    As of March 10, 2023, there was no other agreement between SVBFG and SVB pursuant to which SVB was authorized to cancel deposit liabilities it owed to SVBFG or convert them into equity.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in paragraph 47 of the Complaint and therefore they are denied.

48.    On March 10, 2023 (the "Closure Date"), the DFPI issued an order taking possession of SVB. On the same day, DFPI appointed FDIC-R1 to serve as receiver for SVB.

**ANSWER:** To the extent the allegations in the first sentence of paragraph 48 seek to characterize or summarize the "order," the FDIC-Rs respectfully refer the Court to the "order" for its full and complete terms, and deny the allegations in the first sentence of paragraph 48 to the extent inconsistent therewith.  The FDIC-Rs admit that SVB was closed and the DFPI appointed the FDIC to serve as receiver for SVB.

49.    Typically, when a bank fails, the FDIC pays insurance to depositors up to the insurance

– 31 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

limit of $250,000 within a few days after the bank failure, by either making the funds available through an account at another insured bank or by issuing a check to the depositor. The FDIC acting as receiver for the failed bank then resolves the assets of the failed bank through one or more resolution strategies. The FDIC acting as receiver is also charged with resolving claims against the failed bank, including those for uninsured deposits and paying out claims in accordance with the priority waterfall under the FDIA, pursuant to which deposit liabilities are paid before all other claims other than administrative expenses of the receiver. *See* 12 U.S.C. § 1821(d)(11)(A). Depositors with uninsured funds may or may not recover those funds in full over time as assets of the failed bank are sold.

**ANSWER:** The allegations contained in the first and second sentences of paragraph 49 are denied because SVBFG fails to define (or limit) the term "bank," which appears to generally include both insured and uninsured depository institutions. The allegations in the third sentence of paragraph 49 constitute legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs respectfully refer the Court to the full text of 12 U.S.C. § 1821(d)(11)(A) for its full and complete terms, and deny the remaining allegations in the third sentence of paragraph 49 to the extent inconsistent therewith. The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the fourth sentence of paragraph 49 and therefore they are denied.

50. Because the FDIC may resolve the failed bank's assets in a number of ways that may impact creditors' recoveries under the waterfall of 12 U.S.C. § 1821(d)(11), the FDIC is obligated under federal and state law as applicable to distribute to creditors amounts up to each creditor's *pro rata* portion of the value of the bank as of the date it was placed into receivership. If the FDIC as receiver cannot make such distributions for any reason, the FDIC in its corporate capacity is required to pay depositors up to their *pro rata* liquidation amount out of the Deposit Insurance Fund. Payments on claims for uninsured deposits, or other obligations of the failed institution, may be distributed by the FDIC as dividends paid prior to the liquidation of all of the failed bank's assets. According to the FDIC's resolution handbook, "[c]ustomers with uninsured deposits are sometimes issued advance dividends based on the estimated recovery value of the failed institution's assets."

– 32 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**ANSWER:** The allegations in the first, second, and third sentences of paragraph 50 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first, second, and third sentences of paragraph 50 are denied. To the extent SVBFG attempts to characterize or summarize or otherwise describe the contents of the FDIC's resolution handbook, the FDIC-Rs respectfully refer the Court to the full text of the resolution handbook for its full and complete terms, and deny the allegations in the fourth sentence of paragraph 50 to the extent inconsistent therewith.

51.     On March 10, 2023, the day that SVB was closed, the FDIC created the Deposit Insurance National Bank of Santa Clara ("DINB") and transferred all insured deposits of SVB to the DINB. The FDIC announced that:

> All insured depositors will have full access to their insured deposits no later than Monday morning, March 13, 2023. The FDIC will pay uninsured depositors an advance dividend within the next week. Uninsured depositors will receive a receivership certificate for the remaining amount of their uninsured funds. As the FDIC sells the assets of Silicon Valley Bank, future dividend payments may be made to uninsured depositors.

(Ex. 3 (Press Release, FDIC, *FDIC Creates a Deposit Insurance National Bank of Santa Clara to Protect Insured Depositors of Silicon Valley Bank*).) As noted earlier, the above announcement was made **before** the Secretary invoked the systemic risk exception.

**ANSWER:** The allegations in the first and third sentences of paragraph 51 of the Complaint are admitted. To the extent SVBFG attempts to characterize or summarize or otherwise describe the contents of the cited press release, the FDIC-Rs respectfully refer the Court to the full text of the press release for its full and complete terms, and deny the allegations in the second sentence of paragraph 51 to the extent inconsistent therewith.

52.     Consistent with this announcement, on March 10, 2023, the Board of Directors of the FDIC issued a Resolution authorizing the Director of Complex Institution Supervision & Resolution (or her designee) to credit depositors' accounts at the DINB with an estimated insurance deposit paid by the Deposit Insurance Fund, and to approve the payment by FDIC-R1 of an advance dividend of **[REDACTED]** of the amount of each depositor's uninsured deposit(s). There was no exception to this approach noted for SVBFG, meaning that, based on the FDIC's then-current plan, SVBFG would have

– 33 –

received **[REDACTED]** of its $2.1 billion in Account Funds.

**ANSWER:** To the extent SVBFG attempts to summarize, characterize, or otherwise describe the contents of the March 10, 2023 Resolution, the FDIC-Rs respectfully refer the Court to the full text of the March 10, 2023 Resolution for its full and complete terms, and deny the allegations in paragraph 52 of the Complaint to the extent inconsistent therewith.  The allegations in the second sentence of paragraph 52 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the second sentence of paragraph 52 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

## II.    The Systemic Risk Exception

53.    Under the FDIA, the FDIC is required to resolve failed banks by using the method that would be least costly to the Deposit Insurance Fund. 12 U.S.C. § 1823(c)(4).

**ANSWER:** The allegations in paragraph 53 consist of legal conclusions to which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer the Court to the full text of 12 U.S.C.§ 1823(c)(4) for its full and complete terms and deny allegations in paragraph 53 to the extent inconsistent therewith.

54.    Congress allowed one exception to this least-cost resolution requirement: where the Treasury Secretary, acting upon the written recommendation of not less than two-thirds of the members of the Board of Directors of the FDIC and the Board of Governors of the Federal Reserve System, and after consulting with the President, determines that utilizing the least-cost resolution method "would have serious adverse effects on economic conditions or financial stability," and action or assistance under 12 U.S.C. § 1823(c)(4)(G) "would avoid or mitigate such adverse effect[]," the Treasury Secretary is authorized to invoke the "systemic risk exception" to the least-cost resolution requirement. 12 U.S.C. § 1823(c)(4)(G).

**ANSWER:** The allegations in paragraph 54 consist of legal conclusions to which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer the Court to the full text of 12 U.S.C. § 1823(c)(4)(G) for its full and complete terms, and deny the allegations in paragraph 54 to the extent inconsistent therewith.

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

55.     Section 1823(c)(4)(G) does not define the specific form in which a decision to invoke the systemic risk exception must occur. Rather, the scope of the exception is specifically defined by the Treasury Secretary's determination, invocation, and any instructions on implementation, which follows recommendations from the Boards of the Federal Reserve and the FDIC, and consultation with the President of the United States. To invoke the systemic risk exception, the Treasury Secretary must determine that using the least-cost resolution method would "have serious adverse effects on economic conditions or financial stability," and that the specific action or assistance being adopted "would avoid or mitigate such adverse effects." U.S.C. §§ 1823(4)(G)(i)(I), (II). This is because the systemic risk exception is intended to be used only in extraordinary circumstances when the nation's most senior regulatory officials, rather than the ordinary administrators at the FDIC, determine that such invocation is essential to government policy and process given the severity of the situation. As the sponsor of the FDICIA explained:

> [The] bill makes the situation in the United States more nearly parallel to that in other countries. It leaves the Federal Reserve Board with its current authority to take appropriate action to prevent a collapse of the financial system. But it takes such discretion away from the FDIC. The bill would refocus the FDIC on the narrower task of administering and protecting the deposit insurance fund.

(137 Cong. Rec. 4936 (1991) (statement of Sen. Donald Riegle, Jr.).)

**ANSWER:** The allegations in the first, second, third, and fourth sentences of paragraph 55 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the first, second, third, and fourth sentences of paragraph 55 are denied.  Further, to the extent a response is required to the allegations in the first and third sentences of paragraph 55, the FDIC-Rs respectfully refer the Court to the full text of 12 U.S.C.§ 1823(4)(G)(i)(I),(II) for its full and complete terms and deny allegations in paragraph 55 to the extent inconsistent therewith.  To the extent the allegations in the fifth sentence of paragraph 55 characterize or summarize the Congressional Record, the FDIC-Rs respectfully refer the Court to the full text of the Congressional Record for its full and complete terms, and deny the allegations in the fifth sentence of paragraph 55 to the extent inconsistent therewith.

56.     Since 1991, and prior to March 2023, the FDIC and Federal Reserve have recommended five potential emergency actions that would have required a systemic risk determination

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

and invocation of the systemic risk exception to permit such actions to be taken. The Treasury Secretary invoked the systemic risk exception with respect to three of those five recommended actions, each time, in specifically proscribed ways:

a. In the first instance, in September 2008, the exception was invoked to partially guarantee $312 billion of Wachovia Corporation's ("Wachovia") assets in connection with a potential acquisition of Wachovia by Citigroup, Inc. ("Citigroup"). When Wachovia was purchased by a different banking organization, Wells Fargo & Company, the FDIC assistance that was contemplated pursuant to the systemic risk exception was no longer applicable, and the FDIC was limited to its express statutory authority.

b. In the second instance, in October 2008, the exception was invoked to authorize the establishment of the Temporary Liquidity Guarantee Program, a market-wide program to guarantee certain debt issued by banks and to guarantee in full non-interest-bearing deposit accounts held at participating banks and thrifts.

c. In the third instance, in November 2008, the exception was invoked to provide a partial asset guarantee for $306 billion of Citigroup's assets.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations in paragraph 56 of the Complaint, and therefore they are denied.

III. **The Treasury Secretary Invokes the Systemic Risk Exception to Guarantee All Uninsured Deposits at SVB.**

57. The FDIC's March 10, 2023 announcement that it would pay uninsured SVB depositors an advance dividend did not calm the market as intended. As FDIC-C later explained, "[t]he announcement that the uninsured depositors of Silicon Valley Bank had not been fully protected reverberated through the financial markets on Friday and into the weekend and precipitated the failure of Signature Bank [a second bank unaffiliated with Silicon Valley Bank]. Following these developments, the bank regulatory agencies had significant concerns that uninsured depositors would withdraw funds rapidly from other banks." (FDIC, Options for Deposit Insurance Reform 6-7 (2023), https://www.fdic.gov/analysis/options-deposit-insurance-   reforms/report/options-deposit-insurance-reform-section-2.pdf.)

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first sentence of paragraph 57 of the Complaint and therefore they are denied. To the extent SVBFG seeks to characterize or summarize the announcement, the FDIC-Rs respectfully refer the Court to the full text of the announcement for its full and complete terms, and deny the remaining allegations in paragraph 57 to the extent inconsistent therewith.

58.     Over the weekend of March 11, 2023, the Department of the Treasury, the FDIC, and the Federal Reserve assessed the impact of the closures of SVB and Signature Bank on the American banking system and financial markets. Although the FDIC has since stated that it could have paid out as much as 90 percent of the uninsured deposits through an advance dividend, the FDIC and the Federal Reserve "found that a least-cost resolution of SVB and Signature Bank would intensify deposit runs and liquidity pressures on other U.S. banks," and that "the failure of the two banks would lead to even greater dislocations in deposit markets." (Ex. 4 (GAO Report) at 29.) The Federal Reserve and the FDIC both independently concluded that "preserving unimpaired access to all uninsured deposits for SVB and Signature Bank would help mitigate adverse impacts to financial stability and the economy." (Id. at 30.)

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first sentence of paragraph 58 of the Complaint and therefore they are denied. To the extent SVBFG purports to characterize or describe the contents of the GAO Report and any statement by the FDIC, the FDIC-Rs respectfully refer the Court to the full text of those documents for their full and complete terms, and deny the allegations in the second and third sentences of paragraph 58 to the extent inconsistent therewith.

59.     Accordingly, on March 12, 2023, the FDIC and the Federal Reserve each unanimously recommended to the Treasury Secretary that she invoke the systemic risk exception to the least-cost resolution provision of the FDIA to protect the national banking system. The Treasury Secretary concurred that "the losses uninsured depositors would likely have faced under application of the least cost resolution requirements to SVB and Signature had the potential to undermine confidence in U.S. insured depository institutions, which could have consequences for the broader economy," and thus

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 37 –

after consultation with the President, she adopted the recommendation and invoked the systemic risk exception under 12 U.S.C. § 1823(c)(4)(G) to guarantee that all deposits at SVB—insured and uninsured—would be paid in full, and that depositors would have immediate and uninterrupted access to all of their funds.

**ANSWER:** The FDIC-Rs admit that the FDIC Board of Directors and the Board of Governors of the Federal Reserve System recommended to the Treasury Secretary that she authorize the systemic risk exception. The FDIC-Rs lack sufficient knowledge and information to confirm the accuracy of, and to form a belief regarding, the quote contained in the second sentence of paragraph 59 of the Complaint or to what other statement was allegedly made in "concurre[nce]". Therefore, the allegations in the second sentence of paragraph 59 are denied. The remaining allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

60. In a joint press release issued on March 12, 2023, the Secretary, Federal Reserve Board Chair Powell, and FDIC Chairman Gruenberg unambiguously assured the American public, in no uncertain terms, and in order to quell the rising panic that had not abated with the FDIC's initial announcement of an advance dividend, that the invocation of the systemic risk exception for SVB would "fully protect[] all depositors" who "[would] have access to all of their money starting Monday, March 13." (See Joint Press Release, U.S. Dep't of the Treasury et al., Joint Statement by Treasury, Federal Reserve, and FDIC (Mar. 12, 2023), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm (emphasis added).)

**ANSWER:** To the extent SVBFG purports to characterize or describe the contents of the cited press release, the FDIC-Rs respectfully refer the Court to the full text of the press release for its full and complete terms, and deny the allegations in paragraph 60 to the extent inconsistent therewith. The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the remaining allegations in this paragraph and therefore they are denied.

61. The Treasury Secretary could have chosen to have the FDIC provide less-than-full protection of all depositors but, on the recommendation of the FDIC and Federal Reserve, did not do so. As the FDIC's own Chairman, Martin Gruenberg, later explained:

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1

> And it's true with an advanced dividend, depositors could get back 90 percent or maybe more of their deposits. I think the judgment was, at the time, that anything less than 100 percent really had the potential to perpetuate and exacerbate the contagion effect. And we had pretty clear evidence of that.

(FDIC Chairman Martin Gruenberg, Comments at the Systemic Resolution Advisory Committee Meeting (Dec. 5, 2023).)

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first sentence of paragraph 61 and therefore they are denied. Further, the allegations contained in the first sentence of paragraph 61 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first sentence of this paragraph are denied. To the extent SVBFG attempts to summarize, characterize, or otherwise describe the contents of the December 5, 2023 FDIC Systemic Resolution Advisory Committee Meeting transcript, the FDIC-Rs respectfully refer the Court to the full text of the transcript for its full and complete terms, and deny the allegations in the second sentence of paragraph 61 to the extent inconsistent therewith.

62.     In fact, the GAO Report—a report the Comptroller General is required to prepare pursuant to 12 U.S.C. § 1823(c)(4)(G)(iv) and issued in April 2023—noted that the Federal Reserve staff specifically analyzed extending only partial protection of uninsured depositors. The Federal Reserve staff concluded that extending anything less than 100 percent deposit protection would be insufficient to calm the turmoil at the time, as "extending only partial protection to uninsured depositors would have some beneficial effect, but allowing material losses on these uninsured deposits still would result in significant adverse effects in the financial markets." (Ex. 4 at 30-31.)

**ANSWER:** To the extent the allegations in the first and second sentences of paragraph 62 of the Complaint characterize, summarize, or otherwise describe the contents of the GAO Report, the FDIC-Rs respectfully refer the Court to the full text of the GAO Report for its full and complete terms, and deny the allegations in the first and second sentences of paragraph 62 of the Complaint to the extent inconsistent therewith. The allegations in the first sentence of paragraph 62 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first sentence of this paragraph are denied.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 39 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

63. The invocation of the systemic risk exception to use the Deposit Insurance Fund to pay all deposits of all SVB depositors was a unilateral decision by the United States government that did not require any mutual undertaking by any of the former SVB depositors (including SVBFG).

**ANSWER:** The allegations in paragraph 63 are denied as legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 63 are denied.

64. As a result of the invocation of the systemic risk exception, SVBFG, like all other SVB depositors, was entitled to continued access to all of its deposits through FDIC-R1, Bridge Bank, and later FDIC-R2, to be funded by FDIC-C through the Deposit Insurance Fund to the extent necessary.

**ANSWER:** The allegations in paragraph 64 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 64 are denied.

## IV. The Systemic Risk Exception Invoked on March 12, 2023, Is Consistently and Correctly Described by the Treasury Secretary, the FDIC, and Other Banking Regulators as Applicable to All SVB Depositors and All Deposits.

65. Over the ensuing days and months, Secretary Yellen, the FDIC, Chairman Gruenberg, and numerous other senior government officials involved in the invocation and effectuation of the systemic risk exception made at least thirteen separate public statements— including press releases to the American public, testimony to Congress, and other official statements, including to the Bankruptcy Court—confirming that the systemic risk exception covered all uninsured deposits of all SVB depositors.

**ANSWER:** To the extent the allegations in paragraph 65 of the Complaint seek to characterize, summarize or otherwise describe the contents of press releases, testimony to Congress, and official statements, the FDI—Rs respectfully refer the Court to the full text of those documents for their full and complete terms, and deny the allegations in paragraph 65 of the Complaint to the extent inconsistent therewith. The FDIC-Rs also lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in paragraph 65 to the extent they purport to describe the actions of individuals and entities other than the FDIC-Rs and therefore they are denied.

66. On March 13, 2023, the Monday morning after the Treasury Secretary acted to ensure payment of all deposits, the FDIC issued a press release titled "FDIC Acts to Protect All Depositors

of the Former Silicon Valley Bank, Santa Clara, California." The release describes the transfer of all insured and uninsured deposits to the newly formed Bridge Bank and states that "[t]he transfer of all the deposits was completed under the systemic risk exception approved yesterday. All depositors of the institution will be made whole." (Ex. 5 (Press Release, FDIC, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank).)

**ANSWER:** The FDIC-Rs admit that the FDIC issued a press release on March 13, 2023. To the extent the remaining allegations in paragraph 66 characterize or describe the contents of the press release, the FDIC-Rs respectfully refer the Court to the full text of the press release for its full and complete terms, and deny the remaining allegations in paragraph 66 to the extent inconsistent therewith.

67.     The March 13, 2023 transfer of all insured and uninsured deposits to Bridge Bank properly included all of SVBFG's deposits, then totaling approximately $2.1 billion.

**ANSWER:**  Admitted that most of the SVB deposit account liabilities were transferred to Bridge Bank under and in accordance with the Transfer Agreement and included the deposit liabilities allegedly owed to SVBFG.

68.     On March 16, 2023, in a statement before the Senate Committee on Finance, Treasury Secretary Yellen stated that "we worked with the Federal Reserve and FDIC to protect all depositors of the two failed banks. On Monday morning, customers were able to access all of the money in their deposit accounts so they could make payroll and pay the bills." No reference was made to any exclusion of SVBFG or any other depositor, and consistent with the Treasury Secretary's statement, on Monday, March 13, 2023, SVBFG was among the depositors able to access all of the money in its deposit accounts at Bridge Bank.

**ANSWER:** The FDIC-Rs respectfully refer the Court to the Treasury Secretary's statement before the Senate Committee on Finance for a full and complete statement of its terms. The FDIC-Rs admit that on March 13, 2023, deposits were made accessible, subject to limitations, at Bridge Bank. By way of further response, a deposit is a chose in action, not "money" in a drawer. The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the remaining allegations contained in the second sentence of paragraph 68 and therefore they are denied.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

69.    On March 20, 2023, in a sworn objection to the Bankruptcy Court in relation to SVBFG's motion for entry of an order authorizing SVBFG to continue to use its cash management system (the "Cash Management Motion"), counsel for FDIC-R1 stated: "[t]o the extent that the FDIC agrees that any amount is due to the Debtor (and unavailable for setoff), such amount will be paid in full through the Deposit Insurance Fund."  (Objection of the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank to Debtor's Motion for Entry of Interim and Final Orders ¶ 16, In re SVB Fin. Grp., No. 23-10367-MG (Bankr. S.D.N.Y. Mar. 20, 2023) ("Ch. 11 Case"), ECF No. 33 (emphasis added).) As legal support for its assurances that SVBFG's deposits would be paid in full if valid (which, as alleged supra, they are) and subject only to an FDIC-R1 setoff claim (which, as described further infra, FDIC-R1 has never provided any allegation to support), FDIC-R1 cited its own March 13, 2023 press release. (See id. (citing Press Release, FDIC, FDIC Acts to Protect All Depositors of the Former Silicon Valley Bank, Santa Clara, California (Mar. 13, 2023), https://www.fdic.gov/news/press-releases/2023/pr23019.html).)

**ANSWER:** To the extent the allegations in the first and second sentences of paragraph 69 seek to characterize or describe the objection, the FDIC-Rs respectfully refer the Court to the full text of the objection for its full and complete terms, and deny the allegations in the first and second sentences of paragraph 69 to the extent inconsistent therewith.  The FDIC-Rs deny that the objection was "sworn."  The allegations in the second sentence of paragraph 69 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, the allegations in the second sentence of this paragraph are denied.

70.    On March 21, 2023, counsel for FDIC-R1 repeated this in a hearing before the Bankruptcy Court on the aforementioned objection, expressly confirming that SVBFG's deposits were included in the Treasury Secretary's guarantee, (Ch. 11 Case Mar. 21, 2023 Hr'g Tr. at 56:12-57:2), and adding that "there was not a specific carve out in the [March 13, 2023] press release for [SVBFG]'s deposits[T]o the extent [SVBFG]'s claim is allowed and is not subject to set off or has been reduced by amounts that may be entitled to set off, that claim would be paid by the deposit insurance fund. And that deposit insurance fund is backed by the full faith and credit of the United States." (Id. at 56:24-57:21.) When the U.S. Trustee, a federal bankruptcy watchdog, stated the U.S. Trustee would

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

only be comfortable with the Bankruptcy Court granting the Cash Management Motion if "any claims relating to the deposits . . . are guaranteed by the FDIC through the full faith and credit of the United States" (id. at 85:14-17), counsel for FDIC-R1 assured the Bankruptcy Court that "to the extent [SVBFG's] deposit claim is determined to be valid, to the extent not subject to setoff, it will be paid by what's called the DIF, the Deposit [Insurance] Fund, which is backed by the full faith and credit of the United States" (id. at 86:21-25). The U.S. Trustee subsequently dropped the objection to the Cash Management Motion, which the Bankruptcy Court thereafter granted.

**ANSWER:** To the extent the allegations in the first and third sentences of paragraph 70 of the Complaint characterize or summarize counsel's statements, the FDIC-Rs respectfully refer the Court to the full text of the transcript for its full and complete terms, and deny the allegations in the first and third sentences of paragraph 70 of the Complaint to the extent inconsistent therewith. The allegations in the first and second sentences of paragraph 70 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the first and second sentences of this paragraph are denied.

71.    On March 22, 2023, in testimony before the Senate Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[w]e took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks."

**ANSWER:** The FDIC-Rs respectfully refer the Court to the March 22, 2023 Senate testimony for a full and complete statement of its terms, and deny the allegations in paragraph 71 of the Complaint to the extent inconsistent therewith.

72.    On March 23, 2023, in a statement before the House Subcommittee on Financial Services and General Government Appropriations, Secretary Yellen stated, "[t]wo weeks ago, we learned of problems at two banks that could have had significant impacts on the broader banking system and the American economy. In the days that followed, Treasury worked with the Federal Reserve and the FDIC to take decisive and forceful actions to strengthen public confidence in the U.S. banking system. We took actions to protect all depositors at the two failed institutions and provide additional liquidity for banks. This was designed to mitigate risks to the banking system."

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**ANSWER:** The FDIC-Rs respectfully refer the Court to Secretary Yellen's March 23, 2023 testimony before the House Subcommittee on Financial Services and General Government Appropriations for its full and complete terms, and deny the allegations in paragraph 72 of the Complaint to the extent inconsistent therewith.

73.    On March 28, 2023, in testimony to the Senate Committee on Banking, Housing, and Urban Affairs, FDIC Chairman Gruenberg stated, "[a]fter careful analysis and deliberation, the Boards of the FDIC and the Federal Reserve voted unanimously to recommend, and the Treasury Secretary, in consultation with the President, determined that the FDIC could use emergency systemic risk authorities under the [FDIA] to fully protect all depositors in winding down SVB and Signature Bank." (Emphasis added.)

**ANSWER:** The FDIC-Rs respectfully refer the Court to Martin Gruenberg's March 28, 2023 testimony before the Senate Committee on Banking, Housing, and Urban Affairs for its full and complete terms, and deny the allegations in paragraph 73 of the Complaint to the extent inconsistent therewith.

74.    On the same day, in a statement before the Senate Committee on Banking, Housing, and Urban Affairs, Federal Reserve Vice Chair for Supervision Michael S. Barr stated that "[t]he Federal Reserve, working with the Treasury Department and the Federal Deposit Insurance Corporation (FDIC), took decisive actions . . . [that] demonstrate that we are committed to ensuring that all deposits are safe."

**ANSWER:** The FDIC-Rs respectfully refer the Court to Michael Barr's March 28, 2023 statement before the Senate Committee on Banking, Housing, and Urban Affairs for its full and complete terms, and deny the allegations in paragraph 74 of the Complaint to the extent inconsistent therewith.

75.    On March 29, 2023, in a statement before the House Committee on Financial Services, FDIC Chairman Gruenberg stated, "[m]y testimony today will describe the events leading up to the failure of SVB and Signature Bank and the facts and circumstances that prompted the decision to utilize the authority in the [FDIA] to protect all depositors in those banks following these failures."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**ANSWER:** The FDIC-Rs respectfully refer the Court to Martin Gruenberg's March 28, 2023 statement before the Senate Committee on Banking, Housing, and Urban Affairs for its full and complete terms, and deny the allegations in paragraph 75 of the Complaint to the extent inconsistent therewith.

76.     The statutorily required GAO Report issued in April 2023, which was based on documents and interviews with FDIC, Federal Reserve and Treasury staff, repeatedly reiterated, no fewer than eight times, that the systemic risk invocation guaranteed all uninsured deposits of all depositors of SVB.[3]

**ANSWER:** The FDIC-Rs respectfully refer the Court to the GAO Report for its full and complete terms, and deny the allegations in paragraph 76 of the Complaint to the extent inconsistent therewith.

77.     On May 3, 2023, in a sworn statement submitted to the Bankruptcy Court in response to a question regarding FDIC-R1's purported bases for an assertion of setoff against the SVBFG Account Funds, counsel for FDIC-R1 again confirmed that "[t]o the extent that allowed deposit claims against the SVB receivership estate (including any allowed claim asserted by SVBFG) are not fully satisfied from the SVB receivership assets, the FDIC will fully protect and satisfy any remaining amount under 12 U.S.C. § 1823(c)(4)(G)." (Statement of the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank Pursuant to the Court's Direction at the April 26, 2023 Hearing (May 3, 2023), Ch. 11 Case, ECF No. 145 at 5 (emphasis added).)

---

[3] *See, e.g.*, Ex. 4 at 28 ("Treasury, FDIC, and the Federal Reserve announced the decisions to guarantee all deposits of [SVB]."); *id*. at 29 ("By the evening of March 12th, the three agencies jointly announced the systemic risk determinations authorizing FDIC to guarantee all deposits (including uninsured deposits) of SVB[.]"); *id*. at 30 ("Decision to Insure All Uninsured Deposits at the Two Banks Sought to Avert Financial Contagion and Negative Impact on the Broader Economy"; "The Federal Reserve and FDIC assessed that preserving unimpaired access to all uninsured deposits for SVB and Signature Bank would help mitigate adverse impacts to financial stability and the economy. Treasury concurred with FDIC's and the Federal Reserve's analysis."; "In particular, if all uninsured depositors were largely or fully protected, the adverse effects would be substantially mitigated."); *id*. at 38 ("Secretary Yellen approved actions enabling FDIC to complete its resolution of SVB and Signature Bank in a manner that fully protected all depositors."; "FDIC transferred all deposits and substantially all assets of the former SVB to a newly created, full-service FDIC-operated "bridge bank" in an action designed to protect all depositors of SVB."); *id*. at 39 ("Financial Stability Oversight Council held a meeting in which Treasury, FDIC, and Federal Reserve described their actions in invoking systemic risk exception to insure all depositors of SVB and Signature Bank.").

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   **ANSWER:** The FDIC-Rs respectfully refer the Court to the Statement of the Federal Deposit

2   Insurance Corporation as Receiver for Silicon Valley Bank Pursuant to the Court's Direction at the

3   April 26, 2023 Hearing for its full and complete terms, and deny the allegations in paragraph 77 of the

4   Complaint to the extent inconsistent therewith.  The FDIC-Rs deny that the statement was "sworn."

5   The FDIC-Rs further deny the allegation in paragraph 77 of the Complaint that the "Account Funds"

6   constitute anything different than an uninsured deposit liability claim, subject to FDIC-R1's defensive

7   setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

8       78.     On May 11, 2023, Acting Comptroller of the Currency and FDIC Director Michael J.

9   Hsu stated at an FDIC board meeting, "[i]n March, the U.S. government invoked the systemic risk

10  exception to the least cost resolution requirement for failing banks. The purpose was to protect all

11  depositors, including uninsured depositors, following the failures of Silicon Valley Bank (SVB) and

12  Signature Bank." (Emphasis added.)

13      **ANSWER:** The FDIC-Rs respectfully refer the Court to the Statement by Michael J. Hsu at

14  the May 11, 2023 FDIC board meeting for its full and complete terms, and deny the allegations in

15  paragraph 78 of the Complaint to the extent inconsistent therewith.

16      79.     On May 16, 2023, in a statement before the House Committee on Financial Services,

17  FDIC Chairman Gruenberg stated that "[f]ollowing the decision to fully protect all depositors in the

18  resolution of both SVB and Signature Bank, there has been a moderation of deposit outflows at the

19  publicly traded banks that were experiencing large outflows in the immediate aftermath of those

20  failures."

21      **ANSWER:** The FDIC-Rs respectfully refer the Court to Martin Gruenberg's statement before

22  the Senate Committee on Banking, Housing, and Urban Affairs for its full and complete terms, and

23  deny the allegations in paragraph 79 of the Complaint to the extent inconsistent therewith.

24      80.     On May 18, 2023, FDIC Chairman Gruenberg again referred to "the decision to fully

25  protect all depositors in the resolution of both SVB and Signature Bank" in a statement before the

26  Senate Committee on Banking, Housing, and Urban Affairs.

27

28

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    **ANSWER:** The FDIC-Rs respectfully refer the Court to Martin Gruenberg's statement before

2    the Senate Committee on Banking, Housing, and Urban Affairs for its full and complete terms, and

3    deny the allegations in paragraph 80 of the Complaint to the extent inconsistent therewith.

4        81.    On December 5, 2023, during a meeting of the FDIC's Systemic Resolution Advisory

5    Committee, Ryan Tetrick, FDIC Deputy Director for Resolution Readiness, stated that the systemic

6    risk exception "allowed us to protect all depositors of the failed banks, transfer those to fully

7    operational bridge banks, and provide some . . . assurance to the system broadly."

8        **ANSWER:** The FDIC-Rs respectfully refer the Court to Ryan Tetrick's statement at the

9    December 5, 2023 FDIC Systemic Resolution Advisory Committee Meeting for its full and complete

10   terms, and deny the allegations in paragraph 81 of the Complaint to the extent inconsistent therewith.

11       82.    As noted above, on the same day, at the same event, FDIC Chairman Gruenberg

12   admitted that had the FDIC elected to pay an advance dividend rather than recommending that the

13   Treasury Secretary invoke the systemic risk exception to protect all uninsured deposits, "depositors

14   could get back 90 percent or maybe more of their deposits," but "the judgment was, at the time, that

15   anything less than 100 percent really had the potential to perpetuate and exacerbate the contagion

16   effect."

17       **ANSWER:** The FDIC-Rs respectfully refer the Court to the written record of the statements

18   made at the December 5, 2023 FDIC Systemic Resolution Advisory Committee Meeting for their full

19   and complete terms, and deny the allegations in paragraph 82 of the Complaint to the extent

20   inconsistent therewith.

21       83.    Also during the December 5, 2023 Systemic Risk Resolution Advisory Committee

22   meeting, Tim Mayopoulos—who served as the Chief Executive Officer of Bridge Bank, and oversaw

23   operations of Bridge Bank beginning on March 13, 2023, when all of SVBFG's Account Funds were

24   transferred to Bridge Bank and made available to SVBFG—described the invocation of the systemic

25   risk exception as "the government's decision to protect all the deposits at SVB, regardless of the nature

26   or size of those deposits."

27       **ANSWER:** The FDIC-Rs respectfully refer the Court to the written record of the statement at

28   the December 5, 2023 FDIC Systemic Resolution Advisory Committee Meeting for its full and

– 47 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

complete terms, and deny the allegations in paragraph 83 of the Complaint to the extent inconsistent therewith, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

84.    In marked contrast to all of these public pronouncements, representations to the Bankruptcy Court, and sworn testimony, it was not until the FDIC sought in the Adversary Proceeding to defend its seizure of SVBFG's Account Funds that the FDIC in any of its capacities ever once took the position that "all" deposits could mean "less than all."

**ANSWER:** Denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

**V.    The FDIC-Rs Unlawfully Block SVBFG's Access to Its Account Funds.**

85.    The same day that the Treasury Secretary authorized the invocation of the systemic risk exception, the FDIC filed an application with the Office of the Comptroller of the Currency (the "OCC") to establish Bridge Bank, and the OCC approved the application.

**ANSWER:** Admitted.

86.    Although the FDIC originally contemplated that SVB depositors would receive an immediate advance dividend and a receivership certificate for their uninsured deposits, as a result of the invocation of the systemic risk exception, the FDIC changed course to comply with the Treasury Secretary's action requiring it to honor all uninsured and insured deposits and to do so immediately. Rather than provide an advance dividend or a receivership certificate to SVBFG or to any other depositor with uninsured account funds, FDIC-R1 transferred all deposits formerly held at SVB— insured and uninsured—to Bridge Bank and FDIC-R1 provided, or provided access to, funds from the Deposit Insurance Fund to satisfy all deposit liabilities.[4] As a result, all depositors of SVB, including

---

[4] The transfer of all former SVB deposits to Bridge Bank was carried out without regard to appropriate formalities. FDIC-R1 had already transferred all insured SVB deposits to the DINB, which it had established pursuant to a charter from the OCC when it anticipated carrying out a least cost resolution. The DINB was not insolvent, and its OCC charter still existed. But the DINB did not transfer any deposits to Bridge Bank. Rather, upon invocation of the systemic risk exception by the Treasury Secretary, FDIC-R1 transferred all uninsured and insured deposits to Bridge Bank, but FDIC-

– 48 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  SVBFG, automatically became customers and depositors of Bridge Bank. At that time, Bridge Bank

2  was not in receivership, and the FDIC-Rs had not placed any holds on SVBFG's accounts.

3  **ANSWER:** Admitted that FDIC-R1 transferred most of SVB's deposit liabilities to Bridge

4  Bank on March 13, 2023, at which time Bridge Bank was not in receivership. The remaining

5  allegations in paragraph 86 are denied.

6  87. On March 13, 2023, the FDIC published its own independent press release (see supra

7  ¶¶ 14 and 66) stating that its transfer of "all deposits—both insured and uninsured—and substantially

8  all assets of" SVB to Bridge Bank was "an action designed to protect all depositors of [SVB]," and

9  "[d]epositors will have full access to their money beginning this morning, when Silicon Valley Bridge

10  Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities." (Ex. 5.)

11  **ANSWER:** The FDIC-Rs respectfully refer the Court to the press release for its full and

12  complete terms, and deny the allegations in paragraph 87 of the Complaint to the extent inconsistent

13  therewith. The referenced press release also includes the following omitted language: "Shareholders

14  and certain unsecured debt holders will not be protected."

15  88. When Bridge Bank opened that morning, it announced that all former SVB depositors

16  had "full access to their money," and that all existing and new deposits were protected by the FDIC.

17  The FDIC reiterated this point in its website FAQs:

18      IS MY MONEY SAFE? Yes! No one lost any money on deposit as a result of the
        closure of this bank. All deposits, regardless of dollar amount, were transferred to
19      [Bridge Bank].

20  (Ex. 6 (FDIC SVB FAQs).)

21  **ANSWER:** The FDIC-Rs respectfully refer the Court to the March 13, 2023 press release and

22  the FDIC's frequently asked questions webpage for their full and complete terms, and deny the

23  allegations in paragraph 88 of the Complaint to the extent inconsistent therewith. By way of further

24  response, the FDIC website also contains a general disclaimer that provides, among other things, that

25  "the FDIC makes no express or implied warranty regarding such information or data, and hereby

26  expressly disclaims all legal liability and responsibility to persons or entities who use or access this

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  R1 did not rescind the agreement transferring insured deposits to the DINB until after it purportedly transferred those
    very deposits to Bridge Bank.

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  site and its content, based on their reliance on any information or data that is available through this

2  website. The information available on this website is not intended to constitute and should not be

3  considered as legal advice . . . . The content of this website is not designed or intended to provide

4  authoritative financial, accounting, investment, or other professional advice which may be reasonably

5  relied on by its readers."

6      89.    The transfer of "all deposits" to the newly created, FDIC-operated, Bridge Bank was

7  made pursuant to a Transfer Agreement between FDIC-R1 and Bridge Bank (the "Transfer

8  Agreement") and included the transfer of all deposits as defined in 12 U.S.C. § 1813(l), except

9  accounts identified in SVB's records as "blocked" or "frozen" or were determined by the FDIC should

10  be "blocked" or "frozen" "pursuant to economic or trade restrictions administered or enforced by the

11  United States Treasury Department Office of Foreign Assets Control" (the "Assumed Deposits"). The

12  Transfer Agreement contained no exception for SVBFG's deposits and the Assumed Deposits

13  included the approximately $2,115,958,220 in SVBFG's deposit accounts. Pursuant to the Transfer

14  Agreement, Bridge Bank agreed "to pay all Assumed Deposits, properly drawn checks, drafts, and

15  withdrawal orders of depositors related to the Assumed Deposits presented for payment," and "to

16  discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed

17  Bank with respect to the Assumed Deposit balances due and owing to the depositors of the Failed

18  Bank." This included adhering to the terms and conditions of the Deposit Agreements.

19      **ANSWER:** The FDIC-Rs respectfully refer the Court to the Transfer Agreement for its full

20  and complete terms, and deny the allegations in paragraph 89 to the extent inconsistent therewith.

21      90.    SVBFG was initially treated like all other depositors of SVB, as was required pursuant

22  to the Treasury Secretary's systemic risk determination. Following the transfer of its deposits to Bridge

23  Bank, SVBFG could access its accounts in the same manner as any former depositor of SVB and as it

24  had prior to the Closure Date. On March 15 and 16, 2023, SVBFG successfully initiated eight wire

25  transfers from SVBFG's Account Funds at Bridge Bank, withdrawing approximately $180 million,

26  i.e., monies well in excess of the $250,000 deposit insurance limit.

27      **ANSWER:** The allegations contained in the first sentence of paragraph 90 are denied. The

28  FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the

allegations contained in the second sentence of paragraph 90 and they are therefore denied. The FDIC-Rs deny the allegation in the third sentence of paragraph 90 that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2), and otherwise admit the allegations contained in the third sentence of paragraph 90.

91.     Then, without explanation or warning, on the evening of March 16, 2023, everything changed. On March 16, Bridge Bank rejected wire transfers that were properly initiated, in violation of the Deposit Agreements, because FDIC-R1 instructed Bridge Bank to place a "hold" on SVBFG's accounts at Bridge Bank and to restrict any of the Account Funds from being withdrawn.

**ANSWER:** Denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

92.     The instructions by FDIC-R1 to Bridge Bank to interfere with SVBFG's rights as a Bridge Bank depositor, and the acquiescence by Bridge Bank in those instructions, was a violation of SVBFG's rights under the Deposit Agreements and unlawful.

**ANSWER:** The allegations in paragraph 92 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 92 are denied.

93.     FDIC-R1 has never identified the basis for those instructions or the authority under which it purported to act, none of which exists or existed.

**ANSWER:** Denied.

94.     The Notice of Disallowance suggests that FDIC-R1 made this direction—and continues to exert unlawful control over the Account Funds—to satisfy a hypothetical defensive right to setoff it may assert at some time in the future. However, Bridge Bank had no actual or even hypothetical right of setoff against SVBFG. And despite persistent pressure from SVBFG and the Bankruptcy Court, FDIC-R1 has been unable to substantively identify any basis for its alleged right to "setoff" for nearly a year. For instance, on April 26, 2023, the Bankruptcy Court sought "guidance" on the status of SVBFG's accounts in the FDIC's control. FDIC-R1 stated that it was "identif[ying] and

– 51 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

quantif[ying]" its potential setoff rights. In response, the Bankruptcy Court directed the FDIC to formally file a pleading identifying the specific basis for its authority over the Account Funds. On May 3, 2023, the FDIC filed a pleading citing to general rights provided in FIRREA, but provided no substantive insight into the basis for any potential setoff rights against SVBFG. To this day it has not done so.

**ANSWER:** To the extent the allegations in paragraph 94 characterize, summarize or otherwise describe the contents of the Notice of Disallowance, the *Statement of the Federal Deposit Insurance Corporation, as Receiver for Silicon Valley Bank, Pursuant to the Court's Direction at the April 26, 2023 Hearing* [Bankr. D.I. 145] or statements made in the transcript of the April 26, 2023 hearing, the FDIC-Rs respectfully refer the Court to the full text of those documents for their full and complete terms, and deny the allegations in paragraph 94 to the extent inconsistent therewith. The remaining allegations in paragraph 94 consist of legal conclusions to which no response is required. To the extent a response is required, the remaining allegations in paragraph 94 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

95.     FDIC-R1 also directed Bridge Bank to assign SVBFG's deposit accounts and all associated assets and liabilities to FDIC-R1. Bridge Bank complied with FDIC-R1's instruction. Bridge Bank, however, could not validly transfer SVBFG's deposit accounts to FDIC-R1 without SVBFG's consent.

**ANSWER:** The FDIC-Rs admit that FDIC-R1 called the SVBFG deposit account liability pursuant to the Transfer Agreement and that Bridge Bank complied therewith, but denies the remaining allegations in paragraph 95 including that it directed Bridge Bank, that any assets were transferred, and that SVBFG's consent was required to call that deposit account liability.

96.     FDIC-R1's actions were unlawful, including because they violated the terms of the systemic risk exception. Bridge Bank's compliance with those instructions was also unlawful, including because it violated the Deposit Agreements and amounted to conversion of SVBFG's property. Neither FDIC-R1 nor Bridge Bank was entitled to take SVBFG's uninsured deposits, which were not assets of FDIC-R1 or Bridge Bank. And FDIC-R1 violated its own procedures in purporting

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 52 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    to call back SVBFG's deposit accounts and placing a hold on those accounts.

2        **ANSWER:** The allegations in paragraph 96 consist of legal conclusions to which no response

3    is required.  To the extent a response is required, the allegations in paragraph 96 are denied.

4        97.    Neither Bridge Bank nor FDIC-R1 provided SVBFG any notice of these actions, or

5    sought or obtained SVBFG's consent to them. Indeed, SVBFG was unaware that Bridge Bank had

6    purported to transfer its Account Funds to FDIC-R1 until that purported transfer was disclosed in the

7    context of discovery in the bankruptcy proceeding.[5]

8        **ANSWER:** The allegations contained in the first sentence of paragraph 97 are denied to the

9    extent SVBFG fails to define the term "these actions," as the FDIC-Rs lack sufficient knowledge and

10   information to form a belief regarding these allegations and they are therefore denied.  Admitted that

11   FDIC-R1 did not provide notice of its call back or obtain SVBFG's consent because FDIC-R1 was

12   not required to do so.  The FDIC-Rs lack sufficient knowledge and information to form a belief

13   regarding the truth of the allegations against Bridge Bank in the first and second sentences of paragraph

14   97 and they are therefore denied.  The FDIC-Rs further lack sufficient knowledge and information to

15   form a belief regarding whether SVBFG was "aware" of Bridge Bank's purported actions that are

16   alleged in the second sentence of paragraph 97 and the allegations are therefore denied.  By way of

17   further response, no "Account Funds" were transferred: the SVBFG deposit account liability is a chose

18   in action.

19       98.    Since March 16, 2023, SVBFG has been denied access to any of its Account Funds.

20   Both FDIC-R1 and FDIC-R2 (which was appointed receiver of Bridge Bank following its purchase

21   and assumption transaction with First Citizens as of March 27, 2023) continue to refuse to return any

22   of those funds to SVBFG.

23

24

25   _____

26   [5] Although Bridge Bank could not validly transfer SVBFG's Account Funds to FDIC-R1 without SVBFG's consent, it is
unclear whether the attempted transfer ever occurred. Thus, when Bridge Bank sold its assets to First Citizens Bank &
Trust Company ("First Citizens") several weeks later, the Purchase and Assumption Agreement excluded "[a]ll

27   [d]eposits of SVB's holding company," suggesting that those deposits remained at Bridge Bank. In any event, all Bridge
Bank purported to transfer to FDIC-R1 in response to FDIC-R1's instruction was Bridge Bank's "right, title, and
interest" in the Account Funds. But Bridge Bank did not have any right, title, or interest in SVBFG's funds on deposit

28   superior to SVBFG's and thus had nothing to transfer.

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**ANSWER:** The allegations in paragraph 98 of the Complaint are denied. From the moment SVBFG made a deposit at SVB, SVBFG did not own any "Account Funds" and had nothing more than a deposit claim.

99.    SVBFG's Account Funds at Bridge Bank totaled approximately $1.93 billion as of March 16, 2023, when SVBFG's access to them was taken away by Bridge Bank and FDIC-R1. Those funds were contained in three accounts (the "Deposit Accounts").

| No. | Description | Account No.[6] | Balance |
|---|---|---|---|
| 1. | Operating Account | *5270 | $ 1,771,057,097.76 |
| 2. | Regulation W Account | *0822 | $ 143,593,717.97 |
| 3. | SVB Capital Operating Account | *6176 | $ 19,154,892.40 |
| Total Deposit Balance | | | $ 1,933,805,708.13 |

**ANSWER:** The FDIC-Rs deny the allegations in paragraph 99 of the Complaint to the extent that they purport to identify March 16, 2023, rather than March 10, 2023, as the operative points of reference for the value of the Deposit Accounts. Admitted that, as of March 16, 2023, FDIC-R1 had an uninsured deposit account liability to SVBFG of approximately $1.93 billion. Admitted that SVBFG had three deposit accounts maintained at SVB and that from and after March 16, 2023, SVBFG has not been able to make withdrawals on account of such accounts.

100.    SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code in the early morning of March 17, 2023.

**ANSWER:** Admitted that SVBFG filed a petition for relief under Chapter 11 of the Bankruptcy Code on March 17, 2023.

101.    Later that same day, at FDIC-R1's direction, Bridge Bank unwound the payment of $6,222,681.93 in intercompany receivables to SVBFG. At that point, SVBFG had already obtained all rights of a debtor in possession, including its pre-petition rights to recover its deposits as a matter of

---

[6] The last 4 digits of each Bank Account are listed.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

state and federal law and the benefits and protections of the automatic stay granted by 11 U.S.C. § 362.

**ANSWER:** The FDIC-Rs lack knowledge and information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 101 and therefore such allegations are denied. The allegations in the second sentence of paragraph 101 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

102. On March 27, 2023, the OCC closed Bridge Bank following the purchase and assumption transaction between Bridge Bank and First Citizens, and FDIC-R2 was appointed to act as the receiver for Bridge Bank. The transfer of deposits from Bridge Bank to First Citizens did not include SVBFG's Account Funds.

**ANSWER:** The FDIC-Rs deny the allegations in first sentence of paragraph 102 of the Complaint to the extent that SVBFG alleges that the purchase and assumption transaction was between Bridge Bank and First Citizens but admits that on March 27, 2023, the OCC closed the Bridge Bank. The FDIC-Rs deny the allegations in the second sentence of paragraph 102 of the Complaint to the extent that SVBFG alleges that the transfer of deposits were made from Bridge Bank to First Citizens and purports to characterize the transfer of deposits as involving the movement of specific "Account Funds" but admit that SVBFG's Deposit Accounts were not transferred to First Citizens.

103. On or around April 3, 2023, the FDIC mailed a letter to Bridge Bank depositors informing them that "[a]ll deposits [at SVB] were fully insured" by FDIC-C, and that "the full amount of your deposit was transferred" to First Citizens.[7]

**ANSWER:** To the extent the allegations in paragraph 103 of the Complaint characterize or summarize the letter, the FDIC-Rs respectfully refer the Court to the full text of the letter for its full and complete terms, and deny the allegations in paragraph 103 of the Complaint to the extent inconsistent therewith.

---

[7] The notice established there was no claims process for SVB or Bridge Bank depositors. The notice stated that "[a]ll deposits were fully insured and transferred to FIRST-CITIZENS BANK & TRUST COMPANY, RALEIGH, NC," but "if you disagree with the FDIC's determination of your insurance coverage as represented by the account(s) made available at [First Citizens], you may request a review of the FDIC's determination in the United States District Court where the Failed Institution was located."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## VI.  SVBFG Commences the Adversary Proceeding Against the FDIC.

104.    On April 14, 2023, counsel for SVBFG sent a letter to counsel for FDIC-R1, requesting that it provide a formal statement of the current status of SVBFG's accounts and any changes in status since March 10, 2023, and asking that FDIC-R1 engage with SVBFG with respect to the use and availability of the Account Funds. SVBFG never received a response from FDIC-R1 providing the requested information.

**ANSWER:** To the extent the allegations in paragraph 104 of the Complaint characterize or summarize the letter, the FDIC-Rs respectfully refer the Court to the full text of the letter for its full and complete terms, and deny the allegations in paragraph 104 of the Complaint to the extent inconsistent therewith.  The FDIC-Rs deny that they never provided information requested in and responsive to the letter, and deny that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

105.    On July 9, 2023, SVBFG filed the Adversary Proceeding in the Bankruptcy Court against FDIC-C and the FDIC-Rs, asserting claims against all three for, among other things, turnover of the Account Funds and violation of the automatic stay under the Bankruptcy Code, and a determination that none of the FDIC entities has any right of setoff.

**ANSWER:** Admitted that SVBFG filed an adversary proceeding in the Bankruptcy Court against the FDIC-C and the FDIC-Rs on July 9, 2023.  Paragraph 105 constitutes a summary of the Adversary Proceeding and certain legal conclusions, to which no response is required.  To the extent a response is required, the FDIC-Rs deny that SVBFG is entitled to the relief sought in the Adversary Proceeding, which SVBFG has voluntarily dismissed, and denies the allegations of paragraph 105, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

106.    The deadline for FDIC-C, FDIC-R1, and FDIC-R2 to file proofs of claim in the Bankruptcy Court against SVBFG expired on September 14, 2023. None of them filed any claims. FDIC-R2 has expressly disavowed holding any setoff claims (see Adv. Dkt. No. 32 (FDIC-R2 Motion

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

to Dismiss) at 28 ("FDIC-R2 has no right of setoff against the Deposit Account Liabilities nor has it asserted (nor can it) any right of setoff.")), and FDIC-C likewise has never even suggested that is has any setoff claims. Only FDIC-R1 has ever suggested it could have a setoff claim against SVBFG's Account Funds—and it continues to do so, notwithstanding its failure to file a proof of claim against SVBFG by the Bankruptcy-Court-ordered deadline to do so.

**ANSWER:** Admitted that the deadline for the FDIC-Rs to file proofs of claim in the Bankruptcy Court was September 14, 2023, and that the FDIC-Rs and FDIC-C did not file a proof of claim in the Bankruptcy Court.  To the extent the allegations in the third sentence of paragraph 87 characterize or summarize the FDIC-Rs' motion to dismiss, the FDIC-Rs respectfully refer the Court to the full text of the FDIC-Rs' motion to dismiss for its full and complete terms, and deny the allegations in the third sentence of paragraph 87 to the extent inconsistent therewith.  Admitted that FDIC-R1 has asserted that it has rights to setoff.  The remaining allegations in this paragraph are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

107.    On August 11, 2023, FDIC-C and the FDIC-Rs moved to dismiss the Adversary Proceeding. They argued that no federal district or bankruptcy court had subject matter jurisdiction at that point in time, purportedly because (i) SVBFG was required to file administrative claims against each of them under the FDIA as a prerequisite to seeking recovery of its Account Funds, and (ii) litigation may only be brought after they have acted and only in limited courts—in the United States District Court for the Northern District of California against FDIC-C, and in either that court or the United States District Court for the District of Columbia against the FDIC-Rs. SVBFG opposed each of these motions and continues to dispute the positions of each of FDIC-C and the FDIC-Rs.

**ANSWER:** To the extent the allegations in paragraph 107 of the Complaint characterize or summarize the motions to dismiss, the FDIC-Rs respectfully refer the Court to the full text of the motions to dismiss for their full and complete terms, and deny the allegations in paragraph 107 of the Complaint to the extent inconsistent therewith.  Admitted that the FDIC-C and the FDIC-Rs moved to dismiss the Adversary Proceeding on August 11, 2023.  The FDIC-Rs admit that SVBFG filed a

– 57 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    memorandum of law in opposition to the FDIC-C's and the FDIC-Rs' motions to dismiss; however,

2    the FDIC-Rs lack sufficient knowledge and information to form a belief regarding whether SVBFG

3    continues to dispute the positions of each of the FDIC-C's and the FDIC-Rs' motions and this

4    allegation is therefore denied.   By way of further response, SVBFG involuntarily dismissed the

5    Adversary Proceeding in its entirety.   Further answering, the FDIC-Rs deny any allegation that the

6    "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's

7    defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

8        108.    For the avoidance of doubt, it was and remains SVBFG's position that all the claims

9    asserted in the Adversary Proceeding were properly brought before the Bankruptcy Court, which has

10   subject matter and personal jurisdiction. Sovereign immunity is waived by statute, and contrary to the

11   position of FDIC, no administrative exhaustion was required for any of the claims SVBFG asserted.

12   The turnover and automatic stay claims are explicit rights under the Bankruptcy Code and within the

13   Bankruptcy Court's core jurisdiction.   Nevertheless, inasmuch as the FDIC-Rs dispute the

14   jurisdictional bases for the claims made in the Adversary Proceeding, SVBFG re-asserts them here

15   (along with additional claims based on the FDIC-Rs' January 5 Notices of Disallowance), with a full

16   reservation of rights as to its ability to continue to prosecute the Adversary Proceeding.

17       **ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding

18   the truth of the allegations contained in the first sentence of paragraph 108 of the Complaint and

19   therefore they are denied.   The allegations in the second and third sentences of paragraph 108 consist

20   of legal conclusions to which no response is required.   To the extent a response is required, the

21   allegations in the second and third sentences of paragraph 108 are denied.   The allegations in the fourth

22   sentence of this paragraph purport to repeat and re-allege SVBFG's allegations and arguments made

23   in the Adversary Proceeding.   To the extent a response is required, the FDIC-Rs repeat and re-allege

24   their arguments set forth in the Adversary Proceeding.   By way of further response, SVBFG

25   voluntarily dismissed the Adversary Proceeding in its entirety.

26       109.    On the same day it filed its motion to dismiss, FDIC-R1 filed a motion to withdraw the

27   reference in the Bankruptcy Court pursuant to 28 U.S.C. § 157(d). (Adv. Dkt. No. 30.) That motion

28   was docketed in the United States District Court for the Southern District of New York and assigned

to Judge John P. Cronan on August 15, 2023. (SVB Fin. Grp. V. FDIC, No. 23-cv-07218-JPC (S.D.N.Y.) ("S.D.N.Y. Dkt."), ECF No. 1.) On August 14, 2023, FDIC-C and FDIC-R2 filed non-substantive joinders to FDIC-R1's motion to withdraw the reference. (See S.D.N.Y. Dkt. Nos. 3, 4.) On December 13, 2023, Judge Cronan granted the motion to withdraw the reference. (See S.D.N.Y. Dkt. No. 34.)

**ANSWER:** Admitted that FDIC-R1 filed a motion to withdraw the reference in the Bankruptcy Court pursuant to 28 U.S.C. § 157 and Federal Rule of Bankruptcy Procedure 5011 on August 11, 2023, which was then docketed in the United States District Court for the Southern District of New York and assigned to Judge John P. Cronan on August 15, 2023.  It is further admitted that FDIC-C and FDIC-R2 filed joinders to FDIC-R1's motion to withdraw the reference.  It is further admitted that Judge Cronan entered an Opinion and Order granting the motion to withdraw the reference.

110.    On January 15, 2024, SVBFG requested that Judge Cronan stay the Adversary Proceeding pending a determination in this then-contemplated action as to whether SVBFG was required to file administrative claims under the FDIA against either of the FDIC-Rs, and in the then-pending separate action brought by SVBFG against FDIC-C (described below) as to whether SVBFG was required to file an administrative claim under the FDIA against FDIC-C. To the extent it is determined that SVBFG was not required to file an administrative claim against a particular FDIC entity (whether it be FDIC-C, -R1, or -R2), SVBFG should be free to proceed with its claims under the Bankruptcy Code against that entity, including if it chooses to do so in an adversary proceeding in Bankruptcy Court as part of its Chapter 11 case in New York.

**ANSWER:** Admitted that SVBFG requested that Judge Cronan stay the Adversary Proceeding in a letter dated January 15, 2024.  To the extent the allegations in the first sentence of paragraph 110 of the Complaint characterize or summarize the January 15, 2024 letter to Judge Cronan, the FDIC-Rs respectfully refer the Court to the full text of the January 15, 2024 letter for its full and complete terms, and deny the allegations in the first sentence of paragraph 110 to the extent inconsistent therewith.  The allegations in the second sentence of paragraph 110 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the second sentence of paragraph 110 are denied.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

111.    On January 25, 2024, Judge Cronan temporarily paused the Adversary Proceeding, adjourning the oral argument on the motions to dismiss sine die and requesting an update from the parties regarding related litigation by no later than March 10, 2024. (See S.D.N.Y. Dkt. No. 43.)

**ANSWER:** Admitted.

**VII.    FDIC-C Decides to Treat SVBFG's Demand for Payment of Uninsured Deposits as a Claim for Insured Deposits Under 12 U.S.C. § 1821(f) and Denies the "Claim."**

112.    On June 26, 2023, before filing the Adversary Proceeding, SVBFG sent a letter to FDIC-C demanding that FDIC-C either pay or restore SVBFG full access to all its uninsured funds. FDIC-C did not respond to, or even acknowledge receipt of, SVBFG's demand until months after it was sent.

**ANSWER:** The FDIC-Rs respectfully refer the Court to the June 26, 2023 letter for a full and complete statement of its terms, and deny the allegations in paragraph 112 of the Complaint to the extent inconsistent therewith.

113.    On September 19, 2023, FDIC-C sent SVBFG a letter, characterizing "[SVBFG's] June 26, 2023 letter as a timely claim for insurance coverage with respect to a deposit under 12 U.S.C. § 1821(f)," and stating that "FDIC-C is working to provide [SVBFG] a final determination regarding insurance coverage within 30 days of the date of this letter." Of course, SVBFG did not demand "insurance coverage" in its letter—it demanded that it be restored access to its Account Funds, like other SVB depositors that were given access to their uninsured deposits, pursuant to the invocation of the systemic risk exception.

**ANSWER:** The FDIC-Rs respectfully refer the Court to the September 19, 2023 letter for a full and complete statement of its terms, and deny the allegations in paragraph 113 of the Complaint to the extent inconsistent therewith.  Further answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

114.    Notwithstanding FDIC-C's characterization of SVBFG's June 26, 2023 letter as a claim for insurance coverage, it was a demand for payment. FDIC-C did not have, and does not have generally, a claims process in place for depositors of a failed bank. Moreover, and critically here,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

FDIC-C did not have a claims process in place for SVB deposit claims specifically because no claim for insurance coverage was required to be made by any depositor as a result of the Treasury Secretary's invocation of the systemic risk exception. FDIC-C was required to make SVBFG's Account Funds available to SVBFG—a legal obligation that the FDIC in all of its capacities has breached without any plausible justification.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in paragraph 114 of the Complaint and they are therefore denied. Furthermore, the allegations in the first, third, and fourth sentences of paragraph 114 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

115.    On October 20, 2023, FDIC-C sent SVBFG a letter denying SVBFG's supposed "claim" for its Account Funds. The purported basis of the denial was twofold. *First*, FDIC-C asserted that because SVBFG was able to withdraw more than $250,000 from its accounts at Bridge Bank between March 13 and March 15, 2023, "FDIC-C has satisfied its obligation under 12 U.S.C. § 1821(f)(1) to provide SVBFG with access to its insured deposits." *Second*, FDIC-C asserted that the Treasury Secretary's invocation of the systemic risk exception did not obligate FDIC-C to follow any particular course of action, but rather authorized FDIC-C to exercise unfettered discretion in determining what actions to take, including whether to pay any uninsured deposit claims, whose claims to pay, and in what amounts.

**ANSWER:** To the extent the allegations in paragraph 115 of the Complaint characterize or summarize FDIC-C's October 20, 2023 letter to SVBFG, the FDIC-Rs respectfully refer the Court to the full text of the October 20, 2023 letter for its full and complete terms, and deny the allegations in paragraph 115 of the Complaint to the extent inconsistent therewith. Further answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

116.    This is the subject of a separate litigation, referenced here for completeness. Section 1821(f) of the FDIA is not applicable to SVBFG's demand that FDIC-C pay its Account Funds in accordance with the directive of the Treasury Secretary, including because that Section applies only to claims for payment of insured deposits, i.e., deposits up to the $250,000 deposit insurance limit. SVBFG is seeking restoration of its uninsured deposits guaranteed by operation of the Treasury Secretary's systemic risk determination. To protect its rights in the event it is determined that 12 U.S.C. § 1821(f) is applicable as against FDIC-C, on December 19, 2023, SVBFG timely commenced an action in this Court for review of FDIC-C's final denial of the "claim." That action is currently pending as Case No. 23-cv-06543-BLF before Judge Beth Labson Freeman.

**ANSWER:** The allegations in the first sentence of paragraph 116 of the Complaint constitute a summary of SVBFG's purported claims against FDIC-C in a separate litigation, to which no response is required. The allegations in the second and third sentences of paragraph 116 constitute legal conclusions to which no response is required, and the FDIC-Rs respectfully refer the Court to Section 1821(f) of the FDIA for its full and complete terms. To the extent a response is required, those allegations are denied. The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of allegations contained in the second, third, and fourth sentences of paragraph 116 of the Complaint and they are therefore denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). Admitted that SVBFG commenced an action against the FDIC-C under Case No. 23-cv-06543-BLF pending before Judge Beth Labson Freeman.

**VIII.    SVBFG Files Protective Claims in the FDIC-Rs' Administrative Proceedings, and the FDIC-Rs Disallow SVBFG's "Deposit and General Unsecured Claims."**

117.    Although SVBFG's claims relating to its Account Funds are core claims under the Bankruptcy Code and are not subject to the FDIA's administrative claims process, because FDIC-R1 asserted that SVBFG was required file a proof of claim to pursue recovery of its Account Funds, SVBFG filed protective Proofs of Claim with each of FDIC-R1 and FDIC-R2 on July 10, 2023. (*See* Exs. 7 and 8.) Among other things, the protective Proofs of Claim asserted against each of the FDIC-Rs a claim for the Account Funds in the amount of $1,933,805,708.13 plus interest, a conversion-of-

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  property claim for the FDIC-Rs' wrongful exercise of control and custody of the Account Funds, and

2  19 other unrelated claims.

3  **ANSWER:** The allegations in paragraph 117 consist of legal conclusions to which no response

4  is required.  To the extent a response is required, the allegations are denied, including any allegation

5  that the "Account Funds" constitute anything different than an uninsured liability claim, subject to

6  FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  To the extent

7  the allegations in paragraph 117 of the Complaint characterize or summarize the Proofs of Claim, the

8  FDIC-Rs respectfully refer the Court to the full text of the Proofs of Claim for their full and complete

9  terms, and deny the allegations in paragraph 117 of the Complaint to the extent inconsistent therewith.

10  118.    Both SVBFG's complaint filed in the Adversary Proceeding and the Proofs of Claim

11  state that the Proofs of Claim were being filed without prejudice to SVBFG's positions that the

12  Bankruptcy Court has exclusive jurisdiction to determine the matters subject to the Proofs of Claim

13  and that no proof of claim is required for SVBFG to be paid or provided access to the Account Funds.

14  **ANSWER:** To the extent the allegations in paragraph 118 of the Complaint characterize or

15  summarize the complaint filed in the Adversary Proceeding and the Proofs of Claim, the FDIC-Rs

16  respectfully refer the Court to the full text of those documents for their full and complete terms, and

17  deny the allegations in paragraph 118 of the Complaint to the extent inconsistent therewith.  Further

18  answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute anything different

19  than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed

20  by 12 U.S.C. § 1821(i)(2).

21  119.    On January 5, 2024—the last business day before the statutorily mandated 180-day

22  deadline for each of the FDIC-Rs to notify SVBFG of any determination with respect to its Proofs of

23  Claim—FDIC-R1 and FDIC-R2 each notified SVBFG that it was disallowing the claims. (See Exs. 1

24  and 2.) Even though it took six months to issue its determination, the entirety of FDIC-R1's

25  explanation for its denial consists of two sentences: "The deposit claim is denied as not proven to the

26  satisfaction of the receiver due to the receiver's defenses. All other claims are denied as speculative,

27  unsupportable, or otherwise not proven to the satisfaction of the receiver." Similarly, FDIC-R2's

28  explanation provided only that SVBFG's "deposit claim is denied as not proven to the satisfaction of

– 63 –

the receiver because it is not a liability of the FDIC as receiver for Silicon Valley Bridge Bank," and "[a]ll other claims are denied as speculative, unsupportable, or otherwise not proven to the satisfaction of the receiver."

**ANSWER:** Admitted that the FDIC-Rs notified SVBFG on January 5, 2024 that they were disallowing SVBFG's claims. To the extent the allegations in paragraph 119 of the Complaint characterize or summarize the Notices of Disallowance, the FDIC-Rs respectfully refer the Court to the full text of the Notices of Disallowance for their full and complete terms, and deny the allegations in paragraph 119 of the Complaint to the extent inconsistent therewith. Further answering, the FDIC-Rs state that under 12 U.S.C. § 1821(d)(5)(E), no court has jurisdiction to review the disallowance of an administrative claim filed with the FDIC-Rs and therefore SVBFG's contentions about the Notices of Disallowance are irrelevant.

120. Although FDIC-R1 relies solely on its purported "defenses" in denying SVBFG's "deposit claim" under the FDIA, to date—nearly a year after FDIC-R1 eliminated SVBFG's access to its Account Funds, more than ten months after the Bankruptcy Court ordered the FDIC to identify its specific basis for exercising control over the Account Funds, and more than six months after SVBFG commenced the Adversary Proceeding—FDIC-R1 still has not identified any so-called "defenses."

**ANSWER:** Denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

121. SVBFG was not required to file a proof of claim with FDIC-R1 or FDIC-R2 to recover its Account Funds. The Treasury Secretary's action required immediate access and payment of deposit funds without any "claim," as the FDIC's own repeated public statements make clear. Of course, FDIC-R1 and FDIC-R2 know this: the FDIC's contact email for its administrative claims process—"NonDepClaimsDal@FDIC.gov"—makes clear that the process is not intended for depositors like SVBFG. In any event, as alleged above, the FDIC-Rs had and continue to have no lawful basis to withhold SVBFG's Account Funds and are required to make those funds available to SVBFG together with the almost $10 million monthly lost earnings that have been accruing since March 16, 2023.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**ANSWER:** The allegations in the first, second, and fourth sentences of paragraph 121 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the first, second, and fourth sentences of this paragraph are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2). The remaining allegations set forth in this paragraph are denied.

122. *First*, pursuant to the Treasury Secretary's systemic risk exception invocation, the FDIC in all of its capacities is required to continue to make SVBFG's Account Funds available to SVBFG. The after-the-fact contrary positions of the FDIC, which contradict its own public statements, the public statements and testimony of its own Chairman, and the public statements and testimony of the Treasury Secretary, among others, are baseless and in bad faith and should be unequivocally rejected by this Court.

**ANSWER:** The allegations in paragraph 122 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 122 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

123. *Second*, even if the Court were to disregard the Treasury Secretary's invocation of the systemic risk exception and the FDIC's repeated confirmations that the Deposit Insurance Fund would be used to make all depositors, including SVBFG, whole, SVBFG is entitled under federal and state law, as applicable, at the very minimum to approximately $1.71 billion as the outstanding minimum *pro rata* distribution of SVB's liquidation value. *See, e.g.*, 12 U.S.C. § 194; Cal. Fin. Code §§ 681, 1406; *see also* 12 U.S.C. § 1821(i). And if for any reason there are insufficient assets in the receiverships to satisfy this obligation, then FDIC-C is required to provide the mandated distribution from the Deposit Insurance Fund.

**ANSWER:** The allegations in paragraph 123 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 123 are denied. To the extent the allegations in paragraph 123 of the Complaint characterize or summarize alleged confirmations of the FDIC and/or statutory provisions such as 12 U.S.C. § 194, Cal. Fin. Code §§ 681,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1406, or 12 U.S.C. § 1821(i), the FDIC-Rs respectfully refer the Court to the full text of those alleged confirmations and statutory provisions for their full and complete terms, and deny the allegations in paragraph 123 of the Complaint to the extent inconsistent therewith.  Further answering, the FDIC-Rs deny the allegations in paragraph 123 of the Complaint to the extent they refer to or are premised on claims that have been dismissed.

124.    The FDIC's minimum distribution obligation to SVBFG may lead to a complete recovery by SVBFG on its Account Funds. Numerous reports reflect a widespread belief by the market that First Citizens received a generous deal in connection with the purchase and assumption agreement,[8] and indeed First Citizens' parent company's market capitalization increased by over $4 billion on the day the sale was announced[9]—all of which strongly suggests that there was more value in SVB at the time of its failure than may have been realized by the FDIC based on the actions the FDIC decided to undertake.

**ANSWER:** The allegations in the first sentence of paragraph 124 consist of legal conclusions (and speculation) to which no response is required.  To the extent a response is required, the allegations in the first sentence of paragraph 124 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  The FDIC-Rs also lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the second sentence of paragraph 124 and they are therefore denied.

125.    Indeed, the FDIC's own limited, publicly available sources regarding SVB's balance sheet at the time it was placed into receivership suggests that there was—at a minimum—an

---

[8] *See* Stephen Gandel, et al., *First Citizens Shares Surge After Silicon Valley Bank Deal*, Fin. Times (Mar. 27, 2023), https://www.ft.com/content/70968033-1dbf-4e31-86a9-6271106be1fc; *see also* Joshua Franklin, *First Citizens Makes Huge Gain on Silicon Valley Bank Deal*, Fin. Times (May 10, 2023), https://www.ft.com/content/2df4cea1-1c0c-48b3-8969-95198d497ea4; Editorial, *How the FDIC Rigged the SVB Auction*, Wall St. J. (Apr. 18, 2023), https://www.wsj.com /articles/fdic-nonbanks-silicon-valley-bank-sale-martin-gruenberg-609af47.

[9] Nasdaq, First Citizens BancShares, Inc. Class A Common Stock (FCNCA): FCNCA Historical Data, https://www.nasdaq.com/market-activity/stocks/fcnca/historical (reflecting historical share prices of parent company of $582.55 at market close on Friday, March 24, 2023, and $895.61 at market close on Monday, March 27, 2023); FCN First Citizens BancShares, Inc., Annual Report (Form 10-K) (Feb. 24, 2023), https://www.sec.gov/ixviewer /ix.html?doc=/Archives/edgar/data/0000798941/000079894123000017/fcnca-20221231.htm (Parent company had 13,502,747 shares of Class A Common Stock outstanding as of February 17, 2023).

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

approximately $1.71 billion obligation due and outstanding from the FDIC to SVBFG on the Account Funds. As FDIC Chairman Gruenberg recently stated, the FDIC could have paid SVB depositors "90 percent or maybe more of their deposits" through an advanced dividend, which represents the FDIC's "conservative value estimate of the recoveries that [it will] ultimately make on the bank's assets." Given this conservative estimate, it is likely that SVBFG and other depositors could have received the full amount of their uninsured deposits had SVB been liquidated rather than placed in receivership.

**ANSWER:** To the extent the allegations in paragraph 125 of the Complaint characterize or summarize the transcript of the December 5, 2023 FDIC Systemic Resolution Advisory Committee Meeting, the FDIC-Rs respectfully refer the Court to the full text of the transcript for its full and complete terms, and deny the allegations in paragraph 125 of the Complaint to the extent inconsistent therewith. The FDIC-Rs deny the remaining allegations in paragraph 125, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

126.    *Third*, the FDIC-Rs have no legal basis to disallow SVBFG's claim for its Account Funds. FDIC-R1 stands in the shoes of SVB, which agreed to make SVBFG's deposit funds available on demand. Similarly, in the Transfer Agreement pursuant to which all SVB deposit accounts were transferred to Bridge Bank, Bridge Bank agreed to discharge the duties and obligations of SVB, which includes the contractual obligation to pay SVBFG's deposit funds on demand. FDIC-R2, as the successor to Bridge Bank, does not purport to have any rights of setoff against SVBFG, and FDIC-R2 has no right to exercise any alleged rights of setoff on behalf of FDIC-R1. FDIC-R1 cannot exercise common law or contractual setoff against SVBFG's Account Funds, because SVBFG does not have any matured debts owed to FDIC-R1, and FDIC-R1 does not have any valid, cognizable, liquidated claims against SVBFG. The FDIC-Rs have not even identified or explained any claims they may have against SVBFG that would justify withholding any portion of the Account Funds currently held by either, much less $1.93 billion. There is no right of setoff for contingent, hypothetical claims.

**ANSWER:** The allegations in the first, second and third sentences of paragraph 126 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the first, second and third sentences of paragraph 126 are denied.  To the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  extent the allegations in paragraph 126 of the Complaint characterize, summarize, or otherwise

2  describe the Transfer Agreement, the FDIC-Rs respectfully refer the Court to the full text of the

3  Transfer Agreement for its full and complete terms, and deny the allegations in paragraph 126 of the

4  Complaint to the extent inconsistent therewith.  The allegations in the fourth, fifth, sixth, and seventh

5  sentences of paragraph 126 consist of legal conclusions to which no response is required.  To the extent

6  a response is required, the allegations in the fourth, fifth, sixth, and seventh sentences of paragraph

7  126 are denied.  The remaining allegations in paragraph 126 are denied, including any allegation that

8  the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-

9  R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

10      127.    *Fourth*, FDIC-R1 and FDIC-R2 cannot exercise setoff against any, much less the

11  entirety, of SVBFG's Account Funds under 12 U.S.C. § 1822(d) because, among other reasons,

12  Section 1822(d) provides that the FDIC may only "withhold payment of such portion of the insured

13  deposit of any depositor in a depository institution in default." 12 U.S.C. § 1822(d) (emphasis added).

14  This is but a tiny portion of the $1.93 billion in Account Funds wrongfully withheld from SVBFG.

15      **ANSWER:** The allegations in paragraph 127 of the Complaint consist of legal conclusions to

16  which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer

17  the Court to 12 U.S.C. § 1822(d) for its full and complete terms, and any allegations in paragraph 127

18  inconsistent therewith are denied, including any allegation that the "Account Funds" constitute

19  anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and

20  limitations imposed by 12 U.S.C. § 1821(i)(2).

21      128.    *Fifth*, even if SVBFG had been required to file a claim with FDIC-R1 or FDIC-R2 to

22  recover its Account Funds, neither FDIC-R1's nor FDIC-R2's administrative claims process is the

23  proper place to adjudicate or effectuate any alleged claim, counterclaim, or defense of offset or

24  recoupment against SVBFG respecting an undisputed $1.93 billion estate asset. The FDIA only grants

25  the FDIC in its capacity as a receiver the authority to determine (subject to *de novo* review) claims

26  **against the receivership**. 12 U.S.C. § 1821(d)(4), (5). Only the Bankruptcy Court presiding over

27  SVBFG's Chapter 11 case has the authority to assess, value, and prioritize claims **against SVBFG**.

28  Seeking to recover by way of a distribution from SVBFG or by retaining amounts owed by the FDIC

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

to SVBFG are functionally the same thing—they reduce the assets in the estate available for other creditors and must be litigated before the Bankruptcy Court. If the FDIC in any of its capacities believes it has claims against SVBFG—whether asserted as claims, counterclaims, offsets or for recoupment—it was required to identify them and file proofs of claim in SVBFG's Chapter 11 case before the September 14, 2023 government bar date. None of FDIC-C, FDIC-R1, or FDIC-R2 did so.

**ANSWER:** The allegations in paragraph 128 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 128 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

129.    *Finally*, the same day FDIC-R1 acted, FDIC-R2 denied SVBFG's claim in a similarly conclusory two-sentence denial. FDIC-R2 has never provided an explanation for the basis or authority on which Bridge Bank blocked SVBFG's access to its Account Funds beginning on March 16, 2023; the basis or authority on which it actually purported to remove the Account Funds from SVBFG's accounts—*i.e.*, took an account holder's money without consent from the account holder—and purportedly delivered those funds to FDIC-R1; nor the basis or authority on which it unwound the payment of an intercompany receivable after SVBFG's bankruptcy filing.

**ANSWER:** Admitted that FDIC-R2 notified SVBFG on January 5, 2024 that it was disallowing SVBFG's claims.  To the extent the allegations in paragraph 129 of the Complaint characterize or summarize FDIC-R2's Notice of Disallowance, the FDIC-Rs respectfully refer the Court to the full text of FDIC-R2's Notice of Disallowance for its full and complete terms, and deny the allegations in paragraph 129 of the Complaint to the extent inconsistent therewith. The FDIC-Rs deny the remaining allegations in paragraph 129, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).  Further answering, the FDIC-Rs state that under 12 U.S.C. § 1821(d)(5)(E), no court has jurisdiction to review the disallowance of an administrative claim filed with the FDIC-Rs and therefore SVBFG's contentions about the Notices of Disallowance are irrelevant.

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

## IX.    SVBFG's Non-Deposit Claims Against the FDIC-Rs for Damages to SVBFG Resulting From the FDIC-Rs' and First Citizens' Conduct.

130.    As part of the protective Proofs of Claim that SVBFG filed with the FDIC-Rs on July 10, 2023, SVBFG also sought repayment and damages from the FDIC-Rs for certain payments to which it is entitled under agreements between SVBFG and SVB, and for which the FDIC-Rs are now responsible as successors in interest to SVB and Bridge Bank under 12 U.S.C. § 1821(d)(2)(A). SVBFG does not contend that these claims (which address matters other than the Account Funds) are governed by the systemic risk exception or that that they were not subject to the FDIC-R's administrative process. SVBFG now seeks a *de novo* determination of the FDIC-Rs' denials of these claims, which were made without any explanation.

**ANSWER:** Admitted that SVBFG filed Proofs of Claim with the FDIC-Rs on July 10, 2023. The remaining allegations in the first sentence of paragraph 130 consist of legal conclusions to which no response is required.  To the extent a response is required, the remaining allegations in the first sentence of paragraph 130 are denied.  To the extent the allegations in the first and second sentences of paragraph 130 of the Complaint characterize or summarize the Proofs of Claim, the FDIC-Rs respectfully refer the Court to the full text of the Proofs of Claim for their full and complete terms, and deny the allegations in paragraph 130 of the Complaint to the extent inconsistent therewith. The FDIC-Rs deny the remaining allegations in paragraph 130, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

131.    ***Lease Claims***. At the time it commenced the Chapter 11 bankruptcy proceedings on March 17, 2023, SVBFG was party to certain lease agreements ("Lease Agreements") that were entered into for the sole benefit of SVB. SVBFG had no operations at any of the relevant lease premises and entered into the lease agreements on behalf of and for the sole benefit of SVB.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in paragraph 131 of the Complaint and they are therefore denied. The allegations in the first sentence of paragraph 131 also consist of legal conclusions to which no

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  response is required.  To the extent a response is required, the allegations in the first sentence of this

2  paragraph are denied.

3       132.    SVBFG and SVB entered into an agreement under which SVB and SVBFG agreed to

4  allocate expenses for goods and services based on the extent to which the goods and services are

5  attributable to each entity. Pursuant to that agreement and SVB and SVBFG's ongoing course of

6  conduct, SVB was responsible to pay and in fact paid for all lease obligations, including rent and any

7  associated costs and expenses incurred under any lease agreement, to the extent that any leased

8  property was used by SVB employees for the benefit of SVB. If a leased property was used for the

9  benefit of both SVB and SVBFG, SVB agreed to pay an allocation of the rent and all associated costs

10 and expenses based on the percentage use by its employees for the benefit of SVB.

11      **ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding

12 the truth of the allegations contained in paragraph 132 of the Complaint and they are therefore denied.

13 The allegations in paragraph 132 also consist of legal conclusions to which no response is required.

14 To the extent a response is required, the allegations in this paragraph are denied.

15      133.    In accordance with these agreements, SVB has paid rent and associated costs and

16 expenses on an approximate monthly basis since the Lease Agreements were entered into on SVB's

17 behalf.

18      **ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding

19 the truth of the allegations contained in paragraph 133 of the Complaint and they are therefore denied.

20 The allegations in paragraph 133 also consist of legal conclusions to which no response is required.

21 To the extent a response is required, the allegations in this paragraph are denied.

22      134.    After the Closure Date, Bridge Bank and then First Citizens continued to use these

23 premises, but in or around June 2023, First Citizens informed SVBFG that it was going to vacate

24 several of the leased premises and instructed SVBFG to reject these leases. SVBFG has paid fees and

25 will incur liabilities in SVBFG's Chapter 11 bankruptcy proceeding associated with the rejection of

26 leases for SVB branch offices or other premises that the FDIC-Rs and/or First Citizens determined to

27 vacate. As set forth in Schedule 1 hereto, based on currently available information, the damages to

28 SVBFG for the rejection of these leases total between $22,906,000 to $39,232,000.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first and second sentences of paragraph 134 of the Complaint and they are therefore denied.   The allegations in the second and third sentences of paragraph 134 consist of legal conclusions to which no response is required.   To the extent a response is required, the allegations in the second and third sentences of paragraph 134 are denied.

135.     ***Vendor Claims***. SVBFG also was a party to certain agreements with vendors (the "<u>Vendors</u>") related to services, goods, and software licensing for the primary benefit of SVB (the "<u>Vendor Contracts</u>"). Pursuant to the expense sharing agreement set forth in Paragraph 132 and SVB and SVBFG's ongoing course of conduct, SVB, as the primary beneficiary, was responsible for the payment of the Vendor Contracts. After the Closure Date, there were unpaid obligations outstanding in connection with certain of the Vendor Contracts, including expenses associated with the termination of such Vendor Contracts. This has caused and continues to cause SVBFG to incur administrative expenses in its Chapter 11 proceeding and other damages. In addition, as set forth in Schedule 2 hereto, with respect to certain Vendor Contracts, SVBFG has incurred and will incur in the future substantial costs totaling between \$10,566,000 and \$29,071,000 associated with the rejection of the contracts prior to their expiration dates, including contracts that First Citizens has stopped paying, which has resulted in the Vendors seeking early termination damages. To the extent these amounts are not paid or reimbursed by First Citizens, FDIC-R1 and FDIC-R2 are liable.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first, second, and third sentences of paragraph 135 of the Complaint and they are therefore denied.   The allegations in paragraph 135 also consist of legal conclusions to which no response is required.   To the extent a response is required, the allegations in this paragraph are denied.

136.     ***Employee Claims***. SVBFG has incurred expenses on behalf of SVB for wages, bonuses, deferred compensation, stock plan compensation, healthcare benefits, retirement plans, and severance that are currently owed to certain SVB employees (the "<u>Employee Claims</u>"). Schedule 3 hereto sets out the Employee Claims that have been filed in SVBFG's Chapter 11 proceeding in the Bankruptcy Court to date, which total between \$70,623,000 and \$112,842,000. Pursuant to the

– 72 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

expense sharing agreement set forth in Paragraph 132 and SVB and SVBFG's ongoing course of conduct, SVB, as the primary beneficiary of the services provided by SVB's own employees, was responsible for the payment of the Employee Claims.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in paragraph 136 of the Complaint and they are therefore denied. The third sentence of paragraph 136 constitutes a legal conclusion to which no response is required. To the extent a response is required, the allegations in the third sentence of paragraph 136 are denied.

137.    ***Intercompany Receivables***. Prior to the Closure Date, SVBFG incurred expenses on behalf of SVB for which SVB was contractually required to reimburse SVBFG as intercompany receivables reflected in SVBFG's and SVB's books and records. On approximately March 17, 2023, Bridge Bank—at the direction of FDIC-R1—reversed or unwound approximately $6,222,681.93 of intercompany receivables owed and previously transferred to SVBFG by SVB. On information and belief, SVB and Bridge Bank have failed to reimburse SVBFG for the unwound $6,222,681.93 intercompany receivables payment as well as additional intercompany receivables owed by SVB or Bridge Bank to SVBFG, in an amount to be determined at trial.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the allegations in paragraph 137 and therefore such allegations are denied.

138.    ***Indemnity Claims***. SVBFG's bylaws provide for the indemnification of all SVBFG's directors and officers. Prior to the Closure Date, SVBFG's directors each served concurrently as directors of SVB and each of SVBFG's officers was an employee of SVB. To the extent such persons (or any other officers or employees of SVB) assert indemnification or contribution or similar claims against SVBFG (the "Indemnity Claims"), it in turn asserts claims for reimbursement of such obligations or liabilities against FDIC-R1 and FDIC-R2. Schedule 3 hereto sets out the Indemnity Claims that have been filed by SVBFG's officers and directors in SVBFG's Chapter 11 proceeding in the Bankruptcy Court to date, which total approximately $1,025,000.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in the first, second, and fourth sentences of paragraph 138 of the Complaint and they are therefore denied.  The allegations in the third sentence of paragraph 138 are a

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

summary of the relief requested by SVBFG and therefore no response is required.  To the extent a response is required, the allegations are denied.

## CLAIMS FOR RELIEF

### Count I

### Breach of Contract

### (Against Defendants FDIC-R1 and FDIC-R2)

139.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:** The allegations in this paragraph concern Count I of the Complaint which, pursuant to the Order, was dismissed by the Court without leave to amend with respect to SVBFG's requests for prejudgment interest and lost earnings.  Accordingly, to the extent the allegations in this paragraph are based on SVBFG's assertion that it is entitled to prejudgment interest and/or lost earnings, no response is required.  To the extent a response is required, such allegations are denied.  The allegations in paragraph 139 purport to re-allege and incorporate by reference the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth therein.  To the extent a response to paragraph 139 is required, the FDIC-Rs re-allege and incorporate by reference the answers set forth herein as if fully set forth herein.

140.    The Deposit Agreements are valid contracts between SVBFG and SVB that require SVB to make SVBFG's deposits available on demand. SVBFG has fulfilled its obligations as a depositor under the Deposit Agreements.

**ANSWER:** The allegations in the first sentence of paragraph 140 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the FDIC-Rs admit that the Deposit Agreements are valid contracts but deny that SVB was required to make SVBFG's deposits available on demand.  The allegations in the second sentence of paragraph 140 consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in the second sentence of paragraph 140 are denied.  The FDIC-Rs respectfully refer the Court to the Deposit Agreements, which are documents that speak for themselves, for their full and complete terms.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

141.    On March 12, 2023, Treasury Secretary invoked the systemic risk exception to guarantee all insured and uninsured deposits of SVB. Thereafter, representatives of the FDIC, including Chairman Gruenberg, Secretary Yellen, and counsel for FDIC-R1, as well as numerous other senior government officials, made statements to the American public, to Congress, and to the Bankruptcy Court confirming that the Treasury Secretary's invocation protected all deposits of all depositors of SVB. These statements were made with the intention of avoiding a national banking crisis by convincing SVB stakeholders, including depositors and others, that all deposits of all depositors were 100% safe at Bridge Bank. SVBFG and SVBFG's stakeholders relied on those statements, as intended by the FDIC and others, and kept SVBFG's uninsured deposits at Bridge Bank after March 13, 2023.

**ANSWER:** Admitted that the Treasury Secretary authorized the FDIC's application of the systemic risk exception on March 12, 2023, but denied that the Treasury Secretary's authorization guaranteed all insured and uninsured deposits of SVB.  To the extent the allegations in paragraph 141 of the Complaint characterize, summarize or otherwise describe the statements of Martin Gruenberg, Secretary Yellen, and counsel for FDIC-R1, the FDIC-Rs respectfully refer the Court to the full text of the written or recorded statements for their full and complete terms, and deny the allegations in paragraph 141 of the Complaint to the extent inconsistent therewith.  The FDIC-Rs lack sufficient knowledge or information to form a belief as to the truth of the allegations in the fourth sentence of paragraph 141 and therefore such allegations are denied.

142.    FDIC-Rs had the funds available to satisfy SVBFG's deposit demand, including as a result of the invocation of the systemic risk exception.

**ANSWER:** The FDIC-Rs deny that the FDIC-Rs had funds available to satisfy SVBFG's deposit demand as a result of the invocation of the systemic risk exception.

143.    The instructions by FDIC-R1 to Bridge Bank to deprive SVBFG of access to its Account Funds and Bridge Bank's compliance with those instructions was improper and unlawful.

**ANSWER:** The allegations in paragraph 143 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 143 are denied, including any allegation that the "Account Funds" constitute anything different than an

– 75 –

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12

2  U.S.C. § 1821(i)(2).

3     144.    FDIC-R1 and FDIC-R2 had no valid basis to reject SVBFG's deposit demands, or to

4  otherwise control, interfere with, or inhibit the payment of SVBFG's Account Funds.

5     **ANSWER:** The allegations in paragraph 144 of the Complaint consist of legal conclusions to

6  which no response is required.  To the extent a response is required, the allegations in paragraph 144

7  are denied, including any allegation that the "Account Funds" constitute anything different than an

8  uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12

9  U.S.C. § 1821(i)(2).

10     145.    SVBFG has demanded that FDIC-R1 and FDIC-R2 pay to SVBFG the Account Funds,

11  but FDIC-R1 and FDIC-R2 refuse to do so.

12     **ANSWER:** The FDIC-Rs deny the allegations in paragraph 145 of the Complaint to the extent

13  they purport to characterize the "Account Funds" as anything different than an uninsured deposit

14  liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. §

15  1821(i)(2).  The allegations in paragraph 145 of the Complaint are otherwise admitted.

16     146.    FDIC-R1 and FDIC-R2 have wrongfully refused to pay SVBFG any amount.

17     **ANSWER:** The allegations in paragraph 146 of the Complaint consist of legal conclusions to

18  which no response is required.  To the extent a response is required, the allegations in paragraph 146

19  are denied.

20     147.    As a result of FDIC-R1's and FDIC-R2's continued failure to pay SVBFG the amounts

21  to which it is entitled and their continuing efforts to block SVBFG's access to its Account Funds,

22  SVBFG has also been deprived of earnings on those funds, which SVBFG estimates conservatively to

23  be in excess of approximately $10 million per month.

24     **ANSWER:** The allegations in this paragraph concern SVBFG's request for prejudgment

25  interest and lost earnings under Count I of the Complaint which, pursuant to the Order, was dismissed

26  by the Court without leave to amend.  Accordingly, no response is required.  To the extent a response

27  is required, the allegations in paragraph 147 consist of legal conclusions to which no response is

28  required and the FDIC-Rs lack sufficient knowledge and information to form a belief regarding the

– 76 –

truth of the allegations in paragraph 147 of the Complaint. Therefore, such allegations are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

148.    SVBFG has been further damaged, and will continue to be damaged, until such time as SVBFG is paid the full amount of the Account Funds.

**ANSWER:** The allegations in paragraph 148 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 148 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

149.    Accordingly, SVBFG requests a liquidated judgment for the Account Funds in the amount of $1,933,805,708.13 plus earnings on that amount and an unliquidated judgment for (a) any additional amounts that access to SVBFG's records may show were in SVBFG's Deposit Accounts and have not been returned to SVBFG, and (b) damages from its loss of use of such amounts, including the cost of any debtor in possession financing.

**ANSWER:** The allegations in paragraph 149 of the Complaint concern SVBFG's request for prejudgment interest and lost earnings under Count I of the Complaint which, pursuant to the Order, was dismissed by the Court without leave to amend. Accordingly, to the extent the allegations in this paragraph are based on SVBFG's assertion that it is entitled to prejudgment interest and/or lost earnings, no response is required. To the extent a response is required, the FDIC-Rs deny that SVBFG is entitled to the relief described in paragraph 149, and deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**Count II**

**Estoppel**

**(Against Defendants FDIC-R1 and FDIC-R2)**

150.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:** The allegations in paragraph 150 of the Complaint purport to re-allege and incorporate by reference the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth therein.  To the extent a response to paragraph 150 is required, the FDIC-Rs re-allege and incorporate by reference the foregoing answers set forth herein.

151.    On March 12, 2023, the Treasury Secretary invoked the systemic risk exception to guarantee all insured and uninsured deposits of SVB. Thereafter, the FDIC, Chairman Gruenberg, Secretary Yellen, and counsel for FDIC-R1, as well as numerous other senior government officials, made statements to the American public, to Congress, and to the Bankruptcy Court confirming that the Treasury Secretary's invocation protected **all** deposits of **all** depositors of SVB with the specific intention of avoiding a national banking crisis that would result if depositors withdrew their funds. SVBFG reasonably relied on those statements (as did the Bankruptcy Court and the United States Trustee in the bankruptcy proceedings) and SVBFG did not withdraw its funds, just as the FDIC intended. Instead, SVBFG kept its uninsured deposits at Bridge Bank after March 13, 2023, in reliance on the FDIC's repeated promises and assurances that all deposits would be paid in full.

**ANSWER:** Admitted that the Treasury Secretary authorized the FDIC's application of the systemic risk exception on March 12, 2023, but denied that the Treasury Secretary's authorization guaranteed all insured and uninsured deposits of SVB.  To the extent the allegations in paragraph 151 of the Complaint characterize, summarize or otherwise describe the statements of Martin Gruenberg, Secretary Yellen, counsel for FDIC-R1, and other senior government officials, the FDIC-Rs respectfully refer the Court to the full text of the written or recorded statements for their full and complete terms, and deny the allegations in paragraph 151 of the Complaint to the extent inconsistent therewith.  The FDIC-Rs lack knowledge and information sufficient to form a belief as to the truth of

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    the allegations in the third and fourth sentences of paragraph 151 and therefore such allegations are

2    denied.

3    152.    SVBFG has suffered damages and continues to suffer damages as a result of its

4    reasonable reliance on FDIC-R1's and FDIC-R2's statements that all deposits would be paid in full.

5    SVBFG has been unable to access its approximately $1.93 billion in deposits for nearly a year as a

6    result of FDIC-R1's and FDIC-R2's blatant refusal to honor the protections that the FDIC and persons

7    authorized to speak for the FDIC in its various capacities, including the FDIC's own Chairman

8    Gruenberg and counsel for FDIC-R1, repeatedly represented would be extended to all depositors,

9    including SVBFG. As a result of FDIC-R1's and FDIC-R2's continued failure to pay SVBFG the

10    amounts to which it is entitled and their continuing efforts to block SVBFG's access to its Account

11    Funds, SVBFG has also been deprived of earnings on those Funds, which SVBFG estimates

12    conservatively to be in excess of approximately $10 million per month.

13    **ANSWER:** The allegations in paragraph 152 of the Complaint consist of legal conclusions to

14    which no response is required.  To the extent a response is required, the allegations in paragraph 152

15    are denied, including any allegation that the "Account Funds" constitute anything different than an

16    uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12

17    U.S.C. § 1821(i)(2).  The FDIC-Rs also lack knowledge or information sufficient to form a belief as

18    to the allegations in paragraph 152 regarding SVBFG's alleged damages or other harm allegedly

19    suffered by SVBFG and therefore those allegations are denied.

20    153.    FDIC-R1 and FDIC-R2 are estopped from disregarding the Treasury Secretary's

21    invocation and determination of the systemic risk exception as it was contemporaneously and

22    repeatedly described as an action to protect all uninsured deposits of SVB, including SVBFG's

23    Account Funds. To the extent it is FDIC-R1's and FDIC-R2's position that the systemic risk exception

24    does not apply to SVBFG, it is estopped from taking such position based on repeated statements to the

25    contrary.

26    **ANSWER:** The allegations in paragraph 153 of the Complaint consist of legal conclusions to

27    which no response is required.  To the extent a response is required, the allegations in paragraph 153

28    are denied, including any allegation that the "Account Funds" constitute anything different than an

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1   uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12
2   U.S.C. § 1821(i)(2).

3                                           **Count III**

4   **Turnover of the Account Funds Pursuant to Section 542 of the Bankruptcy Code**

5                      **(Against Defendants FDIC-R1 and FDIC-R2)**

6          154.    SVBFG re-alleges and incorporates by reference the allegations contained in the
7   foregoing paragraphs as if fully set forth herein.

8          **ANSWER:** The allegations in paragraph 154 of the Complaint purport to re-allege and
9   incorporate by reference the allegations contained in the foregoing paragraphs of the Complaint as if
10  fully set forth therein.  To the extent a response to paragraph 154 is required, the FDIC-Rs re-allege
11  and incorporate by reference the foregoing answers set forth herein.

12         155.    The Account Funds constitute property of SVBFG's estate under Section 541(a) of the
13  Bankruptcy Code.

14         **ANSWER:** The allegations in paragraph 155 consist of legal conclusions to which no response
15  is required.  To the extent a response is required, the FDIC-Rs deny the allegation in paragraph 155 of
16  the Complaint that the "Account Funds" constitute anything different than an uninsured deposit
17  liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. §
18  1821(i)(2).  The remaining allegations in paragraph 155 are denied.

19         156.    Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an entity that
20  owes a debt that is property of the estate and that is matured, payable on demand, or payable on order,
21  shall pay such debt to, or on the order of, the trustee."

22         **ANSWER:** The FDIC-Rs refer the Court to section 542(b) of the Bankruptcy Code for its full
23  and complete terms.  To the extent SVBFG purports to characterize or describe section 542(b) of the
24  Bankruptcy Code, the FDIC-Rs respectfully refer the Court to the full text of section 542(b) of the
25  Bankruptcy Code for its full and complete terms, and deny the allegations in paragraph 156 of the
26  Complaint to the extent inconsistent therewith.

27         157.    The Treasury Secretary, based on the recommendation of FDIC-C and the Federal
28  Reserve, and after consultation with the President, invoked the systemic risk exception to guarantee

all deposits, insured and uninsured, at SVB and provided for "full access" to those funds. This includes SVBFG's approximately $2.1 billion in uninsured deposits that existed at the time of the Treasury Secretary's action, and the approximately $1,933,805,708.13 in uninsured Account Funds that remained when SVBFG's access to its Account Funds, then held at Bridge Bank on or about March 16, 2023.

**ANSWER:** The allegations in the first sentence of paragraph 157 of the Complaint are denied. The allegations in the second sentence of paragraph 157 consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in the second sentence of paragraph 157 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

158.    FDIC-R1 and FDIC-R2 unlawfully deprived SVBFG of access to its Account Funds.

**ANSWER:** The allegations in paragraph 158 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 158 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

159.    FDIC-R1 and FDIC-R2 continue unlawfully to refuse to provide SVBFG access to its Account Funds.

**ANSWER:** The allegations in paragraph 159 of the Complaint consist of legal conclusions to which no response is required. To the extent a response is required, the allegations in paragraph 159 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

160.    On January 5, 2024, in response to SVBFG's demand that FDIC-R1 and FDIC-R2 restore SVBFG's access to the Account Funds, FDIC-R1 and FDIC-R2 confirmed in writing that they refuse to do so.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    **ANSWER:** Admitted that the FDIC-Rs sent Notices of Disallowance to SVBFG on January

2    5, 2024.  To the extent SVBFG purports to characterize or describe the Notices of Disallowance, the

3    FDIC-Rs respectfully refer the Court to the full text of the Notices of Disallowance for their full and

4    complete terms, and deny the remaining allegations in paragraph 160 to the extent inconsistent

5    therewith.  By way of further response, the FDIC-Rs deny any allegation that the "Account Funds"

6    constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff

7    rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

8        161.    The Account Funds constitute a debt FDIC-R1 and/or FDIC-R2 owe to SVBFG's

9    estate, which is property of the estate and is matured, payable on demand, or payable on order.

10    **ANSWER:** The allegations in paragraph 161 of the Complaint consist of legal conclusions to

11    which no response is required.  To the extent a response is required, the allegations in paragraph 161

12    are denied, except that the FDIC-Rs admit that "Account Funds" is nothing more than an alleged debt

13    based on an uninsured deposit claim, subject to FDIC-R1's defensive setoff rights and the limitations

14    imposed by 12 U.S.C. § 1821(i)(2).

15        162.    SVBFG's Account Funds are therefore subject to turnover pursuant to Section 542 of

16    the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

17    **ANSWER:** The allegations in paragraph 162 of the Complaint consist of legal conclusions to

18    which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer

19    the Court to Section 542 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy

20    Procedure for their full and complete terms, and deny any allegations in paragraph 162 inconsistent

21    therewith.  Further answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute

22    anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and

23    limitations imposed by 12 U.S.C. § 1821(i)(2).

24        163.    Pursuant to Section 542 of the Bankruptcy Code, FDIC-R1 and FDIC-R2 are required

25    to immediately return to SVBFG its Account Funds, including all earnings that were or would have

26    been earned on the Account Funds since the date the Account Funds were blocked or taken.

27    **ANSWER:** The allegations in paragraph 163 of the Complaint consist of legal conclusions to

28    which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

the Court to Section 542 of the Bankruptcy Code for its full and complete terms, and deny any allegations in paragraph 163 inconsistent therewith.  Further answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

**Count IV**

**Violation of the Automatic Stay Under Section 362(a) of the Bankruptcy Code**

**(Against Defendants FDIC-R1 and FDIC-R2)**

164.    SVBFG re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:** The allegations in paragraph 164 of the Complaint concern Count IV of the Complaint which, pursuant to the Order, was dismissed by the Court as to the FDIC-Rs' "continued refusal to pay the Account Funds."  Accordingly, to the extent the allegations in this paragraph are based on the FDIC-Rs' "continued refusal to pay the Account Funds," no response is required.  To the extent a response is required, the allegations in paragraph 164 purport to re-allege and incorporate by reference the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth therein.  To the extent a response to paragraph 164 is required, the FDIC-Rs re-allege and incorporate by reference the foregoing answers set forth herein.

165.    The automatic stay of Section 362 of the Bankruptcy Code came into effect automatically by statute immediately upon SVBFG's filing of its voluntary petition for relief under Chapter 11 on March 17, 2023, and FDIC-R1 and FDIC-R2 received notice of the automatic stay.

**ANSWER:** The allegations in paragraph 165 of the Complaint concern Count IV of the Complaint which, pursuant to the Order, was dismissed by the Court as to the FDIC-Rs' "continued refusal to pay the Account Funds."  Accordingly, to the extent the allegations in this paragraph are based on the FDIC-Rs' "continued refusal to pay the Account Funds," no response is required.  To the extent a response is required, the FDIC-Rs admit that the FDIC-Rs received notice of the automatic stay.  The remaining allegations in paragraph 165 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the FDIC-Rs respectfully refer the Court to Section 362 of the Bankruptcy Code for its full and complete terms, and deny any

– 83 –

allegations in paragraph 165 inconsistent therewith. Further answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

166.    By refusing to release any of the Account Funds to SVBFG and directing the Bridge Bank to unwind the payment of approximately $6,222,681.93 in intercompany receivables to SVBFG after the stay went into effect on March 17, 2023, and by the Bridge Bank purportedly unwinding the payment of intercompany receivables to SVBFG after the stay went into effect, FDIC-R1 and FDIC-R2 violated, and continue to violate, the automatic stay applicable to SVBFG and its assets wherever located pursuant to Section 362(a) of the Bankruptcy Code.

**ANSWER:** The allegations in paragraph 166 of the Complaint concern Count IV of the Complaint which, pursuant to the Order, was dismissed by the Court as to the FDIC-Rs' "continued refusal to pay the Account Funds." Accordingly, to the extent the allegations in this paragraph are based on the FDIC-Rs' "continued refusal to pay the Account Funds," no response is required. The allegations in paragraph 166 consist of legal conclusions to which no response is required. To the extent a response is required, the FDIC-Rs respectfully refer the Court to Section 362(a) of the Bankruptcy Code for its full and complete terms, and deny any allegations in paragraph 166 inconsistent therewith. Further answering, the FDIC-Rs deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

167.    SVBFG seeks an injunction against FDIC-R1's and FDIC-R2's continued violation of the automatic stay and an order that FDIC-R1 and FDIC-R2 cure their violation of the automatic stay by delivering to SVBFG its Account Funds together with all amounts that were or would have been earned on those Account Funds from and after March 16, 2023.

**ANSWER:** The allegations in paragraph 167 of the Complaint concern Count IV of the Complaint which, pursuant to the Order, was dismissed by the Court as to the FDIC-Rs' "continued refusal to pay the Account Funds." Accordingly, to the extent the allegations in this paragraph are based on the FDIC-Rs' "continued refusal to pay the Account Funds," no response is required. The allegations in paragraph 167 consist of legal conclusions to which no response is required. To the

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

– 84 –

1    extent a response is required, the allegations in paragraph 167 are denied. Further answering, the

2    FDIC-Rs deny any allegation that the "Account Funds" constitute anything different than an uninsured

3    liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. §

4    1821(i)(2).

5    **Count VII**

6    **Declaratory Judgment Under 28 U.S.C. § 2201 *et seq.***

7    **(Against FDIC-R1 and FDIC-R2)**

8    182.    SVBFG re-alleges and incorporates by reference the allegations contained in the

9    foregoing paragraphs as if fully set forth herein.

10    **ANSWER:** The allegations in paragraph 182 of the Complaint purport to re-allege and

11    incorporate by reference the allegations contained in the foregoing paragraphs of the Complaint as if

12    fully set forth therein. To the extent a response to paragraph 182 is required, the FDIC-Rs re-allege

13    and incorporate by reference the foregoing answers set forth herein.

14    183.    FDIC-R1 contends that to recover its Account Funds, SVBFG was required to submit

15    a claim to FDIC-R1 through an administrative claims process pursuant to 12 U.S.C. § 1821(d).

16    **ANSWER:** Admitted that to potentially recover on its Claims, SVBFG was required to file an

17    administrative claim under the FIRREA claims process. The remaining allegations of paragraph 183

18    of the Complaint are denied. By way of further response, SVBFG had no "Account Funds." SVBFG

19    had an uninsured deposit claim.

20    184.    SVBFG denies that it had any such obligation.

21    **ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding

22    the truth of the allegations contained in paragraph 184 of the Complaint and therefore they are denied.

23    185.    FDIC-R2 contends that to recover its Account Funds, SVBFG was required to submit

24    a claim to FDIC-R2 through an administrative claims process pursuant to 12 U.S.C. § 1821(d).

25    **ANSWER:** Admitted that to potentially recover on any Claims (if any) against FDIC-R2,

26    SVBFG was required to file an administrative claim under the FIRREA claims process. The remaining

27    allegations of paragraph 185 of the Complaint are denied. By way of further response, SVBFG had

28    no "Account Funds." SVBFG had an uninsured deposit claim.

*REED SMITH LLP*
*A limited liability partnership formed in the State of Delaware*

186.    SVBFG denies that it had any such obligation.

**ANSWER:** The FDIC-Rs lack sufficient knowledge and information to form a belief regarding the truth of the allegations contained in paragraph 186 of the Complaint and therefore they are denied.

187.    A present and real controversy exists between SVBFG, on the one hand, and each of FDIC-R1 and FDIC-R2 on the other hand, that is ripe for adjudication.

**ANSWER:** The allegations in paragraph 187 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 187 are denied.

188.    If SVBFG is correct, it is not required to seek a *de novo* adjudication of its deposit claim in this Court. Rather, it has the right to have its entitlement to the Account Funds determined in the Southern District of New York, where the United States Bankruptcy Court is presiding over its Chapter 11 proceeding.

**ANSWER:** The allegations in paragraph 188 of the Complaint consist of legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 188 are denied, including any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

189.    Accordingly, SVBFG respectfully requests that the Court declare that (i) to assert its right to recover the Account Funds from FDIC-R1, SVBFG was not required to file an administrative claim with FDIC-R1 pursuant to 12 U.S.C. § 1821(d), and (ii) to assert its right to recover the Account Funds from FDIC-R2, SVBFG was not required to file an administrative claim with FDIC-R2 pursuant to 12 U.S.C. § 1821(d).

**ANSWER:** The allegations in paragraph 189 of the Complaint state the relief requested by SVBFG and therefore no response is required.  To the extent a response is required, the FDIC-Rs deny that SVBFG is entitled to any of the relief requested in paragraph 189, and deny any allegation that the "Account Funds" constitute anything different than an uninsured liability claim, subject to FDIC-R1's defensive setoff rights and limitations imposed by 12 U.S.C. § 1821(i)(2).

## **PRAYER FOR RELIEF**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

NOW, THEREFORE, Plaintiff SVBFG prays for judgment and relief against Defendants FDIC-R1 and FDIC-R2 as follows:

a.    Judgment in SVBFG's favor and against both Defendants FDIC-Rs on all causes of action alleged herein;

b.    An order restoring SVBFG's Account Funds, together with all earnings on those funds since SVBFG was deprived of access on March 16, 2023;

c.    An order enjoining the FDIC-Rs and all affiliated entities acting in concert with the FDIC-Rs from refusing to provide SVBFG with access to the Account Funds;

d.    An order pursuant to 28 U.S.C. § 2201 declaring that SVBFG was not required to file an administrative claim under 12 U.S.C. § 1821(d) and that SVBFG may therefore pursue its claims in the Adversary Proceeding;

e.    An order pursuant to 28 U.S.C. § 2201 declaring and holding unlawful and setting aside the FDIC-Rs' disallowance of SVBFG's non-deposit claims under 12 U.S.C. § 1821(d) and requiring the FDIC-Rs to pay to SVBFG the full amounts requested;

f.    An order pursuant to 28 U.S.C. § 2201 declaring SVBFG's claims to be valid and proven against the Deposit Insurance Fund to the extent SVBFG's claims cannot be satisfied by the assets in the FDIC-Rs' receiverships, as applicable;

g.    In the alternative, an award of SVBFG's pro rata share of SVB's and Bridge Bank's liquidation value as of the time SVB and Bridge Bank were closed and placed into each respective receivership pursuant to Sections 1406 and 681 of the California Financial Code and Sections 91 and 194 of the National Bank Act, as applicable;

h.    An order pursuant to 28 U.S.C. § 2201 declaring that SVBFG is entitled to indemnification and reimbursement from the FDIC-R for any obligations or liabilities asserted against it that arise out of claims for indemnification or contribution from any officers or employees of SVB;

i.    An award of all fees and costs associated with the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims, including any damages or other claims

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

associated with the Lease Agreements, Vendor Contracts, Employee Claims, and Indemnity Claims, in an amount to be determined, plus pre- and post- judgment interest, fees, and costs;

j.    An award of pre- and post-judgment interest to the fullest extent permitted by law;

k.    An award of SVBFG's costs and attorneys' fees as may be permitted by law; and

l.    An award to SVBFG of such other relief as may be just.

**ANSWER:** The FDIC-Rs deny that SVBFG is entitled to any of the relief requested in the Prayer for Relief.

## AFFIRMATIVE DEFENSES

The FDIC-Rs assert their affirmative defenses as follows. The FDIC-Rs reserve the right to amend these defenses, and nothing stated in these defenses constitutes an admission that the FDIC-Rs bear any burden of proof on any issue on which they would not otherwise bear such a burden. These defenses are pleaded in the alternative and do not constitute an admission of liability or that SVBFG is entitled to any relief.

## INTRODUCTION

1.    SVBFG caused billions of dollars in losses through its mismanagement of SVB but now audaciously requests repayment of its deposits. SVBFG controlled and dominated SVB and operated the bank for its benefit—and to SVB's detriment—causing SVB to take excessively risky bets on long-duration securities that exposed SVB to massive interest-rate risk and liquidity risk. SVBFG gambled in pursuit of short-term profits for itself at the expense of SVB's financial condition and safety and soundness. Yet despite this misconduct, SVBFG now seeks to recover $1.93 billion that it had on deposit with SVB at the time of SVB's failure, ignoring that its own wrongdoing caused far more in damages to SVB. All the claims brought by SVBFG in this case are precluded on this basis.

2.    SVBFG and SVB shared identical boards of directors, and their primary officers were the same individuals with the same roles and titles. This overlap allowed SVBFG to control SVB, to direct its operations, and to aid and abet repeated breaches of fiduciary duties owed to SVB by these

– 88 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  shared officers and directors. Among other things, these officers and directors ignored clear warnings

2  of risk to SVB's financial condition well before SVB's demise, including projections from SVB's own

3  risk model showing that its capital could be wiped out if it did not reduce its risk profile. SVBFG and

4  SVB's officers and directors ignored these and other warnings to try to boost SVBFG's short-term

5  income and its stock price, even though doing so exposed SVB to unreasonable risk. Through this and

6  other misconduct, these officers and directors breached fiduciary duties of care and loyalty owed to

7  SVB in multiple ways.

8      3.      First, SVBFG and SVB's officers and directors overexposed SVB to investments in

9  long-term securities, held primarily in its unhedged held-to-maturity ("HTM") securities portfolio, in

10  an effort to increase yield in 2021. In making or approving these imprudent investments, SVBFG and

11  SVB's officers and directors ignored the obvious risk that an increase in interest rates would result in

12  substantial losses to SVB, thereby reducing SVB's capital and liquidity. These investments

13  overconcentrated SVB in long-duration HTM assets contrary to duration and HTM exposure levels

14  recommended by consultants to SVBFG and SVB and caused SVB to repeatedly breach its own

15  interest-rate-risk policies and metrics. But instead of taking corrective action to remedy this

16  overconcentration, address the policy and risk-metric breaches, or otherwise reduce SVB's interest-

17  rate risk, SVBFG and SVB's officers modified the assumptions underlying one of SVB's risk

18  models—without legitimate basis—to try to make it appear as if SVB was not in breach. At the same

19  time, SVBFG and SVB's officers and directors caused SVB to continue holding an HTM portfolio

20  with overexposure to interest-rate risk that was an extreme outlier compared to SVB's peer banks,

21  particularly at a time of actual and anticipated rising interest rates. SVBFG and SVB's officers and

22  directors mismanaged the HTM portfolio, and SVBFG and SVB's officers altered SVB's risk metrics,

23  despite obvious and substantial risks to SVB, to allow SVBFG to show short-term income and to

24  attempt to boost its stock price.

25      4.      Second, from 2021 through July 2022, SVBFG and SVB's officers and directors caused

26  SVB to terminate interest-rate hedges on its available-for-sale ("AFS") securities portfolio. These

27  hedges, which were entered into as interest-rate swaps, partially protected the AFS portfolio from

28  losses in the event of an increase in interest rates. Ignoring the obvious risk of removing this protection

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

during a period of anticipated and actual rising interest rates, SVBFG and SVB's officers and directors caused SVB to terminate and monetize the hedges to try to satisfy SVBFG's earnings expectations and thereby improve its stock price. Doing so allowed SVBFG to show a short-term increase in earnings and ultimately provided income for SVB to resume a dormant program of paying "bank to parent" dividends to SVBFG. In this way, SVBFG and SVB's officers and directors sought short-term benefits for SVBFG at the expense of amplifying SVB's known and substantial exposure to massive losses in a rising interest-rate environment.

5.      Third, SVBFG and SVB's officers and directors caused SVB to issue and pay a $294 million bank-to-parent dividend to SVBFG in December 2022—less than three months before SVB's failure. Bank holding companies (like SVBFG) have a responsibility to serve as a source of financial and managerial strength to subsidiary banks (like SVB). But instead of acting as a source of strength, SVBFG caused SVB to issue a dividend that deprived SVB of essential capital and liquidity, for the sole benefit of SVBFG and its shareholders, at a time in which SVB was in financial distress, in addition to harming the bank by overexposing it to interest-rate risk in its HTM portfolio and removing the protection of the interest-rate hedges.

6.      As a result of the mismanagement of SVB's HTM portfolio, the termination of the interest-rate hedges that partially protected SVB's AFS portfolio, and the issuance of the bank-to-parent dividend, SVB suffered billions of dollars in losses for which the FDIC-R1 can recover as the successor to SVB (and for which the FDIC-R2 alternatively could recover as the successor to the Bridge Bank if it is found that Bridge Bank retained any liability to SVBFG, which the FDIC-Rs contend it did not).

7.      SVBFG is liable for aiding and abetting the breaches of fiduciary duty that caused SVB's losses, and that liability operates as a setoff against all of SVBFG's claims in this case. In addition, SVBFG is directly liable for these losses because the losses resulted from breaches by SVBFG's authorized agents and because SVBFG breached its own independent duty of care to SVB, including its responsibility to serve as a source of financial strength to SVB. That direct liability also operates as a setoff against all of SVBFG's claims in this case. Finally, SVBFG's claims are barred

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

1  by the doctrine of unclean hands, principles of unjust enrichment, constructive fraudulent transfer, and

2  numerous other affirmative defenses listed and explained more fully below.

3  **FACTUAL BACKGROUND**

4  **A.    SVBFG Operated SVB for SVBFG's Benefit Through Overlapping Officers, Directors,**

5     **Boards, and Joint Committees**

6     8.    SVBFG began operating in 1983 and was headquartered in Santa Clara, California.

7  SVB was a California state member bank and was SVBFG's principal subsidiary.

8     9.    SVB was closed on March 10, 2023, in what is now the third largest bank failure in

9  United States history.

10    10.    As of year-end 2022, SVBFG had about $211.8 billion in total assets. About $209

11  billion of these assets were attributable to SdkVB, which accordingly accounted for about 99% of

12  SVBFG's assets.

13    11.    Since at least 2021, SVBFG's and SVB's Boards of Directors overlapped completely.

14  That is, each member of SVBFG's Board of Directors was also a member of SVB's Board of Directors,

15  and vice versa. There were no independent directors of SVB.

16    12.    Not only were the directors entirely overlapping, but SVBFG and SVB also held joint

17  board meetings producing a single set of joint minutes.

18    13.    Decisions concerning SVB's assets were made at joint board and committee meetings

19  of both SVBFG and SVB. When acting or failing to act at these meetings and otherwise, the officers

20  and directors acted in their capacities as officers and directors of both SVBFG and SVB,

21  notwithstanding that doing so created conflicts of interest, especially when actions were taken to

22  financially benefit SVBFG at the expense of the bank's best interests.

23    14.    SVBFG's and SVB's Boards of Directors assigned and delegated responsibilities to

24  unitary committees that acted on behalf of both boards, including the Finance Committee, the Risk

25  Committee, and the Asset Liability Management Committee.

26    15.    A single Finance Committee oversaw financial, capital, and liquidity risks. Under its

27  charter, the Finance Committee's purpose was "to act on behalf of the Board [defined to mean the

28  Boards of Directors of both SVBFG and SVB] in fulfilling its oversight responsibilities" regarding

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

"[o]versight of certain corporate strategic matters; [o]versight of the Company [*i.e.*, SVBFG] and the Bank's financial performance; and [o]versight of the capital planning, stress testing, and capital and liquidity management, including processes and compliance with applicable regulatory requirements, jointly with the Company's Risk Committee of the Board."

16.    Further, under its charter, the unitary Finance Committee of both SVBFG and SVB was tasked with reviewing, discussing with management, and making recommendations regarding (a) investments, (b) derivative activities, (c) hedging activities, (d) management of deposits and client funds, and (e) dividend strategies and any proposed dividend declarations. The Finance Committee also had responsibility for capital and liquidity management, and, in concert with the Risk Committee, for financial risk management and remediation.

17.    A single Risk Committee oversaw the SVBFG and SVB's enterprise risk management. Under its charter, the Risk Committee's purpose was to assist "the Board," which again was defined as the Boards of Directors of SVBFG and SVB, in fulfilling oversight responsibilities to "the Company," which was also defined as a single unit consisting of SVBFG and its subsidiaries, including SVB. The responsibilities of the Risk Committee included oversight of "the Company's" enterprise-wide risk-management policies and frameworks; oversight of "the Company's" risk profile, including monitoring and understanding changes to the risk profile, followed by escalation to the board of any matters of concern; and oversight of "the Company's" compliance with its Risk Appetite Statement, including taking appropriate action upon notification of any breaches of the Risk Appetite Statement. The Risk Committee thus had responsibility for financial risk management and market risk, including specifically capital and liquidity risk management for both SVBFG and SVB.

18.    The Asset Liability Management Committee operated under delegated authority from the Finance Committee and SVBFG's Chief Financial Officer. The committee was composed of senior management from SVBFG and SVB and had responsibility to "[m]onitor changes in the composition of Company assets," where again "Company" was defined as a single unit consisting of SVBFG and its subsidiaries, including SVB. The committee also had responsibility to "review and approve strategies recommended by management that promote optimal financial performance while managing financial risks within levels that are consistent with the Company's domestic and international

– 92 –

business model and risk appetite." Further, the committee advised "senior management on the appropriate use of Company resources to position the balance sheet for minimal liquidity risk, appropriate interest rate sensitivity, optimal allocation of capital resources, and maximum shareholder value." Under its charter, the committee was responsible for recommending strategies "consistent with corporate strategic objectives and should adhere to regulatory requirements and guidelines and internal policy limitations."

19. Throughout the period relevant here, all the directors and officers simultaneously held the same positions at both SVBFG and SVB.

20. The following individuals served on the Boards of Directors for both SVBFG and SVB for some or all of the period between March 2021 and March 2023:

- Gregory Becker ("Becker")
- Eric Benhamou ("Benhamou")
- Elizabeth Burr ("Burr")
- Richard Daniels ("Daniels")
- Alison Davis ("Davis")
- Roger Dunbar ("Dunbar")
- Joel Friedman ("Friedman")
- Jeffrey Maggioncalda ("Maggioncalda")
- Beverly Kay Matthews ("Matthews")
- Mary Miller ("Miller")
- Kate Mitchell ("Mitchell")
- Garen Staglin ("Staglin")

21. In addition to being on the Boards of Directors, Becker was also the Chief Executive Officer of both SVBFG and SVB.

22. The following board members served on the unitary Finance Committee: Friedman (Chair), Benhamou, Dunbar (until April 2022), Miller, and Mitchell (after April 2022).

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

23.    The following board members served on the unitary Risk Committee: Dunbar (Chair until April 2022), Mitchell (who became the Chair after Dunbar departed in 2022), Benhamou, Daniels (after April 2022), Friedman, Matthews, Miller, and Staglin.

24.    The following officers at SVBFG and SVB, among others, served on the Asset Liability Management Committee ("ALCO"):

- Michael Kruse (Chair of ALCO and Global Treasurer of both SVBFG and SVB) ("Kruse")

- Daniel Beck (Chief Financial Officer of both SVBFG and SVB) ("Beck")

- Michael Descheneaux (President of SVB) ("Descheneaux")

- Laura Izurieta (Chief Risk Officer of both SVBFG and SVB through April 2022) ("Izurieta")

- Marc Cadieux (Chief Credit Officer of both SVBFG and SVB) ("Cadieux")

25.    A chart of the directors and officers in paragraphs 20 to 24 with their positions and committee membership is below:

| Name | SVBFG Title/Committees | SVB Title/Committees |
|---|---|---|
| Gregory Becker | Chief Executive Officer<br>President<br>Director | Chief Executive Officer<br>Director |
| Daniel Beck | Chief Financial Officer<br>ALCO | Chief Financial Officer<br>ALCO |
| Marc Cadieux | Chief Credit Officer<br>ALCO | Chief Credit Officer<br>ALCO |
| Michael Descheneaux | President of Silicon Valley Bank<br>ALCO | President<br>ALCO |
| Michael Kruse | Treasurer<br>ALCO | Treasurer<br>ALCO |
| Laura Izurieta | Chief Risk Officer<br>ALCO | Chief Risk Officer<br>ALCO |
| Eric Benhamou | Director<br>Finance and Risk Committees | Director<br>Finance and Risk Committees |
| Roger Dunbar | Director<br>Finance and Risk Committees | Director<br>Finance and Risk Committees |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

| Joel Friedman | Director<br>Finance and Risk Committees | Director<br>Finance and Risk Committees |
|---|---|---|
| Mary Miller | Director<br>Finance and Risk Committees | Director<br>Finance and Risk Committees |
| Kate Mitchell | Director<br>Finance and Risk Committees | Director<br>Finance and Risk Committees |
| Beverly Matthews | Director<br>Risk Committee | Director<br>Risk Committee |
| Garen Staglin | Director<br>Risk Committee | Director<br>Risk Committee |
| Richard Daniels | Director<br>Risk Committee | Director<br>Risk Committee |
| Elizabeth Burr | Director | Director |
| Alison Davis | Director | Director |
| Jeffrey Maggioncalda | Director | Director |

26.     In addition to holding the same titles at both SVBFG and SVB listed above, members of the Boards of Directors, the Finance Committee, Risk Committee, and Asset Liability Management Committee customarily and repeatedly made decisions on behalf of both SVBFG and SVB without distinguishing between the two entities.

27.     The Boards of Directors and the Finance Committee, Risk Committee, and Asset Liability Management Committee also held joint meetings for each board and committee resulting in a single set of joint minutes that routinely fail to distinguish between SVBFG and SVB.

**B.     SVB's Grossly Imprudent Growth and its Governance and Risk-Management Failures**

28.     At the beginning of 2018, SVB had about $56 billion in assets and $50 billion in deposits; by the end of 2019, it had about $70 billion in total assets and $56 billion in deposits.

29.     Between 2020 and 2021, however, SVB more than tripled its assets and deposits. In 2020, SVB's assets nearly doubled to $114 billion, and it had $95 billion in deposits. By the end of 2021, SVB had $209 billion in total assets and $176 billion in deposits.

REED SMITH LLP<br>A limited liability partnership formed in the State of Delaware

30. SVB's growth substantially exceeded that of the banking industry as a whole. Specifically, the industry grew at a rate of approximately 24% from year-end 2019 to year-end 2022, while SVB grew by more than 196% during this same period.

31. Part of SVB's growth was fueled by deposits that were heavily concentrated in the technology and life-sciences sectors. By year-end 2022, venture-capital-backed companies in these sectors accounted for more than half of SVB's deposits, linking SVB's deposits and deposit growth directly to venture-capital-deal activity and liquidity events associated with those deals.

32. The vast majority of SVB's deposits were uninsured because they exceeded the $250,000 threshold for FDIC deposit insurance. As of year-end 2022, SVBFG's and SVB's regulatory filings reflected that approximately 94% of SVB's deposits were uninsured.

33. SVB's extraordinary deposit growth resulted in a larger base of deposits than in prior years, but also one that was inherently less stable. The newness of these deposits, their concentration in specific industry sectors having highly variable liquidity profiles, their uninsured status, and other characteristics all reduced the "stickiness" of these deposits, leaving SVB particularly vulnerable to the risk of deposit withdrawals in the event of an increase in interest rates or loss of market confidence in SVB.

34. SVBFG and SVB chose to invest the bulk of this surge in deposits into SVB's investment portfolio in long-term, fixed-rate, government-backed debt securities, such as U.S. treasuries and mortgage-backed securities.

35. Interest rates in 2020 and 2021 were at historically low levels. During 2020 and 2021, SVB purchased tens of billions of dollars of long-term securities at historically low, fixed interest rates with the aspiration of generating relatively modest income because of the then-nominal difference between the interest paid to depositors and the long-term interest rates on government-backed securities. SVB's portfolio was part of a joint plan and strategy adopted by both SVBFG and SVB that focused on growing long-duration security investments to generate yield. That joint plan and strategy is reflected in presentation materials provided to the Finance Committee and internal communications among SVBFG and SVB's officers and directors, including at Finance Committee meetings, Finance Committee strategy sessions, and Asset Liability Management Committee meetings.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

36.     This investment strategy exposed SVB to severe interest-rate risk of which SVBFG and SVB's officers on the Asset Liability Management Committee were fully on notice. These officers knew or should have known that, in a rising interest-rate environment, long-term securities decline in value and compress net-interest margin (*i.e.*, the difference between the interest income a bank earns from its investments and the interest it pays out to depositors), resulting in reductions in capital, liquidity, and net income.

37.     At the same time, various of SVBFG and SVB's officers and directors also knew or should have known that SVB lacked critical risk-management resources and controls necessary to manage the significant risks associated with SVB's growth and size. Among other things, SVBFG and SVB's chief risk officer left in April 2022 and was not replaced until January 2023. SVB also lacked other foundational best practices, discussed below, related to management of interest-rate and liquidity risk.

**C.     Regulators Repeatedly Warned SVBFG and SVB about Governance and Risk-Management Failures**

38.     Regulators repeatedly put SVBFG and SVB's officers and directors on notice that there were significant deficiencies with SVB's management and governance.

39.     As early as 2019, the Federal Reserve issued a joint Report of Examination with state regulators identifying concerns related to the concentration of SVB's deposits and funding structure, including that the volatility of SVB's deposits could pose liquidity risks.

40.     In the 2020 joint Report of Examination, examiners criticized SVB's risk management practices because those practices were being "outpaced" by SVB's significant asset growth. The Report of Examination also noted a breach of SVB's economic value of equity at risk ("EVE-at-Risk") tolerance—a basic measure of interest-rate risk—and encouraged management to "formalize the process for monitoring, tracking and escalating action plans" to address EVE-at-Risk breaches. Examiners also warned about risks posed by a rising interest rate environment, particularly considering SVB's growth in deposits and the growth in the size and duration of its securities portfolio.

41.     In a November 2, 2021 supervisory letter, examiners concluded that liquidity risk-management practices were inadequate and that this weakness could "underestimate the demands on

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

available liquidity sources in stress." Examiners also noted that liquidity risk-management practices had not kept pace with SVB's significant deposit inflows and very large concentration of uninsured deposits. SVB was ordered to develop a comprehensive liquidity limit and monitoring framework appropriate for its liquidity risk profile. The examiners issued several regulatory notices (called "Matters Requiring Attention" and "Matters Requiring Immediate Attention") that included the following:

    (a)    requiring SVB to develop a plan to improve liquidity risk-management practices to meet supervisory expectations and regulatory requirements, including by addressing past supervisory findings, liquidity stress testing, and contingency funding;

    (b)    warning of insufficient oversight and risk management in SVB's independent liquidity risk function and internal audit in light of the evolution of SVB's liquidity risk profile following SVB's recent substantial deposit inflows and concentrations in uninsured deposits;

    (c)    finding that SVB's stress testing and scenarios were insufficiently stressing liquidity exposures and contained inappropriate assumptions by relying on incomparable peer benchmarks and by ignoring key risk attributes, which limited SVB's ability to differentiate deposit risks in periods of stress;

    (d)    determining that deficiencies in deposit segmentation reduced the reliability of SVB's liquidity buffer; and

    (e)    concluding that SVB's liquidity risk limits and supporting processes were insufficient for the size and complexity of its activities.

42.    In May 2022 examiners again issued a letter on SVB's governance and risk-management program because SVB had ignored their prior warnings. Examiners criticized the "lack of effective board oversight," explaining that "[w]hen risk management weaknesses were indicated by breaches of internal risk metrics, internal audits and past regulatory examinations, the board did not hold senior management accountable to remediate these issues."

43.    In three Matters Requiring Immediate Attention that followed the May 2022 letter, examiners determined (a) that "the Board's oversight over the Firm's risk-management practices is

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

not adequate and has contributed to an ineffective risk management program," (b) that "SVB's existing risk management program is not effective," and (c) that "Internal Audit Department's (IA) methodology and programs do not sufficiently challenge management, provide the Audit Committee with sufficient and timely reporting, or ensure the timely analysis of critical risk management functions and the overall risk management program."

44.     In a supervisory ratings letter dated August 17, 2022, examiners downgraded SVB to a composite score of "3" on the "CAMELS" supervisory rating system (which assesses insured depository institutions' capital adequacy, asset quality, management, earnings, liquidity, and sensitivity to market risk). This rating reflected the examiners' determination that SVB exhibited supervisory concern in one more or more of these component areas, including specifically the management component, which also was downgraded to a "3" rating. Examiners found that "the board's oversight does not meet supervisory expectations," the "risk management program is not effective," and there was a lack of "foundational liquidity risk management elements."

45.     In another supervisory letter and accompanying Matter Requiring Attention, dated November 15, 2022, examiners further warned that the bank's interest-rate-risk models were "unreliable" because they "gave a false sense of safety in a rising rate environment and masked the need to take actions earlier in the rate cycle." Examiners further noted that this deficiency "call[ed] into question the reliability of [interest rate risk] modeling and the effectiveness of risk management practices" at SVB.

**D.    SVBFG and SVB's Own Management Recognized Governance and Risk Management Failures**

46.     Beyond the warnings of examiners, SVBFG and SVB's officers themselves recognized that the bank's risk-management practices and controls were deficient. Becker, Beck, and Izurieta, among others, regularly criticized the Risk Committee and its members as incompetent, inattentive, and ineffective, in addition to being unfamiliar with basic and critical concepts—like the concept of "risk appetite" itself.

47.     SVB's internal audits also found serious deficiencies with the effectiveness of the SVBFG and SVB's Boards of Directors and with SVBFG and SVB's risk management. For example,

in March 2022, SVB's internal audit division issued a report that rated "Corporate Governance-Board Oversight" as insufficient for the audit period September 1, 2020 through November 20, 2021. The report cited several serious deficiencies across all assessed categories. These deficiencies included the following: (a) the lack of a formal framework for the board to hold senior management accountable for risk-related events; (b) a lack of evidence to support the so-called "effective challenge process;" (c) the risk and breach reporting was voluminous and too granular; (d) insufficient time allotted to agenda topics and committee meetings; (e) the lack of a framework for identifying necessary board training; and (f) a lack of clear evidence aligning SVB's strategy to risk appetite.

**E.    Overconcentration in HTM Securities Obscures Losses, Prevents Hedging, and Restricts Liquidity**

48.    As explained above, SVBFG and SVB's decision to invest in long-term government securities at historically low interest rates exposed SVB to severe interest-rate risk because long-term securities decline in value in a rising interest-rate environment and generate less income relative to a bank's deposit costs, which increase as rates rise and depositors expect a higher rate of return on their interest-bearing accounts. The effect is to compress net interest margin, resulting in reductions in capital, liquidity, and net income.

49.    Classifying most of SVB's investments as HTM rather than AFS obscured some of the potential adverse consequences of this decision to principally invest in long-duration securities. Under applicable accounting principles, AFS securities are recorded at "fair value" (they are "marked to market"), and changes in their value are reflected by the unrealized gains or losses reported in assets and shareholder's equity (as accumulated other comprehensive income) on the balance sheet.

50.    In contrast, HTM securities are not recorded at fair value but instead are carried at amortized cost. The accounting treatment for securities classified as HTM allowed SVB to exclude unrealized losses attributable to its HTM portfolio from assets and accumulated other comprehensive income as interest rates rose—the value of its HTM portfolio did not have to be reduced to fair value on the consolidated balance sheet for SVBFG and its subsidiaries despite drastic declines in the value of the portfolio. For example, SVB's unrealized losses in its HTM portfolio skyrocketed from $370 million to over $15.9 billion between September 30, 2021, and September 30, 2022.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

51.     These accounting rules also prohibit hedging of HTM securities against interest-rate risk. In contrast, AFS securities can be hedged.

52.     Classifying the bulk of its securities as HTM limited SVB's ability to liquidate its securities. HTM securities cannot be sold before their maturity date without significant risk of tainting the HTM portfolio and having to reclassify the entire portfolio as AFS, which would result in having to recognize any unrealized loss in the portfolio. The effect of classifying securities as HTM accordingly limits access to these investments as a source of liquidity during times of financial stress. Applicable accounting principles specifically state that HTM securities cannot be sold in response to needs for liquidity such as withdrawal of deposits.

53.     SVB was an extreme outlier among its industry peers regarding the relative size of its HTM securities portfolio. Whereas peer banks on average had less than 10% of total assets classified as HTM, SVB had 46% of its total assets classified as HTM in 2021 and 43% of its total assets classified as HTM in 2022. This concentration was even more pronounced in SVB's securities portfolio, which was 78% HTM both at the end of 2021 and 2022 (as noted in the charts below). This massive overconcentration of long-duration HTM assets exposed the bank to significant interest-rate risk as rates increased in 2022.

**F.     SVBFG and SVB's Officers and Directors Knew or Should Have Known of Substantial Interest-Rate and Liquidity Risks Facing SVB Yet Continued to Purchase Long-Term, Fixed-Rate Government Securities, Which Magnified its Overconcentration**

54.     SVBFG and SVB's officers and directors were well aware of a substantial risk of loss to SVB in the event of a rise in interest rates.

55.     For example, a November 17, 2020 presentation to the Asset Liability Management Committee entitled "Managing Exposure to Rising Rates" warned that continued investment in long-term securities "exposes the portfolio to risk of unrealized losses" and that SVB accordingly should reduce the duration of future investments and other assets to reduce the risk to SVB from an increase in interest rates above their historically low levels. From this presentation, SVBFG and SVB's officers on the committee were aware that SVB's securities portfolio had an average duration of 4.5 years with an average yield of 1.15% and that the committee should seek to reduce the duration of purchased

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

securities to 3 years with an average yield of .75%. As part of this presentation, the committee also was informed that due to "the potential for interest rates to rise significantly and remain high," another supposed "risk mitigation strateg[y]" was to classify securities as HTM rather than AFS to avoid having to recognize unrealized losses on securities classified as AFS.

56.     Similarly, in a January 20, 2021 memorandum to the Finance Committee, Treasurer Kruse reminded members of the joint committee that SVB had "experienced deposit growth well in excess of lending volume," that this growth had produced excess liquidity that could be invested, but that the duration of the investment portfolio should be between 3.5 to 4 years "so that cash flows are not as susceptible to changes in different rate environments" and to "[c]reate consistent, manageable cash flows." The Finance Committee was also advised that SVB's investment strategy should aim for an allocation of 50% to 60% HTM securities (leaving 40% to 50% in the AFS portfolio). These recommended limits tracked a plan developed by a third-party consultant, Blackrock, and were designed to manage the portfolio to enhance earnings while also reducing interest-rate risk and liquidity risks.

57.     Over the next two years, SVBFG and SVB's officers and directors ignored these target durations for SVB's investment portfolio while continuing to expand its HTM portfolio to avoid recognizing unrealized losses from the decline in the value of its long-term securities that would have been recognized if investments had been classified as AFS.

58.     As reported to the Asset Liability Management Committee and the Finance Committee, the effective duration of SVB's investment portfolio increased from year-end 2020 through year-end 2022 and exceeded the January 2021 target of 3.5 to 4 years in all quarters but one:

| Quarter Ending | Duration |
| --- | --- |
| Dec. 31, 2020 | 3.7 years |
| Mar. 31, 2021 | 4.8 years |
| June 30, 2021 | 4.5 years |
| Sep. 30, 2021 | 4.5 years |
| Dec. 31, 2021 | 4.0 years |
| Mar. 31, 2022 | 4.9 years |
| June 30, 2022 | 5.4 years |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

| Sep. 30, 2022 | 5.7 years |
| Dec. 31, 2022 | 5.7 years |

59.     At the same time, SVBFG and SVB's officers and directors caused SVB's ratio of HTM to AFS securities to increase well beyond the target of 50% to 60% of the securities portfolio designated as HTM:

| Quarter Ending | HTM Percentage of Investment Portfolio |
| --- | --- |
| Dec. 31, 2020 | 35% |
| Mar. 31, 2021 | 60% |
| June 30, 2021 | 72% |
| Sep. 30, 2021 | 78% |
| Dec. 31, 2021 | 78% |
| Mar. 31, 2022 | 78% |
| June 30, 2022 | 77% |
| Sep. 30, 2022 | 77% |
| Dec. 31, 2022 | 78% |

60.     SVBFG and SVB's officers and directors took these steps—causing the duration of the investment portfolio and the size of the HTM portfolio to increase—in order to maximize yields in the portfolio (while interest rates remained low) while also attempting to avoid recognition of losses (when interest rates started to rise). This strategy allowed SVBFG to show increased profits in the short term and attempt to boost its stock price—all at the expense of taking on and ignoring obvious and substantial risks of significant losses to SVB as interest rates rose. SVBFG and SVB's officers and directors knew or should have known, for example, that lengthening SVB's asset duration increased its interest-rate risk and that adding to SVB's HTM portfolio restricted its liquidity. Yet they ignored both risks for SVBFG's benefit, ultimately causing SVB substantial and foreseeable losses.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

**G.     SVBFG and SVB's Officers and Directors Ignore Repeated Breaches of SVB's Risk Policies and Risk Thresholds**

61.     Investing in securities that lengthened the duration of SVB's investment portfolio when the portfolio was already significantly overconcentrated in long-term securities caused SVB to repeatedly breach its own risk-management policies and risk thresholds.

62.     SVBFG and SVB's Global Treasury Policy, as approved by the Finance Committee and Asset Liability Management Committee, mandated use of EVE-at-Risk as a primary metric for assessing and controlling interest-rate risk (referred to as "IRR"). EVE-at-Risk is a measure of the sensitivity to changes in interest rates of a firm's economic value of equity. Economic value of equity is calculated by subtracting the present value of all liability cash flows from the present value of all asset cash flows for an institution. EVE-at-Risk is calculated by determining an institution's economic value of equity in the event of a change in interest rates.

63.     In the case of SVBFG and SVB, their Global Treasury Policy set limits for changes in EVE-at-Risk at 8% (the inner limit) and 10% (the outer limit) in the event of a 1% change in interest rates (*i.e.*, 100 basis points) and at 16% (the inner limit) and 20% (the outer limit) in the event of a 2% change in interest rates (*i.e.*, 200 basis points).

64.     If SVB breached or approached a breach of these limits, the Treasurer and Treasury Department had a responsibility to develop and present a mitigation strategy that would bring SVB back into compliance. Members of the Asset Liability Management Committee and Finance Committee (as well as the Financial Risk Management Department) had a responsibility to review and approve that mitigation strategy.

65.     Despite these policy requirements, SVB regularly and materially exceeded the inner and outer limits of EVE-at-Risk throughout 2021 and 2022 in rising-interest-rate scenarios (*i.e.*, +100 basis points and +200 basis points). These breaches were an obvious consequence of the decision to continue lengthening the duration of SVB's investment portfolio, since extending asset duration relative to liability duration causes EVE-at-Risk to drop when interest rates rise. Yet in response to these breaches, SVBFG and SVB's officers and directors took no action to correct the continuous and material breaches, disregarding the risks associated with operating SVB inconsistent with its own risk

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

policies and ignoring their responsibilities to develop and approve a plan to bring SVB into compliance with its EVE-at-Risk limits. Instead, SVBFG and SVB's officers and directors continued to approve increased investments in long-term securities that heightened SVB's exposure and risk to an increase in interest rates.

66.     For example, an internal April 2021 Global Treasury Market Risk Report, which was presented to the joint Finance Committee, stated that SVB's EVE-at-Risk as of February 28, 2021 was -13.48%, (if interest rates increased by 100 basis points) and -27.89% (if interest rates increased by 200 basis points)—both of which far exceeded the acceptable risk limits in the Global Treasury Policy. This presentation also recognized that the breaches resulted from continued "grow[th] in long-duration fixed income securities."

67.     As another example, at a November 2021 meeting of the joint Asset Liability Management Committee of both SVBFG and SVB, Beck reported that SVB had "been out of compliance for EVE at risk for several months" and asked what "additional actions should be taken," including increasing the limits. Kruse responded that one way of improving EVE-at-Risk was to change the assumptions used in SVB's deposit model. Thus, rather than mitigate the interest-rate risk by shortening asset duration or taking other steps to correct the breaches, senior management proposed to alter their models measuring the risk so that the models no longer showed a breach. This is exactly what was done in April 2022, as discussed further below.

68.     SVB's EVE-at-Risk continued to breach the outer limits of the Global Treasury Policy in 2022. SVB's EVE-at-Risk breaches worsened further as the Federal Open Market Committee began to increase the federal funds target rate in March 2022, and by April 2022, materials presented to a joint meeting of the Risk Committee and Finance Committee showed that EVE-at-Risk was -16.92% (if interest rates increased by an additional 100 basis points) and -31.42% (if interest rates increased by an additional 200 basis points). Notwithstanding these worsening material breaches during a period when interest rates were rising and expected to rise further, SVBFG and SVB's officers and directors continued to cause SVB to hold longer duration securities in its HTM portfolio, thereby exacerbating the breaches and further increasing the bank's interest-rate risk.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**H.    SVBFG and SVB's Officers Altered the EVE-at-Risk Model Rather than Reducing SVB's Interest-Rate Risk**

69.    Rather than take steps to correct the EVE-at-Risk breaches or mitigate the interest-rate risk evidenced by those breaches, SVBFG and SVB's officers altered the deposit model that fed into the EVE-at-Risk model to try to make the breaches disappear.

70.    The planning for the deposit-model change began in 2021 when members of the Asset Liability Management Committee discussed the continuous and material breaches of EVE-at-Risk and possibly changing deposit assumptions to artificially lower EVE-at-Risk.

71.    SVBFG further enabled and facilitated this planning by hiring a consultant, Curinos, to specifically advise about these assumptions.

72.    Following reports from Curinos and additional discussions, the Risk Committee was presented in January 2022 with a report providing for mitigation of interest-rate risk by "managing EVE sensitivity through deposit modeling." Specifically, the report provided for altering the deposit model's "curtailment assumption," which was characterized as the "overall time that deposits remained with the firm."

73.    As reported in a May 24, 2022 presentation to the Asset Liability Management Committee, SVBFG and SVB's officers implemented this plan by changing the curtailment assumption from 5.5 to 12 years. This change more than doubled the curtailment assumption—at a time of heightened interest-rate risk due to actual and anticipated increases in interest rates—without any valid justification for the change. Given SVB's extraordinary deposit growth and the risky composition of those deposits, including the excessive number of uninsured deposits, SVBFG and SVB's officers and directors knew or should have known that SVB's deposits were inherently susceptible to leaving the bank (not "sticky").

74.    Ultimately, the change to the deposit model was made at Beck's insistence and without any objection from members of the Asset Liability Management Committee or the Risk Committee. SVBFG and SVB's officers and directors made or approved this change to try to "manage" a critical warning sign of serious risk—SVB's breach of its interest-rate-risk limits—rather than addressing the underlying risk itself.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

75. SVBFG and SVB's change to the deposit curtailment assumption brought EVE-at-Risk within the Global Treasury Policy's limits for only two months: April 2022 and May 2022. By June 2022 SVB was again in material breach—even using its altered model. Those breaches then continued throughout 2022 as reflected in the following chart:



## I.    Mismanagement of the HTM Portfolio Caused Billions in Damages

76. Throughout 2021, SVB's officers, aided and abetted by SVBFG, purchased tens of billions of dollars of long-duration, fixed-interest-rate government securities at historically low interest rates, ignoring the obvious risk that interest rates could rise. In making or approving these purchases, SVBFG and SVB's officers and directors breached their fiduciary duties of care and loyalty by causing SVB to operate in violation of its risk-management policies and metrics for the benefit of SVBFG.

77. This mismanagement of SVB's investment portfolio was all the riskier because of the broadly reported macroeconomic environment during 2021, which was well understood by SVBFG

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

and SVB's officers and directors. As inflation increased in 2021, SVBFG and SVB's directors were aware that there was at least a substantial risk that the Federal Open Market Committee would eventually respond by raising the federal funds target rate (the interest rate that banks charge each other to borrow money overnight). Those risks ultimately materialized.

78.    Following a December 15, 2021 meeting, the Federal Open Market Committee announced early termination of a bond-buying program and signaled the possibility of three interest-rate hikes in 2022 followed by three more in 2023.

79.    By the time of the April 2022 joint meeting of SVBFG and SVB's Risk Committee and Finance Committee, there already had been one rate hike, and SVBFG and SVB's officers and directors were advised to expect at least six more rate hikes in 2022 alone.

**Current Economic Environment:**

- The FOMC raised the Federal Funds rate by 25 bps to a new range of 0.25 – 0.50%, while also stating the Fed will begin reducing asset holdings at a "coming" meeting
- The updated Fed "Dots" now show a median projection of 7 rate hikes this year (6 after today's hike); market expectations for 50bps hike in May-22 now at 80%
- Hawkish tone from the Fed has caused the Treasury yield curve to invert, a key indicator that a

80.    Despite the likelihood of at least six more rate hikes and that EVE-at-Risk far exceeded the bank's policy limits, SVBFG and SVB's officers and directors caused SVB to continue to hold $98 billion in excessively long-duration HTM securities. According to SVBFG and SVB's own models as of April 2022, the bank stood to lose 31.42% (nearly a third) of its economic value of equity in the event of a 2% increase in interest rates (the actual increase after April 2022 turned out to be 4%), yet SVBFG and SVB's officers and directors continued to cause SVB to hold securities that had the effect of lengthening the duration of its investment portfolio.

81.    This investment strategy caused skyrocketing unrealized losses in the HTM portfolio as interest rates rose. As of March 31, 2022, SVB's unrealized HTM losses exceeded $7 billion, and as of September 30, 2022, they exceeded $15.9 billion. The following chart shows these losses (with values displayed in thousands, so "$(2,000,000)" refers to $2 billion in losses, for example):



1
2
3
4
5
6
7
8
9
10
11



REED SMITH LLP

A limited liability partnership formed in the State of Delaware

12    82.    As of September 30, 2022, SVB had only $15.8 billion in total equity—less than the

13 $15.9 billion in unrealized losses in its HTM portfolio alone. Had those losses been recognized, SVB

14 would have been insolvent.

15 **J.    SVBFG and SVB Monetize the Hedges on SVB's AFS Portfolio to Benefit SVBFG and to**

16        **SVB's Detriment**

17    83.    At the end of 2021, SVB's AFS portfolio was valued at $27 billion, roughly one-third

18 the size of its HTM portfolio.

19    84.    Because the AFS portfolio had to be recorded at fair value, SVBFG and SVB hedged

20 the portfolio using interest-rate swaps to mitigate reductions in accumulated other comprehensive

21 income in the event of a rise in interest rates. As part of its "Fair Value Hedging strategy," SVB entered

22 into interest-rate swaps beginning in March 2021, and by November 2021 it had hedged $11.3 billion

23 of its $24.2 billion AFS portfolio. This hedging had the effect of reducing the average duration of the

24 AFS portfolio from 4.5 years to 2.5 years. SVBFG and SVB's officers and directors knew the purpose

25 of the interest-rate swaps was to help protect SVB against the risk of rising interest rates and the

26 detrimental impact on the value of the securities portfolio.

27

28

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

85.     The value of the interest-rate swaps increased, particularly as interest rates rose in 2022. Even though the interest-rate swaps reduced the duration of SVB's securities portfolio and protected the portfolio from the risk of an increase in interest rates, SVBFG and SVB's officers began unwinding the swaps in 2021 and continued that unwinding throughout 2022 as rates were increasing and expected to continue to increase. By July 2022 SVBFG and SVB's officers and directors had caused SVB to terminate all but $564 million of the swaps.

86.     Terminating the interest-rate swaps ignored the obvious and substantial risk that SVB would incur large losses in its AFS portfolio if interest rates increased. SVBFG and SVB's officers and directors ignored this risk to realize short-term earnings that would benefit SVBFG by terminating the swaps that were put in place to protect against the risk of rising interest rates. Among other things, terminating the swaps produced gains that allowed SVBFG to hit earnings expectations of Wall Street analysts, thus supporting its stock price, and to show income that could be used to pay an imprudent dividend from SVB to SVBFG at the end of 2022.

87.     Beck, the Chief Financial Officer of SVBFG and SVB,  explained the rationale for the removal of the hedges in a March 17, 2022 text to Dunbar, a Director and Chair of the Boards of Directors of SVBFG and SVB and a member of the joint Finance and Risk Committees: "Just a quick head[s] up that we are unwinding today a part of our $10Bn hedging position—and selling $2Bn of Treasury securities—the rationale is that we have seen a major increase in short-term rates—and we have the opportunity to re-invest the Treasury positions at higher rates while *monetizing part of our $400MM hedging gain. As a result we will recognize close to $55MM of gains on the swap unwinds and will improve net interest income by close to $19MM for the year*." (Emphasis added.)

88.     SVBFG and SVB's officers communicated extensively about the need for the AFS hedges and the decision to terminate them, including Becker, Beck, Izurieta, and members of the Asset Liability Management Committee (including Kruse, Beck, Descheneaux, Cadieux, and Izurieta). SVBFG and SVB's joint Finance Committee also was kept informed of decisions to terminate and monetize the AFS interest rate hedges.

89.     In March 2022 SVBFG and SVB's officers and directors knew that (a) SVB had been in continuous material breach of the EVE-at-Risk limits in the Global Treasury Policy, (b) SVBFG

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  and SVB's senior management had forecast an increase in short-term interest rates in 2022 of at least

2  2%, and (c) terminating the hedges on the AFS portfolio would lengthen rather than shorten asset

3  duration, thereby exacerbating the risk that SVB would incur significant losses as interest rates

4  continued to rise in accordance with management's own forecasts. Nevertheless, SVBFG and SVB's

5  officers and directors mismanaged SVB's liquidity and interest-rate risk by monetizing these interest-

6  rate hedges at a time of rising interest rates to provide short-term support for SVBFG's earnings and

7  stock price.

8  **K.    SVBFG Plunders $294 Million From SVB Through an Improper Dividend**

9      90.    SVB historically had paid a "bank to parent" dividend to SVBFG. But in 2020 the

10  dividend was suspended, and according to a presentation made to the joint meeting of the joint Risk

11  and Finance Committees on March 22, 2022, it was expected that the "bank-to-parent dividends would

12  remain suspended through FY2023." Indeed, at this very same meeting, there was a discussion of the

13  need to downstream $2.25 billion from SVBFG to SVB in 2022 and 2023 to improve SVB's leverage

14  ratio.

15      91.    Nevertheless, within months of this March 24, 2022 meeting, SVBFG and SVB's

16  officers and directors began to consider resuming the bank-to-parent dividend. Largely because of the

17  monetization of the hedges discussed above, SVB had additional income that could potentially be used

18  to pay a bank-to-parent dividend because SVB and SVBFG's internal policies and regulatory

19  requirements limited the allowable amount of a dividend to a portion of net income.

20      92.    SVBFG and SVB's officers and directors communicated internally about how this

21  additional income could be used to benefit SVBFG. In addition to the bank-to-parent dividend,

22  SVBFG officers and directors considered using the income to pay dividends from SVBFG to its

23  shareholders or to fund share repurchases that would increase SVBFG's stock price.

24      93.    In each case, SVBFG and SVB's officers and directors were considering an upstream

25  of money to SVBFG to increase SVBFG's liquidity and meet SVBFG's cash-flow needs while disregarding

26  SVB's own needs for capital, liquidity, and adequate cash flow.

27      94.    Propping up SVBFG's share price was a particular concern. SVBFG's share price had

28  fallen from an all-time high of $755.03 on November 3, 2021, to $335.51 on October 17, 2022.

SVBFG's officers and directors owned SVBFG stock and in many cases were compensated with equity and bonuses linked to the performance of the stock. They accordingly had a direct interest in its price.

95.    The resumption of the bank-to-parent dividend was discussed at the October 18, 2022 Asset Liability Management Committee meeting where Kruse, Beck, and Descheneaux were in attendance. At that meeting, the committee approved recommending to the Finance Committee that the bank-to-parent dividend resume and that SVB pay a $294 million special dividend to SVBFG.

96.    Kruse delivered this recommendation in an October 19, 2022 memorandum to the Finance Committee. Justifications for paying the dividend in the memorandum included providing "a consistent flow of cash to the Holding Company" and "help[ing] support Parent liquidity."

97.    The October 19, 2022 memorandum reminded the Finance Committee that any dividend must "conform to State and Federal regulatory requirements," including that the "Bank is able to maintain policy limits and thresholds on all regulatory capital ratios post-dividend," in addition to having sufficient liquidity to meet customer needs.

98.    Neither this memorandum nor the Finance Committee minutes or other materials reflect any analysis or discussion of whether or how SVB could meet these and other requirements. Nor did the Finance Committee document any analysis or discussion of how this dividend could be paid consistent with requirements of prudent banking and maintaining SVB's safety and soundness.

99.    Instead, SVBFG and SVB's officers and directors ignored obvious and substantial risks to SVB associated with declaring this dividend. Among other things, members of the Finance Committee knew or should have known at this time that SVB had been breaching its EVE-at-Risk limits for over a year, that it was well outside those limits in an environment where interest rates were continuing to rise, that its deposit base lacked characteristics of "stickiness" that guard against deposit runs and protect liquidity, and that SVB had unrealized losses in its HTM portfolio exceeding the total value of its equity.

100.    In fact, at the same meeting where the joint Finance Committee evaluated the dividend, it received the results of a stress test showing breaches of its liquidity requirements in 30-day, 90-day, and 1-year stress scenarios as a result of large client outflows ($7 billion), a lack of alternative

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

monetization channels, and higher interest rates that had resulted in market declines in the securities portfolio. The joint committee members also learned that "wholesale borrowings will continue to be the primary bridge until deposit growth returns." These liquidity concerns were in addition to no less than thirty-one open regulatory matters requiring attention and matters requiring immediate attention, including matters requiring immediate attention related to liquidity risk management, weak risk management and oversight of liquidity, board ineffectiveness, and internal audit ineffectiveness.

101.    Disregarding the risks to SVB of plundering it of needed capital at a time of financial distress and management weakness, the joint Finance Committee of SVBFG and SVB approved the $294 million dividend to benefit SVBFG at the expense of SVB. A memorandum from Kruse to the Finance Committee stated that the purpose of the dividend was to help support liquidity at SVBFG. The Finance Committee's resolution approving the dividend required that the final amount of the dividend be determined and approved by the Chief Financial Officer or Treasurer of SVBFG. Members of the Finance Committee who approved this dividend were Friedman, Benhamou, Mitchell, and Miller.

102.    In addition to the members of the Finance Committee who voted to approve the dividend, the full Boards of Directors of SVBFG and SVB were notified of the intended dividend at their October 2022 combined meeting. Friedman reported that the Finance Committee had discussed the resumption of the payment of bank-to-parent dividends and that the Committee had "approved a dividend payment to be paid in the fourth quarter." The directors that attended this meeting included Matthews, Becker, Benhamou, Burr, Daniels, Davis, Friedman, Maggioncalda, Miller, Mitchell and Staglin. The minutes do not reflect any objection or other opposition to the dividend by these joint directors of SVBFG and SVB.

103.    The dividend was paid in late December 2022. By that time, SVB's liquidity position had only gotten worse. In advance of a November 2022 meeting, the Boards of Directors were advised that management was then anticipating quarterly deposit outflows of at least $5 billion and that SVB was in breach of two key liquidity metrics. One of these metrics required that SVB have a 90-day net-liquidity position, as part of a stress test, greater than $5 billion (as an outer threshold), yet SVB's 90-day stressed position was *negative* $23 billion. The November 2022 board packet also reflected that

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

management was considering a series of extraordinary "balance sheet management actions" to improve liquidity, including a one-time transfer of HTM securities to the AFS portfolio, progressive sales of AFS securities, share repurchases, and issuances of long-term debt.

104.    Similarly, on December 6, 2022, the joint Finance Committee expressed "concerns regarding the strength of the deposit base and the expected market competition for deposits going forward" and the "impact to balance sheet management and liquidity." In an Executive Summary, dated December 6, 2022, Treasury updated the Finance Committee on various matters including "Liquidity Risk Management." In this regard, it noted that "[a]s of 10-31-2022, two key liquidity metrics . . . have breached thresholds."

105.    At the December 16, 2022 Risk Committee meeting, management advised the committee members that "market and liquidity risk profiles had increased materially over 2022, causing a deterioration of the Company's liquidity and market status, as evidenced by internal liquidity stress testing, resulting in [the Financial Risk Management Department] raising the risk profile rating to 'high' for both market and liquidity risk." Friedman, Benhamou, Daniels, Matthews, Miller, and Mitchell were on the Risk Committee and attended the portion of the meeting where this information was presented. Despite the worsening financial conditions of SVB, there was no effort by any of the directors to reverse the decision to make the bank-to-parent dividend payment.

106.    Similarly, senior management made no effort to stop the bank-to-parent dividend and instead reaffirmed the decision to pay the dividend. For example, a December 21, 2022 presentation to the Finance Committee highlighted that SVB remained in breach of its liquidity metrics: "With higher than forecast deposit outflows, we have breached our Net Liquidity Position (NLP) metric. How do we stabilize our funding and mitigate our NLP breach?" Nonetheless, Beck replied that he was "good" with paying the dividend and had it paid out to SVBFG at the end of December.

107.    Remarkably, on January 18, 2023, the Finance Committee approved an additional $200 million dividend from SVB to SVBFG despite the incredibly negative information it had received regarding SVB's breaches of its liquidity metrics and interest-rate-risk metrics. In this same meeting, the Finance Committee was presented with the economic forecast for 2023, showing an anticipated 23% decline in net income, expected earnings per share falling to $19.27 (versus $25.35 in 2022), and

– 114 –

a 3.2% reduction in return on equity (dropping from 12.2% in 2022 to 9.0% in 2023). The Finance Committee was also informed that the Financial Risk Management Department continued to rate market risk as "high," based on the ongoing breaches of EVE-at-Risk limits and the challenge to remediate this breach by the end of 2023.

108.    SVB failed before this additional $200 million dividend could be paid to SVBFG.

**L.    SVBFG Ignores its Responsibilities to Serve as a Source of Strength for SVB**

109.    By overconcentrating SVB's securities portfolio in long-term securities, terminating the hedges, approving the $294 million dividend, and otherwise operating SVB for SVBFG's benefit, SVBFG and SVB's officers and directors ignored SVBFG's fundamental responsibility to serve as a source of strength for SVB.

110.    Bank holding companies, like SVBFG, are regulated institutions supervised by the Federal Reserve Board as primary regulator. Bank holding companies are authorized by statute, the Bank Holding Company Act of 1956 (*see* 12 U.S.C. §§ 1841 to 1852), and governed by regulations promulgated by the Federal Reserve that implement this statute, including Regulation Y (*see* 12 C.F.R. Part 225).

111.    Since 1984 Regulation Y has provided that bank holding companies, like SVBFG, "shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1). As explained in a policy statement issued three years later, this regulation reflects a "fundamental and long-standing principle underlying the Federal Reserve's supervision and regulation of bank holding companies"—namely that "in serving as a source of strength to its subsidiary banks, a bank holding company should stand ready to use available resources to provide adequate capital funds to its subsidiary banks during periods of financial stress or adversity and should maintain the financial flexibility and capital-raising capacity to obtain additional resources for assisting its subsidiary banks in a manner consistent with the provisions of this policy statement." Policy Statement; Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks, 52 FR 15707-01.

112.    This requirement to act as a source of strength reflects that "a bank holding company derives certain benefits at the corporate level that result, in part, from the ownership of an institution

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

– 115 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

that can issue federally insured deposits and has access to Federal Reserve credit. . . . Thus, in seeking the advantages flowing from the ownership of a commercial bank, bank holding companies have an obligation to serve as sources of strength and support to their subsidiary banks." (*Id.*) The Federal Reserve has explained that failure to meet these obligations "will generally be considered an unsafe and unsound banking practice or a violation of Regulation Y, or both."

113.    In addition to Regulation Y and the Federal Reserve's policy statements, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 now codifies the source-of-strength doctrine. *See* 12 U.S.C. § 1831o-1(a). The requirement to serve as a source of strength also was provided for in SVBFG's own policies, including its capital policy.

114.    By concentrating SVB's securities portfolio in long-term securities classified as HTM to generate yield and avoid recognizing unrealized losses, by terminating the hedges protecting the AFS portfolio, and by approving and paying the $294 million bank-to-parent dividend, SVBFG and SVB's officers and directors ignored obvious and substantial risks of loss to SVB to provide benefits to SVBFG. These actions breached SVBFG's basic responsibility to act as a source of strength for SVB.

**FIRST AFFIRMATIVE DEFENSE**

**(Setoff for Aiding and Abetting Breaches of Fiduciary Duty)**

115.    SVBFG alleges that its deposits at SVB were governed by the Bank Depositor Agreement and Deposit Agreement and Disclosure Statement—Business Accounts, dated as of February 27, 2023 ("Deposit Agreement").

116.    SVBFG's claims are barred, in whole or part, because they are setoff by claims of equal or greater value for SVBFG's aiding and abetting breaches of fiduciary duty owed to SVB. This right to setoff is established under federal and state law and the terms of the Deposit Agreement to the extent that it applies.

117.    Due to their positions, SVB's officers and directors had a fiduciary relationship with SVB and therefore owed fiduciary duties of care and loyalty to SVB. These duties included, but were not limited to, (a) acting as prudent and diligent professionals in conducting and monitoring the affairs

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

of SVB and (b) refusing to advance their own personal or business interests, or those of others, such as SVBFG, at the expense of SVB.

118. SVB's officers and directors breached their fiduciary duties to SVB in numerous ways, including, but not limited to, the following:

(a)    Ignoring the obvious and substantial risk to SVB of a rise in interest rates by causing SVB to invest in and continue to hold long-term government securities, primarily in its unhedged HTM portfolio, at a time when it already was in breach of its interest-rate risk metrics, like EVE-at-Risk, and thereby lengthening its asset duration and further exacerbating its exposure to substantial losses in the event of an increase in interest rates, for the self-interested purposes (among others) of boosting SVBFG's short-term earnings and stock price;

(b)    Ignoring the obvious and substantial risk to SVB of an increase in interest rates by causing SVB to terminate interest-rate swaps providing protection for its AFS portfolio from an increase in interest rates, thereby lengthening SVB's asset duration and further exacerbating its exposure to substantial losses in the event of a rise in interest rates, for the self-interested purposes (among others) of boosting SVBFG's short-term earnings and stock price and purporting to enable SVB to pay a dividend to SVBFG; and

(c)    Ignoring the known and substantial risk to SVB of depriving it of necessary capital and liquidity, at a time of continuing rising interest rates and financial distress, by approving in October 2022 and then paying in December 2022 a $294 million bank-to-parent dividend.

119. SVB's officers and directors who breached their fiduciary duties to SVB for the specific breaches set forth above in paragraph 118(a-b) include (but are not necessarily limited to) Becker, Beck, Cadieux, Descheneaux, Kruse, Izurieta, Benhamou, Dunbar, Friedman, Miller, Mitchell, Matthews, and Staglin.

120. SVB's officers and directors who breached their fiduciary duties to SVB for the specific breaches set forth above in paragraph 118(c) include (but are not necessarily limited to) Becker, Beck,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    Cadieux, Descheneaux, Kruse, Benhamou, Friedman, Miller, Mitchell, Matthews, Staglin, Burr,

2    Daniels, Davis, and Maggioncalda.

3        121.    SVBFG aided and abetted SVB's officers and directors in their breaches of fiduciary

4    duty to SVB because SVBFG (a) had actual knowledge of the conduct constituting such breaches and

5    (b) substantially assisted, encouraged, and participated in the breaches.

6        122.    SVBFG had actual knowledge of the conduct constituting breaches of fiduciary duty

7    by SVB's officers and directors. SVBFG shared the same officers and directors as SVB and therefore

8    SVBFG's own officers and directors engaged in the conduct constituting the breaches, either

9    individually or through actions of joint boards or joint committees of SVBFG and SVB, such as the

10   Finance Committee, Risk Committee, and Asset Liability Management Committee. The knowledge

11   of these officers and directors is imputed to SVBFG, particularly because the breaches benefited

12   SVBFG by, among other things, attempting to improve its short-term earnings and stock price and

13   purporting to enable SVB to issue dividends to it.

14       123.    SVBFG also substantially assisted, encouraged, and participated in the breaches of

15   fiduciary duty by SVB's officers and directors. SVBFG shared the same officers and directors as SVB

16   and therefore SVBFG's own officers and directors engaged in the conduct constituting the breaches,

17   either individually or through actions of joint boards or joint committees of SVBFG and SVB, such as

18   the Finance Committee, Risk Committee, and Asset Liability Management Committee. The acts and

19   omissions of these officers and directors are imputed to SVBFG. Further, the acts and omissions of

20   these officer and directors are imputed to SVBFG because the breaches benefited SVBFG by, among

21   other things, improving its short-term earnings, attempting to improve its stock price, and purporting

22   to enable SVB to issue dividends to it. Rather than serve as a source of financial and managerial

23   strength and support for SVB and instead of promoting SVB's operation as a safe-and-sound

24   institution, SVBFG designed and facilitated transactions, through its officers and directors, that

25   increased obvious risks to SVB, deprived SVB of needed capital and liquidity, and ultimately caused

26   billions in losses, all so that SVBFG could receive the short-term benefits of those transactions for

27   itself.

28

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

124.    SVBFG's assistance, encouragement, and participation in the breaches of fiduciary duty by SVB's officers and directors was a substantial factor in causing those breaches, and as a natural and foreseeable consequence of the breaches, as well SVBFG's assistance, encouragement, and participation in the breaches, SVB incurred damages in an amount to be proven, but which substantially exceeds $1.93 billion. Had SVBFG not assisted, encouraged, and participated in these breaches, those losses would have been avoided.

125.    Under 12 U.S.C. § 1821(d)(2)(A), the FDIC-R1 succeeded to "all rights, titles, powers, and privileges" of SVB, including its claims against SVBFG for aiding and abetting breaches of fiduciary duty. SVBFG's liability for aiding and abetting these breaches accordingly constitutes a mutual debt that offsets any liability of the FDIC-R1 to SVBFG.

126.    In addition, to the extent that the FDIC-R2 retained any liability to SVBFG (which is expressly denied), the FDIC-R2 would be entitled to setoff that liability as the successor under 12 U.S.C. § 1821(d)(2)(A) to the Bridge Bank (which succeeded to certain rights of the FDIC-R1 under the Transfer Agreement) in an amount at least equal to SVBFG's liability to SVB for aiding and abetting breaches of fiduciary duty owed to SVB. Under these circumstances, SVBFG's liability for aiding and abetting these breaches would constitute a mutual debt that offsets any liability of the FDIC-R2 to SVBFG.

## SECOND AFFIRMATIVE DEFENSE

### (Setoff for SVBFG's Liability for Acts of its Agents)

127.    SVBFG's claims are barred because they are setoff by claims of equal or greater value based on SVBFG's liability for the misconduct of SVB's officers and directors who also were SVBFG's agents. These officers and directors were negligent, grossly negligent, and breached their fiduciary duties to SVB by improperly causing SVB to

(a)    invest in and continue to hold long-term government securities, primarily in its unhedged HTM portfolio, without regard to interest-rate risk metrics, like EVE-at-Risk, thereby lengthening its asset duration and further exacerbating its exposure to substantial losses in the event of an increase in interest rates;

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF

(b) terminate interest-rate swaps providing protection for its AFS portfolio from an increase in interest rates, thereby lengthening SVB's asset duration and further exacerbating its exposure to substantial losses in the event of a rise in interest rates; and

(c) approve in October 2022 and then pay in December 2022 a $294 million bank-to-parent dividend that deprived SVB of necessary capital and liquidity at a time of significant financial distress.

128.    Because SVBFG and SVB shared the same directors and the same primary officers, SVBFG had control over and directed the improper conduct of SVB's directors and officers. SVB's directors and officers, including those identified above in paragraphs 119 and 120, were acting as authorized agents of SVBFG and for SVBFG's benefit in negligently and grossly negligently discharging their obligations to SVB in breach of their fiduciary duties to SVB. Accordingly, SVBFG is liable for their negligent and grossly negligent acts and omissions and their fiduciary breaches, which actually and proximately caused damages in an amount to be proven, but which substantially exceeds the $1.93 billion deposit claim of SVBFG.

129.    Under 12 U.S.C. § 1821(d)(2)(A), the FDIC-R1 succeeded to "all rights, titles, powers, and privileges" of SVB, including with respect to any claims based on SVBFG's liability to SVB for acts of SVBFG's agents. That liability constitutes a mutual debt that offsets any liability of the FDIC-R1 to SVBFG under federal and state law and the Deposit Agreement to the extent it applies.

130.    In addition, to the extent that the FDIC-R2 retained any liability to SVBFG (which is expressly denied), the FDIC-R2 would be entitled to setoff that liability as the successor under 12 U.S.C. § 1821(d)(2)(A) to the Bridge Bank (which succeeded to certain rights of the FDIC-R1 under the Transfer Agreement) in an amount at least equal to SVBFG's liability to SVB for acts of SVBFG's agents. Under these circumstances, SVBFG's liability would constitute a mutual debt that offsets any liability of the FDIC-R2 to SVBFG.

**THIRD AFFIRMATIVE DEFENSE**

**(Setoff for Negligence)**

131.    As a bank holding company, SVBFG had a duty to act or refrain from acting in a manner consistent with principles of ordinary care, including, but not limited to, responsibilities to

– 120 –

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1    avoid causing SVB unnecessary risk of loss and to serve as a source of financial and managerial

2    strength to SVB consistent with federal law and SVBFG's own policies.

3        132.    SVBFG breached its duties to SVB through, among other things, acts or omissions that

4    improperly caused SVB to

(a)    invest in and continue to hold long-term government securities, primarily in its unhedged HTM portfolio, without regard to interest-rate risk metrics, like EVE-at-Risk, thereby lengthening its asset duration and further exacerbating its exposure to substantial losses in the event of an increase in interest rates;

(b)    terminate interest-rate swaps providing protection for its AFS portfolio from an increase in interest rates, thereby lengthening SVB's asset duration and further exacerbating its exposure to substantial losses in the event of a rise in interest rates; and

(c)    approve in October 2022 and then pay in December 2022 a $294 million bank-to-parent dividend that deprived SVB of necessary capital and liquidity at a time of significant financial distress.

133.    As a direct and proximate result of SVBFG's breaches, SVB incurred damages in an amount to be proven, but which substantially exceeds the $1.93 billion deposit claim of SVBFG. SVBFG's conduct was a substantial factor in causing these damages, and had SVBFG not breached its duties to SVB, those losses would have been avoided.

134.    Under 12 U.S.C. § 1821(d)(2)(A), the FDIC-R1 succeeded to "all rights, titles, powers, and privileges" of SVB, including its claims against SVBFG for breach of duty to it. SVBFG's liability for these breaches accordingly constitutes a mutual debt that offsets any liability of the FDIC-R1 to SVBFG under federal and state law and the Deposit Agreement to the extent it applies.

135.    In addition, to the extent that the FDIC-R2 retained any liability to SVBFG (which is expressly denied), the FDIC-R2 would be entitled to setoff that liability as the successor under 12 U.S.C. § 1821(d)(2)(A) to the Bridge Bank (which succeeded to certain rights of the FDIC-R1 under the Transfer Agreement) in an amount at least equal to SVBFG's liability for breaches of duties owed to SVB. Under these circumstances, SVBFG's liability for these breaches would constitute a mutual debt that offsets any liability of the FDIC-R2 to SVBFG.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## FOURTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

136.     SVBFG's claims are barred, in whole or part, because (a) it engaged in inequitable conduct, (b) that conduct relates to the claims asserted against the FDIC-R1, and (c) that conduct caused damages.

137.     Through its officers and directors, SVBFG controlled and managed SVB for SVBFG's own benefit, despite SVBFG's responsibility to serve as a source of financial and managerial strength and support for SVB and to promote SVB's operation as a safe-and-sound institution. In doing so, SVBFG caused SVB to engage in transactions and otherwise operate in a manner that was grossly imprudent, inconsistent with principles of safety and soundness, and otherwise improper, including, among other things, (a) SVB's investment in and continued retention of long-term government securities, primarily in its HTM portfolio, at a time of actual or anticipated rising interest rates, (b) SVB's operation in repeated material breach of its EVE-at-Risk policy limits, despite alteration of the assumptions underlying its EVE-at-Risk models, at a time of actual or anticipated rising interest rates, (c) SVB's termination of interest-rate swaps protecting its AFS portfolio from an increase in interest rates, and (d) SVB's approving and paying a $294 million dividend to SVBFG in December 2022.

138.     SVBFG's conduct, through its directors and officers, was wrongful and inequitable and caused billions of dollars in damages that greatly exceed what SVBFG seeks to recover in this case. The doctrine of unclean hands precludes SVBFG from taking advantage of its own wrongdoing and therefore bars its claims in this case in whole or part.

## FIFTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

139.     SVBFG's claims are all barred to the extent that it received and unjustly retained a benefit at the expense of SVB and now the FDIC-Rs.

140.     As explained above, SVBFG wrongfully obtained short-term benefits at SVB's expense that included, among other things, the following:

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

(a)     Short-term earnings resulting from SVB's imprudent investment in long-term government securities, primarily in its unhedged HTM portfolio, without regard to interest-rate risk metrics, like EVE-at-Risk;

(b)     Short-term earnings resulting from SVB's imprudent termination of interest-rate swaps providing protection for its AFS portfolio from an increase in interest rates; and

(c)     $294 million resulting from SVB's imprudent payment of a dividend to SVBFG in December 2022 that enriched SVBFG at SVB's expense by depriving SVB of necessary capital and liquidity at a time of significant financial distress.

141.     As a result of this wrongful conduct, SVBFG obtained benefits to the detriment of SVB and now the FDIC-Rs, in an amount to be determined, that would be unjust for SVBFG to retain. SVBFG's claims are barred to the extent of all amounts that it received constituting unjust enrichment.

## SIXTH AFFIRMATIVE DEFENSE

## (<u>Constructive Fraudulent Transfer</u>)

142.     SVBFG's claims should be setoff by the $294 million bank-to-parent dividend in December 2022 via constructive fraudulent transfer because SVB did not receive in exchange therefor reasonably equivalent value to the extent that SVB (a) was insolvent or rendered insolvent, (b) was engaged or was about to engage in a business or transaction for which SVB's remaining assets were unreasonably small in relation to the business or transaction, and/or (c) intended to incur, or believed or reasonably should have believed that SVB would incur, debts beyond SVB's ability to pay as they became due.

## SEVENTH AFFIRMATIVE DEFENSE

## (<u>Failure to State a Claim</u>)

143.     The Complaint, and each cause of action stated therein (except Counts I, IV, V, VI, VIII, IX, X, XI, and XII, to the extent dismissed in the Order), fails to state a claim upon which relief can be granted.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**EIGHTH AFFIRMATIVE DEFENSE**

**(Lack of Subject Matter Jurisdiction)**

144.     SVBFG's claims are barred, in whole or in part, because the Court lacks subject matter jurisdiction over them.

**NINTH AFFIRMATIVE DEFENSE**

**(Condition Precedent)**

145.     SVBFG's claims are barred, in whole or in part, by SVBFG's failure to satisfy one or more conditions precedent.

**TENTH AFFIRMATIVE DEFENSE**

**(Precluded by Contract)**

146.     SVBFG's claims are barred, in whole or in part, because SVBFG seeks relief that is foreclosed by the existence of applicable, binding contracts between the parties.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Immunity)**

147.     SVBFG's claims are barred, in whole or in part, because the claims are unavailable against the federal government, or an agency thereof, pursuant to controlling and applicable law.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Inconsistent with Governing Statute)**

148.     SVBFG's claims are barred, in whole or in part, because the relief sought is foreclosed by, or inconsistent with, the governing statutory scheme of Title 12.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Speculative Damages)**

149.     SVBFG's alleged out-of-pocket damages and other alleged damages, if any, are speculative and incapable of being ascertained with the requisite certainty.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(In Pari Delicto)**

150.     SVBFG's claims are barred, in whole or in part, by the doctrine of in pari delicto.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Estoppel and Waiver)

151.    SVBFG's claims are barred, in whole or in part, by the doctrines of estoppel and waiver.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Fault of SVBFG)

152.    Any damages allegedly suffered by SVBFG were caused, in whole or in part, by SVBFG's own conduct.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Fault of Another)

153.    Any damages allegedly suffered by SVBFG were caused, in whole or in part, by the acts and/or omissions of parties other than the respective FDIC-Rs, for whom the FDIC-Rs are not responsible or liable, including that FDIC-R1 is not responsible or liable for the acts and/or omissions of FDIC-R2 and vice versa.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Limitation of Liability)

154.    SVBFG's claims are barred, in whole or in part, by limitation of liability pursuant to the governing contracts and/or other operation of law.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Failure of Performance)

155.    SVBFG's claims are barred, in whole or in part, by its failure to perform all of its obligations under the governing contracts, and/or any other alleged contracts or agreements relied on in the Complaint.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Material Breach)

156.    SVBFG's claims are barred, in whole or in part, by SVBFG's own material breach of the governing contracts, and/or any other alleged contracts or agreements relied on in the Complaint.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

### TWENTY-FIRST AFFIRMATIVE DEFENSE

#### (Failure to Mitigate Damages)

157.    SVBFG's claims are barred, in whole or in part, by SVBFG's failure to mitigate its alleged damages.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

#### (Precluded by 12 U.S.C. § 1821(i))

158.    SVBFG's claims are barred, in whole or in part, by the limitations imposed by 12 U.S.C. § 1821(i).

### TWENTY-THIRD AFFIRMATIVE DEFENSE

#### (Precluded by Documentary Evidence)

159.    SVBFG's claims are barred, in whole or in part, by documentary evidence.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

#### (Failure to Exhaust Administrative Remedies)

160.    SVBFG's claims are barred, in whole or in part, by its failure to exhaust administrative remedies under 12 U.S.C. § 1821(d).

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

#### (Lack of Third Party Beneficiary)

SVBFG's claims are barred, in whole or in part, because SVBFG is not a third-party beneficiary.

### RESERVATION OF RIGHTS

The FDIC-Rs reserve the right to amend or supplement this Answer and any Affirmative Defenses contained herein, including the FDIC-Rs' right to assert any additional defenses. The assertion of an Affirmative Defense does not assume the burden of proof for any issue as to which applicable law places the burden on SVBFG as an element of its claim or otherwise.


WHEREFORE, the FDIC-Rs respectfully request judgment in their favor (i) dismissing with prejudice the Complaint in its entirety (including Counts I, II, III, IV, and VII) and (ii) such further relief in favor of the FDIC-Rs as is appropriate.

Dated: January 10, 2025

OF COUNSEL:

Jeffrey E. Schmitt, Senior Counsel
Sonya Levine, Counsel
FEDERAL DEPOSIT INSURANCE
CORPORATION
3501 Fairfax Drive
Room VS-D-7066
Arlington, VA 22226
Telephone: (703) 562-2783
Facsimile: (202) 898-3838
E-Mail: jschmitt@fdic.gov
E-Mail: slevine@fdic.gov

**REED SMITH LLP**

By: */s/ Raymond Cardozo*
Raymond A. Cardozo

*Counsel to the Federal Deposit Insurance
Corporation, as Receiver for Silicon Valley
Bank, and the Federal Deposit Insurance
Corporation, as Receiver for Silicon Valley
Bridge Bank, N.A.*

**FDIC-R1 AND FDIC-R2'S ANSWER TO SVB FINANCIAL GROUP'S COMPLAINT**
Case No. 5:24-cv-01321-BLF