1

2

3      **UNITED STATES DISTRICT COURT**

4      **NORTHERN DISTRICT OF CALIFORNIA**

5      **SAN JOSE DIVISION**

6

7   SVB FINANCIAL TRUST,                       Case No.  24-cv-01321-BLF

8              Plaintiff,

9         v.                                   **ORDER GRANTING IN PART, DENYING IN PART, AND TERMINATING IN PART PLAINTIFF'S MOTION TO STRIKE**

10  FEDERAL    DEPOSIT    INSURANCE
    CORPORATION,   AS   RECEIVER   FOR
11  SILICON VALLEY BANK, et al.,              [Re:  ECF No. 160]

12             Defendants.

13

14         On March 10, 2023, the California Department of Financial Protection and Innovation

15  ("DFPI") closed Silicon Valley Bank ("SVB"). ECF 135, Answer ("Ans.") ¶ 11. On the same day,

16  the DFPI appointed the Federal Deposit Insurance Corporation as receiver ("FDIC-R1"). *Id.* ¶ 48.

17  The FDIC Board of Directors and the Board of Governors of the Federal Reserve System

18  recommended to Treasury Secretary Yellen that she authorize the systemic risk exception. *Id.* ¶ 59.

19  Plaintiff SVB Financial Trust ("Trust")[1] alleges that Secretary Yellen invoked the Systemic Risk

20  Exception, codified at 12 U.S.C. § 1823(c)(4)(G), to guarantee that all deposits at SVB, regardless

21  of insurance status, would be paid in full and that depositors would immediately have access to their

22  funds. ECF 1, Complaint ("Compl.") ¶¶ 3, 58–59; Ex. 5 at 1. On Monday, March 13, 2023, all

23  insured and uninsured deposits, including SVBFG's deposits at SVB, were transferred to the newly

24  formed Silicon Valley Bridge Bank ("Bridge Bank"). Compl. ¶¶ 67, 89. SVBFG successfully

25

26  ───────────────

27  [1] This action and the consolidated *SVB Financial Trust v. Federal Deposit Insurance Corp., in its corporate capacity*, No. 5:23-cv-06543-BLF (N.D. Cal.) ("FDIC-C Action") were initially brought by SVB Group ("SVBFG"). *See* ECF 1; FDIC-C Action, ECF 1. The parties in both this action and FDIC-C Action have stipulated to substitute SVB Financial Trust for SVBFG as plaintiff in both actions. *See* ECF 146; FDIC-C Action, ECF 129.

28

1    withdrew approximately $180 million via eight wire transfers, but, on March 16, 2023, Bridge Bank

2    began rejecting wire transfers. *Id.* ¶¶ 90-91. On March 27, 2023, Bridge Bank closed, and the FDIC

3    was appointed to act as the receiver for Bridge Bank ("FDIC-R2"). *Id.* ¶ 102. SVBFG brought this

4    action against FDIC-R1 and FDIC-R2 (collectively, the "FDIC-Rs") for blocking access to

5    approximately $1.93 billion of its deposits ("Account Funds"). *Id.* ¶ 99.

6          Before the Court is the Trust's Motion to Strike twenty-five affirmative defenses asserted by

7    FDIC-Rs in their Answer to the Trust's Complaint. ECF 160 ("Mot."). FDIC-Rs oppose the motion.

8    ECF 174 ("Opp."). The Trust filed a Reply. ECF 179 ("Reply"). The Court heard oral argument on

9    the motion on May 1, 2025. ECF 192.

10          For the following reasons, the Court GRANTS IN PART, DENIES IN PART the Trust's

11    Motion to Strike.

12    **I.    BACKGROUND**

13          For purposes of this motion, the Court accepts as true all well-pled facts in FDIC-Rs'

14    Affirmative Defenses. *See* ECF 135 ("Aff. Def.").

15        **A.  SVBFG and SVB Had Overlapping Officers and Directors.**

16          SVB Financial Group ("SVBFG") started operations in 1983 with its headquarters in Santa

17    Clara, California. Aff. Def. ¶ 8. SVB was a California state member bank and SVBFG's principal

18    subsidiary. *Id.* As of the end of 2022, SVBFG had about $211.8 billion in total assets, of which 99%

19    (about $209 billion) was attributable to SVB. *Id.* ¶ 10.

20          Since at least 2021, SVBFG and SVB had completely overlapping Boards of Directors. *Id.* ¶

21    11. Each member of SVB's Board of Directors was also a member of SVBFG's Board of Directors

22    and vice versa. *Id.* SVBFG and SVB held joint board meetings and produced one set of joint minutes

23    for those meetings. *Id.* ¶ 12. During joint board and committee meetings, the officers and directors

24    made decisions concerning SVB's assets. *Id.* ¶ 13. Unitary committees acted on behalf of both

25    SVBFG's and SVB's Boards of Directors. *Id.* ¶ 14. Those unitary committees included the Finance

26    Committee, the Risk Committee, and the Asset Liability Management Committee. *Id.* The unitary

27    Finance Committee oversaw investment recommendations and capital and liquidity management

28    for both SVBFG and SVB. *Id.* ¶ 16. A single Risk Committee directed SVBFG and SVB's

enterprise risk management and assisted the Board of Directors of both SVBFG and SVB in fulfilling oversight responsibilities to SVBFG and its subsidiaries. *Id.* ¶ 17. The Asset Liability Management Committee was composed of senior management from SVBFG and SVB and was responsible for monitoring changes in assets and reviewing and approving strategies to promote optimal financial performance. *Id.* ¶ 18. During the time period relevant to this litigation, all directors and officers simultaneously held the same positions at SVBFG and SVB. *Id.* ¶ 19.

**B. SVB's Investment in Long-Term Securities.**

At the beginning of 2018, SVB had about $56 billion in assets and $50 billion in deposits. *Id.* ¶ 28. By the end of 2021, SVB had $209 billion in total assets and $176 billion in deposits. *Id.* SVB's growth far exceeded that of the overall banking industry. *Id.* ¶ 30. The vast majority of SVB's deposits were uninsured because they were above the $250,000 threshold for FDIC deposit insurance. *Id.* ¶ 32. SVBFG and SVB decided to invest a substantial amount of the deposits into SVB's investment portfolio, focusing on long-term, fixed-rate, government-backed debt instruments like U.S. Treasuries and mortgage-backed securities. *Id.* ¶ 34.

In 2020 and 2021, interest rates were at historically low levels. *Id.* ¶ 35. During that period, SVB purchased tens of billions of dollars of long-term securities at low, fixed interest rates. *Id.* This investment strategy exposed SVB to severe interest-rate risk because long-term fixed rate securities lose value when interest rates increase. *Id.* ¶ 36. SVB's officers on the Asset Liability Management Committee were fully on notice of this severe interest-rate risk. *Id.*

Between 2019 and 2022, regulators and examiners expressed their concerns about SVB's governance and risk-management program on multiple occasions. *Id.* ¶¶ 39-45. In addition, SVBFG and SVB's officers recognized that SVB's risk-management practices and controls were deficient. *Id.* ¶ 46. SVB's internal audits also found deficiencies in the effectiveness of SVBFG and SVB's Boards of Directors and with SVBFG and SVB's risk management. *Id.* ¶ 47.

A substantial portion of SVB's long-term securities were classified as held-to-maturity ("HTM") securities. *Id.* ¶¶ 3, 52-53. Under applicable accounting principles, HTM securities are not recorded at fair value but are carried at amortized cost. *Id.* ¶¶ 49-50. The accounting treatment for HTM securities allowed SVB to exclude unrealized losses attributable to its HTM portfolio from

assets. *Id.* ¶ 50. As a result, the value of SVB's HTM portfolio did not have to be reduced to fair value on the consolidated balance sheet for SVBFG and its subsidiaries, despite the value of the portfolio declining. *Id.* HTM securities cannot be hedged against interest-rate risk. *Id.* ¶ 51. Additionally, because HTM securities cannot be sold before their maturity date, SVB's liquidity risk increased. *Id.* ¶ 52. SVB's concentration in HTM securities was an outlier in the industry. *Id.* ¶ 53.

SVBFG and SVB's officers and directors knew of SVB's substantial interest-rate and liquidity risk resulting from SVB's investment in long-term, fixed-rate government securities. *Id.* ¶ 54. Nonetheless, the officers and directors continued to expand SVB's HTM portfolio to avoid recognizing unrealized losses resulting from the decline in the value of its long-term securities. *Id.* ¶ 57.

SVBFG and SVB use EVE-at-Risk as a primary metric for assessing and controlling interest-rate risk. *Id.* ¶ 62. EVE-at-risk measures the sensitivity of the firm's economic value of equity to changes in interest rates. *Id.* Between 2021 and 2022, SVB's EVE-at-Risk exceeded inner and outer limits set in SVBFG and SVB's Global Treasury Policy. *Id.* ¶¶ 63, 65-68. Instead of trying to correct these breaches, SVBFG and SVB's officers and directors altered the deposit model for the EVE-at-Risk model to artificially lower EVE-at-Risk. *Id.* ¶¶ 69-70.

Inflation increased in 2021, and SVBFG and SVB's directors were aware that the Federal Open Market Committee would respond by raising the federal funds target rate (the interest rate that banks charge each other to borrow money overnight). *Id.* ¶ 77. By April 2022, there had been one interest rate hike, and the officers and directors were advised to expect at least six more interest rate hikes in 2022. *Id.* ¶ 79. Nonetheless, SVBFG and SVB's officers and directors decided that SVB would continue to hold $98 billion in long-duration HTM securities. *Id.* ¶ 80. As a result of this investment strategy, unrealized losses in the HTM portfolio skyrocketed as interest rates increased. *Id.* ¶ 81. As of September 30, 2022, SVB's unrealized HTM losses exceeded $15.9 billion while SVB only had $15.8 billion in total equity. *Id.* ¶¶ 81-82.

//

//

4

**C.  SVB's Termination of Its Interest-Rate Swaps.**

From 2021 through July 2022, SVBFG and SVB's officers and directors caused SVB to terminate interest-rate hedges on its available-for-sale ("AFS") securities portfolio. *Id.* ¶ 4. Unlike HTM securities, AFS securities are marked to market and are recorded at fair value. *Id.* ¶ 49. Changes in the value of AFS securities are reported as unrealized gains or losses in assets and shareholder's equity on SVB's balance sheet. *Id*. AFS securities can be hedged. *Id.* ¶ 51.

By the end of 2021, SVB's AFS portfolio was valued at $27 billion, which was about one-third the size of SVB's HTM portfolio. *Id.* ¶ 83. Because the AFS portfolio had to be recorded at fair value, SVBFG and SVB used interest-rate swaps to hedge the portfolio. *Id.* ¶ 84. These swaps aimed to mitigate reductions in accumulated other comprehensive income in the event of a rise in interest rates. *Id.* ¶ 84. SVB entered into interest-rate swaps in March 2021, and had hedged $11.3 billion of its $24.2 billion AFS portfolio by November 2021. *Id.*

In 2022, interest rates rose, and the value of the interest-rate swaps increased. *Id.* ¶ 85. SVB began terminating the interest-rate swaps in 2021. *Id.* Terminating the interest-rate swaps realized short-term earnings that benefited SVBFG and supported its stock price, but exposed SVB's AFS portfolio to the risk of large losses in the event of further interest rate increases. *Id.* ¶ 86. By July 2022, SVB had terminated all but $564 million of the interest-rate swaps. *Id.* ¶ 85.

**D.  SVB's Dividend Payment to SVBFG.**

In 2022, SVBFG and SVB's officers and directors began to consider resuming paying the bank-to-parent dividend from SVB to SVBFG, largely because they had monetized the interest-rate swaps. *Id.* ¶ 91. The officers and directors internally discussed how this dividend payment could benefit SVBFG. *Id.* ¶ 92. SVBFG and SVB's officers and directors considered this bank-to-parent dividend to address SVBFG's liquidity and cash flow needs, while disregarding SVB's own capital, liquidity, and cash flow needs. *Id.* ¶ 93. SVBFG and SVB's officers and directors recommended a $294 million dividend payment from SVB to SVBFG, and the joint Finance Committee approved it. *Id.* ¶ 101. In December 2022, the bank-to-parent dividend was paid. *Id.* ¶ 103.

**E.  Procedural History**

On March 5, 2024, SVBFG filed the present suit against FDIC-Rs, asserting twelve claims

for relief: (1) Breach of Contract, Compl. ¶¶ 139–149; (2) Estoppel, *id.* ¶¶ 150–153; (3) Turnover of the Account Funds Pursuant to Section 542 of the Bankruptcy Code, *id.* ¶¶ 154–163; (4) Violation of the Automatic Stay Under Section 362(a) of the Bankruptcy Code, *id.* ¶¶ 164–167; (5) Claim Under Sections 1406 and 681 of the California Financial Code (against FDIC-R1 only), *id.* ¶¶ 168–175; (6) Claim Under Sections 91 and 194 of the National Bank Act (against FDIC-R2 only), *id.* ¶¶ 176–181; (7) Declaratory Judgment Under 28 U.S.C. § 2201 et seq., *id.* ¶¶ 182–189; (8) Violation of SVBFG's Fifth Amendment Rights Under the United States Constitution, *id.* ¶¶ 190–199; (9) Conversion, *id.* ¶¶ 200–207; (10) Breach of Contract (against FDIC-R1 only), *id.* ¶¶ 208–216; (11) Breach of Implied Contract (against FDIC-R1 only), *id.* ¶¶ 217–224; and (12) Breach of Contract (against both FDIC-Rs), *id.* ¶¶ 225–231. On November 29, 2024, the Court granted in part and denied in part FDIC-Rs' motion to dismiss SVBFG's complaint. ECF 108.

On January 17, 2025, FDIC-Rs filed their Answer to the Trust's Complaint and asserted twenty-five affirmative defenses. ECF 135. The twenty-five affirmative defenses are: (1) Setoff for Aiding and Abetting Breaches of Fiduciary Duty, Aff. Def. ¶¶ 115-26; (2) Setoff for SVBFG's Liability for Acts of its Agents, *id.* ¶¶ 127-30; (3) Setoff for Negligence, *id.* 131-35; (4) Unclean Hands, *id.* ¶¶ 136-38; (5) Unjust Enrichment, *id.* ¶¶ 139-41; (6) Constructive Fraudulent Transfer, *id.* ¶ 142; (7) Failure to State a Claim, *id.* ¶ 143; (8) Lack of Subject Matter Jurisdiction, *id.* ¶ 144; (9) Condition Precedent, *id.* ¶ 145; (10) Condition Precedent, *id.* ¶ 145; (11) Immunity, *id.* ¶ 147; (12) Inconsistent with Governing Statute, *id.* ¶ 148; (13) Speculative Damages, *id.* ¶ 149; (14) In Pari Delicto, *id.* ¶ 150; (15) Estoppel and Waiver, *id.* ¶ 151; (16) Fault of SVBFG, *id.* ¶ 152; (17) Fault of Another, *id.* ¶ 153; (18) Limitation of Liability, *id.* ¶ 154; (19) Failure of Performance, *id.* ¶ 155; (20) Material Breach, *id.* ¶ 156; (21) Failure to Mitigate Damages, *id.* ¶ 157; (22) Precluded by 12 U.S.C. § 1821(i), *id.* ¶ 158; (23) Precluded by Documentary Evidence, *id.* ¶ 159; (24) Failure to Exhaust Administrative Remedies, *id.* ¶ 160; and (25) Lack of Third Party Beneficiary, *id.* at 126.

On May 28, 2025, the Trust and FDIC-Rs filed a Stipulation Regarding Resolution of Certain Claims. *See* ECF 205. Relevant to this Order, in the stipulation, the parties state that FDIC-R1 preserves the following affirmative defenses: Setoff For Aiding and Abetting Breaches of Fiduciary Duty (Affirmative Defense No. 1); Setoff for SVB Financial Group's Liability For Acts of its Agents

United States District Court
Northern District of California

(Affirmative Defense No. 2); Setoff For Negligence (Affirmative Defense No. 3); Unclean Hands (Affirmative Defense No. 4); Unjust Enrichment (Affirmative Defense No. 5); Constructive Fraudulent Transfer (Affirmative Defense No. 6); Precluded By Contract (Affirmative Defense No. 10); Immunity (Affirmative Defense No. 11); and In Pari Delicto (Affirmative Defense No. 14) (collectively "Preserved Defenses"). *Id.* at 2. The Parties stipulate that "[f]or purposes of this litigation only, the parties agree that FDIC-R1's liability (subject to FDIC-R1's Preserved Defenses) for the Trust's Breach of Contract claim in Count 1 of the Complaint shall be in the amount of $1,710,000,000." *Id.* at 3. The Parties stipulate that "the Trust hereby dismisses all of its remaining claims and causes of action against FDIC-R1 and FDIC-R2 with prejudice." *Id.* The Parties stipulate that FDIC-R1 "dismisses with prejudice all affirmative defenses except its Preserved Defenses." *Id.* at 5. On May 29, 2025, the Court granted the Parties' Stipulation Regarding Resolution of Certain Claims. ECF 208.

## II.    LEGAL STANDARD

### A.  Rule 12(f)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a motion made under this rule is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quotation marks and citation omitted). Motions to strike are "generally viewed with disfavor, and will usually be denied unless the allegations in the pleading have no possible relation to the controversy, and may cause prejudice to one of the parties." *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2012) (citations omitted).

### B.  Leave to Amend

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003). A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue

1    delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4)

2    undue prejudice to the opposing party, or (5) futility of amendment. *Eminence Capital*, 316 F.3d at

3    1051–52. "[I]t is the consideration of prejudice to the opposing party that carries the greatest

4    weight." *Id.* at 1052 (citation omitted). However, a strong showing with respect to one of the other

5    factors may warrant denial of leave to amend. *Id.*

6    ## III.    REQUEST FOR JUDICIAL NOTICE

7         The Court may take judicial notice of matters which "can be accurately and readily

8    determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

9    The Trust requests the Court to take judicial notice of three exhibits to the Declaration of Elliot

10   Moskowitz in support of its Motion to Strike. Mot. at 7. The first exhibit is a copy of selected

11   standards from the GAAP Standards. *See* ECF 160-2. The second exhibit is SVBFG's Form 10-Q

12   for the quarter ending September 30, 2022 filed with the Securities Exchange Commission. *See* ECF

13   160-3. The third exhibit is SVBFG's Form 10-K for the fiscal year ending December 31, 2022 filed

14   with the Securities Exchange Commission. *See* ECF 160-4.

15        FDIC-Rs do not dispute that the Court can take judicial notice of the existence of SVBFG's

16   SEC filings, but argue that the SEC filings contain disputed facts that are not subject to judicial

17   notice. Opp. at 24.

18        The Court GRANTS judicial notice of the existence of Plaintiff's exhibits. *See Metzler Inv.*

19   *GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (taking judicial notice of

20   publicly available financial documents such as SEC filings); *Mulderrig v. Amyris, Inc.*, 492 F. Supp.

21   3d 999, 1008 n.7 (N.D. Cal. 2020) (taking judicial notice of GAAP Standards). The Court does not

22   take notice of the truth of any of the facts asserted in these documents. *See Khoja v. Orexigen*

23   *Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself is

24   susceptible to judicial notice does not mean that every assertion of fact within that document is

25   judicially noticeable for its truth.").

26   ## IV.    APPLICABLE LAW

27        As an initial matter, the Court addresses which law governs FDIC-Rs' affirmative defenses.

28   The Trust argues that FDIC-Rs' affirmative defenses should be governed by California state law

United States District Court
Northern District of California

1    because "SVB was a California state member bank, notwithstanding that SVBFG is a Delaware

2    corporation." Mot. at 6. In response, FDIC-Rs state that they "rely on California law" because "there

3    is no relevant conflict of laws at this juncture." Opp. at 8 n. 1.

4        Here, the Court is exercising supplemental jurisdiction over FDIC-Rs' affirmative defenses

5    and the Court "applies the choice-of-law rules of the forum state—in this case, California." *Paracor*

6    *Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). Additionally, because SVB

7    was headquartered in Santa Clara, California, Aff. Def. ¶ 40, California law applies under the

8    internal affairs doctrine. *See F.D.I.C. v. Faigin*, No. CV 12–03448, 2013 WL 3389490, at *10-11

9    (C.D. Cal. July 8, 2013) (finding California law applies to action involving California bank based

10   on the internal affairs doctrine); *F.D.I.C. v. Van Dellen*, No. CV 10–4915, 2012 WL 4815159, at *3

11   (C.D. Cal. Oct. 5, 2012) (same).

12       Accordingly, for the purpose of this Order, the Court applies California state law.

## V.    PLEADING STANDARD

14       The Parties dispute the pleading standard for affirmative defenses. The Trust argues that

15   affirmative defenses must meet the plausibility pleading standard of *Twombly* and *Iqbal* to survive

16   a Rule 12(f) motion. Mot. at 6. In response, FDIC-R1 argues that the "fair notice" standard under

17   Rule 8(c) is sufficient for pleading an affirmative defense. Opp. at 7 (citing *Garcia v. Salvation*

18   *Army*, 918 F.3d 997, 1008 (9th Cir. 2019) and *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1019

19   (9th Cir. 2015)).

20       After *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S.

21   662 (2009), courts in this district have generally applied the heightened "plausibility" pleading

22   standard to affirmative defenses. *See, e.g., Snap! Mobile, Inc. v. Croghan*, No. 18-CV-04686-LHK,

23   2019 WL 884177, at *2 (N.D. Cal. Feb. 22, 2019); *Powertech Tech., Inc. v. Tessera, Inc.*, No. C 10-

24   945 CW, 2012 WL 1746848, at *4 (N.D. Cal. May 16, 2012) (collecting cases); *Fishman v. Tiger*

25   *Nat. Gas Inc.*, No. C 17-05351 WHA, 2018 WL 4468680, at *4 (N.D. Cal. Sept. 18, 2018)

26   ("[D]efendant must plead facts sufficient to establish the plausibility of such affirmative defense.").

27   Thus, "a defendant's pleading of affirmative defenses must put a plaintiff on notice of the underlying

28   factual bases of the defense" and include more than "bare statements reciting mere legal

United States District Court
Northern District of California

conclusions." *Snap! Mobile*, 2019 WL 884177, at *2 (citations omitted). "An affirmative defense is insufficiently pleaded if it fails to give the plaintiff fair notice of the defense." *Finjan, Inc. v. Cisco Sys., Inc.*, No. 17-CV-00072-BLF, 2018 WL 4361134, at *2 (N.D. Cal. Sept. 13, 2018) (quotation and citation omitted).

FDIC-Rs' reliance on *Garcia* and *Kohler* is unavailing. In *Garcia*, the Ninth Circuit addressed whether an affirmative defense that was not raised in the answer could be preserved at motion for summary judgment. *Garcia*, 918 F.3d at 1008. In *Kohler*, the Ninth Circuit did not "disturb the district court's finding" that plaintiff received sufficient notice of the affirmative defenses. *Kohler*, 779 F.3d at 1019. The Court notes that the Ninth Circuit did not explicitly address the pleading standard required for an affirmative defense to survive a motion to strike in either case.

For the above reasons, the Court will apply the *Iqbal/Twombly* plausibility pleading standard to FDIC-Rs' affirmative defenses.

## VI.    DISCUSSION

### A.  FDIC-R2's Affirmative Defenses

The Trust argues that FDIC-R2 does not have set off rights. Mot. at 20-21; Reply at 14.  In response, FDIC-R2 argues that it can set off the Trust's claims. *See* Opp. at 10.

In the Parties' Stipulation Regarding Resolution of Certain Claims, the Parties stipulated that "the Preserved Defenses belong to FDIC-R1 and that FDIC-R1 is the proper party with standing to assert the Preserved Defenses," and that "the Trust . . .  dismisses all of its remaining claims and causes of action against [] FDIC-R2 with prejudice." ECF 208 at 3. Accordingly, the Court will consider the Trust's Motion to Strike only as it relates to FDIC-R1.

### B.  FDIC-R1's Setoff Rights

"The right of setoff (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995) (quotation marks and internal citation omitted). FDIC-R1 alleges that "SVBFG's claims are barred, in whole or part, because they are setoff by [FDIC-Rs'] claims of equal or greater value." Aff. Def. ¶ 116. FDIC-R1 alleges that it has setoff rights "under federal and state law and the terms of the Deposit Agreement to the extent

United States District Court
Northern District of California

1    that it applies." *Id.*

2          As an initial matter, the parties dispute whether FDIC-R1 has setoff rights. The Trust argues

3    that FDIC-R1 has no setoff right. Mot. at 8-9. In response, FDIC-R1 argues that it has setoff rights

4    under 1) Section 553 of the Bankruptcy Code, 11 U.S.C. § 553 ("Section 553"); 2) California

5    common-law codified at Cal. Civ. Proc. Code § 431.70; 3) under 12 U.S.C. § 1822(d); and 4) the

6    Deposit Agreements between SVB and SVBFG. Opp. at 8-10.

7          The Court addresses the parties' arguments in turn.

8                 **1.  Section 553 of the Bankruptcy Code, 11 U.S.C. § 553**

9          Section 553 of the Bankruptcy Code provides that, "[e]xcept as otherwise provided . . ., this

10   title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the

11   debtor . . . against a claim of such creditor against the debtor[.]" 11 U.S.C. § 553(a) (emphasis

12   added).

13         FDIC-R1 argues that Section 553 "recognizes a right to set off a bankruptcy debtor's

14   prepetition claims." Opp. at 8. In its reply, the Trust argues that Section 553 "does not create a right

15   of setoff but rather preserves pre-existing rights of setoff in bankruptcy proceedings." Reply at 2

16   (citing *Citizen Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995)).

17         Section 553 does not create a "federal right of setoff." *Strumpf*, 516 U.S. at 18. Rather, with

18   a few exceptions, Section 553 preserves whatever setoff right that "otherwise exists" in bankruptcy.

19   *Id.* Section 553 "is generally understood as a legislative attempt to preserve the common-law right

20   of setoff arising out of non-bankruptcy law." *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d

21   1392, 1398 (9th Cir. 1996) (quoting *United States v. Arkison (In re Cascade Rds., Inc.)*, 34 F.3d

22   756, 763 (9th Cir.1994)). Under Section 553, "a claim may . . . be set off without regard to whether

23   it is contingent or unliquidated, as long as the claim qualifies as 'mutual' under applicable

24   nonbankruptcy law. . . ." *Newbery Corp.*, 95 F.3d at 1398; *see also In re Weisberg v. Shearson

25   Lehman Brothers, Inc.*, 136 F.3d 655, 658 (9th Cir. 1998) ("Under the [Bankruptcy] Code's broad

26   definition of 'claim,' . . . an unmatured claim could form the basis of a 'debt' for setoff purposes

27   [under 11 U.S.C. § 362(b)(6)].").

28         Thus, although Section 553 does not stand in the way of a setoff claim, it creates no such

United States District Court
Northern District of California

11

1    right. To maintain its setoff claims, FDIC-R1 must rely on another source of law, which it does.

2

3                    **2.  12 U.S.C. § 1822(d)**

4          FDIC-R1 argues that 12 U.S.C. § 1822(d) ("Section 1822(d)") "provides a separate setoff

5    right for FDIC acting as receiver." Opp. at 9 (citing 12 U.S.C. § 1822(d)). In its reply, the Trust

6    argues that its claims "are not claims for insured deposits." Reply at 2.

7          Section 1822(d) provides that FDIC can "withhold payment of such portion of the *insured*

8    *deposit* of any depositor in a depository institution in default as may be required to provide for the

9    payment of any liability of such depositor to the depository institution in default or its receiver,

10   which is not offset against a claim due from such depository institution, pending the determination

11   and payment of such liability by such depositor or any other person liable therefor." 12 U.S.C. §

12   1822(d) (emphasis added). As the Court previously found, the Trust's Breach of Contract claim does

13   not concern its insured deposits at SVB. *See* ECF 108, Order Granting in Part and Denying in Part

14   Motion to Dismiss. Thus, FDIC-Rs lack a setoff right under Section 1822(d) because the statute

15   only recognizes a right of setoff for "insured deposit[s]." 12 U.S.C. § 1822(d).

16         For the above reasons, the Court GRANTS the Trust's motion to strike on the basis that

17   FDIC-R1 does not have setoff right under 12 U.S.C. § 1822(d).

18                   **3.  Setoff Right under California Common Law**

19         FDIC-R1 next points to California common-law codified at Cal. Civ. Proc. Code § 431.70

20   as a basis for its setoff rights. *See* Opp. at 8-9. FDIC-R1 argues that, under California law, setoffs

21   can be "based on obligations that are unliquidated and unadjudicated." Opp. at 9 (citing *Constr.*

22   *Protective Servs., Inc. v. TIG Specialty Ins. Co.*, 29 Cal. 4th 189, 196 (2002) and *Comcast of*

23   *Sacramento I, LLC v. Sacramento Metro. Cable Tele. Comm'n*, 250 F. Supp. 3d 616, 623 (E.D. Cal.

24   2017), *vacated and remanded on other grounds*, 923 F.3d 1163 (9th Cir. 2019)).

25         The Trust argues that Section 431.70 of the California Code of Civil Procedure ("Section

26   431.70") provides the procedural means for a party to assert a setoff right. Reply at 2. The Trust

27   argues that Section 431.70 does not create a right to assert setoff. *See id.* The Trust argues that there

28   must be a "debt" owed for a right to setoff, and "there is none." Reply at 2-3 (citing *Cory v. Golden*

1    *State Bank*, 95 Cal. App. 3d 360, 369 (1979) and *Crocker-Citizens Nat. Bank v. Control Metals

2    *Corp.*, 566 F.2d 631, 637 (9th Cir. 1977), *abrogated by Hollinger v. Titan Cap. Corp.*, 914 F.2d

3    1564 (9th Cir. 1990)).

4         Having reviewed the parties' authorities, the Court finds that California law provides that

5    unliquidated or unadjudicated claims can be the basis for a setoff. Section 431.70 provides that a

6    defendant "may assert in the answer" the defense of setoff "[w]here cross-demands for money have

7    existed between persons at any point in time when neither demand was barred by the statute of

8    limitations." Cal. Civ. Proc. Code § 431.70. Under California law, the test to determine whether a

9    defendant is entitled to setoff is "whether the defendant could have maintained an independent

10   action on the demand attempted to be set off." *Cathay Logistics, LLC v. Gerber Plumbing Fixtures,

11   *LLC*, No. 215CV02926ODWRAO, 2016 WL 3912011, at *5 (C.D. Cal. July 19, 2016) (quoting

12   *Cuneo v. Lawson*, 203 Cal. 190, 196 (1928)). Under California law, a claim need not be liquidated

13   or adjudicated for a defendant to allege the claim a setoff. *See Constr. Protective Servs.*, 29 Cal. 4th

14   at 196 ("[A] claim need not be liquidated (that is, one having a fixed monetary value) in order for a

15   defendant to allege the claim as a setoff."); *Comcast*, 250 F.Supp.3d at 623 ("In determining whether

16   to grant a set-off, the court may adjudicate the merits of yet-to-be-adjudicated set-off claims.")

17   (citing *Unicom Sys., Inc. v. Farmers Grp., Inc.*, 405 Fed. Appx. 152, 154 (9th Cir. 2010)); *Campos

18   *v. Wells Fargo Bank, N.A.*, 345 B.R. 678, 683 (E.D. Cal. 2005) (holding the bank could assert setoff

19   rights against the debtor's checking account with the bank based on the Bank's judgment against

20   the debtor and this right was separate from any contractual right).

21        The Trust's reliance on *Cory* and *Crocker-Citizens* is off-point. *See* Reply at 3 (citing *Cory

22   *v. Golden State Bank*, 95 Cal. App. 3d 360, 369 (1979) and *Crocker-Citizens Nat'l Bank v. Control

23   *Metals Corp.*, 566 F.2d 631, 637 (9th Cir. 1977), *abrogated by Hollinger v. Titan Cap. Corp.*, 914

24   F.2d 1564 (9th Cir. 1990)). In *Cory,* the Bank asserted its setoff right on the basis that it had rights

25   to "deduct service charges with respect to uncashed money orders." *Cory*, 95 Cal. App. 3d at 364.

26   After finding that there was no contractual obligation to pay service charges when a money order

27   was purchased, the Court found that the bank lacked any setoff right because there was no "matured

28   debt owed to the Bank against which the setoff could be applied." *Id.* at 369. Similarly, in *Crocker-

United States District Court
Northern District of California

*Citizens*, the bank brought claims against Defendant Dougherty for violations of Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5, and common law fraud, and confiscated the cash balance in Dougherty's account. *Crocker-Citizens*, 566 F.2d at 634. After the Ninth Circuit affirmed the district court's judgment "absolving Dougherty of liability," the Ninth Circuit found its affirmance "conclusively negates the claim that there was any 'debt' upon which the bank could base a setoff." *Id.* at 637-38. These two cases further show that, under California law, any "debt" for setoff could be based on an unliquidated or unadjudicated claim brought by the bank.

Here, FDIC-R1's setoff rights under California common law are based on its first, second and third affirmative defenses against SVBFG. *See* Aff. Def. ¶¶ 115-35. None of those defenses relies on some future potential debt, but rather claim indebtedness based on prior misconduct. The fact that FDIC-R1's claims are unadjudicated does not bar its setoff claim. Thus, the Court DENIES the Trust's motion to strike on the basis that FDIC-R1 does not have a setoff right under California common law.

### 4. Deposit Agreements

The Deposit Agreements between SVB and SVBFG provide:

> "**Set Off and Security Interest.** We may charge or set off funds in your account for any direct, indirect and/or acquired obligations that you owe us, regardless of the source of the funds in the account, to the fullest extent permitted by law. We are not required to provide notice before applying your funds to any debt you owe to us."

ECF 33, Ex. B, Deposit Agreement and Disclosure Statement – Business Accounts, at 47 § (p).

The Trust argues that the Deposit Agreements do not provide a right to setoff based on "contingent or hypothetical claims." Mot. at 8. The Trust contends that FDIC-R1 has not alleged that SVBFG had any "unsatisfied 'debt' or 'obligation'" to SVB that could allow it to exercise the setoff provision in the Deposit Agreements. Mot. at 8; *see* Reply at 3.

In response, FDIC-R1 argues that its setoff defenses are based on SVBFG's obligations that had matured by the time of SVB's failure. Opp. at 9 (citing Aff. Def. ¶¶ 76-82). FDIC-R1 further argues that there is nothing "contingent or hypothetical" about its claims, and, in any event, such claims can be the basis for setoff because the Deposit Agreements permit setoffs "to the fullest

extent permitted by law." Opp. at 9 (citing ECF 33 Ex. B at 47 § (p)).

The Court concludes that the broad scope of the Deposit Agreement encompasses FDIC-R1's claims. Nothing in that agreement would preclude proven setoffs. The Court disagrees with the Trust that the claims are merely "contingent or hypothetical." As pled, FDIC-R1 claims setoff for alleged fully mature obligations. That those obligations are, as yet, unproved and unadjudicated is irrelevant. Because the Court has determined that FDIC-R1 may maintain its affirmative defenses under California common law as codified by statute, these claims are clearly consistent with the Deposit Agreement's provision allowing setoff "to the fullest extent permitted by law." ECF 33 Ex. B at 47 § (p).

For the above reasons, the Court DENIES the Trust's motion to strike the affirmative defenses on the ground that the Deposit Agreements between SVBFG and SVB do not provide a basis for FDIC-R1's setoff rights.

***

For the above reasons, the Court DENIES SVBFG's motion to strike the affirmative defenses on the ground that FDIC-R1 does not have setoff rights.

### C.  Analyzing FDIC-R1's Preserved Defenses under Rule 12(f)

#### 1.  Aiding and Abetting Breaches of Fiduciary Duty (First Affirmative Defense)

The Trust separately argues that FDIC-R1's first affirmative defense, setoff for aiding and abetting breaches of fiduciary duty, fails as a matter of law. Mot. at 9; Reply at 4. The Trust argues that FDIC-R1's aiding and abetting theory is precluded by the agency immunity rule because a single legal person cannot aid and abet itself. Mot. at 9-10; Reply at 4-5. The Trust further argues that FDIC-R1 has failed to plead that SVBFG took a separate affirmative act that assisted SVB's directors and officers in breaching their fiduciary duty. Mot. at 10-11; Reply at 5-6.

In response, FDIC-R1 argues that it has adequately alleged that SVBFG had knowledge of the officers' and directors' breaches and substantially participated or assisted in the breaches. Opp. at 16. FDIC-R1 argues that the "agent immunity rule" does not apply in this case where the officers and directors acted "on behalf of multiple parties." Opp. at 17. FDIC-R1 further contends that a "separate affirmative act" is not required for its aiding and abetting liability and that it has pled a

1    "separate affirmative act" by SVBFG even if it is a requirement. Opp. at 18-19.

2                    **a. FDIC-R1's Aiding and Abetting Affirmative Defense Is Not**

3                    **Precluded by the Agency Immunity Rule.**

4         The Trust argues that FDIC-R1's aiding and abetting affirmative defense fails because

5    "a person cannot aid and abet their own conduct." Mot. at 9. The Trust argues that the officers and

6    directors could not aid and abet their own conduct because "there was complete overlap between

7    the directors and officers of SVBFG and SVB." Mot. at 9. The Trust argues that FDIC-R1's aiding

8    and abetting affirmative defense is barred the agency immunity rule because SVBFG and its

9    agents—the officers and directors—constitute a single person for aiding and abetting claims. Mot.

10   at 10.

11        In response, FDIC-R1 argues that the agency immunity rule does not apply because the

12   officers and directors were acting for multiple entities—SVBFG and SVB. Opp. at 17. FDIC-R1

13   further argues that the officers and directors breached their duty to SVB and acted in their own

14   interest at SVB's expense. Opp. at 17-18.

15        The agency immunity rule typically applies "when a plaintiff alleges that an agent of a

16   corporation conspired with the corporation against the plaintiff." *Villains, Inc. v. Am. Econ. Ins. Co.*,

17   870 F. Supp. 2d 792, 795 (N.D. Cal. 2012). Under the agency immunity rule, the agent is immune

18   from liability because a corporation cannot conspire with itself. *See id.* Thus, "an agent or employee

19   who is acting within the scope of his authority is (in the eyes of the law) one and the same 'person'

20   as the corporation." *Id.* at 795-96 (quoting *Everest Invs. 8 v. Whitehall Real Est. P'ship XI,* 100

21   Cal.App.4th 1102, 1108, 123 Cal.Rptr.2d 297 (2002)). Courts have extended the agency immunity

22   rule to aiding and abetting claims. *See Opera Gallery Trading Ltd. v. Golden Trade Fine Art Inc.*,

23   No. 2:15-CV-00569-SVW-RZ, 2016 WL 7665408, at *4 (C.D. Cal. Jan. 6, 2016). Exceptions to the

24   agency immunity rule apply: "(1) where the [agent] violates a duty that he or she independently

25   owes to the plaintiff; and (2) where the [agent's] acts go beyond the performance of a professional

26   duty owed to the client and are, in addition, done for his or her own personal financial gain." *Id.*

27   (quoting *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 32 Cal. Rptr. 3d 325, 333 (Cal. Ct.

28   App. 2005)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    FDIC-R1 alleges that the SVB officers and directors owed duties of care and loyalty to SVB

2    due to their fiduciary relationship with SVB, and they breached their fiduciary duty by 1) "causing

3    SVB to invest in and continue to hold long-term government securities" despite the "obvious and

4    substantial risk" in the event of a rise in interest rates; and 2) causing SVB to terminate its interest-

5    rate swaps which protected SVB's AFS portfolio for the "self-interested purposes" of boosting

6    SVBFG's short-term earnings and stock price. Aff. Def. ¶¶ 116, 118. What the Trust refuses to

7    acknowledge is that the directors and officers wore two hats. And although the agency immunity

8    rule might prevent SVBFG's directors and officers from aiding and abetting SVBFG's conduct,

9    when SVBFG, acting through its directors and officers assists in SVB's misconduct, no authority

10   cited by the Trust immunizes a holding company's potential liability just because the directors and

11   officers of the two entities overlap. These directors and officers perform different functions

12   depending on which hat they are wearing.

13   Considering the facts alleged in the affirmative defense, the Court finds that the agency

14   immunity rule does not bar FDIC-R1's aiding and abetting affirmative defense. Here, FDIC-R1 has

15   plausibly alleged that the officers and directors' actions were not "solely on behalf of" SVBFG.

16   *Doctors' Co. v. Superior Ct.*, 49 Cal. 3d 39, 47 (1989). Rather, the officers and directors breached

17   their duty to SVB while acting as SVB's fiduciary and assisted those breaches while acting as

18   SVBFG's fiduciary. *See* Aff. Def. ¶¶ 118, 121. The Court finds that FDIC-R1 has plausibly alleged

19   that SVBFG knew that the SVB officers and directors breached their fiduciary duty to SVB and that

20   SVBFG assisted the SVB's officers and directors in that breach. *See ASARCO LLC v. Am. Min.*

21   *Corp.*, 382 B.R. 49, 72 (S.D. Tex. 2007) ("[I]f a fiduciary duty exists, a parent corporation may be

22   guilty of aiding and abetting its directors' breach of that fiduciary duty when those directors are also

23   the directors of its subsidiary.") (citation omitted); *AngioScore, Inc. v. TriReme Med., LLC*, 70 F.

24   Supp. 3d 951, 958, 961 (N.D. Cal. 2014) (holding plaintiff sufficiently alleged its aiding and abetting

25   claim under California and Delaware law by claiming that the defendants' founder breached his

26   fiduciary duty to plaintiff "by secretly conceiving of and commercializing" a device when acting as

27   the agent of defendants whose purpose was to sell the device).

28   The Court finds the cases relied on by the Trust distinguishable. *See* Mot. at 10 (citing

17

*Sanchez v. Am. Media*, No. CV 20-2924-DMG, 2021 WL 4731344, at *8 (C.D. Cal. July 13, 2021); *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 78 (1996); and *Villains, Inc. v. Am. Econ. Co.*, 870 F. Supp. 2d 792, 795-96 (N.D. Cal. 2012)). In *Sanchez*, the Court found that Plaintiff's aiding and abetting claim against a media company was barred by the agency immunity rule because plaintiff did not allege that the media company's officers and directors "acted outside the scope of their authority or violated separate duties owed to Plaintiff." *Sanchez*, 2021 WL 4731344, at *8. In *Janken*, the California Court of Appeal found that corporate employees were not "personally liable for transactions consummated on behalf of" the corporation in the aiding and abetting context. *Janken*, 46 Cal. App. 4th at 78-79. In *Villains*, the Court applied the agency immunity rule and found that an insurance company could not aid and abet itself through its employee. *Villains*, 870 F. Supp. 2d at 795-96. Unlike those cases, here, FDIC-R1 has plausibly alleged that the officers and directors breached their fiduciary duty to SVB when acting as SVB's fiduciary, and SVBFG aided and abetted those breaches through its officers and directors acting in their capacity as SVBFG's fiduciary. *See AngioScore*, 70 F. Supp. 3d at 958; *ASARCO*, 382 B.R. at 72.

The Court is also unpersuaded by the Trust's argument that the alleged breaches "[were] not done for personal financial gain." Mot. at 10. Here, FDIC-R1 has plausibly alleged that the officers and directors' compensation was tied to the stock price of SVBFG and that the officers and directors breached their fiduciary duty to SVB for the purpose of their own financial gain. *See* Aff. Def. ¶¶ 94, 118; *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1037 (9th Cir. 2016) (holding aiding and abetting claims against attorneys were not barred by the Agent's Immunity Rule because the attorneys owed an independent legal duty to the plaintiff when distributing the plaintiff's funds); *Opera Gallery Trading Ltd. v. Golden Trade Fine Art Inc.*, No. 2:15-cv-00569, 2016 WL 7665408, at *5 (C.D. Cal. Jan. 6, 2016) (finding agent immunity rule did not bar plaintiff's claim at motion to dismiss stage because plaintiff's allegations were related to defendants' mischaracterization of the fees they received).

For the above reasons, the Court DENIES the Trust's Motion to Strike FDIC-R1's First Affirmative Defense on the basis that it is barred by the agency immunity rule.

//

**b. FDIC-R1 has adequately pled that SVBFG took a separate affirmative act.**

To bring a claim for aiding and abetting breaches of fiduciary duty against a corporate entity under California law, a plaintiff must allege 1) knowledge of the breaches of fiduciary duty, and 2) substantial participation in the breaches. *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014) (citing *Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal. App.4th 1138, 1144, 26 Cal. Rptr. 3d 401 (2005)).

The Trust argues that aiding and abetting requires an act that is distinct from the primary violation. Mot. at 11 (citing *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1133-35 (C.D. Cal. 2003) and *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 n.10 (2005)); *see* Reply at 5-6. The Trust argues that FDIC-R1 has failed to identify any specific affirmative act taken by the SVBFG. Mot. at 11; Reply at 6.

In response, FDIC-R1 argues that aiding and abetting does not require "separate affirmative act." Opp. at 18 (citing *AngioScore*, 70 F. Supp. 3d at 960-61 and *Neilson v. Union Bank*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003)). FDIC-R1 further argues that it has pled a "separate affirmative act" even if it is a requirement. Opp. at 18-19.

Having reviewed the parties' authorities, Court finds that FDIC-R1 must allege an affirmative action on the part of the SVBFG for FDIC-R1's aiding and abetting affirmative defense. *See Aguado v. XL Ins. Am.*, 721 F. Supp. 3d 811, 816 (D. Ariz. 2024) (holding "the plaintiff must allege some action taken separate and apart from the facts giving rise to" an underlying tort claim) (internal quotation omitted); *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 n.10 (2005) (finding aiding and abetting "necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.") (quotation omitted) (emphasis added). The Court finds that FDIC-R1's reliance on *AngioScore* is off-point. Opp. at 18 (citing *AngioScore*, 70 F. Supp. 3d at 960-61). In *AngioScore*, a patent infringement case, in addition to breaching his fiduciary duty to the plaintiff by causing the other corporations to commercialize the infringing device, the officer-defendant was also alleged to have infringed the plaintiff's patent, which was a separate act. *See AngioScore*, 70 F.

United States District Court
Northern District of California

1    Supp. 3d at 956.

2        Nonetheless, based on at least the following allegations, the Court finds that FDIC-R1 has

3    alleged a separate affirmative act on the part of SVBFG that would establish a plausible inference

4    that SVBFG assisted the officers and directors in breaching a duty to SVB. FDIC-R1 has alleged

5    that SVBFG, through the actions of the joint Finance Committee and Risk Committee, approved the

6    decisions to purchase long-duration securities, terminate the interest-rate swaps, and pay the $294

7    million dividend. *See* Aff. Def. ¶¶ 14, 35, 56-58, 64, 68, 74, 88, 99, 102, 123. Additionally, SVBFG

8    hired a consultant, Curinos, to advise about changing deposit assumptions to artificially manipulate

9    the EVE-at-Risk model. *Id.* ¶¶ 70-71.

10        For the above reasons, the Court DENIES the Trust's Motion to Strike FDIC-R1's First

11    Affirmative Defense on the basis that FDIC-R1 has failed to allege a separate affirmative act by

12    SVBFG.

13                **2.    Setoff Defenses (First, Second, and Third Affirmative Defenses)**

14        FDIC-R1 asserts three setoff affirmative defenses: 1) setoff for aiding and abetting breaches

15    of fiduciary duty, Aff. Def. ¶¶ 115-26; 2) setoff for SVBFG's liability for acts of its agents, *id.* ¶¶

16    127-30; and 3) setoff for negligence, *id.* ¶¶ 131-35. As to the first setoff affirmative defense, FDIC-

17    R1 alleges that SVB's officers and directors breached their fiduciary duties to SVB, and that SVBFG

18    aided and abetted SVB's officers and directors in their breaches. Aff. Def. ¶¶ 118, 121. As to the

19    second setoff affirmative defense, FDIC-R1 alleges that SVBFG is liable for the misconduct of

20    SVB's officers and directors because they were SVBFG's agents. Aff. Def. ¶ 127. As to the third

21    setoff affirmative defense, FDIC-R1 alleges that SVBFG "had a duty to . . . avoid causing SVB

22    unnecessary risk of loss and to serve as a source of financial and managerial strength to SVB

23    consistent with federal law and SVBFG's own policies." Aff. Def. ¶ 131.

24        The Trust argues that these three affirmative defenses should be stricken because FDIC-R1's

25    theory that the shared directors and officers favored SVBFG's interests over those of SVB is

26    "fundamentally flawed." Mot. at 12. The Trust argues that SVB, a wholly-owned subsidiary of

27    SVBFG, did not breach fiduciary duty when it acted for the benefit of SVBFG. *Id.* at 12-14; *see*

28    Reply at 7-9. The Trust further argues that there was no duty for SVBFG to serve as a "source of

United States District Court
Northern District of California

20

strength" for SVB as a matter of law. *Id.* at 14-16; *see* Reply at 9-10.

In response, FDIC-R1 argues that SVB's officers and directors have duties of care and loyalty to SVB, and that they breached those duties. Opp. at 10-15. FDIC-R1 further contends that SVBFG was required to serve as a source-of-strength to SVB under federal banking regulation and its internal policy. Opp. at 20-21.

The Court addresses the Parties' arguments in turn.

### a. FDIC-Rs' First, Second, and Third Affirmative Defenses Are Not Precluded by the Unitary Interest Rule.

The Trust argues that SVBFG and SVB had "a complete unity of interest" because "SVB was a wholly-owned subsidiary of SVBFG." Mot. at 12 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)). The Trust argues that the officers and directors owed duties to SVBFG. Mot. at 13. The Trust argues that SVBFG and the officers and directors could not breach their duty to SVB based on actions taken in SVBFG's interest. Mot. at 12 (citing *Wenzel v. Mathies*, 542 N.W.2d 634, 641 (Minn. App. 1996)). The Trust further contends that the exception to this unitary interest is that the "wholly-owned subsidiary is actually insolvent." Mot. at 13 (citing *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1041 (2009)). The Trust argues that no exception applies because FDIC-R1 has failed to allege that SVB was insolvent during the relevant time period. Mot. at 13-14.

In response, FDIC-R1 argues that bank officers and directors owe duties of care and loyalty to the federally insured bank. Opp. at 10-11. FDIC-R1 argues that bank officers and directors cannot benefit the parent holding company by sacrificing the bank's safety and soundness. Opp. at 11. FDIC-R1 argues that banks are unlike other businesses because banks must be managed "safely and soundly" and "cannot be run solely to maximize shareholder value." Opp. at 13. FDIC-R1 further argues that it has adequately alleged that the actions of SVB's officers and directors caused SVB's insolvency. Opp. at 14-15.

Having reviewed the authorities cited by the parties, the Court finds that the officers and directors acting as SVB's officers and directors owe fiduciary duties to SVB, a federally insured bank, and not to enriching SVBFG's shareholders. Under federal banking regulation, the officers

and directors of a federally insured bank owe duties of care and loyalty to the bank, and they cannot sacrifice the financial soundness of the bank for their or the bank's holding company's benefits. *See* Office of the Comptroller of the Currency, The Director's Book, at 34-35 (2020) ("[A] bank's board should ensure the interests of the bank are not subordinate to the interests of the parent holding company in decisions that may adversely affect the bank's risk profile, financial condition, safety and soundness, and compliance with laws and regulations. Additionally, a director who serves on the board of both the bank and its holding company must comply with the director's fiduciary duties to the bank, including the duty of loyalty."). The directors or officers of an insured depository institution "may be held personally liable for monetary damages in any civil action" brought by FDIC acting as receiver of such institution. 12 U.S.C. § 1821(k); *Atherton v. F.D.I.C.*, 519 U.S. 213, 226-27, 117 S. Ct. 666, 674, 136 L. Ed. 2d 656 (1997); *see also, e.g., FDIC v. Ching*, 189 F. Supp. 3d 978, 983 (E.D. Cal. Jan. 29, 2018) (FDIC as receiver for a failed bank brought lawsuit against the bank's former officers and directors for stripping the bank of cash and assets to benefit the bank's shareholder). Additionally, "[a] bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1). These regulations provide that the bank holding company and the officers and directors of the bank must manage the bank in a safe and sound manner that serves the interests of the bank.

The Court finds the authorities cited by the Trust distinguishable. Opp. at 12-13 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984), *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988), and other cases and statutes). In *Copperweld*, the Supreme Court considered a claim brought under Section 1 of the Sherman Act and found that, in antitrust context, the "coordinated activity" of a parent and its wholly owned subsidiary "must be viewed as that of a single enterprise for purpose of § 1 of the Sherman Act." *Copperweld*, 467 U.S. at 771. The Supreme Court explained that, because "[a] parent and its wholly owned subsidiary have a complete unity of interest," scrutiny under Section 1 of the Sherman Act is not justified if the parent and the wholly owned subsidiary agree to a course of action. *Id.* The Supreme Court did not address the unity of interest between a bank holding company and its wholly-

United States District Court
Northern District of California

1    owned subsidiary bank and the issue of breach of fiduciary duty in the banking context. *See id.*

2          In *Anadarko*, the Supreme Court of Delaware explained that, under Delaware General

3    Corporation Law, "the directors of the subsidiary are obligated only to manage the affairs of the

4    subsidiary in the best interests of the parent and its shareholders." *Anadarko*, 545 A.2d at 1174.

5    Nonetheless, the Supreme Court of Delaware found, given the unique facts in the case, the directors

6    of the wholly owned subsidiary did not owe fiduciary duties to prospective shareholders who would

7    acquire the subsidiary through a spin-off. *Id.* at 1177. California Courts have "relied on" Delaware

8    corporate law to the extent "it is identical to California corporate law for all practical purposes."

9    *Kanter v. Reed*, 92 Cal. App. 5th 191, 208 (2023). California Corporations Code provides that "[a]

10   director shall perform the duties of a director . . . in good faith, in a manner such director believes

11   to be in the best interests of the corporation and its shareholders." Cal Corp. Code 309(a); *see, e.g.,*

12   *Beryl v. Navient Corp.*, No. 20-cv-05920-LB, 2023 WL 2908805, at *12 (N.D. Cal. Apr. 11, 2023)

13   ("Officers or directors of a wholly owned subsidiary owe a fiduciary duty to the parent

14   corporation."); *Thomas Wiesel Partners LLC v. BNP Paribus*, No. C 07–6198 MHP, 2010 WL

15   1267744, at *5 (N.D. Cal. Apr. 1, 2010) ("A fiduciary of a subsidiary also owes a fiduciary duty to

16   the subsidiary's parent corporation."). But none of the authorities provide that the state law

17   principle—the officers and directors of a wholly-owned subsidiary only have a duty to act in the

18   best interest of the holding company—can be broadly applied in the banking context in which the

19   subsidiary is a federally insured bank. *See In re Sw. Supermarkets, LLC*, 376 B.R. 281, 283 (Bankr.

20   D. Ariz. 2007) (finding *Anadarko* did not address the issue of "whether any fiduciary duty was owed

21   directly to the subsidiary."); *In re Touch Am. Holdings, Inc.*, 401 B.R. 107, 129 (Bankr. D. Del.

22   2009) (rejecting overly broad reading of *Anadarko*); *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d

23   10, 26 (D.D.C. 1998) ("[T]he proposition that a wholly-owned subsidiary's director's fiduciary

24   duties flow only to the parent corporation ... overstates the 'narrow confines' of the [*Anadarko*]

25   court's holding."); *see also Wenzel v. Mathies*, 542 N.W.2d 634, 641 (Minn. Ct. App. 1996) (holding

26   the directors of the bank also owe fiduciary duty to the equitable shareholders of the holding

27   company). Indeed, the Ninth Circuit in *McSweeney* has explicitly found that these state regulations

28   are preempted by Federal banking regulations. *See F.D.I.C. v. McSweeney*, 976 F.2d 532, 538 (9th

Cir. 1992) (holding Section 1821(k) preempts state laws "to the extent that they insulate [bank] officers and directors from liability for gross negligence, because such laws directly conflict with its grant of authority").

Here, FDIC-R1 alleges that SVB's officers and directors owe fiduciary duties to SVB. Aff. Def. ¶¶ 2, 117. FDIC-R1 alleges that the officers and directors "breached their fiduciary duties to SVB in numerous ways." *Id.* ¶ 118. As discussed above, FDIC-R1's theories of breach are not precluded by the unitary interest between SVBFG and its wholly owned subsidiary SVB. *See Ching*, 189 F. Supp. 3d at 983.

Because the Court finds that FDIC-R1's first, second, and third affirmative defenses are not precluded by the unitary interest rule, the Court need not address the exception to the application of the unitary interest rule.

For the above reasons, the Court DENIES the Trust's motion to strike on the basis that FDIC-R1's first, second, and third affirmative defenses are precluded by the unitary interest rule.

### b. FDIC-R1 Has Failed to Allege Facts Demonstrating that SVBFG Serve Had a Duty to Serve as a Source of Strength to SVB.

FDIC-R1 alleges in its affirmative defenses that SVBFG breached its duty to serve as a "source of financial and managerial strength to SVB" arising from federal law, including the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act") and Regulation Y, and SVBFG's own policies. Aff. Def. ¶¶ 111-13, 131. FDIC-R1 alleges that SVBFG's and SVB's officers and directors "ignored SVBFG's responsibility to serve as a source of strength for SVB" when they overconcentrated SVB's securities portfolio in long-term securities, terminated the hedges protecting the portfolio, approved the $294 million dividend that benefited SVBFG at the expense of SVB, and otherwise operated SVB for SVBFG's benefit. Aff. Def. ¶ 109.

The Trust argues that SVBFG had no duty to serve as a source of strength for SVB. Mot. at 14; Reply at 9. The Trust argues that the Dodd-Frank Act and Regulation Y do not automatically impose an obligation for a bank holding company to act as a source of strength, but rather impose an obligation on regulators to take action when a bank is undercapitalized. Mot. at 14-15. The Trust further argues that the Dodd-Frank Act and Regulation Y do not create any "private right of action."

1    *Id.* at 15. The Trust further argues that a breach of SVBFG's internal policy "does not give rise to a

2    tort claim." *Id.*

3        In response, FDIC-R1 argues that "federal regulations have required that bank holding

4    companies [] serve as a source of financial strength for subsidiary banks." 12 C.F.R. § 225.4(a)(1).

5    FDIC-R1 states that it is "not seeking to enforce a private right of action created by the federal

6    regulation," but seeks to bring its claims on the basis that SVBFG had a "general duty of care" under

7    California law. Opp. at 20. FDIC-R1 argues that the source-of-strength regulation informs SVBFG's

8    standard of care. *Id.* at 21. FDIC-R1 further argues that SVBFG's internal policy is "relevant

9    evidence of a breach of a duty of care." *Id.* (citing *Goodell v. Soledad Unified Sch. Dist.*, No. 19-

10   CV-06196-VKD, 2021 WL 2635908, at *5 (N.D. Cal. Jun. 26, 2021)).

11       The Dodd-Frank Act provides that "[t]he appropriate Federal banking agency . . . shall

12   require the bank holding company . . . to serve as a source of financial strength for any subsidiary .

13   . . that is a depository institution." 12 U.S.C. §§ 1831o-1(a). The Dodd-Frank Act defines "source

14   of financial strength" as "the ability of a company that directly or indirectly owns or controls an

15   insured depository institution to provide financial assistance to such insured depository institution

16   in the event of the financial distress of the insured depository institution." 12 U.S.C. §§ 1831o-1(f).

17       Regulation Y provides that "[a] bank holding company shall serve as a source of financial

18   and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or

19   unsound manner." 12 C.F.R. § 225.4(a)(1). A later policy statement explains that Regulation Y

20   reflects that "[a] fundamental and long-standing principle underlying the Federal Reserve's

21   supervision and regulation of bank holding companies is that bank holding companies should serve

22   as sources of financial and managerial strength to their subsidiary banks." Policy Statement;

23   Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks,

24   52 FR 15707-01, 1987 WL 133897.

25       Here, FDIC-R1 has not alleged that any Federal banking agency imposed a requirement for

26   SVBFG to serve as a source of strength for SVB under the Dodd-Frank Act. *See* Aff. Def. ¶¶ 124,

27   128, 133, 138.  Additionally, neither the Dodd-Frank Act nor Regulation Y creates a private right

28   of action, and FDIC-R1 is not seeking to enforce a private right of action under those regulations.

United States District Court
Northern District of California

1    *See* Mot. at 15; Opp. at 21. The Court is also unpersuaded by FDIC-R1's argument that "the

2    regulation can and should inform the standard of care that SVBFT was required to exercise as the

3    holding company of the Bank." Opp. at 21. Indeed, FDIC-R1 has not alleged the basis of SVBFG's

4    "source of strength" obligation.

5        FDIC-R1 has also failed to allege how its claims against the Trust can be based on

6    California's general duty of care. California's general duty of care provides that "[e]veryone is

7    responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the

8    management of his or her property or person." Cal. Civ. Code § 1714(a). Under California's general

9    duty of care, "all persons owe a duty of care to avoid injuring others" unless an exception is

10   warranted. *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 217, 483 P.3d 159, 167 (2021). "[S]ection

11   1714 does not impose a general duty to avoid purely economic losses." *Sheen v. Wells Fargo Bank,*

12   *N.A.*, 12 Cal. 5th 905, 920 (2022).

13       Here, FDIC-R1 alleges that SVBFG is liable for the damages it caused, which "substantially

14   exceeds" its $1.93 billion deposit claim. Aff. Def. ¶¶ 124, 128, 133, 138. Thus, FDIC-R1's alleged

15   harm is economic loss, and FDIC-R1 has failed to allege how California's general duty of care could

16   give rise to SVBFG's duty to serve as a source of strength to SVB. The Court is also unpersuaded

17   by the other authorities cited by FDIC-R1 because they all concern personal injury torts as opposed

18   to financial harms. *See Brown*, 11 Cal. 5th at 210 (alleged tort arose from sexual abuse); *DiRosa v.*

19   *Showa Denko K.K.*, 44 Cal. App. 4th 799, 801 (1996) (alleged tort arose from ingesting toxic

20   tryptophan); *Norman v. Life Care Centers of Am., Inc.*, 107 Cal. App. 4th 1233, 1234 (2003) (tort

21   action brought for elder abuse and wrongful death); *Ramirez v. Plough, Inc.*, 6 Cal. 4th 539, 540-41

22   (1993) (alleged injury caused by drug manufacturer's failure to warn about the dangers of Reye's

23   syndrome). At the hearing, FDIC-R1 argued that the applicability of the California general duty of

24   care should be analyzed under the factors in *Rowland v. Christian*, 69 Cal. 2d 108, 112-13, 443 P.2d

25   561, 567 (1968). ECF 200, Motion to Strike Hearing Tr. at 46:10-48:1; *see* Opp. at 20 (citing

26   *Rowland*, 69 Cal. 2d at 112-13). But FDIC-R1 has failed to allege how the *Rowland* factors could

27   provide the basis for the SVBFG's duty to serve as a source of strength to SVB.  To the extent that

28   FDIC-R1 argues that SVBFG is required to serve as a source of strength to SVB pursuant to

United States District Court
Northern District of California

SVBFG's internal policy, Opp. at 21, FDIC-R1 has failed to allege how SVBFG's violation of its internal policy could give rise to a tort claim. *See Morelewicz v. Gov't Emps. Ins. Co.*, 207 F. App'x 823, 826 (9th Cir. 2006).

For the above reasons, the Court GRANTS SVBFG's motion to strike on the basis that FDIC-Rs have failed to allege facts demonstrating that SVBFG breached a duty to serve as a source of strength to SVB.

### 3. Unclean Hands (Fourth Affirmative Defense)

FDIC-R1 asserts its Fourth Affirmative Defense that the Trust's Breach of Contract claim is barred by the doctrine of unclean hands. Aff. Def. ¶ 136. FDIC-R1 alleges that the Trust's Breach of Contract claim is barred because the Trust "engaged in inequitable conduct," "[the inequitable conduct] relates to the claims asserted against FDIC-R1," and "[the inequitable conduct] caused damages." *Id.*

The Trust argues that FDIC-R1's unclean hands affirmative defense should be stricken because it is unrelated to the Trust's Breach of Contract claim. Mot. at 17; Reply at 10-11. The Trust further argues that FDIC-R1 has failed to allege a "willful act that violates conscience or good faith." *Id.* (citing *LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 821 (N.D. Cal. 2019)) (internal quotation omitted).

In response, FDIC-R1 argues that it has alleged that the Trust's Breach of Contract claim "[is] attributable to" SVBFG's misconduct in sacrificing SVB's safety. Opp. at 22. FDIC-R1 argues that the $294 million bank-to-parent dividend and the Trust's financial and liquidity position were a result of SVBFG's "misuse" of SVB. *Id.*

The unclean hands doctrine applies when "the party against whom the doctrine is sought to be invoked directly 'infected' the actual cause of action before the court, and is not merely guilty of unrelated improper past conduct." *Pond v. Ins. Co. of N. Am.*, 151 Cal. App. 3d 280, 290 (1984). California Courts apply a three-prong test to determine whether the alleged claim is barred by the doctrine of unclean hands: "(1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." *Padideh v. Moradi*, 89 Cal. App. 5th 418, 436 (2023).

United States District Court
Northern District of California

United States District Court
Northern District of California

The Court finds that FDIC-R1 has plausibly pled its unclean hands affirmative defense. As to the first factor, "analogous case law," unclean hands is available as an affirmative defense to a breach of contract claim under California law. *See Camp v. Jeffer, Mangels, Butler & Marmaro,* 35 Cal.App.4th 620, 638, (1995) ("In California, the doctrine of unclean hands may apply to legal as well as equitable claims . . . and to both tort and contract remedies.") (internal citation omitted). As to the second factor, "nature of the misconduct," FDIC-R1 has plausibly alleged that "SVBFG controlled and managed SVB for SVBFG's own benefit," and caused SVB to operate in a "grossly imprudent" manner that was "inconsistent with principles of safety and soundness." Aff. Def. ¶137.

As to the third factor, "the relationship of the misconduct to the claimed injuries," FDIC-R1 alleges that its unclean hands defense is based on SVBFG's control and management of SVB "for SVBFG's own benefit," including SVBF's investment in long-term government securities, SVB's breach of its EVE-at-Risk policy limits, SVB's termination of interest-rate swaps, and SVB's approval and payment of a $294 million bank-to-parent dividend to SVBFG. Aff. Def. ¶ 137, all of which FDIC-R1 alleges caused SVB to fail. The Court finds that FDIC-R1 has plausibly alleged that SVBFG caused SVB to fail and the failure of SVB led to the necessity of the federal guarantee of all SVB deposits.

The Trust's reliance on *Cal-Agrex* is misplaced. *See* Mot. at 16 (citing *See Cal-Agrex, Inc. v. Tassell*, 258 F.R.D. 340, 351 (N.D. Cal. 2009)). In *Cal-Agrex*, the Court found defendants' asserted actions for the unclean hands defense did not relate to the breach of contract claim decided by the jury and rejected defendants' motion for relief from a judgment. *See Cal-Agrex*, 258 F.R.D. at 351. The Court explained that it was undisputed that the plaintiff never acquired nonfat dry milk under the Purchase Agreement, and that "anything [plaintiff] did to the [nonfat dry milk] it actually received has no bearing on the breach of contract claim that was submitted to the jury." *Id.* Unlike *Cal-Agrex*, the Court finds that FDIC-R1 has plausibly alleged a misconduct by SVBFG that "infect[s] the cause of action before the court." *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 614 (1992).

For the above reasons, the Court DENIES the Trust's motion to strike the Fourth Affirmative Defense, Unclean Hands.

### 4. Unjust Enrichment (Fifth Affirmative Defense)

FDIC-R1 asserts that "SVBFG's claims are all barred to the extent it received and unjustly retained a benefit at the expense of SVB and now FDIC-Rs." Aff. Def. ¶ 139.

The Trust argues that FDIC-R1 has failed to allege how any benefit received by SVBFG is "unjust." Mot. at 17; Reply at 11. The Trust further argues that FDIC-R1's unjust enrichment affirmative defense is precluded by the valid and enforceable Deposit Agreement between SVBFG and SVB. Mot. at 18.

In response, FDIC-R1 argues that it has alleged that SVBFG unjustly retained benefits at the expense of SVB. Opp. at 23. FDIC-R1 further argues that the Deposit Agreement does not bar the unjust enrichment affirmative defense because the unjust enrichment claim is not based on the Trust's breach of the Deposit Agreement and the Deposit Agreement does not provide recovery for FDIC-R1's unjust enrichment claim. *Id.*

"[U]njust enrichment is an action in quasi-contract." *Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). An unjust enrichment claim "cannot lie where there exists between the parties a valid express contract covering the same subject matter." *Yang v. Dar Al-Handash Consultants*, 250 F. App'x 771, 773 (9th Cir. 2007) (quoting *Lance Camper Manufacturing Corp. v. Republic Indemnity, Co.,* 44 Cal.App.4th 194, 203 (1996)). Here, the Trust's Breach of Contract claim is based on the Deposit Agreement. Compl. ¶¶ 140-41. It is undisputed that the Deposit Agreement is enforceable and that the Deposit Agreement "provided for contractual setoff defenses." Ans. ¶¶ 45, 140. Accordingly, FDIC-R1 has failed to state a claim for unjust enrichment where it has failed to allege that the Deposit Agreement is unenforceable. *Rabin v. Google LLC*, No. 22-cv-04547, 2023 WL 4053804, at *13 (N.D. Cal. June 15, 2023). The Court also find that FDIC-R1 has failed to allege how SVBFG's allegedly unjust conduct is not covered by the Deposit Agreement.

For the above reasons, the Court GRANTS the Trust's motion to strike the Fifth Affirmative Defense, Unjust Enrichment WITH LEAVE TO AMEND.

### 5. Constructive Fraudulent Transfer (Sixth Affirmative Defense)

FDIC-R1 asserts that the Trust's claim should be setoff by the $294 million bank-to-parent

United States District Court
Northern District of California

1    dividend in December 2022 because the dividend constitutes a constructive fraudulent transfer. Aff.

2    Def. ¶ 142. The Trust argues that FDIC-R1 has failed to plead that SVB was insolvent at the time

3    the dividend was paid or that SVB became insolvent as a result of the payment. Mot. at 18-19. The

4    Trust also argues that FDIC-R1 has failed to plead that, at the time of the payment, SVB's assets

5    were unreasonably small in relation to the payment or that the payment would incur debts beyond

6    SVB's ability to pay when they become due. *Id.* at 19. In response, FDIC-R1 argues that it has pled

7    SVB was insolvent at least when the dividend was approved in October 2022. FDIC-R1 further

8    argues that the Trusts' arguments rely on SVBFG's Form 10-K whose contents should be ignored.

9    Opp. at 24.

10        In California, constructive fraudulent transfer claims may be brought under Cal. Civ. Code

11    §§ 3439.04(a)(2)–3439.05. *See In re UC Lofts on 4th, LLC*, No. ADV 07-90139-CL, 2014 WL

12    1285415, at *12 (Bankr. S.D. Cal. Mar. 27, 2014), *aff'd,* No. AP 07-90139-CL, 2015 WL 5209252

13    (B.A.P. 9th Cir. Sept. 4, 2015). Under Cal. Civ. Code § 3439.05, a constructive fraudulent transfer

14    claim requires that "the debtor was insolvent at [the time of the transfer] or the debtor became

15    insolvent as a result of the transfer." Under Cal. Civ. Code § 3439.04(a), a constructive fraudulent

16    transfer claim requires 1) the debtor's asserts "were unreasonably small in relation to the business

17    or transaction," or 2) the debtor "[i]ntended to incur, or believed or reasonably should have believed

18    that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

19        FDIC-R1 alleges that, "[a]s of September 30, 2022, SVB had only $15.8 billion in total

20    equity," which was "less than the $15.9 billion in unrealized losses in its HTM portfolio alone." Aff.

21    Def. ¶ 82. FDIC-R1 alleges that, "[h]ad those losses been recognized, SVB would have been

22    insolvent." *Id.* FDIC-R1 alleges that the $294 million bank-to-parent dividend was a constructive

23    fraudulent transfer because SVB did not receive reasonably equivalent value in exchange for the

24    transfer and "was insolvent or rendered insolvent." *Id.* ¶ 142.

25        In light of these pleadings, the Court finds that FDIC-R1 has plausibly pled that SVB was

26    insolvent at the time the bank-to-parent dividend was paid because its total equity was less than its

27    unrealized losses at the time the dividend was paid. The Trust's reliance on the facts within

28    SVBFG's Form 10-K is misplaced because the truth of the facts are not judicially noticeable. *See*

United States District Court
Northern District of California

30

United States District Court
Northern District of California

1    *Khoja v. Orexigen Ther., Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because the document itself

2    is susceptible to judicial notice does not mean that every assertion of fact within that document is

3    judicially noticeable for its truth."). In any event, whether SVB was insolvent at the time the bank-

4    to-parent dividend was paid is "highly fact-specific" and should be resolved at a later stage of the

5    litigation. *See, e.g.*, *In re Prototype Eng'g & Mfg., Inc.*, No. 2:17-BK-21018-RK, 2019 WL 9243004

6    (Bankr. C.D. Cal. Dec. 12, 2019) (denying motion to dismiss claims for constructive fraudulent

7    transfer in part because "determination of insolvency is highly fact-specific and should be based on

8    seasonable appraisals or expert testimony") (internal citation omitted).

9        For the above reasons, the Court DENIES the Trust's motion to strike the Sixth Affirmative

10   Defense, Constructive Fraudulent Transfer.

### 6. FDIC-Rs' Remaining Affirmative Defenses

#### a. Affirmative Defenses Dismissed by FDIC-R1

13       The Court previously granted the Parties' stipulation that FDIC-R1 "dismisses with

14   prejudice all affirmative defenses except its Preserved Defenses." ECF 208 at 5. The Court hereby

15   TERMINIATES AS MOOT the Trust's motion to strike as to the Seventh, Eighth, Ninth, Twelfth,

16   Thirteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-First,

17   Twenty-Second, Twenty-Third, Twenty-Fourth and Twenty-Fifth affirmative defenses.

#### b. The Tenth, Eleventh, and Fourteenth Affirmative Defenses

19       FDIC-R1 also preserves the following affirmative defenses: Precluded by Contract

20   (Affirmative Defense No. 10), Immunity (Affirmative Defense No. 11), and In Pari Delicto

21   (Affirmative Defense No. 14). ECF 208 at 2. The Trust argues that the Tenth, Eleventh, and

22   Fourteenth Affirmative Defenses should be stricken because FDIC-R1 has failed to "assert anything

23   more than a recitation of bare legal conclusions," and these affirmative defenses are insufficiently

24   pled "as a matter of law." Mot. at 21. The Trust further argues that these affirmative defenses "are

25   not actual affirmative defenses but 'simply deny liability.'" *Id.* (citing *Pertz v. Heartland Realty*

26   *Invs., Inc.*, No. 19-cv-06330, 2020 WL 95636, at *2 (N.D. Cal. Jan. 8, 2020)).

27       In response, FDIC-Rs argue that these affirmative defenses "are supported by 114

28   paragraphs of detailed facts" and are not conclusory. Opp. at 25. FDIC-Rs argue that those

affirmative defenses are based on statutory bars and contractual bars that should proceed. *Id.*

The Court agrees with the Trust. "Courts generally apply the *Twombly*/*Iqbal* plausibility standard to pleading affirmative defenses." *Ochoa v. City of San Jose*, No. 21-CV-02456-BLF, 2022 WL 1619152, at *2 (N.D. Cal. May 23, 2022). Here, FDIC-R1 pleads in conclusory fashion that the Trust's "claims are barred, in whole or in part," by the Tenth, Eleventh, and Fourteenth Affirmative Defenses. *See* Aff. Def. ¶¶ 146-47, 150. The Court finds that these "bare statements reciting mere legal conclusions" and incorporating but not identifying specific factual allegations pled over 114 paragraphs do not provide fair notice or a plausible basis for FDIC-R1's allegations. *Hall-Johnson v. Citibank*, N.A., 2024 WL 3907037, at *2 (N.D. Cal. Aug. 19, 2024); *see Ochoa*, 2022 WL 1619152, at *2.

For the above reasons, the Court GRANTS the Trust's motion to strike the Tenth Affirmative Defense, Precluded by Contract; the Eleventh Affirmative Defense, Immunity; and the Fourteenth Affirmative Defense, In Pari Delicto WITH LEAVE TO AMEND.

## VII.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) To the extent the motion was asserted against FDIC-R2, the parties' stipulation has resolved all claims against FDIC-R2.

(2) Trust's motion to strike on the basis that FDIC-R1 has no setoff rights is DENIED.

(3) The Trust's motion to strike FDIC-R1's First Affirmative Defense, Setoff for Aiding and Abetting Breaches of Fiduciary Duty on the basis that the affirmative defense is barred by the agency immunity rule and that FDIC-R1 has failed to plead that SVBFG took any separate affirmative act is DENIED.

(4) The Trust's motion to strike the First Affirmative Defense, Setoff for Aiding and Abetting Breaches of Fiduciary Duty; the Second Affirmative Defense, Setoff for SVBFG's Liability for Acts of its Agents; the Third Affirmative Defense, Setoff for Negligence is DENIED on the basis that these affirmative defenses are barred by the unitary interest rule and is GRANTED WITH LEAVE TO AMEND on the basis that SVBFG owed a duty to act as a source of strength to SVB.

United States District Court
Northern District of California

(5) The Trust's motion to strike the Fourth Affirmative Defense, Unclean Hands is DENIED.

(6) The Trust's motion to strike the Fifth Affirmative Defense, Unjust Enrichment is GRANTED WITH LEAVE TO AMEND.

(7) The Trust's motion to strike the Sixth Affirmative Defense, Constructive Fraudulent Transfer is DENIED.

(8) The Trust's motion to strike the Seventh Affirmative Defense, Failure to State a Claim; Eighth Affirmative Defense, Lack of Subject Matter Jurisdiction; Ninth Affirmative Defense, Condition Precedent; Twelfth Affirmative Defense, Inconsistent with Governing Statute; Thirteenth Affirmative Defense, Speculative Damages; Fifteenth Affirmative Defense, Estoppel and Waiver; Sixteenth Affirmative Defense, Fault of SVBFG; Seventeenth Affirmative Defense, Fault of Another; Eighteenth Affirmative Defense, Limitation of Liability; Nineteenth Affirmative Defense, Failure of Performance; Twentieth Affirmative Defense, Material Breach; Twenty-First Affirmative Defense, Failure to Mitigate Damages; Twenty-Second Affirmative Defense, Precluded by 12 U.S.C. § 1821(i); Twenty-Third Affirmative Defense, Precluded by Documentary Evidence; Twenty-Fourth Affirmative Defense, Failure to Exhaust Administrative Remedies; and Twenty-Fifth Affirmative Defense, Lack of Third Party Beneficiary is TERMINATED AS MOOT.

(9) The Trust's motion to strike the Tenth Affirmative Defense, Precluded by Contract; the Eleventh Affirmative Defense, Immunity; the Fourteenth Affirmative Defense, In Pari Delicto is GRANTED WITH LEAVE TO AMEND.

The amended pleading shall be filed no later than July 10, 2025. FDIC-R1 may only amend to correct the deficiencies identified in this Order. In the event that the Trust chooses to file a further motion to strike, it shall be limited to contesting only the amended claims and the motion will be limited to ten (10) pages. The Response will also be limited to ten (10) pages, and the Reply will be limited to six (6) pages.

Dated:  June 24, 2025

_____
BETH LABSON FREEMAN
United States District Judge