KEKER, VAN NEST & PETERS LLP
ROBERT A. VAN NEST - # 84065
rvannest@keker.com
JAN NIELSEN LITTLE - # 100029
jlittle@keker.com
JULIA L. ALLEN - # 286097
jallen@keker.com
MAYA JAMES - # 318554
mjames@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:   415 397 7188

Attorneys for Plaintiff
SVB FINANCIAL TRUST

DAVIS POLK & WARDWELL LLP
Elliot Moskowitz (pro hac vice)
elliot.moskowitz@davispolk.com
Christina Costello (pro hac vice)
christina.costello@davispolk.com
450 Lexington Avenue
New York, NY 10017
Telephone:   212 450 4000

DAVIS POLK & WARDWELL LLP
Jonathan K. Chang - # 355907
jonathan.chang@davispolk.com
900 Middlefield Road
Redwood City, CA 94063
Telephone:   650 752 2000

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SVB FINANCIAL TRUST,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Silicon Valley Bank and Silicon Valley Bridge Bank, N.A.,<br><br>Defendants. | Case No. 5:24-cv-01321-BLF<br><br>**SVB FINANCIAL TRUST'S TRIAL BRIEF**<br><br>Dept.:   Courtroom 3 – 5th Floor<br>Judge:   Hon. Beth Labson Freeman<br><br>Date Filed:  March 5, 2024<br><br>Trial Date:  June 29, 2026 |

6228636

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ..................................................................................................2

    A.    The Bank's portfolio and dividend decisions were reasonable. ...............................2

    B.    The Bank managed its portfolio and risks under Director-approved policies and active Director feedback and oversight. ..........................................................4

III.  ARGUMENT .......................................................................................................6

    A.    FDIC cannot impose setoff liability on the Holding Company based on a simple agency theory. ...........................................................................................6

        1.    FDIC cannot establish that Officers and Directors breached any duty. ..................................................................................................6

        2.    Absent more, FDIC cannot impose liability on the Holding Company for acts undertaken by Bank Officers and Directors. ...............10

        3.    The Holding Company operated through its Board and Director committees whose conduct is subject to the business judgment rule. .......10

    B.    FDIC cannot prove aiding and abetting liability.....................................................11

    C.    FDIC cannot prove unclean hands.........................................................................12

    D.    The Trust is not liable for constructive fraudulent transfer. ..................................13

    E.    FDIC cannot establish the causation required to establish an offset. ....................14

IV.   CONCLUSION....................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*1st Valley Credit Union v. Bland,*
2010 WL 8757250 (C.D. Cal. Dec. 20, 2010) ................................................................16

*In re AWTR Liquidation Inc.,*
548 B.R. 300 (Bankr. C.D. Cal. 2016) .........................................................................16

*Burckhardt v. Northwestern Nat. Bank,*
38 F.2d 568 (9th Cir. 1930) .........................................................................................16

*Corales v. Bennett,*
567 F.3d 554 (9th Cir. 2009) .......................................................................................16

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.,*
920 F.2d 457 (7th Cir. 1990) .......................................................................................16

*Med. Self Care, Inc. ex rel. Dev. Specialists, Inc. v. Nat'l Broad. Co.,*
2003 WL 1622181 (S.D.N.Y. Mar. 28, 2003) .............................................................16

*Dollar Sys., Inc. v. Avcar Leasing Sys.,*
890 F.2d 165 (9th Cir. 1989) .......................................................................................16

*FDIC v. Castetter,*
184 F.3d 1040 (9th Cir. 1999) .....................................................................................16

*FDIC v. Faigin,*
2013 WL 3389490 (C.D. Cal. July 8, 2013) ................................................................16

*FDIC v. Hurwitz,*
384 F. Supp. 2d 1039 (S.D. Tex. 2005) .......................................................................16

*FDIC v. Switzer,*
2014 WL 12696532 (N.D. Cal. Apr. 9, 2014) ..............................................................16

*In re GSM Wireless,*
2013 WL 4017123 (C.D. Cal. Apr. 5, 2013) ................................................................16

*Intervest Mortg. Inv. Co. v. Skidmore,*
655 F. Supp. 2d 1100 (E.D. Cal. 2009) .......................................................................16

*LL B Sheet 1, LLC v. Loskutoff,*
362 F. Supp. 3d 804 (N.D. Cal. 2019) .........................................................................16

*Marketquest Grp., Inc. v. BIC Corp.,*
316 F. Supp. 3d 1234 (S.D. Cal. 2018) ........................................................................16

*Nat'l Credit Union Admin. v. Siravo*,
  2011 WL 8332854 (C.D. Cal. 2011)........................................................................16

*Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*,
  894 F.3d 1015 (9th Cir. 2018) ...............................................................................16

*Splunk Inc. v. Cribl, Inc.*,
  2024 WL 2701628 (N.D. Cal. May 24, 2024).........................................................16

*In re UC Lofts on 4th*,
  2014 WL 1285415 (Bankr. S.D. Cal. Mar. 27, 2014)..............................................16

*United States v. Able Time, Inc.*,
  2011 WL 2669222 (C.D. Cal. July 7, 2011)............................................................16

*United States v. Bestfoods*,
  524 U.S. 51 (1998)..................................................................................................16

**State Cases**

*Chen v. Howard-Anderson*,
  87 A.3d 648 (Del. Ch. 2014)...................................................................................16

*In re Citigroup*,
  964 A.2d 106 (Del. Ch. 2009)..................................................................................16

*City of Santa Barbara v. Super. Ct.*,
  41 Cal. 4th 747 (2007) ............................................................................................16

*Doe v. Roman Catholic Archbishop of Los Angeles*,
  247 Cal. App. 4th 953 (2016) .................................................................................16

*Eng v. Opperman*,
  117 Cal. App. 5th 354 (2025) .................................................................................16

*Fiol v. Doellstedt*,
  50 Cal. App. 4th 1318 (1996) .................................................................................16

*Kanter v. Reed*,
  92 Cal. App. 5th 191 (2023) ...................................................................................16

*Katz v. Chevron*,
  22 Cal. App. 4th 1352 (1994) .................................................................................16

*Knutson v. Foster*,
  25 Cal. App. 5th 1075 (2018) .................................................................................16

*Laird v. Cap. Cities/ABC, Inc.*,
  68 Cal. App. 4th 727 (1998) ...................................................................................16

*Lee v. Interinsurance Exch. of Auto. of S. Cal.*,
  50 Cal. App. 4th 694 (1996) ...........................................................................................16

*Lola Cars Int'l Ltd. v. Krohn Racing*,
  2010 WL 3314484 (Del. Ch. Aug. 2, 2010) ...................................................................16

*MacLaughlan v. Einheiber*,
  354 A.3d 864 (Del. Ch. 2026)..........................................................................................16

*Pro. Hockey Corp. v. World Hockey Ass'n.*,
  143 Cal. App. 3d 410 (Ct. App. 1983).............................................................................16

*Rudd v. Brown*,
  2020 WL 5494526 (Del. Ch. Sept. 11, 2020) .................................................................16

*Scott v. Sec. Title Ins. & Guarantee Co.*,
  9 Cal. 2d 606 (1937) .......................................................................................................16

*Shafi v. Chien*,
  2025 WL 671854 (Del. Ch. Mar. 3, 2025)......................................................................16

*Sinclair Oil Corp. v. Levien*,
  280 A.2d 717 (Del. 1971) ................................................................................................16

*Tribeca Cos. v. First Am. Title Ins. Co.*,
  239 Cal. App. 4th 1088 (2015) ........................................................................................16

*Tuli v. Specialty Surgical Ctr. of Thousand Oaks*,
  105 Cal. App. 5th 997 (2024) ..........................................................................................16

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*,
  1 Cal. 3d 586 (1970) .......................................................................................................16

*Wessels v. Read*,
  2020 WL 5052765 (Cal. Ct. App. Aug. 27, 2020)..........................................................16

**State Statutes**

Cal. Civ. Code § 2338................................................................................................................16

Cal. Corp. Code § 309................................................................................................................16

**Regulations**

12 C.F.R. § 252.35(b)(1).............................................................................................................16

SVB FINANCIAL TRUST'S TRIAL BRIEF
Case No. 5:24-cv-01321-BLF

6228636

## I.      INTRODUCTION

In the midst of a global pandemic and rock-bottom interest rates, the Holding Company and Bank faced a significant challenge: how to manage an unprecedented inflow of more than a hundred billion dollars in deposits that challenged the Bank's ability to maintain sufficient capital. Managing that influx of funds to ensure the Bank's safe and sound operation required balancing many competing risks, including capital, credit, liquidity, and market risks—all of which the Directors and Officers closely monitored. Ultimately, after ensuring sufficient liquidity and growing its loan portfolio and other offerings to the extent possible, the Bank—acting under Board-set policies—invested the remaining funds in safe, Government-backed securities. Throughout this period, Directors and Officers evaluated and discussed the issues at the center of FDIC's case: portfolio duration, held-to-maturity (HTM) and available-for-sale (AFS) allocations, hedges for interest rate risk, and the bank-to-parent dividend. Nothing was overlooked or ignored.

The Federal Reserve and California DFPI contemporaneously reviewed those decisions, regularly met with Directors and Officers, and received detailed financial and risk analyses. From 2018 to mid-2022 (the final review cycle), regulators rated as strong or satisfactory the Bank's liquidity, capital, asset quality, sensitivity to market risk, and earnings. Even in closing the Bank, the DFPI stated that the Bank was in "sound financial condition" prior to the Bank run. TX 1454.

The Directors and Officers who navigated these decisions were dedicated, experienced, and diligent. CEO Greg Becker served the Bank since the early 1990s, and peer banks elected him to the San Francisco Federal Reserve Board. CFO Dan Beck devoted his career to working at banks and oversaw the Treasury department. Treasurer Mike Kruse dedicated nearly twenty years to the Bank. The Directors were well-respected, highly-credentialed professionals who helped steer the transition to becoming a Large Financial Institution ("LFI")—including the heightened regulatory scheme—in the wake of the Bank's extraordinary growth. Beverly (Kay) Matthews, Board Chair, was a former managing partner of Ernst & Young; Joel Friedman, Finance Committee Chair, held senior roles at Accenture and served on numerous boards; Mary Miller was the Under Secretary and later Acting Secretary of the U.S. Treasury; Eric Benhamou was a prominent venture capitalist who led Fortune 500 companies; Garen Staglin had experience with

6228636

venture capital, private equity, and board compensation committees; Kate Mitchell, Risk Committee Chair, spent years in leadership at Bank of America and founded its venture capital arm. These Directors devoted thousands of hours a year to poring over detailed analyses of the Bank's finances and risk metrics and overseeing its path forward—the opposite of a lack of care.

FDIC's claims stem from its disagreement with business decisions, but that does not amount to a breach of fiduciary duty. FDIC's criticisms are based on hindsight. In light of the circumstances when the decisions were made, the 2021-2022 investments and sale of hedges were reasonable, adhered to Board-set policies, aligned with peer banks, and were endorsed by regulators. Nor can FDIC establish the other elements of agency liability or aiding and abetting liability. For agency liability, FDIC cannot impute the relevant conduct to the Holding Company because the challenged investments were plainly made on behalf of the Bank. Nor can FDIC show that Directors and Officers made a willful decision to participate in tortious activity on behalf of the Holding Company for the purpose of assisting a breach to the Bank, as required for aiding and abetting. Likewise, FDIC cannot prove unclean hands by clear and convincing evidence. And FDIC's constructive fraudulent transfer claim fails because the Bank not only was solvent when the dividend issued but also had tens of billions of dollars of liquid assets available.

FDIC is not entitled to any reduction of its $1.71 billion liability.

## II.    BACKGROUND

### A.    The Bank's portfolio and dividend decisions were reasonable.

When interest rates plummeted in 2020, the Bank's existing clients experienced a historic surge in cash as pandemic-era monetary policy flooded the system with liquidity, venture capital fundraising exploded, and startups raised unprecedented amounts of capital. Bank deposits ballooned from $62.9 to $191.4 billion. Dkt. 294 at 17 ¶ 5. As a regulated, for-profit business, the Bank could not simply hold those deposits—liabilities on its balance sheet—as cash. Instead, the Bank had to generate earnings for its operations. As regulators observed, "a low interest rate environment" and "economic uncertainty caused by the pandemic" had significantly compressed the Bank's earnings. TX 1424 at 12.

Facing interest rates close to zero and projections from the Federal Reserve that low rates

6228636

would persist through 2024, the Bank invested the money that could not be prudently loaned or otherwise deployed through customer investment and cash-management programs in safe, Government-backed securities. Dkt. 333-1 at 51; TX 2038. These securities had low credit risk and provided the Bank with steady interest income to bolster its capital position. And the Bank's share of mortgage-related assets aligned with the 100 largest banks. Dkt. 333-1 at 70-71. Financials publicly disclosed these investments, and regulators endorsed the approach, stating that "[m]anagement has appropriately monitored the Bank's capital position" and "[s]ensitivity to market risk is adequately monitored and controlled." TX 1424 at 2. In 2022, regulators reiterated "[m]anagement has demonstrated effective governance and planning processes to determine the amount of capital necessary to cover the Firm's risks and exposures." TX 1442 at 6.

The Bank also reasonably executed on its hedging strategy. In 2021, the Bank purchased interest rate hedges to guard against rising rates. TX 359 at 253. Based on guidance from the Federal Reserve indicating that rising interest rates were "transitory" and concerned about a recession, the Bank terminated hedges in July 2022 at a pre-tax gain of $313 million, which it planned to recognize over approximately seven years. TX 603 at 11; TX 998; TX 2038. This sale mitigated the potential impact of declining interest rates on Net Interest Income (NII) at Risk, a Board-approved metric projected to exceed an internal threshold if interest rates decreased. TX 397 at 53-60. Again, regulators lauded the Bank, noting "[m]anagement has appropriately considered strategies to limit the impact of potential declining rate scenarios." TX 1442 at 8.

Likewise, Directors and Officers carefully considered the dividend from the Bank to the Holding Company in 2022. In the years prior—when the pandemic and low interest rates pressured the Bank's capital position—the Bank paused dividend payments, and the Holding Company down-streamed $6.4 billion to the Bank to support its capital ratios. But by late 2022, circumstances changed. The Bank's capital position improved following stabilization of deposit inflows and its investment in higher-yield securities. In turn, the Holding Company's capital position improved, and a dividend from the Bank would "support the Holding Company's cash flow requirements." TX 470 at 33. The dividend complied with federal and state regulations, regulators did not object, and the Bank was solvent when the dividend issued. The dividend

SVB FINANCIAL TRUST'S TRIAL BRIEF
Case No. 5:24-cv-01321-BLF

6228636

represented only 2% of the Bank's cash on hand, Dkt. 333-1 at 139, and FDIC's expert agrees the Bank had $79.6 billion in borrowing capacity when the dividend issued, TX 2463.

Finally, Directors and Officers were diligent in working to mitigate the impact of the dramatic and unanticipated increase in interest rates. Following interest rates spiking from approximately 0% to 5% between March 2022 and March 2023, the Board formed a Special Committee to assess repositioning the portfolio. Based on advice from Goldman Sachs and Sullivan & Cromwell, the Committee decided to restructure the Bank's balance sheet and (1) sell nearly all securities designated AFS, (2) absorb a $1.8 billion post-tax loss to reposition the portfolio and protect against further interest rate increases, and (3) complete a $2 billion capital raise. That plan was ultimately thwarted when, in the midst of that sale and capital raise, Silvergate Bank announced its voluntary dissolution. TX 94 at 3; TX 93. In the panic that followed, there was an unprecedented Bank run where depositors withdrew $42 billion on March 9, 2023, with $65 billion more expected in withdrawals the next day. This was the fastest and largest bank run in history. *Id.*

Notably, at all times, the Bank maintained liquidity exceeding regulatory minimums. In May 2021, regulators rated the Bank's liquidity as "more than sufficient to meet current and prospective operational funding needs." TX 1424 at 13. In August 2022, they again rated liquidity satisfactory. TX 1424 at 6. Indeed, the Bank met nearly $42 billion in deposit demands in one day—more than many peer banks could have withstood.

**B.    The Bank managed its portfolio and risks under Director-approved policies and active Director feedback and oversight.**

The Bank Officers and employees who built the portfolio did not act on their own. Directors approved policies that guided all of the investment and dividend decisions, including the Risk Appetite Statement ("RAS"), Global Treasury Policy, and Capital Management Policy.

*First*, the RAS "put[] in place guidance, goals, and constraints" to ensure the Bank "properly manage[d] risk," including market, liquidity, capital, and credit risk; identified specific metrics—over 50 altogether—that "define[d] the guardrails" of the Bank's risk appetite; and set forth the protocol for monitoring and responding to any breaches of those metrics. TX 475 at 2-3.

The RAS required quarterly reports to the Board on each risk category, including liquidity, capital, and market risk. TX 475 at 2. It identified six metrics for market risk, and two focused on interest-rate risk: NII-at-Risk (12-month horizon) and NII-at-Risk (24-month horizon). *Id.* at 4. It identified the former as a "prioritized metric" subject to additional reporting in the event of breach. *Id.* at 13. In contrast, "EVE-at-Risk"—a different interest-rate risk metric that was based on a heavily assumption-dependent model—was not selected as a RAS metric. The RAS further required management to report regularly to the Board's Risk Committee about adherence to the RAS. *Id.* at 11. Pursuant to that framework, Directors reviewed and discussed all RAS metrics and plans to ensure they stayed within the established thresholds.

*Second*, the Board's Finance Committee annually approved the Global Treasury Policy. That policy identified "eligible investments and corresponding restrictions," and restricted the portion of the portfolio that could be composed of municipal and corporate bonds or other investments that would carry additional yields, in favor of U.S. Treasuries and agency-backed mortgage-backed securities (which ultimately made up the bulk of the Bank's investments in 2021 and 2022). TX 465 at 21, 24. It further identified permissible hedging strategies and confirmed that the Finance Committee was responsible for reviewing and approving hedging programs. *Id.* at 11. Finally, it listed additional metrics for Treasury to monitor, including EVE-at-Risk, and set protocols for when metrics exceeded the established thresholds. *Id.* at 13.

Officers closely followed the Global Treasury Policy in managing the Bank's portfolio and monitoring risk metrics. The 2021-2022 investments conformed to the policy's portfolio allocation, and the Finance Committee regularly received and reviewed reporting on the agency mortgage-backed securities allocation, portfolio duration, and HTM and AFS designations. TX 130 at 35-42; TX 134 at 49-52. The Finance Committee routinely discussed these topics with Messrs. Beck and Kruse. TX 131 at 2 ("[F]ulsome discussion ensued regarding interest rate prospects and portfolio interest rate characteristics, future hedging activities, and balance of available-for-sale and held-to-maturity assets."); TX 125 at 2-3 ("[E]xtensive discussion[s] of durations of different portfolios, including shifts between available-for-sale and held-to-maturity portfolios."). Consistent with the Global Treasury Policy, the Committee also received reports

when the relevant metrics, such as EVE-at-Risk, exceeded set thresholds, along with the Bank's plans for response. *See, e.g.*, TX 135 at 1 ("The Committee . . . questioned management regarding interest rate risk . . . metrics."); TX 130 at 38 (report to Committee regarding purchase of hedges "[t]o support the efforts to flatten the EVE profile"). Likewise, Messrs. Beck and Kruse reported to the Finance Committee on hedging strategy, which (as FDIC acknowledges) the Committee reviewed and endorsed. Dkt. 294 at 28.

Finally, the Board approved the Capital Management Policy, which authorized "cash dividends from surplus capital to the Holding Company." TX 470 at 33. That policy set a dividend threshold of 50% of the Bank's prior quarter net income and required consideration of the Bank's capital position. *Id.* The December 2022 dividend payment was made pursuant to this policy: it was less than 50% of the Bank's third-quarter net income, and Directors considered the Bank's capital position, including reports that the Bank's capital ratios were well above its minimum requirements, before approving it. TX 149 at 113-24.

In sum, the challenged decisions were the result of regular deliberation between Directors and Officers and reflected the implementation of Director-approved policies.

## III.    ARGUMENT

### A.    FDIC cannot impose setoff liability on the Holding Company based on a simple agency theory.

#### 1.    FDIC cannot establish that Officers and Directors breached any duty.

A predicate to FDIC's agency theory is an underlying breach of a fiduciary duty. But FDIC cannot establish that Officers and Directors breached their fiduciary duties of care and loyalty. The challenged decisions were reasonable, guided by Director-approved policies, and made in good faith without conflicts of interest. FDIC claims Officers and Directors should have managed the risks the Bank faced differently, yet identifies no prudent alternative path. But disagreement with business judgment is not a basis for liability. *In re Citigroup*, 964 A.2d 106, 130 (Del. Ch. 2009).

FDIC must show "(1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Tribeca Cos. v. First Am. Title Ins. Co.*, 239 Cal.

6

App. 4th 1088, 1114 (2015) (cleaned up). "[A] breach of fiduciary duty can be based upon either negligence or fraud depending on the circumstances." *Knutson v. Foster*, 25 Cal. App. 5th 1075, 1093-94 (2018). Negligence involves conduct that "a reasonably careful person would not do in the same situation." CACI 401. Gross negligence is the "want of even scant care" or "an extreme departure from the ordinary standard of conduct." *City of Santa Barbara v. Super. Ct.*, 41 Cal. 4th 747, 754 (2007); CACI 425. It is insufficient for FDIC to show Officers and Directors made a mere "[e]rror[] in judgment." *Scott v. Sec. Title Ins. & Guarantee Co.*, 9 Cal. 2d 606, 614 (1937); *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 590 (1970). Rather, FDIC must prove a "want of care or diligence." *Scott*, 9 Cal 2d at 614.

FDIC cannot prove a breach of the duty of care. The duty of care is "the duty to exercise reasonable prudence in making business judgments for the corporation, including gathering adequate information and undertaking due consideration of the relevant issues." *In re AWTR Liquidation Inc.*, 548 B.R. 300, 313 (Bankr. C.D. Cal. 2016); Cal. Corp. Code § 309.

*First*, the Directors and Officers prudently managed and oversaw the investment portfolio in 2021-2022. The investments purchased were within the limits that the Directors approved in the RAS and Global Treasury Policy and were low-credit risk, high-quality government backed securities, which are prudent and safe. *FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1078 (S.D. Tex. 2005) (FDIC sanctioned in part because "not gross negligence . . . to invest in highly marketable securities based on the fundamental business of the thrift—mortgages"); *Nat'l Credit Union Admin. v. Siravo*, 2011 WL 8332854, at *2 (C.D. Cal. 2011) ("[A] seemingly gigantic problem with [FDIC's] case is that WesCorp never invested in securities graded lower than AA.").

Additionally, the investment portfolio's proportion of held-to-maturity securities and duration was reasonable. The securities and HTM allocations had a rational business purpose: among other things, they mitigated the exceptional pressure that massive deposit inflows and near-zero interest rates in 2020 and 2021 put on the Bank's capital ratios. *Tuli v. Specialty Surgical Ctr. of Thousand Oaks*, 105 Cal. App. 5th 997, 1010 (2024) ("Courts defer to board judgments that can be attributed to any *rational* business purpose."). Those decisions were made when the market and Federal Reserve expected low-interest rates to persist—not skyrocket to

significant levels in one year—and regulators and market participants assessed them as sound. *Lola Cars Int'l Ltd. v. Krohn Racing*, 2010 WL 3314484, at \*12 (Del. Ch. Aug. 2, 2010) (sales estimates, though inaccurate in hindsight, were reasonable under economic conditions).

Nor did Officers and Directors disregard EVE-at-Risk or interest rate risk, as FDIC claims. Between 2021 and mid-2022, the Board-identified interest rate risk metric (NII-at-Risk) was within RAS limits. And Officers worked to remediate EVE-at-Risk throughout 2021 and 2022 while balancing other metrics like liquidity, capital, and credit risk. Directors regularly received EVE-at-Risk reports and discussed remediation with Officers. Although FDIC may disagree with how Officers and Directors balanced competing risks, FDIC cannot show a "want of care or diligence," let alone an "extreme departure" from the standard of care. Directors met frequently and regularly communicated with Officers and regulators about the very strategies that FDIC challenges. *FDIC v. Castetter*, 184 F.3d 1040, 1045 (9th Cir. 1999) (no liability for directors of failed bank where directors met regularly and took good faith action in response to regulator concerns); *Burckhardt v. Northwestern Nat. Bank*, 38 F.2d 568 (9th Cir. 1930) (no liability for directors of bank that suffered run after decline in investments value due to economic depression where directors met regularly, assessed plans, and addressed regulator concerns).

***Second***, the unwinding of the hedges in July 2022 was also reasonable under the circumstances. At that point, rates had increased, and economists projected that the Federal Reserve's aggressive rate hikes would soon result in a recession and lower interest rates. Based on that information, it was prudent to sell hedges to position the portfolio for a down-rate scenario—and doing so protected NII-at-Risk. The fact that interest rates ultimately did not drop as predicted does not reflect negligence or gross negligence. *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("The fiduciary duty of care . . . requires prudence, not prescience." (cleaned up)); *Citigroup*, 964 A.2d at 126 ("Business decision-makers must operate in the real world, with imperfect information, limited resources, and an uncertain future"). What's more, the hedge sale followed extensive discussion among management, ALCO, and the Finance Committee; complied with the Global Treasury Policy; provided $312 million profits to the Bank; and was endorsed by regulators as prudent strategy.

***Finally***, the resumption of the bank-to-parent dividend did not constitute a breach of fiduciary duty. It was a reasoned decision based on the determination that it did not harm the Bank's capital position, left the Bank with sufficient liquidity, and provided needed capital to the Holding Company. Moreover, it was set under the Capital Management Policy and disclosed to regulators, who did not object. *Lee v. Interinsurance Exch. of Auto. of S. Cal.*, 50 Cal. App. 4th 694, 717 (1996) (dividend had business purpose).

FDIC cannot prove any breach of the duty of loyalty either. That duty "is the duty to give primacy to the interest of the corporation." *In re AWTR Liquidation Inc.*, 548 B.R. at 313 (citation omitted). It requires a showing of bad faith or the "intentional[] act[]" of putting one's own interests before the corporation. *MacLaughlan v. Einheiber*, 354 A.3d 864, 894 (Del. Ch. 2026); *Pro. Hockey Corp. v. World Hockey Ass'n.*, 143 Cal. App. 3d 410, 414 (Ct. App. 1983). But FDIC cannot establish bad faith. First, there is ***no evidence*** that the Officers and Directors were motivated to prioritize short-term income over the health of the Bank. *Chen v. Howard-Anderson*, 87 A.3d 648, 685 (Del. Ch. 2014) ("[A] plaintiff's inability to explain a Board's motivation to act in bad faith may . . . be relevant in analyzing bad faith claims."). Nor did their status as dual fiduciaries create a material conflict of interest, since the interests of the Holding Company and the Bank were aligned. *Einheiber*, 354 A.3d at 900 ("If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict."); *Lee*, 50 Cal. App. 4th at 717 ("interlocking boards" not per se conflict); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721 (Del. 1971) (no conflict for overlapping boards of parent and subsidiary absent proof of self-dealing). Further, the challenged actions were not "inconsistent with the business purpose that is asserted" or "so clearly against the interests of" the Bank as to constitute bad faith. *1st Valley Credit Union v. Bland*, 2010 WL 8757250, at *5 (C.D. Cal. Dec. 20, 2010).

Finally, to the extent FDIC argues that Directors breached their duties by "failing to effectively challenge" the decisions at issue, the record is overwhelmingly to the contrary. But, even if that were not the case, the FDIC could not satisfy *Caremark*. PTC Tr. at 112:3-7. "[B]ad faith is a *necessary condition*" to a *Caremark* claim, which FDIC cannot show. *Kanter v. Reed*, 92 Cal. App. 5th 191, 206 (2023); *Wessels v. Read*, 2020 WL 5052765, at *12 (Cal. Ct. App.

9

Aug. 27, 2020) ("[A]lleging [calamity] occurred on the directors' watch" insufficient).

**2.      Absent more, FDIC cannot impose liability on the Holding Company for acts undertaken by Bank Officers and Directors.**

FDIC's agency theory also fails because, *even if* FDIC could prove breach of fiduciary duty, FDIC must show that Directors and Officers were acting as agents of, and on behalf of, the Holding Company when they engaged in the challenged conduct. Cal. Civ. Code § 2338; *Doe v. Roman Catholic Archbishop of Los Angeles*, 247 Cal. App. 4th 953, 969 (2016). FDIC cannot make that showing. Dual-role directors and officers of a parent and subsidiary "can and do 'change hats' to represent the two corporations separately," and are presumed to wear "subsidiary hats" when acting for the subsidiary. *United States v. Bestfoods*, 524 U.S. 51, 69–70 (1998). The relevant conduct was on behalf of the Bank: the funds were *Bank* deposits invested by the *Bank*.

Further, FDIC has not identified any authority recognizing agency liability of a parent for a dual officer's breach of a fiduciary duty owed to the subsidiary. Courts regularly reject attempts to bypass corporate formalities for fiduciary duty claims. *Shafi v. Chien*, 2025 WL 671854, at *16–17 (Del. Ch. Mar. 3, 2025) (refusing to impute director's breach of fiduciary duty despite director acting as investor's agent); *Med. Self Care, Inc. ex rel. Dev. Specialists, Inc. v. Nat'l Broad. Co.*, 2003 WL 1622181, at *7 (S.D.N.Y. Mar. 28, 2003) (same). Allowing such liability would be an "unprecedented, revolutionary change" to corporate law, *Shafi*, 2025 WL 671854, at *16, improperly bypassing the requirements to hold a parent liable for the conduct of a subsidiary's directors and officers under veil-piercing doctrines, which FDIC does not pursue, *Laird v. Cap. Cities/ABC, Inc.*, 68 Cal. App. 4th 727, 742 (1998). FDIC's proposed theory would disrupt the banking system and California corporate law by imposing liability on Holding Companies for engaging in the common practice of operating through dual directors and officers.

**3.      The Holding Company operated through its Board and Director committees whose conduct is subject to the business judgment rule.**

The business decisions that FDIC challenges are also entitled to deference under the business judgment rule, which establishes a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that

10

the action taken was in the best interests of the company." *Eng v. Opperman*, 117 Cal. App. 5th 354, 366 (2025). FDIC may rebut that presumption with proof of "fraud, bad faith, overreaching or an unreasonable failure to investigate material facts." *Lee*, 50 Cal. App. 4th at 715. The standard of liability is gross negligence. *Katz v. Chevron*, 22 Cal. App. 4th 1352, 1366 (1994).

Here, the Holding Company acted through its Directors. As discussed, Directors reviewed and deliberated the investment strategy before implementation and the investments adhered to Director-approved policies. Additionally, the Finance Committee had approval authority over the hedging program and the bank-to-parent dividend under the Global Treasury Policy and the Capital Management Policy. The challenged decisions are thus considered under the business judgment rule, and this case materially differs from FDIC's cited cases. Dkt. 310 at 42. In *Faigin* and *Switzer*—motion to dismiss cases—officers were individually sued based on independent decisions to approve allegedly fraudulent loans. *FDIC v. Switzer*, 2014 WL 12696532, at *1 (N.D. Cal. Apr. 9, 2014); *FDIC v. Faigin*, 2013 WL 3389490, at *1 (C.D. Cal. July 8, 2013). Here, however, the relevant business strategies resulted from Officers' and Directors' deliberation and were guided by Director-approved policies. In *Bland*—also a motion to dismiss case—the court never addressed joint decision making. 2010 WL 8757250, at *1.

Nor does any exception to the business judgment rule apply. As discussed, the Officers and Directors faced no conflict of interest, and they did not put their own personal interests or the interests of the Holding Company ahead of the Bank's by simply owning stock. *Tuli*, 105 Cal. App. 5th at 1011 (no conflict for ownership of shares); *Rudd v. Brown*, 2020 WL 5494526, at *11 (Del. Ch. Sept. 11, 2020) ("[I]nterest in options vesting does not violate the duty of loyalty.").

**B.    FDIC cannot prove aiding and abetting liability.**

FDIC cannot prove the elements of aiding and abetting liability: (1) breach of fiduciary duty; (2) actual knowledge that conduct constituted a breach; (3) conscious decision to participate in tortious activity for the purpose of assisting the wrongful act; and (4) substantial assistance or encouragement that was a substantial factor in causing harm. Dkt. 331 at 10. In addition, FDIC must prove the Holding Company took an affirmative action separate and distinct from the acts constituting the underlying breach. Dkt. 233 at 19–20.

SVB FINANCIAL TRUST'S TRIAL BRIEF
Case No. 5:24-cv-01321-BLF

6228636

FDIC cannot satisfy any of those requirements. ***Even if*** FDIC could prove a breach, there is no evidence that any Director or Officer of the Holding Company knew their conduct constituted a breach or made a conscious decision to participate in tortious activity for the purpose of assisting a wrongful act. *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325–26 (1996). The challenged decisions were reviewed and approved through the Bank's governance structure and regulators who examined these decisions consistently rated the Bank strong or satisfactory.

Nor can FDIC identify any affirmative action by the Holding Company "separate and apart from the facts giving rise to" the alleged breach. Dkt. 233 at 19. In declining to strike this defense, the Court pointed to alleged joint committee approvals and the retention of Curinos as plausible bases for a separate act. *Id.* at 20. But FDIC identifies no proof to support that theory: its alleged acts of "aiding and abetting" are indistinguishable from the governance decisions that purportedly constitute the breach itself. Indeed, among other things, FDIC's chart identifies Mr. Beck as both recommending the dividend and "aiding and abetting" by setting its final amount— claiming, in substance, that he aided and abetted himself. FDIC cannot meet the separate-and-distinct-action requirement by simply repackaging the underlying conduct as aiding and abetting.

### C.     FDIC cannot prove unclean hands.

FDIC's unclean hands defense fails because it cannot establish by clear and convincing evidence that the Holding Company committed a "willful act" that "violates conscience[] or good faith." *LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 821 (N.D. Cal. 2019); *Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018) (clear and convincing burden). The "essence" of unclean hands is "[b]ad intent." *Dollar Sys., Inc. v. Avcar Leasing Sys.*, 890 F.2d 165, 173 (9th Cir. 1989). But as discussed, the investments, hedge sale, and dividend were reasonable, done in good faith, and do not reflect unconscionable, dishonest, or bad faith behavior. *LL B Sheet*, 362 F. Supp. 3d at 821 (rejecting unclean hands for lack of "bad faith"); *United States v. Able Time, Inc.*, 2011 WL 2669222, at *8 (C.D. Cal. July 7, 2011).

FDIC's unclean hands defense also fails because it is based on conduct unrelated to the Trust's post-closure breach of contract claim. To establish unclean hands, FDIC must prove by clear and convincing evidence that "the alleged misconduct by the [Holding Company] relate[s]

6228636

directly to the transaction concerning which the complaint is made." *Dollar Sys.*, 890 F.2d at 173. Here, the relevant "transaction" is FDIC's breach of its contractual obligation to return the Holding Company's deposit funds following the Bank's closure. As the Court acknowledged, that contractual obligation *only exists because of the Bank's closure*. Dkt. 233 at 28. But here, FDIC's claims relate exclusively to *pre-closure* conduct regarding the Bank's investment portfolio, hedge sales, and bank-to-parent dividend. Moreover, FDIC has *disavowed* any intent to "take[] on the burden in this case of proving that the [pre-closure] negligence here caused the bank failure," PTC Tr. 43:1-2, and emphasized "[t]hat the Bank failed or why it failed has never been a component of the FDIC's claim or required proof," Dkt. 294 at 6; Dkt. 272 at 14.

In any event, because the factual basis for FDIC's unclean hand defense is coextensive with its other affirmative defenses, and because FDIC cannot prove its other claims, there is no inequitable conduct to support unclean hands—much less *clear and convincing evidence* of such misconduct. *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1295 (S.D. Cal. 2018); *Splunk Inc. v. Cribl, Inc.*, 2024 WL 2701628, at *1 (N.D. Cal. May 24, 2024).

**D.   The Trust is not liable for constructive fraudulent transfer.**

FDIC cannot claw back the $294 million dividend. The transfer is voidable only if the Bank was insolvent at the time the transfer was made. FDIC pursues only the "unreasonably small assets" test to prove insolvency and cannot satisfy that standard.

Courts evaluating unreasonably small assets generally "'weigh[] the raw financial data of the balance sheet against the nature of the entity and its need for capital over time,' or have evaluated the 'debtor's future ability to generate cash and pay its debts as they come due.'" *Intervest Mortg. Inv. Co. v. Skidmore*, 655 F. Supp. 2d 1100, 1105 (E.D. Cal. 2009) (citations omitted). A company with assets "reasonably likely" to meet ordinary business needs satisfies the test. *Id.* at 1106; *In re UC Lofts on 4th*, 2014 WL 1285415, at *14 (Bankr. S.D. Cal. Mar. 27, 2014) ("[A] debtor's assets may be reasonable in light a debtor's business even when they leave the debtor insolvent."). FDIC cannot demonstrate the Bank had unreasonably small assets as of the dividend.

***First***, there is no dispute that the Bank had a positive balance sheet value as of December

SVB FINANCIAL TRUST'S TRIAL BRIEF
Case No. 5:24-cv-01321-BLF

6228636

2022. The Bank's internal models, market participants, and Professor Hubbard's calculations show that, even accounting for the Bank's unrealized losses, the Bank had equity value of around $16 billion at the end of 2022. And though FDIC asserts that the Bank's EVE-at-risk model as of December 2022 showed that further increases in interest rates would decrease that value, the Bank would still maintain a $10.7 billion equity value even with a 2% instant rate increase.

*Second*, the Bank's projections under regulator-approved stress scenarios showed the Bank would be "well capitalized" for years under the rubric set by FDIC's regulatory manuals.

*Third*, the Bank had sufficient liquidity to meet ordinary business needs. The Bank had $12.5 billion cash on hand at the end of 2022 and nearly $80 billion in unused borrowing capacity as of the date of the dividend. TX 644 at 21. *In re UC Lofts*, 2014 WL 1285415, at *15 ("It is appropriate for the court to consider availability of credit in the [unreasonably small assets] analysis."), *aff'd* 2015 WL 5209252. Even under extreme stress test scenarios, the Holding Company exceeded the required liquidity buffer, 12 C.F.R. § 252.35(b)(1): indeed, the Bank met $42 billion in deposit withdrawals (25% of total deposits) in a single day during the Bank run.

FDIC's solvency expert, Mr. Malek, purports to rely on the Bank's closure on March 10, 2023, but the closure is irrelevant. The test is "based on information available at the time of the transfer," *Intervest*, 655 F. Supp. 2d at 1104, not later conditions affected by "intervening events," *In re GSM Wireless*, 2013 WL 4017123, at *30–32 (C.D. Cal. Apr. 5, 2013). Mr. Malek's hindsight reliance on the Bank's closure assumes away an intervening event: the Bank run. The run was not part of the Bank's "ordinary business needs," not only because bank runs are unforeseeable, sudden changes in depositor belief, but also because the run of over 80% of the Bank's deposits in two days was unprecedented in speed and size.

### E.     FDIC cannot establish the causation required to establish an offset.

FDIC cannot prove an offset "caused by [a] breach." *Tribeca*, 239 Cal. App. 4th at 1114.

FDIC acknowledges it "has not alleged—and need not prove—that the imprudent conduct at issue caused a run on the Bank or the Bank's ultimate failure." Dkt. 272 at 14; Dkt. 294 at 9. Furthermore, FDIC's offset theory is not causally linked to the alleged misconduct because it is based on a comparison to implausible alternate hypothetical scenarios that no FDIC expert opines

6228636

are prudent. FDIC's expert, Mr. Malek, proposes hypotheticals where the Bank hoards cash rather than engages in the fundamental business of banking—loans and investments. But Mr. Malek, who has no direct banking experience, does not assess the impact of his scenarios on the Bank's business, much less whether they would align with the significant business needs, regulatory constraints, and tradeoffs that the Bank faced during the deposit influx. His alternate scenarios likewise ignore the banking industry at large, with no attempt to isolate losses consistent with the numerous banks that made similar choices and suffered similar unrealized losses as the Bank due to the unexpected and massive rise in interest rates in 2022 and 2023. It's no wonder Mr. Malek has conceded that his scenarios are not "prudent alternative investment approaches," Dkt. 336-6 at 9, or that no other FDIC expert has opined that his scenarios are prudent.

FDIC also has pointed in passing to the $1.8 billion after-tax loss from the Bank's AFS portfolio sale on March 8, 2023. But that loss was not caused by any alleged breach. The $1.8 billion includes losses on securities that FDIC has conceded are not at issue and arose from an independent, unchallenged business judgment to sell the AFS securities.

Multiple "unforeseeable or extraordinary" intervening causes of the asserted offset also interrupt any causal link. *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009). The run on the Bank was an unforeseeable, panic-induced sudden change in depositor behavior that was unprecedented in speed and size. FDIC's Chairman acknowledged "surviving an SVB-style run is not a realistic goal for any liquidity regime, and we should be humble in recognizing that banking panics can always defy expectations about how different actors will behave." TX 1543 at 5. Further, the losses occurred because the federal funds rate increased at a speed and magnitude far greater than any tightening cycle in the history of the Bank. Indeed, FDIC has identified *no* case holding that a bank run (let alone one of this speed and magnitude) was foreseeable.

## IV.    CONCLUSION

FDIC cannot meet its burden to prove its affirmative defenses and is not entitled to setoff. FDIC's $1.7 billion liability should be paid in full.

Dated:  June 22, 2026                                  KEKER, VAN NEST & PETERS LLP


                                              By:    */s/ Robert A. Van Nest*
                                                     ROBERT A. VAN NEST
                                                     JAN NIELSEN LITTLE
                                                     JULIA L. ALLEN
                                                     MAYA JAMES

                                                     Attorneys for Plaintiff
                                                     SVB FINANCIAL TRUST

SVB FINANCIAL TRUST'S TRIAL BRIEF
Case No. 5:24-cv-01321-BLF

6228636