Stephen Sorensen (Bar No. 199408)
Elliott McGraw (Bar No. 275613)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
Phone: (202) 463-2101
E-mail: ssorensen@baileyglasser.com
E-mail: emcgraw@baileyglasser.com

Lawrence H. Heftman (admitted *pro hac vice*)
David C. Giles (admitted *pro hac vice*)
Michael K. Molzberger (admitted *pro hac vice*)
Kaitlin G. Klamann (admitted *pro hac vice*)
**ARENTFOX SCHIFF LLP**
233 S. Wacker Dr., Suite 7100
Chicago, IL 60606
Telephone: (312) 258-5500
E-mail: lawrence.heftman@afslaw.com
E-mail: david.giles@afslaw.com
E-mail: michael.molzberger@afslaw.com
Email: kaitlin.klamann@afslaw.com

*Counsel to the Federal Deposit Insurance
Corporation as Receiver for Silicon Valley Bank*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| SVB FINANCIAL TRUST,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SILICON VALLEY BANK AND SILICON VALLEY BRIDGE BANK, N.A.,<br><br>　　　　Defendants. | Case No. 5:24-cv-01321-BLF<br><br>**FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SILICON VALLEY BANK'S TRIAL BRIEF**<br><br>Date Filed: March 5, 2024<br>Trial Date: June 29, 2026<br>Judge: Hon. Beth L. Freeman |

**TABLE OF CONTENTS**

**Page**

I.  Holding Company Officers Mismanaged the Bank's Interest-Rate and Liquidity
    Risk. .......................................................................................................... 1

    A.  Holding Company Officers Bought and Held More Than $115 Billion in
        Primarily Long-Term Securities in Breach of Board-Approved Risk Limits. ......... 2

    B.  Holding Company Officers Improperly Retained Hundreds of Millions of
        Dollars in Previously Hedged Securities After Terminating the Hedges. .............. 5

    C.  Holding Company Officers and Directors Approved a Grossly Imprudent
        $294 Million Dividend from the Bank to the Holding Company. .......................... 6

    D.  The Officers' and Directors' Breaches Caused Over $5.4 Billion in
        Damages. ................................................................................................. 8

II.  Holding Company Officers and Directors Encouraged the Breaches. ................................. 8

III.  The Holding Company Is Liable Under Agency Law. ....................................................... 10

IV.  The Holding Company Aided and Abetted the Officers' Breaches. .................................... 11

V.  The Holding Company's Claims Are Precluded by Its Unclean Hands. ........................... 13

VI.  The $294 Million Dividend Constitutes a Voidable Transfer. ........................................... 13

VII.  No Causation Defense Relieves the Liquidating Trust of Liability. ................................... 14

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*1st Valley Credit v. Bland*, No. CV 10-1597-GW,
  2010 WL 8757250 (C.D. Cal. Dec. 20, 2010) ................................................................ 16

*AngioScore, Inc. v. TriReme Med., LLC*,
  70 F. Supp. 3d 951 (N.D. Cal. 2014) ........................................................................... 12

*ASARCO LLC v. Am. Min. Corp.*,
  382 B.R. 49 (S.D. Tex. 2007) ...................................................................................... 12

*Bergstrom v. Zions Bancorporation, N.A.*,
  78 Cal. App. 5th 387 (2022) ........................................................................................ 12

*Cal. Med. Assn. v. Aetna Health*,
  14 Cal. 5th 1075 (2023) ............................................................................................... 16

*FDIC v. Switzer*, No. 3:13-CV-03834-RS,
  2014 WL 12696532 (N.D. Cal. Apr. 9, 2014) .............................................................. 16

*First Heights Bank, FSB v. United States*,
  422 F.3d 1311 (Fed. Cir. 2005) ................................................................................... 15

*FlatWorld Interactives LLC v. Apple Inc.*, No. 12-CV-01956-WHO,
  2013 WL 6406437 (N.D. Cal. Dec. 6, 2013) ............................................................... 13

*In re First All. Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ....................................................................................... 13

*In re Prototype Eng'g & Mfg., Inc.*, No. 2:17-BK-21018-RK,
  2019 WL 9243004 (Bankr. C.D. Cal. Dec. 12, 2019) .................................................. 15

*Musk v. Altman*,
  818 F. Supp. 3d 1109 (N.D. Cal. 2026) ....................................................................... 13

*NJOY, LLC v. Imiracle (HK) Ltd.*,
  760 F. Supp. 3d 1084 (S.D. Cal. 2024) ........................................................................ 13

*Padideh v. Moradi*,
  89 Cal. App. 5th 418 (2023) ........................................................................................ 14

*Qiuzi Hu v. Plehn-Dujowich*, No. 18-CV-01791-EDL,
  2018 WL 8221268 (N.D. Cal. Dec. 11, 2018) .............................................................. 11

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011) ..................................................................................................... 16

*Uriell v. Regents of Univ. of Cal.*,
  234 Cal. App. 4th 735 (2015) ...................................................................................... 15

**Statutes**

12 U.S.C. § 1821(d)(13)(E)...................................................................................................... 14

Cal. Civ. Code § 2332 ............................................................................................................... 11

Cal. Civ. Code § 2338 ............................................................................................................... 10

Cal. Civ. Code § 3439.04(a)(2) ................................................................................................. 13

Cal. Civ. Code § 3439.05 .......................................................................................................... 13

**Other Authorities**

CACI No. 3700 ........................................................................................................................... 10

Restatement (Third) of Agency § 7.03(1)(a)............................................................................. 10

Restatement (Third) of Torts: Liab. for Econ. Harm § 28 ........................................................ 12

It is fundamental that officers of a federally insured bank and bank holding company cannot gamble with depositor funds by taking excessive interest-rate risk. The issue for trial is whether officers of SVB Financial Group ("Holding Company") and its subsidiary, Silicon Valley Bank ("Bank"), did so, causing the Bank to lose billions. As we will show through the evidence at trial, including from the officers' own sworn testimony, the answer is, "yes." And because the answer is "yes," the Court should enter judgment that SVB Financial Trust ("Liquidating Trust"), as the Holding Company's successor, takes nothing on its claim for $1.7 billion against the Federal Deposit Insurance Corporation as Receiver for Silicon Valley Bank ("FDIC-R").

The officers' gambling with depositor funds and other improper risk-taking took three principal forms: (1) investing and holding billions in fixed-income securities when interest rates were at historic lows, which exposed the Bank to catastrophic losses when interest rates predictably increased; (2) selling the only hedges the Bank had against rising rates while retaining the underlying, previously hedged, securities without interest-rate protection; and (3) approving a $294 million dividend from the Bank to the Holding Company when the Bank was insolvent and needed liquidity. This conduct was negligent and grossly negligent and breached the officers' duties of care and loyalty to the Bank. These breaches in turn prove each of FDIC-R's affirmative defenses: (1) setoff for agency liability; (2) setoff for aiding and abetting breaches of fiduciary duty; (3) unclean hands; and (4) constructive fraudulent transfer. As the trial evidence will show, Holding Company officers engaged in this specific misconduct; other Holding Company officers as well as directors knew of and encouraged the specific misconduct; the Holding Company's misconduct relates to its claims in this case and constitutes unclean hands; and the payment of the dividend under the facts and circumstances here was a fraudulent transfer.

Because the Court should conclude that FDIC-R has proved each of these affirmative defenses, the Liquidating Trust can recover nothing.

## I.   Holding Company Officers Mismanaged the Bank's Interest-Rate and Liquidity Risk.

The Holding Company controlled the Bank's activities through its and the Bank's joint officers and the unitary Asset Liability Management Committee ("ALCO"), which was a

"decision-making committee of [the Holding Company], including its affiliates and subsidiaries" that was composed of only officers. (Joint Exhibit List ("JE") 446 at 1; *see also* JE 437 at 1-2.) Chief Financial Officer Daniel Beck and Treasurer Michael Kruse (and Treasury Department members) will testify that they and ALCO were responsible for managing interest-rate and liquidity risk using consolidated interest-rate-risk metrics of the Holding Company and Bank under policies, like the "Global Treasury Policy," that the Holding Company had established. (JE 446 at 1-2; *see also* JE 437 at 1; JE 465 at 5, 11-14, 19-20 (Global Treasury Policy's scope is "enterprise-wide covering all treasury activities and related risk management practices"); JE 1951 at 3 (Holding Company's "Risk Management Policy" established a "uniform approach to Risk Management" across the Holding Company and its subsidiaries).) As the trial evidence will show, the Holding Company and Bank's officers grossly mismanaged these risks in multiple ways—and they did so to try to boost the Holding Company's short-term income and stock price, for which they were richly rewarded by the Boards of Directors.

**A.      Holding Company Officers Bought and Held More Than $115 Billion in Primarily Long-Term Securities in Breach of Board-Approved Risk Limits.**

In 2020 and 2021, the Bank's deposit growth was unprecedented in its history, with deposits more than tripling from $61.8 billion to $189.2 billion, and far outpacing any peer bank. (JE 502 at 85; JE 584 at 81.) This growth came largely from a surge of uninsured, unstable deposits from venture-capital-backed companies and other startups fueled by massive government stimulus and interest-rate cuts to historically low levels in response to COVID. At the end of 2021, the Bank's uninsured deposits exceeded 96% of total deposits compared to a peer-group median of 51%. (JE 584 at 81-82; JE 2486.)

Chief Financial Officer Beck recognized that these deposits could leave as quickly as they had arrived. In March 2021, he told Treasurer Kruse and others that they needed to plan for "sudden and massive outflows," and that although the Bank had seen "a step function change in the level and velocity of liquidity," it lacked "the right risk metrics and indicators" to assess potential outflows. (JE 740 at 1.) Despite recognizing the negative effect of potential outflows, Beck, Kruse, and the officer-only ALCO used the surge in uninsured deposits to invest in long-

5:24-CV-01321-BLF
FDIC-R'S TRIAL BRIEF

term, fixed-rate, debt securities paying very low interest. Specifically, in 2021, they caused the Holding Company and Bank to grow the securities portfolio by $98 billion. (JE 584 at 89.) Because these securities were low yielding and lose value when interest rates rise and because rates were at historic lows in 2020 and 2021 (*see* JE 2354), the investment decision exposed the Bank to excessive interest-rate risk.

Of the $98 billion in securities growth in 2021, more than $68 billion was invested in residential mortgage-backed securities, with 15- to 35-year terms. (JE 1488.) These long-term securities carried significant "duration-extension risk," meaning their value would become *more sensitive* to interest-rate changes as rates rose. In large part because of this duration-extension risk, ALCO knew throughout 2021 that the securities portfolio would have massive losses in a rising-rate environment and that new purchases into the portfolio were worsening that risk. Monthly calculations presented to ALCO in June 2021, for instance, showed that a 3% increase in rates would cause more than $12 billion in losses, while the same monthly report in December 2021 showed more than $17 billion in losses. (JE 367 at 70; JE 381 at 82.)

Beck, Kruse, and ALCO irresponsibly chased yield through these investments in disregard of their excessive risks. These officers and the officer-only ALCO sought to boost short-term earnings and the Holding Company's stock price, rather than focusing on the safety and soundness of the Bank. In doing so, they ignored not only the risk of losses in a rising-rate environment but sustained material breaches of the outer and inner limits set in the Holding Company's Global Treasury Policy relating to "economic value of equity" ("EVE"). EVE is a standard measure of interest-rate risk that banks must evaluate under longstanding regulatory guidance. (*E.g.*, JE 1681.) Under the Global Treasury Policy, the Holding Company measured, monitored, and managed "EVE-at-Risk" on a consolidated basis (JE 465 at 5), and any outer-limit breaches should have served as a "red light" to stop taking additional risk. (*See* JE 679 at 2.) It didn't. Beck, Kruse, and ALCO ignored the clear warnings, never cured the breaches, and instead worsened the risk by continuing to buy long-term securities with duration-extension risk.

ALCO members were on notice of the sustained breaches of interest-rate-risk limits. They received reports of continuing breaches monthly in 2021 and at least quarterly in 2022 and up to

the Bank's failure in March 2023. ALCO was also advised, repeatedly, that it could reduce this risk and address the EVE-at-Risk breaches by shortening the duration of the investment portfolio and limiting duration-extension risk. (*See, e.g.*, JE 353 at 5, 212; JE 355 at 160.) Before ALCO had approved the purchase of nearly $100 billion in long-term securities in 2021, David Busch, the Head of Investments and Derivatives Strategy, highlighted in November 2020 both the risk of higher interest rates and the need to invest in shorter-duration investments. (*See* JE 353 at 208-216; JE 354 at 2-3.) The Holding Company's third-party advisor, BlackRock Financial Management, Inc., also prepared example portfolios showing that compliance with the Holding Company's interest-rate-risk limits could be achieved for modest reductions in yield. (JE 704 at 74; JE 2631 at 31-34.) But rather than changing the securities purchases and portfolio to reduce the excessive interest-rate risk, the Holding Company's officers exacerbated that risk through massive long-term securities purchases in 2021, and then simply changed the EVE model in 2022 to give an appearance of reduced interest-rate risk. (JE 393 at 12.) That model change brought EVE into compliance—for only two months—by assuming depositors would continue to accept zero or very low rates as rates rose—an assumption contradicted by reports from a third-party advisor, Curinos, and the Bank's historical experience.

Beck, Kruse, and the officer-only ALCO further exacerbated the Bank's interest-rate and liquidity risk by designating the vast majority of new securities purchases in 2021 as "held to maturity" ("HTM"). The HTM designation benefited the Holding Company's investor-facing metrics by temporarily shielding the impact of billions in losses in the securities portfolio on the Holding Company's tangible-common-equity ratio and certain income metrics. But the designation simultaneously harmed the Bank by depriving it of flexibility to manage liquidity and interest-rate risk. HTM-classified assets cannot be hedged to reduce interest-rate risk; they cannot be sold for liquidity without fully recognizing the losses on all HTM-classified assets; and they are harder to monetize. Due to these HTM designations, the Bank was an extraordinary outlier among peers. It had more than 45% of its total assets classified as HTM while the peer-group median was less than 5%. (JE 584 at 67, 98; JE 2396.)

Had Beck, Kruse, and ALCO designated securities purchased in 2021 as "available for

sale" ("AFS"), rather than HTM, those securities could have been hedged or immediately sold to manage interest-rate risk or for liquidity. Instead, Beck, Kruse, and ALCO increased the HTM portfolio during 2021 by $81.6 billion (to a total of more than $98 billion, which was 78% of the fixed-income portfolio), while the AFS portfolio *decreased* by $3.7 billion despite the Bank's growth. (JE 584 at 66-67.) In this way, the Bank grew dramatically in 2021, but it had access to less cash. Beck, Kruse, and ALCO's decisions deprived the Bank of needed liquidity and options to manage interest-rate risk, leaving it vulnerable to a liquidity crisis. Their decisions also encouraged taking further excessive interest-rate risk by temporarily masking this risk in Holding Company capital and income metrics tracked by investors and analysts.

By the middle of 2021, the Treasury Department and the officer-only ALCO were both advised that the required liquidity buffer would be insufficient under regulatory standards applicable to a "Large Financial Institution" of the Holding Company and Bank's size. (*See* JE 369 at 191-93.) In November 2021, regulators concluded that liquidity risk-management practices were below supervisory expectations and reflected "foundational" shortcomings under standards applicable to financial institutions of any size. (JE 1439 at 1; JE 1431 at 1 & n.1.) To try to address these significant deficiencies, a new internal-liquidity-stress test was implemented in June 2022, but it immediately showed multi-billion-dollar liquidity shortfalls from its inception through the Bank's failure. (JE 401 at 221; JE 405 at 141; JE 411 at 13.) Neither Beck, Kruse, nor ALCO took or required timely steps—such as sufficiently increasing the AFS portfolio or expanding reliable monetization channels in times of stress—to remediate this shortfall.

**B.      Holding Company Officers Improperly Retained Hundreds of Millions of Dollars in Previously Hedged Securities After Terminating the Hedges.**

In February and March 2021, Kruse proposed, and the officer-only ALCO approved, about $10 billion in interest-rate swaps as a form of "insurance" to protect part of the AFS portfolio "over the next 3-4 years," if long-term rates rose. (JE 726 at 3; JE 360 at 2-3; JE 362 at 2.) This hedging program cost $11-15 million annually and provided $350 million in protection for every 1% rate increase. (JE 726 at 3.) The hedging program also reduced interest-rate risk but did not correct the ongoing EVE-at-Risk breaches because the hedges were far too limited.

In March 2022, the Federal Reserve began increasing the target short-term interest rate. Despite the rising-rate environment, Beck and Kruse obtained ALCO approval *to sell* about $4 billion of the hedges with the underlying AFS securities. (JE 887; JE 912.) Then, in July 2022, as rates continued to rise, the Treasury Department sold the remaining hedges, yet this time retained the underlying securities (valued at $8 billion). In doing so, the officers took a risk-management tool and improperly treated it like a trading instrument to generate short-term income.

The officers' decision to terminate the hedges while retaining the underlying securities was extraordinarily imprudent and prioritized the Holding Company's interests over the Bank's. Terminating the hedges while retaining the underlying securities allowed the Holding Company to avoid a nearly $1 billion loss that would have been realized if the underlying securities were sold. (JE 988 at 11–12.) That loss would have harmed the Holding Company's share price (which was falling throughout 2022) and prevented future dividends to it from the Bank (since those dividends were capped at 50% of the prior quarter's net profit and the loss would have wiped out any profit). But these benefits to the Holding Company came at the expense of the Bank's having to retain $8 billion in AFS-classified securities without any interest-rate protection, leaving the securities fully exposed to more losses as rates rose. (*See* JE 391 at 14.)

**C.    Holding Company Officers and Directors Approved a Grossly Imprudent $294 Million Dividend from the Bank to the Holding Company.**

After March 2022, interest rates continued to climb, and by September 30, 2022, the losses in the HTM securities portfolio had reached about $15.9 billion. This was no surprise—the monthly calculations presented to ALCO throughout 2021 showed that this was exactly what would happen. (*See, e.g.*, JE 367 at 70; JE 375 at 85; JE 381 at 82.) At this time, the Bank's total equity capital was only $15.13 billion, less than the $15.9 billion in HTM losses. (JE 643 at 21-22.) By March 2022, deposit growth also had slowed and then reversed into outflows that continued throughout 2022, and the Holding Company and Bank began to borrow funds to support the balance sheet. (JE 411 at 106.) As of June 2022, the consolidated EVE-at-Risk metric was again in material breach of the outer threshold. (JE 397 at 126.) As of July 2022, the Holding Company and Bank were in breach of new liquidity metrics that regulators had required. (JE 399

at 118.) By the second half of 2022, the Holding Company and the Bank's officers and directors knew of more than thirty unresolved regulatory Matters Requiring Attention. (JE 194 at 147, 153.) And in October 2022, Beck and other officers were considering a radical balance-sheet restructuring ("Project Phoenix") to attempt to address the large losses in the securities portfolio and the illiquidity of the HTM position, but they held off at that time because of negative feedback from investors. (JE 1052 at 1; JE 1614 at 1; JE 1615 at 1.)

Despite the Bank's worsening financial condition, Beck, Kruse, and the officer-only ALCO decided in October 2022 to strip the Bank of $294 million in capital through a bank-to-parent dividend. Originally, this dividend was planned to provide the Holding Company with cash for a stock buyback. (JE 401 at 50.) The intended effect of this buyback was to provide a short-term boost to the Holding Company's stock price—which had crashed more than 66% during 2022—by improving its return on equity through a reduction in the number of shares. (*E.g.*, JE 1276 (Beck: "[e]ven a token buyback could be seen as a signal to the markets").)

Ultimately, the Treasury Department decided against a buyback because regulators were unlikely to support it given the liquidity breaches. (*See* JE 402 at 2; JE 401 at 5.) But the Treasury Department recommended and ALCO approved the dividend anyway to stockpile cash at the Holding Company with the hope of funding the buyback the following year. Although the stated justification for the dividend was to improve Holding Company liquidity, the Holding Company did not need more liquidity as measured by its own "coverage ratio," a specific metric that monitored liquidity adequacy exclusively of the Holding Company. (*See* JE 403 at 67.) The Bank, of course, did need this money given its deteriorating financial condition. It was borrowing more than $13 billion at high rates at that time to support its balance sheet.

Under the Capital Management Policy, ALCO was required to approve any bank-to-parent dividend, and it did so in both September and October 2022. (JE 404 at 3; JE 149 at 114.) The Finance Committee approved the dividend the day after ALCO's October 2022 approval without analysis or discussion of the dividend's impact on the Bank's worsening financial condition. (JE 149 at 113-123.) The Finance Committee authorized Beck, in his capacity as Chief Financial Officer of the Holding Company, to determine and approve the "exact amount of the

cash dividend" by December 31, 2022. (*Id.* at 124.) Under that authority, Beck set the amount of the dividend at $294 million (the maximum amount that policy would allow), and the Bank paid that amount on December 28, 2022. (JE No 1074 at 1-2; JE 1078.) Although this dividend was intended to be "reversed as needed" (JE 149 at 118), the Holding Company never returned the money, even as the Bank suffered sustained deposit outflows the day before its failure. Instead of reversing the dividend to protect depositors, the Holding Company kept the money for itself. When the Bank failed, it was holding more than $2 billion.

**D.      The Officers' and Directors' Breaches Caused Over $5.4 Billion in Damages.**

The FDIC-R's damages expert, Kenneth Malek, will testify that the officers' and directors' breaches caused more than $5.4 billion in damages to the Bank. If officers had complied with the EVE risk limits (by buying fewer long-term mortgage-backed securities), the Bank would have avoided $4.5 billion in losses. The Bank also suffered damages of $636 million from the July 2022 hedge sales and securities retention and $294 million from the dividend.

**II.      Holding Company Officers and Directors Encouraged the Breaches.**

Beck, Kruse, and the officer-only ALCO were all assisted and enabled in their tortious mismanagement of the Bank's interest-rate and liquidity risk through separate acts of other Holding Company representatives who had an obligation to challenge their decisions. These enablers included, among others, the joint directors of the Holding Company and Bank, the Chief Executive Officer (Gregory Becker), and the Chief Risk Officer (Laura Izurieta, together with her department). In fact, by arguing (incorrectly as explained below) that the business-judgment rule applies to officer decisions because of director involvement in those decisions, the Liquidating Trust has effectively conceded that the directors encouraged and supported the decisions.

The trial evidence will show the following examples of this encouragement:

**Long-Term Securities Investments.** Chief Executive Officer Becker encouraged maximizing short-term income through long-term securities investments though he knew the excessive interest-rate risk and risk of loss associated with those decisions. (*E.g.*, JE 607 at 94,102 (Becker's signing off on SEC filings showing EVE breaches).) Chief Risk Officer Izurieta also encouraged the decisions by failing to effectively challenge the EVE-at-Risk breaches,

require remediation of the breaches, or question the securities purchases that caused the breaches, though she had an obligation to do all these things. Directors on the unitary Finance and Risk Committees of the Holding Company's and Bank's Boards of Directors also supported the officers' investment strategies and investments despite knowing of the ongoing policy breaches and interest-rate risk caused by their investment decisions. (*See, e.g.*, JE 553; JE 561; JE 568; JE 584; JE 597; JE 602; JE 607; JE 409; *see also* ECF 294 at 38 (the Liquidating Trust's acknowledging the Finance Committee's "oversight, review, and evaluation" of these decisions).)

**HTM Securities Classifications.** As shown earlier, Beck and Kruse directed a massive increase in HTM classifications in the investment portfolio. In turn, Becker, Izurieta, ALCO, and the Finance Committee all knew about these decisions and either encouraged them or failed to effectively challenge them. (JE 136 at 54; s*ee also* ECF 294 at 39 (the Liquidating Trust acknowledging that "[t]he Finance Committee also oversaw, reviewed, and evaluated those decisions").) These HTM classifications enabled taking further interest-rate risk in the securities portfolio by temporarily shielding Holding Company performance metrics from the impact of rising rates on the securities' value. (*See* JE 353 at 211; JE 124 at 96.)

**Compensation Decisions.** Through annual compensation decisions, the unitary Compensation Committee of the Holding Company's and Bank's Boards of Directors encouraged excessive risk-taking by focusing on short-term income and Holding Company stock-price performance over the Bank's safety and soundness. (*E.g.*, JE 586 at 31-35 (2022 Proxy Statement showing four of five components of officer compensation linked to stock price or shareholder-driven metrics); JE 545 at 34 (same for 2021 Proxy Statement).) Senior officers like Becker and Beck were given large multi-million-dollar cash bonuses and compensation packages in 2021, rewarding their negligent conduct rather than holding them accountable for excessive risk-taking.

**Curinos Engagement.** As noted earlier, the Holding Company (through Beck) engaged a third party, Curinos, to try to justify changes to deposit modeling that would improve the appearance of EVE-at-Risk sensitivity, thereby enabling further risk-taking in the securities portfolio. (JE 1567; JE 730.) Rather than taking less interest-rate risk, the Holding Company used Curinos to justify continuing securities purchases throughout 2021 and the first quarter of 2022.

**Hedge Terminations.** Becker encouraged the sale of interest-rate hedges to generate short-term income. (*E.g.*, JE 1269.) As the Liquidating Trust concedes, the Finance Committee also "reviewed and endorsed the sale of hedges in 2022." (ECF 294 at 41.) For its part, the Risk Committee failed to effectively challenge these decisions, despite their ability and duty to do so.

**$294 Million Dividend.** Both Beck and Becker encouraged the dividend to fund a potential share repurchase to boost the Holding Company's stock price. (*See*, *e.g.*, JE 401 at 50.) As Chief Financial Officer of the Holding Company, Beck also set and approved the final amount of the dividend. (JE 1071; JE 1074; JE 1611.) Later, the entire Holding Company Board of Directors, ALCO, Becker, Beck, and Kruse failed to take any action to reverse the dividend or downstream funds for the Bank's liquidity needs, despite their ability and duty to do so.

### III.    The Holding Company Is Liable Under Agency Law.

The most straightforward reason that the Liquidating Trust can recover nothing in this action is that Holding Company agents committed the tortious acts described above that injured the Bank. A principal is liable for torts committed by its agents within the scope of their authority. *Qiuzi Hu v. Plehn-Dujowich*, No. 18-CV-01791-EDL, 2018 WL 8221268, at *6 (N.D. Cal. Dec. 11, 2018); Cal. Civ. Code § 2338; Restatement (Third) of Agency § 7.03(1)(a); CACI No. 3700. Here the Holding Company managed the Bank's interest-rate and liquidity risk at the holding-company level—not at the Bank level—under "global" and "enterprise-wide" policies, applicable to the Holding Company and all its subsidiaries, using consolidated metrics, like EVE-at-Risk, that were calculated and reported at the holding-company level. (*See supra* Section I.) Shared officers of the Holding Company and Bank—like Beck, Kruse, and the members of the officer-only ALCO—were responsible for measuring, monitoring, and managing risks defined by these Holding Company policies and metrics, meaning that they did so within the scope of their authority as Holding Company agents. ALCO was a unitary committee of the Holding Company and its subsidiaries that managed risk on a global basis in a single meeting. The Holding Company is liable for mismanagement by that committee and its officers under standard agency principles. It also is liable for the $294 million dividend because its agents (including Beck, as Holding Company Chief Financial Officer) caused the dividend to be approved and paid.

**IV.    The Holding Company Aided and Abetted the Officers' Breaches.**

Through the acts of encouragement described in Section II above, the Holding Company also aided and abetted breaches of duty by Beck, Kruse, and the ALCO's other members. Liability for aiding and abetting arises where a party (1) provides assistance or encouragement of breaches of duty with (2) knowledge of the wrongful conduct. *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 957 (N.D. Cal. 2014). The acts of encouragement described in Section II satisfy the assistance or encouragement requirement and also all constitute separate acts from the underlying breaches performed by separate individuals. *See* ECF 233 at 20 (director support for "decisions to purchase long-duration securities, terminate the interest-rate swaps, and pay the $294 million dividend" sufficient to show separate affirmative acts).

The Holding Company also had actual knowledge of the breaches because its agents committed them. A corporation has the collective knowledge of all its officers and directors. *See, e.g.*, *Bergstrom v. Zions Bancorporation, N.A.*, 78 Cal. App. 5th 387, 399 (2022) ("[N]otice to or knowledge possessed by an agent is imputable to the principal," and this rule of imputation includes both "what the agent subjectively *does* know as well as what the agent reasonably *should* know" (internal citation and quotation omitted)); *AngioScore*, 70 F. Supp. 3d at 958 ("[C]orporations know things through the persons that work for them."); *see also* Cal. Civ. Code § 2332. Here the Holding Company had knowledge of the breaches by Beck, Kruse, and ALCO's members because those officers were all Holding Company agents acting within the scope of their authority. *AngioScore*, 70 F. Supp. 3d at 958 (corporate agent's "own personal knowledge of his fiduciary obligations" imputed to corporation for purposes of knowledge requirement of aiding-and-abetting claim against corporation based on agent's breaches); *ASARCO LLC v. Am. Min. Corp.*, 382 B.R. 49, 72 (S.D. Tex. 2007) (same; applying this principle in a suit against a parent corporation for aiding and abetting breaches of duty owed to subsidiary by joint officers and directors of parent and subsidiary); *accord ASARCO LLC v. Am. Min. Corp.*, 396 B.R. 278, 412-13 & n.156 (S.D. Tex. 2008).

Moreover, even absent these imputation rules for corporations, "actual knowledge" does not require that an aider and abettor have a "specific intent" to cause harm. *In re First All. Mortg.*

*Co.*, 471 F.3d 977, 993 (9th Cir. 2006); *FlatWorld Interactives LLC v. Apple Inc.*, No. 12-CV-01956-WHO, 2013 WL 6406437, at *4 (N.D. Cal. Dec. 6, 2013) (same). Nor does an aider and abettor need to have "understood the full legal significance of the facts, or all the details of the primary wrongdoing. It is sufficient if the defendant was aware of facts that made the primary conduct wrongful." Restatement (Third) of Torts: Liab. for Econ. Harm § 28, cmt. c. That awareness "can be inferred from circumstances such that the defendant must have known" of the wrongdoing, even if there is no direct evidence of knowledge. *NJOY, LLC v. Imiracle (HK) Ltd.*, 760 F. Supp. 3d 1084, 1110 (S.D. Cal. 2024) (citation modified); *accord Musk v. Altman*, 818 F. Supp. 3d 1109, 1131 (N.D. Cal. 2026).

Here there is ample evidence that the Holding Company was aware of all the breaches not only because its agents committed them, but also because the directors and officers who encouraged the breaches knew of facts showing their wrongfulness. Specifically:

- Holding Company representatives who encouraged or failed to challenge decisions to maximize short-term income through excessive long-term fixed-rate-securities investments—including Becker, Izurieta, and the directors on the Finance Committee and Risk Committee—knew that these investments would lose billions of dollars in a rising-rate environment, that the purchases were worsening breaches of the EVE-at-Risk policy limit, and that there was no actionable plan to remediate the breaches;

- Holding Company representatives who encouraged or failed to challenge the July 2022 hedge termination while retaining the underlying securities—including Becker, Izurieta, and the directors on the Finance Committee and Risk Committee—knew that terminating the hedges while retaining the underlying securities would remove interest-rate-risk protection during a time of rising rates, leave the AFS portfolio completely unhedged, and worsen EVE-at-Risk sensitivity;

- Holding Company representatives who encouraged the dividend—including Becker and Beck—and the directors and officers who failed to reverse the dividend were fully aware of the Bank's deteriorating financial condition, including more than $17 billion in securities losses (exceeding total equity), loss of depositors, sustained liquidity

breaches, ongoing EVE-at-Risk breaches, and multiple unresolved regulatory issues. These facts and others that will be presented at trial all show knowledge of improper decisions, which in turn establishes the Holding Company's liability for aiding and abetting.

### V.    The Holding Company's Claims Are Precluded by Its Unclean Hands.

Unclean hands independently bars recovery because the Holding Company's own misconduct caused damages exceeding the deposits the Liquidating Trust seeks to recover. This defense applies based on the nature of the misconduct and the relationship between the misconduct and the claimed injury. *Padideh v. Moradi*, 89 Cal. App. 5th 418, 436 (2023). Here the misconduct is serious and directly related to the Liquidating Trust's claim. The Holding Company, through overlapping officers, directors, and committees, disregarded known and obvious risks when the Bank bought long-duration fixed-rate securities, sold hedges, and paid the $294 million dividend. That misconduct is directly tied to the Liquidating Trust's claimed injury: the deposit funds that the Liquidating Trust seeks to recover—and indeed the Holding Company's entire financial position—are the product of the misconduct that forms the basis for the unclean-hands defense. Both the $294 million dividend and the other amounts on deposit with the Bank sought by the Liquidating Trust are all attributable to the Bank's operations because the Bank constituted 99% of the Holding Company's assets and produced substantially all its earnings. Equity does not permit the Liquidating Trust to recover these amounts.[1]

### VI.    The $294 Million Dividend Constitutes a Voidable Transfer.

The $294 million bank-to-parent dividend was a voidable transfer. A transfer is voidable when a debtor receives less than reasonably equivalent value in exchange and was left with unreasonably small assets after the transaction. Cal. Civ. Code §§ 3439.04(a)(2); 3439.05; *In re Prototype Eng'g & Mfg., Inc.*, No. 2:17-BK-21018-RK, 2019 WL 9243004, at *2 (Bankr. C.D.

---

[1] The FDIC-R will present and prove an unclean-hands defense at trial in part because the Liquidating Trust continues to insist—now on appeal to the Second Circuit—that the FDIC-R cannot assert setoffs outside of bankruptcy court, despite losing that argument in the trial court. Because unclean hands is not a setoff, the Liquidating Trust's appeal cannot affect this defense.

Cal. Dec. 12, 2019). The Bank received no reasonably equivalent value for the dividend, and at the time of payment it had unreasonably small assets to sustain itself through the ebbs and flows of the business cycle, including the interest-rate fluctuations, deposit outflows, and liquidity stresses of which its own metrics were warning. The Bank's more than $17 billion in securities losses exceeding its equity, material interest-rate-risk breaches, loss of depositors as venture-capital activity slowed, liquidity breaches, and inability to monetize HTM assets all showed that it had unreasonably small assets, making the $294 million dividend a voidable transfer.

## VII.    No Causation Defense Relieves the Liquidating Trust of Liability.

The Liquidating Trust has previously contended that the FDIC-R's losses resulted from causes other than misconduct of Holding Company's officers, including the FDIC-R's decision to sell certain HTM securities after the Bank's failure, the increase in interest rates in 2022, and the run on the Bank and its closing. None of these events is a valid defense.

With respect to the FDIC-R's own conduct, the Court granted summary judgment on any "failure to mitigate" defense (ECF 284 at 7-8; ECF 334 at 74:7), and the Liquidating Trust cannot circumvent that ruling by recharacterizing a mitigation argument as an attack on the FDIC-R's evidence of causation. *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316-17 (Fed. Cir. 2005); *see also* ECF 334 at 77:14-16 (the Court: "saying but-for the choices made by the FDIC, there would be no losses" cannot be argued as "a back door to mitigation"). Moreover, the evidence at trial will show that the FDIC-R had a statutory mandate to "maximize[] the net present value return from the sale or disposition" of the Bank's assets, 12 U.S.C. § 1821(d)(13)(E), that it received fair-market value for the assets that it sold for which it claims damages, that it would have had billions in additional losses due to negative carrying costs had it held the assets to maturity, and that the losses on these assets were all economic losses predating the Bank's failure, as the Liquidating Trust's own expert has acknowledged.

As for interest-rate increases in 2022 and the Bank run and failure, the FDIC-R bears no burden to disprove alleged alternative causes of its damages. *E.g., Uriell v. Regents of Univ. of Cal.*, 234 Cal. App. 4th 735, 746-47 (2015). Instead, the Liquidating Trust has the burden to prove that these events were "superseding causes" (*see* ECF 334 at 69:12-13), which requires

evidence that the events produced harm of a *kind* and *degree* that was unforeseeable. *Cal. Med. Assn. v. Aetna Health*, 14 Cal. 5th 1075, 1097 (2023). Changes in market conditions, changes in interest rates, and the possibility of a bank run are all known and foreseeable risks in banking. As a matter of law, these conditions are not superseding causes of the FDIC-R's damages.

Finally, the Liquidating Trust continues to insist that mere director "oversight" or other involvement in officers' decisions subjects those decisions to the business-judgment rule. No California authority supports that theory, and accepting it would rewrite the settled scope of the business-judgment rule since directors oversee virtually all corporate operations. Even where officers and directors act jointly or sequentially, officer conduct is evaluated for ordinary negligence and director conduct is evaluated under the standard applicable to directors. *1st Valley Credit v. Bland*, No. CV 10-1597-GW, 2010 WL 8757250, at *6-7 (C.D. Cal. Dec. 20, 2010); *FDIC v. Switzer*, No. 3:13-CV-03834-RS, 2014 WL 12696532, at *2 (N.D. Cal. Apr. 9, 2014).

Nor does director involvement negate causation. Recommendations, decisions, or other conduct by officers is actionable under an ordinary-negligence standard if it is a substantial factor in causing harm, regardless of whether another corporate decisionmaker is involved or exercises ultimate decision-making authority. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) ("[I]t is axiomatic under tort law that the exercise of judgment by the [ultimate] decisionmaker does not prevent the earlier agent's action … from being the proximate cause of the harm."); *Switzer*, 2014 WL 12696532, at *1-2 ("fact that others were involved" in a bank's decisions "does not shield" officers from liability for negligent recommendations even if directors had "final approval" authority over the decisions). Here all relevant decisions were *approved* by officers, and even if the decisions were merely *recommended* by officers and approved by directors, the officers' recommendations would still be actionable for ordinary negligence. Under that standard, the FDIC-R must show only that the officers failed to use the skill and care that a "reasonably careful officer" employed by a bank "would have used in similar circumstances." *FDIC v. Van Dellen*, No. 2:10-cv-04915 (C.D. Cal. Dec. 7, 2012), ECF 597 at 25 (jury instruction); *accord FDIC v. Ching*, No. 2:13-cv-01710 (E.D. Cal. Nov. 16, 2016), ECF 263 at 25 (similar instruction). The FDIC-R's evidence at trial will more than meet that standard.

Dated: June 22, 2026                    By:  /s/ *Lawrence H. Heftman*
                                             Lawrence H. Heftman

                                             One of the Attorneys for the Federal
                                             Deposit Insurance Corporation as
                                             Receiver for Silicon Valley Bank