**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SVB FINANCIAL TRUST,<br>Plaintiff,<br>v.<br>FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR SILICON VALLEY BANK, et al.,<br>Defendants. | Case No. 5:24-cv-01321-BLF<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Silicon Valley Bank ("Bank") and its holding company SVB Financial Group ("Holding Company") enjoyed almost forty years of success as a regional bank, having developed an enviable customer base made up of start-up companies and venture capital firms. Its growth was steady and its early depositors were loyal.

Beginning in 2020, with interest rates near zero and a massive government infusion of cash into the economy related to the COVID-19 pandemic, the Bank experienced a rapid, unprecedented growth in deposits over a short period of time, far outpacing its competitors. Its deposits grew from roughly $50 billion in 2018 to a high of almost $200 billion in 2021.

By 2021, the Holding Company had grown into a "Large Financial Institution," holding more than $100 billion in assets. Unfortunately, the Holding Company still had a board of directors and management assembled to run a much smaller regional bank. Its officers and directors were ill-equipped to handle the challenges that came with the explosive growth in deposits in a near-zero rate environment. During this time, more than 90% of the Bank's deposits were uninsured, far exceeding other banks.

United States District Court
Northern District of California

Focusing on generating earnings and investing in high-credit-quality, government-backed securities, the Bank, run by its Holding Company, doubled down on its traditional investment strategy of purchasing long-term assets like mortgage-backed securities. The duration of the investments it purchased in 2021 was far longer than most banks were willing to hold, with maturities of ten, twenty, and thirty years. Although these securities paid higher yields than more customary, shorter-term bonds and provided a reliable stream, they were subject to rapid devaluation when interest rates rose. Additionally, management chose to designate the vast majority of these securities as held to maturity, which committed the Bank to holding them well into the future.

The officers at the Holding Company virtually ignored the interest-rate risk that these instruments carried. They ignored the red flag warnings put out by the Holding Company's own internal risk thresholds and liquidity stress tests embedded in mandatory, global policies, disregarded the outside experts they hired, and instead trusted in speculation that interest rates would stay near zero and their depositors would stick with them. This thinking turned out to be fanciful, negligent, and devastating to the Bank.

By early 2022, interest rates began to rise. And once the rates started to rise, they rose rapidly. Having failed to protect the investment portfolio against this foreseeable risk by properly managing the investments, adhering to the breach limits set by its own metrics, and ensuring adequate liquidity and borrowing capacity, the Holding Company and Bank found themselves with close to $100 billion tied up in held-to-maturity securities. These investments were locked in at a 1.5% return in a 4% rate environment.

Depositors defied management's expectation that they would remain loyal and moved on to greener pastures. After the Holding Company and Bank announced on March 8, 2023, that the Bank was selling its available-for-sale portfolio at a $1.8 billion loss, its primarily uninsured deposit base left in droves, withdrawing billions of dollars in deposits in hours. The officers of the Holding Company negligently caused billions of dollars in losses by their imprudent investment strategy that favored yield over safety. Their conduct fell below the standard of care for ordinarily prudent bankers and was the cause of at least $4.5 billion in losses.

By March 10, 2023, regulators closed the Bank, in what was the third-largest bank failure in U.S. history. The perceived impact on the U.S. banking industry and national economy was so serious that two days later, the Secretary of the Treasury invoked the rarely used systemic risk exception under 12 U.S.C. § 1823(c)(4)(G) to guarantee all deposits above the federally insured limit. The Federal Deposit Insurance Corporation ("FDIC" or "FDIC-R") stepped in as receiver for the Bank and established a bridge bank to manage the deposits and pay depositors. At the time, the Holding Company had approximately $2 billion in deposits at the Bank. FDIC blocked payment to the Holding Company and denied its claims for payment due, invoking its setoff rights. This suit followed.

On March 5, 2024, the Holding Company filed a twelve-count complaint against FDIC, alleging that FDIC unlawfully blocked the Holding Company's access to its deposits after the Bank closed and FDIC was appointed the Bank's receiver. ECF No. 1. On February 3, 2025, SVB Financial Trust ("Trust")—the Holding Company's successor—was substituted for the Holding Company as the plaintiff in this action. ECF No. 146. On May 29, 2025, FDIC and the Trust agreed to dismiss each of the Trust's claims except its breach of contract claim, for which FDIC's liability was fixed at $1.71 billion, subject to any setoffs that may be applicable should FDIC prevail on one or more of its affirmative defenses. ECF No. 208.

By way of its affirmative defenses, FDIC asserted that the Trust could not recover on its breach of contract claim because the Holding Company through, inter alia, its Chief Financial Officer, Global Treasurer, and officer-only Asset Liability Management Committee caused the Bank to take excessive risk using depositor funds in violation of prudent banking standards, causing damages exceeding $1.71 billion.

On June 24, 2025, the Court granted in part and denied in part the Trust's motion to strike FDIC's affirmative defenses, after which FDIC proceeded with the following four affirmative defenses: (1) setoff for aiding and abetting breach of fiduciary duties; (2) setoff for agency liability for breach of fiduciary duties; (3) unclean hands; and (4) voidable transfer under California Civil Code §§ 3439.04, 3439.05. *See* ECF Nos. 233, 237.

United States District Court
Northern District of California

On February 23, 2026, the Court granted FDIC's motion for partial summary judgment, holding that (1) the business-judgment rule applies to the directors of the Holding Company and Bank but does not apply to the officers of the Holding Company and Bank; and (2) the Trust cannot assert that FDIC failed to mitigate its damages as the Bank's receiver. ECF No. 284.

The Court held a twelve-day bench trial from June 29, 2026, to July 17, 2026, on FDIC's affirmative defenses. *See* ECF Nos. 394–405 ("Tr."). The theory of FDIC's case at trial was that the Holding Company, which controlled and directed the Bank's activities, (1) exposed the Bank to excessive interest-rate risk and liquidity risk by concentrating the Bank's investment portfolio in long-term, fixed-rate securities and designating the majority of those securities as held-to-maturity, breaching interest-rate risk limits set by the Board of Directors of the Holding Company and applicable to the Holding Company's subsidiaries (including the Bank) and thereby exposing the Bank to billions of dollars in losses when interest rates increased; (2) amplified this interest-rate risk by removing partial hedges against the risk of rising rates while retaining the underlying, previously hedged available-for-sale securities; and (3) approved a $294 million bank-to-parent dividend when the Bank had unreasonably small assets and was in need of capital and liquidity.

FDIC argued that the Bank officers—encouraged by the Holding Company's officers and directors—breached their fiduciary duties to the Bank by seeking to boost the Holding Company's short-term income and stock price at the Bank's expense. FDIC further argued that the Bank officers' misconduct also benefited them personally because they owned Holding Company stock and were compensated based on the Holding Company's financial performance. Finally, FDIC argued that the Holding Company is liable for the Bank officers' breaches of their fiduciary duties to the Bank because it aided and abetted the breaches and because those officers were acting as agents of the Holding Company in carrying out the challenged actions.

The Parties have filed trial briefs, proposed findings of fact and conclusions of law, and post-trial briefs. *See* ECF Nos. 353 ("FDIC Trial Br."), 412 ("FDIC FFCL"), 414 ("FDIC Resp. Br."); ECF Nos. 352 ("Trust Trial Br."), 413 ("Trust FFCL"), 415 ("Trust Resp. Br.").

United States District Court
Northern District of California

Having considered the evidence and arguments of counsel, the relevant law, and the record in this case, the Court hereby enters the following findings of fact ("FF") and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## TABLE OF CONTENTS

I. FINDINGS OF FACT ..... 10

A. Factual Background ..... 10

1. Parties ..... 10
2. Officers and Directors ..... 10
3. Regulators ..... 13
4. Banking Principles ..... 14
5. Bank's Growth in 2020–2021 ..... 17
6. Bank's Decline and Failure in 2022–2023 ..... 19

B. The Holding Company Controlled and Directed the Bank's Activities Through the Holding Company's Officers ..... 23

1. Holding Company Officers were responsible for managing the Holding Company and Bank's interest-rate risk, liquidity risk, and investment portfolio. ..... 23
2. Holding Company Directors were primarily responsible for oversight. ..... 27
3. The Holding Company controlled the Bank by establishing uniform, enterprise-wide policies and internal metrics. ..... 29
4. Holding Company Policies explicitly required Officers to measure, monitor, and manage interest-rate risk using NII-at-risk and EVE-at-risk. ..... 32

C. The Standard of Care of an Ordinarily Prudent Banker Requires Measuring, Monitoring, and Managing Interest-Rate Risk and Liquidity Risk ..... 39

1. An ordinarily prudent banker uses both EVE-at-risk and NII-at-risk to monitor interest-rate risk. ..... 40
2. An ordinarily prudent banker adheres to internal risk thresholds and breach escalation procedures. ..... 43
3. An ordinarily prudent banker manages the known, foreseeable risk that interest rates will rise, particularly in a low-rate environment. ..... 45

D. Holding Company Officers Caused the Bank to Take Excessive Interest-Rate Risk by Concentrating the Bank's Investments in Long-Term, Fixed-Rate Securities ..... 47

1. Mr. Beck, Mr. Kruse, and the other ALCO members concentrated the Bank's influx of uninsured deposits into long-term, fixed-rate securities. 48

2. Mr. Beck, Mr. Kruse, and the other ALCO members were on notice of the risk of significant, sustained interest rate increases in 2020 and 2021....... 50

3. Mr. Beck, Mr. Kruse, and the other ALCO members received continuous notifications of sustained EVE-at-risk breach while approving securities purchases that they knew would exacerbate the breach. .......................... 53

4. Mr. Beck, Mr. Kruse, and the other ALCO members violated the Global Treasury Policy by failing to require a risk mitigation plan to bring EVE-at-risk back into compliance and failing to actually achieve compliance. ..... 65

5. Mr. Beck, Mr. Kruse and the other ALCO members used the investment portfolio to generate short-term earnings without regard to the impact on EVE-at-risk. ........................................................................................ 68

6. Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care by concentrating the investment portfolio in long-term, fixed-rate securities. .................................................................... 73

E. Holding Company Officers Caused the Bank to Take Excessive Interest-Rate Risk and Liquidity Risk by Over-Designating the Bank's Securities Portfolio as Held-to-Maturity ..... 76

1. Mr. Beck, Mr. Kruse, and the other ALCO members designated most of the investment portfolio as HTM. ................................................... 77

2. Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that the Holding Company and Bank had "foundational shortcomings" in their liquidity framework while designating the majority of the Bank's long-term, fixed-rate securities as HTM. ........................................................ 78

3. Mr. Beck, Mr. Kruse, and the other ALCO members over-designated securities as HTM due to concerns about financial metrics reported to investors, not the Bank's economic health. ............................................. 82

4. Mr. Beck, Mr. Kruse, and the other ALCO members created excessive interest-rate risk and liquidity risk by designating 80% of the investment portfolio as HTM. ....................................................................... 84

5. Mr. Beck, Mr. Kruse, and the other ALCO members failed to ensure reliable ways to monetize the HTM portfolio. ......................................... 88

6. Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care by designating nearly 80% of the securities portfolio as HTM. ......................................................................................... 89

F. Holding Company Officers Caused the Bank to Take Excessive Interest-Rate Risk by Terminating Interest-Rate Hedges Early While Retaining the Underlying, Previously Hedged AFS Securities ........................................................................................................ 90

1. During the first half of 2021, the purchase of interest-rate swaps protected the AFS portfolio against rising rates. ................................................... 91

2. Mr. Beck, Mr. Kruse, and the other ALCO members terminated the interest-rate swaps in the first half of 2022. ........................................................ 92

3. Mr. Beck, Mr. Kruse, and the other ALCO members terminated the Hedges while retaining the underlying, previously hedged AFS securities to "lock in" yield without realizing losses from selling the AFS securities. ........... 94



United States District Court
Northern District of California

4. Mr. Beck, Mr. Kruse, and the other ALCO members departed from the applicable standard of care by terminating the hedges while retaining the underlying, previously hedged AFS securities. .......... 95

G. Holding Company Directors and Senior Officers Knowingly Encouraged ALCO to Take Excessive Interest-Rate Risk and Liquidity Risk .......... 97

1. Members of the Finance Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk and liquidity risk. .......... 98

2. Members of the Risk Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk and liquidity risk. .......... 102

3. Members of the Compensation Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the Holding Company's short-term interests over the Bank's long-term safety and soundness. .......... 104

4. As Chief Executive Officer of the Holding Company, Mr. Becker encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the Holding Company's short-term interests over the Bank's long-term safety and soundness. .......... 108

5. As Chief Risk Officer of the Holding Company, Ms. Izurieta knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the Holding Company's short-term interests over the Bank's long-term safety and soundness. .......... 110

H. Holding Company Officers and Directors Caused the Bank to Exacerbate Its Liquidity Risk by Resuming Bank-to-Parent Dividends .......... 111

1. Holding Company Officers and Directors approved a $294 million bank-to-parent dividend for December 2022. .......... 112

2. The primary purpose of the Dividend was to provide the Holding Company with sufficient liquidity to carry out a stock buyback. .......... 114

3. Holding Company Officers departed from the applicable standard of care in approving the Dividend while the Bank was in dire financial condition. 116

4. The Bank had unreasonably small assets at the time of the Dividend. .... 118

I. The Trust's Explanations for the Securities Portfolio and EVE-at-Risk Mitigation Are Neither Factually Supported nor Credible .......... 122

1. Concentrating the investment securities portfolio in long-term, fixed-rate securities while in breach of EVE-at-risk was not necessary to sustain capital. .......... 122

2. BlackRock did not recommend concentrating the securities portfolio in long-term mortgage-backed securities in breach of EVE-at-risk. .......... 127

3. Holding Company Officers' doubts regarding the assumptions built into the EVE-at-risk model did not justify disregarding the continued breach without meaningful attempts at mitigation. .......... 129



United States District Court
Northern District of California

4. Curinos did not recommend or approve the modeling assumption changes that Holding Company Officers adopted to mask EVE-at-risk breaches. 132

5. None of the materials identified by the Trust as EVE-at-risk mitigation plans were Global Treasury Policy-compliant or otherwise comported with prudent banking principles. ... 136

J. The Trust's Reliance on Regulatory Examinations is Ill-Placed ... 141

1. Regulators found that the Holding Company and Bank's risk management and governance were inadequate. ... 141

2. Holding Company Officers also recognized the governance and risk-management problems. ... 145

3. The existence of "action plans" does not establish that foundational regulatory concerns were remedied. ... 147

4. CAMELS ratings are not dispositive. ... 147

K. Holding Company Officers' Actions Caused Damages Exceeding $1.71 Billion 149

1. Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent purchase of long-term, fixed-rate securities and designation of most of those securities as HTM caused more than $4.5 billion in losses. ... 150

2. The risk of loss in the securities portfolio was known and foreseeable. .. 152

3. The Bank's investment portfolio suffered actual economic losses prior to the Bank's failure. ... 154

4. Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent termination of the Hedges and retention of underlying, previously hedged AFS securities caused more than $600 million of securities losses. ... 157

5. The Dividend deprived the Bank of $294 million in cash. ... 158

6. FDIC obtained fair market value in compliance with its statutory obligations ... 158

II. CONCLUSIONS OF LAW ... 160

A. Legal Background and Overview ... 160

B. Mr. Beck, Mr. Kruse, and the Other ALCO Members Breached Their Fiduciary Duties to the Bank ... 164

1. Mr. Beck, Mr. Kruse, and the other ALCO members owed fiduciary duties to the Bank. ... 165

2. Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank. ... 165

3. Under California Law, Mr. Beck, Mr. Kruse, and the other ALCO members are not protected by the Business-Judgment Rule. ... 174

C. FDIC Has Established Aiding-and-Abetting Liability of the Holding Company (Affirmative Defense No. 1) ... 177




United States District Court
Northern District of California

1. Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank. .......... 177

2. Members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta knew of and encouraged the breaches. .......... 177

3. Members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta, as Officers and Directors of the Holding Company, substantially assisted and encouraged the breaches on a regular basis. .......... 179

4. The Finance Committee, Risk Committee, Compensation Committee, Ms. Izurieta, and Mr. Becker's encouragement of the breaches was a substantial factor in causing harm to the Bank. .......... 183

5. FDIC's aiding-and-abetting defense is not barred by the agency immunity rule. .......... 183

6. California law recognizes a cause of action for aiding and abetting negligence. .......... 184

D. FDIC Has Established Agency Liability of the Holding Company (Affirmative Defense No. 2) .......... 185

1. Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank. .......... 186

2. Mr. Beck, Mr. Kruse, and the other ALCO members were acting as actual agents of the Holding Company and within the scope of their agency relationship while engaging in the challenged conduct. .......... 186

E. FDIC Has Established that Mr. Beck, Mr. Kruse, and the other ALCO Members' Breaches of Fiduciary Duty were a Substantial Factor in Causing Damages .......... 196

F. FDIC Has Not Established that the Trust Has Unclean Hands (Affirmative Defense No. 4) 200

G. FDIC Has Established that the Dividend Was a Voidable Transfer (Affirmative Defense No. 6) .......... 202

H. FDIC Has Established Damages with Reasonable Certainty .......... 205

III. ORDER .......... 206



United States District Court
Northern District of California

# I. FINDINGS OF FACT

## A. Factual Background

### 1. Parties

1. The Holding Company was a Delaware corporation. Stipulated Facts, ECF No. 365 ("SF") ¶ 1.

2. The Bank was a California state-chartered bank that commenced operations in 1983. SF ¶ 2.

3. At all relevant times, the Bank was a wholly owned subsidiary of the Holding Company and constituted over 98% of the Holding Company's assets and liabilities. SF ¶¶ 3–4.

4. The Trust is a liquidating trust created under the operative Chapter 11 Plan of Reorganization for the Holding Company. The Trust is not an operating business and exists solely to litigate the claims in this case, liquidate assets, and distribute cash to beneficiaries of the Trust. *See In re SVB Fin. Grp.*, No. 23-10367-MG (Bankr. S.D.N.Y. July 24, 2024), at ECF No. 1332.

5. FDIC is an independent federal agency established under the Federal Deposit Insurance Act and is tasked with promoting the stability of the nation's banking system. Tr. at 1447:19–23 (Walker). As receiver for a failed insured depository institution, FDIC acts to resolve the failure by, among other things, marshaling the institution's assets and disposing of them in a way that maximizes their net present value and minimizes their losses. *See* 12 U.S.C. § 1821(d)(13)(E).

6. FDIC is the receiver for the Bank and was appointed as the Bank's receiver after the Bank closed on March 10, 2023. SF ¶ 46.

### 2. Officers and Directors

7. At all relevant times, the Holding Company and Bank had the same primary officers, including the same Chief Executive Officer, Chief Financial Officer, Chief Risk Officer, and Global Treasurer. SF ¶ 24. The Court refers to the shared officers of the Holding Company and Bank as the "Officers."



United States District Court
Northern District of California

United States District Court
Northern District of California

8. At all relevant times, Gregory Becker was the Chief Executive Officer of the Holding Company and Bank, a member of the boards of the Holding Company and Bank, and President of the Holding Company. SF ¶ 25.

9. At all relevant times, Daniel Beck was the Chief Financial Officer of the Holding Company and Bank. SF ¶ 26.

10. Laura Izurieta was the Chief Risk Officer of the Holding Company and Bank from 2016 to April 2022. SF ¶ 29.

11. Michael Kruse was the Global Treasurer of the Holding Company and Bank from 2010 to November 2022. SF ¶ 30.

12. After Mr. Kruse left his position as Global Treasurer to become the Chief Financial Officer of the Holding Company's UK Bank Subsidiary, Zain Haider became the Global Treasurer of the Holding Company and Bank and served in this capacity from November 2022 to 2023. SF ¶ 31; Tr. at 1729:15–18 (Kruse).

13. Mr. Becker, Mr. Beck, Ms. Izurieta, Mr. Kruse, and Mr. Haider were employed by the Holding Company. Tr. at 53:18–55:1 (Beck); Tr. at 671:9–11 (Becker); Tr. at 1729:19–23 (Kruse); Trial Exhibit ("TX") 3006 at 10:2–6 (Haider); TX 586 at 30–31 (2022 Proxy Statement).

14. Mr. Beck, Ms. Izurieta, Mr. Kruse, and Mr. Haider were members of the Asset Liability Committee ("ALCO"), SF ¶¶ 26, 29–31, a single, officer-only decisionmaking committee of the Holding Company and its subsidiaries that was responsible for managing interest-rate and liquidity risk, developing balance-sheet allocation strategies, purchasing securities, and approving financial risk-management policies. TX 437 at 1 (ALCO Charter).

15. Mr. Kruse remained an Officer and voting member of ALCO after Mr. Haider became the Global Treasurer of the Holding Company and Bank. SF ¶ 30.

16. The members of the boards of directors of the Holding Company and Bank were the same; the boards of directors of the Holding Company and Bank held joint meetings that produced a single set of minutes. SF ¶ 24; Tr. at 927:21–928:3 (Friedman) (agreeing that the boards of directors of the Holding Company "held a single joint meeting" and "produced a single

United States District Court
Northern District of California

set of minutes"). The Court refers to the shared directors of the Holding Company and Bank as the "Directors," and the boards of directors of the Holding Company and Bank as the "Board."

17. The Finance Committee, Risk Committee, and Compensation & Human Capital Committee served as unitary, director-level committees of the Holding Company and Bank and were made up solely of Directors. TX 438 at 1 (Compensation Committee Charter); TX 441 at 1 (Finance Committee Charter); TX 443 at 1 (Risk Committee Charter).

18. Except for Mr. Becker, each Board member was an independent outside director. TX 586 at 18 (2022 Proxy Statement).

19. At all relevant times, Mary Miller served as a Board member and was the Chair of the Audit Committee and a member of the Finance Committee and Risk Committee. SF ¶ 36.

20. At all relevant times, Beverly "Kay" Matthews served as a Board member and was a member of the Audit Committee and Risk Committee. Ms. Matthews became the Chair of the Board in May 2022. Ms. Matthews was a member of the Compensation Committee through April 2022 and became a member of the Governance Committee in July 2022. SF ¶ 35.

21. At all relevant times, Kate Mitchell served as a Board member and was a member of the Credit Committee and Risk Committee. Ms. Mitchell was the Chair of the Credit Committee and a member of the Governance Committee until April 2022, after which she became the Chair of the Risk Committee and a member of the Finance Committee. SF ¶ 37.

22. At all relevant times, Joel Friedman served as a Board member and was the Chair of the Finance Committee and a member of the Governance Committee and Risk Committee. SF ¶ 34.

23. At all relevant times, Eric Benhamou served as a Board member and was the Chair of the Governance Committee and a member of the Finance Committee and Risk Committee. SF ¶ 32.

24. At all relevant times, Garen Staglin served as a Board member and was the Chair of the Compensation Committee and a member of the Risk Committee and Governance Committee. SF ¶ 38.

25. The Finance Committee consisted only of Directors. Tr. at 614:5–7 (Warman). The following Board members, among others, served on the Finance Committee: Mr. Benhamou, Mr. Friedman (Chair), Ms. Miller, and Ms. Mitchell (beginning July 2022). SF ¶ 39.

26. The Risk Committee, comprising the chairs of the other committees, consisted only of Directors. The following Board members, among others, served on the Risk Committee: Mr. Benhamou, Mr. Friedman, Ms. Matthews, Ms. Miller, Ms. Mitchell (became the Chair in April 2022), and Mr. Staglin. SF ¶ 40; Tr. at 1136:17–1137:5 (Staglin).

**3. Regulators**

27. The Bank was supervised by the Federal Reserve and the California Department of Financial Protection and Innovation under the "dual" charter system for banks in the United States. TX 1442 at 1 (Supervisory Ratings Letter dated Aug. 17, 2022); Tr. at 827:17–828:1 (Becker); Tr. at 1630:6–14 (Watkins).

28. The Federal Reserve and California Department of Financial Protection and Innovation continuously supervised the Bank and jointly conducted annual safety and soundness examinations. Tr. at 1631:4–8 (Watkins); TX 2681 (summary of CAMELS ratings).

29. In its role as the deposit insurer for the Bank, FDIC served as a "back-up" regulator for the Bank. Tr. at 1623:20–1624:17, 1630:15–25 (Watkins); Tr. at 2352:10–11 (Warman).

30. The bank supervision and annual examination process includes review of a bank's financial records and reports, board and committee materials, and internal policies, as well as meetings with management. Tr. at 1633:17–1634:13 (Watkins).

31. The Holding Company was regulated and supervised by the Federal Reserve as a bank holding company. TX 1442 at 1 (Supervisory Ratings Letter dated Aug. 17, 2022).

32. Until the middle of 2021, based on the Holding Company's consolidated asset size, the Federal Reserve supervised the Holding Company through the Federal Reserve's Regional Banking Organization program. Tr. at 753:6–11 (Becker); Tr. at 1685:1–9 (Watkins).

33. In June 2021, after the Holding Company exceeded $100 billion in average consolidated assets, the Holding Company shifted to the Federal Reserve's Large Financial Institution program and began the multi-year statutory phase-in of the Enhanced Prudential



United States District Court
Northern District of California

Standards for liquidity, capital, and risk management applicable to Large Financial Institutions. TX 1442 at 1 (Supervisory Ratings Letter dated Aug. 17, 2022); Tr. at 1628:10–1629:5 (Watkins).

**4. Banking Principles**

34. A bank earns net income from the difference between the interest rate the bank pays for deposits and the interest rate it charges for lending money through direct loans or debt securities, known as the bank's net interest income. Joint Glossary, ECF No. 363 ("JG") at 3.

35. A bank's economic value of equity is the net present value of assets, minus the net present value of liabilities. JG at 2.

36. The maturity of a loan or debt security is the contractually defined period of time it will take to repay the loan or debt, assuming the minimum principal and interest payments on the loan or debt are made. JG at 3.

37. After purchasing securities, a bank can designate the securities as either available for sale ("AFS") or held to maturity ("HTM") under generally accepted accounting principles ("GAAP"). JG at 1–2.

38. Under the AFS accounting designation, a bank can sell or hedge a security at any time. AFS securities are thus "marked to market," such that their fair market value—including unrealized gains or losses—is reflected on a bank's balance sheet. JG at 1; Tr. at 520:21–521:2 (Warman).

39. Under the HTM accounting designation, a bank with the intent and capability to hold a security to maturity does not recognize unrealized gains or losses as part of its balance sheet. JG at 2.

40. HTM securities cannot be hedged and cannot be sold without fully marking to market the entire HTM portfolio to its current fair market value if any portion of a HTM portfolio is sold; in other words, selling any part of the HTM portfolio will cause the entire portfolio of HTM-designated securities to be marked to market, thereby converting "unrealized" losses into "realized" losses. Tr. at 68:19–69:1 (Beck); Tr. at 520:21–521:10 (Warman).

United States District Court
Northern District of California

United States District Court
Northern District of California

41. Banks monitor and manage multiple financial factors and risks, including capital, earnings, liquidity risk, credit risk, and interest-rate risk. Tr. at 624:20–626:22, 2334:15–18 (Warman).

42. Capital is the difference between an institution's total assets and total liabilities and reflects the financial cushion, primarily derived from retained earnings and shareholder equity, that a bank has available to absorb losses. JG at 1; Tr. at 1636:22–1637:8 (Watkins).

43. Earnings include net interest income and measure a bank's ability to fund operations and accrue capital. Tr. at 1541:4–14 (Miller).

44. Liquidity refers to available assets, borrowing capacity, or other funding that a bank can convert to cash to pay its obligations. Liquidity risk is the risk that a bank will be unable to pay such obligations as they become due. Tr. at 1639:2–12 (Watkins). Banks assess liquidity risk by using an internal liquidity stress test, which measures whether the bank has sufficient liquidity to satisfy modeled net outflows over a simulated stress period over one day, thirty days, ninety days, and one year. JG at 3.

45. The primary output of a bank's internal liquidity stress test model is the net liquidity position, which measures a bank's excess or shortfall of liquidity following outflows from overnight, thirty-day, ninety-day, and one-year stress scenarios. JG at 3.

46. Credit risk is the risk that borrowers will fail to repay loans, including direct loans or loans underlying a security. Tr. at 252:25–253:5, 287:25–288:6 (Beck).

47. Interest-rate risk is the risk that a change in market interest rates will change a bank's earnings or the value of its assets and liabilities. JG at 2; Tr. at 1639:13–23 (Watkins).

48. The two fundamental metrics for measuring interest-rate risk are net interest income sensitivity ("NII-at-risk") and economic value of equity sensitivity ("EVE-at-risk"). Tr. at 483:12–484:3 (Warman).

49. EVE-at-risk shows how much a bank's total long-term capital and net worth could increase or decrease if market interest rates change. Specifically, EVE-at-risk measures the expected change in an institution's economic value of equity due to modeled immediate changes in interest rates (i.e., ±100 "basis points"/"bps" or ±1 percentage points). JG at 2.

United States District Court
Northern District of California

50. NII-at-risk shows how much a bank's net earnings could increase or decrease if market interest rates change. Specifically, NII-at-risk measures the expected change in an institution's net interest income due to modeled immediate or gradual changes in interest rates. JG at 3.

51. An interest rate hedge, or interest rate swap, is a contract between parties to exchange future interest rate payments to protect against rising interest rates (i.e., a "pay fix/receive floating" interest rate swap) or falling interest rates (i.e., a "receive fix/ pay floating" interest rate swap). JG at 2–3.

52. Duration measures a financial instrument's price sensitivity to market interest rate fluctuations and is defined as the weighted average time (in years) to receive all expected cash flows. Tr. at 73:23–74:8 (Beck); 484:18–485:11 (Warman).

53. Duration roughly corresponds to the change in value of a fixed-income financial instrument given a 1% change in interest rates. For example, if market interest rates increase by 2%, the market price of a long-term, fixed-rate security with a duration of 5 years is expected to decrease by 10%. JG at 2.

54. Convexity measures a financial instrument's duration sensitivity to market interest rate fluctuations. Certain long-term, fixed-rate securities, like mortgage-backed securities, exhibit negative convexity. JG at 1; Tr. at 527:6–527:11 (Warman).

55. Negative convexity means that the duration of a financial instrument decreases when interest rates fall and increases when interest rates rise. JG at 2.

56. Negative convexity exposes the holder of a financial instrument to extension risk (i.e., duration lengthening when interest rates rise and fewer borrowers prepay their mortgages) and contraction risk (i.e., duration shortening when interest rates fall and more borrowers prepay their mortgages). JG at 2; Tr. at 525:25–527:11 (Warman).

57. The value of variable-income assets, such as variable rate loans, generally increases as market interest rates increase. Tr. at 2073:9–21 (Mitchell).

58. The value of fixed-income assets, such as U.S. Treasuries and mortgage-backed securities, generally decreases as market interest rates increase. Tr. at 1534:21–25 (Miller).

United States District Court
Northern District of California

59. One common regulatory metric for comparing banks' safety and soundness is the CAMELS rating system, which stands for Capital Adequacy, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk. Tr. at 1632:2–12, 1633:17–1634:13 (Watkins).

60. For each CAMELS component, a bank may be rated 1 (Strong), 2 (Satisfactory), 3 (Fair/Less than Satisfactory), 4 (Deficient), or 5 (Critically Deficient); banks are also assigned composite scores from 1 to 5. Tr. at 1632:13–1633:16, 1635:13–15 (Watkins).

61. Banks are subject to specific regulatory capital adequacy requirements, including Common Equity Tier 1 ratio, Tier 1 Capital ratio, Total Capital ratio, and Tier 1 Leverage ratio. JG at 3–4; Tr. at 2331:11–15 (Warman).

62. Under these regulations, banks are required to maintain a minimum Tier 1 Leverage ratio of 4.0%, a Common Equity Tier 1 ratio of 4.5%, a Tier 1 Capital ratio of 6.0%, and a Total Capital ratio of 8.0%. 12 C.F.R. § 208.43(b)(2).

63. The Tangible Common Equity to Total Assets Ratio measures an institution's total common shareholder equity (reduced by goodwill and other intangible assets) divided by its total assets. Unrealized gains or losses in AFS securities are reflected in the Tangible Common Equity to Total Assets Ratio, but unrealized gains or losses in HTM securities are excluded from the Tangible Common Equity to Total Assets Ratio. JG at 4.

64. Other Comprehensive Income is a component of shareholder equity that records certain gains or losses such as unrealized gains or losses from AFS securities that are not otherwise reflected in an institution's income statement. JG at 1.

**5. Bank's Growth in 2020–2021**

65. The Bank experienced a rapid, unprecedented surge in deposits beginning in 2020 and continuing through 2021. Tr. at 244:12–15 (Beck).

66. As reported in the Bank's Consolidated Reports of Condition and Income, the Bank's year-end total deposits were as follows:

| Year-End | Total Deposits |
|---|---|
| 2018 | $50.0 billion |
| 2019 | $62.9 billion |
| 2020 | $103.2 billion |
| 2021 | $191.4 billion |
| 2022 | $175.4 billion |

SF ¶ 6.

67. The Bank's assets also grew rapidly and far more significantly in 2020 and 2021 than at any time in its history. As reported in the Bank's Consolidated Reports of Condition and Income, the Bank's year-end total assets were as follows:

| Year-End | Total Assets |
|---|---|
| 2018 | $56.1 billion |
| 2019 | $69.9 billion |
| 2020 | $113.8 billion |
| 2021 | $208.6 billion |
| 2022 | $209.0 billion |

SF ¶ 5.

68. This growth resulted largely from an influx of deposits that were concentrated in venture-capital-backed and other startup companies serving the innovation economy. SF ¶ 8. This rapid influx resulted from the governmental response to the COVID-19 pandemic, including interest rates being rapidly cut to historical lows and trillions of dollars being injected into the financial system. Tr. at 101:1–5 (Beck); Tr. at 510:23–511:21 (Warman).

69. In 2020 and 2021, the Bank's growth rate far exceeded its peers. Tr. at 512:13–513:18 (Warman).

70. Most of the Bank's total deposits were uninsured, with the percentage of uninsured domestic deposits over total deposits before exclusions hovering above 90% throughout 2020, 2021, and 2022. *See* SF ¶¶ 10–12.

71. The Bank's level of uninsured deposits was far higher than any member of its peer group, which had a median level of uninsured deposits of slightly over 50%. Tr. at 516:16–22 (Warman).

United States District Court
Northern District of California

72. A significant portion of the Bank's newly acquired assets during this period was concentrated in newly purchased securities. TX 2650 (summary of securities purchases); *see also* Tr. at 1301:6–1303:14 (Malek).

73. As reported in the Bank's Consolidated Reports of Condition and Income, the Bank's year-end securities, at cost and fair value, were as follows:

| **Year-End** | **AFS Securities (at cost)** | **AFS Securities (fair value)** | **HTM Securities (at cost)** | **HTM Securities (fair value)** |
|---|---|---|---|---|
| 2019 | $13.8 billion | $13.9 billion | $13.8 billion | $14.1 billion |
| 2020 | $30.2 billion | $30.8 billion | $16.6 billion | $17.2 billion |
| 2021 | $27.2 billion | $27.1 billion | $98.2 billion | $97.2 billion |
| 2022 | $28.5 billion | $26.0 billion | $91.3 billion | $76.2 billion |

SF ¶¶ 16–17.

**6. Bank's Decline and Failure in 2022–2023**

74. Interest rates in 2020 and 2021 were historically low. Tr. at 96:2–11, 98:13–20, 240:20–23 (Beck).

75. The effective federal funds rate from 2021 to the first quarter of 2023 was as follows:




Federal Reserve Bank of St. Louis, *Federal Funds Effective Rate (DFF)*.[1]

[1] Historical data for the federal funds effective rate is available at https://fred.stlouisfed.org/series/DFF# (last visited Aug. 17, 2026). Under Federal Rule of Evidence 201, a judicially noticed adjudicative fact must be one "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court takes judicial notice of the federal funds effective rate over the period 01/01/2020 to 04/01/2023 "because it is an undisputed 'matter of public record.'" *t'Bear v. Forman*, 359 F. Supp. 3d 882, 897 (N.D. Cal. 2019) (quoting

76. After March 2022, interest rates continued to increase, and by September 30, 2022, the unrealized losses in the HTM securities portfolio exceeded the Bank's entire equity capital. TX 607 at 15, 91 (Q3 2022 Form 10-Q).

77. Although many other financial institutions suffered losses in their HTM portfolios in mid-to-late 2022, the Holding Company and Bank were an extreme outlier compared to peer banks in the amount of risk and resulting losses in the HTM securities portfolio relative to tangible common equity. Tr. at 1615:21–1617:3 (Miller) (agreeing that the Bank was holding less than 1% of the assets in the U.S. banking industry despite accounting for roughly 4.45% of HTM losses at the end of 2022); Tr. at 2300:16–2301:21 (Warman) (stating that no other peer bank was "even close" to $15 billion in losses in the HTM portfolio compared to $12 billion of Holding Company's tangible common equity). By the end of 2022, these HTM losses were more than twenty-one times higher than the median for the Bank's peer group of institutions with $100 billion to $250 billion in assets. Tr. at 2299:23–2301:21 (Warman).

78. In the second half of 2022, the Officers and Directors were also on notice of more than thirty regulatory Matters Requiring Attention that were not yet closed. TX 324 at 224, 229–30 (07/2022 Joint Finance and Risk Committee Packet); TX 196 at 186 (12/2022 Risk Committee Packet).

79. By September 2022, deposit balances had been decreasing "month over month" for that year, and short-term borrowing was being used to offset the runoff. TX 401 at 107–08 (09/2022 ALCO Packet) ("The month-end borrowing position of $10.8B was used to fully support Fed cash ($8.8B).").

80. In October 2022, the Officers recognized that the absence of liquidity was itself an impediment to managing the Bank's worsening balance sheet; Mr. Beck directed members of the Global Treasury Department to develop strategies to address these issues through a significant balance sheet restructuring, which came to be known internally as "Project Phoenix." TX 1614 at 1, 5 (Project Phoenix Memo); Tr. at 1360:4–23 (Malek).

---

*Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).

81. Project Phoenix consisted of two restructuring options. Option 1 was a one-time transfer of $15–20 billion in securities from HTM to AFS; Option 2 was a sale of up to $20 billion of AFS securities, which would realize approximately $2 billion in losses. TX 1614 at 4–5 (Project Phoenix Memo); Tr. at 198:1–200:22 (Beck).

82. Project Phoenix was intended to reposition the Bank's securities portfolio and balance sheet due to the large losses in the securities portfolio, the liquidity shortfalls posed by the losses and HTM designations, the low yield of the securities portfolio relative to then-current interest rates, and the compressed net interest margin. TX 1614 at 1, 3–8 (Project Phoenix Memo); Tr. at 194:20–195:17 (Beck).

83. When Mr. Beck solicited preliminary feedback from investors in late October 2022 regarding potential restructuring, the reaction was "strongly against" restructuring. Tr. at 202:15–204:5 (Beck) ("The feedback was from our third quarter call, where we mentioned security sales, and . . . there were a significant amount of concerns from investors."); TX 1614 at 5 (Project Phoenix Memo) ("Investor reaction is expected to be <u>very negative</u> to any large securities portfolio repositioning although can be managed by messaging" (emphasis in original)); *see also* Tr. at 2226:13–2227:18 (Matthews).

84. Mr. Beck reported investor feedback to Project Phoenix to Board members and senior management, noting investors' concerns about the potential of a liquidity shortfall:

> [P]reliminary investor feedback has been strongly against the potential for a restructuring, as post earnings there has been a lot of concern in the market about the potential of a liquidity shortfall[] and a move of this magnitude would confirm it… especially in the eyes of generalist investors and open up the potential of having to do more sales from the HTM book, unlocking a massive unrealized loss and reduction of tangible book through reclassification of the book to Available to Sale driving unrealized losses of close to $14Bn… (Total equity is $15Bn today)—a scenario we do not see playing out. This can be overcome by good communications, but is a risk we need to dimension and plan around.

TX 1614 at 1 (Project Phoenix Memo) (ellipses in original); *see also* Tr. at 202:14–204:18 (Beck), 2226:5–2227:25 (Matthews).

85. In November 2022, the Holding Company and Bank's Financial Risk Management team escalated the internal "Market Risk" rating to "high" due to "continued breaches of EVE"

and the “likelihood that remediation by 12/31/2023 may be challenging.” TX 196 at 149 (12/2022 Risk Committee Packet); *see also* TX 1064 at 2 (email from head of Financial Risk Management to Mr. Becker dated Nov. 16, 2022) (“The EVE breaches are primarily driven by the longer duration on the investment portfolio, leading to unrealized losses of $18–$20B in the portfolio and making opportunities to restructure very costly.”).

86. In November 2022, Financial Risk Management also escalated the internal “Liquidity Risk” rating to “high” due to the sustained net liquidity position breaches since June 2022 and “increasing direction of risk and lack of adequate path . . . for issue remediation.” TX 196 at 150 (12/2022 Risk Committee Packet) (“The combined **90 Day** [**Net Liquidity Position**], which is the current binding constraint for the internal liquidity stress test (ISLT), has been breaching the outer threshold since June 2022 . . . . Failure to remediate a breach of this metric poses regulatory compliance risk and means we may not be well positioned to weather a hypothetical liquidity stress event[.]” (emphasis in original)); TX 1064 at 1 (email from head of Financial Risk Management to Mr. Becker dated Nov. 16, 2022) (reporting that recent forecasts “indicate the potential for further deposit attrition through year-end which would put further downward pressure on our [net liquidity position]”.

87. On March 8, 2023, the Holding Company issued a mid-quarter update press release indicating that the Bank had sold its AFS securities portfolio and announcing a $2.25 billion capital raise. TX 627 at 2 (Mar. 8, 2023, Form 8-K). The Bank also announced a loss of approximately $1.8 billion from this sale. TX 1454 at 1 (Department of Financial Protection Order dated Mar. 10, 2023).

88. Investors and depositors reacted to this announcement by initiating withdrawals of $42 billion in deposits from the Bank on March 9, 2023, causing a run on the Bank; as of the close of business on March 9, 2023, the Bank had a negative cash balance of approximately $958 million. TX 1454 at 1 (Department of Financial Protection Order dated Mar. 10, 2023).

89. The Bank expected additional withdrawals of $90 billion on March 10, 2023. Tr. at 2235:18–24 (Matthews) (“40 billion [dollars] was paid out, but what I also recall is there was



United States District Court
Northern District of California

another 90 billion [dollars] . . . in the queue. So depositors had asked for their money but given the timing of the banking day, that was not yet fulfilled.”).

90. The California Department of Financial Protection and Innovation closed the Bank on March 10, 2023, and FDIC was appointed the Bank’s receiver. SF ¶ 46.

### B. The Holding Company Controlled and Directed the Bank’s Activities Through the Holding Company’s Officers

#### 1. Holding Company Officers were responsible for managing the Holding Company and Bank’s interest-rate risk, liquidity risk, and investment portfolio.

91. The Holding Company controlled and directed the Bank’s activities, including activities related to interest-rate risk, liquidity risk, and the investment portfolio, through policies and consolidated metrics that were established at the holding company level and through ALCO. Tr. at 56:6–58:3 (Beck) (“Q. There is a single ALCO committee, set at the holding company level, that manages all the risk of the company including at its subsidiary, the bank, right? A. Yes. It covered all entities.”). Officers and employees of the Holding Company acting in their Holding Company capacities with authority from the Holding Company were responsible for measuring, monitoring, and managing those risks and the investment portfolio.

92. ALCO was a unitary management committee of the Holding Company, including its subsidiaries. TX 437 at 1 (ALCO Charter); Tr. at 55:10–22, 79:24–80:3 (Beck).

93. ALCO was operated on a consolidated basis: There was no separate ALCO for the Bank. TX 437 at 1 (ALCO Charter); Tr. at 56:2–19 (Beck) (agreeing that “[t]here was no separate ALCO committee of the Bank,” “[t]here [was] a single ALCO committee, set at the Holding Company level, that manage[d] all the risks of the company including at . . . the Bank,” “ALCO was responsible for managing the Holding Company’s consolidated balance sheet,” and “the Holding Company chartered a single asset liability management committee to oversee all asset liability management risks of the company”).

94. ALCO consisted only of Officers. TX 437 at 2 (ALCO Charter); Tr. at 58:9–13 (Beck).



United States District Court
Northern District of California

95. ALCO was chaired by the Global Treasurer, operated the consolidated balance sheet of the Holding Company and Bank, and managed the interest-rate risk and liquidity risk of the Holding Company and Bank. TX 437 (ALCO Charter); Tr. at 55:10–60:20, 80:8–20 (Beck).

96. ALCO operated "under delegated authority from the Finance Committee" to manage interest-rate risk, develop balance-sheet allocation strategies within established risk parameters, make investment-strategy decisions, manage liquidity risk, and approve financial risk-management policies. TX 437 at 1–2 (ALCO Charter); Tr. at 56:16–58:19 (Beck).

97. On a monthly basis, ALCO received packets that contained detailed information, including the amount of mortgage-backed securities in the portfolio, the duration of the portfolio, the duration-extension risk of the portfolio, prior period purchases (by asset class and amount), future period purchases (by asset class and amount), and the magnitude of loss in the portfolio if rates went up by 2% or 3%. Tr. at 123:10–124:22 (Beck); *see also, e.g.*, TX 351 at 92–111 (10/2020 ALCO Packet); TX 357 at 81–100 (01/2021 ALCO Packet); TX 381 at 74–93 (12/2021 ALCO Packet); TX 383 at 127–46 (01/2022 ALCO Packet); TX 403 at 104–26 (10/2022 ALCO Packet).

98. ALCO meetings were not divided into separate portions for management of the Bank and management of the Holding Company. Tr. at 57:21–58:3 (Beck).

99. Nothing was withheld from ALCO members about the securities purchases in 2021. Tr. at 222:23–25 (Beck).

100. ALCO was ultimately responsible for the Bank's securities investment portfolio. Tr. at 59:19–21 (Beck) (agreeing that he, "along with the other voting members of the ALCO, [was] responsible for the security portfolio that was on the books of the Holding Company and Bank at the end of 2021").

101. As Chief Executive Officer of the Holding Company and Bank, Mr. Becker was responsible for (1) ensuring the Bank's safe and sound operation, (2) ensuring the Bank avoided excessive risk-taking with deposits, and (3) ensuring that there was the "right governance" around compliance with the Holding Company's policies, including the Global Treasury Policy. Tr. at 672:9–21, 674:7–16 (Becker).



United States District Court
Northern District of California

102. As Chief Financial Officer of the Holding Company and Bank, Mr. Beck was responsible for (1) ensuring that the Holding Company and Bank complied with the Global Treasury Policy, (2) overseeing and working closely with the Global Treasury Department regarding balance sheet strategy and individual investment decisions, and (3) ensuring that the Holding Company and Bank complied with the guidance and risk thresholds set forth in the Global Treasury Policy and the Capital Management Policy. TX 461 at 7, 10–11 (Global Treasury Policy); TX 470 at 10 (Capital Management Policy); Tr. at 60:1–7, 80:8–81:11, 99:21–100:11 (Beck).

103. Mr. Beck's employment agreement for the Chief Financial Officer position was only with the Holding Company; he did not have a separate employment agreement with the Bank. TX 481; Tr. at 54:24–55:1 (Beck).

104. Mr. Beck received regular reports regarding the securities that were purchased from 2020 to 2022, as well as information concerning their duration and yield. Tr. at 61:6–17 (Beck).

105. From 2020 to 2022, Mr. Beck had regular communications with Mr. Kruse and David Busch, the Bank's Head of Corporate Investments, about the Bank's investment portfolio and investment balances. Tr. at 60:21–61:8 (Beck).

106. As Global Treasurer of the Holding Company and Bank, Mr. Kruse (and later Mr. Haider) led the Global Treasury Department and was responsible for (1) "executing a balance sheet management strategy that was consistent with the guidelines and limitations" of the Global Treasury Policy, (2) conducting "treasury activities in a safe and sound manner," (3) overseeing all securities purchases and hedging decisions, (4) managing interest rate, liquidity, funding, and capital risk, and (5) reporting and escalating any breaches of risk thresholds. TX 461 at 7–8 (Global Treasury Policy); Tr. at 1731:9–1736:9, 1756:13–23, 1871:25–1872:15 (Kruse).

107. Mr. Kruse carried out his responsibilities as Global Treasurer in his capacity as an officer of the Holding Company. Tr. at 1870:24–1871:7 (Kruse) (agreeing that the Holding Company told him "how to do [his] job and what [his] limits [we]re" and "controlled all of the activities that [he] did as Treasurer"); *see also* Tr. at 60:14–20 (Beck) (acknowledging that the

Global Treasury Department was the "unit of the Holding Company" that managed interest-rate risk and liquidity risk for both the Holding Company and Bank).

108. As Chief Risk Officer of the Holding Company and Bank, Ms. Izurieta was responsible for (1) designing and implementing overall risk management functions for the Holding Company and Bank, (2) overseeing all risk management activities performed by Enterprise Risk Management, Financial Risk Management, and Model Risk Management, and (3) regulatory compliance. TX 461 at 7–9 (Global Treasury Policy); Tr. at 89:7–11 (Beck).

109. Through its enterprise-wide policies, including the Global Treasury Policy, the Holding Company maintained "three lines of defense" for risk management:

> The Company's risk governance structure and controls are founded upon three lines of defense, each of which is critical to ensuring that risk and reward in all our activities are properly identified, measured, and managed. The first line of defense encompasses functional business units and is responsible for owning and managing risks within their respective areas. The second line of defense encompasses risk oversight functions in [Enterprise Risk Management], [Financial Risk Management], and [Model Risk Management], and Compliance and is responsible for providing independent risk oversight and monitoring. And the third line of defense is Internal Audit ("IA") and is responsible for ensuring the first and second lines operate as intended and provides independent assessment and assurance to the Executive Committee and the Board.

TX 461 at 8 (Global Treasury Policy); *see also* TX 470 at 12 (Capital Management Policy).

110. For both the Holding Company and Bank, Officers alone were responsible for day-to-day operations. Tr. at 675:12–17 (Becker); Tr. at 1732:1–5 (Kruse); Tr. at 2191:8–10 (Matthews).

111. For both the Holding Company and Bank, Officers alone were responsible for development and implementation of investment strategies, including the purchase and sale of interest rate swaps, or "hedges." Tr. at 57:3–8, 175:16–176:1 (Beck); Tr. at 723:15–24 (Becker); Tr. at 929:11–16 (Friedman); Tr. at 1177:2–10, 1200:24–1201:13, 1266:10–25 (Benhamou); Tr. at 1584:1–6 (Miller); Tr. at 2192:1–3 (Matthews).

112. For both the Holding Company and Bank, Officers alone were responsible for deciding which securities to purchase. Tr. at 60:8–10 (Beck); Tr. at 929:23–930:9 (Friedman); Tr.



United States District Court
Northern District of California

at 1175:22–25 (Benhamou); Tr. at 1584:12–22 (Miller); Tr. at 2191:11–14 (Matthews); TX 3002 (Busch Tr.) at 71:18–23.

113. For both the Holding Company and Bank, Officers alone were responsible for interest-rate risk management. Tr. at 60:14–16 (Beck); Tr. at 1176:4–8 (Benhamou); Tr. at 1583:3–8 (Miller); Tr. at 2192:9–13 (Matthews); TX 465 at 12 (Global Treasury Policy).

114. For both the Holding Company and Bank, Officers alone were responsible for liquidity risk management. Tr. at 931:9–932:5 (Friedman); Tr. at 1176:9–17 (Benhamou); Tr. at 1583:9–21 (Miller); Tr. at 1732:22–1733:6 (Kruse); Tr. at 2192:9–13 (Matthews).

115. The Court accordingly finds that, by virtue of the Holding Company and Bank's structure and policies, the Holding Company through its Officers had authority for managing the Bank's interest-rate risk, liquidity risk, and investment portfolio.

**2. Holding Company Directors were primarily responsible for oversight.**

116. The Directors' actions are attributable to the Holding Company. There is no dispute that the Directors at all times served as Directors of the Holding Company, and no credible evidence was presented at trial that any Director at any point acted solely in his or her capacity as a Bank Director. There was also no credible evidence presented at trial that the Board ever held separate meetings for the Bank solely in their capacities as Bank Directors.

117. The Board and its committees did not separate the minutes of their meetings into sections for the Holding Company and Bank. *See, e.g.*, TX 61 at 1 (11/2021 Board Minutes); TX 138 at 3 (10/2021 Finance Committee Packet); TX 169 at 2 (04/2021 Risk Committee Packet); TX 264 at 4 (04/2021 Compensation Committee Packet). There was no separate Finance Committee, Risk Committee, or Compensation Committee for the Bank. Tr. at 928:15–20 (Friedman); Tr. at 1084:5–13 (Staglin).

118. The Finance Committee met quarterly in person and quarterly by telephone, with a monthly standing call between the Finance Committee Chair, Chief Financial Officer, and Global Treasurer. Tr. at 987:19–988:13 (Friedman); Tr. at 1209:14–23 (Benhamou).

119. Among the Finance Committee's responsibilities were "oversight of the financial . . . risk management of the Company and the Bank;" "oversight of capital planning,

capital and liquidity management and stress testing;" "reviewing the Company and the Bank's financial performance and compliance with applicable financial regulatory requirements;" and "reviewing certain corporate strategic initiatives." TX 441 at 1 (Finance Committee Charter).

120. The Finance Committee was also responsible for "oversee[ing] and monitor[ing] any financial risk metrics" set forth in the Risk Appetite Statement, TX 441 at 1–2 (Finance Committee Charter), which reflected the "amount and type of risk" that the Board was "prepared to accept" to achieve the Holding Company and Bank's "business and strategic objectives," TX 475 at 2 (Risk Appetite Statement).

121. Most of the Finance Committee's oversight function took the form of questioning and discussion; formal votes were reserved for a limited set of matters such as the annual budget, bank-to-parent dividends, and the annual approval of the Global Treasury Policy. Tr. at 996:19–997:8 (Friedman) ("Most of what we did, did not require formal approval in the sense of a vote. It required that we ask questions, that we challenge management, that we understand, that we kick ideas around and make sure that management is making the best-informed judgment that we all felt they ought to be making."); Tr. at 1177:2–7 (Benhamou) ("Q. . . . [M]anagement is the one who decided to create [a] $125 billion securities portfolio by the end of 2021 that was primarily invested in long-term fixed-rate mortgage-backed securities, right? A. . . . Management built and managed this portfolio on a day-to-day basis.").

122. The Risk Committee's purpose was to assist the Board in its "oversight of the enterprise risk management of" the Holding Company and Bank, including compliance with the Risk Management Policy and Risk Appetite Statement. It was also responsible for "review[ing]," "monitor[ing] and understand[ing] changes to the risk profile." TX 443 at 1–2 (Risk Committee Charter).

123. The Compensation Committee was responsible for "[o]versight of the compensation strategies, plans, policies and programs of the Company[] [and] the Bank . . . particularly with respect to director and executive compensation," and "[e]nsuring that the Company's compensation strategies and programs are providing appropriate incentives to recruit,

motivate and retain the Company's employees and are also in the best interests of stockholders." TX 438 at 1 (Compensation Committee Charter); Tr. at 1138:20–1141:3 (Staglin).

124. The Court accordingly finds that, by virtue of the Holding Company and Bank's structure and policies, Directors had authority to supervise the Officers' activities and to require compliance with the Holding Company's policies. The Court rejects the Trust's argument that Directors ran the bank, since Directors did not have day-to-day responsibility for managing the investment portfolio or interest-rate risk and liquidity risk.

**3. The Holding Company controlled the Bank by establishing uniform, enterprise-wide policies and internal metrics.**

125. The Holding Company established a "uniform" approach to managing risk that was "global" and "enterprise-wide" using policies, like the Global Treasury Policy and Risk Appetite Statement, that governed the entire organization. Tr. at 78:10–79:13 (Beck); Tr. at 1586:10–13 (Miller); TX 461 at 1 (Global Treasury Policy); TX 475 at 2 (Risk Appetite Statement); *see also* TX 466 at 2 (Risk Management Policy); TX 470 at 5 (Capital Management Policy).

126. Through these global and enterprise-wide policies, the Holding Company also required that the Officers measure, monitor, and manage risks, including interest-rate and liquidity risk, using consolidated metrics that were applied to the Holding Company and all subsidiaries and were calculated at the holding company level. Tr. at 80:8–25, 83:1–17 (Beck); Tr. at 304:23–305:2; Tr. at 938:2–22 (Friedman); Tr. at 1871:2–7 (Kruse) ("Q. . . [T]his Holding Company policy controlled all of the activities that you did as the Treasurer, right? A. Yes, it did.").

127. The Global Treasury Policy was renewed on an annual basis by ALCO and the Finance Committee and was implemented by the Global Treasury Department. TX 461 (2020 Global Treasury Policy); TX 465 (2021 Global Treasury Policy).

128. The Global Treasury Policy was "global" because it "describe[d] treasury activities and risk management practices, applicable to the operations of the Holding Company and its subsidiaries and affiliates, including the Bank and its branches, and to all employees and, as applicable, third parties that support the Company's operations." TX 461 at 1 (Global Treasury Policy); *see also* Tr. at 78:6–9 (Beck).

United States District Court
Northern District of California

129. Section 1.2 of the Global Treasury Policy, entitled "Scope," stated as follows:

> The scope of the Policy is global and enterprise-wide covering all treasury activities and related risk management practices and is applicable to the operations of the Holding Company and its subsidiaries, branches, and affiliates. The Policy establishes the minimum standards required for the oversight of treasury activities, creating consistency in the monitoring, evaluation, response, and controlling of market and liquidity risks in a timely and coordinated manner. Where the activities of subsidiaries, branches, and affiliates are managed separately from the rest of the group, they must remain in accordance with these overarching requirements at all times. . . . While this Policy governs a consolidated global view of its five primary functional areas, covering Structural Interest Rate Risk Management, Liquidity and Funding Management, Corporate Investment Portfolio Management, Corporate Derivatives Portfolio Management, and [Foreign Exchange] Revaluation Risk Management, the Treasury department, as the first line of defense, is responsible for implementing the details of the Policy.

TX 461 at 5 (Global Treasury Policy).

130. There was no separate Treasury Policy for the Bank. Tr. at 1870:24–1871:1 (Kruse).

131. The Holding Company directed the Global Treasury Department through the Global Treasury Policy. Tr. at 1873:5–14 (Kruse) (agreeing that "it was [his] job" to "implement processes and controls that demonstrate compliance with this policy," to "comply with the Global Treasury Policy on a day-to-day basis," and "to manage investments consistent with the Holding Company's risk limits" as set forth in the Global Treasury Policy).

132. It is common for banks and bank holding companies to have overlapping officers and directors. Tr. at 612:10–14 (Warman). However, there was no credible evidence presented at trial that other bank holding companies and banks are structured so that the holding company has the high degree of control that the Holding Company possessed and exercised over the Bank in this case.

133. Similarly, there was no credible evidence presented at trial that other bank holding companies structure management of the investment portfolio, interest-rate risk, and liquidity risk at the holding company level using global policies controlled exclusively by the holding company.

134. The evidence presented at trial showed that the Board never met separately to approve Bank policies solely in their capacity as Bank Directors. Similarly, Officers did not have

a separate ALCO for the Bank, and there was no credible evidence presented at trial showing that any Officer ever managed the Bank's investment portfolio, interest-rate risk, or liquidity risk solely in his or her capacity as a Bank Officer.

135. The Court accordingly finds that ALCO's day-to-day operation of the Bank's investment portfolio, including its management of interest-rate risk and liquidity risk, was expressly authorized by the Holding Company and within the scope of its authority as an agent of the Holding Company.

136. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members' management of the investment portfolio was expressly authorized by the Holding Company and within the scope of their authority as agents of the Holding Company. The Trust did not present any credible evidence that Mr. Beck, Mr. Kruse, or any other Officer ever took any action solely as an agent of the Bank.

137. The Court accordingly rejects the Trust's contention that ALCO's actions were solely attributable to the Bank. *See* Trust FFCL ¶¶ 91–92. The only record support cited for this contention—Mr. Beck's and Mr. Busch's vague, conclusory testimony that they were acting "on behalf of the bank" in implementing ALCO's investment strategy—is without contemporaneous factual support and in any case does not establish the Trust's position. Tr. at 295:24–296:6 (Beck) ("[In determining how to invest the Bank's deposits], I was acting on behalf of the Bank, as that was the entity that we were purchasing [securities assets] for."); TX 3002 at 21:10–25 (Busch Tr.) ("Once approved [by ALCO], we would go out and – transact on behalf of the bank."). There is no credible evidence that either Mr. Beck or Mr. Busch—or any employee at the Holding Company or Bank—was acting pursuant to a bank-level policy in carrying out those transactions.

138. In any case, the fact that the Bank owned the security instruments and interest-rate swap contracts at issue in this case does not change the fact that the Bank purchased those financial instruments under directions from the Holding Company, that these purchases were executed by Officers of the Holding Company, and that these purchases were in accordance with consolidated metrics and policies established by the Holding Company.

**4. Holding Company Policies explicitly required Officers to measure, monitor, and manage interest-rate risk using NII-at-risk and EVE-at-risk.**

139. Through the Global Treasury Policy, the Holding Company stated that "Treasury shall[] . . . [u]se NII-at-Risk and EVE-at-Risk as the primary metrics for assessing and controlling the Bank's [interest-rate risk]." TX 461 at 10 (Global Treasury Policy); *see also* Tr. at 82:15–18 (Beck).

140. NII-at-risk and EVE-at-risk are the two standard industry measures for interest-rate risk, as acknowledged by Mr. Beck and Mr. Kruse at trial. Tr. at 81:5–11 (Beck); Tr. at 1874:8–11 (Kruse).

141. The Global Treasury Policy did not prioritize either NII-at-risk or EVE-at-risk over the other. Tr. at 82:9–11 (Beck); Tr. at 1873:23–25 (Kruse).

142. Section 4.2.3 of the Global Treasury Policy, entitled "[Interest-Rate Risk] Management and Controlling," stated that "[t]o prudently control [interest-rate risk], the Company has established the following set of Inner Thresholds and Outer Limits" with the following chart:

| Metric | Scenario | Threshold and Limits | Rate Change (in bps) | |
|---|---|---|---|---|
| | | | +/-100 | +/-200 |
| Short Term NII-at-Risk (1-12 Months) | Ramp | Inner | -5.0% | -10% |
| | | Outer | -10.0% | -15% |
| Long Term NII-at-Risk (13-24 Months) | Ramp | Inner | -15.0% | -20% |
| | | Outer | -20.0% | -25% |
| Short Term NII-at-Risk (12-Month) | Immediate Shock | Inner | -7.5% | -15% |
| | | Outer | -10% | -20% |
| Long Term NII-at-Risk (24-Month) | Immediate Shock | Inner | -12.5% | -20% |
| | | Outer | -15% | -25% |
| EVE-at-Risk | Immediate Shock | Inner | -8.0% | -16% |
| | | Outer | -10.0% | -20% |

TX 461 at 11 (Global Treasury Policy).



United States District Court
Northern District of California

143. Breaches of the inner EVE-at-risk threshold were a warning to slow further risk-taking to avoid the outer limit due to the substantial losses that could result from the elevated risk; breaches of the outer EVE-at-risk limit were supposed to serve as an immediate warning to stop taking further risk and to bring the risk into compliance with the limits. Tr. at 499:10–500:10 (Warman). The breach notifications stated that the outer thresholds expressed the maximum extent of the Global Treasury Department's appetite for a given risk and that breaches of an outer threshold were "of serious concern" and "must be immediately reported and acted upon." TX 351 at 115 (10/2020 ALCO Packet); Tr. at 541:11–542:20 (Warman).

144. The Global Treasury Policy "explicitly refer[red] to" related "laws, regulations, and regulatory guidelines," "aiming to provide regulatory standards and frameworks and promoting compliance with relevant laws, policies, and regulations." TX 461 at 28 (Global Treasury Policy). One of the regulatory guidelines identified in the Global Treasury Policy's "Laws, Regulations, and Regulatory Guidelines" section was SR 10-1. TX 461 at 28 (Global Treasury Policy).

145. SR 10-1, entitled "Interagency Advisory on Interest Rate Risk," was issued on January 11, 2010, as an interagency advisory by the Board of Governors of the Federal Reserve System and the other primary financial regulators including FDIC, the National Credit Union Administration, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the Federal Financial Institutions Examination Council State Liaison Committee. TX 1681 at 1 (SR 10-1). SR 10-1 constituted guidance regarding interest-rate management and was expressly incorporated into the Global Treasury Policy. Tr. at 476:15–20 (Warman).

146. As Mr. Beck and Mr. Kruse conceded at trial, SR 10-1 constitutes important guidance that senior bank officers should be familiar with to be able to discharge their duties to prudently monitor and manage interest-rate risk. Tr. at 93:20–94:6 (Beck) (stating that SR 10-1 constitutes "important guidance" and that Mr. Beck had "read it and understood it" as part of his duties as Chief Financial Officer); Tr. at 1876:24–1877:3 (Kruse) (agreeing that "as the Global Treasurer, . . . SR 10-1 was the guidance that told [him] how to prudently measure, monitor and manage interest-rate risk at the holding company"). SR 10-1 provides that a financial institution

should use both NII-at-risk and EVE-at-risk in managing interest-rate risk. TX 1681 at 5–6 (SR 10-1); *see also infra* FF ¶¶ 172–177.

147. The Global Treasury Policy required Officers to comply with the risk thresholds for NII-at-risk and EVE-at-risk. In addition, the Global Treasury Policy required Officers to prepare and submit a risk mitigation plan if the above thresholds were in breach or even nearing a breach:

> If the above thresholds are breached or are nearing a breach, Treasury is responsible for developing appropriate strategies and mitigating steps to ensure [interest-rate risk] exposures are maintained within approved thresholds. Specific [interest-rate-risk] mitigation strategies developed will analyze the impact on prospective earnings, capital, and liquidity. Treasury will provide the analysis and strategy recommendation to Financial Risk Management, ALCO, and the Finance Committee, seeking approvals where appropriate.

TX 461 at 11, 13 (Global Treasury Policy); *see also* Tr. at 1878:7–15 (Kruse).

148. Section 6.4 of the Global Treasury Policy, entitled "Threshold Breach and Escalation Process," provided for the following breach and escalation process for inner- and outer-threshold breaches:

| | **Inner Threshold** | **Outer Limit** |
|---|---|---|
| **Notification** | • Notify breach to CFO, CRO, Treasurer, FRM and ERM of an Inner Threshold breach<br>• Followed by notification to the ALCO and ERMC of the Inner Threshold breach | • Communicate a risk mitigation plan to CFO, CRO, Treasurer, FRM and ERM of an Outer Limit breach<br>• Followed by communication of the risk mitigation plan to the Finance Committee, ALCO and ERMC of the Outer Limit breach |
| **Action** | • Partnering with FRM, Treasury shall develop a risk mitigation plan and discuss it with ALCO<br>• If the risk measure is trending toward or nearing the defined threshold, Treasury shall consider activating the steps above | • Partnering with FRM, Treasury shall develop a risk mitigation plan and submit to the next Finance Committee and ALCO meetings for approvals<br>• If approved, take necessary steps to implement the risk mitigation plan |

TX 461 at 25 (Global Treasury Policy).

149. It was mandatory for the Officers to comply with the Global Treasury Policy. Tr. at 1872:5–10 (Kruse) ("Q. The Global Treasury Policy was not optional for you, right? A. No. Q. It was your job to operate within the limits of this policy, right? A. Yes.").

150. It was mandatory for the Officers to comply with the inner and outer risk thresholds set forth in the Global Treasury Policy. Tr. at 1877:14–21 (Kruse).

United States District Court
Northern District of California

151. The seriousness of the Global Treasury Policy was underscored by the fact that Officers could be disciplined or even terminated for failing to comply with the Global Treasury Policy. TX 465 at 30 (Global Treasury Policy) ("[P]olicy non-compliance shall be communicated through a formal memorandum and presented to ALCO as soon as practicable with a notification provided to Chief Financial Officer, Chief Risk Officer, Treasurer, Head of [Financial Risk Management], and Head of [Enterprise Risk Management]. Failure to comply with this policy may result in disciplinary action, up to and including termination of employment or association with SVB.").

152. The Court accordingly finds that, through the Global Treasury Policy, the Holding Company required Officers to maintain the Bank's investment portfolio in compliance with the specified NII-at-risk and EVE-at-risk thresholds. Moreover, in the event that those thresholds were breached or nearing breach, Officers were additionally required to submit a risk mitigation plan, and, upon approval by the Finance Committee and ALCO, take steps to implement the plan.

153. The Court does not credit the Trust's suggestion at trial that breaching the interest-rate risk thresholds in the Global Treasury Policy was not itself a breach of the policy simply because "[b]anks have breaches all the time." Tr. at 1717:14–17 (Watkins). There is no suggestion in the Global Treasury Policy that a certain number of breaches is acceptable—rather, the policy is written using compulsory language such as "will" and "shall." *See, e.g.*, FF ¶¶ 139, 147, 151.

154. While the Trust has correctly pointed out that the Global Treasury Policy does not explicitly require that a risk mitigation plan be presented in writing, *see* Trust FFCL ¶ 83, the policy provides that "[e]xceptions to provisions of this Policy or risk limits are permitted with a prior written approval by ALCO" and required "policy non-compliance [to] be communicated through a formal memorandum." TX 461 at 25 (Global Treasury Policy). The Court accordingly concludes that the Global Treasury Policy requires risk mitigation plans to be formally prepared and communicated, whether that be in writing or otherwise.

155. There is no language in the Global Treasury Policy suggesting that any other Holding Company policy supersedes the limits set forth in the Global Treasury Policy. The

Global Treasury Policy did state that it was "best read in conjunction with the Company's [Risk Appetite Statement]." TX 461 at 5 (Global Treasury Policy).

156. The Risk Appetite Statement set forth "the amount and type of risk [the Holding Company] is prepared to accept in pursuit of its business and strategic objectives. [The Holding Company]'s risk appetite is manifested in its business strategy, risk strategy, and liquidity and capital management." TX 475 at 2 (Risk Appetite Statement); Tr. at 2044:17–19 (Mitchell).

157. The Risk Appetite Statement was renewed on an annual basis by the Board of the Holding Company and implemented by the Risk Department; the Risk Committee was required to be notified of any changes to the Risk Appetite Statement. TX 475 at 14–15 (2021 Risk Appetite Statement); Tr. at 2045:11–15 (Mitchell); *see also* TX 476 (2022 Risk Appetite Statement); TX 477 (2023 Risk Appetite Statement).

158. The Risk Appetite Statement included inner and outer thresholds of metrics relating to market risk, liquidity risk, capital risk, credit risk, operational risk, compliance risk, reputational risk, and strategic risk. TX 475 at 3–12 (Risk Appetite Statement). The Risk Appetite Statement defined market risk as "risk to earnings and capital from changes in various market risk factors, such as interest rates, credit spreads, foreign exchange rates, equity prices, market volatility and abrupt changes in economic conditions." The metrics for market risk included short-term NII-at-risk, long-term NII-at-risk, foreign exchange reevaluation impact, net foreign exchange trading position, and market-making loss ratio. TX 475 at 3–5 (Risk Appetite Statement).



United States District Court
Northern District of California

159. Of the five interest-rate risk metrics identified in the Global Treasury Policy, only two were included in the Risk Appetite Statement:

| Metric | Purpose & Thresholds |
|---|---|
| **Non-Trading: Short-Term Net Interest Income at Risk (12-month horizon)** | To measure and control the potential for adverse impacts on SVBFG Net Interest Income ("NII") over 12 months stemming from changes in interest rates and changes in the mix and volume of earning assets and funding liabilities.<br><br>Inner Threshold: -5.00% under -100 bps ramp scenario over 12 months using the internal business forecast provided by Financial Planning & Analysis.<br>Outer Threshold: -10.00% under -100 bps ramp scenario over 12 months using the internal business forecast provided by Financial Planning & Analysis. |
| **Non-Trading: Long-Term Net Interest Income at Risk (24-month horizon)** | To measure and control the potential for adverse impacts on SVBFG Net Interest Income (NII) over an extended period of 24-months, stemming from changes in interest rates and changes in the mix and volume of earning assets and funding liabilities.<br><br>Inner Threshold: -15.00% under -100 bps ramp scenario over 24 months, using the internal business forecast provided by Financial Planning & Analysis.<br>Outer Threshold: -20.00% under -100 bps ramp scenario over 24-months, using the internal business forecast provided by Financial Planning & Analysis. |

TX 475 at 4 (Risk Appetite Statement).

160. The Risk Appetite Statement does not state that compliance with NII-at-risk 12-month ramp and NII-at-risk 24-month ramp can be achieved at the expense of compliance with NII-at-risk 12-month immediate shock, NII-at-risk 24-month immediate shock, or EVE-at-risk.

161. The Capital Management Policy was also approved annually by the Finance Committee and "establishe[d] the minimum standards required for the oversight of Treasury activities." TX 470 at 5, 8 (Capital Management Policy).

162. Like the Global Treasury Policy, *see* FF ¶¶ 142, 147–148, the Capital Management Policy set inner and outer thresholds for specific financial metrics. This included inner and outer

| Silicon Valley Bank (SVB) | | | | |
|---|---|---|---|---|
| (in %) | CET1 | Tier 1 | Total | Leverage |
| **Post-Stress Capital Goal** | **5.00%** | **6.50%** | **8.50%** | **4.50%** |
| (+) Stress Loss Buffer[a] | 1.75% | 1.75% | 1.75% | 1.25% |
| (+) Model Risk Buffer[a] | 0.75% | 0.75% | 0.75% | 0.75% |
| **Capital Target** (Outer Threshold) | **7.50%** | **9.00%** | **11.00%** | **6.50%** |
| (+) Business Forecast Volatility | 0.50% | 0.50% | 0.50% | 0.50% |
| **Trigger for Capital Target** (Inner Threshold) | **8.00%** | **9.50%** | **11.50%** | **7.00%** |
| Regulatory Minimum[b] | 4.50% | 6.00% | 8.00% | 4.00% |
| Well-Capitalized Level[c] | 6.50% | 8.00% | 10.00% | 5.00% |



United States District Court
Northern District of California

thresholds for the four regulatory capital ratios of Common Equity Tier 1 Capital, Tier 1 Capital, Total Capital, and Tier 1 Leverage:

TX 470 at 28 (Capital Management Policy).

163. The inner and outer thresholds for these regulatory ratios were higher than both the regulatory minimums and well-capitalized level. *Compare* TX 470 at 28 (Capital Management Policy), *with* FF ¶ 62.

164. The Capital Management Policy also set forth the procedures by which a quarterly bank-to-parent dividend could be distributed, stating that "[the Bank's] primary capital action is payment of cash dividends from surplus capital to the Holding Company" and set a "threshold of the Bank to Holding Company dividend [of] 50% of the Bank's prior quarter net income." TX 470 at 33 (Capital Management Policy); *see also* Tr. at 2001:5–2002:7 (Kruse).

165. The Court does not credit the Trust's representation at trial that the Global Treasury Policy was one of "multiple subsidiary policies" that was less important than the Risk Appetite Statement. Trust FFCL ¶ 77. Both the Global Treasury Policy and Risk Appetite Statement were "set at the Holding Company level" and "established" by the Holding Company to promote "a consistent framework for managing risk exposures" and to cover "all activities under the umbrella of the Holding Company." Tr. at 78:10–79:13 (Beck). The fact that the Risk Appetite Statement was annually renewed by the full Board while the Global Treasury Policy (like the Capital Management Policy, *see* FF ¶ 162) was annually renewed by the Finance Committee and ALCO does not mean that one was more important than the other, nor does either policy state as much.

166. Nor does the Court credit the Trust's suggestion at trial that EVE-at-risk was a "secondary" interest-rate-risk metric by virtue of not being included in the Risk Appetite Statement. Tr. at 242:9–18 (Beck); *see also* Trust FFCL ¶¶ 65, 73. When the Court asked Mr. Beck to identify the Holding Company or Bank policy that allowed NII-at-risk compliance to be prioritized over EVE-at-risk compliance, he was unable to do so. Tr. at 290:12–18 (Beck) ("The Court: But compliance was required with the EVE-at-risk and the NII, and I didn't see anywhere where the policies said if you are balancing different interests you don't have to meet

the EVE-at-risk. Tell me – I would just like you to point that out. The Witness: Yeah. I don't think that's explicit in any of the policies.").

167. Moreover, compliance with both NII-at-risk and EVE-at-risk is clearly set forth in SR 10-1, which Mr. Beck acknowledged was foundational guidance and Mr. Warman opined was essential for prudent banking practices. TX 1681 at 6–7 (SR 10-1); Tr. at 94:3–7 (Beck); Tr. at 475:6–18 (Warman).

168. The Court accordingly finds that the Holding Company required Officers to comply with the Holding Company's risk thresholds for NII-at-risk and EVE-at-risk while managing the investment portfolio. As discussed below, Mr. Beck, Mr. Kruse, and the other ALCO members managed the Bank's investments in a manner that produced sustained outer limit breaches of EVE-at-risk that they failed to remediate from approximately 2021 to the time the Bank failed in 2023.

169. The Court also finds that the Holding Company required breaches of NII-at-risk or EVE-at-risk to be accompanied by a risk mitigation plan analyzing the impact on prospective earnings, capital, and liquidity. As discussed below, Mr. Beck, Mr. Kruse, and the other ALCO members knowingly exacerbated the sustained breach of the EVE-at-risk metric by approving the purchase of long-term, fixed-rate investment securities. During this time, they did not present any risk mitigation plan as required by the Global Treasury Policy.

### C. The Standard of Care of an Ordinarily Prudent Banker Requires Measuring, Monitoring, and Managing Interest-Rate Risk and Liquidity Risk

170. Scott Warman testified as FDIC's standard of care expert. Mr. Warman was Treasurer at M&T Bank, an institution of comparable size to the Holding Company and Bank during the relevant period, with over three decades of experience and ample qualifications to credibly opine on prudent banking standards as applied in this case. Tr. at 463:3–21 (Warman). The Court finds Warman's testimony to be highly credible.

171. At trial, Mr. Warman presented unrebutted testimony of the standard of care for an ordinarily prudent banker, opining that prudent bankers (1) use both EVE-at-risk and NII-at-risk to manage interest-rate risk, (2) comply with their own interest-rate risk policies, and (3) manage the

United States District Court
Northern District of California

balance sheet to account for the known and foreseeable risk that interest rates will rise, particularly when interest rates are at historically low levels. The Court accords significant weight to Mr. Warman's testimony because it was thorough, believable, and uncontroverted.

**1. An ordinarily prudent banker uses both EVE-at-risk and NII-at-risk to monitor interest-rate risk.**

172. SR 10-1 is foundational guidance for measuring, monitoring, and controlling interest-rate risk. Tr. at 1875:15–1877:3 (Kruse) (admitting that SR 10-1 was "foundational guidance" that told him as the Global Treasurer "how to prudently measure, monitor and manage interest rate risk at the Holding Company"); *see also* TX 1681 at 1, 3 (SR 10-1); Tr. at 94:3–97:21 (Beck); Tr. at 475:9–477:14 (Warman); Tr. at 1606:2–7 (Miller); TX 3006 at 26:19–27:07 (Haider Tr.).

173. SR 10-1 requires using both NII-at-risk and EVE-at-risk to manage, measure, and monitor interest-rate risk, reflecting an industry standard. TX 1681 at 6 (SR 10-1); Tr. at 480:7–12, 660:14–20 (Warman) ("Q. In your experience and based on your conversations with treasurers of many other institutions, do they manage those two risk measures on a daily basis? A. Yes, they do."); TX 3006 at 26:22–27:07 (Haider Tr.) ("Generally speaking, in the industry, the two primary metrics for interest rate risk measurement and management, as I have seen it and also from regulatory feedback, is a short-term interest rate risk measure, which is your NII at risk, and then your long-term interest rate risk measure, which is your EVE, with the NII at risk being more focused on earnings risk and EVE being more focused on capital risk."); *see also* Tr. at 80:21–25, 81:8–11 (Beck); Tr. at 1606:2–7 (Miller).

174. NII-at-risk and EVE-at-risk assess different things and therefore capture different risks. NII-at-risk measures short-term earnings risk due to potential interest rate changes, while EVE-at-risk measures impact to long-term value due to potential interest rate changes. Tr. at 483:18–484:3 (Warman) ("A. [NII-at-risk is] a short-term look at interest rate risk. . . . Q. Okay. Does the Economic Value of Equity sensitivity test tell you something different? A. It does. So the difference with economic value over equity sensitivity is that it's looking at the impact of interest rates on the full life of the assets and liabilities, and so it shows a very different

picture if interest rates rise or fall."); see also 479:19–22 (Warman) ("Q. . . . [D]o these two measures measure the same thing. A. No, no, not at all. The first is income over a short period of time, and the second is a sensitivity to the value, taking into account the full term.").

175. The Court accordingly finds that the standard of care of an ordinarily prudent banker requires use of both NII-at-risk and EVE-at-risk to measure, monitor, and manage interest-rate risk. Tr. at 479:4–480:15 (Warman) ("Q. These two measures, net interest income and economic value of equity, are these the primary measures used by banks and bank holding companies to measure interest-rate risk in the United States? A. The answer is yes. It's required in 10-1, and it's what every treasurer that I knew did."); TX 3006 at 29:12–23 (Haider Tr.) ("[B]ased on my historical experience at prior institutions[,] . . . EVE and NII both needed to be the primary metrics for measurement of interest rate risk."). The Court further finds that, by incorporating thresholds and breach escalation procedures for NII-at-risk and EVE-at-risk, the Global Treasury Policy integrated these sound prudent banking principles.

176. The Court finds that focusing exclusively on NII-at-risk in constructing an investment portfolio is inconsistent with prudent banking principles because it focuses solely on "income over a short period of time" and thus "would very likely not see or properly measure a lot of the risk" associated with the "full term of the assets and liabilities." Tr. at 479:11–22; 488:11–16 (Warman); *see also* Tr. at 660:17–23 (Warman) ("Q. In your experience and based on your conversations with treasurers of many other institutions, do they manage [EVE-at-risk and NII-at-risk] on a daily basis? A. Yes, they do. Q. In your experience, is it a prudent banking practice to take an excessive amount of risk to generate short-term income? A. Absolutely not.").

177. SR 10-1 provides express guidance to financial institutions on how to manage interest-rate risk during periods of low interest rates. SR 10-1 was issued in an "environment of historically low short-term interest rates" after the Global Financial Crisis of 2008 to inform banks and bank holding companies regarding the importance of "hav[ing] robust processes for measuring and, where necessary, mitigating their exposure to potential increases in interest rates." TX 1681 at 3 (SR 10-1); *see also* Tr. at 95:22–96:1 (Beck) (agreeing that, at the time SR 10-1 was issued, interest rates were extremely low); Tr. at 1882:23–1883:1 (Kruse).

178. In low interest rate environments, SR 10-1 explains that banks should assess their exposure to increases in interest rates, including large or unexpected increases in interest rates. In a section entitled "Stress Testing," SR 10-1 states as follows

> When conducting scenario analyses, institutions should assess a range of alternative future interest rate scenarios in evaluating [interest-rate-risk] exposure. This range should be sufficiently meaningful to fully identify basis risk, yield curve risk and the risks of embedded options. In many cases, static interest rate shocks consisting of parallel shifts in the yield curve of plus and minus 200 basis points may not be sufficient to adequately assess an institution's [interest-rate-risk] exposure. As a result, institutions should regularly assess [interest-rate-risk] exposures beyond typical industry conventions, including changes in rates of greater magnitude (e.g., up and down 300 and 400 basis points) across different tenors to reflect changing slopes and twists of the yield curve. Institutions should ensure their scenarios are severe but plausible in light of the existing level of rates and the interest rate cycle. For example, in low-rate environments, scenarios involving significant declines in market rates can be deemphasized in favor of increasing the number and size of alternative rising-rate scenarios.

TX 1681 at 7 (SR 10-1).

179. Interest rates in 2020 and 2021 were historically low. FF ¶ 74. The Court accordingly finds that a prudent banker would test for the foreseeable risk of large increases in interest rates during the historically low interest-rate environment in 2020:

> Q. And so in your opinion, would any prudent treasurer, in 2020 and 2021, have had to test and plan for the risk of large increases in interest rates and their effects on their balance sheet in 2020 and 2021?
> A. Absolutely, it's required by the guidance, it's what I did, and it's what every treasurer that I spent time with did.
> Q. Okay. And why did you need to do that? Why would a prudent treasurer have needed to do that in 2020 and 2021?
> A. Well, interest rates are very low, and so one needs to test the vulnerability of the bank and holding company, if they return to more normal levels and beyond.

Tr. at 490:17–491:2 (Warman).

180. In fact, a straightforward application of SR 10-1 reflects that "it's just really fundamental risk management" to test interest rate increases of 3% to 4% in a low-rate environment. Tr. at 581:24–582:6 (Warman); *see also* TX 1681 at 7 (SR 10-1) ("[I]nstitutions should regularly assess [interest-rate-risk] exposures beyond typical industry conventions, including changes in rates of greater magnitude (e.g., up and down 300 and 400 basis points) . . . .

United States District Court
Northern District of California

[I]n low-rate environments, scenarios involving significant declines in market rates can be deemphasized in favor of increasing the number and size of alternative rising-rate scenarios."); Tr. at 98:16–99:17 (Beck).

181. As Mr. Warman explained at trial, a reasonably prudent banker would understand by the fact that the Global Treasury Policy refers to and "actually itself quotes SR 10-1" that Officers should not prioritize NII-at-risk or EVE-at-risk over one another. Tr. at 494:15–495:5 (Warman).

182. The Trust suggested at trial that it may be appropriate to ignore risk breaches because SR 10-1 advises setting thresholds "that are neither so high that they are never breached nor so low that exceeding the limits is considered routine and not worthy of action." Trust FFCL ¶ 171 (quoting TX 1681 at 9). The Court rejects this assertion, crediting Mr. Warman's explanation at trial that this provision "doesn't mean . . . that you can be in sustained breach of your measures and not do anything about it." Tr. at 493:1–6 (Warman).

183. The Court accordingly finds that prioritizing NII-at-risk over EVE-at-risk simply because NII-at-risk measures short-term earnings is not in accord with the standard of care of an ordinarily prudent banker:

> The Court: Now shifting, based upon your work with the organizations that you have led, with other banks of significant assets, are you aware of any other bank that ignores and doesn't attempt compliance with the EVE-at-risk limits?
> The Witness: Not a one.
> The Court: And none of those banks that you are familiar with substituted different measurement[s] such as the NII?
> The Witness: No. And the reason is it's quite clearly required in SR 10-1. All of the treasurers that I spend time with understand that certain measures – they need to supplement each other, right. They, my word, "see" the risk differently, and if you only use one or the other, you are going to miss something.

Tr. at 604:13–605:2 (Warman).

**2. An ordinarily prudent banker adheres to internal risk thresholds and breach escalation procedures.**

184. The Global Treasury Policy set EVE-at-risk thresholds to ensure that interest-rate risk exposures were maintained within approved thresholds, requiring "[s]pecific [interest-rate-

risk] mitigation strategies" in the event of breach. TX 461 at 11 (Global Treasury Policy); *see also* FF ¶¶ 139–148.

185. The same EVE-at-risk limits remained in place, unchanged, from December 2019 until the Bank's failure on March 10, 2023. *See, e.g.*, TX 461 at 10–11 (Global Treasury Policy); TX 465 at 13 (2021 Global Treasury Policy).

186. Prudent bankers manage both NII-at-risk and EVE-at-risk consistent with the Global Treasury Policy. While "there is a[n] optimization in ongoing tension between those two interest rate risk metrics," "[t]here's some balance that [bankers] seek generally." TX 3006 at 27:09–28:10 (Haider Tr.). In other words, "you can manage both your NII and your EVE within compliance limits, but the give-up is yield," i.e., short-term earnings. TX 3002 at 221:10–20 (Busch Tr.); *see also* 221:21–21 (Busch Tr.) ("Q. So if you want to stay within EVE compliance, you have to give up a little bit on . . . yield or income; right? A. That's right[] . . . .").

187. Faced with the options of complying with NII-at-risk and EVE-at-risk on one hand and generating short-term earnings on the other hand, the Court finds that the standard of care of an ordinarily prudent banker requires complying with internal NII-at-risk and EVE-at-risk metrics. Prudent bankers do not take excessive interest-rate risk to generate short-term income; instead, they focus on risk-adjusted return to ensure that they are not taking excessive risk and stay within their risk limits. Tr. at 660:21–661:16 (Warman).

188. The Court accordingly does not credit the Trust's contention that metrics in the Holding Company's Risk Appetite Statement, like NII-at-risk, took "priority" over the EVE-at-risk metric or allowed EVE-at-risk to be consistently breached without implementation of a risk mitigation plan. Tr. at 82:5–18 (Beck); Tr. at 1874:18–25 (Kruse). The Global Treasury Policy did not prioritize one interest-rate-risk metric over the other. TX 465 at 12 (Global Treasury Policy); *see also* FF ¶ 141. Nothing in either the Global Treasury Policy or Risk Appetite Statement permits the Holding Company to be in sustained breach of the EVE-at-risk limits based on any provision in the Risk Appetite Statement or any other Holding Company policy. Tr. at 290:12–18 (Beck).



United States District Court
Northern District of California

189. The Court accordingly finds that the Boards' own policies required compliance with the Global Treasury Policy and its risk limits, including EVE-at-risk, and that the standard of care of an ordinarily prudent banker requires adhering to these limits. Prioritizing NII-at-risk over EVE-at-risk is a departure from the standard of care of an ordinarily prudent banker.

**3. An ordinarily prudent banker manages the known, foreseeable risk that interest rates will rise, particularly in a low-rate environment.**

190. The risk that interest rates would rise significantly and remain high was a known and foreseeable risk in 2020 and 2021 before and during the securities purchases approved by Mr. Beck, Mr. Kruse, and the other ALCO members. Prior to the drop of interest rates in early 2020, the Federal Reserve had been raising interest rates, reaching an upper target of approximately 2.5%. Tr. at 510:14–511:3 (Warman). The Federal Reserve cut interest rates to historically low levels in 2020 and maintained those historically low levels in 2021 because of extraordinary and temporary conditions, including the pandemic response and efforts to stimulate the economy. Tr. at 572:4–19 (Warman).

191. The Court accordingly finds that, consistent with regulatory guidance, the standard of care of an ordinarily prudent banker requires anticipating that, as the extraordinary conditions during the COVID pandemic ended, rates could return to normal levels or even rise above them:

> Q. Mr. Warman, when you were the treasurer of M&T in 2020 and 2021, did you plan for the risk of sustained and rapid interest rate rises?
> A. Yes, absolutely. As did—
> Q. Why did you do so?
> A. Well, because interest rates were really low. These were extraordinary times that drove interest rates to low levels, and, you know, expecting there to be a vaccine, expecting the cessation of the fiscal stimulus, just writing checks for folks, that was going to go away at some point. And so when that did happen, if that did happen, it's logical to think interest rates would go back to, you know, at a minimum, more normal levels. And, again, there was a lot of focus around the guidance and reminders that, when rates are really low, one needs to concern [oneself] with, you know, more than just a 1 or 2 percent increase[], but 3 and 4 percent.

Tr. at 536:3–19 (Warman).

192. The Court also finds that under the standard of care, an ordinarily prudent banker would have planned for the risk of large rate increases, measuring their impact on the Bank and

Holding Company, and ensuring that the consequences would not be catastrophic. Tr. at 537:7–20 (Warman); *see also* Tr. at 96:23–25 (Beck); Tr. at 1895:16–22 (Kruse).

193. As Mr. Beck conceded at trial, the risk of rates rising suddenly was foreseeable, and as Chief Financial Officer he had to plan for 3% and 4% rate increases in 2020 and 2021. Tr. at 96:14–99:4, 240:20–23 (Beck) ("Q. Okay. So it was your job as Chief Financial Officer to make sure that tests were done looking at the impact of interest rates of rises of 3 percent or 4 percent in 2020 and 2021, right? A. It was mine . . . yes."); TX 366 at 2 (11/2021 ALCO Minutes).

194. The Court rejects the Trust's suggestion that interest-rate risk thresholds could be breached based on expectations that interest rates would rise or fall. The Court finds that basing investment decisions on speculation in interest rate trends is not in accord with the standard of care of an ordinarily prudent banker:

> Q. . . . [Y]ou heard testimony from Mr. Beck that he solicited the opinions of economists on the economy and interest rates, right?
> A. I did, yes.
> Q. Okay. And did you similarly read economic reports about projections of interest rates during this period of time?
> A. Yes, of course.
> Q. Okay. And that Mr. Beck testified that he looked at what the Federal Reserve Open Market's committee might have published or talked about too, right?
> A. He did, yes.
> Q. Okay. And did you pay attention to that type of information too?
> A. I paid attention to it, yeah.
> Q. Okay. Did you rely upon those projections, assuming they would occur in managing your balance sheet?
> A. No, that would be counter to, you know, risk management 101. You need to make sure you are testing – you know, in a simple sense, what if you are wrong? So maybe that's a reasonable base case scenario, but you still need to understand what's the impact on your bank and bank holding company if that forecast is wrong. And, you know, I think the Fed has acknowledged that their forecast is often wrong. I think Chair Powell warned of that repeatedly, former Chair Powell.

Tr. at 491:6–492:5 (Warman); *see also* Tr. at 97:1–4 (Beck); Tr. at 776:10–16 (Becker); Tr. at 1600:10–19 (Miller) ("Q. Prudent bankers cannot rely on an expectation of what's going to happen to interest rates and then breach their risk limits assuming that risk won't occur, right? A. I think that's right.").



United States District Court
Northern District of California

195. Thus, to the extent that the Trust suggested at trial that the actions at issue in this case could be justified based on the unforeseeability of the Federal Reserve's "rapid rate hike in 2022," the Court finds that the standard of care of an ordinarily prudent banker required the Holding Company Officers to be prepared to manage the known, foreseeable risk that interest rates would rise from their near-zero level. As set forth below, the Holding Company Officers' actions were negligent because they were completely unprepared to weather the rate hikes.

**D. Holding Company Officers Caused the Bank to Take Excessive Interest-Rate Risk by Concentrating the Bank's Investments in Long-Term, Fixed-Rate Securities**

196. FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members breached basic prudent banking standards and their fiduciary duties of care and loyalty that they owed to the Bank by concentrating the Bank's investment portfolio in long-duration, fixed rate securities. This created excessive interest-rate risk and exposed the Bank to the risk of billions of dollars in losses in the foreseeable event that interest rates rose from historically low levels.

197. As set forth below, Mr. Beck, Mr. Kruse, and the other ALCO members knew of the possibility of increased interest rates, decided to overwhelmingly concentrate the Bank's investment portfolio in securities that would lose value in an up-rate environment, persevered in this strategy in the face of near-continuous EVE-at-risk breaches, and took no action to remediate EVE-at-risk breaches based on their unfounded beliefs that those risks could be ignored.

198. When interest rates foreseeably went up, the very risk that Mr. Beck, Mr. Kruse, and the other ALCO members had been warned of by virtue of the sustained EVE-at-risk breaches materialized—the Bank suffered billions of dollars in losses. Contrary to the Trust's suggestion that these findings are based on "hindsight," they are based on a straightforward application of prudent banking principles that Mr. Beck, Mr. Kruse, and the other ALCO members knowingly disregarded in subordinating the Bank's interests to the Holding Company's interests.



United States District Court
Northern District of California

**1. Mr. Beck, Mr. Kruse, and the other ALCO members concentrated the Bank's influx of uninsured deposits into long-term, fixed-rate securities.**

199. Mr. Beck, Mr. Kruse, and the other ALCO members caused the Bank to purchase more than $113 billion in securities from January 2021 to April 2022. TX 2650 (summary of securities purchases); Tr. at 59:12–14 (Beck) ("Q. As a member of ALCO you approved the securities purchased in 2020, 2021, and 2022, right? A. As a part of ALCO, yes."). These purchases were primarily of long-term, fixed-rate securities—Mr. Beck, Mr. Kruse, and the other ALCO members grew the Bank's mortgage-backed securities portfolio from $18.6 billion at the end of 2019 to more than $100 billion at the end of 2021; in addition, more than $100 billion of the total securities had a maturity date of ten years or longer by the end of 2021. *Compare* TX 502 at 64 (2019 Form 10-K), *with* TX 584 at 67 (2021 Form 10-K).

200. The Court acknowledges that earnings are an important part of managing a bank and that long-term, fixed-rate securities such as mortgage-backed securities present the benefit of securing a reliable income stream. That said, Mr. Beck, Mr. Kruse, and the other ALCO members' investment decisions made the Bank an extreme outlier from its peers across multiple dimensions, including investment in long-term securities, *see* Tr. at 465:21–466:14 (Warman), and proportion of investment securities to total assets, *see* Tr. at 520:2–10 (Warman).

201. These securities were paying a very low yield. TX 584 at 67 (2021 Form 10-K) (reporting 1.17% for securities classified as AFS and 1.64% for securities classified as HTM); Tr. at 524:8–10 (Warman) ("I mean, there is no free lunches, as they say. If you are buying a lot of securities and interest rates are very low, you are going to get really low yields."); Tr. at 1892:22–1893:3 (Kruse) ("Q. [The portfolio] generated, you know, on average about 1.5 percent interest, right? A. As I recall, yes."). As a result, the risk-adjusted return for purchasing these long-term, fixed-rate securities with heightened interest-rate risk was very low. Tr. at 2283:18–2284:10 (Warman).

202. By concentrating this surge of deposits into long-term, fixed-rate securities paying very low yields, Mr. Beck, Mr. Kruse, and the other ALCO members exposed the Bank to

excessive interest-rate risk. This is because the value of fixed-rate securities generally falls as interest rates rise, *see* FF ¶ 58, and interest rates were historically low at the time of these securities purchases, *see* FF ¶ 74. Mr. Beck, Mr. Kruse, and the other ALCO members knew that they were exposing the Bank to the risk that the value of the portfolio would decline in the event that interest rates increased:

> Q. . . . [I]t was a known risk that if interest rates rose significantly and remained high, . . . those assets would be underwater because they would be paying well below [the] market rate, right?
> A. Yes.
> Q. And you knew that . . in the fall of 2020, and you knew that in 2021 when you were constructing that portfolio, right?
> A. Yes.

Tr. at 1893:4–12 (Kruse).

203. The known risk that the investment portfolio would suffer huge losses if interest rates increased materialized when interest rates did in fact increase. Tr. at 540:4–7 (Warman) ("Q. And what were the consequences for the market value of the securities portfolio? A. The market value of the securities portfolio declined, as happens to fixed-rate investments when interest rates rise.").

204. The Court accordingly finds that, in the near-zero interest rate environment of 2020 and 2021, Mr. Beck, Mr. Kruse, and the other ALCO members knew or should have known that rate increases were likely and foreseeable. Their choice to concentrate the Bank's assets in long-term, fixed-rate securities that would be exposed to large losses in that event was not in accord with the standard of care of an ordinarily prudent banker.

205. In addition, by concentrating the investment portfolio in long-term, fixed-rate securities, Mr. Beck, Mr. Kruse, and the other ALCO members exposed the Bank to excessive interest-rate risk in the form of duration extension risk due to these securities' negative convexity. FF ¶¶ 52–56; *see also* Tr. at 73:10–12 (Beck); Tr. at 526:11–527:11 (Warman); Tr. at 1894:8–18 (Kruse); TX 690 at 1 (email from Mr. Kruse to Mr. Beck dated Nov. 8, 2020).

206. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members knew or should have known that the duration-extension risk in the portfolio they created



United States District Court
Northern District of California

United States District Court
Northern District of California

was foreseeable. Tr. at 553:7–10 (Warman) ("[T]hat's just the way mortgage-backed securities work.").

207. At no point did any Director on the Finance Committee or Risk Committee advocate reducing the risk in the securities portfolio to bring EVE-at-risk into compliance. Tr. at 165:23–166:3 (Beck).

208. The individuals responsible for prioritizing net interest income over risk management were Mr. Beck, Mr. Kruse, and the other ALCO members. TX 3002 at 85:5–87:22 (Busch Tr.) (explaining that the "directive" he received from Mr. Beck was to take deposits and deploy them in securities and specifically securities that were "out on the [risk] curve to get additional returns").

209. In approving these purchases, Mr. Beck, Mr. Kruse, and the other ALCO members were all acting as Holding Company Officers within the scope of their authority.

**2. Mr. Beck, Mr. Kruse, and the other ALCO members were on notice of the risk of significant, sustained interest rate increases in 2020 and 2021.**

210. The Holding Company Officers were on notice of the risk of significant and sustained interest rate increases in 2020 and 2021. For example, in an email dated November 6, 2020, to Mr. Busch, Mr. Kruse wrote that "[t]he most visible risk" facing the Bank "comes from the potential for interest rates to rise significantly and to remain high." TX 689.

211. This comment was subsequently reiterated by Mr. Busch to all ALCO members at the November 2020 ALCO meeting, where Mr. Busch gave a presentation entitled "Managing Exposure to Rising Rates." TX 353 at 208–16 (11/2020 ALCO Packet); Tr. at 118:5–12 (Beck).

212. During that November 2020 presentation, Mr. Busch repeatedly advised Mr. Beck, Mr. Kruse, and the other ALCO members that "[t]he most visible risk" to the investment portfolio "comes from the potential for interest rates to rise significantly and remain high." TX 353 at 210 (11/2020 ALCO Packet); *see also* TX 353 at 210 (11/2020 ALCO Packet) ("Based on current portfolio duration, rates would have to increase 60 bps in order for the total portfolio net gain to be reduced to $0.").

213. During that November 2020 presentation, Mr. Busch also advised Mr. Beck, Mr. Kruse, and the other ALCO members of how to mitigate that risk, i.e., to "limit the duration of future investment purchases to gradually reduce portfolio risk" by purchasing shorter-term securities instead of long-term 20-year and 30-year mortgage-backed securities. TX 353 at 211–12 (11/2020 ALCO Packet); Tr. at 118:8–12 (Beck).

214. As another example, at the December 2020 ALCO meeting, Mr. Busch gave another presentation entitled "Duration Target Action Plan," in which he suggested limiting duration extension risk by purchasing shorter duration securities in anticipation of a rising rates scenario. TX 355 at 159–61 (12/2020 ALCO Packet).

215. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that the foreseeable event of rising interest rates presented specific risks to the Bank's portfolio that they needed to consider and plan for. Tr. at 99:1–7 (Beck) (acknowledging that ALCO needed to "consider and plan for" the "potential for rates to rise significantly and remain high"); *see also* Tr. at 118:5–16 (Beck) (agreeing that in 2021, higher-rate scenarios were important to consider given that interest rates were at historically low levels).

216. Mr. Beck, Mr. Kruse, and the other ALCO members did not follow Mr. Busch's recommendations about shortening the portfolio's duration. *Compare* Tr. at 1898:16–1900:7 (Kruse) ("Q. So Mr. Busch is telling [ALCO] that to reduce duration to address the risk of interest rates going high and staying high, we should be buying securities that . . . are up to three years in duration, right? A. That's what the analysis shows. Q. . . And we just looked at the 2021 purchases and what actually happened is the treasury department and ALCO purchased securities that had more than 4.5 duration, every quarter in 2021, right? A. Yes."); *with* TX 3002 at 109:13–110:4, 217:25–219:19 (Busch Tr.) ("Q. Okay. What was your recommendation? A. . . . [I]t was a combination of things. One was to shorten the . . . duration of securities purchased and classified as [AFS]. There was a hedging component. . . . Q. Okay. So you made a . . . recommendation to ALCO, and did ALCO approve that recommendation? [A.] No.").

217. Mr. Beck, Mr. Kruse, and the other ALCO members also did not set a maximum duration extension in a rates-up scenario. Tr. at 1898:11–1902:13 (Kruse).



United States District Court
Northern District of California

218. Each ALCO Packet contained information about the market value of newly purchased securities, yield of newly purchased securities, duration of newly purchased securities, and estimates of how much the market value of the fixed income portfolio would decrease in the event of interest rate increases. Tr. at 123:14–20, 124:15–18, 149:4–7 (Beck).

219. At the end of 2020, Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that: the securities portfolio had grown to $43 billion; $8.6 billion of the securities portfolio comprised HTM-designated residential mortgage-backed securities; duration of the portfolio was 3.71 years; duration would extend to 5.75 years if rates rose by 2%; and the securities portfolio would lose $4.3 billion if rates rose by 2%. TX 355 at 83, 88 (12/2020 ALCO Packet).

220. After purchasing roughly $22 billion of securities in the first quarter of 2021, Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that: the securities portfolio had grown to $56.3 billion; $18.6 billion of the securities portfolio comprised HTM-designated residential mortgage-backed securities; average yield of newly purchased securities was 1.46%; duration of the portfolio was 4.61 years; duration would extend to 6.24 years if rates rose by 2%; and the securities portfolio would lose $6.1 billion if rates rose by 2%. TX 361 at 78, 83 (03/2021 ALCO Packet).

221. After purchasing roughly $23 billion of securities in the second quarter of 2021, Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that: the securities portfolio had grown to $83.6 billion; $41.3 billion of the securities portfolio comprised HTM-designated residential mortgage-backed securities; average yield of newly purchased securities was 1.45%; duration of the securities portfolio was 4.49 years; duration of the securities portfolio would extend to 6.49 years if rates rose by 2%; and the portfolio would lose $8.6 billion if rates rose by 2%. TX 369 at 86, 90–91 (07/2021 ALCO Packet).

222. Ultimately, after purchasing roughly $98 billion of securities in 2021, Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that: the securities portfolio had grown to $125 billion; $74 billion of the securities portfolio comprised HTM-designated residential mortgage-backed securities; average yield of newly purchased securities was 1.45%; duration of the portfolio was 3.97 years; duration of the securities portfolio would extend to 5.72 years if rates

rose by 2%; and the portfolio would lose $10.9 billion if rates rose by 2%. TX 383 at 130, 134–35 (01/2022 ALCO Packet).

223. The Court accordingly does not credit the Trust's argument that the increase in interest rates—and resulting losses in the investment portfolio—was unforeseeable. To the extent that the Trust suggested at trial that Mr. Beck, Mr. Kruse, and the other ALCO members acted reasonably while concentrating the Bank's portfolio in long-term, fixed-rate securities, the Court disagrees and finds that the failure to account for the foreseeable risk of interest rates rising was negligent.

### 3. Mr. Beck, Mr. Kruse, and the other ALCO members received continuous notifications of sustained EVE-at-risk breach while approving securities purchases that they knew would exacerbate the breach.

224. The Holding Company and the Bank remained in sustained breach of the Global Treasury Policy's EVE-at-risk limits throughout 2021 and 2022. Tr. at 165:3–5 (Beck); Tr. at 547:24–548:18 (Warman); Tr. at 1913:9–12 (Kruse); *see also* Tr. at 1878:16–1879:2 (Kruse) (confirming that "nothing in the Global Treasury Policy says you can stay in sustained breach of these risk limits for EVE-at-risk").

225. The EVE-at-risk results were reported in the Holding Company's public filings throughout 2021 and 2022 (until the Holding Company stopped reporting them publicly in the fourth quarter of 2022), as shown in the following tables:

| Rate Change | 2021 Q1 | 2021 Q2 | 2021 Q3 | 2021 Q4 | Outer Threshold |
|---|---|---|---|---|---|
| +100 bps | -10.9% | -10.9% | -15.2% | -13.9% | -10% |
| +200 bps | -22.7% | -22.8% | -30.9% | -27.7% | -20% |

| Rate Change | 2022 Q1 | 2022 Q2 | 2022 Q3 | 2022 Q4 | Outer Threshold |
|---|---|---|---|---|---|
| +100 bps | -16.4% | -12.7% | -15.8% | -17.5% | -10% |
| +200 bps | -30.4% | -22.9% | -29.5% | -33.1% | -20% |



United States District Court
Northern District of California

TX 553 at 102 (2021 Q1 Form 10-Q); TX 561 at 108 (2021 Q2 Form 10-Q); TX 568 at 109 (2021 Q3 Form 10-Q); TX 584 at 92 (2021 Form 10-K); TX 597 at 254 (2022 Q1 Form 10-Q); TX 602 at 94 (2022 Q2 Form 10-Q); TX 607 at 94 (2022 Q3 Form 10-Q); TX 2174 at 1 (showing EVE-at-risk results as of December 31, 2022).

226. Mr. Beck, Mr. Kruse, and the other ALCO members were on notice since October 2020 of the ongoing EVE-at-risk breaches, which were reported as part of every monthly ALCO meeting in the policy compliance section of the ALCO Packet. Tr. at 1773:10–14 (Kruse); *see infra* FF ¶¶ 232–251. Mr. Beck, Mr. Kruse, and Mr. Becker each testified at trial that they received notifications of the sustained EVE-at-risk breaches. Tr. at 138:21–139:12 (Beck); Tr. at 704:11–14, 705:4–8 (Becker); Tr. at 1773:10–14 (Kruse).

227. Mr. Beck, Mr. Kruse, and the other ALCO members knew that a breach of the EVE-at-risk outer threshold set forth in the Global Treasury Policy required prompt action. The breach notifications stated that the outer thresholds expressed the maximum extent of the Global Treasury Department's appetite for a given risk and that breaches of an outer threshold were "of serious concern" and "must be immediately reported and acted upon." FF ¶ 143.

228. Mr. Beck, Mr. Kruse, and the other ALCO members knew from the face of the breach notifications and the ALCO Packets that the reason that EVE-at-risk continued to be breached was the ongoing purchases of long-term, fixed-rate securities, which exacerbated the breaches. Tr. at 542:21–543:12 (Warman) (explaining that ALCO members knew from their own "breach notifications [that] the explanations for the breach are really their own behavior"); *see also, e.g.*, TX 351 at 115 (10/2020 ALCO Packet) (stating that growth in "long-term investment balances have pushed these measures beyond the established policy limits"); TX 361 at 94 (03/2021 ALCO Packet) (stating that "primary factor" for breach was "increase in investment portfolio holdings such as [mortgage-backed securities], [commercial mortgage-backed securities], and [collateralized mortgage obligations] with higher duration"); TX 383 at 19 (01/2022 ALCO Packet) (stating that "increase in investment portfolio holdings particularly in Agency [mortgage-backed securities], which carries with it higher duration and negative convexity," was a factor for breach).



United States District Court
Northern District of California

229. Confronted with the breach notifications, Mr. Beck, Mr. Kruse, and the other ALCO members approved additional purchases of fixed-rate, long-term securities with knowledge that doing so would worsen the breaches. *See infra* FF ¶¶ 239, 242, 252.

230. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care of an ordinarily prudent banker by continually breaching the Global Treasury Policy's EVE-at-risk thresholds. The Court also credits Mr. Haider's testimony that "[f]rom [his] point of view in a very, very traditional form," what management should have done is to "adhere to [the Holding Company's] policy limits and guidelines and operate within the risk appetite of the board as set forth in the policies." TX 3006 at 153:14–24 (Haider Tr.).

231. Mr. Beck, Mr. Kruse, and the other ALCO members were repeatedly advised at monthly ALCO meetings that EVE-at-risk was in breach and that the actions they were taking were exacerbating that breach. They chose to ignore and in fact exacerbate that risk based on their unfounded belief that the breaches were not as serious as was being reported based on vague doubts as to the EVE-at-risk model's accuracy.

232. At the October 2020 ALCO meeting, ALCO members received notice that, as of September 30, 2020, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -11.2% and -23.4%, respectively. TX 351 at 8, 14 (10/2020 ALCO Packet). The October 2020 ALCO Packet also stated that the EVE-at-risk breaches were "due primarily to the model change that was approved in the August 2020 meeting," which "aligned the [Asset Liability Management] model with the model that was being used to generate [the Funds Transfer Pricing model]." TX 351 at 114 (10/2020 ALCO Packet). Mr. Beck, Mr. Kruse, and the other ALCO members thereafter continually attributed EVE-at-risk breaches to unspecified inaccuracies in the EVE-at-risk model while approving purchases that they knew would exacerbate EVE-at-risk, regardless of the model's accuracy.

233. At the November 2020 ALCO meeting, ALCO members received notice that, as of October 31, 2020, the Holding Company and Bank were in breach of the outer thresholds for



United States District Court
Northern District of California

EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -13.2% and -26.6%, respectively. TX 353 at 7, 13 (11/2020 ALCO Packet).

234. At the December 2020 ALCO meeting, ALCO members received notice that, as of November 30, 2020, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -15.2% and -29.6%, respectively. TX 355 at 6, 12 (12/2020 ALCO Packet). At the December 2020 meeting, ALCO members also learned that modifying certain assumptions in the EVE-at-risk model would bring the metric into compliance. TX 355 at 162–63 (12/2020 ALCO Packet) ("Aligning Investment Portfolio Prepayment Assumptions with Benchmarks Brings EVE Sensitivity Measures into Compliance").

235. At the January 2021 ALCO meeting, ALCO members received notice that, as of December 31, 2020, the Holding Company and Bank were in compliance with the inner and outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -5.9% and -15.4%, respectively. TX 357 at 5, 12 (01/2021 ALCO Packet). At the January 2021 meeting, ALCO members learned that the reason that EVE-at-risk was no longer in breach was because the EVE-at-risk modeling assumptions had been changed. TX 357 at 103 (01/2021 ALCO Packet) ("One of the action items that was identified as part of last year's EVE limit breach was to conduct a comprehensive review of the Empyrean cash flow model and related assumptions driving valuation sensitivities for the investment portfolio . . . The EVE sensitivity results presented in the ALCO materials this month are reflective of these changes.").

236. At the February 2021 ALCO meeting, ALCO members received notice that EVE-at-risk had returned to breach status even under the new modeling assumptions and that, as of January 31, 2021, the Holding Company and Bank were in breach of the inner threshold for EVE-at-risk for +100 basis points and the outer threshold for EVE-at-risk for +200 basis points, with EVE-at-risk values of -9.9% and -21.7%, respectively. TX 359 at 9, 15 (02/2021 ALCO Packet); Tr. at 122:8–24 (Beck); see also TX 359 at 145, 148 (02/2021 ALCO Packet). At the February 2021 meeting, ALCO members were also advised that certain strategies could be implemented to bring EVE-at-risk back into compliance, including "[i]ncreas[ing] cash and/or loan balances by



United States District Court
Northern District of California

$5 billion, reduc[ing] investment portfolio balances by the same amount, "[r]educ[ing] overall investment portfolio duration by 25 bps," and "[e]nter[ing] into a pay fix swap (macro hedge) to reduce overall EVE duration." TX 359 at 148 (02/2021 ALCO Packet); Tr. at 126:11–128:14 (Beck).

237. There was no credible evidence presented at trial that Mr. Beck, Mr. Kruse, and the other ALCO members ever took any actions toward increasing cash or loan balances or reducing the portfolio duration for the purpose of managing interest-rate risk; while they did use interest-rate hedges to protect portions of the AFS portfolio, they removed those hedges in the first half of 2022. *See infra* FF ¶¶ 354–360. On the contrary, Mr. Beck agreed at trial that "in February of 2021, ALCO had numerous options available to it to bring the company into compliance with its EVE risk limits," but stated that this "deserved more context as well because there [were] questions about the accuracy of the calculation." Tr. at 128:15–20 (Beck); *see also* Tr. at 130:6–10 (Beck) ("The Asset Liability Committee had doubts about the accuracy of the model. There had been a material error identified in the end of 2020 that changed the profile quite significantly. And then within the next month, it shifted out of compliance again, so there were questions about that.").

238. At the March 2021 ALCO meeting, ALCO members received notice that, as of February 28, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -13.5% and -27.9%, respectively. TX 361 at 9, 15 (03/2021 ALCO Packet); Tr. at 131:23–132:3 (Beck). At the March 2021 meeting, ALCO members also learned that one of the primary factors for the breach was that "[o]ngoing balance sheet growth has driven an increase in investment portfolio holdings such as [mortgage-backed securities], [commercial mortgage-backed securities], and [collateralized mortgage obligations] with higher duration (market value sensitivity) compared to the loan portfolio." TX 361 at 93–94 (03/2021 ALCO Packet); Tr. at 132:25–134:15 (Beck). At the March 2021 meeting, ALCO members also received notice of two strategies to manage EVE-at-risk:

1) Investment portfolio management: This consists of managing the

> duration of the investment portfolio. Since the portfolio now represents nearly half of total assets, managing the duration lower even in smaller increments would reduce overall EVE sensitivity. Portfolio management actions may also include changing the mix of HTM [and] AFS securities, also with the intent of reducing overall investment portfolio duration.
> 2) Fair Value Hedging: As of the writing of this memo on 3/19/2021, we have already put on $7.5 billion in notional of fair value hedges as approved by ALCO in the 2/16/2021 meeting. . . . At this level of notional balances, the hedging program alone is not sufficient to mitigate the excess EVE risk exposure. However, when combined with the portfolio management actions described, the swaps will play a key part in reducing the exposure.

TX 361 at 94–95 (emphasis omitted) (03/2021 ALCO Packet).

239. Again, there is no credible evidence that Mr. Beck, Mr. Kruse, and the other ALCO members implemented any of the actions in the "investment portfolio management" strategy. In fact, they did the exact opposite, continuing to purchase securities with high duration and duration extension risk that they knew would exacerbate the EVE-at-risk breaches. Mr. Beck again agreed that he and the other ALCO members "could have" required that the portfolio be brought into compliance with EVE and that they "could have sold securities to bring it into compliance" but chose not to because "there was a question about the [accuracy of the] measurement." Tr. at 136:5–14 (Beck).

240. At the April 2021 ALCO meeting, ALCO members received notice that, as of March 31, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -10.9% and -22.7%, respectively. TX 363 at 8, 14 (04/2021 ALCO Packet); Tr. at 141:13–23 (Beck). The Court does not credit Mr. Beck's testimony that "there were questions of whether these metrics included the impact of our very large hedging program" for March 2021. Tr. at 141:24–142:1 (Beck). The March 2021 breach notification plainly acknowledged that the hedges placed as of March 19, 2021, would not be sufficient to remedy the breach, and the Trust provided no contemporaneous evidence demonstrating that any Officer or Director questioned whether the EVE-at-risk model accounted for the impact of the hedges.

241. At the May 2021 ALCO meeting, ALCO members received notice that, as of April 30, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-

at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -11.2% and -24.9%, respectively. TX 365 at 7, 14 (05/2021 ALCO Packet); Tr. at 145:11–15 (Beck). Again, the Court does not credit Mr. Beck's testimony that there were doubts regarding whether the impact of the hedges was factored into the EVE-at-risk numbers for May 2021, *see* Tr. at 147:10–12 (Beck), because, in a presentation entitled "Additional [Interest-Rate Risk] Detail," ALCO received data for "EVE Before Hedges," "Hedge Impact," and "EVE After Hedges." TX 365 at 113, 117 (05/2021 ALCO Packet).

242. At the June 2021 ALCO meeting, ALCO members received notice that, as of May 31, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -10.9% and -23.0%, respectively. TX 367 at 7, 13 (06/2021 ALCO Packet); Tr. at 148:21–25 (Beck). Despite these breaches, Mr. Beck, Mr. Kruse, and the other ALCO members planned to and in fact did "continue to add mortgage-backed securities throughout 2021" while they "investigated the [EVE-at-risk] model," with full knowledge "that the securities portfolio was exposed to greater and greater losses every month because the purchases continue[d]." Tr. at 146:17–147:2 (Beck). At this point, too, Mr. Beck agreed that "ALCO had the ability [to] cure the EVE breach by reducing the amount of risk in the securities portfolio" through mid-2021 but decided not to do so because there were doubts regarding the "accuracy of the calculation." Tr. at 150:15–25 (Beck).

243. At the July 2021 ALCO meeting, ALCO members received notice that, as of June 30, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -10.9% and -22.8%, respectively. TX 369 at 8, 14 (07/2021 ALCO Packet). Despite acknowledging that "[o]ngoing deposit growth deployed to investments is the primary driver of EVE sensitivity," TX 369 at 103, 112 (07/2021 ALCO Packet), the July 2021 ALCO Packet described various changes to assumptions regarding the duration of noninterest bearing deposits that could be implemented to generate compliant EVE sensitivity numbers. TX 369 at 123 (07/2021 ALCO Packet) ("If we assume [noninterest bearing] deposit duration is roughly one

United States District Court
Northern District of California

percent higher than current levels, EVE exposure (after hedging) would be in compliance"); TX 369 at 125 (07/2021 ALCO Packet) ("If portfolio duration were 50 bps lower, and duration were 60 bps higher, EVE exposure (after hedging) would be in compliance" (underlining in original)).

244. At the August 2021 ALCO meeting, ALCO members received notice that, as of July 31, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -13.1% and -25.6%, respectively. TX 375 at 8, 14 (08/2021 ALCO Packet). At the August 2021 meeting, ALCO members were notified that "EVE sensitivity increase[d] from last month because of $7.5B in new [mortgage-backed securities]" and "[t]he convexity of the [mortgage-backed securities] portfolio is now a major driver of EVE sensitivity." TX 375 at 97, 105 (08/2021 ALCO Packet).

245. At the December 2021 ALCO meeting, ALCO members received notice that, as of November 30, 2021, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -16.6% and -30.0%, respectively. TX 381 at 9, 15 (12/2021 ALCO Packet). At the December 2021 meeting, ALCO members were again notified that "[g]rowth and the increase in the duration of Investments drove the increase in negative EVE sensitivity" in the event of interest rates increasing and that "[o]ngoing deposit growth deployed to investments is the primary driver of EVE sensitivity." TX 381 at 94, 104–05 (12/2021 ALCO Packet). Changing the assumptions once again became a topic of discussion at the December 2021 meeting, where ALCO members were notified that "[noninterest bearing] deposit duration only picked up 43 bps due to the lower core balance assumption" and "[t]he resulting EVE sensitivity in +100 and +200 is still out of compliance with limits and/or thresholds using these assumptions." TX 381 at 158–59 (12/2021 ALCO Packet). ALCO members were notified that "[h]igher core balance assumptions would result in . . . [l]ower EVE sensitivity" but that "Curinos recommended applying a lower core balance allocation based on 'surge balances' that came in during 2020," asking as an "Item[] for

Additional Discussion[:] Does a higher core balance assumption make sense?" TX 381 at 162, 166–67 (12/2021 ALCO Packet).

246. At the January 2022 ALCO meeting, ALCO members received notice that the Holding Company and Bank had been in sustained outer-threshold breaches of the +100 metric from August 2021 to December 2021 and sustained outer-threshold breaches of the +200 metric from July 2021 to December 2021. From July 2021 to December 2021, EVE-at-risk for +100 basis points was -8.7%, -13.1%, -15.2%, -16.8%, -16.6%, and -13.9%, and EVE-at-risk for +200 basis points was -25.8%, -26.6%, -30.9%, -30.2%, -30.0%, and -27.7%. TX 383 at 16 (01/2022 ALCO Packet); Tr. at 153:3–25 (Beck). At the January 2022 meeting, ALCO members were once again notified that the EVE-at-risk breaches were driven by "an increase in investment portfolio holdings particularly in Agency [mortgage-backed securities], which carries with it a higher duration and negative convexity compared to the loan portfolio." TX 383 at 19 (01/2022 ALCO Packet); Tr. at 156:2–13 (Beck). The face of the ALCO Packet plainly stated, however, that management did not expect to resolve the outer threshold breaches of the EVE-at-risk metric until "the end of 2022." TX 383 at 16 (01/2022 ALCO Packet).

247. The Holding Company and Bank continued to be in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 points in February 2022 and March 2022. In February 2022, the EVE-at-risk values were -16.9% and -31.4%, respectively; in March 2022, the EVE-at-risk values were -16.4% and -30.4%, respectively. TX 393 at 30 (05/2022 ALCO Packet).

248. At the May 2022 ALCO meeting, ALCO members received notice that, as of April 30, 2022, the Holding Company and Bank were in compliance with the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -6.3% and -11.2%, respectively. TX 393 at 30 (05/2022 ALCO Packet). At the May 2022 meeting, ALCO members learned that the only reason why EVE-at-risk was temporarily compliant was the change in deposit assumptions, not any underlying change in the investment portfolio. TX 393 at 13 (05/2022 ALCO Packet) ("As expected, the revised deposit assumptions fundamentally change the EVE profile[] but have little impact on NII @ risk."); *see also* TX 393



United States District Court
Northern District of California

at 74, 81 (05/2022 ALCO Packet) ("EVE sensitivity is in compliance with the new, longer duration, deposit model."). ALCO members were further advised that the assumptions were based on "the high end of the Curinos recommendations." TX 393 at 10, 12 (05/2022 ALCO Packet); *see also infra* FF ¶¶ 522–539.

249. In May 2022, the Holding Company and Bank were in compliance with the inner and outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -5.6% and -10.0%, respectively. TX 397 at 41 (07/2022 ALCO Packet).

250. While implementation of the new EVE-at-risk model resulted in compliant EVE-at-risk metrics for May 2022, EVE-at-risk soon fell back out of compliance even under the changed model. At the July 2022 ALCO meeting, ALCO members received notice that, as of June 30, 2022, the Holding Company and Bank were in breach of the outer thresholds for EVE-at-risk for +100 basis points and EVE-at-risk for +200 basis points, with EVE-at-risk values of -11.6% and -20.8%, respectively. TX 397 at 122, 126 (07/2022 ALCO Packet); Tr. at 163:20–164:10 (Beck); *see also* TX 397 at 113, 120 (07/2022 ALCO Packet) (stating that "EVE sensitivity increased significantly and is out of compliance in the up scenarios" and that "[r]ising rates reduced the value and increased the duration of investments as underlying prepayment vectors changed"). Again, ALCO members were notified that "[noninterest bearing] deposits and [mortgage-backed securities] investments are the primary drivers of EVE sensitivity." TX 397 at 121 (07/2022 ALCO Packet).

251. EVE-at-risk remained in sustained breach of the outer threshold limits until the Bank's failure in March 2023. Tr. at 165:3–5 (Beck).

252. The Court finds that the common thread in each of these ALCO meetings is that Mr. Beck, Mr. Kruse, and the other ALCO members knew that the purchases of long-term, fixed-rate securities were driving the EVE-at-risk breaches but nonetheless continued to approve these purchases based on unspecified doubts regarding the accuracy of the EVE-at-risk model. *See* Tr. at 134:11–15 (Beck) (agreeing that "continuing to approve more purchases of mortgage-backed

securities" drove the breach of the EVE-at-risk metric but stating that "the accuracy of that calculation was in question").

253. Indeed, there is no dispute that Mr. Beck, Mr. Kruse, and the other ALCO members could have brought EVE-at-risk into compliance at any point during 2021 by not continuing to purchase long-term, fixed-rate securities but simply chose not to cure the EVE-at-risk breach based on nebulous, unsubstantiated "doubts" regarding the measure's accuracy:

> Q. So you could have, but did not require EVE compliance in 2021, right?
> A. We did not. The Asset Liability Committee did not, again, because of questions of the modeling assumptions.
> Q. At no time did anyone on the ALCO or the Finance Committee say to you that the EVE risk measure should be brought into compliance?
> A. Not that I recall.

Tr. at 157:11–20 (Beck).

254. The Court does not credit Mr. Beck's testimony that he and other ALCO members reasonably doubted the accuracy of the EVE-at-risk model. *See, e.g.*, Tr. at 135:17–18 (Beck) (defending ALCO's inaction because "part of the mitigation plan is to also make sure that the measure is correct."). On the contrary, the Court infers based on his repeated invocation of these putative doubts at trial—without offering any credible evidence of actual inaccuracies in the model's assumptions—that he and other ALCO members intentionally characterized the model as inaccurate simply because the EVE-at-risk model produced information that was inconsistent with their investment plan. The Court further finds that these doubts were unfounded, without any factual support or contemporaneous documentation by any Officers or Directors and were used as a pretext to disregard the enormous risk posed by the foreseeable risk of rising interest rates.

255. Indeed, the Court's colloquy with Mr. Beck at trial confirmed that the only changes that were being implemented to the EVE-at-risk model were changes in assumptions, not changes addressing problems in the underlying calculations:

> The Court . . . Mr. Beck, was the problem like a bug in the calculation or a change in the assumptions?
> The Witness. There was a change in the assumptions.
> The Court. So it wasn't that the prior model was flawed; you were changing the criteria?
> The Witness. There were assumption changes throughout this period, and there was a material assumption change that was being evaluated



United States District Court
Northern District of California

by our independent risk management before implementation.

Tr. at 155:3–12 (Beck).

256. The Court further discounts Mr. Beck's testimony that he and other ALCO members had reasonable concerns regarding the accuracy of the EVE-at-risk model because he certified and swore in SEC filings that the numbers contained therein—including the EVE model calculation—were accurate and reliable to the best of his knowledge in his capacity as Chief Financial Officer of the Holding Company. TX 553 at 109 (2021 Q1 Form 10-Q); Tr. at 159:2–25 (Beck). The Trust's theory at trial would accordingly require that the Court find simultaneously that (1) Mr. Beck did not mislead investors in certifying the EVE-at-risk numbers and (2) ALCO reasonably doubted the accuracy of the EVE-at-risk numbers. To the extent that Mr. Beck ultimately testified that he and other ALCO members understood the model to be unreliable at the end of 2021, *see* Tr. at 154:1–155:1 (Beck), that testimony is not credible and is entitled to no weight.

257. The Court is left to conclude that, if Mr. Beck believed that the EVE-at-risk model was sufficiently reliable to present to the investing public, notwithstanding his putative concerns with the underlying modeling assumptions, he could not reasonably have disregarded the EVE-at-risk breaches solely based on those concerns. Indeed, at trial Mr. Beck justified his certification of the EVE-at-risk output for each quarter in the SEC filings, characterizing EVE-at-risk as "the best information we had." Tr. at 160:1–21 (Beck).

258. The Court accordingly finds that Mr. Beck and the other ALCO members did not set forth serious, specific remediation efforts to bring EVE-at-risk into compliance. Rather, ALCO justified ignoring the breaches by denigrating the EVE-at-risk model and presuming without justification that the numbers were inaccurate. The Court accordingly does not credit Mr. Beck's testimony that "[t]he asset liability committee had doubts about the accuracy of the EVE, while at the same time taking actions to begin remediation." Tr. at 135:11–13 (Beck).

259. The Court also does not credit the Trust's suggestion at trial that the Directors and Officers made an *a priori* business decision to deemphasize EVE-at-risk relative to NII-at-risk based on "the assumption-dependent nature of [EVE-at-risk] over a long time horizon." Trust



United States District Court
Northern District of California

United States District Court
Northern District of California

FFCL ¶ 73. The Trust did not introduce any credible evidence that either the Officers or Directors had any reason to doubt the accuracy of the EVE-at-risk model other than the fact it was showing that ALCO's investment strategy was creating an unacceptable amount of interest-rate risk.

**4. Mr. Beck, Mr. Kruse, and the other ALCO members violated the Global Treasury Policy by failing to develop and implement a risk mitigation plan to bring EVE-at-risk back into compliance and failing to actually achieve compliance.**

260. As set forth above, EVE-at-risk remained in near-continuous breach of outer limits throughout 2021 and 2022. FF ¶¶ 224–259. The Global Treasury Department was accordingly required to (1) communicate a risk mitigation plan to the Chief Financial Officer, Chief Risk Officer, Global Treasurer, Financial Risk Management, and Enterprise Risk Management; (2) communicate the risk mitigation plan to the Finance Committee, ALCO, and Enterprise Risk Management; and (3) partner with Financial Risk Management to develop a risk mitigation plan analyzing the impact on prospective earnings, capital, and liquidity and submit it at the next Finance Committee and ALCO meetings for approval. FF ¶¶ 147–148; *see also* TX 465 at 29–30 (Global Treasury Policy).

261. Throughout the trial, the Trust repeatedly argued that Mr. Beck, Mr. Kruse, other ALCO members, and the Global Treasury Department had complied with the Global Treasury Policy by presenting a compliant risk mitigation plan addressing the EVE-at-risk breaches. In so arguing, the Trust identified disparate portions of a variety of the Officers' materials that, according to the Trust, constituted a compliant risk mitigation plan under the Global Treasury Policy. *See infra* FF ¶¶ 540–568. The Court rejects this argument because a reasonably prudent banker would understand that to be capable of being evaluated, a risk mitigation plan needs to identify specific actions management should take, quantify those actions, and calculate how those actions would return the institution to compliance:

> Q. Does a mitigation plan have to be a concrete plan with specifics?
> A. Absolutely. . . . It needs to say, you know, "I'm going to do, you know, $10 of this. $5 of that. Stop doing this." It needs to be very specific; otherwise, you know, folks cannot be held accountable for implementing the plan.

> Q. So does a mitigation plan have to spell out math of how you are going to get within a limit?
> A. Yes, absolutely. "Here's the breach. Here's how much it's in breach. Here's the impact of this particular action, that particular action." You know, "calculate we are in compliance," . . . it needs to be specific. And it needs to be, you know, time-bound, if you were. It can't just be open-ended.

Tr. at 500:11–25 (Warman); see also Tr. at 546:21–547:5, 2264:4–2265:11 (Warman).

262. There were a few presentations at the monthly ALCO meetings that addressed the sustained EVE-at-risk breaches, none of which come close to what an ordinarily prudent banker would consider a risk mitigation plan. At the July 2021 ALCO Meeting, ALCO members received a presentation entitled "EVE Sensitivity Mitigation Roadmap," which included the following slide:




TX 369 at 119 (07/2021 ALCO Packet).

263. From then on, the Global Treasury Department and the ALCO members routinely extended the timeline to actually bring EVE-at-risk into compliance. At the August 2021 ALCO Meeting, ALCO members received a presentation entitled "Update: EVE Sensitivity Mitigation Roadmap," which included a slide that was substantially similar to the one presented the prior month but had pushed back the deadlines:



United States District Court
Northern District of California




TX 375 at 151–52 (08/2021 ALCO Packet).

264. This trend of delaying remediation continued through 2022. At the time of the January 2022 ALCO meeting, Mr. Beck, Mr. Kruse, and the other ALCO members did not in fact intend to remediate the EVE-at-risk breaches until the end of 2022. *See* FF ¶ 246. The January 2022 breach notification stated that "[s]ince balance sheet growth is expected to continue in 2022, the EVE sensitivity trend will likely continue as investment portfolio balances increase," identifying an expected date of remediation of December 31, 2022. TX 383 at 20 (01/2022 ALCO Packet); *see also* Tr. at 156:14–17 (Beck).

265. Indeed, apart from the purchase of the interest-rate swaps (which were subsequently unwound), the Trust was unable to identify any credible evidence that Mr. Beck, Mr. Kruse, and the other ALCO members took any actions to remediate EVE-at-risk other than changing the modeling assumptions. This is reflected in the January 2022 breach notification, which contained a "revised action plan for mitigating EVE sensitivity . . . in a phased approach": (1) "Review the non-maturity deposit behavior assumptions (timeline 03/21/2022)"; (2) "additional macro hedging activity as needed (03/21/2022)"; (3) "Re-assessment of EVE exposure limits (timeline 06/30/2022)"; (4) "Develop in-depth deposit behavioral models (timeline 12/31/2022)." TX 383 at 20 (01/2022 ALCO Packet).



United States District Court
Northern District of California

United States District Court
Northern District of California

266. As both Officers and Directors admitted at trial, the Global Treasury Department did not submit to ALCO and the Finance Committee a concrete, written mitigation plan that complied with the Global Treasury Policy for the sustained EVE-at-risk outer-threshold breaches at any time in 2021 and 2022. Tr. at 138:3–17 (Beck); Tr. at 1263:14–1264:9, 1268:23–1269:1 (Benhamou) ("Q. And you never got a written analysis supporting[] [or] justifying staying in sustained breach of EVE on the basis that 'we need it for our capital,' right? A. Written analysis, no.").

267. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members violated the Global Treasury Policy by continually breaching EVE-at-risk without submitting a risk mitigation plan. These continued Global Treasury Policy violations represented an extreme departure from the standard of care of an ordinarily prudent banker, which requires compliance with internal risk metrics and procedures. *See* FF ¶ 189.

268. In finding that the failure to comply with the Global Treasury Policy was imprudent, the Court also rejects the Trust's representation at trial that the Finance Committee "made a reasoned decision not to compel management to immediately resolve the EVE-at-Risk breach at the expense of other metrics that the Board deemed more important." Trust FFCL ¶ 149. The Trust did not present any credible evidence that the Officers or Directors even discussed whether EVE-at-risk breaches were necessary to comply with other metrics. *See infra* FF ¶¶ 504–511. The Court finds that the Finance Committee's inaction and failure to enforce its own policies is not the same thing as a reasoned decision to modify them.

**5. Mr. Beck, Mr. Kruse and the other ALCO members used the investment portfolio to generate short-term earnings without regard to the impact on EVE-at-risk.**

269. Fundamentally, the Bank's investment portfolio strategy was not a risk-managed allocation of excess deposits but an exercise in generating yield and boosting net interest income in violation of prudent banking standards.

270. The Trust has presented a variety of justifications for Mr. Beck, Mr. Kruse, and the other ALCO members' decision to concentrate the investment portfolio in long-term, fixed-rate

securities during a time of historically low interest rates, none of which is credible or supported by the evidence presented at trial. *See infra* FF ¶¶ 476–568. The evidence and testimony presented at trial instead reflects that Mr. Beck, Mr. Kruse, and the other ALCO members based their investment decisions on maximizing short-term earnings, to the exclusion of long-term risk considerations.

271. The Court accords significant weight to the testimony of Mr. Haider, who joined the Holding Company and Bank largely after the investment portfolio had been constructed and was hired based on his experience at Large Financial Institutions. Tr. at 246:12–18 (Beck) ("Q. You are talking about people like Mr. Haider and Mr. Gardi, right? A. Yes. Q. And you viewed those people as having greater capabilities and experience, right? A. They had larger bank – large financial institution experience, yes.").

272. Based on Mr. Haider's testimony, the Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members managed the Bank's investment portfolio primarily to increase earnings, without regard to the significant interest-rate risk they were creating. The Court credits Mr. Haider's observation as Deputy Treasurer in late 2021 that there was no linkage between asset liability management reports on EVE-at-risk breaches and limits and the investment portfolio decisions being made, in which he stated that Asset Liability Management "does not have any weight or substance." TX 1204 at 2 (Teams message from Mr. Haider dated December 15, 2021). The Court further credits Mr. Haider's characterization of Asset Liability Management's deficiencies, specifically his observation that "[t]he return was a greater priority than the risk." TX 3006 at 90:16–91:12, 106:22–107:04, 232:3–233:4 (Haider Tr.).

273. The Court also accords significant weight to Mr. Busch, who received regular directives from ALCO regarding the day-to-day management of the investment portfolio. TX 3002 at 40:13–25 (Busch Tr.) ("[O]ur process was essentially . . . [identifying] excess deposits, you know, or . . . cash above and beyond what . . . were asked to keep at the Federal Reserve. So that was . . . the first step. Then the next step was to make investment purchases in line with the policy and directives from the Asset and Liability Committee. And . . . once those two steps were completed, then the . . . individual securities were transacted by my team.").



United States District Court
Northern District of California

274. Based on Mr. Busch's testimony, the Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members knew of the interest-rate risk they were taking in the investment portfolio and nonetheless continued to exacerbate this risk to increase earnings, which was also directly tied to their personal compensation. The Court credits Mr. Busch's testimony that he was directed to invest in higher-risk assets such as those with "increas[ed] duration or negative convexity risk" because those "improve[d] purchase yield on the investment securities," and that Mr. Beck was "focused on NII and not EVE sensitivity." TX 3002 at 86:22–87:22, 220:18–221:8 (Busch Tr.).

275. The Court also finds that the primary purpose of this selection of investment securities was to increase the portfolio's yield. The Court credits Mr. Busch's testimony that he "fe[lt] pressure from Beck and others to find additional yield for the securities portfolio." TX 3002 at 222:5–11 (Busch Tr.). That testimony reflects the implicit directive from management that earnings, not risk management, was the driving force behind ALCO's decisionmaking process.

276. The Court finds that Mr. Busch's characterization of "pressure . . . to find yield" has corroboration in the evidence presented at trial. For example, a Bank employee characterized Mr. Busch's "marching orders" as "yield and more yield (at the bottom of the cycle)." TX 1377 at 2 (Teams message to Mr. Busch dated Mar. 9, 2023).

277. As another example, on June 7, 2021, Mr. Beck asked Mr. Busch whether he would "be making some securities purchases in the next week or so," explaining that he was "trying to accelerate a bit to add some more interest-earning assets for the month" because they were "a bit behind on [net interest income]." TX 1150 at 1 (Teams message from Mr. Beck dated June 7, 2021).

278. As another example, when discussing purchase yield of the investment portfolio that had been shared with investors, Mr. Beck stated that he was "telling the team to hold on doing more [lower yielding] treasuries for now" because he "may want to accelerate some longer duration purchases in HTM to give a bit of juice to the [net interest income]." TX 1147 at 2 (Teams message from Mr. Beck dated May 27, 2021); Tr. at 182:6–183:22 (Beck). Those lower-yield treasuries were in fact the exact type of security that Mr. Beck, Mr. Kruse, and other ALCO members would have purchased instead of mortgage-backed securities if they were seriously



United States District Court
Northern District of California

United States District Court
Northern District of California

concerned with reducing the duration and extension risk of the securities portfolio in the event of interest-rate increases.

279. The Court finds that Mr. Beck's directive to the very individual tasked with executing securities purchases on a daily basis—while the Holding Company and Bank were in breach of EVE-at-risk—that he nonetheless wanted to "accelerate" breach-exacerbating purchases "to give a bit of juice" to earnings reveals an extreme departure from the standard of care and is significantly more credible than his testimony at trial. Thus, to the extent Mr. Beck suggested at trial that his investment strategy as Chief Financial Officer was not focused on prioritizing short-term income, *see, e.g.*, Tr. at 181:13–16, 183:14–17 (Beck), the Court finds that testimony less credible than contemporaneous communications with Holding Company and Bank employees.

280. The Court also accords significant weight to the internal communications between Jignesh Gardi and Mr. Haider, who both joined the Holding Company and Bank largely after the investment portfolio had been constructed and were hired based on their experience at Large Financial Institutions. FF ¶ 271. Mr. Gardi was the Head of Asset & Liability Management within the Global Treasury Department. *See, e.g.*, TX 994 at 9 (email from Mr. Gardi dated June 7, 2022). These frank, spontaneous remarks are more probative of the Officers' motivations than the Officers' coached, defensive testimony at trial. And, in the middle of one conversation, Mr. Gardi noted that the opinions he was sharing were "not [be]cause I am jaded, just what I have seen." TX 1327 at 5 (text message from Mr. Gardi dated Nov. 19, 2022).

281. Based on these communications, the Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members' mismanagement of the investment securities portfolio was obvious to other bankers. In messages dated November 19, 2022, Mr. Gardi and Mr. Haider were highly critical of the investment portfolio they had inherited from Mr. Beck and Mr. Kruse. TX 1327 at 2 (text message from Mr. Gardi dated Nov. 19, 2022) ("Current state of affairs as [Mr. Beck] boards thst [sic] 20k flight to India [Common Equity Tier 1] $13b Total [marked-to-market] unrealized loss $20b[.]"). Mr. Gardi and Mr. Haider agreed that, together, Mr. Beck and Mr. Kruse "destroyed the balance sheet." TX 1327 at 5; *see also id.* at 3–4 ("We need to get through this and

Becky needs to be gone . . . . He should be gone now[.]"), 5 ("Single hands fly with full support from Kruse . . . . I mean how can your existence be a negative value add[.]").

282. These communications provide additional confirmation that Mr. Beck, Mr. Kruse, and the other ALCO members' driving concern of management was earnings, not risk management. For example, in Teams messages dated February 24, 2023, Mr. Gardi and Mr. Haider reiterated that they were "trying to bring sanity in [management's] thinking" and trying to "force the decision points" "[r]ather than masking it." TX 1361 at 2 (Teams messages from Mr. Haider dated Feb. 24, 2023); *see also* TX 1327 at 9 (text message from Mr. Gardi dated Nov. 19, 2022) ("The moment deposits return he will look for yield[.]"). Mr. Beck admitted as much at trial, stating that he wanted "the longer duration securities with more interest-rate risk in the held-to-maturity securities portfolio." Tr. at 181:6–16 (Beck).

283. These communications provide additional confirmation that Mr. Beck, Mr. Kruse, and the other ALCO members received and disregarded recommendations from employees "that growth in vehicles with shorter duration would help." TX 1361 at 4–5 (Teams message from Mr. Gardi dated Feb. 24, 2023); *see also id.* at 5 ("What was the treasurer and cfo doing at this point? Chasing 20bps in yield.").

284. The Court finds that the Directors' testimony at trial shows that they, too, viewed the investment portfolio as a way to generate yield (and therefore earnings), at the expense of risk management. For example, Mr. Friedman testified that "taking on reasonable additional yield is important, particularly in a low interest rate environment," and because of that low-rate environment "[t]here was little opportunity to earn interest income . . . [so] it became important to look for some degree of marginal income." Tr. at 1009:14–1010:13 (Friedman). Mr. Friedman further testified that, by investing in long-duration, fixed-income securities, "it increased EVE sensitivity, but as you can also see on the same page, net interest income at risk was in a very strong position. And we were generating more capital by putting the funds into hold-to-maturity by getting high yield." Tr. at 1045:4–22 (Friedman).

285. As another example, Mr. Benhamou testified that, despite the risk that an investment portfolio with longer duration securities created exposure to interest-rate risk if interest

United States District Court
Northern District of California

rates increased, the "more important, immediate risk [to confront] was to ensure that we had sufficient earnings." Tr. at 1237:4–15 (Benhamou).

286. As another example, Ms. Mitchell agreed that "the focus of the investment portfolio" was "the adequacy of earnings." Tr. at 2059:8–20 (Mitchell).

287. The Court recognizes and credits the Directors' view expressed at trial that the Holding Company had a responsibility to generate earnings. The problem was that they allowed Mr. Beck, Mr. Kruse, and the other ALCO members to utterly disregard their concomitant responsibility to prudently manage interest-rate risk within the established risk-tolerance limits contained in their own Global Treasury Policy.

288. The Court also finds that the Directors' testimony at trial shows that they were aware of the resulting EVE-at-risk sensitivities and permitted management to keep investing anyway. For example, when asked whether the Finance Committee "agree[d] with the investment in longer duration assets, including Agency [mortgage-backed securities], despite EVE sensitivities," Mr. Benhamou answered, "Yes, we did." Tr. at 1237:4–7 (Benhamou).

289. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members concentrated long-term, fixed-rate securities in the investment portfolio to realize short-term earnings, without regard to the long-term safety and soundness of the Bank. The Court finds that this conduct represented an extreme departure from the standard of care of an ordinarily prudent banker, which requires consideration of both short-term and long-term effects of investment decisions. See FF ¶ 186.

**6. Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care by concentrating the investment portfolio in long-term, fixed-rate securities.**

290. The Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members were repeatedly advised that their purchases of long-term, fixed-rate securities were causing and exacerbating EVE-at-risk above the Global Treasury Policy's outer threshold. They knew from their own "breach notifications [that] the explanations for the breach [were] really their own behavior" because they were "buying long-term securities, which certainly doesn't remediate the

breach, and . . . . the purchases of these securities [were] contributing to the breach." Tr. at 542:21–543:12 (Warman); *see also* FF ¶ 228. Moreover, they were advised at monthly meetings that continued purchases of long-term, fixed-rate securities were exacerbating the breaches. TX 351 at 115 (10/2020 ALCO Packet); TX 361 at 94 (03/2021 ALCO Packet); TX 383 at 19 (01/2022 ALCO Packet).

291. The Court finds that Mr. Beck, Mr. Kruse and the other ALCO members nonetheless continued to approve additional purchases of long-term, fixed-rate securities with knowledge that the EVE-at-risk exposure would result in catastrophic losses in the foreseeable event that rates rose above historically low levels. *See* FF ¶¶ 229, 242, 252. They used unfounded concerns regarding the assumptions in the EVE-at-risk model to downplay the significance of the sustained EVE-at-risk breaches; even when Mr. Beck, Mr. Kruse, and the other ALCO members implemented new assumptions to momentarily bring EVE-at-risk into compliance, they quickly breached it again by continuing to purchase long-term, fixed-rate securities. *See infra* FF ¶¶ 504–510. Prudent bankers do not simply ignore risk metrics because they have concerns regarding assumptions underlying their calculation. Tr. at 605:3–606:25 (Warman).

292. The Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members caused the Bank to take excessive interest-rate risk to boost short-term earnings. At trial, FDIC presented strong evidence that the reason why Mr. Beck, Mr. Kruse, and the other ALCO members continued to purchase long-term, fixed-rate securities in the face of continuous EVE-at-risk breaches was because they wanted to maximize short-term earnings, which would boost the Holding Company's stock performance and benefit them personally. This is the only explanation for Mr. Beck, Mr. Kruse, and the other ALCO members' actions with any contemporaneous factual support in the record. While the Trust offered a variety of explanations by way of witness testimony, that testimony was not credible and had no factual basis.

293. At trial, the Trust contended that concentrating its investment portfolio in mortgage-backed securities during 2020 and 2021 was reasonable because those securities provide predictable cash flows. As an initial matter, the premise of this argument is flawed because seeking regular payments is not a justification for breaching board-approved risk limits or taking

United States District Court
Northern District of California

excessive interest-rate risk. TX 461 at 11 (Global Treasury Policy). As Mr. Kruse conceded at trial, cash flows substantially extended when rates rose because there were fewer mortgage repayments or prepayments when borrowers were holding mortgages with below-market rates. Tr. at 1888:16–1889:17 (Kruse).

294. In rejecting the Trust's argument that concentrating mortgage-backed securities in the investment portfolio was reasonable based on predictable cash flows, the Court also credits Mr. Warman's testimony that predictable cash flows are not a legitimate reason to take on an unacceptable degree of long-term interest-rate risk in a historically low rate environment. Tr. at 2289:16–2290:11 (Warman) ("Q. So if you are looking for predictable cash flows, does it make sense to primarily concentrate in long-term fixed-rate mortgage-backed securities? A. No. The cash flows change and can change quite a bit. They get much smaller when interest rates rise, and they get much larger when interest rates decline. So, I mean, that's highly variable, I would say.").

295. At trial, the Trust also contended that the breaches were the product of a business determination to prioritize maintaining regulatory capital ratios over EVE-at-risk compliance. *See, e.g.*, Trust FFCL ¶¶ 112–113. As set forth *infra* FF ¶¶ 478–491, there is no factual support for this argument. At no point did the Directors approve a policy tradeoff between EVE-at-risk and other financial metrics, nor was there any contemporaneous evidence that any Officer or Director actually determined that such a tradeoff was needed.

296. The Court accordingly finds that, by continuing to approve the purchase of long-term, fixed-rate securities while in breach of the EVE-at-risk thresholds, Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care of an ordinarily prudent banker because they knew that they were exacerbating the Bank's exposure to losses in the foreseeable event of interest rate increases.

297. The Court also finds that, by continuing to approve the purchase of long-term, fixed-rate securities while in breach of the EVE-at-risk thresholds, Mr. Beck, Mr. Kruse, and the other ALCO members improperly subordinated the interests of the Bank to the interests of the

Holding Company in being able to show additional short-term income as well as the individual officers' own interest in personal compensation.

**E. Holding Company Officers Caused the Bank to Take Excessive Interest-Rate Risk and Liquidity Risk by Over-Designating the Bank's Securities Portfolio as Held-to-Maturity**

298. FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members breached prudent banking standards and their fiduciary duties of care and loyalty that they owed to the Bank by excessively designating their imprudently constructed investment portfolio as HTM, exacerbating interest-rate risk by limiting the Bank's ability to hedge against the foreseeable event of interest rates rising and creating excessive liquidity risk by limiting the Bank's ability to dispose of long-term securities purchased with uninsured, newly arrived deposits.

299. Liquidity risk is fundamental to banking. FF ¶ 44. But at the time that Mr. Beck, Mr. Kruse, and the other ALCO members caused the Bank to purchase tens of billions of dollars of long-term, fixed-rate securities and designated those securities as HTM, they knew that the Holding Company and Bank lacked a reliable liquidity framework for determining how much liquidity for depositors was needed in a time of stress. Tr. at 587:4–20, 2304:21–2306:7 (Warman).

300. Despite their recognition that the Holding Company and Bank lacked a reliable liquidity framework, Mr. Beck, Mr. Kruse, and the other ALCO members compounded the investment portfolio's interest-rate risk and liquidity risk by designating roughly 80% of the securities as HTM by the end of 2021. Tr. at 465:20–466:14, 567:13–24 (Warman); Tr. at 1962:18–20 (Kruse); TX 381 at 77 (12/2021 ALCO Packet).

301. As set forth below, Mr. Beck, Mr. Kruse, and the other ALCO members knew that designating the majority of the investment portfolio as HTM caused the Bank to assume enormous interest-rate risk and liquidity risk at the time the decisions were made. Tr. at 563:23–565:1, 566:10–23, 590:10–593:2 (Warman); Tr. at 1331:3–13, 1426:19–25 (Malek); Tr. at 1894:23–1895:10 (Kruse).

**1. Mr. Beck, Mr. Kruse, and the other ALCO members designated most of the investment portfolio as HTM.**

302. In 2021, Mr. Beck, Mr. Kruse, and ALCO directed that the vast majority of new securities purchases be classified as HTM and that existing AFS securities be redesignated as HTM. TX 357 at 83 (01/2021 ALCO Packet); TX 359 at 127 (02/2021 ALCO Packet); TX 361 at 78 (03/2021 ALCO Packet); TX 363 at 84, 86 (04/2021 ALCO Packet); TX 365 at 84, 86 (05/2021 ALCO Packet); TX 367 at 65 (06/2021 ALCO Packet) (noting that "robust purchasing activity was allocated to HTM portfolio"); TX 369 at 84, 86 (07/2021 ALCO Packet); TX 373 at 82 (07/2021 ALCO Minutes); TX 375 at 80 (08/2021 ALCO Packet); TX 381 at 74, 77 (12/2021 ALCO Packet). The result is that the investment portfolio went from being roughly two-thirds AFS-designated at the end of 2020 to nearly 80% HTM-designated at the end of 2021. *Compare* TX 544 at 130, 176 (2020 Form 10-K), *with* TX 584 at 66 (2021 Form 10-K).

303. As with the decision to concentrate the investment portfolio in long-term, fixed rate securities, Mr. Beck, Mr. Kruse, and the other ALCO members' decision to concentrate the portfolio in HTM also made the Holding Company and Bank an extreme outlier compared to other institutions. Tr. at 566:10–20 (Warman) ("Q. And how does [having near 45% of total assets in HTM securities] compare to their peers? A. Multiples higher."). Mr. Haider also testified that the Bank was a "complete outlier" among Category III and Category IV institutions measured by HTM securities as a percentage of tangible assets. TX 3006 at 43:2–43:12, 54:24–56:2, 63:25–64:8 (Haider Tr.); *see also* TX 844 at 1 (email from Mr. Haider dated Jan. 8, 2022) ("I don't think the spot metric . . . will let us really lower our HTM allocation, which is a complete outlier as a category III (or IV) institution."); TX 1244 at 1 (Teams message from Mr. Haider dated Apr. 1, 2022) ("We are such an HTM outlier[.]").

304. There are well-known interest-rate risks and liquidity risks associated with designating a security as HTM. For example, HTM securities cannot be hedged against interest-rate fluctuations and cannot be sold for liquidity purposes without fully marking to market the entire HTM portfolio to current fair market value if any HTM-designated asset is sold. In contrast, AFS securities can be hedged against interest-rate fluctuations and can be readily sold for liquidity



United States District Court
Northern District of California

purposes. FF ¶¶ 38–40; *see also* Tr. at 65:17–24, 68:19–69:1 (Beck); Tr. at 520:21–521:10 (Warman).

305. As Mr. Beck conceded at trial, despite these well-known risks, he did not know that HTM-designated securities could not be hedged until April 2021, months after beginning to designate a substantial portion of the long-term securities portfolio as HTM. Tr. at 180:1–19 (Beck). Mr. Beck learned that HTM-designated securities could not be hedged when he asked Mr. Kruse and Mr. Busch whether "we able to hedge any of the fixed rate securities in HTM? Wondering [whether] that opens up the capacity we have to do more." TX 752 at 3 (email from Mr. Beck dated Apr. 17, 2021); Tr. at 179:24–180:4 (Beck). Mr. Kruse responded, "Since the [fair value] changes of HTM securities are not reflected in [Other Comprehensive Income], I don't think we can get hedge accounting. Even if we do, the changes in the value of the swaps would be reflected in [Other Comprehensive Income] but changes in HTM aren't so the result would be more [Other Comprehensive Income] sensitivity." TX 752 at 3 (email from Mr. Kruse dated Apr. 18, 2021).

306. In designating the majority of the Bank's investment securities as HTM, Mr. Beck, Mr. Kruse, and the other ALCO members were all acting as Holding Company Officers within the scope of their authority.

**2. Mr. Beck, Mr. Kruse, and the other ALCO members were on notice that the Holding Company and Bank had "foundational shortcomings" in their liquidity framework while designating the majority of the Bank's long-term, fixed-rate securities as HTM.**

307. As the Holding Company transitioned to Large Financial Institution status, it was required to develop an enhanced internal-liquidity-stress test and other liquidity metrics. TX 322 at 70 (04/2022 Joint Finance and Risk Committee Packet). By July 2021, Mr. Beck, Mr. Kruse, and the other ALCO members were advised that the Bank's liquidity buffer was insufficient and needed to be increased by approximately $31 billion, as well as that its AFS portfolio was insufficient to cover stress outflows. TX 369 at 167 (07/2021 ALCO Packet); *see also* Tr. at 1952:7–16 (Kruse) ("Q. And so you were told in the summer of 2021, you need a lot more

reliable ways to access liquidity, right? A. The stress test analysis that was being performed was showing there needed to be a larger amount of liquidity available than what was available under the current way that we were looking at liquidity stress tests.”).

308. These deficiencies were confirmed in a supervisory letter dated November 2, 2021, to Mr. Becker, in which the Federal Reserve “identified foundational shortcomings in three key areas: (1) internal liquidity stress testing[,] (2) the liquidity limits framework, and (3) the contingency funding plan.” TX 1431 at 1; *see also* Tr. at 585:1–586:24 (Warman). The Federal Reserve also issued two Matters Requiring Immediate Attention, finding that “[m]anagement needs to enhance the Liquidity Risk Management project plan,” and “[the Holding Company] lacks effective independent review oversight and challenge of its liquidity risk management framework.” TX 1431 at 2–3.

309. At trial, the Trust attempted to downplay these deficiencies by asserting that they were the result of the Holding Company being examined under enhanced standards applicable to Large Financial Institutions for the first time. *See, e.g.*, Tr. at 765:12–14 (Becker) (“My recollection is this was actually being viewed as these were [Large Financial Institution] reviews, not regional bank reviews.”). In fact, these deficiencies were evaluated under supervisory guidance applicable to institutions with assets exceeding $10 billion, not the enhanced standards applicable to Large Financial Institutions. TX 1431 at 1 n.1 (11/2021 Supervisory Letter); Tr. at 1191:3–10 (Benhamou).

310. These deficiencies were in fact very serious, since the internal liquidity stress test is the mechanism through which the Holding Company modeled the amount and timing of deposit outflows and other funding needs during stress to ensure that there was a sufficient liquidity buffer. Tr. at 584:22–586:24, 2305:10–2306:4.

311. The Court accordingly finds that, by purchasing $100 billion in long-term, fixed-rate securities and designating 80% of those securities as HTM without being able to reliably determine how much liquidity would be needed in a stress situation, Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care of an ordinarily prudent banker:

> Q. . . . When those held-to-maturity designations were being made,



United States District Court
Northern District of California

> did the Officers have a reliable way to test their liquidity in a time of stress?
> A. I don't believe so, no.
> Q. From your perspective, is that a problem?
> A. That's a big problem.
> Q. Why is that?
> A. Well, first of all, the liquidity risk, much like interest-rate risk, is just inherent in the business of banking, and one needs to be able to measure that risk so that one can manage that risk. And here, you know, what we are talking about is the fact that this organization did not measure the amount of liquidity risk it was taking. That's step 1. Can't manage it; can't measure it.

Tr. at 2305:15–2306:4 (Warman).

312. These deficiencies persisted into mid-to-late 2022, with the Holding Company improperly including bilateral repurchase-agreement ("repo") capacity in calculating its internal liquidity stress test. As Mr. Warman explained, bilateral repo is not a reliable source of liquidity during a bank-specific stress scenario because "if [other financial institutions are] aware that Silicon Valley [Bank] is having troubles, they are not going to do this transaction with Silicon Valley [Bank]. We all learned that in the Great Financial Crisis." Tr. at 2306:9–2309:18 (Warman). The Court accordingly rejects the Trust's suggestion that the Holding Company and Bank had a reliable source of liquidity from the HTM portfolio in a time of stress based on bilateral repo.

313. The Court also credits Mr. Warman's testimony that, faced with the Bank's balance sheet in 2021, an ordinarily prudent banker would have ensured that there was a reliable way to monetize the HTM portfolio. Tr. at 2309:11–18 (Warman). Mr. Beck, Mr. Kruse, and the other ALCO members' failure to do so constitutes a further deviation from the standard of care of an ordinarily prudent banker.

314. To the extent that the Trust suggested at trial that Mr. Beck, Mr. Kruse, and the other ALCO members acted reasonably based on the historically sticky nature of deposits at the Bank, the Court disagrees. In internal communications, Mr. Beck recognized the risk that deposits, being uninsured, could leave as quickly as they came in and that a short-term investment plan was needed to account for that liquidity risk. For example, in June 2020, Mr. Beck advised ALCO that there was "much uncertainty concerning the stability" of deposits. TX 344 at 2 (06/2020 ALCO Minutes).

315. In another example, in an email dated March 30, 2021, to Mr. Kruse and copied to Mr. Jones and Mr. Busch, Mr. Beck advised the Global Treasury Department as follows:

> I think we should be devising a series of metrics with much more granularity by each of our business and deposit types that help us understand the potential longevity or stickiness of the fund flows that we are seeing.
> . . . .
> I don't think we have the right risk metrics and indicators to shape our view of an unprecedented situation that will shape our balance sheet and client interactions for years to come.
> . . . .
> **Our growth rate is unprecedented** and with it comes the need for better indicators of risk as they have massive implications on how we manage interest rate risk and the investment securities portfolio, along with our capital position. **<u>To make it simple we need new and better tools</u>**[.]

TX 740 at 1 (emphasis in original). In that same March 30, 2021, email, Mr. Beck recognized that it would be prudent to prepare an investment plan for deposits "that could be short term in nature." TX 740 at 1.

316. At trial, Mr. Beck sought to characterize this email as a "challenge to the team to evaluate" its metrics and indicators. Tr. at 106:13–14 (Beck). The Court does not find that characterization credible and treats the email as evidence of Mr. Beck's honest view that the rapid influx of deposits into the Bank was unstable and potentially short-term in nature.

317. Despite identifying these challenges, Mr. Beck admitted at his deposition that he could not recall whether he or the other ALCO members devised an investment strategy for funding that could be short term in nature, got "a better understanding of the potential rate sensitivity to deposit flows and speed of moving in cases of changing short-term rates," or ever hired any consultant to advise management regarding any of the questions identified in this email. Tr. at 110:4–11, 114:2–7, 115:4–11 (Beck). To the extent that Mr. Beck suggested at trial that, after his deposition, he "spent more time going back through and looking at the actions that we took, and we did take actions coming out of that time period," *see* Tr. at 110:14–17 (Beck), the Court does not credit that testimony.

United States District Court
Northern District of California

**3. Mr. Beck, Mr. Kruse, and the other ALCO members over-designated securities as HTM due to concerns about financial metrics reported to investors, not the Bank's economic health.**

318. A prudent banker would not accept the interest-rate risk and liquidity risk associated with locking up billions of dollars in long-term, fixed-rate securities as HTM to avoid having AFS losses flow to the metrics that were of concern to investors. The evidence produced at trial establishes that Mr. Beck, Mr. Kruse, and the other ALCO members' decisions were a deviation from the ordinary standard of care of an ordinarily prudent banker.

319. As Mr. Beck and Mr. Kruse admitted at trial, the reason they and the other ALCO members designated the long-term, fixed-rate securities in the investment portfolio as HTM was to shield the Holding Company's Tangible Common Equity to Total Assets Ratio metric from losses caused by rising rates:

> Q. And so the reason that you and the other members of ALCO put $98 billion in held-to-maturity securities was due to the risk that rates would go up, right?
> A. It was to protect our tangible equity, yes. Correct. . . .
> Q. That's the whole reason for the held-to-maturity designation is to avoid having the decline in value of those securities from rising rates hit that tangible common equity note, right?
> A. It is part of how we manage the balance sheet, yes.

Tr. at 75:25–76:11 (Beck).

> Q. . . . [O]ther comprehensive income risk is the risk that as the value of your securities go down, it impacts this measure of income, which then flows through to the tangible common equity measure, right?
> A. Yes.
> Q. So the reason you and the rest of ALCO put $98 billion in the next year in held-to-maturity securities was to avoid realizing the interest-rate risk in those securities in this accounting of [Other Comprehensive Income], right?
> A. It was to protect the Bank against the potential for movements to tangible common equity, while making sure that we had the appropriate level of available-for-sale securities.
> Q. Okay. Designating securities as held-to-maturity does not change the amount of economic risk in those securities, right?
> A. No, it does not.

Tr. at 119:10–25 (Beck); *see also* Tr. at 1910:8–21 (Kruse) (admitting that HTM designations were "out of a concern for the impact [that] rising rates . . . would have on . . . [the] tangible common equity to tangible assets ratio").

320. The Tangible Common Equity to Total Assets Ratio was a focus of the Holding Company, its investors, and research analysts. Tr. at 75:4–16 (Beck); TX 130 at 22–23 (04/2021 Finance Committee Packet); TX 1053 at 1, 6 (report attached to email to management dated Nov. 2, 2022) ("Experienced bank investors have long focused on Tangible Common Equity-to-Tangible Asset (TCE/TA) ratios[] . . . .").

321. Accounting classification of AFS or HTM does not change the economic risk of the underlying securities. Tr. at 118:5–119:6 (Beck); Tr. at 566:6–9 (Warman). The Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members knew that the reason for the economic risk in the portfolio was their imprudent investment decisions and instead sought to use HTM designations to deemphasize that economic risk in metrics reported to investors. TX 353 at 210 (11/2020 ALCO Packet) (Mr. Busch advising ALCO members that "[a]lthough the economic reality of market moves is the same to both portfolios, due to accounting rules, the [Other Comprehensive Income] risk remains in the AFS portfolio").

322. The Court concludes based on Mr. Haider and Mr. Busch's testimony that the purpose of designating long-term fixed-rate securities as HTM was to protect the Tangible Common Equity to Total Assets Ratio and that doing so was not in accord with the standard of care of an ordinarily prudent banker. Mr. Haider stated that, in his experience, managing interest-rate risk and using "such a large HTM portfolio" to protect the Tangible Common Equity to Total Assets Ratio rather than managing interest-rate risk through EVE-at-risk was not a "reasonable approach" to managing interest-rate risk and did not address the economic losses from rising rates. TX 3006 at 44:14–45:10 (Haider Tr.). Mr. Busch testified that EVE-at-risk is generally recognized as a "far more encompassing" and "far more comprehensive . . . metric than [Tangible Common Equity] to [Total Assets]" based on his peers' "experience[] at bigger banks." TX 3002 at 231:24–235:6, 233:10–19 (Busch Tr.).



United States District Court
Northern District of California

United States District Court
Northern District of California

**4. Mr. Beck, Mr. Kruse, and the other ALCO members created excessive interest-rate risk and liquidity risk by designating 80% of the investment portfolio as HTM.**

323. By designating 80% of the investment portfolio as HTM, Mr. Beck, Mr. Kruse, and the other ALCO members exacerbated the interest-rate risk caused by their imprudent purchase of long-term, fixed-rate securities, *see* FF ¶¶ 196–297, and caused the Bank to take excessive liquidity risk.

324. As to interest-rate risk, FDIC established at trial that, by using HTM designations to shield metrics like Tangible Common Equity to Total Assets and Other Comprehensive Income, Mr. Beck, Mr. Kruse, and the other ALCO members also used the HTM designation to take excessive risk in the investment portfolio by placing longer-duration securities on the balance sheet. Mr. Busch testified that "there was a push to move" "longer duration securities into HTM." TX 3002 at 180:11–181:6 (Busch Tr.).

325. Indeed, in contemporaneous communications with Mr. Busch, Mr. Beck and Mr. Kruse repeatedly suggested that they were using the HTM portfolio to take more risk with longer-duration securities without being constrained by AFS losses showing up in the Tangible Common Equity to Total Assets Ratio. For example, in Teams messages dated April 12, 2021, Mr. Beck stated, "I am fine taking on a bit more duration in the book as a total… just not in AFS considering the [Other Comprehensive Income] risk and the rapid balance sheet growth." TX 1131 at 2 (ellipsis in original).

326. As another example, in Teams messages dated April 16, 2021, Mr. Beck expressed that he was not concerned with the duration of HTM-designated securities. TX 1132 at 2 ("I don't mind having longer dated bonds in HTM… so I wouldn't go shorter there…" (ellipses in original)).

327. As another example, in Teams messages dated June 7, 2021, Mr. Beck instructed Mr. Busch that he "was trying to accelerate [securities purchases] a bit to add some more interest earning assets for the month – we are running a bit behind on [net interest income]," explaining that he "was feeling better on rates for now – so we can stick where we are with AFS… and buy

more duration in HTM." TX 1150 at 1 (Teams message from Mr. Beck dated June 7, 2021) (ellipsis in original).

328. Mr. Beck, Mr. Kruse, and the other ALCO members understood that, by using the HTM designation to build a riskier portfolio without having to recognize losses in certain metrics, they were nonetheless exposing the Bank to real financial risks. On August 9, 2021, when asked by a Holding Company and Bank employee about the duration and convexity risk associated with mortgage-backed securities, Mr. Beck explained that "we are adding the longer duration securities in HTM… so [it] allows us to 'ignore' the [mark-to-market] risk… so we've been taking duration there… and buying short in AFS (treasuries)." TX 1167 at 2 (ellipses in original); Tr. at 185:7–187:3 (Beck). As Mr. Beck conceded at trial, the mark-to-market losses that he recommended "ignor[ing]" in the HTM portfolio reflected "real economic risks." Tr. at 187:3–8 (Beck); TX 1167 at 2.

329. The Court accordingly finds that Mr. Beck, Mr. Kruse, and ALCO used accounting designations to shield the Tangible Common Equity to Total Assets Ratio from the impact of rising rates and thereby evade Tangible Common Equity to Total Assets Ratio as a risk constraint:

> Q. . . . You ran multiple scenarios, but the only measure that measured the risk of the value of the assets declining was EVE, right?
> A. It was EVE. And we also had a measure that looked at the change in the tangible common equity, the tangible asset ratio assuming an increase in interest rates. . . .
> Q. Yeah. Right. And that accounting excluded HTM losses from its calculation, right?
> A. It excluded HTM from its calculation.

Tr. at 1967:10–1969:1 (Kruse).

330. As to liquidity risk, FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members' excessive use of the HTM designation deprived the Bank of available liquidity in the case of a stress event.

331. AFS securities are treated as available liquidity under liquidity stress testing because the securities can be freely sold for cash, whereas selling HTM securities would "taint" the entire HTM portfolio and require all the losses in the portfolio to be recognized through Other Comprehensive Income. Tr. at 566:21–567:18 (Warman); Tr. at 950:13–20 (Friedman); *see also*

United States District Court
Northern District of California

FF ¶¶ 38–40, 64. In messages with Mr. Busch and other employees, Mr. Beck recognized that "a taint of the HTM portfolio is a nuclear event - so we must treat any action or discussion there VERY carefully." TX 1249 at 2 (Teams message from Mr. Beck dated Apr. 20, 2022); Tr. at 191:8–23 (Beck). Mr. Beck warned employees that failing to seek approval before proceeding with actions that could lead to a taint "will lead to folks being terminated." TX 1249 at 2.

332. After receiving notice from regulators of the liquidity framework's deficiencies, *see* FF ¶¶ 308–310, the Holding Company and Bank redesigned the liquidity stress test and risk-management framework in 2022. Tr. at 1192:18–1193:25 (Benhamou); Tr. at 2306:5–2307:12 (Warman). The new framework produced preliminary results that demonstrated a "sustained liquidity shortfall." TX 322 at 73 (04/2022 Joint Finance and Risk Committee Packet); *see also* Tr. at 1192:25–1193:25 (Benhamou) ("Q. And now the Finance Committee is being told once we run a proper liquidity stress test, we have a $35 billion shortage in our liquidity in a time of stress, right, that's what you were told? A. Yeah, that's what the page says.").

333. At trial, the Holding Company and Bank's internal metrics showed that, as soon as the Holding Company began using a sufficiently developed framework to estimate its liquidity needs during stress, the framework revealed that the Bank did not have reliable liquidity and could not depend on monetizing much of the HTM portfolio that Mr. Beck, Mr. Kruse, and the other ALCO members assembled in 2021. At the April 2022 Joint Finance and Risk Committee meeting, members of the Finance Committee and Risk Committee learned that the Bank was projected to have a substantial liquidity shortfall within thirty days of a stress event, due in large part to these HTM designations:

> [W]e are severely constrained in our ability to monetize assets in stress due to:
> **1. Accounting designation**: Held to Maturity (HTM) vs Available for Sale (AFS) securities, and
> **2. Lack of monetization channels**: Limited repo counterparty relationships for monetizing our $84Bn HTM portfolio (we currently only have $8Bn in repo capacity)
> We are currently projected to have a liquidity gap of **$35Bn** at day 30

TX 322 at 73 (04/2022 Joint Finance and Risk Committee Packet) (emphasis in original).

334. Similarly, once the new internal liquidity stress test was implemented to compute net-liquidity position in 2022, it immediately showed liquidity breaches that persisted until the Bank's failure. TX 324 at 77–78 (07/2022 Joint Finance and Risk Committee Packet) ("Current operational constraints exist due to: Insufficient bilateral repo lines[,] Lack of alternative monetization channels (e.g., Sponsored Programs, [Fixed Income Clearing Corporation] Direct Membership, Triparty)[,] Current investment portfolio mix ([HTM] vs [AFS])"); *see also* TX 2664 (summary of reported net liquidity positions); Tr. at 1355:6–1357:9 (Malek) (documenting sustained breaches for net liquidity position measured over 30-day, 90-day and 1-year periods).

335. Despite these sustained breaches, Mr. Beck, Mr. Kruse, and the other ALCO members did not at any point take timely steps such as sufficiently increasing the AFS portfolio or expanding monetization channels. Similarly, neither the Finance Committee nor the Risk Committee took any action to require the Officers to remediate these breaches before the Bank failed. Tr. at 1197:4–1198:17 (Benhamou).

336. The Court accordingly finds that the over-designation of securities as HTM caused excessive liquidity risk by depriving the Bank of needed liquidity and caused sustained breaches of the internal-liquidity-stress test throughout 2022 and up to the Bank's failure in 2023.

337. The Court finds that investing more than one hundred billion dollars' worth of uninsured deposits—during historically low interest rates—in long-term, fixed-rate securities and then proceeding to lock those securities up by designating them as HTM represented an extreme departure from the standard of care of an ordinarily prudent banker. By taking these actions, Mr. Beck, Mr. Kruse, and the other ALCO members subjected the bank to compounding interest-rate risk and liquidity risk:

> The Bank and Holding Company had extraordinary amounts of growth, 200 percent over a very short time period. These deposits, as was their business practice, were uninsured. But if you combine this incredible growth with the fact that they are uninsured, you are beginning to compound the risk through – really through their business model. And then they took that money, and they invested it into long-term securities. Long-term securities could get longer as rates rise . . . and then they locked that up in held-to-maturity. That restricted their ability to hedge interest-rate risk and also created

> problems . . . when it comes to contemplating borrowing against those securities.

Tr. at 465:23–466:11 (Warman); see also Tr. at 567:13–24, 590:10–593:2 (Warman); TX 2664 (summary of reported net liquidity positions).

**5. Mr. Beck, Mr. Kruse, and the other ALCO members failed to ensure reliable ways to monetize the HTM portfolio.**

338. A prudent banker relying on a bank's HTM portfolio for liquidity would have established and tested that funding channel before relying on it in a stress scenario. Tr. at 590:10–592:3, 2305:10–2306:4 (Warman) ("Q. When those held-to-maturity designations were being made, did the officers have a reliable way to test their liquidity in a time of stress? A. I don't believe so, no. Q. From your perspective, is that a problem? A. That's a big problem.").

339. Because the Holding Company and Bank could not rely on selling HTM securities during stress, management needed reliable borrowing channels, available during both market-wide stress and Bank-specific stress, through which those securities could be pledged as collateral and monetized. Tr. at 590:10–13, 591:22–592:5 (Warman) (opining that a prudent banker would have gone to a clearinghouse to "demonstrate the ability to raise money against a portfolio that you can't otherwise sell" because "it's quite well known in the industry that this was the path").

340. Mr. Beck, Mr. Kruse, and ALCO members knew or should have known that under the liquidity-stress test requirements for Large Financial Institutions, credit-market lines, such as those available from the Federal Home Loan Bank and the Federal Reserve discount window, could not be relied on during the first 30 days of a stress event except for reliable repo capacity. TX 401 at 254; TX 134 at 105. Mr. Kruse, Mr. Beck, and ALCO nonetheless imprudently relied on bilateral repo as a liquidity source in the Bank's stress testing. Tr. at 1564:16–1565:2 (Miller); Tr. at 2308:6–13 (Warman).

341. The Court also finds that Mr. Beck, Mr. Kruse, and the other ALCO members knew or should have known before concentrating the Bank's deposits into the HTM portfolio that access to repo markets could become restricted during severe stress; in March 2019, regulators advised management that its contingent-liquidity profile could be affected by restricted or unavailable repo-market access in periods of severe stress due to an unwillingness to do business



United States District Court
Northern District of California

with the Bank. TX 1413 at 15 ("[I]n recognition of the growing HTM portfolio, examiners advised management to consider how the Bank's contingent liquidity profile could be impacted by restricted or lack of access to the repo market in periods of severe stress."); *see also* Tr. at 1611:1–15 (Miller); Tr. at 591:22–592:10, 2308:17–21 (Warman).

342. Mr. Beck, Mr. Kruse, and ALCO members knew or should have known that the Fixed Income Clearing Corporation is the primary way to secure funding from the HTM portfolio to reduce counterparty risk; the April 2022 Joint Finance and Risk Committee Packet identified engagement with Fixed Income Clearing Corporation as having the "largest impact on expanding capacity" to monetize the HTM portfolio. TX 322 at 73 (04/2022 Joint Finance and Risk Committee Packet); Tr. at 589:19–591:3 (Warman). Mr. Beck, Mr. Kruse, and ALCO nonetheless neglected to complete the work necessary to monetize the HTM portfolio through Fixed Income Clearing Corporation before the Bank failed in March 2023. Tr. at 1611:1–1612:1 (Miller); Tr. at 2308:17–2309:18 (Warman). And from March 8, 2023, until the Bank's failure on March 10, 2023, the Bank did not in fact obtain liquidity through the bilateral repo arrangements on which its stress calculations had relied. Tr. at 2308:22–24 (Warman). As set forth below, these decisions fell below the standard of care of an ordinarily prudent banker.

343. The Court accordingly does not credit the Trust's contention at trial that the Holding Company and Bank had $80 billion in potential borrowing capacity. *See* Trust FFCL ¶ 234. The HTM securities portfolio could not be hedged or sold without realizing losses. Tr. at 68:19–69:7 (Beck); Tr. at 1855:25–1856:15 (Kruse). Even the specter of the sale of HTM securities raised an adverse market reaction given the magnitude of the losses. HTM securities could not be monetized through bilateral repo in a time of Bank stress, and short-term borrowings needed to be quickly repaid.

**6. Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care by designating nearly 80% of the securities portfolio as HTM.**

344. The Court credits Mr. Warman's testimony that it was imprudent to designate 80% of the investment portfolio as HTM while the Bank was "in sustained breach of the only measure

that saw the risk" because doing so deprived the Holding Company and Bank of the ability to hedge interest-rate risk and magnified liquidity risk. Tr. at 567:13–24 (Warman).

345. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members deviated from the standard of care of an ordinarily prudent banker by designating nearly 80% of its investment portfolio as HTM without a reliable liquidity framework and stress test to accurately measure its liquidity risk. Tr. at 587:4–20, 2305:10–2306:4 (Warman).

346. The Court accordingly finds that, by designating nearly 80% of the investment portfolio as HTM, Mr. Beck, Mr. Kruse, and the other ALCO members deviated from the standard of care of an ordinarily prudent banker because they knowingly impaired the Bank's ability to manage interest-rate risk and liquidity risk.

347. The Court also finds that, by designating nearly 80% of the investment portfolio as HTM, Mr. Beck, Mr. Kruse, and the other ALCO members subordinated the interests of the Bank to the interests of the Holding Company. Mr. Beck, Mr. Kruse, and the other ALCO members used HTM designations to avoid having to recognize AFS losses flowing to the Tangible Common Equity to Total Assets Ratio and Other Comprehensive Income metric. They did so to be able to show additional short-term income, which boosted the Holding Company's stock and ultimately accrued to their personal benefit financially.

### F. Holding Company Officers Caused the Bank to Take Excessive Interest-Rate Risk by Terminating Interest-Rate Hedges Early While Retaining the Underlying, Previously Hedged AFS Securities

348. FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members breached basic prudent banking standards and their fiduciary duties of care and loyalty that they owed to the Bank by terminating hedges against rising interest rates while retaining the underlying, previously hedged AFS securities in July 2022, which exposed the Bank to the risk of losses in the AFS portfolio in the foreseeable event that interest rates rose from historically low levels.

349. As set forth above, Mr. Beck, Mr. Kruse, and the other ALCO members unreasonably caused the Bank to take on a massive amount of interest-rate risk by concentrating

its investment portfolio in long-term, fixed-rate securities paying low yields at a time of historically low interest rates. FF ¶¶ 196–297. They exacerbated this interest-rate risk by designating the majority of that investment portfolio as HTM, which prevented the Bank from being able to hedge the majority of those securities against the risk of rising rates. FF ¶¶ 298–347. As set forth below, Mr. Beck, Mr. Kruse, and the other ALCO members removed the little bit of protection that the investment portfolio had against rising interest rates by removing the hedges from the AFS portfolio while retaining the underlying securities without any protection.

350. Mr. Beck, Mr. Kruse, and the other ALCO members removed the interest rate hedges while retaining the underlying securities in order to realize earnings for the benefit of the Holding Company without having to realize losses from the sale of the AFS portfolio. They knew that this decision threatened the long-term safety and soundness of the Bank and proceeded in the face of that risk.

**1. During the first half of 2021, the purchase of interest-rate swaps protected the AFS portfolio against rising rates.**

351. In the first half of 2021, Mr. Beck, Mr. Kruse, and the other ALCO members approved the purchase of pay-fixed, receive-floating interest-rate swaps (the "Hedges") with a notional value of approximately $10.7 billion for the Bank's AFS portfolio. TX 363 at 5 (04/2021 ALCO Packet); Tr. at 578:12–20 (Warman). The Hedges were limited to the AFS portfolio because HTM securities cannot be hedged, a fact that Mr. Beck did not know until late in the game, *see* FF ¶¶ 304–305. Tr. at 166:4–25 (Beck); TX 3002 at 138:20–139:3 (Busch Tr.).

352. The purpose of the Hedges was to protect a portion of the AFS portfolio against the impact of higher interest rates negatively impacting the Bank's Other Comprehensive Income metric. TX 359 at 253 (02/2021 ALCO Packet). Mr. Busch recommended the purchase of the Hedges "to reduce the duration of [the Bank's] AFS portfolio" to "provide protection in . . . the event that interest rates rose." TX 3002 at 123:24–124:5 (Busch Tr.); *see also* Tr. at 1540:6–1541:14 (Miller); Tr. at 2015:2–16 (Kruse); TX 3006 at 75:16–76:7 (Haider Tr.).

353. Although the Hedges improved EVE-at-risk sensitivity, Mr. Beck, Mr. Kruse, and the other ALCO members recognized that "the hedging program alone [was] not sufficient to

United States District Court
Northern District of California

mitigate the excess EVE risk exposure." Tr. at 1822:4–18 (Kruse); *see also* Tr. at 578:16–20 ("Q. And were those hedges sufficient, in your view, to manage interest rate risk? A. No. I mean, by their own description, this was never going to be enough to remediate the EVE breach . . . ."). The addition of the Hedges did not at any point fully cure the EVE-at-risk breach. Tr. at 1822:19–1823:11 (Kruse).

**2. Mr. Beck, Mr. Kruse, and the other ALCO members terminated the interest-rate swaps in the first half of 2022.**

354. As rates began to rise in early 2022, the Global Treasury Department recommended, and ALCO approved, the termination of the Hedges despite ongoing EVE-at-risk breaches. TX 393 at 4 (05/2022 ALCO Packet); *see also* TX 891 at 4 (email from Mr. Kruse dated Mar. 16, 2022); TX 994 at 6 (email from Mr. Gardi dated June 7, 2022). The termination of the Hedges occurred in two parts: Phase I in March 2022 and Phase II in July 2022. TX 397 at 21 (07/2022 ALCO Packet).

355. In Phase I, the Global Treasury Department terminated approximately $5 billion of pay-fixed, receive-floating swaps, sold the underlying hedged securities, and reinvested the proceeds in U.S. Treasury securities, for a total gain of $37 million. Tr. at 579:2–9 (Warman); TX 397 at 22 (05/2022 ALCO Packet); TX 891 at 4 (email from Mr. Kruse dated Mar. 16, 2022). The newly purchased U.S. Treasury securities were not hedged, thereby exposing those securities to the risk of loss if interest rates were to increase. Tr. at 579:7–9 (Warman).

356. In Phase II, the Global Treasury Department terminated all remaining interest rate hedges but retained the $8 billion in underlying securities, thereby exposing those securities to the risk of loss if interest rates were to increase. TX 994 at 1 (email from Mr. Haider dated July 14, 2022); Tr. at 454:1–455:3 (Beck); Tr. at 965:24–966:7 (Friedman). At this time, the Bank and Holding Company were in breach of EVE-at-risk metrics, and terminating the Hedges worsened the EVE-at-risk breaches. FF ¶¶ 250–251; Tr. at 582:7–17 (Warman) ("[T]he hedges are removing duration risk from a portion of the securities portfolio. Once you remove that, the duration of the assets increases, and when one does that exercise, you know, you see more sensitivity."); Tr. at 1840:11–18 (Kruse) ("[T]he action would have increased the duration

component because you are reducing the hedge on the fixed asset, and that would have moved the EVE sensitivity back toward a condition where it was closer to sensitivity.").

357. While the Court does not find that the termination of the Hedges in isolation constituted a deviation from the standard of care of an ordinarily prudent banker, as set forth below, retaining the underlying, previously hedged AFS—without any interest rate protection—during Phase II was not in accord with the standard of care of an ordinarily prudent banker in light of the sustained EVE-at-risk breaches.

358. Mr. Beck, Mr. Kruse, and the other ALCO members knew that terminating the Hedges would necessarily exacerbate the EVE-at-risk breach by extending the duration of the Bank's security portfolio. Tr. at 582:7–17 (Warman); Tr. at 1840:11–18, 2015:7–16 (Kruse).

359. At the time of termination, the losses on those now-unhedged securities exceeded $1.1 billion. TX 397 at 21 (07/2022 ALCO Packet); *see also* Tr. at 452:16–23 (Beck). By terminating the Hedges and retaining the AFS securities, those securities were now fully exposed to further losses in value from rising interest rates. Tr. at 453:24–454:9 (Beck); Tr. at 965:23–966:10 (Friedman).

360. In fact, Mr. Beck acknowledged in private messages that "the swap terminations were early[,] and we should not have done them" because of the resulting "exceptional level of extension risk." TX 1354 at 2 (Teams message from Mr. Beck dated Feb. 2, 2023); Tr. at 221:7–23 (Beck); Tr. at 580:25–581:14 (Warman). The Court does not credit Mr. Beck's testimony at trial that his private recognition that the swap terminations were early was made "with the benefit of hindsight." Tr. at 221:20 (Beck). In those messages, Mr. Beck was suggesting that Mr. Busch's compensation should be reduced based on the "exceptional level of extension risk we put on." TX 1354 at 2; Tr. at 222:1–11 (Beck). And as Mr. Beck acknowledged at trial, he was personally involved in communicating with Mr. Busch about the securities purchases, knew how much duration extension risk was in the portfolio, and ultimately approved these purchases as a member of ALCO. Tr. at 222:6–25 (Beck).

361. After completing Phase II, ALCO later approved purchasing up to $5 billion in additional interest rate hedges but only ended up purchasing $550 million more. TX 401 at 16

(09/2022 ALCO Packet). The Court agrees with Mr. Warman that the reinstatement of a portion of the hedges under these circumstances suggests the "admission of a mistake." Tr. at 581:7–14 (Warman).

362. In terminating the Hedges, Mr. Beck, Mr. Kruse, and the other ALCO members were all acting as Holding Company Officers within the scope of their authority.

**3. Mr. Beck, Mr. Kruse, and the other ALCO members terminated the Hedges while retaining the underlying, previously hedged AFS securities to "lock in" yield without realizing losses from selling the AFS securities.**

363. The sale of the Hedges generated net interest income at a time when the stock price of the Holding Company was in decline. Tr. at 171:16–172:25 (Beck). The Court finds based on the communications exchanged between Mr. Beck and Mr. Becker at this time that the purpose of terminating the Hedges was to increase earnings. Put simply, at a time when the Holding Company and Bank had been operating in sustained breach of EVE-at-risk, Mr. Beck, Mr. Kruse, and the other ALCO members knowingly exacerbated that risk by selling the only risk mitigation instrument they had to "get value." TX 1221 at 1 (text message from Mr. Becker dated Feb. 11, 2022).

364. On February 11, 2022, Mr. Beck and Mr. Becker exchanged the following text messages. Mr. Beck notified Mr. Becker that "the swap portfolio we put on to protect against higher rates is now wor[th] 350MM :)" and "[t]hat's real life tangible book protection :)." TX 1221 at 1 (text message from Mr. Beck dated Feb. 11, 2022); Tr. at 168:24–169:7 (Beck). Mr. Becker responded less than one minute later, "Nice! Can we sell some of it this quarter to get value?" TX 1221 at 1 (text message from Mr. Becker dated Feb. 11, 2022); Tr. at 169:17–25 (Beck).

365. On March 16, 2022, Mr. Beck and Mr. Becker exchanged the following text messages. Mr. Beck notified Mr. Becker that "we are monetizing a portion of our rising rate hedges on afs securities – will recognize 50-60MM pre-tax." TX 1233 at 1 (text message from Mr. Beck dated Mar. 16, 2022); Tr. at 170:21–171:4 (Beck). Mr. Becker responded by providing

a "thumbs up" to the message. TX 1233 at 1 (text message from Mr. Becker dated Mar. 16, 2022); Tr. at 170:5–6 (Beck).

366. On June 15, 2022, Mr. Beck and Mr. Becker exchanged the following text messages. Mr. Beck notified Mr. Becker, "We are going to start doing some hedges to lock those rates in… not much opportunity left to hedge against higher rates – we will probably take off our 5.5bn of hedges… now worth close to 40MM." TX 1269 at 1 (text message from Mr. Beck dated June 15, 2022) (ellipses in original); Tr. at 174:13–17 (Beck). Mr. Becker responded, "That's smart. Lock in the yields." TX 1269 at 1 (text message from Mr. Becker dated June 15, 2022); Tr. at 174:18–20 (Beck).

367. The Court finds based on these messages that the purpose of terminating the Hedges was to generate income. The Trust did not produce any credible evidence at trial supporting any explanation for retaining the newly unhedged AFS securities other than avoiding having to realize the billion dollars of loss on their sale.

368. The Court does not credit Mr. Beck's testimony that retaining the AFS securities whose hedges were removed during Phase II was "helpful [to net interest income] in the potential for a lower rate environment," Tr. at 176:20–24 (Beck), since NII-at-risk is a short-term measure and the contractual maturity of those securities was very long. Tr. at 176:25–177:8 (Beck).

369. The Court accordingly finds that the purpose of terminating the Hedges while retaining the newly unhedged securities was to create income without realizing losses attributable to rising interest rates. This choice accordingly reflected a prioritization of the Holding Company's interests over the Bank's safety and soundness.

**4. Mr. Beck, Mr. Kruse, and the other ALCO members departed from the applicable standard of care by terminating the hedges while retaining the underlying, previously hedged AFS securities.**

370. Mr. Beck, Mr. Kruse, and the other ALCO members' decision to sell the hedges and worsen the EVE-at-risk breaches based on an expectation that rates would ultimately decline was inconsistent with prudent banking. Tr. at 580:25–582:17, 2303:16–2304:13 (Warman) ("You can't manage the Bank and Bank Holding Company assuming a singular forecast will come

United States District Court
Northern District of California

through."). In correspondence between Mr. Beck, Mr. Kruse, and Mr. Haider, Mr. Kruse acknowledged that management wrongly "put a lot of emphasis on addressing down rate risk (in a rising rate environment) with portfolio strategy" and that they should "[t]ak[e] more 'measured' steps in execution respecting potential risk exposures." TX 1343 at 2.

371. The Court finds that Mr. Beck, Mr. Kruse, and the other ALCO members' decision to terminate the July 2022 hedges and retain the underlying securities cannot be justified based on NII-at-risk breaches to downrate scenarios. Mr. Busch testified that it was possible to manage NII-at-risk and EVE-at-risk simultaneously "but the give-up is yield." TX 3002 at 221:10–20 (Busch Tr.); *see also* Tr. at 176:16–19 (Beck). The Court understands Mr. Busch's testimony to mean that selling the underlying securities and replacing them with short-term securities would have improved the NII-at-risk and EVE-at-risk breaches but would have reduced short-term income. Tr. at 550:7–551:14 (Warman).

372. The Court accordingly finds that, by deciding to terminate these hedges while retaining the underlying securities, Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care of an ordinarily prudent banker because they disregarded the known risk of potential further rate increases, which would result in further losses on the unhedged securities that were retained as part of the July 2022 hedge termination. Tr. at 582:7–17 (Warman); *see also* Tr. at 454:6–9 (Beck) (acknowledging that securities were now fully exposed to losing more value from a rise in interest rates). The July 2022 hedge termination further exacerbated the Bank's interest-rate risk and was initiated, managed, and implemented by Holding Company Officers. TX 994 at 5 (email from Mr. Beck dated June 9, 2022).

373. The termination of the hedges and retention of the underlying securities, in addition to being imprudent, were also carried out for the improper purpose of showing additional income at the expense of the Bank's safety and soundness. For a bank or bank holding company, the purpose of interest-rate-risk hedges is to manage interest-rate risk; they are not a money-making tool or vehicle for speculation on the direction of interest rates. Tr. at 579:14–25 (Warman). Here the Holding Company sold the hedges to generate income.

374. The Court accordingly finds that, by deciding to terminate Hedges while retaining the underlying, previously hedged AFS securities, Mr. Beck, Mr. Kruse, and the other ALCO members subordinated the interests of the Bank to the interests of the Holding Company in being able to show additional income as well as the individual officers' own interest in personal compensation.

### G. Holding Company Directors and Senior Officers Knowingly Encouraged ALCO to Take Excessive Interest-Rate Risk and Liquidity Risk

375. FDIC established at trial that members of the Finance Committee, Risk Committee, and Compensation Committee, as well as Mr. Becker and Ms. Izurieta, knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to breach basic prudent banking standards and their fiduciary duties of care and loyalty that they owed to the Bank by continually purchasing long-term, fixed-rate securities while breaching EVE-at-risk, designating the majority of those securities as HTM, and terminating the Hedges on the AFS securities while retaining the underlying, previously hedged AFS securities.

376. As set forth above, Mr. Beck, Mr. Kruse, and the other ALCO members unreasonably caused the Bank to take on a massive amount of interest-rate risk and liquidity risk by continually purchasing long-term, fixed-rate securities while breaching EVE-at-risk, designating the majority of those securities as HTM, and terminating the Hedges on the AFS securities while retaining the underlying, previously hedged AFS securities. FF ¶¶ 196–374. As set forth below, the Court finds that members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta were aware of these actions and encouraged them.

377. Contrary to the Trust's representations at trial, the Court does not find any support in the record that the Holding Company Directors made a reasoned decision to defer complying with EVE-at-risk in order to focus on other risks facing the Bank. The Trust presented no contemporaneous evidence at trial suggesting that any Officer or Director ever concluded that such a tradeoff was necessary. On the contrary, the evidence establishes that, by failing to hold Mr. Beck, Mr. Kruse, and the other ALCO members accountable or effectively challenge their

decisions, Holding Company Directors and Senior Officers encouraged them to uncritically prioritize short-term earnings over long-term risk management.

**1. Members of the Finance Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk and liquidity risk.**

378. The Finance Committee had a responsibility to oversee interest-rate risk management and to require a remediation plan for EVE-at-risk breaches. TX 441 at 1 (Finance Committee Charter); Tr. at 500:4–502:7 (Warman). The Finance Committee also had a responsibility to take seriously breaches of risk metrics in its own Global Treasury Policy, which also reflected industry standards and foundational regulatory guidance as set forth in SR 10-1.

379. Members of the Finance Committee knew about the EVE-at-risk limit breaches beginning with the Finance Committee's October 2020 meeting. TX 116 at 35 (10/2020 Finance Committee Packet). The Finance Committee thereafter received regular notice of EVE-at-risk breaches. Tr. at 946:8–947:7 (Friedman) ("Q. You were advised of the status of the [interest-rate risk] metrics, correct? A. Correct."); Tr. at 1589:6–9 (Miller) ("Q. . . . [Y]ou knew throughout those years . . . 2021 through 2023, that the [Holding] Company was in sustained breach of the EVE-at-risk limits that you approved in the Global Treasury Policy, right? A. Yes."); *see also, e.g.*, TX 116 at 35 (10/2020 Finance Committee Packet); TX 124 at 31–32 (01/2021 Finance Committee Packet); TX 130 at 37–38 (04/2021 Finance Committee Packet); TX 134 at 48–49 (07/2021 Finance Committee Packet); TX 138 at 51 (10/2021 Finance Committee Packet); TX 142 at 129 (01/2022 Finance Committee Packet); TX 322 at 45 (04/2022 Joint Finance and Risk Committee Packet); TX 324 at 32 (07/2022 Joint Finance and Risk Committee Packet); TX 155 at 90 (01/2023 Finance Committee Packet).

380. Despite knowledge of the EVE-at-risk breaches, the Finance Committee encouraged Mr. Beck, Mr. Kruse, and the other ALCO members' investment strategy of concentrating the securities portfolio in long-term, fixed-rate securities with excessive interest-rate risk. Tr. at 1237:4–15 (Benhamou). The Finance Committee encouraged these purchases with knowledge that such long-term, fixed-rate securities hold duration risk and would lose more value

in a rising rate environment. Tr. at 1590:7–1591:10 (Miller) ("Q. And given your prior experience in fixed-rate investing, you knew that fixed-rate long-term mortgage-backed securities held duration extension or convexity risk, right? A. Yes. Q. You knew that those particular types of investments would lose more value in a rising rate environment while you were getting notice in 2021 of these purchases, right? A. I knew that, along with knowing how other parts of the Bank's assets would perform."). Indeed, Mr. Benhamou conceded the Finance Committee did not object to Management adding to the EVE breach and the risk to the portfolio and the Bank through continued long-term securities purchases. Tr. at 1278:1–8 (Benhamou).

381. Once the EVE-at-risk outer threshold was breached, the Finance Committee should have forced adherence to the Global Treasury Policy, which was "the very policy that [the Finance Committee] imposed on management." Tr. at 2263:18–2264:3 (Warman). The Finance Committee at no point challenged Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent actions. Tr. at 1880:12–1881:3 (Kruse) (admitting that the Finance Committee "never disagreed a single time" with management in more than a decade about "investment or hedging strategies that were approved at the ALCO level").

382. Indeed, the Finance Committee at no point required the Officers to comply with the Global Treasury Policy despite repeatedly receiving notice that EVE-at-risk was in continuous breach. Mr. Benhamou was forced to admit as much at trial:

> Q. You know that throughout 2021 when EVE was in sustained breach, management kept purchasing more long-term fixed-rate securities of [mortgage-backed securities], adding to the EVE breach and the risk to the portfolio and the Bank, right?
> A. Right.
> Q. That happened without objection from the Finance Committee for the entirety of 2021, right?
> A. Right.
> Q. And as we showed you in your deposition and you affirmed, not one person on the Finance or Risk committee ever directed management to bring EVE into compliance, right? That's what we saw in your deposition, right?
> A. We expected management to want to bring EVE into compliance, this is an obligation.
> Q. Can you answer the question I asked, sir? Not one person on the Finance and Risk Committee directed management to bring EVE into compliance at any point in 2020, 2021 or 2022, right?
> A. No, that's not correct.
> Q. Okay. Well, let's play your deposition again. If we could look at



United States District Court
Northern District of California

> 239, 14 to 20. We will play it on the screen, sir.
> [Q. Okay. Did anyone within the Board, Finance Committee, or Risk Committee advocate for taking any action to bring EVE into compliance in 2020 or 2021? . . . The Witness: No.]
> Q. That was truthful testimony, right, sir?
> A. Correct.

Tr. at 1278:1–25 (Benhamou) (citing Benhamou Deposition Tr. at 239:14–20); *see also* Tr. at 1590:7–1591:3 (Miller).

383. Nor did the Finance Committee at any point receive or approve a written mitigation plan that identified specific actions sufficient to return EVE-at-risk to compliance or analyzed the effect of those actions on earnings, capital, and liquidity. Tr. at 1263:14–19 (Benhamou).

384. The Court finds that the Finance Committee knowingly permitted and encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to breach the Finance Committee's own policies because members of the Finance Committee did not believe that EVE-at-risk mattered. At trial, the Chair of the Finance Committee Mr. Friedman did not dispute that he had dismissed EVE-at-risk as a "fad," also admitting that he was "not familiar" with SR 10-1 because "the Board did not read regulatory guidance documents." Tr. at 959:19–961:3, 1079:5–1081:6 (Friedman). Similarly, Ms. Miller also discredited EVE-at-risk, testifying at trial that she believed the EVE-at-risk model was "broken" because it could not test downward-rate adjustments in a low-rate environment. Tr. at 1591:4–12 (Miller).

385. Based on Mr. Warman's experience and his analysis at trial, the Court accords greater weight to Mr. Warman's testimony regarding the reliability of EVE-at-risk as compared to Mr. Friedman and Ms. Miller's testimony. In fact, Mr. Warman's testimony reveals that Mr. Friedman and Ms. Miller simply did not comprehend the importance of EVE-at-risk sensitivity in a historically low interest-rate environment, as they appeared to believe that it could be dismissed out of hand either by virtue of being too complicated or being a fad. Tr. at 2254:9–20 (Warman) ("Q. In your experience, is EVE-at-risk a fad in banking? A. No, it's not a fad. It's a requirement. It's what every practitioner in the industry uses . . . .").

386. The Court finds that the Finance Committee Chair Mr. Friedman's lack of familiarity with SR 10-1 and misplaced personal views caused him to downplay EVE-at-risk as a primary measure of interest-rate risk. Tr. at 2254:9–20 (Warman); FF ¶ 384. Similarly,



United States District Court
Northern District of California

Ms. Miller's belief that the EVE-at-risk model was broken because it could not test downward-rate adjustments in a low-rate environment was contrary to regulatory guidance in SR 10-1 and caused her to encourage Mr. Beck, Mr. Kruse, and the other ALCO members' continuous breaches of prudent banking principles. Tr. at 2255:23–2256:23 (Warman); FF ¶ 384. As Mr. Warman explained, a prudent director would consider SR 10-1's suggestion that "in low-rate environments, scenarios involving significant declines in market rates can be deemphasized in favor of increasing the number and size of alternative rising-rate scenarios." TX 1681 at 7 (SR 10-1); Tr. at 2255:23–2257:2 (Warman).

387. The Court is left to conclude that Ms. Miller either did not know or otherwise ignored that SR 10-1 provides that "in low-rate environments, scenarios involving significant declines in market rates can be deemphasized in favor of increasing the number and size of alternative rising-rate scenarios." TX 1681 at 7 (SR 10-1). The Court credits Mr. Warman's testimony that, contrary to Ms. Miller's beliefs as expressed in her testimony at trial, in the low-rate environment of 2021, EVE-at-risk was "critical" because EVE-at-risk "was the only measure that saw the risk that was being built throughout 2021 in the securities portfolio." Tr. at 2257:7–12, 2293:16–20 (Warman).

388. The Court accordingly finds that the Finance Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk in sustained breach of the Finance Committee's own Global Treasury Policy, exposing the Bank to billions of dollars in losses in the foreseeable event of interest rate increases.

389. The Finance Committee at no point objected to the termination of the Hedges and retention of the underlying, previously hedged AFS securities despite knowing of Mr. Beck, Mr. Kruse, and the other ALCO members' plan. Tr. at 964:1–966:7 (Friedman); Tr. at 1200:24–1201:3 (Benhamou). In fact, members of the Finance Committee "expressed support" for the plan to terminate the Hedges during its April 2022 meeting. SF ¶ 47; TX 145 at 3–4 (04/2022 Finance Committee Minutes). The Finance Committee's support included supporting the imprudent termination of the Hedges while retaining the underlying, previously hedged AFS securities. Tr. at 1247:21–1248:19 (Benhamou) ("Q. Did you understand the Finance Committee to be

expressing support for the termination of hedges? A. Yes. Q. Did you understand the Finance Committee to be expressing support for continuing to hold the underlying securities? A. Yes.").

390. The Court accordingly finds that the Finance Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to terminate the Hedges while retaining the underlying, previously hedged AFS securities, exposing the Bank to greater losses in the foreseeable event of an increase in interest rates.

391. The Finance Committee had a responsibility to oversee and effectively challenge management if it took excessive liquidity risk. TX 441 at 1 (Finance Committee Charter). The Finance Committee received notice regarding the designation of nearly 80% of the investment portfolio as HTM, the sustained liquidity shortfalls, and ALCO's failure to secure a reliable means of monetizing the HTM portfolio. TX 124 at 93–96 (01/2021 Finance Committee Packet); TX 130 at 37 (04/2021 Finance Committee Packet); TX 322 at 73 (04/2022 Joint Finance and Risk Committee Packet); Tr. at 1177:11–18 (Benhamou). In fact, as Mr. Friedman admitted at trial, "[a]s a member of the Finance Committee, [he] supported th[e] strategy to designate more securities as HTM rather than available-for-sale." Tr. at 949:16–19 (Friedman).

392. The Court accordingly finds that the Finance Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to designate an unreasonable proportion of the Bank's investment portfolio as HTM, thereby exacerbating interest-rate risk and liquidity risk.

393. In encouraging Mr. Beck, Mr. Kruse, and the other ALCO members' purchases of long-term, fixed-rate securities, sustained EVE-at-risk breaches, termination of the Hedges and retention of the underlying AFS securities, and over-designation of the investment portfolio as HTM, the members of the Finance Committee were acting on behalf of the Holding Company within the scope of their authority.

**2. Members of the Risk Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk and liquidity risk.**

394. The Risk Committee was responsible for "oversight of the operation of the Company's enterprise risk management framework," including establishing "risk management



United States District Court
Northern District of California

governance" and "processes and systems for identifying and reporting risks and risk management deficiencies" and "integrating risk management . . . with . . . compensation structure." The Risk Committee was required to "monitor and understand changes to the risk profile of the Company, with a focus on the most significant risks faced by the Company." TX 443 at 1–2 (Risk Committee Charter).

395. The Risk Committee had knowledge of the EVE-at-risk breaches, of which it received continuous notices since its January 2021 meeting. TX 167 at 29 (01/2021 Risk Committee Packet) ("Higher balances in longer duration fixed income securities increase exposure to market value declines if long-term rates increase substantially and remain high . . . ."); *see also* TX 169 at 57 (04/2021 Risk Committee Packet); TX 171 at 20 (07/2021 Risk Committee Packet); TX 177 at 79 (01/2022 Risk Committee Packet); TX 322 at 44–45 (04/2022 Joint Finance and Risk Committee Packet); TX 324 at 32–33 (07/2022 Joint Finance and Risk Committee Packet); Tr. at 1123:8–17 (Staglin); Tr. at 2070:21–2071:3 (Mitchell); Tr. at 2193:16–20 (Matthews).

396. No member of the Risk Committee directed management to reduce the duration of the investment portfolio or raised concern about excessive interest-rate risk in 2021 or 2022. Tr. at 1170:2–6 (Staglin) ("Q. Did you personally, at any time during 2021 or 2022, raise a concern to management that you were concerned that they were taking excessive interest-rate risk in the investment securities portfolio? A. I did not."); *see also* Tr. at 2193:25–2194:4 (Matthews). Nor did any member of the Risk Committee direct Mr. Beck, Mr. Kruse, and the other ALCO members to submit a risk mitigation plan as required by the Global Treasury Policy. TX 3008 at 239:14–20 (Benhamou Tr.) (agreeing that no one on "the Board, Finance Committee or Risk Committee ever advocate[d] for taking any action to bring EVE into compliance in 2020 or 2021"); *see also* Tr. at 165:23–166:3 (Beck); FF ¶ 382.

397. The Court accordingly finds that the Risk Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk in sustained breach of EVE-at-risk, exposing the Bank to billions of dollars in losses in the foreseeable event of interest rate increases.

398. On June 27, 2022, Mr. Kruse notified all members of the Risk Committee that management intended to "[t]erminate $5.9B notional of remaining Fair Value Hedges that are hedging a portion of our Available for Sale securities against unrealized market value losses if long-term rates move higher." TX 972 at 1 (email from Mr. Kruse dated June 27, 2022). The Risk Committee failed to do anything in response to the plan despite the plain negative impact on EVE-at-risk from selling the hedges and retaining the underlying securities.

399. The Court accordingly finds that the Risk Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to terminate the Hedges while retaining the underlying, previously hedged AFS securities, exposing the Bank to greater losses in the foreseeable event of an increase in interest rates.

400. The Risk Committee knew or should have known that HTM designations were exacerbating interest-rate risk and liquidity risk. TX 1431 (Liquidity Target Examination Letter) (identifying "foundational shortcomings"); TX 322 at 3 (04/2022 Joint Finance and Risk Committee Packet) ("[T]he fact that we have a large portion of those securities classified as [HTM] . . . we cannot monetize those securities for purposes of the stress test."); *see also* TX 584 at 67 (2021 Form 10-K). No member of the Risk Committee directed management to reduce the concentration of HTM-designated securities or raised concern about liquidity risk caused by these designations.

401. In encouraging Mr. Beck, Mr. Kruse, and the other ALCO members' purchases of long-term, fixed-rate securities, sustained EVE-at-risk breaches, termination of the Hedges and retention of the underlying AFS securities, and over-designation of the investment portfolio as HTM, the members of the Risk Committee were acting on behalf of the Holding Company within the scope of their authority.

**3. Members of the Compensation Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the**

**Holding Company's short-term interests over the Bank's long-term safety and soundness.**

402. Instead of enforcing limits on interest-rate risk in the Holding Company's Global Treasury Policy, the Holding Company incentivized the continued investment in long-duration securities that significantly worsened that risk. The Holding Company did so, in part, by implementing through the Compensation Committee an executive-pay structure that incentivized executives to take excessive risk and focus on short-term stock-price performance rather than the safety and soundness of the Bank's deposits. Compensation for named executive officers was established at the holding company level only. Tr. at 1091:18–1092:3 (Staglin).

403. Compensation for named executive officers (including Chief Executive Officer, Chief Financial Officer, and Chief Risk Officer) consisted of cash (i.e., base salary and an annual incentive compensation plan bonus) and equity (i.e., stock options, restricted stock units, and performance-restricted stock units). TX 545 at 34 (2021 Proxy Statement); TX 586 at 33 (2022 Proxy Statement).

404. Other than the base salary, all compensation components were based on the Holding Company's financial performance or the performance of its stock price. Tr. at 230:3–5 (Beck); Tr. at 1092:14–1093:1 (Staglin). The incentive cash bonus was funded entirely based on the Holding Company's return on equity measured against the Holding Company's annual budget and its performance relative to peers. TX 586 at 41 (2022 Proxy Statement). All else equal, higher net interest income results in a higher return on equity. Tr. at 1090:22–24 (Staglin). The performance-restricted stock units were based on a combination of return on equity and total shareholder return, which was calculated by taking the Holding Company's average stock price at the beginning of the period and at the end of the period and comparing the gain (or loss) to peers. TX 586 at 33, 43 (2022 Proxy Statement). Stock options and restricted stock units did not have any performance criteria and were based solely on Holding Company stock appreciation and their value was "inherently tied to the future performance of [Holding Company] Common Stock." TX 586 at 43 (2022 Proxy Statement).



United States District Court
Northern District of California

405. The Court finds that members of the Compensation Committee knew that Mr. Beck, Mr. Kruse, and the other ALCO members were continually subordinating the interests of the Bank to the interests of the Holding Company, in part based on their own financial interests as based on their compensation structure. Members of the Compensation Committee knew that a poor incentive compensation structure could lead to a focus on outsized financial performance rather than prudently considering risk management. Tr. at 1084:10–1086:14 (Staglin).

406. The Compensation Committee knew of the continuous EVE-at-risk breaches each quarter during 2021 and 2022 at the time that they occurred or shortly thereafter. Tr. at 1123:8–17 (Staglin). During 2021, however, the Compensation Committee chose not to make any downward adjustment for compensation of any named executive officer despite the ongoing EVE-at-risk breaches, the liquidity criticisms issued in November 2021, or failure to comply with other risk metrics. Tr. at 1093:4–1094:20, 1097:22–1098:5 (Staglin).

407. The Compensation Committee rewarded Mr. Beck for his imprudent management of the Bank's investment portfolio because it had resulted in the Holding Company having an outsized financial performance and stock price performance in 2021. Mr. Beck received his largest bonus, $1.4 million, from the Holding Company in 2021. Tr. at 227:25–229:6 (Beck). The payment was issued from the Holding Company, not the Bank. Tr. at 1088:22–24 (Staglin). Mr. Beck testified at trial that he felt the Compensation Committee supported and rewarded his actions in 2021, which was reflected in his compensation. Tr. at 227:25–229:3 (Beck) ("Q. . . . [Y]ou were not docked in any way from your compensation for any risk management deficiencies that you were responsible for as the chief financial officer, right? A. That's correct. That's true."). Mr. Beck also personally benefited from the Holding Company's stock-price appreciation, selling more than $10 million in Holding Company stock between 2021 and 2023 and nearly half of that in 2021. TX 2658 (Form 4 Filings for Mr. Beck).

408. At no time during 2021 or 2022 were any Officers held accountable through reduced incentive compensation for the sustained and material breaches of EVE-at-risk limits. Tr. at 1093:21–1094:6, 1094:18–21, 1097:22–1098:5, 1169:10–12 (Staglin).



United States District Court
Northern District of California

409. Members of the Compensation Committee were also on notice during this time that their compensation practices were insufficiently linked to basic risk management functions. In May 2022, regulators issued a Matter Requiring Immediate Attention advising the Holding Company that "deficiencies, identified by independent risk functions or through regulatory examinations, have not been meaningfully considered in the Firm's incentive compensation program" and that "[s]enior management performance objectives and incentive compensation practices do not clearly link to risk management objectives." TX 1438 at 3, 7 (Supervisory Letter dated May 31, 2022); *see also* Tr. at 1101:8–1102:6 (Staglin).

410. Rather than changing the incentive compensation structure to discourage excessive risk-taking, Mr. Staglin was more concerned with increasing the Holding Company's stock price as chair of the Compensation Committee. For example, in a confidential meeting in June 2022, Mr. Staglin informed counsel from Sullivan & Cromwell that he "wanted to get compensation to be tied to risk metrics without destroying the incentive structure that got SVB to this place" or words to that effect. Tr. at 1102:11–1103:2 (Staglin). In that same meeting, Mr. Staglin told counsel from Sullivan & Cromwell that "obsession with [Large Financial Institutions] was not in line with the business needs. Share price is our job as directors," or words to that effect. Tr. at 1103:3–7 (Staglin).

411. In August 2022, regulators again advised the Holding Company that "[r]isk management deficiencies, such as those identified through regulatory examinations or reviews performed by independent risk functions, have not been meaningfully considered in the firm's incentive compensation program or executive officer performance evaluations." TX 1442 at 4 (Supervisory Ratings Letter dated Aug. 17, 2022).

412. While the Holding Company hired consultants to advise on the structure of compensation and aggregate levels of compensation, those consultants did not review confidential information (such as Matters Requiring Immediate Attention or Matters Requiring Attention), and there is no credible evidence that the consultants analyzed the impact of EVE-at-risk breaches or were even aware of them. Tr. at 1167:10–1168:9 (Staglin).



United States District Court
Northern District of California

413. On March 10, 2023, the date the Bank failed and was placed into FDIC receivership, the Holding Company paid millions of dollars in bonuses to executives for their 2022 performance. Tr. at 1125:9–25 (Staglin), TX 624 at 84 (2023 Proxy Statement). Mr. Staglin stated at trial that he was unaware of anyone at the Holding Company or the Bank making any effort to stop these payments. Tr. at 1126:1–14 (Staglin).

414. The Court accordingly finds that the Compensation Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to expose the Bank to excessive interest-rate risk and liquidity risk—and the concomitant billions of dollars in losses in the foreseeable event of a rise in interest rates—by prioritizing short-term income over long-term safety and soundness.

415. The Court accordingly also finds that the Compensation Committee knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the Holding Company's short-term income and stock price—to which their personal financial compensation was tied—over the safety and soundness of the Bank.

416. In encouraging Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent investment decisions and prioritization of the Holding Company's financial performance over the Bank's exposure to risk, the members of the Compensation Committee were acting on behalf of the Holding Company within the scope of their authority.

**4. As Chief Executive Officer of the Holding Company, Mr. Becker knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the Holding Company's short-term interests over the Bank's long-term safety and soundness.**

417. One of Mr. Becker's responsibilities as Chief Executive Officer of the Holding Company and Bank was to ensure that "the Bank was operated in a safe and sound manner" and was "not taking excessive risk with depositor money." Tr. at 672:9–18 (Becker); *see also* FF ¶ 101.

418. Mr. Becker knew that Mr. Beck, Mr. Kruse, and the other ALCO members' concentration of long-term, fixed-rate securities was causing the Bank to take excessive interest-



United States District Court
Northern District of California

rate risk. At trial, Mr. Becker stated, "I had oversight [and] . . . visibility into it, and I agreed with the approach they were taking. And if I didn't, I would have shared my point of view." Tr. at 693:14–19 (Becker). He also conceded that he received monthly reports on investments and knew that "mortgage-backed securities had something called 'duration risk,'" that "in a rising rate interest environment, [mortgage-backed securities] are much more sensitive to interest rates than, say U.S. treasuries," and that, "as interest rates go up, refinancing activity slows down" and "[t]he duration will extend." Tr. at 699:4–700:14 (Becker).

419. Despite his awareness of the risks to which Mr. Beck, Mr. Kruse, and the other ALCO members were exposing the Bank, Mr. Becker at no point advised management to take any action in response to the interest-rate risk that was being taken in the investment portfolio. Tr. at 1978:13–16 (Kruse).

420. The Court accordingly finds that Mr. Becker knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk in sustained breach of EVE-at-risk, exposing the Bank to billions of dollars in losses in the foreseeable event of interest rate increases.

421. Mr. Becker repeatedly provided personal encouragement to Mr. Beck to terminate the Hedges. TX 891 at 1 (email from Mr. Becker dated Mar. 17, 2022) ("Great work!"); TX 1233 at 1 (text message from Mr. Becker dated Mar. 16, 2022). As an example, when Mr. Beck told Mr. Becker that the Bank would "probably take off our 5.5bn of hedges… now worth close to [$]400MM," Mr. Becker responded, "that's smart. Lock in the yields." TX 1269 (ellipsis in original). As another example, when Mr. Becker learned of the increased value of the Hedges, he asked Mr. Beck, "[c]an we sell some of it this quarter to get value?" TX 1221 at 1 (text message from Mr. Becker dated Feb. 11, 2022).

422. The Court does not credit Mr. Becker's testimony at trial that the purpose of the termination of the Hedges was to protect against falling rates and the potential for a recession followed by interest-rate decreases. Tr. at 725:24–726:5 (Becker). That testimony is directly contrary to his personal communications to Mr. Beck. The Court also credits Mr. Warman's testimony that prudent bankers do not sell hedges based on an expectation that a singular rate

forecast will come true, particularly when the termination further worsens internal risk metric breaches. Tr. at 466:15–467:3, 582:7–17, 2303:16–2304:13 (Warman).

423. The Court accordingly finds that Mr. Becker knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to terminate the Hedges while retaining the underlying, previously hedged AFS securities, exposing the Bank to greater losses in the foreseeable event of an increase in interest rates.

424. Mr. Becker did not challenge the designation of nearly 80% of the securities portfolio as HTM or require management to establish a reliable means of monetizing the HTM portfolio. Tr. at 697:7–698:9 (Becker).

425. The Court accordingly finds that Mr. Becker knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to designate the vast majority of the long-term, fixed-rate securities in the investment portfolio as HTM, which impaired the ability of the Bank to hedge against rising interest rates or manage liquidity by selling its long-term, fixed-rate assets.

426. In encouraging Mr. Beck, Mr. Kruse, and the other ALCO members' purchases of long-term, fixed-rate securities, sustained EVE-at-risk breaches, termination of the Hedges and retention of the underlying AFS securities, and over-designation of the investment portfolio as HTM, Mr. Becker was acting on behalf of the Holding Company within the scope of his authority.

**5. As Chief Risk Officer of the Holding Company, Ms. Izurieta knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to prioritize the Holding Company's short-term interests over the Bank's long-term safety and soundness.**

427. As the leader of the second line of defense, Ms. Izurieta was responsible for ensuring that the Officers and Directors were informed as to the material risks facing the Bank and Holding Company. Ms. Izurieta was responsible for (1) designing and implementing overall risk management functions for the Holding Company and Bank, (2) overseeing all risk management activities performed by Enterprise Risk Management, Financial Risk Management, and Model Risk Management, and (3) ensuring regulatory compliance. Tr. at 499:5–9 (Warman); TX 3004 at 42:17–24 (Izurieta Tr.); TX 466 at 3–4 (Risk Management Policy); FF ¶ 108.



United States District Court
Northern District of California

428. The Court finds that, as the Chief Risk Officer, Ms. Izurieta had notice of the continuous EVE-at-risk breaches that were caused by Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent actions. It was her job to evaluate breach reports and the adequacy of responses to breaches in the area of market risk, and she supervised a "team of experts that worked for [her] who engaged with treasury." TX 3004 at 77:25–83:07 (Izurieta Tr.).

429. Despite that knowledge, Ms. Izurieta never challenged the risk taken in the investment portfolio. Tr. at 140:14–18 (Beck) ("Q. . . . At no time did Ms. Izurieta challenge the Finance and Treasury Departments to take less risk in the securities portfolio, right? A. Not that I recall; but, again, remember there were questions in the accuracy of that calculation."); Tr. at 1978:6–12 (Kruse) ("Q. Ms. Izurieta never challenged the amount of interest-rate risk you were taking, right? A. Not to my knowledge, no."); Tr. at 2196:14–17 (Matthews) ("Q. You don't recall Ms. Izurieta ever raising the risk profile of the investment portfolio as a topic of concern at the risk committee, right? A. I don't recall that, no."); Tr. at 2273:20–2274:12 (Warman) ("Q. . . . Did Ms. Izurieta effectively challenge the first line of defense interest risk taken? A. No. If she had, she would have demanded that management follow the policy that was imposed on them by the Finance Committee of the Board.").

430. The Court accordingly finds that Ms. Izurieta knowingly encouraged Mr. Beck, Mr. Kruse, and the other ALCO members to take excessive interest-rate risk in sustained breach of EVE-at-risk, exposing the Bank to billions of dollars in losses in the foreseeable event of interest rate increases.

431. In encouraging Mr. Beck, Mr. Kruse, and the other ALCO members' purchases of long-term, fixed-rate securities and sustained EVE-at-risk breaches, Ms. Izurieta was acting on behalf of the Holding Company within the scope of her authority.

### H. Holding Company Officers and Directors Caused the Bank to Exacerbate Its Liquidity Risk by Resuming Bank-to-Parent Dividends

432. FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members breached prudent banking standards by resuming bank-to-parent dividends while the Bank's financial condition was deteriorating at the end of 2022. FF ¶¶ 74–86. Mr. Beck, Mr. Kruse, and

the other ALCO members breached their fiduciary duties of care and loyalty that they owed to the Bank in approving this transaction because they deprived the Bank of essential liquidity when it needed it most, all for the benefit of the Holding Company. FDIC also established at trial that members of the Finance Committee and Board were aware of the Bank's dire financial condition and nonetheless encouraged and approved the resumption of bank-to-parent dividends at this time.

433. The Court does not credit the Trust's arguments that the Bank was in sound financial condition at the time that the bank-to-parent dividend was approved. Unrebutted expert testimony established that, on the contrary, the Bank had unreasonably small assets at the time and was unable to sustain itself through stresses in the context of the ebbs and flows of the business cycle, including the interest-rate fluctuations, deposit outflows, and liquidity stresses that its own metrics were warning it to plan for in a stress event. As set forth below, the Court does not find any reason to discount this expert testimony based on the Trust's arguments at trial. FF ¶ 440.

**1. Holding Company Officers and Directors approved a $294 million bank-to-parent dividend for December 2022.**

434. Despite the Bank's worsening financial condition and securities losses throughout 2022, *see* FF ¶¶ 74–86, the Global Treasury Department (led by Mr. Kruse and with Mr. Beck's approval) proposed that the Bank resume bank-to-parent dividends at the September 2022 ALCO meeting. TX 401 at 49 (09/2022 ALCO Packet).

435. At the September 2022 ALCO Meeting, the Global Treasury Department gave a presentation entitled "Deep-dive on Bank to Parent Dividend and Share Repurchase Proposal," which stated under the header "Key Takeaways" the purpose of resuming bank-to-parent dividends: "Stronger than projected capital position allow consideration of capital distributions, including bank-to-parent dividends and share repurchases, absent other strategic investment opportunities." TX 401 at 50 (09/2022 ALCO Packet). Under the header "Committee Actions Requested," the presentation also stated that the Global Treasury Department was requesting "[r]esumption of Bank-to-Parent dividends to support parent company liquidity needs (including funding of share repurchases as needed)[.]" TX 401 at 50 (09/2022 ALCO Packet); Tr. at 213:2–8 (Beck).



United States District Court
Northern District of California

436. In October 2022, ALCO was presented with a proposed resolution entitled "APPROVAL OF QUARTERLY DIVIDEND," which stated:

> RESOLVED, that pursuant to its authority by the Board of Directors, the Finance Committee of the Board of Directors (the "Committee") hereby declares a cash dividend from Silicon Valley Bank (the "Bank") to its parent company, SVB Financial Group (the "Company");
> RESOLVED FURTHER, that such cash dividend shall be an amount equal up to fifty percent (50%) of the Bank's net interest income for the quarter ended September 30, 2022, . . . but in no case more than $295 million. The exact amount of the cash dividend shall be determined and approved by the Chief Financial Officer or Treasurer of the Company, with the effective date of the dividend being on or before December 31, 2022;

TX 1611; *see also* Tr. at 216:2–22 (Beck).

437. Under the Capital Management Policy, ALCO approval was a required and necessary step for the dividend to be considered and ultimately paid. TX 470 at 33–34 (Capital Management Policy); Tr. at 2001:5–2002:7 (Kruse); FF ¶ 164.

438. In October 2022, ALCO reviewed and approved the bank-to-parent dividend. SF ¶ 42; Tr. at 210:14–16 (Beck).

439. Following ALCO approval, the Finance Committee reviewed and approved the dividend. SF ¶¶ 43–44.

440. In accordance with his approval authority from the Finance Committee, Mr. Beck set the amount of the dividend to its maximum amount of $294 million in his capacity as Chief Financial Officer of the Holding Company. Tr. at 217:17–25 (Beck); TX 1074 (email from Mr. Beck approving the dividend dated Dec. 16, 2022); TX 1611 (proposed dividend resolution).

441. Following Finance Committee approval, the full boards of directors of the Holding Company and Bank approved the dividend, and on December 28, 2022, the Bank issued a $294 million dividend to the Holding Company (the "Dividend"). SF ¶¶ 41, 45.

442. In approving the Dividend, Mr. Beck, Mr. Kruse, and the other ALCO members were all acting as Holding Company Officers within the scope of their authority. In approving the Dividend, members of the Finance Committee and the Board of Directors were all acting as Holding Company Directors within the scope of their authority.

United States District Court
Northern District of California

**2. The primary purpose of the Dividend was to provide the Holding Company with sufficient liquidity to carry out a stock buyback.**

443. The contemporaneous evidence produced at trial establishes that the central concern driving the proposal and approval of the Dividend was to eventually fund a share repurchase agreement, which Mr. Becker conceded was "one of the reasons" for the Dividend. Tr. at 797:24–798:14 (Becker); *see also* Tr. at 211:17–212:4 (Beck).

444. By December 2022, the Holding Company's stock had fallen from an all-time high of $755 per share in November 2021 to $230 per share, representing a decrease of about 69.5%. Tr. at 1363:15–1364:2 (Malek). Buying back shares from the market is one way that companies can increase stock price. Tr. at 2416:6–2417:9 (Warman); *see also* Tr. at 210:17–25 (Beck). The intended effect of this share repurchase was to provide a short-term boost to the Holding Company's stock price by improving its return on equity and earnings per share through a reduction in the number of outstanding shares. Tr. at 211:1–7 (Beck).

445. In internal communications, Mr. Beck and Mr. Kruse confirmed that the purpose of the Dividend was to finance a stock buyback. For example, Mr. Beck asked Mr. Kruse to consider buyback scenarios because "even a token buyback could be seen as a signal to the markets." TX 1276 at 2 (Teams message from Mr. Beck dated June 30, 2022). As another example, in response to a Bank employee's question about "how we are going to get the liquidity to do [a] buyback," Mr. Kruse responded that "it will be covered by reinstitutin[g] bank to parent dividends." TX 1288 at 2 (Teams messages dated July 19, 2022).

446. The stated rationale for the Dividend was to provide the Holding Company with liquidity for its operations. TX 149 at 112, 116 (10/2022 Finance Committee Packet) ("ALCO recommends authorization of an ongoing Bank to Parent quarterly Dividend Program[] . . . to support parent company liquidity needs—up to 50% of prior quarter's net income."); TX 403 at 48 (10/2022 ALCO Packet) ("We request that the ALCO endorse a recommendation to the Finance Committee to review and authorize an ongoing quarterly Bank to Parent Dividend program of up to 50% of Silicon Valley Bank's net income to help support liquidity at the Holding Company."); Tr. at 213:9–13 (Beck) ("Q. . . . [T]he genesis of the idea for the bank's parent dividend was to do

a share repurchase to boost the stock price, right? A. No. It was in combination of making sure we were supporting the parent company liquidity, at the same time.").

447. Officers and Directors knew (or should have known) that the Holding Company had ample liquidity at this time. The Holding Company's coverage ratio (i.e., its measure of its own specific holding-company-level liquidity needs) was far in excess of the Holding Company's inner and outer thresholds. TX 403 at 128 (10/2022 ALCO Packet) (coverage ratios of 218.5%, 196.0%, and 189.1%, as compared to an inner threshold of 120% and outer threshold of 100%); Tr. at 213:14–18 (Beck) ("The parent company had sufficient liquidity[] . . . ."); Tr. at 594:2–595:9 (Warman) ("Q. And so based on your review of the coverage ratio, in your opinion, did the holding company need liquidity for its expenses at this time? A. Certainly not relative to the inner and outer thresholds that were set, no.").

448. At trial, the Trust offered other justifications for the Dividend, none of which is credible. For example, witnesses testified that the Dividend could improve the Holding Company's double leverage ratio. *See, e.g.*, Tr. at 213:17–18 (Beck); Tr. at 1574:14–1575:16 (Miller). There is no contemporaneous evidence that the Dividend was intended for that purpose, nor is there any expert testimony that this justification would warrant a dividend considering the Bank's financial condition at the time.

449. Witnesses similarly suggested at trial that capital could be made available to the Holding Company so that it could "serve as a source of strength" for the Bank. *See, e.g.*, Tr. at 866:3–11 (Becker); Tr. at 1251:8–24 (Benhamou); Tr. at 1574:6–10 (Miller). There is no contemporaneous evidence that the Dividend was intended for that purpose, nor is there any expert testimony that this justification would warrant a dividend considering the Bank's financial condition at the time.

450. The Trust's source-of-strength explanation is also facially implausible, since, far from strengthening the Bank in any measurable way, the Dividend reduced the Bank's capital and converted an asset (i.e., cash) into a liability (i.e., a deposit). Tr. at 1274:3–7 (Benhamou); Tr. at 1678:25–1679:2 (Watkins).



United States District Court
Northern District of California

451. Witnesses similarly suggested at trial that the Dividend was justified by virtue of the Holding Company and Bank having consolidated liquidity metrics, *see* Tr. at 2054:6–15 (Mitchell), or the Dividend representing a small percentage relative to the size of the overall balance sheet, *see* Tr. at 866:12–24 (Becker). These explanations are also facially implausible because the Dividend undisputedly reduced liquidity at the Bank level and thus reduced the funds available to pay depositors. Tr. at 595:14–596:8 (Warman).

452. The Court accords little weight to Mr. Watkins's testimony that the Dividend was in accordance with the Holding Company and Bank policies because of the limited scope of Mr. Watkins's opinion, which did not address the impact of net-liquidity position breaches, did not conduct a solvency analysis when assessing the Dividend, and did not opine whether the payment comported with prudent banking principles. *Compare* Tr. at 1629:6–16, 1678:16–24 (Watkins), *with* Tr. at 2312:1–2313:16 (Warman).

453. Although no share repurchase was approved before the Bank's failure in March 2023, the Holding Company did not return the Dividend, which was reversible, to the Bank. Tr. at 801:11–15 (Becker); Tr. 1126:15–24 (Staglin).

454. ALCO and the Finance Committee approved another $200 million bank-to-parent dividend to be paid in the first quarter of 2023. TX 155 at 18–20 (01/2023 Finance Committee Packet). The Bank failed before that dividend could be paid.

**3. Holding Company Officers departed from the applicable standard of care in approving the Dividend while the Bank was in dire financial condition.**

455. While approving the Dividend, the members of ALCO and the Finance Committee were aware of the Bank's poor financial condition, including the level of unrealized losses in the securities portfolio, deposit outflows, ongoing interest-rate-risk breaches, and liquidity breaches, as well as the projection for further interest-rate increases in 2023. For example, at the September 2022 ALCO meeting, ALCO members were advised that the federal funds rate could reach 4.75% by the end of the first quarter of 2023 and that the Bank's "balance sheet mix will continue to challenge balance sheet & [Asset Liability Management] position." TX 401 at 10 (09/2022 ALCO



United States District Court
Northern District of California

Packet) (capitalization altered). ALCO members also learned that wholesale borrowing was required to "serve as a bridge to plug the gap from a shortfall in deposits and to fund potential lending growth." TX 401 at 11 (09/2022 ALCO Packet); *see also* TX 401 at 107–08 (09/2022 ALCO Packet) ("[R]eplacing deposits with security-backed borrowing has put pressure on the already negative [internal stress liquidity test] Net Liquidity Position.").

456. As another example, at the October 2022 Finance Committee meeting, members of the Finance Committee were advised that the results of Internal Liquidity Stress Testing indicated that the Bank was in breach of its Day 30, Day 90, and 1 Year net liquidity position metric due to an "operational and real liquidity shortfall," "[l]arge client outflows," and "[s]ecurities [portfolio] market value decline" due to "[h]igher interest rates." TX 149 at 44 (10/2022 Finance Committee Packet); *see also* TX 149 at 103, 107–10 (10/2022 Finance Committee Packet).

457. Although Mr. Beck stated at trial that he nonetheless believed that "[t]he Bank was in a good financial position," he acknowledged that "[o]verall liquidity was down[] . . . and we were in a borrowing position at this period of time." Tr. at 366:19–367:04 (Beck). The Court finds more credible Mr. Warman's testimony that "there were very significant issues during that time period," including "significant securities losses," "an enormous portfolio at a very low yield," and "breach of [the Bank's] net liquidity position" driven by "deposits . . . leaving" and the Bank "borrowing in the wholesale markets," such that the Bank was considering the "draconian measures" set forth in Project Phoenix. Tr. at 2310:3–21 (Warman).

458. The evidence produced at trial established that the Bank was in dire financial condition at the time of the Dividend, which was only exacerbated by stripping out that liquidity and upstreaming it to the Holding Company. The Court credits Mr. Warman's testimony that approving the Dividend was inconsistent with prudent banking practices given the Bank's "financial distress" as evidenced by, among other things, the more than $15 billion in losses in the securities portfolio (in excess of TCE), the $14 billion in borrowings to support the balance sheet, the consideration of a potential sale of the AFS portfolio through Project Phoenix, ongoing deposit outflows, and ongoing liquidity-metric breaches. Tr. at 595:10–598:16, 2309:19–2311:25 (Warman) ("Q. So under these circumstances, in your view, was the Dividend consistent with



United States District Court
Northern District of California

prudent banking practices? A. No. Moving money [to the Holding Company] and away from the bank, which is where the deposits are[,] . . . seemed imprudent to me.”).

459. The Court accordingly finds that, by approving the Dividend while the Bank was in dire financial condition, Mr. Beck, Mr. Kruse, and the other ALCO members departed from the standard of care of an ordinarily prudent banker, who would have recognized the dire condition of the Bank in light of unrealized losses in the Bank’s securities portfolio, ongoing interest-rate-risk breaches, loss of depositors as venture-capital activity slowed, and liquidity breaches, as well as the risk of further interest-rate increases in 2023.

460. The Court also finds that, by approving the Dividend while the Bank was in dire financial condition, Mr. Beck, Mr. Kruse, and the other ALCO members subordinated the interests of the Bank to the interests of the Holding Company. Knowing that the Bank was in no position to upstream $294 million to the Holding Company, Mr. Beck, Mr. Kruse, and the other ALCO members nonetheless chose to pursue a bank-to-parent dividend to boost investors’ confidence in (and the stock price of) the Holding Company.

461. While the Court finds that approving the Dividend departed from the standard of care of an ordinarily prudent banker and subordinated the Bank’s interests to that of the Holding Company, there was insufficient evidence for the Court to conclude that this decision was made in want of even scant care or that it represented an extreme departure from the ordinary standard of care. The approval reflected the resumption of the policy of the Holding Company and Bank of upstreaming capital to the Holding Company that was in place prior to the COVID-19 pandemic and was carried out within the limits of the Holding Company’s Capital Management Policy.

**4. The Bank had unreasonably small assets at the time of the Dividend.**

462. At trial, Mr. Malek presented unrebutted expert testimony that the Bank had unreasonably small assets to sustain itself through stress testing in the context of the ebbs and flows of the business cycle, including the interest-rate fluctuations, deposit outflows, and liquidity stresses that its own metrics were warning it to plan for in a stress event. Tr. at 1293:18–23, 1344:3–7, 1347:17–25 (Malek).

United States District Court
Northern District of California

463. For a bank, the unreasonably-small-assets test ("USA Test") accounts for (1) the current balance sheet, with assets adjusted to fair value and liabilities measured at face value, (2) the potential for changes in interest rates, (3) the liquidity needs of the Bank and liquidity stress testing results, (4) depositor behavior, and (5) access to sustainable long-term borrowing. Tr. at 1343:12–1345:12 (Malek).

464. At the time of the Dividend, unrealized losses in the HTM securities portfolio were approximately $15.2 billion, which approached the total amount of the Bank's entire reported equity capital. Tr. at 1352:17–1354:3 (Malek); SF ¶ 17. A 1% increase in interest rates would lead to at least an additional $5 billion in losses. Tr. at 1354:21–1355:10 (Malek).

465. The Bank's unrealized losses nearing its equity, material interest-rate-risk breaches, loss of depositors as venture-capital activity slowed, liquidity breaches, and inability to monetize HTM assets through repurchase transactions in times of stress or other monetization channels all showed that it had unreasonably small assets to sustain itself through the fluctuations of the business cycle. Tr. at 1352:17–1354:16 (Malek) ("In the case of September 30, 2022, . . . when you subtract the liabilities from the assets and then subtract the HTM losses, there is a deficit of $790 million, just looking at the face of the Bank's balance sheet."). The HTM securities losses exceeded the tangible common equity of the Holding Company. TX 621 at 85, 125 (2022 Form 10-K). The Court credits Mr. Warman's testimony that financial analysts would find this consideration relevant. Tr. at 596:10–25 (Warman).

466. At the time of the Dividend, the Bank had experienced $25 billion in net deposit outflows in the last three quarters of 2022 and was internally forecasting about $5 billion in outflows per quarter of 2023. Tr. at 1359:9–1360:1 (Malek). The Bank also was in breach of its internal liquidity stress-testing metrics. Tr. at 1343:12–1345:12 (Malek) ("SVB, from the point in time it was required as a Large Financial Institution to begin a formal internal liquidity stress-testing process, was in continuous violations every stress test of multiple material stress test measures.").

467. The Bank was also borrowing at elevated interest rates to hold onto its massive long-term, fixed-rate investment portfolio that was paying considerably less. In an email to

Ms. Miller and Mr. Friedman dated October 31, 2022, Mr. Beck recognized that "[t]he true economic destruction occurs when borrowings become larger than the cash position." TX 1050 at 1; Tr. at 205:20–207:16 (Beck). Mr. Beck conceded at trial that, at the time of that email, the Bank's borrowings ($14 billion) did in fact exceed its cash position ($8 billion). Tr. at 207:17–208:2 (Beck).

468. The Court finds that the Bank's consideration of Project Phoenix and the expected adverse reaction in the market about a sale of AFS securities suggests that the Bank was in poor financial condition. Tr. at 1360:25–1363:1, 1366:17–25 (Malek) ("They were highly worried about adverse market reaction[,] so they were hoping to wait and see and hope things would work out. Hope doesn't count when you are working with a restructured company that's working on borrowed time, which is what was happening here.").

469. The Trust's assertion that the Bank had adequate regulatory capital does not undermine Mr. Malek's conclusion. The USA Test evaluates assets at fair value, not book value (which excludes mark-to-market losses on HTM securities). Tr. at 1342:10–1343:11, 1352:10–16 (Malek). The fact that Mr. Beck, Mr. Kruse, and the other ALCO members had used the HTM designation to avoid having to show massive unrealized losses in their investment portfolio does not change the economic position of the Bank at the time of the Dividend.

470. The Trust's assertion that the Bank's financial statements reflected adequate assets does not undermine Mr. Malek's conclusion. The Court credits Mr. Malek's testimony that, when total assets were reduced by total liabilities and then the HTM losses were subtracted—reflecting fair value—the Bank had negative equity of $790 million as of September 30, 2022, and only a "sliver" of $303 million in equity at the end of 2022. Tr. at 1352:1–1353:1 (Malek).

471. The Trust's assertion that the Bank's potential borrowing capacity was adequate also does not undermine Mr. Malek's conclusion. Short-term borrowing does not constitute an "asset" for the purpose of the USA Test. Tr. at 1343:13–1345:12 (Malek) ("The financial instructions are clear that it's only long-term permanent capital that counts. For short-term capital all that's being done is the debtor is substituting one short-term creditor due immediately or almost immediately for another short-term creditor due almost immediately.").



United States District Court
Northern District of California

472. Any "potential" long-term capacity was "subject to counterparty risk and other issues," and for purposes of the USA Test, "only long-term permanent capital . . . counts." Tr. at 1395:21–1396:4 (Malek). Accordingly, even crediting all the "potential" long-term capacity as being available, the Bank still lacked sufficient assets to satisfy the USA Test, and the Holding Company failed to secure a reliable way to monetize the HTM portfolio in a bank-specific stress scenario. Tr. at 1412:21–1413:8 (Malek); FF ¶¶ 338–343.

473. In fact, the Holding Company Directors recognized that the Bank would eventually have to realize losses on its HTM portfolio. Tr. at 2223:13–2224:2 (Matthews) (admitting that the Holding Company discussed potentially selling HTM securities in 2023); TX 3009 at 344:20–345:6 (Benhamou Tr.) (admitting that "the losses in the investment portfolio were of such magnitude that the probability of a decline . . . in interest rates was so low, there was no way for the EVE to fix itself" and that "recognition of these losses was inevitable").

474. To the extent the Trust suggests that, because the Bank was able to fund $40 billion in outflows on March 9, 2023, it necessarily had adequate assets or liquidity, the Court disagrees—that $40 billion in cash paid to depositors came from borrowed cash and the sale of the AFS securities on March 8, 2023. Tr. at 2411:11–2412:6 (Warman). Even if one includes short-term borrowing, that short-term borrowing was not actually available to the Bank because of counterparty risk as demonstrated by the fact that the Trust put in no credible evidence that repo agreements were used in the days prior to the Bank's failure. Tr. at 1417:1–9 (Malek); Tr. at 2238:4–2239:3 (Matthews); Tr. at 2308:17–24 (Warman). The Court agrees with Mr. Malek's testimony that at least some sale of AFS securities was inevitable as contemplated by Project Phoenix, leaving the sale of the underwater HTM securities (which would trigger immediate accounting recognition of the losses in the entire HTM portfolio) as the last viable source of liquidity. Tr. at 1416:2–9 (Malek).

475. The Court accordingly finds that, at the time of the Dividend, the Bank had unreasonably small assets to sustain itself through the ebbs and flows of the business cycle, including the interest-rate fluctuations, deposit outflows, and liquidity stresses that its own metrics were warning it to plan for in a stress event. Tr. at 1293:18–23, 1347:17–25 (Malek) ("[M]y

opinion is that SVB failed the unreasonably small assets test in December 2022 because it was suffering dire financial conditions and was on the road to financial ruin.”).

**I. The Trust’s Explanations for the Securities Portfolio and EVE-at-Risk Mitigation Are Neither Factually Supported nor Credible**

476. At trial, the Trust presented a variety of explanations that, according to the Trust, showed that Mr. Beck, Mr. Kruse, and the other ALCO members acted reasonably in constructing and managing the Bank’s portfolio and failing to bring EVE-at-risk into compliance. Each of these explanations suffers from the same defect: The Trust failed to introduce contemporaneous evidence at trial actually showing that any Officer or Director actually believed the explanation. Instead, the entirety of the Trust’s argument rests on highly coached, self-serving testimony from the Officers and Directors that the Court finds entitled to minimum weight.

477. The Trust also suggested at trial that a variety of actors, including outside advisers, Holding Company Directors, and regulators blessed the challenged actions. Again, that assertion is not supported by the evidence presented at trial, which established to the contrary that Mr. Beck, Mr. Kruse, and the other ALCO members directly contradicted outside advisers’ recommendations and continually breached the Holding Company’s EVE-at-risk threshold without justification.

**1. Concentrating the investment securities portfolio in long-term, fixed-rate securities while in breach of EVE-at-risk was not necessary to sustain capital.**

478. The Trust argued at trial that the Holding Company Directors exercised their business judgment to determine that sustained EVE-at-risk breaches were justified by capital needs. *See* Trust FFCL ¶¶ 111, 114–117. The Court does not credit this explanation because the Trust did not present any credible evidence at trial suggesting that any Officer or Director even linked the EVE-at-risk breaches to the pressure on capital ratios resulting from the influx of deposits in 2020 and 2021.

479. The Trust similarly neglected to introduce any contemporaneous evidence at trial demonstrating that Mr. Kruse, Mr. Beck, ALCO, or any other Officer or Director intentionally accepted the breaches of EVE-at-risk thresholds as necessary to maintain capital at regulatory



United States District Court
Northern District of California

United States District Court
Northern District of California

levels. Mr. Beck and Mr. Kruse admitted at trial that they never decided that the Bank had to breach the EVE-at-risk thresholds set forth in the Global Treasury Policy to sustain capital or generate sufficient earnings, *see* Tr. at 399:1–25 (Beck), and never conducted or presented any analysis suggesting that ALCO needed to breach EVE-at-risk to generate sufficient capital, *see* Tr. at 1861:14–19 (Kruse) ("You never performed an analysis and presented it to ALCO that the Holding Company and Bank needed to breach the EVE limits in order to support Tier 1 leverage? A. No, we did not.").

480. In fact, Mr. Kruse admitted that, even at trial, he was not taking the position that there was a tradeoff between breaching EVE-at-risk and maintaining adequate capital. Tr. at 1863:25–1864:1 (Kruse) ("I didn't testify to having to breach EVE continually in order to support capital.").

481. Mr. Friedman and Mr. Benhamou similarly agreed that management never told the Finance Committee or the Board that breaching EVE-at-risk was required to generate sufficient capital, earnings, or liquidity. Tr. at 1076:18–23, 1077:7–10 (Friedman); Tr. at 1260:9–12, 1268:18–22 (Benhamou).

482. The sustained EVE-at-risk breaches were not the result of an approved, policy-compliant tradeoff between EVE-at-risk and other financial metrics. Tr. at 2415:15–18 (Warman).

483. The only support that the Trust presented at trial for its assertion that breaching EVE-at-risk was necessary to maintain capital at regulatory ratios was witness testimony, which the Court does not find factually supported or credible. The Court does not credit Mr. Benhamou's testimony that the capital levels were a "clear and present danger" that could have "jeopardized the health of the Bank." Tr. at 1218:15–24 (Benhamou). In fact, as Mr. Kruse recognized at trial, "at no time in 2021 or 2022 were [the Holding Company and Bank] anywhere near the regulatory minimum." Tr. at 1858:18–20 (Kruse).

484. The Court does not credit testimony from Mr. Benhamou, Mr. Friedman, and Ms. Mitchell suggesting that the Holding Company made a business judgment that generating income on its security portfolio to maintain regulatory capital ratios required breaching EVE-at-

risk. *See* Trust FFCL ¶¶ 116–117. This testimony contains no specificity regarding the time, place, or manner of any such decision.

485. The Trust's suggestion that the EVE-at-risk breaches were justified by capital needs is further undermined by Mr. Kruse's concession at trial "[t]hat was not anything that was a consideration of breaching EVE in order to preserve Tier 1 Capital. It was – they were not associated in that way." Tr. at 1861:20–24 (Kruse); *see also* Tr. at 1862:18–20 (Kruse) ("That was not a direct link in the quantifiable change in Tier 1 leverage ratio relative to EVE because the two were measured in different ways.").

486. The Trust's attempts at trial to link EVE-at-risk breaches with the need to support capital by boosting short-term income is further contradicted by the Holding Company and Bank's internal analysis. In a presentation dated February 9, 2021, the Asset Liability Pricing Committee estimated that "[i]f we earn 2% on asset (deployed roughly 50/50 in loans and investment securities yielding 3% and 1%), it will take almost 5 years to accumulate enough capital to mute asset growth impact on leverage ratio." TX 412 at 5; Tr. at 1866:13–1868:4 (Kruse).

487. The Court also rejects the Trust's explanation because the evidence at trial showed that the Holding Company Officers and Directors knew and understood that they could not solve the Bank's capital ratio problems through investment strategy. It was always incumbent upon the Holding Company to raise capital and downstream it to the Bank. The Bank and Holding Company knew that "[l]ower yields on high-quality earning assets cannot generate capital fast enough [to] offset the effect on the ratio from the increase in asset growth." TX 116 at 50 (10/2020 Finance Committee Packet).

488. Contemporaneous internal documentation consistently shows that management understood that downstreaming money to the Bank—not generating short-term income by deploying deposits to purchase securities—was the primary way to maintain capital:

> Over the last two quarters, we have been monitoring the trends in the Leverage Ratio daily and are providing weekly updates to ALCO and to our regulators. This will continue until the ratio trend reverses and moves higher. Remediation initiatives to date have focused on slowing the pace of on-balance sheet deposit growth (positioning off-balance investments as an alternative to on-balance deposits) but have not resulted in a slowing of the growth trend. A new product (FDIC-

United States District Court
Northern District of California

> Insured Cash Sweep targeting Q1 2021 rollout) is expected to be an impactful tool in managing the pace of on-balance asset growth but must be used in conjunction with other products to be the most effective. Downstreaming capital from the holding company will have an immediate positive impact and is likely to be the course of action in the near-term if the ratio continues moving lower. Holding Company cash totals $1.3B and is available to downstream and correct the ratio immediately. **In terms of sensitivity, downstreaming $400 million would increase the ratio by approximately 45bps.** <u>We expect to maintain the ratio above 6.00%</u>. . . .
>
> **If the ratio moves below 6.00% over the course of the fourth quarter, Treasury will recommend a capital downstream to bring the ratio back up to at least the outer threshold of 6.50%.**

TX 116 at 50–51 (10/2020 Finance Committee Packet) (emphasis in original).

> Substantial growth in client deposits since May 2020 has led to a growing balance sheet and a declining trend in the Bank's regulatory tier 1 leverage ratio, despite steady capital growth. The ratio is estimated to be ~6.40% at the end of Q3 2020 which is below our Risk Appetite Statement ("Risk Appetite Statement") Outer Threshold of 6.50%. Management's recommendation is to allow the ratio to move lower, temporarily, under the expectation that the pace of deposit growth will slow in Q4 2020 allowing the ratio to stabilize and increase, supported by continued earnings growth. If the declining trend continues to the point to falling below 6.00% in Q4, Management recommends a capital downstream to the Bank to bring the ratio back above 6.50%.

TX 351 at 22 (10/2020 ALCO Packet).

> The Bank Leverage Ratio at the end of April was 6.77%, above i[t]s Outer Limit of 6.50% but 23bps below its Inner Threshold. Without the proposed downstream, the ratio at the Bank-level is estimated to end the month of May at 6.44%. With the downstream, the ratio is forecasted to end May at 7.34%. **As noted during our Capital Plan discussions, our intent is to reach and maintain Tier 1 Leverage Ratios of 8.0% at SVBFG and 7.0% at SVB through the remainder of 2021**. . . . **We request approval from ALCO to downstream $1.25B to the Bank, effective May 14, 2021**. Doing so will increase the Bank Leverage Ratio by approximately 90bps to 7.34% and provide support to the ratio.
>
> . . . .

**Appendix A – Summary of Capital Action Plan and current Status**

| Capital Actions | Timing | Ratio Impact | Status |
|---|---|---|---|
| $400MM Capital Downstream to SVB | November 25, 2020 | +42bp Dec'20 (Bank) | COMPLETE |
| $300MM Capital Downstream to SVB | December 24, 2020 | +30bp Dec'20 (Bank) | COMPLETE |
| $750MM Preferred Equity Issuance SVBFG | January 26, 2021 | +65bp Feb'21 (Consolidated) | COMPLETE |
| $750MM Capital downstream to SVB | February 2021 (Preferred Equity proceeds) | +68bps Feb'21 (Bank) | COMPLETE |
| $750MM Capital downstream to SVB | March 4, 2021 (Senior Notes proceeds) | +61bps Mar'21 (Bank) | COMPLETE |
| $1B Common Equity Issuance at SVBFG | March 22, 2021 | +78bps Mar'21 (Consolidated) | COMPLETE |
| $500M Capital Downstream to SVB | March 30, 2021 | +40pbs Mar'21 (Bank) | COMPLETE |
| $1B Preferred Equity Issuance at SVBFG | May 6, 2021 | +81bps May'21 (Consolidated) | COMPLETE |
| $1.25B Capital Downstream to SVB | May 12, 2021 | +90 bps May '21 (Bank) | Recommended Approval |

TX 365 at 158–159 (05/2021 ALCO Packet) (emphasis in original).

489. Mr. Kruse admitted at trial that the primary way to address capital ratios was to downstream money from the Holding Company to the Bank:

> Q. The primary way that the Holding Company addressed the being within an inner threshold for capital was there was billions of dollars that were downstreamed from the Holding Company to the Bank in 2021, right?
> A. During 2021, yes.
> Q. Right. And that's the primary way. Because the whole reason for [the] existence of a holding company is to provide support to a bank, right?
> A. Yes, I understand that.
> Q. That's its reason for being, right?
> A. Yes.

Tr. at 1864:5–15 (Kruse).

490. The Court credits Mr. Warman's testimony that, based on his three decades of experience as a treasurer and the experience of other prudent treasurers, it is possible to manage both net interest income and economic value of equity at the same time, as he did as treasurer of M&T Bank and as did every other treasurer of large financial institutions that he knew. Tr. at 478:3–8, 480:7–15, 492:12–493:17, 660:14–20 (Warman).

491. In response to the Court's questions, Mr. Warman testified that he was not aware of a single organization that does not attempt compliance with EVE-at-risk or substitutes EVE-at-risk with a different measurement. Tr. at 493:14–17, 604:13–605:2 (Warman) ("Q. . . . [D]o you take [SR 10-1], based on your experience, to mean that risk limits are made to be broken at banks? A.



United States District Court
Northern District of California

Not in the least."). The Court accords significant weight to this testimony because Mr. Warman was the only standard-of-care expert presented at trial.

**2. BlackRock did not recommend concentrating the securities portfolio in long-term mortgage-backed securities in breach of EVE-at-risk.**

492. In fall 2020, Holding Company Officers hired BlackRock to assess its credit asset risk appetite. *See* TX 704 at 6 (11/21/2020 Materials from BlackRock) ("In partnership with the Treasury team, we [BlackRock] analyzed a series of hypothetical model portfolios . . . to create target allocations that may achieve greater yield within SVB policy and balance sheet constraints."). The Trust suggested at trial that Mr. Beck, Mr. Kruse, and the other ALCO members' investment portfolio was reasonable because it was recommended in part by BlackRock. This explanation is not supported by the factual record developed at trial.

493. BlackRock's analysis of optimized portfolios focused on allocations within the limits set by the Global Treasury Policy for the allocation of specific security types. BlackRock's optimized portfolios called for reduced duration of the investment portfolio, significant reductions in investments in conventional mortgage-backed securities from 39% of the portfolio to 20% of the portfolio and increased credit investments, among other modifications. TX 699 at 5 (12/07/2020 Materials from BlackRock); TX 704 at 7 (11/21/2020 Materials from BlackRock).

494. In addition to presenting optimized portfolios, BlackRock also analyzed how the Holding Company could bring EVE sensitivity into compliance based on the fall 2020 portfolio and observing the limits set by the Global Treasury Policy. BlackRock's analyses showed that EVE-at-risk compliance could be achieved for modest reductions in yield, advising management that compliance with EVE-at-risk limits could be achieved with limited tradeoff in income. TX 699 at 7 (12/07/2020 Materials from BlackRock); TX 704 at 9 (11/21/2020 Materials from BlackRock).

495. Although giving lip service to adopting BlackRock's recommendations, Mr. Beck, Mr. Kruse, and ALCO actually rejected BlackRock's suggested portfolios by deciding to concentrate the majority of the much larger investment portfolio in 2021 in conventional



United States District Court
Northern District of California

mortgage-backed securities. *Compare* TX 704 at 9 (11/21/2020 Materials from BlackRock), *with* TX 383 at 186 (01/2022 ALCO Packet).

496. Mr. Beck's testimony to the contrary that the investment strategy was based on BlackRock's advice is not credible. At trial, Mr. Kruse admitted that the investments approved by him, Mr. Beck, and ALCO were not "base[d] . . . on BlackRock's total advice as presented in their materials." Tr. at 1908:3–9 (Kruse). In response to the Court's questions, Mr. Kruse confirmed that BlackRock recommended rebalancing the investment portfolio but that management "went in the other direction" by adding more mortgage-backed securities designated as held-to-maturity where BlackRock recommended less. Tr. at 2006:14–2009:14 (Kruse).

497. Other portions of Mr. Kruse's testimony similarly cast doubt on Mr. Beck's suggestion that the investment portfolio was based on BlackRock's recommendations. Mr. Kruse also testified that the increased investment in mortgage-backed securities during 2021 and 2022 "wasn't specifically based upon" BlackRock's recommendation on balancing the portfolio. Tr. at 2008:18–22 (Kruse). He also denied ever telling ALCO or the Finance Committee that the Global Treasury Department "based" its "investment strategy for 2021 on BlackRock's advice." Tr. at 1908:3–9 (Kruse). Although some members of the Finance Committee testified at trial that they believed the Officers were adopting the BlackRock recommendation, that is not what the evidence shows.

498. The Court also finds that Mr. Beck's testimony was not based on actual personal knowledge. For example, Mr. Beck could not recall meeting with BlackRock or reviewing materials beyond summaries, and he testified that his testimony about the strategy being based on BlackRock's advice was entirely based on what other people allegedly told him. *See* Tr. at 373:23–375:12, 376:5–16, 379:11–380:5, 392:22–393:1 (Beck).

499. When confronted with BlackRock's actual reports and the ALCO report showing the actual portfolio created by ALCO, Mr. Beck could not meaningfully testify about the meaning of either BlackRock's portfolios or the ALCO reports that he reviewed and approved every month as an ALCO member and Chief Financial Officer. Tr. at 374:25–375:12, 391:12–393:1 (Beck)

United States District Court
Northern District of California

(“Q. Other than the summary, the two-page summary that we saw . . . did you read any other materials from BlackRock? A. I can’t recall that in detail, no.”).

500. Based on Mr. Beck’s admission that he never actually reviewed BlackRock’s recommendations outside of a two-page executive summary, the Court does not credit his testimony that his investment strategy was based on BlackRock’s recommendations. *See* Tr. at 255:17–19 (“Q. And was your 2021 strategy based, at least in part, on the advice you got from BlackRock? A. It was based largely on the advice from BlackRock.”). The Court is left to conclude that Mr. Beck was particularly negligent in rejecting the BlackRock recommendations without even reading or studying the reports.

501. No Director had any personal knowledge to testify that 2021 investment decisions were based on any BlackRock advice. Both Mr. Friedman and Mr. Benhamou conceded that they had no direct interaction with BlackRock and could not testify whether the investment decisions were based on any BlackRock report or guidance. *See* Tr. at 1074:10–1075:6 (Friedman); Tr. at 1269:2–1270:20 (Benhamou).

502. The Court thus concludes that Mr. Friedman’s testimony that the Bank’s investment portfolio “reflected [BlackRock’s] guidance” either was (1) the result of a misrepresentation made to him by management or (2) without any factual basis. Tr. at 1009:10–13 (Friedman). In either case, he was wrong.

503. The Court thus similarly concludes that Mr. Benhamou’s testimony that the Bank’s investment portfolio was based on BlackRock’s recommendations was either (1) based on his misplaced “rel[iance] on management” or (2) without any factual basis. Tr. at 1270:5–20 (Benhamou). In either case, he, too, was wrong.

**3. Holding Company Officers’ doubts regarding the assumptions built into the EVE-at-risk model did not justify disregarding the continued breach without meaningful attempts at mitigation.**

504. Many banking models, including EVE-at-risk, NII-at-risk, and internal-liquidity-stress tests, rely upon inputs and assumptions. Tr. at 2293:24–2294:15 (Warman).

United States District Court
Northern District of California

505. An important assumption used in both EVE-at-risk and NII-at-risk is the modeled duration of deposits. TX 584 at 92–93 (2021 Form 10-K); Tr. at 1073:20–1074:3 (Friedman); Tr. at 1602:7–9 (Miller).

506. All else equal, a longer deposit duration would reduce the EVE-at-risk breaches, and a shorter deposit duration would increase the EVE-at-risk breaches. Tr. at 1769:1–1770:4 (Kruse); Tr. at 2297:6–2298:7 (Warman).

507. At trial, the Trust presented EVE-at-risk as an unreliable, assumption-riddled metric that the Holding Company Officers justifiably deprioritized. *See, e.g.*, Trust FFCL ¶¶ 73, 155–159. The Court does not find this presentation credible. The Trust did not present any credible evidence that the model was, in fact, wrong or inaccurate. The only evidence presented was that certain Officers and Directors doubted the accuracy of some undefined assumptions built into the model.

508. Similarly, Officers and Directors testified that they suspected that the EVE-at-risk model underestimated the duration of the Bank's deposits or that breaches could be ameliorated following a deposit study by Curinos. *See, e.g.*, Tr. at 1547:13–1548:20 (Miller). The Court does not find this testimony credible or supported by the record, as there is no credible evidence that the duration assumption was incorrect.

509. Several Holding Company Directors' concerns regarding the accuracy of the EVE-at-risk model's breach determinations are also not credible because those directors admitted that they were unaware of any specifics. For example, Mr. Friedman admitted he never read the Curinos report, never met with Curinos, and had no firsthand knowledge of what Curinos recommended or whether management implemented those recommendations. Tr. at 1075:7–19 (Friedman).

510. As another example, Mr. Benhamou admitted he never met with Curinos and did not know specifically that Curinos warned management that deposits would shorten in a rising-rate environment. Tr. at 1270:24–1271:10 (Benhamou).

511. Ms. Miller's concern that "the EVE model was broken in a very low interest rate environment because you could not shock rates further downward" and accordingly "[o]nly one

United States District Court
Northern District of California

half of the model could be deployed" only confirms that the Finance Committee's concerns regarding EVE-at-risk modeling were largely the result of the members either not being familiar with or flat out ignoring the clear regulatory guidance set forth in SR 10-1. Tr. at 1591:3–1592:24 (Miller).

512. The Court is left to conclude that Mr. Beck, Mr. Kruse, and the other ALCO members either did not take the EVE-at-risk breach seriously or instead prioritized NII-at-risk simply to avoid having to give up yield. Either way, the primary way that they tried to "remediate" the breach was by changing the assumptions underlying the Holding Company and Bank's deposit model. TX 393 at 11, 13 (05/2022 ALCO Packet).

513. The Court credits Mr. Warman's testimony that assumptions underlying risk metrics should be reviewed through a controlled and serious process and that a bank cannot ignore a risk simply by saying it does not believe the measure. Tr. at 605:3–606:25 (Warman).

514. Mr. Beck agreed at trial with the statement that "during this period of sustained doubt about whether [management] had a reliable interest-rate risk measure, the ALCO committee kept directing more securities purchases that created more risk in interest rates." Tr. at 144:18–24 (Beck).

515. The Court accords significant weight to Mr. Warman's opinion that if a risk metric is thought to be unreliable, the prudent response is to not continue taking the risk until its reliability can be established. Tr. at 568:3–25 (Warman) ("[I]f you can't measure the risk, you can't take it."). The Court credits this opinion over Officers and Directors' testimony at trial that EVE-at-risk breaches could be discounted based on doubts in the model.

516. Mr. Kruse admitted that no policy or directive allowed management to disregard EVE-at-risk breaches simply based on potential updates to the model's underlying assumptions. Tr. at 1960:2–6 (Kruse).

517. At trial, the Trust did not identify any legitimate basis for the Holding Company Officers and Directors to doubt the accuracy of the deposit assumptions feeding into the EVE-at-risk model. On these bases, the Court finds that Mr. Beck, Mr. Kruse, and the other ALCO

members' repeated failure to remediate the EVE-at-risk breaches represented an extreme departure from the standard of care of an ordinarily prudent banker.

518. In response to the Court's question whether his concerns about EVE-at-risk were caused by a calculation bug or a change in assumptions, Mr. Beck testified that it was a "change in the assumptions" and that it was not that the prior model was flawed. Tr. at 155:4–12 (Beck).

519. Mr. Beck also agreed that "the gist of those model changes was that [he] assumed that the deposits that had come in to [the Bank] in this surge would stay longer" than the original model predicted. Tr. at 161:25–162:4 (Beck). That assumption had no discernible factual basis based on the evidence presented at trial and turned out to be simply wrong. To the extent that assumption was one of the reasons that Mr. Beck caused ALCO to continue purchasing long-term, fixed-rate securities while in continuous breach of EVE-at-risk, that assumption was imprudent and ultimately caused the Bank harm when those deposits foreseeably were withdrawn in 2022.

520. Mr. Beck and Mr. Becker's stated concerns regarding the accuracy of the EVE-at-risk model's breach determinations are also contradicted by the fact that, as conceded at trial, Mr. Beck and Mr. Becker repeatedly certified and swore in securities filings that the EVE-at-risk disclosures represented the best information available through 2021 and 2022. Tr. at 160:7–161:21 (Beck) ("Q. So the best information that you had about the level of interest-rate risk you were taking in your securities portfolio told you that you were in sustained breach of the Global Treasury Policy, right? A. That's correct."); Tr. at 696:2–7, 700:16–701:2, 702:5–11 (Becker).

521. The Court is left to conclude that, to the extent the EVE-at-risk modeling assumptions were sufficiently reliable to inform the investing public, the EVE-at-risk breaches should have been taken seriously at the Holding Company and Bank during this period, and Mr. Beck, Mr. Kruse, and the other ALCO members were negligent in failing to do so.

**4. Curinos did not recommend or approve the modeling assumption changes that Holding Company Officers adopted to mask EVE-at-risk breaches.**

522. In May 2021, less than a year after completing its own two-year deposit study, the Holding Company engaged Novantas (renamed Curinos) to model the estimated duration of the

Bank's deposits. Tr. at 327:12–328:11 (Beck); Tr. at 2016:17–2017:3 (Kruse); TX 1567 (05/2021 Novantas/Curinos Proposal). The Holding Company Officers' stated reliance on the engagement of Curinos to justify continued breach of EVE-at-risk limits is not credible because Mr. Beck, Mr. Kruse, and ALCO did not follow Curinos's recommendations.

523. Mr. Beck represented to ALCO in July 2021—months prior to Curinos's November report and prior to any actionable information from Curinos—that the expected deposit-modeling would cure the EVE-at-risk breaches. TX 373 at 4 (07/2021 ALCO Minutes); TX 369 at 120 (07/2021 ALCO Packet). Mr. Beck was counting on Curinos to back his belief that deposit duration was stronger than currently reflected in the EVE-at-risk model, which would bring EVE-at-risk closer to compliance.

524. In November 2021, Curinos issued a report in which it provided a range of core percentage by deposit segment and recommended that management use the midpoint for each segment, which ranged between 51.8% and 67.7%. TX 1579 at 61 (Curinos Report). A core deposit is "the portion of [the] balance that is long-term investable . . . . [and] not volatile or susceptible to . . . runoff in a short period of time." TX 3011 at 114:22–115:03 (Muenzen Tr.).

525. After the Curinos report was issued in November 2021, the Holding Company and Bank ran the EVE-at-risk numbers using Curinos's recommendations; those assumption changes were insufficient to cure the sustained EVE-at-risk breaches. TX 381 at 159 (12/2021 ALCO Packet); Tr. at 419:3–420:11 (Beck) ("Q. . . . [N]ow after this information comes in, they are still out of compliance, right? Even making assumptions about deposits staying longer, right? A. That's what's on the page, yes."); Tr. at 1971:4–19 (Kruse).

526. After Curinos's recommendation failed to "cure" the EVE-at-risk breach, Mr. Beck, Mr. Kruse, and the other ALCO members disregarded the Curinos report and went outside of Curinos's range of permissible assumptions regarding how much of the deposit base was "core" and therefore more stable and potentially long-term investable. TX 1579 at 5 (Curinos Report); TX 3011 at 114:18–115:15 (Muenzen Tr.); Tr. at 2294:24–2295:25 (Warman).

527. Mr. Beck, Mr. Kruse, and the other ALCO members approved a "management overlay" to increase the proposed core percentage to 74%, which was beyond even the high end of

Curinos's recommended range between 51.8% and 67.7%. *Compare* TX 393 at 11–12 (05/2022 ALCO Packet), *with* TX 1579 at 61 (Curinos Report). The overlay was unsupported and inconsistent with Curinos's warnings about surge deposits, higher-rate environments, and the need for a more conservative core/non-core approach. TX 1579 at 45, 57–58, 60–61 (Curinos Report).

528. In fact, Curinos warned Mr. Beck, Mr. Kruse, and the other ALCO members that, according to its historical deposit data, when the federal funds target rate was at or above 1%, the Bank's deposits would leave or re-price faster and that deposits showed shorter "weighted average life" in that rate environment. TX 1579 at 32, 45, 50, 60–61 (Curinos Report); TX 3011 at 136:24–138:6 (Muenzen Tr.).

529. By the time that ALCO adopted changes to the deposit model in May 2022, rates were already rising. TX 393 at 12 (05/2022 ALCO Packet); TX 3011 at 264:20–265:4 (Muenzen Tr.).

530. The Court accordingly finds that it was imprudent and objectively unreasonable for ALCO to assume that nearly three-quarters of the new, uninsured deposits would remain at the Bank in the long term to support the securities portfolio. Tr. at 2295:11–25 (Warman) ("Q. . . . In your opinion, did the Officers of the Holding Company and the Bank have a reliable basis to know how these deposits would behave? A. No. . . . $120 billion came in over a two-year time period [This was] money from the same customers, . . . but money those customers didn't have before. . . . [I]n my opinion, there's no reasonable way to think, you know, you can even really understand these [deposits]."); *see also* TX 1579 at 45 (Curinos Report); TX 3011 at 264:20–265:16 (Muenzen Tr.).

531. To the extent that the Trust suggests that the Finance Committee reasonably believed that deposits would not decline significantly in a rising rate scenario based on historically "sticky" deposit bases, *see* Trust FFCL ¶ 128, that belief was directly contrary to Curinos's report, and the Trust provided no explanation why the Directors' anecdotal beliefs would be more reliable than the deposit study the Holding Company itself commissioned.

532. Even after implementing unsupported deposit assumptions beyond Curinos's recommendation, EVE-at-risk was again in breach of the outer thresholds within two months of the model change. TX 401 at 110 (09/2022 ALCO Packet).

533. Holding Company and Bank personnel flagged that the altered model's increased deposit durations "seem[ed] unlikely" given the market reality. TX 1273 at 2.

534. Gregory Muenzen, a Senior Vice President at Curinos, testified that no one from the Bank consulted him around May 2022 to tell him what the Bank intended to do with its deposit model. TX 3011 at 247:7–247:15 (Muenzen Tr.).

535. Mr. Muenzen also testified that he did not know what the Bank ultimately implemented until he later saw the May 2022 ALCO packet. TX 3011 at 242:20–244:6 (Muenzen Tr.).

536. As was the case with BlackRock's recommendation, *see* FF ¶¶ 498–503, Officers and Directors acted contrary to Curinos's recommendation and did not have a factual basis for their testimony that they followed the recommendation at trial. Mr. Beck admitted at trial that he approved these changes without reading the Curinos report "in detail" or even being aware of Curinos's warning about the implications of rising interest rates for deposits. Tr. at 393:8–20, 417:4–15 (Beck). The Court accordingly finds that this conduct was not in accord with the standard of care of an ordinarily prudent banker.

537. The Court credits Mr. Warman's testimony that nothing in the Curinos report would have led a prudent banker to assume they did not have an interest-rate risk problem based on the sustained EVE breaches. Tr. at 577:1–578:7, 606:21–608:1 (Warman) ("Q. And so in your opinion, would a prudent banker have to have factored in . . . the risk that rates would rise and change their depositors' behavior? A. Yes, of course. That's what Curinos was warning them about.").

538. Going into the Curinos engagement, the Officers believed that deposit duration was under-counted and should be extended in the new model assumptions; this turned out to be wishful thinking because Curinos found that a lower duration assumption was warranted. Ignoring Curinos's recommendation, the Officers implemented their own, unsupported duration

assumptions in hope of curing the EVE-at-risk breach. This hope was proved wrong by the market; EVE sensitivity was not cured, and deposit outflows surged.

539. The Court accordingly finds that the aggressive deposit duration assumptions implemented by ALCO were not justified in light of the Curinos report or consistent with prudent bankers managing risk posed by a sudden surge of deposits. Tr. at 2295:8–25 (Warman) ("Q. In your opinion, did the officers of the Holding Company and Bank have a reliable basis to know how these deposits would behave? A. No."). The Court further finds that Mr. Beck, Mr. Kruse, and the other ALCO members were negligent in disregarding Curinos's recommendations.

**5. None of the materials identified by the Trust as EVE-at-risk mitigation plans were Global Treasury Policy compliant or otherwise comported with prudent banking principles.**

540. At trial, the Trust presented various disconnected, passing references to EVE by Officers and Directors from 2021 and 2022, suggesting these materials constituted a risk mitigation plan as required by the Global Treasury Policy. *See* Trust FFCL ¶¶ 142–153. None of these materials—considered separately or together—remotely suggest that management was even taking EVE-at-risk breaches seriously, let alone putting together a Global Treasury Policy compliant remediation plan assessing the impact on prospective earnings, capital, and liquidity.

541. The October 2020 breach notification did not identify any action that would bring EVE back into compliance with Board-mandated thresholds in the Global Treasury Policy. TX 351 at 115–17 (10/2020 ALCO Packet). Instead, under "action plan," and after expressly stating that the Global Treasury Policy requires development of a risk mitigation plan to be submitted to ALCO and the Finance Committee, the October 2020 breach notification simply stated the "limits themselves may also need to be reviewed and recalibrated" but that they should not consider changing the newly deployed deposit model. TX 351 at 116 (10/2020 ALCO Packet).

542. The March 2021 breach notification listed two potential actions but did not provide any specificity for the two actions, any information about how either action would bring EVE-at-risk back within limits or any analysis on the impact of "prospective earnings, capital, and

liquidity" as required by the Global Treasury Policy. TX 361 at 94–95 (03/2021 ALCO Packet); TX 465 at 13 (2021 Global Treasury Policy); Tr. at 2267:1–2268:9 (Warman) ("Q. And [the March 2021 breach notification action plan] says '[t]his consists of managing the duration of the investment portfolio.' Is that a remediation plan? A. No, it's not. It's, candidly, a statement of the obvious.").

543. Mr. Kruse's own June 21, 2021, email confirmed that he understood reporting the EVE breach was not enough and that ALCO was not taking actions to attempt to remediate the EVE breach. TX 762 at 1.

544. Six months into the sustained 2021 EVE breach, Mr. Kruse wrote to Treasury members, "We can't just simply keep reporting it as out of compliance while knowing there are ways to address the sensitivity." Tr. at 1938:7–1939:7 (Kruse).

545. Nor did the various iterations of the "proposed EVE sensitivity mitigation roadmap" satisfy the Global Treasury Policy as a legitimate mitigation plan. This roadmap was initially circulated as part of Mr. Kruse's June 21, 2021, email and subsequently incorporated into an ALCO package in July 2021. TX 762 at 4; TX 369 at 119 (07/2021 ALCO Packet).

546. At trial, Mr. Kruse conceded that this mitigation roadmap "was not meant to be a sufficient mitigation plan" under the Global Treasury Policy. Tr. at 1946:17–21 (Kruse). The Court also credits Mr. Warman's testimony that the roadmap lacked the requisite specificity to identify how to bring the metric back within limits. Tr. at 2269:2–2270:11 (Warman).

547. The four-bullet-point list identified by Mr. Benhamou and presented to the Finance Committee in October 2021 also was not a mitigation plan. TX 138 at 50 (10/2021 Finance Committee Packet).

548. Mr. Benhamou at trial conceded that the October 2021 document merely listed a set of possible actions, but he could not testify there was any plan for additional hedging, to increase cash balances, or to reduce the duration of the HTM portfolio to cure the EVE-at-risk breach. Tr. at 1275:16–1277:25 (Benhamou).

549. During his direct examination, Mr. Kruse testified to six categories of "actions" purportedly taken in response to the Bank's sustained EVE-at-risk breaches: (1) Increase Cash;



United States District Court
Northern District of California

(2) Lower Duration; (3) Hedges; (4) Deposit Products; (5) Analyze Assumptions; and (6) Increase Loans. Tr. at 1761:17–1764:9 (Kruse).

550. The Trust's counsel reduced this testimony to a demonstrative exhibit, Demonstrative Exhibit 3010, entitled "EVE Actions." Mr. Kruse confirmed that these six items represented "the actions that were taken to address EVE breaches between the fall of 2020 until the bank's failure in March of 2023." Tr. at 1845:11–17 (Kruse).

551. This made-for-trial "plan" does not have any contemporaneous documentation in the record, and Mr. Kruse's testimony that he intended this list of actions to constitute a Global Treasury Policy compliant mitigation plan during 2021 is not credible.

552. The Trust failed to introduce any contemporaneous evidence reflecting that Mr. Kruse's six action items were ever adopted, quantified, or executed by the officers responsible for curing the EVE-at-risk breach.

553. The Trust failed to introduce any contemporaneous evidence or testimony suggesting that Mr. Kruse's six action items were presented to or approved by ALCO or the Finance Committee as required by the Global Treasury Policy. *See* Tr. at 1765:14–16, 1848:7–24 (Kruse).

554. The Court finds it simply implausible that Mr. Kruse actually believed that he had created a Global Treasury Policy compliant mitigation plan without writing it down or presenting it to anyone at the Holding Company or Bank.

555. Each of the six items on the Trust's Demonstrative Exhibit amounts to nothing more than, in Mr. Warman's words, "a listing of the . . . potential of the tools that potentially could be used." Tr. at 2269:9–2270:11 (Warman). The Court credits Mr. Warman's opinion that a generic list of options is not a mitigation plan because it cannot be objectively evaluated by a reasonably prudent banker. Tr. at 2265:1–11 (Warman).

556. As to Item 1 (Increase Cash), Mr. Kruse could not identify any document setting a target cash amount intended to reduce EVE sensitivity. Tr. at 1848:13–16 (Kruse) ("Q. You are not aware of any document in the ALCO materials that says, 'We are going to target an amount of cash to reduce EVE duration,' right? A. Not with that specificity, no.").

557. The contemporaneous evidence shows that, on the contrary, the Holding Company and Bank's combined cash balance declined from $17.7 billion at the end of 2020 to $14.6 billion at the end of 2021. TX 584 at 98 (2021 Form 10-K); Tr. at 1847:4–18 (Kruse).

558. As to Item 2 (Lower Duration), although Mr. Kruse testified at trial that the "plan" was to target a duration of 3.5 to 4 years, the contemporaneous evidence reflects that the overall average duration of the securities purchased in 2021 was 4.6. TX 383 at 134 (01/2022 ALCO Packet) (showing that duration of newly purchased securities was 4.4 in Q1, 4.4 in Q2, 4.9 in Q3, and 4.4 in Q4); Tr. at 1851:14–1852:10 (Kruse).

559. Mr. Kruse stated at his deposition that he did not recall any specific actions to reduce the duration of securities as a direct response to cure EVE. Tr. at 1855:4–19 (Kruse) ("Question: Was part of the action plan to mitigate this breach at this particular time, as of the date of this ALCO meeting, to take steps to reduce the duration of the investment portfolio and therefore the liability sensitivity of that portfolio? Answer: I don't recall any specific actions to reduce the duration of securities as a direct response to cure EVE." (internal quotation marks omitted)). The Court credits Mr. Kruse's answer at his deposition over his testimony at trial.

560. As to Item 3 (Hedges), the entire interest-rate swap portfolio grew to $10.7 billion, an amount that, "by [ALCO's] own description . . . was never going to be enough to remediate the breach." Tr. at 557:13–18 (Warman); *see also* Tr. at 1856:16–19 (Kruse) ("Q. . . . Had you kept . . . more of the securities in the available-for-sale portfolio and put on more hedges, you would have reduced the EVE sensitivity, right? A. It would have contributed toward reducing EVE sensitivity.").

561. Mr. Kruse's testimony that placing the Hedges on the AFS securities was part of ALCO's risk mitigation plan is also undercut by the simple fact that ALCO terminated the Hedges in 2022, worsening EVE-at-risk and leaving the entire $125 billion investment portfolio unprotected to rising rates. Tr. at 580:17–19 (Warman).

562. As to Item 4 (Deposit Products), Mr. Kruse could not state the impact of any new deposit product on the EVE calculation, let alone explain how ALCO took steps to meaningfully reduce interest-rate risk exposure as required by the Global Treasury Policy:



United States District Court
Northern District of California

> Q. Okay. Well, tell the Court in 2021, the magnitude of the impact of any new deposit products on the EVE calculation?
> A. I don't know specifically what it was on any point in time.
> Q. Well, you just testified that this was one of the actions that was taken in EVE. Quantify for the Court how much effect those deposits products that you were referring to had on the EVE breaches?
> A. I can't quantify it.

Tr. at 1857:7–15 (Kruse).

563. As to Item 5 (Analyze Assumptions), Mr. Beck conceded that the "best information" that ALCO possessed on its deposit assumptions and EVE calculations was that it was in sustained breach of its own risk limits. Tr. at 160:1–161:9 (Beck).

564. As explained above, the Court does not credit the Trust's suggestion that a reasonably prudent banker would view changing modeling assumptions (rather than revisiting the investment strategy driving the breach) as a Global Treasury Policy compliant risk mitigation plan.

565. As to Item 6 (Increase Loans), while the Bank and Holding Company did increase the total dollar volume of loans, the ratio of loans to securities continued to shrink as Mr. Beck and Mr. Kruse kept directing new funds into the investment portfolio, such that by the end of 2021, the Bank and Holding Company's assets had shifted to roughly two-thirds investment securities. TX 584 at 98 (2021 Form 10-K).

566. These six items, whether considered alone or in combination, did not constitute a risk mitigation plan as required by the Global Treasury Policy, nor would they be recognized as a reasonably definite plan under prudent banking principles.

567. Failure to present a mitigation plan constituted a breach of Mr. Beck's responsibilities as Chief Financial Officer, Mr. Kruse's responsibilities as Global Treasurer, and ALCO's duties as a committee, as set forth in the Global Treasury Policy.

568. The Global Treasury Policy did not permit management to ignore EVE-at-risk or remain in breach of EVE-at-risk in favor of another metric. Tr. at 290:8–18 (Beck) (admitting that no policy authorized management to disregard the EVE-at-risk limits in favor of another metric).

### J. The Trust's Reliance on Regulatory Examinations is Ill-Placed

569. At trial, the Trust repeatedly suggested that Mr. Beck, Mr. Kruse, and the other ALCO members could not have deviated from the standard of care based on certain ratings issued by the regulators and examiners, urging that these ratings showed that Mr. Beck, Mr. Kruse, and the other ALCO members managed interest-rate risk and liquidity risk in accord with the standard of care of an ordinarily prudent banker. Trust FFCL ¶¶ 181–193. The Court does not find the Trust's argument persuasive because these reports do not displace the standard of care and, in any case, are not nearly as complimentary as the Trust suggested at trial.

570. The Trust's regulatory expert James Watkins opined at trial that, based on his review of the Holding Company and Bank's examination reports, the supervision of the Holding Company and Bank was rigorous and demonstrates that Mr. Beck, Mr. Kruse, and the other ALCO members acted prudently. The Court accords very little weight to Mr. Watkins's testimony based on the extremely narrow scope of his opinion, which expressly disclaimed many of the central issues in this case and was based largely on simply reading publicly available regulatory reports and supervisory correspondence.

571. As set forth below, the Court finds that the Trust's evidence of regulatory reports and examinations plainly does not show that Mr. Beck, Mr. Kruse, and the other ALCO members acted in accordance with the standard of care of an ordinarily prudent banker. As between FDIC's experts Mr. Warman and Mr. Malek and the Trust's expert Mr. Watkins, the Court accords significantly more weight to FDIC's experts, whose opinions were based on direct evidence of Mr. Beck, Mr. Kruse, and the other ALCO members' investment and risk-management decisions and the application of their skills and background to issues pertinent to the central issues in this case.

#### 1. Regulators found that the Holding Company and Bank's risk management and governance were inadequate.

572. The Holding Company and Bank's primary regulators consistently identified ongoing risk-management and governance failures that the Officers and Directors failed to resolve.



United States District Court
Northern District of California

573. Prior to the influx of deposits in 2020, the Federal Reserve Bank found in 2017 that there were "weaknesses in management's ability to effectively identify and monitor key risks and vulnerabilities" and found in 2018 that "risk management processes have not kept pace with growth," requiring "further strengthening of oversight . . . through ongoing effective challenge to policies, procedures, limits, strategies/plans, and model assumptions." TX 710 at 8, 11. The Holding Company Officers and Directors failed to address these foundational deficiencies before the Holding Company became a Large Financial Institution.

574. In late 2021 and early 2022, regulators identified deficiencies in the Holding Company's Large Financial Institution gap assessment that was performed in 2020 by McKinsey & Co. Tr. at 2124:23–2125:4 (Mitchell) ("Q. . . . [T]here was a gap assessment that was created in 2020 by McKinsey; isn't that right? A. I came to find out later, yes. Q. And the regulators found that that assessment was deficient, didn't they? A. I was unaware of it until it was completed, that that was the case.").

575. In January 2022, regulators requested a meeting with the full boards of the Holding Company and Bank to discuss the risk-management and governance weaknesses that they had identified in late 2021. TX 3004 at 288:20–289:25 (Izurieta Tr.). At that meeting, regulators disapproved of and had concerns with several comments made by the Directors that reflected foundational deficiencies in the Holding Company and Bank's governance.

576. For example, at the January 2022 meeting, Mr. Friedman was dismissive of regulators' concerns regarding the growth of the Bank and Holding Company, asking "why it's in [the regulators' view] that SVB is growing fast, because in his world of start-ups, the whole goal is to grow fast." TX 3004 at 291:06–292:05 (Izurieta Tr.). Regulators later referred to these comments as "the seven seconds you can't take back" and recommended that Mr. Friedman be removed from the Board. TX 3004 at 293:10–296:05 (Izurieta Tr.) ("They suggested that [Mr. Friedman] be removed from the board. And that the board effectiveness exam might be difficult for us based on what they saw."); *see also* Tr. at 782:2–783:8 (Becker).

577. Regulators similarly disapproved of a question from Mr. Staglin asking "if [the regulators] could provide us consulting services to just tell us what we needed to do," since that



United States District Court
Northern District of California

question reflected a basic "lack of understanding of how banks and regulators operate" given that it was the job of the Board of Directors on which he was sitting rather than the regulators to oversee the Bank. TX 3004 at 291:06–293:09 (Izurieta Tr.).

578. Following this meeting and the Federal Reserve's governance and risk-management target examination, the Federal Reserve notified the Board of Directors of additional deficiencies in a May 2022 Supervisory Letter:

> The Firm's governance and risk management practices are below supervisory expectations. The board has not provided effective oversight to ensure senior management implements risk management practices commensurate with the Firm's size and complexity. The board did not provide effective oversight of management's responsibility to implement the Large Financial Institution readiness initiatives or the foundational risk management program principles applicable for all banks, irrespective of size. When risk management weaknesses were indicated by breaches of internal risk metrics, internal audits and past regulatory examinations, the board did not hold senior management accountable to remediate these issues.

TX 1438 at 1–2 (Supervisory Letter dated May 31, 2022).

579. In that May 2022 letter, the Federal Reserve also issued three additional Matters Requiring Immediate Attention for board effectiveness, risk management program, and internal audit effectiveness. TX 1438 at 7–10 (Supervisory Letter dated May 31, 2022) ("The current board composition lacks depth and experience. The board's director recruiting process does not effectively address what would constitute an appropriate mix of skills, tenure, and risk experience in alignment with the changes in the Firm's size and complexity.").

580. On August 17, 2022, the regulators formally downgraded the Holding Company and Bank's ratings because of continued governance and risk management deficiencies:

> [T]he board did not provide effective oversight of management's implementation of the [Large Financial Institution] transition plan, or the execution of corrective actions needed to address the root causes for various issues cited from the prior and current supervisory cycles. . . .
> The Firm's risk management program is not effective. The current risk management framework is not comprehensive, does not incorporate coverage for all risk categories, and does not address foundational enterprise level risk management matters, such as risk acceptance, issues management and escalation protocols.

TX 1442 at 4 (Supervisory Ratings Letter dated Aug. 17, 2022).

581. The Bank's composite ranking and management rating were downgraded to a 3 for "fair." TX 1442 at 6 (Supervisory Ratings Letter dated Aug. 17, 2022). In that August 17, 2022, Supervisory Ratings Letter, regulators also announced that a Memorandum of Understanding was forthcoming and issued a 4(m) notice stating that the Holding Company was "not well-managed." TX 1442 at 3 (Supervisory Ratings Letter dated Aug. 17, 2022); Tr. at 2133:21–2134:22 (Mitchell).

582. A few months later, on November 15, 2022, regulators informed the Holding Company and Bank that "the firm's interest-rate risk simulations are not reliable and require improvements," warning that "[c]hanges in [net interest margin], [net interest income], and earnings are directionally inconsistent with internal projections and [interest-rate risk] simulations calling into question the reliability of [interest-rate risk] modeling and the effectiveness of risk management practices." TX 1448 at 1 (Supervisory Letter dated Nov. 15, 2021). Regulators also issued a Matter Requiring Attention regarding interest-rate risk simulations and modeling. TX 1448 at 4.

583. The Court credits Mr. Warman's testimony that these regulatory criticisms were consistent with the breach of prudent banking standards that he had observed. Tr. at 561:4–562:10, 2277:19–2281:8 (Warman) ("[W]hen [regulators] came in, you know, they also saw that when risk management weaknesses were indicated by breaches of internal risk metrics, the Board did not hold senior management accountable to remediate these issues."). The Court further credits and finds persuasive Mr. Warman's opinion that it is "not a close question" whether directors on the Finance Committee and Risk Committee failed to discharge their responsibilities. Tr. at 467:7–24, 2275:17–2277:18 (Warman) ("[The Finance Committee and Risk Committee] knew of this risk. They didn't require the remediation of it, which was mandated by the policy that they themselves had imposed on management. And then, again, approved the Dividend at the end of 2022 when the bank was under stress."). Mr. Warman explained in response to the Court's questions at trial that this failure by the Directors to require appropriate remediation "was totally contrary to good governance." Tr. at 2414:17–2415:7 (Warman).



United States District Court
Northern District of California

### 2. Holding Company Officers also recognized the governance and risk-management problems.

584. The concerns that regulators expressed to the Board were also shared by senior Officers, including Mr. Beck and Mr. Becker, who internally acknowledged that the Bank's risk, treasury, and asset-liability-management functions were understaffed and led by individuals lacking the technical capabilities required for the Bank's size. Tr. at 244:21–247:16 (Beck); Tr. at 760:1–761:22 (Becker); TX 3006 at 90:8–91:12 (Haider Tr.).

585. The seriousness of the risk-management issues was also reflected in the 2022 Chief Executive Officer performance review materials, which stated that prior to Ms. Izurieta's departure in April 2022, "there was a lack of understanding at all levels, including the Board, of almost all elements of risk." TX 1619 at 1; Tr. at 1130:13–17 (Staglin).

586. Ms. Izurieta criticized Officers and Directors' understanding of foundational risk management principles. *See, e.g.*, TX 1186 at 2 (referring to the Risk Committee as a "shit show"); TX 1188 at 2 (complaining that Directors "don't remember things from meeting to meeting"); TX 1190 at 1 ("[W]e need to work on board training, starting with the basics[.]"); TX 1199 at 1 ("I really wish we had ONE board member that understood risk management mechanics"); TX 1197 at 2–3 (criticizing Officers' focus on growth and noting, among other things, "[t]hey don't have the same sense of alarm we do," "[t]his is why the Fed is alarmed," and "[g]row grow grow"); *see also* TX 3004 at 219:03–222:08, 224:03–224:17, 227:18–238:13, 238:22–240:07, 270:08–270:20 (Izurieta Tr.).

587. Mr. Becker concluded that Ms. Izurieta herself was not meeting expectations and ultimately removed her from her position as Chief Risk Officer. TX 721 at 2 (noting that regulators were "very disturbed by the second line not holding the first line accountable"); *see also* Tr. at 758:17–760:20 (Becker); Tr. at 2103:18–2104:22 (Mitchell).

588. The Holding Company did not hire a replacement Chief Risk Officer until late 2022, which further exacerbated the risk to the Bank. Tr. at 857:25–858:2 (Becker). The Court credits Mr. Warman's explanation at trial that the delays in hiring appropriate staff could have



United States District Court
Northern District of California

United States District Court
Northern District of California

been remedied by simply offering prospective employees more money. Tr. at 2417:10–25 (Warman).

589. Following criticism from the regulators, the Holding Company's third line of defense (Internal Audit) performed an audit of corporate governance and board oversight and rated those areas as "insufficient" in 2021. TX 883 at 4 (04/2021 Internal Audit Report).

590. These problems are underscored by the fact that, for the entirety of 2021, the Risk Committee only met for a total of six hours. Tr. at 2118:6–24 (Mitchell).

591. The governance and risk-management failures also included Mr. Becker who had ultimate responsibility for the level of risk at the Holding Company and Bank. Tr. at 2274:13–17 (Warman). Mr. Becker failed in his responsibilities because he never challenged Mr. Beck or Mr. Kruse to take less interest-rate or liquidity risk in the investment portfolio or required that they adhere to Board-approved policy limits or address the ongoing EVE-at-risk breaches. Tr. at 139:13–22 (Beck); Tr. at 2274:13–2275:16 (Warman).

592. The governance and risk-management failures also included Ms. Izurieta who was responsible for leading the second line of defense with regard to the level of risk at the Holding Company and Bank. Ms. Izurieta failed in her responsibilities because she never "effectively challenged the first line"; the Court credits Mr. Warman's testimony that "one of the biggest failures here" was that Ms. Izurieta never required a remediation plan or a reduction in risk-taking despite the sustained material breaches of the EVE-at-risk limits. Tr. at 562:11–563:22, 2273:20–2274:12 (Warman).

593. Alternative explanations for Ms. Izurieta's failures were offered at trial: Either she was incapable of fulfilling her duties or she was intentionally sidelined by the first line of defense. Either way, the Court finds that her conduct fell below the standard of care of an ordinarily prudent banker.

594. The Court finds that these fundamental management failures supply additional evidence that Mr. Becker and Ms. Izurieta aided and abetted the officers' breaches of duty by failing to effectively challenge management.

**3. The existence of "action plans" does not establish that foundational regulatory concerns were remedied.**

595. The Trust suggested at trial that the fact that management had submitted responses to the regulators showed that these fundamental governance and risk-management concerns were resolved or in the process of being resolved. Tr. at 1651:4–1652:9 (Watkins). This assertion is without factual support apart from the fact of the responses themselves.

596. The fact that management had submitted these responses does not mean that the Matters Requiring Attention or Matters Requiring Immediate Attention were resolved or that they would be resolved. Tr. at 853:6–13 (Becker). In fact, Mr. Benhamou admitted at trial that the regulators had not seen "sustained progress over a period of several quarters" such that they would "feel comfortable" closing the pending Matters Requiring Attention and Matters Requiring Immediate Attention. Tr. at 1257:2–7 (Benhamou).

597. More fundamentally, the Trust's invocation of these action plans does not change the fact that these deficiencies existed when the regulators identified them and were present during the critical period in 2021 when management decided to purchase $100 billion of long-term, fixed-rate securities with duration and duration-extension risk in violation of EVE-at-risk.

**4. CAMELS ratings are not dispositive.**

598. The Trust also suggested that the examiners' ratings in the categories of "Sensitivity to Market Risk" and "Liquidity" demonstrate that Mr. Beck, Mr. Kruse, and the other ALCO members appropriately discharged their duties in managing interest-rate risk and liquidity risk. Tr. at 1636:4–13, 1639:24–1640:1 (Watkins). The Court accords little weight to these component ratings for multiple reasons.

599. First, in urging that the Court should infer from the component ratings that Mr. Beck, Mr. Kruse, and the other ALCO members were acting in accordance with the standard of care, the Trust neglects to explain how to weight these component ratings against the composite rating of "3," which is defined as less than satisfactory or fair. Tr. at 1633:1–8 (Watkins); TX 1442 at 2 (Supervisory Ratings Letter dated Aug. 17, 2022).

United States District Court
Northern District of California

600. Second, as Mr. Watkins admitted at trial, "regulators do not run banks," "whether the regulators did their job does not absolve the officers or directors of the Holding Company or the Bank of doing their jobs," and "it wasn't the regulators' job to tell the officers and directors how to operate the Bank." Tr. at 1675:21–1676:6 (Watkins). The Court thus accords little to no probative value to the component ratings identified by the Trust as to the ultimate issue whether Mr. Beck, Mr. Kruse, and the other ALCO members acted in accordance with the standard of care. Tr. at 886:14–887:6 (Becker) (agreeing that regulators "don't manage balance sheets," "don't make investment purchases," and are "not a line of defense").

601. The Court also discounts Mr. Watkins's testimony in general because of the narrow scope of the opinions he offered at trial, which, as he admitted, did not touch on the central issues in this case:

> Q. . . . Mr. Watkins, you have no opinion in this case on whether the senior Officers of the Bank and Holding Company prudently managed interest-rate risk, right?
> A. That's right, it was outside the scope of my review.
> Q. You have no opinion in this case on whether the Board of Directors prudently oversaw management of interest-rate risk, right?
> A. Again, that was outside the scope of my review.
> Q. You have no opinion about whether the Officers prudently managed liquidity risk, right?
> A. That was outside the scope of my review.
> Q. You have no opinion about whether the Directors prudently oversaw management of liquidity risk, right?
> A. Again, that was outside the scope of my review.
> Q. You have no opinion on what caused billions of dollars of losses in the security portfolio, right?
> A. Again, that was outside the scope of my review.
> Q. You have no opinion about whether it was prudent for the Holding Company's Officers to direct the purchase of tens of billions of dollars of long-term securities in 2021, right?
> A. Again, I looked at the supervisory record and findings at the time, so that was outside the scope of my review

Tr. at 1668:24–1669:21 (Watkins); *see also* Tr. at 1669:22–1672:16 (Watkins).

602. The Court also discounts Mr. Watkins's testimony that the regulatory examinations in his view were "rigorous, thorough, and complete," Tr. at 1684:22–25 (Watkins), because Mr. Watkins admitted that he had no basis for the opinion beyond what he could observe by reading the publicly available regulatory reports and supervisory correspondence. Tr. at 1679:24–1681:6, 1719:6–18 (Watkins).

603. Finally, the Court also discounts Mr. Watkins's testimony because it is contrary to numerous reports from the regulators themselves prepared shortly after the Bank's failure that identified serious shortcomings in the supervision of the Holding Company and Bank. *See* Tr. at 1683:23–1703:16 (Watkins).

604. The Court accordingly finds that the regulatory ratings on sensitivity to market risk or liquidity risk are not persuasive evidence that Mr. Beck, Mr. Kruse, and the other ALCO members properly discharged their duties in managing interest-rate risk and liquidity risk.

**K. Holding Company Officers' Actions Caused Damages Exceeding $1.71 Billion**

605. FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent actions caused the Bank to suffer $5.4 billion in losses, most of which were reflected in the real economic losses in the Bank's HTM investment portfolio when interest rates foreseeably increased. But for the imprudent purchase and holding of long-term, fixed-rate securities, the Bank would have avoided $4,521,583,000 in losses. But for the imprudent retention of the previously hedged AFS securities when the Hedges were terminated in July 2022, the Bank would have avoided $636,080,000 in additional losses. But for the imprudent payout of the Dividend, the Bank would have retained $294,000,000.

606. At trial, the Trust suggested that the Bank's losses were not caused by Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent actions because the dollar loss from the diminution in value of the securities portfolio was largely realized after FDIC disposed of those assets as the Bank's receiver following the Bank run. The Trust accordingly argued that the true cause of the Bank's losses was the Bank's failure on March 10, 2023, absent which the HTM securities would have been carried to maturity. The Court rejects this argument because FDIC has established that these real economic losses were incurred prior to the Bank run as a foreseeable result of Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent actions.

607. Additionally, the Trust presented no credible evidence suggesting that the Bank could have held its investment portfolio to maturity apart from wishful testimony suggesting that was possible. On the other side, FDIC showed that the Officers and Directors recognized that realizing losses from the investment portfolio was inevitable and were already considering options

to dispose of them. FDIC also showed that it obtained fair market value for the securities in compliance with its statutory obligations.

**1. Mr. Beck, Mr. Kruse, and the other ALCO members' imprudent purchase of long-term, fixed-rate securities and designation of most of those securities as HTM caused more than $4.5 billion in losses**

608. FDIC's damages expert Kenneth Malek opined at trial that the Bank suffered at least $4,521,583,000 in securities losses that would have been avoided if Mr. Beck, Mr. Kruse, and the other ALCO members had complied with the Global Treasury Policy's EVE-at-risk thresholds and abstained from increasing interest-rate risk in the securities portfolio while in sustained breach. Tr. at 1308:1–15, 1339:13–21 (Malek). The Trust did not present a damages expert.

609. Mr. Malek testified that he arrived at his $4.5 billion figure as follows. First, he calculated that, as of March 2023, the Bank's investment securities portfolio suffered roughly $2.5 billion in AFS securities losses and $15 billion in HTM securities losses. Tr. at 1303:17–1304:9 (Malek). Second, excluding certain securities that also had losses, he computed that the total economic losses on securities purchased after January 1, 2021, were about $11.5 billion. Tr. at 1304:10–20 (Malek). Third, limiting his analysis to securities purchased on or after January 1, 2021, that caused the Holding Company and Bank to exceed their own EVE-at-risk limits, he computed total economic losses of $4.5 billion. Tr. at 1307:2–8 (Malek).

Mr. Malek constructed a "but-for world" in which Mr. Beck, Mr. Kruse, and the other ALCO members did not cause the Bank to purchase $32.7 billion in long-term, fixed-rate securities during the first three quarters of 2021. Tr. at 1308:18–24 (Malek). In this "Minimally EVE Compliant But-For World," the Bank still would have purchased about $80 billion in securities after January 1, 2021. Tr. at 1316:2–13 (Malek). He selected this approach based on Mr. Warman's standard-of-care opinion. Tr. at 1307:2–1308:15 (Malek) ("I selected that approach because I'm relying on the opinion of Mr. Warman who said that prudent securities portfolio management would not have been purchasing long-term mortgage securities that caused



United States District Court
Northern District of California

United States District Court
Northern District of California

and contributed to continuing and increasing violations of the Bank's own internal EVE-at-risk metrics.").

610. Mr. Malek testified that holding $32.7 billion in a cash equivalent rather than purchasing long-term, fixed-rate securities would have resulted in compliance with EVE-at-risk limits throughout 2021, 2022, and 2023. Tr. at 1313:25–1314:10 (Malek). The Court finds that this option was possible and available to the Holding Company and Bank as reflected in internal documents and Mr. Warman's testimony. Tr. at 549:7–551:17, 557:13–21, 550:9-551:20, 556:8–557:12 (Warman); *see also* Tr. at 1920:13–17 (Kruse).

611. The Court finds that there is a causal nexus between the imprudent mismanagement of the investment securities portfolio and the ultimate damages measured by Mr. Malek's Minimally EVE Compliant But-For World; the $4.5 billion damages figure reflects the difference between the losses the Bank actually incurred on the securities portfolio and the losses it would have incurred had it complied with the Global Treasury Policy's EVE-at-risk limits.

612. The Trust's contention at trial that Mr. Malek failed to adequately measure damages because of capital requirements or NII-at-risk deviations in his Minimally EVE Compliant But-For World is not accurate and does not undermine Mr. Malek's conclusions. Rather, the Court credits Mr. Malek's testimony that, in his Minimally EVE Compliant But-For World, the Bank (1) satisfied all regulatory capital requirements, (2) deviated from an inner threshold for a single nonregulatory capital ratio in only two quarters and by de minimis amounts, and (3) complied with NII-at-risk for all of 2021 during the period in which the $32.7 billion in long-term, fixed-rate securities were not purchased. Tr. at 1326:5–1327:23, 1329:4–1330:6 (Malek).

613. The Court also finds that complying with Mr. Malek's Minimally EVE Compliant But-For World was possible without compromising the NII-at-risk metric. During 2022, there were breaches of NII-at-risk in downrate scenarios in both the actual world and the Minimally EVE Compliant But-For World. Tr. at 1330:15–1331:2 (Malek). The Court credits Mr. Malek's testimony that, in the Minimally EVE Compliant But-For World, the Bank would have been better able to manage those NII-at-risk breaches because it would have had an additional $32.7 billion in

cash that could be deployed to purchase short-term Treasury securities at a higher yield than the long-term securities that were actually purchased in the real world during 2021. Tr. at 1331:3–13 (Malek).

614. The Trust's contentions at trial that Mr. Malek failed to adequately account for the need to generate earnings and net interest income to support capital in his Minimally EVE Compliant But-For World do not undermine Mr. Malek's conclusions. No analysis was performed showing that the Holding Company and Bank needed to violate EVE-at-risk to support earnings to generate capital. *See, e.g.*, Tr. at 399:8–25 (Beck); Tr. at 1077:7–13 (Friedman); Tr. at 1268:18–22 (Benhamou); Tr. at 1861:14–24 (Kruse); Tr. at 2287:21–25 (Warman).

615. The Trust's argument that Mr. Malek's Minimally EVE Compliant But-For World would result in noncompliance with regulatory capital ratios is additionally undermined by Mr. Warman's credible testimony that the way to solve a capital problem is by raising capital through the debt and equity markets—which the Holding Company and Bank in fact did—rather than breaching EVE-at-risk limits, which exposes capital to excessive risk. Tr. at 660:21–23, 2262:8–20, 2284:11–2286:8, 2289:7–15, 2415:8–18 (Warman); *see also* FF ¶¶ 487–489.

**2. The risk of loss in the securities portfolio was known and foreseeable.**

616. The Court does not find credible the Trust's contention that the Holding Company Officers could not have anticipated the rise in interest rates. Rather, the Court finds that rising rates in a near-zero rate environment are foreseeable, fundamental risks that prudent bankers are required to prepare for.

617. In fact, Officers and Directors repeatedly conceded at trial that predictions regarding interest rate trends cannot and should not be used as a basis for investment decisions. Tr. at 96:14–22 (Beck); Tr. at 773:7–774:1 (Becker); Tr. at 1556:17–1557:1 (Miller) ("I don't try to forecast rates. That's a dangerous business."). This is also in accord with Mr. Warman's testimony that a prudent banker does not "try to predict the direction of interest rates." Tr. at 581:19–25 (Warman).

618. Mr. Beck, Mr. Kruse, and the other ALCO members repeatedly received notice that the value of the securities portfolio would decrease in the event of increased interest rates,

including the $17 billion in losses that were ultimately realized. TX 2634 (summary of ALCO Packets); Tr. at 187:24–188:9 (Beck) (acknowledging that "escalating amounts of unrealized losses" were "relatively close" to $17 billion); *see also* FF ¶¶ 210–223.

619. The Court finds that an ordinarily prudent banker would recognize the risk that long-term, fixed-rate securities with duration-extension risk would lose value in an up-rate environment. Tr. at 540:20–541:3 (Warman). Mr. Beck and Mr. Kruse acknowledged at trial that duration-extension risk is a well-known attribute of long-term, fixed-rate assets like mortgage-backed securities. Tr. at 73:10–17 (Beck); Tr. at 1746:18–1747:12 (Kruse).

620. As set forth above, *see* FF ¶¶ 210–215, the Court also finds that the risks of concentrating the portfolio in mortgage-backed securities were known to ALCO. Mr. Busch warned ALCO in 2020 that "continuing to invest in [mortgage-backed securities, commercial mortgage-backed securities, and collateralized mortgage obligations] exposes the portfolio to risk of unrealized losses" and recommended that ALCO limit the duration of future securities purchases. TX 353 at 208–12 (11/2020 ALCO Packet). Mr. Beck and Mr. Kruse elected to disregard that recommendation. Tr. at 240:7–241:8 (Beck); Tr. at 1898:16–1900:7 (Kruse).

621. The foreseeability of the kind and degree of losses suffered by the Bank is further corroborated by internal communications. On January 11, 2023, Mr. Beck, Mr. Kruse, and Mr. Haider exchanged the following messages on Teams. Mr. Beck asked "I am working on a short retrospective and lessons about the investment securities portfolio for my Board presentation next week. Can I ask both of you to help me edit the slide[?]" Mr. Haider responded, "Certainly," continuing, "Too much fixed rate, too much duration, too much convexity, too much [mortgage-backed securities] exposure and lack of coupon diversification :-)." Mr. Beck responded, "thanks – that all seems pretty clear now…." TX 1343 (ellipsis in original); Tr. at 218:4–25 (Beck). Based on the near-continuous warnings to ALCO regarding sustained breaches of EVE-at-risk, the Court finds that a reasonably prudent banker would have recognized and acted upon these foreseeable risks prior to January 2023 as well. *See* Tr. at 219:9–220:3 (Beck) (agreeing that he "knew [the purchases] were virtually all fixed-rate securities," "knew how much duration risk was in the investments themselves," "got monthly reports on the amount of duration risk in the

investment portfolio," "knew how much convexity risk the investments had," and "knew [he was] primarily buying mortgage-backed securities").

622. The Court accordingly finds that the risk of losses was foreseeable at the time that Mr. Beck, Mr. Kruse, and the other ALCO members imprudently concentrated the Bank's investment portfolio in long-term, fixed-rate assets.

**3. The Bank's investment portfolio suffered actual economic losses prior to the Bank's failure.**

623. The Court rejects the Trust's argument at trial that the Bank's losses were caused by the bank run on March 10, 2023. FDIC has proven real losses that were incurred prior to the bank failure as a result of Mr. Beck, Mr. Kruse, and the other ALCO members' purchase of long-term, fixed-rate securities in a historically low rate environment. The Trust has also provided no credible evidence for its suggestion that the Bank could have held these securities to maturity, and the evidence at trial in fact shows the opposite.

624. The Court finds that the diminution in market value of the Bank's assets in its HTM and AFS portfolio was an actual economic loss to the Bank. The Court credits Mr. Warman's testimony that, "[b]y definition," "securities losing market value represent real economic loss for the institution," and that ordinarily prudent bankers recognize these losses to be real economic losses. Tr. at 608:10–12, 661:24–662:2, 2302:11–2303:1 (Warman). The Court also credits Mr. Malek's testimony that the losses reflected in his calculation "were all incurred" before the bank run that precipitated the Bank's failure. Tr. at 1427:22–25 (Malek).

625. In fact, Mr. Beck admitted at trial that it would be "imprudent for a banker to ignore mark-to-market risk in the HTM securities portfolio" because "those are real economic risks." Tr. at 187:3–8 (Beck).

626. The only support for the Trust's suggestion that the Bank could hold its massive HTM portfolio to maturity was testimony at trial, which was not factually supported and not credible. The Court does not credit Mr. Beck's testimony suggesting that the Holding Company and Bank could indefinitely hold underwater, long-term, fixed-rate securities because "they have no credit risk." Tr. at 187:12–14 (Beck). Rather, the Court credits Mr. Warman's testimony that



United States District Court
Northern District of California

United States District Court
Northern District of California

HTM losses in a higher-rate environment are eventually "going to show up in your earnings" when liabilities reprice. Tr. at 602:10–604:12 (Warman).

627. That the Bank would not be able to carry these assets to maturity is also confirmed by internal communications. Ms. Matthews conceded that management and certain directors had discussed selling HTM securities in 2023 and that doing so would have resulted in realizing losses that would have "eliminated the capital on the balance sheet." Tr. at 2223:6–2224:2; 2227:19–2228:5 (Matthews). Similarly, Mr. Benhamou testified that "the losses in the investment portfolio were of such magnitude that the probability of a decline . . . in interest rates was so low, there was no way for the EVE to fix itself," and that therefore, "recognition of these losses was inevitable." TX 3009 at 344:20–345:6 (Benhamou Tr.).

628. The Court accordingly credits Mr. Malek's testimony that even absent a bank run, the Holding Company and Bank would have had no choice but to eventually sell some of the HTM securities—thereby forcing the accounting recognition through Other Comprehensive Income of all the HTM losses. Tr. at 1416:2–9 (Malek).

629. The fact that securities losses ultimately had to be realized in some form is further confirmed by the actual events taking place before the Bank's failure, including management being forced to sell substantially all of the AFS portfolio and realize a $1.8 billion post-tax loss as part of "Project Sierra." TX 627 at 10 (March 8, 2023, 8-K).

630. Mr. Becker's testimony that the Holding Company was forced to sell substantially all of the AFS securities portfolio because of a single Financial Times article published on February 21, 2023, is not credible or supported by the record. Tr. at 870:9–872:17 (Becker). The article itself contained no information that had not already been disclosed to or discussed with investors and analysts. *See* TX 1091 at 1 (email from Mr. Beck dated Feb. 22, 2023) ("The article calls into question SVB's financial strength, however there is no new information in this article that has not already been addressed with other media and analysts."). To the extent the Trust argues that the article's linkage of HTM-related losses to TCE was a novel or causal shock, the Court finds that this argument has no basis in the facts presented at trial. Tr. at 203:21–204:22

(Beck) (acknowledging that the relative magnitudes of the unrealized losses in the securities portfolio and equity of the Bank "is the comparison that the market was making").

631. Moreover, this was not the first time the financial press compared the HTM losses to tangible common equity. For example, on November 2, 2022, Wolfe Research circulated a report titled "TCE Tail Risks Come into Sharper Focus," which addressed this issue:

> [Common Equity Tier 1] serves as the primary binding constraint for most of the Mid-Cap Banks and Consumer Finance stocks under our coverage, but a growing number of investors have started to view [Common Equity Tier 1] as somewhat tainted because it does not reflect the headwinds associated with higher interest rates for Category III and IV banks that have opted out of including changes in [Other Comprehensive Income] in their regulatory capital. For the Mid-Cap Banks, the spread between [Common Equity Tier 1] and [Tangible Common Equity to Total Assets Ratio] averaged 250bps pre-COVID but more recently gapped out to 488bps as higher rates and the associated fair value marks on [AFS] securities portfolios have fueled [Other Comprehensive Income] headwinds to [Tangible Common Equity to Total Assets Ratio] ratios but not [Common Equity Tier 1].

TX 1053 at 3; *see also* TX 1082 at 7 (Seeking Alpha Article) ("Given [that] the bulk of this portfolio was acquired in a lower interest rate environment, there are unrealized losses, $17 billion in the HTM portfolio alone. While these losses are run through earnings, they are not run through regulatory capital unless they're realized. Fully recognizing this loss would essentially wipe out the company's tier 1 capital and force a capital raise.").

632. The record instead shows that management decided to sell substantially all of the AFS portfolio on March 8, 2023, because of balance-sheet pressures, many of which were previously or contemporaneously disclosed, and a potential downgrade from Moody's precipitated by those balance-sheet pressures. TX 627 at 24 (Mar. 8, 2023, Form 8-K); TX 2210 at 1 (Moody's Downgrade Announcement).

633. In addition to compressing net interest income and precipitating a ratings downgrade, the Court credits Mr. Warman's testimony that the securities portfolio constructed by Mr. Beck, Mr. Kruse, and ALCO made the Bank vulnerable to a sudden loss of confidence among depositors and investors, a foreseeable risk that a prudent banker must always account for. Tr. at 463:24–464:14, 599:4–14 (Warman) ("Q. [I]n your opinion, did the risks that they had here

make the bank susceptible to a shock? A. Yes. Susceptible to a loss of confidence. They took enormous amounts of [interest-rate] risks by their own measures.”).

634. The Court also finds that bank runs and bank failures are a known and foreseeable risk. Tr. at 740:20–25 (Becker); Tr. at 1872:21–23 (Kruse). And Mr. Beck, Mr. Kruse, and the other ALCO members’ conduct increased that risk.

635. Management was on notice of the risk of loss of confidence after management decided against a similar balance sheet restructuring designed to address “the same problems” in October 2022 due, in part, to the likelihood of a strong “investor concern.” Tr. at 2224:3–2225:8, 2226:13–2227:18 (Matthews); Tr. at 202:15–203:2 (Beck).

636. The Court accordingly finds that Mr. Beck, Mr. Kruse, and the other ALCO members’ imprudent purchases of long-term, fixed-rate securities with low yield at a time of historically low interest rates caused $4,521,583,000 in securities losses that would have been avoided if the Holding Company and Bank’s officers had complied with the Global Treasury Policy’s EVE-at-risk thresholds and abstained from increasing interest-rate risk in the securities portfolio while in sustained breach.

**4. Mr. Beck, Mr. Kruse, and the other ALCO members’ imprudent termination of the Hedges and retention of underlying, previously hedged AFS securities caused more than $600 million of securities losses.**

637. The Court finds that FDIC has established that the Bank suffered an additional $636,080,000 in damages because of the retention of the securities underlying the interest-rate swaps that were terminated in July 2022.

638. Mr. Malek explained that this figure represents the additional losses incurred from the date the hedges were terminated on the previously hedged securities because the hedges were terminated and the underlying securities were retained without protection. Tr. at 1339:22–24 (Malek).

639. The July 2022 termination of the interest-rate hedges and retention of the underlying AFS securities left those securities unprotected against further rate increases. Tr.

at 582:7–17 (Warman). By October 2022, losses materialized when interest rates increased. Tr. at 580:17–24 (Warman).

640. The Court accordingly finds that the $636,080,000 loss in the value of the AFS securities was a real economic loss incurred prior to the Bank's failure. In addition, the loss in value was realized from an accounting perspective when the entire AFS portfolio was sold on March 8, 2023). Tr. at 1296:19–1297:3 (Malek).

**5. The Dividend deprived the Bank of $294 million in cash.**

641. The Bank received no reasonably equivalent value in exchange for the Dividend. Tr. at 1339:25–1340:8 (Malek).

642. Although the Dividend was reversible, the Holding Company did not return the $294 million to the Bank. Tr. at 801:11–15 (Becker). This imprudent decision deprived the Bank of $294 million.

**6. FDIC obtained fair market value in compliance with its statutory obligations**

643. Prior to the Bank's failure, the AFS portfolio was sold at a pre-tax loss of $2.5 billion and post-tax loss of $1.8 billion. Tr. at 1296:19–1297:3 (Malek); TX 625 at 5–6.

644. When the Bank failed and FDIC was appointed as its receiver on March 10, 2023, there was insufficient liquidity to meet depositor outflows. Tr. at 1451:6–12 (Walker). FDIC pledged the Bank's remaining fixed income securities to the Federal Reserve Bank as collateral and borrowed against those securities to generate liquidity; some of the Bank's securities had already been pledged prior to the failure. Tr. at 1451:13–17, 1452:4–8 (Walker). The total fair market value of the securities pledged to the Federal Reserve Bank was about $76 billion. Tr. at 1452:9–12 (Walker).

645. There were no other viable alternatives available to FDIC given the assets available and the immediacy of the funding needs given deposit outflows. Tr. at 1451:18–22 (Walker). If FDIC had held the Bank's remaining securities to maturity, the negative carrying costs would have been at least $2 billion per year because it was borrowing at a rate of at least 5% interest on $76 billion in securities paying less than 2% interest. Tr. at 1453:7–1454:2 (Walker).



United States District Court
Northern District of California

646. FDIC has a statutory obligation to "maximize[] the net present value return from the sale or disposition" and "minimize losses" of the Bank's assets under 12 U.S.C. § 1821(d)(13)(E); Tr. at 1449:7–11 (Walker). FDIC generally acts as a liquidator pursuant to its statutory obligations and does not carry out the business of a failed bank as its receiver. Tr. at 1448:21–1449:6 (Walker).

647. Following its appointment as receiver, FDIC sold most of the Bank's remaining fixed-income securities for which it claims damages by November 2023 through a competitive, commercially reasonable, and orderly sales process that resulted in its receiving fair-market value for the securities. Tr. at 1450:3–9, 1457:18–25 (Walker). That includes the sale of securities previously designated as HTM; had the FDIC held those securities to maturity, it would have "incurred billions and billions of dollars in losses, directly in conflict with [its] statutory obligations to maximize proceeds and minimize losses to the receivership." Tr. at 1459:19–1460:1 (Walker).

648. For about $12.4 billion in Ginnie Mae Project Loan securities (for which FDIC would not have received fair market value upon selling), FDIC successfully re-securitized those securities in coordination with FDIC acting in its corporate capacity adding a corporate guarantee. Tr. at 1458:7–1459:18 (Walker).

649. The Trust's suggestion at trial that FDIC should have bound itself by the Bank's accounting designations and held the HTM securities to maturity is contrary to FDIC's statutory obligations.

650. The Court credits Mr. Walker's testimony that the sale was the only logical solution available to FDIC given the more than $2 billion in negative annual carrying costs and FDIC's statutory obligations. Tr. at 1459:19–1460:1 (Walker).

651. The evidence presented at trial established that Mr. Beck, Mr. Kruse, and the other ALCO members knowingly exposed the Bank to billions of dollars in losses in the foreseeable event that interest rates rose above their historically low levels. When interest rates did in fact rise, the Bank's imprudently purchased assets predictably lost billions of dollars in value. To the



United States District Court
Northern District of California

United States District Court
Northern District of California

extent that the Trust suggested at trial that these losses were attributable to FDIC carrying out its statutory obligations to dispose of the Bank's assets, the Court disagrees.

## II. CONCLUSIONS OF LAW

### A. Legal Background and Overview

The Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 and 12 U.S.C. § 1819(b)(2). Venue is proper under 28 U.S.C. § 1391(b), (e)(1). The Court previously held that, to the extent that the Parties have not identified any relevant conflict of laws and state law supplies the rule of decision, California law applies. ECF No. 233 at 9; *see also FDIC v. Faigin*, No. 12-cv-03448-DDP-CWx, 2013 WL 3389490, at *10–11 (C.D. Cal. July 8, 2013); *FDIC v. Van Dellen*, No. 10-cv-04915-DSF-SHx, 2012 WL 4815159, at *3 (C.D. Cal. Oct. 5, 2012).

FDIC has the right to assert the equitable setoff defenses presented at trial. Under 12 U.S.C. § 1821, FDIC succeeded to "all rights, titles, powers, and privileges" of the Bank upon its appointment as receiver, including the Bank's setoff rights asserted in this action. 12 U.S.C. § 1821(d)(2)(A). Under California law, unliquidated or unadjudicated claims or defenses can be the basis for a setoff. *See* Cal. Civ. Proc. Code § 431.70; *Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co.*, 29 Cal. 4th 189, 196 (2002). None of FDIC's affirmative defenses relies on any future potential debt; instead, each asserts indebtedness based on prior misconduct. In addition, as the Court previously concluded, FDIC has a contractual basis for its setoff defenses under the deposit agreement between the Bank and Holding Company. ECF No. 233 at 14–15. FDIC's first affirmative defense (aiding and abetting breach of fiduciary duty), second affirmative defense (vicarious liability as principal for agent's breach of fiduciary duty), fourth affirmative defense (unclean hands), and sixth affirmative defense (voidable transfer) are accordingly based on enforceable setoff rights under California law.

At trial, FDIC argued that its stipulated liability of $1.71 billion on the Trust's breach of contract claim is completely offset by the losses that the Bank suffered as a result of Mr. Beck, Mr. Kruse, and the other ALCO members' actions. These actions included (1) investing and holding billions of dollars of uninsured deposits in fixed-income securities subsequently

United States District Court
Northern District of California

designated as HTM when interest rates were at historic lows, which exposed the Bank to catastrophic losses when interest rates predictably increased; (2) selling the only hedges the Bank had against rising rates while retaining the underlying, previously hedged AFS securities, thereby exacerbating interest-rate risk; and (3) approving a $294 million dividend from the Bank to the Holding Company when the Bank had unreasonably small assets and needed liquidity.

FDIC argues that each of these three actions constituted a breach of Mr. Beck, Mr. Kruse, and the other ALCO members' fiduciary duties of care and loyalty to the Bank, which they owed to the Bank by virtue of being Bank Officers. FDIC's first and second affirmative defenses seek to hold the Holding Company liable for Mr. Beck, Mr. Kruse, and the other ALCO members' torts under theories of aiding-and-abetting and agency liability, respectively. As to its first affirmative defense, FDIC argues that the Holding Company (through its Finance Committee, Risk Committee, Compensation Committee, Chief Executive Officer Mr. Becker, and Chief Risk Officer Ms. Izurieta) aided and abetted the breaches of fiduciary duty. As to its second affirmative defense, FDIC argues that the Holding Company is liable for the breaches of fiduciary duty because it is vicariously liable for the torts of the Holding Company Officers, i.e., its agents.

As to its fourth affirmative defense, FDIC argues that the above three actions—as well as other actions taken by the Holding Company Officers and Directors—bar the Trust's recovery under the equitable doctrine of unclean hands. As to its sixth affirmative defense, FDIC argues that it is at least entitled to a setoff of $294 million on the ground that the Dividend was a voidable transfer under California Civil Code §§ 3439.04, 3439.05.

In addition to arguing that FDIC has failed to prove the required elements of each individual affirmative defense, the Trust lodged several cross-cutting defenses at trial. The Trust contends that FDIC's first and second affirmative defenses are both defective for failure to prove that any of the three aforementioned actions committed by Mr. Beck, Mr. Kruse, and the other ALCO members constituted a breach of their fiduciary duties owed to the Bank. Moreover, the Trust argues that these Officers' actions were entitled to protection under the business-judgment rule because they were approved by the Directors and were reasonable at the time they were made, accusing FDIC of basing its case on hindsight. The Trust also argues that, because FDIC's first

and second affirmative defenses seek to hold the Holding Company liable for breaches of fiduciary duties owed to the Bank, they "would dramatically expand the scope of actionable corporate conduct," since "the vast majority of the banks in the United States" are subsidiaries of a bank holding company. Trust FFCL at 66. Finally, the Trust also argues that FDIC has failed to establish causation as to its first, second, and fourth affirmative defenses because FDIC's losses are attributable to the Bank's failure, not the challenged actions carried out by Mr. Beck, Mr. Kruse, and the other ALCO members.

FDIC has the burden of proving all the facts necessary to establish the essential elements of its first, second, and sixth affirmative defenses by a preponderance of the evidence. *See, e.g.*, *Westrec Marina Mgmt., Inc. v. Jardine Ins. Brokers Orange Cnty., Inc.*, 85 Cal. App. 4th 1042, 1050 (2000). FDIC has the burden of proving all the facts necessary to establish the essential elements of its fourth affirmative defense for unclean hands by clear and convincing evidence. *Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018). The Court's analysis proceeds as follows.

Because FDIC's first and second affirmative defenses are based on the same predicate alleged breaches of fiduciary duty, the Court first considers whether FDIC has proven by a preponderance of the evidence that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank, concluding that it has. In so holding, the Court rejects (again) the Trust's argument that California law offers business-judgment protection to officers of a corporation.

Turning to FDIC's first affirmative defense for aiding-and-abetting liability, the Court concludes that FDIC has proven by a preponderance of the evidence that the Holding Company's members of the Finance Committee, Risk Committee, and Compensation Committee, Chief Executive Officer, and Chief Risk Officer aided and abetted Mr. Beck, Mr. Kruse, and the other ALCO members' breaches of fiduciary duty, also rejecting the Trust's contentions that liability is precluded by the agency immunity rule and that California law does not recognize aiding-and-abetting liability for negligence.

As to FDIC's second affirmative defense for agency liability, the Court concludes that FDIC has proven by a preponderance of the evidence that Mr. Beck, Mr. Kruse, and the other ALCO members were acting with actual authority as Holding Company Officers and within the scope of that authority when carrying out the challenged actions. The Court accordingly agrees with FDIC that the Holding Company is liable as a principal for the acts of its agents under a straightforward application of agency law, notwithstanding the Trust's attempt to carve out an exception for bank holding companies.

As to FDIC's fourth affirmative defense for unclean hands, the Court concludes that FDIC has not proven by clear and convincing evidence that the Holding Company acted with ill intent or otherwise has unclean hands with respect to its claim for breach of contract, nor has FDIC demonstrated a direct connection between the Holding Company's misconduct and the Trust's breach of contract claim on which it seeks recovery.

As to FDIC's sixth affirmative defense for voidable transfer, the Court concludes that FDIC has proven by a preponderance of the evidence that the Dividend was a voidable transfer because the Bank had unreasonably small assets when the Dividend was approved and did not receive reasonably equivalent value in exchange for the $294 million it upstreamed to the Holding Company.

Because the Court concludes that the Holding Company is liable for Mr. Beck, Mr. Kruse, and the other ALCO members' breaches of fiduciary duties, it next considers whether FDIC has demonstrated that its losses were proximately caused by those breaches. The Court concludes that FDIC has made this showing, finding that FDIC has proven that the Bank incurred actual economic losses prior to the Bank's failure. Despite the Trust's attempts to disguise its argument as an attack on FDIC's causation evidence, its argument is at bottom a superseding cause affirmative defense, which it has not come close to proving.

The Court finally turns to determining whether FDIC has proven its damages with reasonable certainty. The Court concludes that the uncontroverted expert testimony of FDIC's damages expert meets this standard and rejects the Trust's factual attacks. The Court further finds that these reasonably certain damages far exceed $1.71 billion.

United States District Court
Northern District of California

**B. Mr. Beck, Mr. Kruse, and the Other ALCO Members Breached Their Fiduciary Duties to the Bank**

FDIC argues that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties of care and loyalty to the Bank by (1) deploying the Bank's uninsured, newly arrived deposits to purchase billions of dollars' worth of long-term, fixed-rate securities and designating those securities as HTM; (2) terminating the Hedges early while retaining the underlying, previously hedged AFS securities without interest-rate protection; and (3) approving the Dividend at a time when the Bank had unreasonably small assets and needed liquidity. FDIC argues that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duty of care because they were negligent and departed from the standard of care of an ordinarily prudent banker in similar circumstances. FDIC also contends that Mr. Beck, Mr. Kruse, and the other ALCO members breached their duty of loyalty through these same actions, arguing that Mr. Beck, Mr. Kruse, and the other ALCO members subordinated the Bank's safety and soundness to the Holding Company's short-term interest in boosting share price, which also personally benefited them by increasing their compensation.

The Trust responds that the challenged actions are protected by the business-judgment rule: According to the Trust, since Mr. Beck, Mr. Kruse, and the other ALCO members acted with the blessing of the Directors, "[a]s a matter of law, FDIC cannot now prove a breach by Officers for acting pursuant to the Directors' business judgments." Trust Resp. Br. at 10 (citing *Levin v. Miller*, 900 F.3d 856 (7th Cir. 2018)). On the facts, the Trust argues that the challenged actions were reasonable at the time they were taken, charging that FDIC's theory of the case is riddled with hindsight bias. Specifically, the Trust urges that "the Director-approved investment strategy and the challenged investments were reasonable at the time they were made," and "[c]ontemporaneous regulatory feedback further corroborates the reasonableness of the investment decisions." Trust FFCL at 68–70.

In California, the elements of a breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) proximately caused damages. *Knox v. Dean*, 205 Cal. App. 4th 417, 432 (2012); *LaMonte v. Sanwa Bank Cal.*, 45 Cal. App. 4th 509, 517 (1996). "While breach

United States District Court
Northern District of California

of fiduciary duty is a question of fact, the existence of legal duty in the first instance and its scope are questions of law." *Kirschner Bros. Oil, Inc. v. Natomas Co.*, 185 Cal. App. 3d 784, 790 (1986) (citations omitted).

**1. Mr. Beck, Mr. Kruse, and the other ALCO members owed fiduciary duties to the Bank.**

The Court has already held that officers and directors of a federally insured bank owe duties of care and loyalty to the bank:

> Under federal banking regulations, the officers and directors of a federally insured bank owe duties of care and loyalty to the bank, and they cannot sacrifice the financial soundness of the bank for their or the bank's holding company's benefits. *See* Office of the Comptroller of the Currency, The Director's Book, at 34–35 (2020) ("[A] bank's board should ensure the interests of the bank are not subordinate to the interests of the parent holding company in decisions that may adversely affect the bank's risk profile, financial condition, safety and soundness, and compliance with laws and regulations. Additionally, a director who serves on the board of both the bank and its holding company must comply with the director's fiduciary duties to the bank, including the duty of loyalty.").

ECF No. 233 at 21–22.

The Trust does not dispute that Mr. Beck, Mr. Kruse, and the other ALCO members were officers of a federally insured bank to which they owed fiduciary duties. Rather, the Trust argues that FDIC has failed to prove a breach of those duties or that the Holding Company is liable for those breaches.

**2. Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank.**

A fiduciary's departure from the applicable standard of care constitutes a breach of the fiduciary duty of care. *See Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 562–63 (1994); *Duffy v. Cavalier*, 215 Cal. App. 3d 1517, 1538 (1989). In California, the duty of care for a bank officer is the skill and care that a reasonably careful officer would use in similar circumstances. *St. Paul Fire & Marine Ins. Co. v. Bank of Stockton*, 213 F. Supp. 716, 721 (N.D. Cal. 1962); *see also FDIC v. Hawker*, No. 12-cv-00127-LJO-DLB, 2012 WL 2068773, at *4 (E.D. Cal. June 7, 2012). A fiduciary duty imposes an obligation to act with due care,

utmost good faith, and in the best interest of the party to whom the fiduciary duty is owed. *Wolf v. Superior Ct.*, 107 Cal. App. 4th 25, 29–30 (2003).

The duty of loyalty for bank officers requires that they act in the interests of the bank and not subordinate the bank's interests to their own self-interest or the interests of others, including the bank's holding company. CACI No. 4102; Restatement (Third) of Agency § 8.01. A fiduciary's participation in activities adverse to the interests of a party to whom a fiduciary duty is owed constitutes a breach of the fiduciary duty of loyalty. CACI No. 4102; *Sequoia Vacuum Sys. v. Stransky*, 229 Cal. App. 2d 281, 287 (1964); *Wolf*, 107 Cal. App. 4th at 29–30.

To establish liability for breach of fiduciary duty, the plaintiff must show (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach. CACI No. 4101; *see also Knox*, 205 Cal. App. 4th at 432; *LaMonte*, 45 Cal. App. 4th at 517. Liability for breach of fiduciary duty "can be based upon either negligence or fraud, depending on the circumstances." *Tribeca Companies, LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1114 (2015). To establish liability for negligence, the plaintiff must show (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) damages proximately caused by the breach. CACI No. 400; *see also Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998); *Hawker*, 2012 WL 2068773, at *4.

Breach of fiduciary duty is ultimately an issue of fact. *USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1412 (9th Cir. 1994); *Schaeffer v. Gregory Vill. Partners, L.P.*, 105 F. Supp. 3d 951, 963 (N.D. Cal. 2015); *see also Marzec v. Public Emps.' Retirement Sys.*, 236 Cal. App. 4th 889, 915 (2015).

The standard of care is that of an ordinarily prudent banker. An ordinarily prudent banker recognizes the importance of managing market risks, including interest-rate risk and liquidity risk, and evaluates his or her financial institution's exposure to such risks in accord with foundational principles of finance as reflected in industry practice, regulatory guidance, and the financial institution's own internal policies and procedures. FF ¶¶ 173, 184–189, 191. An ordinarily prudent banker measures, manages, and monitors interest-rate risk using the two primary metrics of EVE-at-risk and NII-at-risk and manages the balance sheet to account for the known,

foreseeable risk that interest rates may rise, particularly when interest rates are at historically low levels. FF ¶¶ 172–183, 190–195.

As detailed in the findings of fact, the Court finds as a matter of fact that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties of care and loyalty to the Bank and were negligent by, among other things, (1) causing the Bank to take on excessive interest-rate risk and liquidity risk for the benefit of the Holding Company and adversely to the Bank by repeatedly breaching EVE-at-risk limits by purchasing long-term, fixed-rate securities and designating the majority of those securities as HTM, *see* FF ¶¶ 196–347; (2) terminating the Hedges while retaining the underlying, previously hedged AFS securities, *see* FF ¶¶ 348–374; and (3) approving the Dividend while the Bank was in dire financial condition and in need of liquidity, *see* FF ¶¶ 432–474. The evidence at trial established that Mr. Beck, Mr. Kruse, and the other ALCO members made all material decisions claimed as breaches of fiduciary duties by FDIC. *See, e.g.*, FF ¶¶ 91–96, 101–115, 199–205, 302–306, 354–362, 438–442.

First, Mr. Beck, Mr. Kruse, and the other ALCO members negligently caused the Bank to take excessive interest-rate and liquidity risk by deploying an unprecedented surge of primarily uninsured deposits received during a time of historically low interest rates to purchase billions of dollars in long-term, fixed-rate securities (primarily mortgage-backed securities) in violation of Board-approved interest-rate limits. FF ¶¶ 68–70, 74, 139–147, 199–209. These Officer-approved purchases were made while operating in sustained breach of the Holding Company's outer thresholds for EVE-at-risk, *see* FF ¶¶ 224–231, with actual knowledge that the continued purchases would exacerbate rather than remediate the breach based on the information that Mr. Beck, Mr. Kruse, and other ALCO members received during regular ALCO meetings and from regular reports, *see* FF ¶¶ 210–223, 232–251, 290–297. These Officer-approved purchases were clearly contrary to prudent banking principles and the mandatory provisions of the Global Treasury Policy, which also required Mr. Beck, Mr. Kruse, and the other ALCO members to promptly submit a detailed, actionable risk mitigation plan that would analyze its impact on earnings, capital, and liquidity. FF ¶¶ 139–154, 166–195, 260–268. Further, Mr. Beck, Mr. Kruse, and the other ALCO members exacerbated the investment portfolio's interest-rate risk

United States District Court
Northern District of California

and created excessive liquidity risk by designating a large percentage of these long-term, fixed-rate securities as HTM, which limited the Bank's ability to dispose of those assets for liquidity purposes or to protect them from the foreseeable risk of rising interest rates. FF ¶¶ 190–195, 302–317.

Mr. Beck, Mr. Kruse, and the other ALCO members knew or should have known that these decisions would impair the safety and soundness of the Bank and the interests of the Bank's depositors. FF ¶¶ 210–268, 307–317. They nonetheless took these actions to bolster the short-term income of the Holding Company, boost the Holding Company's share price, and ultimately, realize personal financial gain in the form of their compensation from the Holding Company. FF ¶¶ 269–289, 402–415. An ordinarily prudent banker would have known that these long-term, fixed-rate securities would be less valuable in the event that interest rates rose and would have prepared for interest rates to rise above the historically low levels they were at when these securities were purchased. FF ¶¶ 58, 74–76, 190–195, 290–297. The Court is left to conclude that Mr. Beck, Mr. Kruse, and the other ALCO members either ignored or were unaware of these risks and chose to chase short-term yields to boost the earnings of the Holding Company instead. They sought to deemphasize the risks they were taking and to draw attention away from the unrealized losses in the Bank's portfolio by designating these assets as HTM so that their fair market value would not be marked to market. FF ¶¶ 318–337. In other words, Mr. Beck, Mr. Kruse, and the other ALCO members cemented interest-rate risk and liquidity risk by locking up these long-term, fixed-rate securities with low yield and designating them as HTM so that the Holding Company could simultaneously boost short-term earnings from these investments without having to report their unrealized losses to investors in the form of the Tangible Common Equity to Total Assets Ratio or Other Comprehensive Income metric. *See* FF ¶¶ 338–343. The fact that these investments were high-credit-quality, government-backed securities and produced a reliable revenue stream at about a 1.5% yield does not diminish the imprudence of investing upward of $100 billion in long-term, fixed-rate securities. ALCO's own monthly modeling showed that, with 1%, 2%, and 3% interest-rate hikes, these securities would be underwater and, being designated HTM, unavailable to protect liquidity. FF ¶¶ 218–223.

United States District Court
Northern District of California

Mr. Beck's and Mr. Kruse's testimony at trial that they made and approved these decisions at the recommendation of outside advisers (like BlackRock and Curinos) is not credible and without any basis in the factual record. Mr. Beck and Mr. Kruse repeatedly took actions that were directly contrary to the recommendations of expert advice while inexplicably claiming to comply with them, leading to the inescapable inference that engaging the advisors was an end in itself and intended to lend legitimacy to the challenged decisionmaking. FF ¶¶ 492–503, 522–539. The Court accordingly does not find that their imprudent actions can be justified based on the advice that they received from outside advisers.

Likewise, Mr. Beck's and Mr. Kruse's explanations that they believed these actions to be justified to maintain regulatory capital ratios or based on their doubts regarding the accuracy of the EVE-at-risk modeling are entitled to little to no weight in the Court's analysis. None of the Trust's witnesses at trial was able to point to a single internal document or analysis connecting the EVE-at-risk breaches to maintaining capital, nor was there any suggestion that they had any valid basis for disbelieving the assumptions underlying their EVE-at-risk modeling that they swore and certified as accurate to the investing public. FF ¶¶ 478–491, 504–521. And, as set forth in the findings of fact, the Court does not credit Mr. Kruse's testimony that he created or even attempted to create a Global Treasury Policy compliant risk mitigation plan to deal with the sustained EVE-at-risk breaches. FF ¶¶ 540–568. To the contrary, the fact that the Holding Company and Bank were able to create and present detailed, specific remediation plans in other circumstances—to wit, in response to receiving dozens of Matters Requiring Attention and Matters Requiring Immediate Attention from regulators—shows that management understood what a remediation plan looked like and simply thought the EVE-at-risk breaches weren't important enough to merit one. *See* FF ¶¶ 595–596.

Finally, there is no factual basis for the Trust's argument that Mr. Beck, Mr. Kruse, and the other ALCO members approved these imprudent securities purchases and HTM-designations because the Directors "determine[d] . . . that demanding immediate compliance with the Bank's internal EVE-at-Risk-thresholds could compromise other important objectives, like supporting its capital, earnings, and net interest income—and therefore decide[d] ***not*** to demand immediate

compliance." Trust FFCL at 71 (emphasis in original). The Trust did not present any credible evidence at trial that compliance with EVE-at-risk limits would cause capital ratios to fall below regulatory standards or that net interest income or NII-at-risk would be significantly impaired. *See* FF ¶¶ 478–491. The record is devoid of any such studies or analyses being presented to any Officer or Director.

The Trust has persistently attempted to invoke business-judgment-rule protection by suggesting that, in approving the purchases of long-term, fixed-rate securities in a historically low rate environment, Mr. Beck, Mr. Kruse, and the other ALCO members were simply implementing the Directors' decision "to select NII-at-Risk—and not EVE-at-Risk—as the 'prioritized' Board-level interest rate risk metric to be managed under the [Risk Appetite Statement]," contending that the Officers "acted reasonably in responding to the EVE-at-Risk breaches in accordance with the Board's prioritization of NII-at-Risk and holistic balancing of competing risk objectives." Trust FFCL at 71–72. As the Court discusses more fully *infra* section II.B.3, the Trust did not present any credible evidence that any Director *ever* instructed Mr. Beck, Mr. Kruse, and the other ALCO members to suspend the Global Treasury Policy's EVE-at-risk thresholds to protect NII-at-risk, let alone exacerbate outer threshold EVE-at-risk breaches on a near-continuous basis from 2021 to 2022.

The Directors' instructions to management are embodied in the Holding Company's policies, including the Global Treasury Policy's requirement that management comply with EVE-at-risk thresholds and present a timely mitigation plan in the event of breach. FF ¶¶ 96, 102–109, 116–121, 125–169. While, in hindsight, it may have been better for the Trust's litigation position if the Holding Company decided that the Risk Appetite Statement superseded the Global Treasury Policy, there is no credible evidence that it did so. Nothing in the plain text of the policies suggests that internal controls in one policy could be suspended in favor of compliance with internal controls in another policy. *See* FF ¶¶ 151–155, 165–169. And the Trust did not introduce any credible evidence at trial showing that the Directors told Mr. Beck, Mr. Kruse, and the other ALCO members that they could breach risk metrics in the Global Treasury Policy if those risk metrics were not included in the Risk Appetite Statement.

Second, Mr. Beck, Mr. Kruse, and the other ALCO members terminated the little bit of protection they had in the AFS portfolio. They did this by terminating the Hedges in July 2022 while retaining the underlying, previously hedged AFS securities so they could—as Mr. Becker put it—"get[] value" from the Hedges without having to realize losses from selling the unprotected securities. FF ¶¶ 351–369. FDIC proved that the combination of terminating the Hedges while retaining the underlying, previously hedged AFS securities without interest-rate protection was not in accord with the standard of care of an ordinarily prudent banker in light of the sustained EVE-at-risk breaches. FF ¶¶ 370–374.

The decision to terminate the Hedges and leave the underlying, previously hedged AFS securities unprotected directly contradicts Mr. Kruse's suggestion at trial that he intended to remediate the EVE-at-risk breaches through hedge protection, *see* FF ¶¶ 560–561, and, more fundamentally, reflects his and other ALCO members' belief that the risk thresholds set forth in the Global Treasury Policy were optional and could be suspended without consequences, *see* FF ¶¶ 237, 239, 253–259. To the extent that, as the Trust argues, Mr. Beck, Mr. Kruse, and the other ALCO members relied on their prediction that interest rates would decrease in the long run and thus remediate the EVE-at-risk breaches, that conclusion was based on pure speculation in the market about the direction of interest rates and completely untethered to any interest-rate modeling or studies performed by Mr. Beck, Mr. Kruse, or any other ALCO members. Rather, as Mr. Warman explained, an ordinarily prudent banker would not remove protections from interest rates moving in one direction based on a few crystal ball predictions that they may go the other way. FF ¶¶ 194–195.

Third, unable to sustain the Holding Company's stock price on the Bank's failing financial condition by late 2022, Mr. Beck, Mr. Kruse, and the other ALCO members recommended the Dividend for the purpose of financing a stock repurchase. FF ¶¶ 434–438, 442–446. The stated justifications at trial, namely, that the Dividend was intended to improve the Holding Company's liquidity position or to enable the Holding Company to remain a source of strength for the Bank, were not credible and were, as with the Trust's other representations at trial, devoid of contemporaneous factual support. FF ¶¶ 447–452. The Court concludes based on the evidence

presented at trial that Mr. Beck, Mr. Kruse, and the other ALCO members knew or should have known that the Bank was in dire financial condition. FF ¶¶ 457–460. The only conceivable basis for recommending and approving the Dividend was to boost the position of the Holding Company (by, as internal documents confirm, financing a share repurchase) at the expense of the Bank's financial position.[2] *See* FF ¶¶ 443–447, 455–460.

To the extent that the Trust argues that FDIC's theory of the case is infected with hindsight bias, the Court disagrees. As Mr. Warman explained, the entire premise of risk management is to prepare for reasonably foreseeable risks, which include the risk of rising interest rates (particularly in a historically low-rate environment) and the directly related risk of outflows of uninsured noninterest bearing deposits. *See, e.g.*, FF ¶¶ 171, 179–183. While the Trust is right that nobody can be expected to predict the ultimate direction of macroeconomic changes in the banking system with 100% accuracy, that very uncertainty is the basis for risk management and preparation: Prudent bankers plan for the reasonably foreseeable risk that interest rates will change and prepare for liquidity stress events. FF ¶¶ 172–179, 190–195. On top of that, FDIC presented evidence that high-level employees like Mr. Busch and Mr. Haider perceived the risk of interest rates rising at the time these actions were being taken and warned Mr. Beck, Mr. Kruse, and the other ALCO members of that risk—those warnings fell on deaf ears. FF ¶¶ 210–214, 216, 271–283, 322. And the fact that Mr. Beck, Mr. Kruse, and the other ALCO members finally "paused additional securities purchases" once interest rates did in fact increase does not make their prior actions prudent, as the Trust appears to suggest. Trust FFCL at 70.

Finally, the Trust's reliance on certain ratings given to the Bank by regulators is misplaced, and the Court certainly does not find, as the Trust urges, that "contemporaneous reports by regulators confirmed the reasonableness of the Bank's investment strategy." Trust FFCL ¶ 181.

---

[2] FDIC also requests a finding that the Holding Company Directors were grossly negligent in approving the Dividend. *See* FDIC FFCL at 151. As set forth in the findings of fact, while FDIC proved that approving the Dividend in late 2022 during a period of dire financial circumstances for the Bank was imprudent, it did not provide sufficient evidence that this decision (which resumed the Holding Company and Bank's prior policy of bank-to-parent dividends prior to COVID-19) constituted an extreme departure from the standard of care or was made in want of even scant care. FF ¶ 461.

United States District Court
Northern District of California

As a preliminary matter, regulators examine banks to protect the banking system and the deposit-insurance system, not to tell officers and directors how to manage the institution that they are responsible for running. *FDIC v. Van Dellen*, No. 10-cv-04915-DSF-SHx, 2011 WL 13128983, at *3 (C.D. Cal. Sept. 27, 2011) ("[T]he FDIC 'owes no duty to the failed financial institution or to the wrongdoers who contributed to its failure, but rather to the public at large.'" (quoting *FDIC v. Oldenburg*, 38 F.3d 1119, 1121 (10th Cir. 1994)); *see also Harmsen v. Smith*, 586 F.2d 156, 158 (9th Cir. 1978) ("Bank examinations are not beacons to light the path of erring directors."). Because bank examiners do not have any duty to notify bank officers or directors of breaches of fiduciary duties of care, an absence of criticism in their reports does not show compliance with the standard of care. The Trust could have but elected not to present a standard-of-care expert witness to rebut Mr. Warman's testimony that the Officers' conduct fell well short of the ordinary diligence of a reasonably prudent banker—it cannot now fill that gap with cherry-picked regulatory findings. In any case, regulatory feedback was far from stellar: Examiners rated the Bank a composite 3 ("less than satisfactory or fair") for 2021 and the first half of 2022, and during that period issued a host of serious criticisms and numerous Matters Requiring Attention and Matters Requiring Immediate Attention identifying "foundational shortcomings" related to liquidity, governance, risk management, and interest-rate-risk modeling. FF ¶¶ 307–313, 572–583, 599.

As set forth in the findings of fact, the Court accords little weight to the testimony of the Trust's regulatory expert Mr. Watkins, who opined that, based on regulators' examination of the Holding Company and Bank, the Bank was in sound condition. Mr. Watkins expressly disclaimed any opinion on the central issues in the case, including whether the Holding Company and Bank's officers prudently managed interest-rate risk and liquidity risk. FF ¶ 601. The Court further discounts Mr. Watkins's testimony based on his ignoring independent governmental reports that contradicted his opinions and his failure to conduct an independent reexamination of the Holding Company and Bank to validate the regulatory ratings. *See* FF ¶ 603. Finally, there was no credible evidence presented at trial suggesting that Mr. Beck, Mr. Kruse, and the other ALCO members took the challenged actions based on support from regulators in any case.

United States District Court
Northern District of California

The Court accordingly concludes that Mr. Beck, Mr. Kruse, and the other ALCO members' investment portfolio mismanagement, early termination of the Hedges and retention of the underlying AFS securities, and approval of the Dividend constitute breaches of their fiduciary duty of care to the Bank. Each of these actions fell below the standard of care, which involves measuring, monitoring, and managing interest-rate and liquidity risk within established risk limits, consistent with industry practice and foundational regulatory guidance, and complying with internal risk policies and metrics. FF ¶¶ 172–194. Mr. Warman was the only standard-of-care expert presented at trial, and the Court finds his testimony to be more credible and reliable than the self-interested testimony of the Holding Company and Bank's officers and directors. As confirmed by both the foundational regulatory guidance in the form of SR 10-1 and the internal risk thresholds established by the Holding Company, the Court concludes that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties of care because ordinarily prudent bankers do not cause their banks to take actions that lead to sustained breach of risk limits (including EVE-at-risk) or knowingly incur risks that would lead to catastrophic losses if those risks materialize. *See* FF ¶¶ 139–151, 172–180, 184–186.

The Court also concludes that Mr. Beck, Mr. Kruse, and the other ALCO members' investment portfolio mismanagement, early termination of the Hedges and retention of underlying AFS securities, and approval of the Dividend constitute breaches of their fiduciary duty of loyalty to the Bank. Mr. Beck, Mr. Kruse, and the other ALCO members sacrificed the interests of the Bank and its depositors to be able to show additional short-term income for the benefit of the Holding Company, and the Trust's alternative explanations for Mr. Beck, Mr. Kruse, and the other ALCO members' actions are not credible and have no basis in the evidence presented at trial. FF ¶¶ 269–289, 318–329, 363–369, 443–454. That benefit to the Holding Company also at least partially accrued to the Officers personally, since their individual compensation was directly impacted. *See* FF ¶¶ 402–404, 407–408, 413.

**3. Under California Law, Mr. Beck, Mr. Kruse, and the other ALCO members are not protected by the Business-Judgment Rule.**

As the Court explained at the summary judgment stage, California's business-judgment

rule does not apply to officer conduct, which is instead evaluated under an ordinary negligence standard. *See* ECF No. 284 at 6. Unsatisfied with that holding, the Trust has repeatedly invited the Court to drastically rewrite the settled scope of the business-judgment rule in California by holding that officer conduct is also entitled to the rule's protection whenever it is "guided by Director-approved policies" that "Directors [have] reviewed and deliberated"—or even when directors merely possess "approval authority" over the conduct at all. Trust Trial Br. at 11. This the Court declines to do.

Courts in California have regularly held that officers do not receive derivative business-judgment protection simply by virtue of directors' participation in the decisionmaking process: On the contrary, where officers and directors act together—whether jointly or sequentially—officer conduct is evaluated for ordinary negligence and director conduct is evaluated for gross negligence. *See, e.g.*, *FDIC v. Faigin*, No. 12-cv-03448-DPP, 2013 WL 3389490, at *11 (C.D. Cal. July 8, 2013); *1st Valley Credit Union v. Bland*, No. 10-cv-01597-GW, 2010 WL 8757250, at *6 (C.D. Cal. Dec. 20, 2010); *FDIC v. Switzer*, No. 13-cv-03834-RS, 2014 WL 12696532, at *2 (N.D. Cal. Apr. 9, 2014). So long as an officer's recommendations, decisions, or other conduct is a substantial factor in causing harm, that conduct is actionable for ordinary negligence, regardless of whether another corporate decisionmaker is involved or exercises ultimate decisionmaking authority. *Switzer*, 2014 WL 12696532, at *1–2 (explaining that the "fact that others were involved" in a bank's decisions "does not shield" officers from liability for negligent recommendations even if directors had "final approval" authority over the decisions).

In any event, the evidence presented at trial forecloses the Trust's factual premise because the Officers—not the Directors—made the material decisions challenged by FDIC in its affirmative defenses. Officers were responsible for—and in fact carried out—the day-to-day operations of the Bank and Holding Company, the development and implementation of the investment strategies, the selection of which securities to purchase, the designation of securities as HTM or AFS, the management of interest-rate and liquidity risk, the purchase and sale of hedging instruments, and the recommendation and approval of bank-to-parent dividends. FF ¶¶ 91–100, 102–115. Officers and directors uniformly testified that management—led by Mr. Beck, Mr. Kruse,

and the officer-only ALCO—decided what securities to purchase and to designate as HTM, and had primary responsibility for securities investment strategy, interest-rate risk, and liquidity risk. *See, e.g.*, FF ¶¶ 109–115, 121.

On this score, the Trust's citation to *Levin* is of no help. The Seventh Circuit in *Levin*, applying Indiana law, affirmed a district court's grant of summary judgment for defendant corporate officers on the plaintiff's "claims that the officers breached their duty to provide information to the Board[] . . . that an earlier bankruptcy could have maximized [the bank's] value." 900 F.3d at 862. Because "[t]he duty to provide information is not absolute" under Indiana law and "is qualified by the duty to obey the Board's lawful instructions," the Seventh Circuit held that the defendants "had no right—much less a duty—to pursue a course that directly contradicted the Board's clear instructions." *Id.* at 863 (citing Ind. Code § 23-1-36-2 official cmt.). That is not what happened here. While it is true that the Directors had the authority to oversee and effectively challenge the Officers' decisions, FDIC has demonstrated that the Directors *did not* in fact exercise that oversight with respect to the challenged Officer conduct.

Far from following "clear instructions" to breach the Holding Company's EVE-at-risk limits, FDIC demonstrated at trial that the Officers *did not* comply with the Directors' directions, which included the Board-approved Global Treasury Policy. FF ¶¶ 125–131, 139–155. On the contrary, the Officers continuously breached the Global Treasury Policy's EVE-at-risk thresholds and violated the Global Treasury Policy's directive that the Treasury Department develop, communicate, and submit for approval a risk-mitigation plan analyzing the impact on earnings, capital, and liquidity in response to those breaches. FF ¶¶ 260–268, 540–568. While the Trust now argues that the Directors made the "strategic decisions" to "prioritize earnings" and "*not* . . . demand immediate compliance with the Bank's internal EVE-at-Risk thresholds in light of concerns that this would compromise other important objectives," Trust Resp. Br. at 9 (emphasis in original), the Trust did not present any credible evidence at trial that the Directors amended the Global Treasury Policy's EVE-at-risk thresholds or suspended the Global Treasury Policy's requirement for a risk-mitigation plan. FF ¶ 185. Nor did the Trust present any credible evidence that any Officer or Director actually believed that breaching EVE-at-risk was necessary to comply

with other objectives like regulatory capital ratios; to the contrary, Mr. Kruse conceded at trial that these metrics "were not associated in any way." FF ¶ 485.

### C. FDIC Has Established Aiding-and-Abetting Liability of the Holding Company (Affirmative Defense No. 1)

A defendant is liable for aiding and abetting a breach of fiduciary duty if the defendant "knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act." *Casey v. U.S. Bank Nat. Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) ("[I]t is uncontroversial for parent corporations to be subjected to claims for aiding and abetting breaches of fiduciary duty committed by directors of their subsidiaries." (citing *Universal Studios, Inc. v. Viacom, Inc.*, 705 A.2d 579, 600 (Del. Ch. 1997))). The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of the breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff. *Hoffman v. Goli Nutrition, Inc.*, No. 23-cv-06597-CAS-MAAx, 2024 WL 3541194, at *13 (C.D. Cal. July 24, 2024); *see also Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 n.10 (2005).

#### 1. Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank.

As discussed *supra* section II.A.2, the Court finds that FDIC has established by a preponderance of evidence that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties of care and loyalty that they owed to the Bank as its officers.

#### 2. Members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta knew of the breaches.

FDIC argues that the evidence presented at trial establishes that Mr. Becker, Ms. Izurieta, and the Directors on the Finance Committee, Risk Committee, and Compensation Committee

United States District Court
Northern District of California

knew that the Officers were mismanaging interest-rate and liquidity risk in the securities portfolio and that the Bank was in dire financial condition when approving the Dividend. The Trust responds that "there is no credible evidence Directors thought Officers were breaching their fiduciary duties." Trust Resp. Br. at 11. The Trust also argues that the "FDIC's concession that Directors were not grossly negligent except as to the Dividend negates its ability to prove wrongful intent." Trust Resp. Br. at 11–12 (citing Tr. at 2451:18–22).

FDIC has proved that Mr. Becker, Ms. Izurieta, and the Directors on the Finance Committee, Risk Committee, and Compensation Committee were on notice of the underlying acts, knew that those underlying acts imprudently breached the outer threshold of the Global Treasury Policy's EVE-at-risk limits, and knew that those underlying acts subordinated the Bank's interests to the Holding Company's interests. Knowledge of the wrongfulness of Mr. Beck, Mr. Kruse, and the other ALCO members' actions "can be inferred from circumstances such that the defendant must have known" that they represented a deviation from the exercise of reasonable care. *NJOY, LLC v. Imiracle (HK) Ltd.*, 760 F. Supp. 3d 1084, 1110 (S.D. Cal. 2024); *accord Musk v. Altman*, 818 F. Supp. 3d 1109, 1131 (N.D. Cal. 2026).

Based on the regular reports they received and the risk limits set forth in the Global Treasury Policy and SR 10-1, Mr. Becker, Ms. Izurieta, and the Directors on the Finance Committee, Risk Committee, and Compensation Committee knew of the continuous EVE-at-risk breaches and that purchasing long-term, fixed-rate securities and designating them as HTM exacerbated interest-rate and liquidity risk. FF ¶¶ 379, 395, 409, 418, 428. They also knew from these materials that terminating the hedges while retaining the underlying securities would remove interest-rate-risk protection during a time of rising rates, and that the Dividend was approved during the time of the Bank's deteriorating financial condition. FF ¶¶ 398, 412, 418, 428.

To the extent that the Trust argues that FDIC cannot prevail on its affirmative defense without introducing direct evidence that Mr. Becker, Ms. Izurieta, and the Directors on the Finance Committee, Risk Committee, and Compensation Committee knew that the challenged acts as a matter of law constituted breaches of Mr. Beck, Mr. Kruse, and the other ALCO members' fiduciary duties to the Bank, the Court disagrees. The actual knowledge requirement for aiding

and abetting does not require "specific intent" to cause harm. *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006); *FlatWorld Interactives LLC v. Apple Inc.*, No. 12-cv-01956-WHO, 2013 WL 6406437, at *4 (N.D. Cal. Dec. 6, 2013); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 28, cmt. c ("[Defendant need not have] understood the full legal significance of the facts, or all the details of the primary wrongdoing. It is sufficient if the defendant was aware of facts that made the primary conduct wrongful."). Similarly, while the Trust is correct that FDIC must establish the Holding Company's conscious decision to assist the wrongful conduct, *see, e.g.*, *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 641–42 (2021), FDIC need not adduce evidence of bad faith or ill intent to satisfy this element.

Finally, the Trust's suggestion that FDIC "conceded" that the Directors were not grossly negligent is a mischaracterization of FDIC's colloquy with the Court during closing argument:

> The Court. Am I clear then, you are not seeking a finding that the Board Members breached their duties?
> Mr. Heftman. None of our claims depend –
> The Court. I didn't ask what they depend on. Are you trying to prove that the individual board members or these committees were grossly negligent?
> Mr. Heftman. Solely with respect to the dividends, Your Honor.
> The Court. Okay. Okay.
> Mr. Heftman. The other claims with respect to securities mismanagement and hedging, solely concern, and we seek a finding, as to the officers who made those decisions and who were negligent in making those decisions and who have no business judgment rule protection in making those decisions, Your Honor.

Tr. at 2451:15–2452:4. The Trust's suggestion that FDIC's strategic choice not to seek a finding that the Directors' conduct (apart from the Dividend) was so imprudent as not to be protected by the business-judgment rule constitutes a concession that they did not have the intent to aid or abet the Officers' misconduct is self-evidently nonsensical and does not merit further comment.

**3. Members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta, as Officers and Directors of the Holding Company, substantially assisted and encouraged the breaches on a regular basis.**

As to the affirmative act element, FDIC has identified various separate instances in which the Holding Company through its Officers and Directors—namely, members of the Finance

Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta—substantially assisted and encouraged Mr. Beck, Mr. Kruse, and the other ALCO members' breach of fiduciary duties owed to the Bank. "Substantial assistance or encouragement" of a breach of duty can occur through ordinary business transactions. *AngioScore, Inc. v. TriReme Med., LLC*, 70 F. Supp. 3d 951, 960 (N.D. Cal. 2014). Substantial assistance or encouragement can be—but does not need to be—independently tortious. *Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1099 (N.D. Cal. 2013) (collecting cases). Substantial assistance or encouragement also can take the form of inaction where the aider and abettor has a duty to act. Restatement (Second) of Torts § 876(c); Restatement (Third) of Torts: Liab. for Econ. Harm § 28 (2020); *see also In re Zetta Jet USA, Inc.*, No. 21-cv-07572, 2024 WL 3198826, at *65 (C.D. Cal. Mar. 26, 2024); *Seaman v. Sedgwick LLP*, No. 11-cv-0664-DOC-RNBx, 2013 WL 12204741, at *4 (C.D. Cal. July 8, 2013).

The evidence at trial established that members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta had an obligation to effectively challenge Mr. Beck, Mr. Kruse, and the other ALCO members' decisions related to interest-rate risk, liquidity risk, and the investment portfolio flowing from their positions in the Holding Company and from specific policy requirements, like the Global Treasury Policy and Risk Management Policy. FF ¶¶ 378, 391, 394, 405, 411, 417, 427. As set forth in the findings of fact, they failed to discharge these obligations and supported actions by Mr. Beck, Mr. Kruse, and the other ALCO members that constituted breaches of Mr. Beck, Mr. Kruse, and the other ALCO members' fiduciary duties to the Bank. These acts and omissions occurred while the members of the Finance Committee, Risk Committee, and Compensation Committee were acting in their capacity as Holding Company Directors and Mr. Becker and Ms. Izurieta were acting in their capacity as Holding Company Officers. FF ¶¶ 393, 401, 416, 426, 431.

First, members of the Finance Committee and Risk Committee, Mr. Becker, and Ms. Izurieta substantially assisted and encouraged Mr. Beck, Mr. Kruse, and the other ALCO members' continued purchases of long-term, fixed-rate securities by permitting management to keep adding excessive interest-rate risk after repeated notices that those purchases were causing

sustained breaches of the Global Treasury Policy's EVE-at-risk limits. The members of the Finance Committee and Risk Committee knew of these breaches and the excessive interest-rate risk caused by their investment decisions. FF ¶¶ 379, 395. They also knew of ways to reduce the excessive risk taken by ALCO and shown by the breaches, including buying fewer long-term, fixed-rate securities with heightened interest-rate risk, but they never challenged management's decision to continue investing in these assets in an effort to increase yield. FF ¶¶ 380–388, 396–397.

Mr. Becker and Ms. Izurieta likewise encouraged the same tortious conduct by failing to stop or effectively challenge these investment decisions. FF ¶¶ 584–594. Mr. Becker never instructed Mr. Beck, Mr. Kruse, or the other ALCO members to bring EVE into compliance, to discontinue investments in long-term, fixed rate securities while in breach, or to take less interest-rate risk in the securities portfolio, despite knowing the excessive interest-rate risk and risk of loss associated with those decisions. FF ¶ 420. Ms. Izurieta similarly failed to challenge these decisions despite also knowing the risks; nor did she ever suggest that Mr. Beck, Mr. Kruse, and the other ALCO members take less risk in the securities portfolio to comply with the Holding Company's risk limits. As set forth in the findings of fact, she virtually abdicated her role as leader of the second line of defense. FF ¶¶ 428–431.

Based on applicable Holding Company charters, policies, and their individual responsibilities within the organization, members of the Finance Committee and Risk Committee, Mr. Becker, and Ms. Izurieta all had obligations to challenge management decisions related to interest-rate-risk management, liquidity-risk management, and the investment portfolio. By supporting negligent decisions in each of these areas or failing to discharge their obligation to challenge the decisions, members of the Finance Committee and Risk Committee, Mr. Becker, and Ms. Izurieta aided and abetted breaches of fiduciary duty to the Bank.

Second, the members of the Finance Committee knew that Mr. Beck, Mr. Kruse, and the other ALCO members subsequently designated most of the long-term, fixed-rate securities as HTM and that doing so would exacerbate interest-rate risk and liquidity risk. The Directors on the Finance Committee enabled continued excessive risk-taking by allowing management to continue



United States District Court
Northern District of California

buying long-term, fixed-rate securities in breach of EVE-at-risk, which allowed them to mask losses on the balance sheet under GAAP and present a rosier picture to investors, to the detriment of the Bank. Under its charter and the Global Treasury Policy, the Directors on the Finance Committee had obligations to effectively challenge management decisions related to the designation of securities as HTM. FF ¶¶ 378, 391, 394, 417, 427. By supporting or failing to challenge negligent management decisions related to these classifications, members of the Finance Committee aided and abetted breaches of fiduciary duty to the Bank.

Third, members of the Finance Committee and Risk Committee and Mr. Becker also substantially assisted the breaches by supporting the 2022 termination of the Hedges while retaining the underlying securities, thereby removing protection against further losses from rising interest rates. The Trust has stipulated that the Directors on the Finance Committee similarly supported these decisions. SF ¶ 47. There also was no effective challenge of this decision from the Directors on the Risk Committee despite the ongoing EVE-at-risk breaches and the fact that removal of the hedges would worsen those breaches. FF ¶¶ 398–399. Mr. Becker directly encouraged Mr. Beck to take these actions in their personal communications. FF ¶¶ 421–423. By supporting or failing to challenge negligent management decisions, members of the Finance Committee and Risk Committee and Mr. Becker aided and abetted breaches of fiduciary duty to the Bank.

Fourth, members of the Finance Committee approved the Dividend on behalf of both the Boards of Directors for the Holding Company and Bank after approval by Mr. Beck, Mr. Kruse, and the other ALCO members. FF ¶¶ 440–441. Mr. Becker also substantially assisted the Dividend by approving and supporting this transfer at least in part to give the Holding Company flexibility to repurchase its own stock to attempt to boost the stock price after the stock price had fallen. FF ¶¶ 441, 443. By supporting or failing to challenge negligent management decisions, members of the Finance Committee and Mr. Becker aided and abetted breaches of fiduciary duty to the Bank.

Fifth, the members of the Compensation Committee encouraged the same excessive risk-taking by rewarding the senior officers responsible for the balance-sheet decisions that violated

board-approved policies and took excessive risk with depositor money through compensation tied principally to Holding Company performance, return on equity, total stockholder return, and stock-price appreciation. FF ¶¶ 402–415. Although members of the Compensation Committee had discretion to reduce incentive compensation based on inadequate risk management, they chose not to do so. FF ¶ 406. On the contrary, in 2021 Mr. Beck received the highest incentive cash bonus he had ever received, approximately $1.4 million, and was not docked for the risk-management deficiencies associated with the securities portfolio, leaving him encouraged that his actions were supported by the Compensation Committee because he was rewarded for them. FF ¶ 407. More broadly, the Compensation Committee prioritized Holding Company short-term income and stock performance over effective risk management and compliance with risk limits.

**4. The Finance Committee, Risk Committee, Compensation Committee, Ms. Izurieta, and Mr. Becker's encouragement of the breaches was a substantial factor in causing harm to the Bank.**

As explained *infra* section II.E, the Court finds that FDIC has shown by a preponderance of evidence that this encouragement or absence of required effective challenge was a substantial factor in causing the breaches, for the breaches would not have occurred if they had not been encouraged or if they had been effectively challenged.

**5. FDIC's aiding-and-abetting defense is not barred by the agency immunity rule.**

To the extent that the Trust argues that FDIC's aiding and abetting claim is barred by the agency immunity rule—since the Holding Company cannot "aid and abet" itself—that is not what FDIC argues in this case. *Villains, Inc. v. Am. Econ. Ins. Co.*, 870 F. Supp. 2d 792, 795 (N.D. Cal. 2012). Although the agency immunity rule has been extended to aiding-and-abetting claims (and applies both to claims against an agent and against a corporation), there is a settled exception to the rule "where the [agent] violates a duty that he or she independently owes to the plaintiff." *Opera Gallery Trading Ltd. v. Golden Trade Fine Art Inc.*, No. 15-cv-00569-SVW-RZ, 2016 WL 7665408, at *4 (C.D. Cal. Jan. 6, 2016); *see also ESG Cap. Partners, LP v. Stratos*, 828 F.3d

1023, 1037 (9th Cir. 2016) (explaining that aiding-and-abetting claims could proceed because the agent had “an independent legal duty” to the plaintiff).

That is the case here. Holding Company agents (i.e., Mr. Beck, Mr. Kruse, and the other ALCO members) breached a duty that they independently owed to the Bank as Bank Officers. *See supra* section II.B.2. Other Holding Company agents (i.e., Mr. Becker, Ms. Izurieta, and the Directors on the Finance Committee, Risk Committee, and Compensation Committee) encouraged those breaches. This case is not a case where a corporation aided and abetted itself by both breaching a duty that it owed to the plaintiff and aiding and abetting that breach through conduct of its agents. As the Court previously held, the Holding Company did not have a direct duty to the Bank—its Officers (who also served as Bank Officers) did. *See* ECF No. 233 at 23–27. FDIC proved at trial that the Holding Company aided and abetted those breaches of duty; it did not aid and abet its own breach of duty.

**6. California law recognizes a cause of action for aiding and abetting negligence.**

Finally, the Court disagrees with the Trust’s interpretation of California law, which the Trust suggests only recognizes aiding-and-abetting liability in the context of intentional torts. The cases that the Trust cites are either plainly distinguishable or otherwise do not support its general statement that “California law does not recognize a cause of action for aiding and abetting negligence.” Trust FFCL at 78.

The Trust’s primary authority, *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318 (1996), involved claims for workplace sexual harassment under the California Fair Employment and Housing Act. *Id.* at 1323. The court of appeal affirmed the trial court’s dismissal of the plaintiff’s aiding and abetting claim against his supervisor because “a supervisory employee owes no duty to his or her subordinates to prevent sexual harassment in the workplace. That is a duty owed only by the employer.” *Id.* at 1326. Nowhere in *Fiol* is there any suggestion that California law categorically bars claims for aiding and abetting negligence. The district court cases the Trust cites are similarly off base. In *Nasrawi v. Buck Consultants, LLC*, 713 F. Supp. 2d 1080 (E.D. Cal. 2010), the district court held that the plaintiff beneficiary of a public retirement trust failed to state a

claim against the defendant actuarial employee for aiding and abetting his employer's allegedly negligent actuarial valuation. *Id.* at 1083. In *Garber v. United States*, No. 15-cv-05867-CAS-JPRx, 2016 WL 552656, at *3 n.2 (C.D. Cal. Feb. 9, 2016), the district court in a footnote refused to credit a pro se plaintiff's argument in an improper sur-reply brief that his claim for aiding and abetting fraud was actually a claim for aiding and abetting negligence (so as to invoke the Federal Tort Claims Act's waiver of sovereign immunity for suits against the United States).

To the extent that any of these nonbinding district court orders rested on a conclusion that California law does not recognize a claim for aiding and abetting negligence (though the Court does not read them that way), the Court disagrees. California authorities have consistently so held because California's law of aiding and abetting tracks Restatement (Second) of Torts § 876, "which expressly states that liability may exist for aiding and abetting negligent acts." *McKay v. Hageseth,* No. 06-cv-01377, 2007 WL 1056784, at *2 (N.D. Cal. April 6, 2007); *see also Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1290 (2015) (rejecting "the assertion that the law in California does not permit liability for aiding and abetting 'unintentional conduct'"); CACI No. 3610 ("One may be liable as an aider and abettor of a negligent act.").

**D. FDIC Has Established Agency Liability of the Holding Company (Affirmative Defense No. 2)**

To prevail on its second affirmative defense for agency liability, FDIC must establish that (1) agents of the Holding Company (2) acting within the scope of their authority (3) breached their fiduciary duties to the Bank, (4) causing damages. *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 917 (1996).

FDIC argues that, under a straightforward application of California's law of agency, the Holding Company is liable to the Bank for the conduct of Mr. Beck, Mr. Kruse, and the other ALCO members in two ways. First, FDIC argues that the Holding Company is liable under actual-authority principles because the Holding Company managed the Bank's interest-rate and liquidity risk under global, enterprise-wide policies using consolidated metrics that were calculated and reported at the holding company level rather than the bank level. FDIC argues that because the Holding Company authorized and required Mr. Beck, Mr. Kruse, and the other ALCO

members to manage the Bank's investment portfolio, risk exposure, and capital management pursuant to these policies, the Holding Company is liable for Mr. Beck, Mr. Kruse, and the other ALCO members' breaches of fiduciary duties they owed to the Bank. Second, FDIC argues that, because the Holding Company made the affirmative choice to manage the Bank in this manner, Mr. Beck, Mr. Kruse, and the other ALCO members' breaches of fiduciary duties to the Bank fall within the scope of their authority as Holding Company Officers.

The Trust responds that FDIC has failed to prove that Mr. Beck, Mr. Kruse, and the other ALCO members were acting as agents of the Holding Company when they engaged in the challenged conduct. Specifically, the Trust argues that the Supreme Court's decision in *United States v. Bestfoods*, 524 U.S. 51 (1998), establishes a presumption that Mr. Beck, Mr. Kruse, and the other ALCO members were acting as agents of the Bank that FDIC has failed to rebut. The Trust also contends that to find the Holding Company liable for Mr. Beck, Mr. Kruse, and the other ALCO members' breaches of fiduciary duties to the Bank "requires ignoring and contravening established agency law, corporate law, the liability framework that Congress enacted to govern bank holding companies and their affiliates, and custom and practice for how bank holding companies and their subsidiaries operate in the industry." Trust FFCL at 84.

**1. Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties to the Bank.**

As discussed *supra* section II.B, the Court finds that FDIC has established by a preponderance of evidence that Mr. Beck, Mr. Kruse, and the other ALCO members breached their fiduciary duties of care and loyalty to the Bank.

**2. Mr. Beck, Mr. Kruse, and the other ALCO members were acting as actual agents of the Holding Company and within the scope of their agency relationship while engaging in the challenged conduct.**

Under California law, "a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business." Cal. Civ. Code § 2338. California law accordingly recognizes principal liability for the conduct of agents that (1) is actually authorized

(or ratified after the fact) or (2) undertaken within the scope of the agent's authority. *Doe v. Roman Cath. Archbishop of Los Angeles*, 247 Cal. App. 4th 953, 969 (2016); *see also* Restatement (Third) of Agency §§ 7.03, 7.04, 7.07, 7.08. Conduct is within the scope of an agent's authority where (1) the conduct is reasonably related to the kinds of tasks that the agent was authorized to perform or (2) the conduct was reasonably foreseeable in light of the principal's business or the agent's responsibilities. *Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*, 39 Cal. App. 5th 995, 1015 (2019).

"[I]t is considered a normal attribute of ownership that officers and directors of the parent serve as officers and directors of the subsidiary." *Williams v. Progressive Cnty. Mut. Ins. Co.*, 2019 WL 1434241, at *2 (S.D. Cal. Mar. 29, 2019). Neither side contends that there was anything unusual about the fact that the Holding Company and Bank had overlapping Officers and Directors. *See* FF ¶ 132. Rather, the issue that the Court must now resolve is whether FDIC has demonstrated under the facts of this case that the Holding Company authorized Mr. Beck, Mr. Kruse, and the ALCO members to carry out the actions that FDIC claims were negligent. On this score, the evidence is overwhelming and uniformly establishes that the Holding Company specifically authorized and directed its own Officers to carry out the Bank's investment decisions and risk management strategy in accordance with the Holding Company's own policies.

Mr. Beck, Mr. Kruse, and the other ALCO members acted with actual authority as agents for the Holding Company because the Holding Company required them to manage the Bank's interest-rate risk, liquidity risk, and investment portfolio under a single, consolidated policy set by the Holding Company. Mr. Beck was employed exclusively by the Holding Company and did not have a separate employment agreement with the Bank. FF ¶ 103. Mr. Kruse headed the single Global Treasury Department that executed purchases on behalf of both the Holding Company and Bank. FF ¶¶ 106–107. ALCO was chartered by the Holding Company to manage asset-liability management risks and the consolidated balance sheet of the Holding Company and its subsidiaries, including the Bank. FF ¶¶ 91–100. Mr. Beck, Mr. Kruse, and ALCO members' specific responsibilities were set forth by the Holding Company's Global Treasury Policy and ALCO Charter and involved measuring, monitoring, and managing consolidated metrics under

"uniform," "enterprise wide" policies established by the Holding Company. FF ¶¶ 109, 125–131.

Mr. Beck, Mr. Kruse, and the other ALCO members carried out the challenged acts within the scope of their roles as Holding Company Officers. FF ¶¶ 199, 208–209, 303, 306, 356, 362, 437–440. The Bank did not have a separate ALCO, separate Treasury Department, or any separate policies governing interest-rate risk, liquidity risk, or the investment portfolio. FF ¶¶ 93, 107, 125, 130. The fact that the Bank owned the security instruments and interest-rate swap contracts at issue in this case does not change the fact that the Bank purchased those financial instruments under directions from the Holding Company, that these purchases were executed by Officers of the Holding Company and in accordance with consolidated metrics and policies established by the Holding Company. Nor does it make any difference that the Trust's counsel asked each witness in this case to confirm that they carried out their actions "on behalf of" the Bank, since they indisputably carried out these actions with express authorization from the Holding Company and within the scope of their agency or employment. Mr. Kruse conceded that the Holding Company's policy alone "controlled all of the activities" he performed in his role as the Global Treasurer, and the Court has been unable to locate even one example of a decision or purchase directed by the Bank and not the Holding Company. FF ¶ 107.

Perhaps in recognition of there being no credible evidence of any separate decisionmaking apparatus or policy of the Bank, the Trust pivots to *Bestfoods*—a statutory interpretation case concerning the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA")—which the Trust cites for the proposition that "[d]ual-role officers of a parent and subsidiary 'can and do "change hats" to represent the two corporations separately' and are 'presume[d]' to wear 'subsidiary hats' when acting for the subsidiary." Trust Resp. Br. at 3 (second alteration in original) (quoting *Bestfoods*, 524 U.S. at 69–70). The Court disagrees both with the Trust's invocation of *Bestfoods* and its application of that case, which involved whether a parent company could be liable under CERCLA's strict-liability regime for cleanup costs at a polluted facility that was (1) "own[ed]" by a subsidiary but (2) nonetheless "operat[ed]" by the parent. *See* 524 U.S. at 56 ("The phrase 'owner or operator' is defined only by tautology, however, as 'any person owning or operating' a facility, and it is this bit of circularity that prompts

our review." (citation omitted) (quoting 42 U.S.C. § 9601(20)(A)(ii))); *see also id.* ("CERCLA, 'unfortunately, is not a model of legislative draftsmanship[.]'" (quoting *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986))).

In its "enquiry into the meaning Congress presumably had in mind when it used the verb 'to operate,'" the Court held that a parent could be liable as an "operator" of a facility owned by its subsidiary if (1) the "parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture," (2) "a dual officer or director . . . depart[s] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility," or (3) "an agent of the parent with no hat to wear but the parent's hat . . . manage[s] or direct[s] activities at the facility." *Id.* at 71. Because the district court "focus[ed] on the relationship between parent and subsidiary (rather than parent and facility)" and "automatic[ally] attribute[ed] . . . the actions of dual officers and directors to the corporate parent," the Supreme Court remanded the case for assessment of the parent's degree of control over the subsidiary's environmental matters. *Id.* at 59, 72–73.

As a preliminary matter, the Court agrees with FDIC that the federal statutory-construction principles articulated in *Bestfoods* shed little light on common-law tort liability under California law. To the extent that they do, the evidence here establishes that Mr. Beck, Mr. Kruse, and the other ALCO members were acting with their Holding Company hats tightly secured, and FDIC has accordingly rebutted any presumption that they were acting solely in their capacity as Bank Officers. In *Bestfoods*, the subsidiary's own officers "set the day-to-day operating policies for the [subsidiary] without any need to obtain formal approval from [the parent]." *Id.* at 59. Here, by contrast, the Bank had no distinct policies or management of its own apart from those of the Holding Company, which exerted complete control over management of the Bank's risks and decisionmaking process. FF ¶¶ 91–115, 125–138. That Mr. Busch testified at his deposition that he executed purchases "on behalf of" the Bank misses the point. Trust Resp. Br. at 5 (citing TX 3002 at 21:10–13 (Busch Tr.)). The challenged action here is not the ministerial act of purchasing and recording securities instruments in the Bank's portfolio but rather the risk-management decisionmaking process set by the Holding Company.

The Trust also cites several district court orders that it says "apply *Bestfoods* broadly, including to bank and bank holding companies." Trust Resp. Br. at 3. The Court does not read those cases so broadly and finds them readily distinguishable from the case at bar, which includes a fully developed record after a bench trial. In *Campidoglio LLC v. Wells Fargo & Co.*, No. 12-cv-09949-TSZ, 2012 WL 5844693 (W.D. Wash. Nov. 19, 2012), the district court entered summary judgment against a putative class of plaintiff debtors on their claim against a dual officer because they "present[ed] no credible evidence or issues of fact that would demonstrate the 'more' required by the Supreme Court," concluding that "a broad definition of 'Wells Fargo' as including the Bank and [Holding] Company is not sufficient." *Id.* at *3 (quoting *Bestfoods*, 524 U.S. at 69). In *Kriegel v. Bank of Am., N.A.*, No. 07-cv-12246-NG, 2010 WL 3169579 (D. Mass. Aug. 10, 2010), the district court dismissed the plaintiff debtors' negligence and negligent misrepresentation claims against a bank holding company because "[a]ll [they] . . . asserted is parental control and the presence of [the holding company's] insignia on some documents," which "alone is not enough." *Id.* at *8 (citing *Bestfoods*, 524 U.S. at 61). In *Youkelsone v. Washington Mutual, Inc. (In re Washington Mutual, Inc.)*, No. 08-12229-MFW, 2010 WL 3238903 (Bankr. D. Del. Aug. 13, 2010), *aff'd*, 741 F. App'x 88 (3d Cir. 2018), the bankruptcy court dismissed a pro se plaintiff's fraud claim for failure to allege dominion and control for the corporate veil-piercing doctrine. *Id.* at *8 (quoting *Bestfoods*, 524 U.S. at 61). None of those cases "appl[ied] *Bestfoods* broadly," instead citing it for the general proposition that a parent-subsidiary relationship alone is insufficient to impute liability to the parent for the subsidiary's wrongdoing, and only *Campidoglio* even mentioned dual officers.

Nor is there any basis for the Trust's contentions that holding a parent liable for its agents' breaches of fiduciary duties owed to its subsidiaries is "contrary to fundamental principles of corporate law and agency law[] and would extend liability beyond the framework Congress set and the practice of the U.S. banking industry," Trust Resp. Br. at 6, or that "FDIC's proposed theory would disrupt the banking system . . . by imposing liability on Holding Companies for engaging in the common practice of operating through dual directors and officers," Trust Trial Br. at 10. Nothing in FDIC's argument regarding Holding Company liability relies on disregarding

United States District Court
Northern District of California

the corporate separateness of the Holding Company and Bank or otherwise seeks to pierce the corporate veil. Thus, the Trust's parade of horribles is simply not at issue in this case. Nor is it relevant how common it is for banks and bank holding companies to operate through dual directors and officers. The issue before the Court pertains to the scope of authority the Holding Company reserved for itself in managing the Bank's assets. As discussed throughout this order, the Holding Company chose to run the Bank through Holding Company Officers in accordance with the global, enterprise-wide policies, limits, and metrics that the Holding Company established. Having made this choice, it must live with the consequences.

The Court recognizes that most insured banks in the United States are owned by bank holding companies, *see* FF ¶ 132, and imposing liability on the Trust in this case does not cast any doubt on that well recognized corporate structure. As the authorities cited by the Supreme Court in *Bestfoods* make clear, *see* 524 U.S. at 61, the premise of the dual-hat apparatus is that the subsidiary retains an institutional identity of its own. *See, e.g.*, William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 YALE L. J. 193, 197 (1929) ("The ritual of separate meetings should be religiously observed. The activities of the individuals serving on the two boards can be tagged so that the individuals qua directors of the subsidiary can always be distinguished from the same individuals qua directors of the parent. Such tagging is not pure fiction. It draws the line that keeps the dual capacities separate and distinct."). Here, the Holding Company chose to structure its relationship to the Bank in a manner such that the Holding Company Officers were responsible for day-to-day operation of the Bank's investment portfolio and risk management—that choice was one of several options that the Holding Company could have permissibly taken and has the effect of subjecting the Holding Company to liability for the acts of its Officers with actual authorization and within the scope of their authority.

Here, the Holding Company is liable for the tortious misconduct of Mr. Beck, Mr. Kruse, and the other ALCO members because they were all Holding Company agents who acted with actual authorization from the Holding Company. These Officers also owed duties of care and loyalty to the Bank, which they breached while working within the scope of their Holding

Company employment or agency. A straightforward application of the common law of agency imputes liability for those torts to the Holding Company. *See, e.g.*, *United States v. Romitti*, 353 F.2d 662, 666 (9th Cir. 1966) ("[L]iability imposed upon the principal by the doctrine of respondeat superior is vicarious and does not rest upon the principal's fault."); *Diaz v. Carcamo*, 51 Cal. 4th 1148, 1157 (2011) (explaining that the vicariously liable principal, while not the "tortfeasor," is simply liable for the torts of its employee).

The evidence that FDIC presented at trial established that the Holding Company made the affirmative choice to authorize and direct its Officers to run the Bank's investment portfolio and risk management apparatus. The Bank had no policies, committees, ALCO meetings, treasury department, or officers of its own that were independent of the Holding Company. Each action by Mr. Beck, Mr. Kruse, and the other ALCO members that is challenged in this case involved the exercise of responsibilities specifically conferred on them by the Holding Company. The Trust cites several district court cases that it says have held that analogous express authorizations are "insufficient to impute liability to a holding company." Trust Resp. Br. at 5. The Court reads those cases differently.

The Trust's primary case, *In re Western States Wholesale Natural Gas Antitrust Litigation*, No. 03-cv-01431-PMP-PAL, 2009 WL 455601 (D. Nev. Feb. 23, 2009), does not even involve actual or apparent authority: The district court in that case held that the plaintiffs "failed to establish a prima facie case of personal jurisdiction based on . . . alter ego." *Id.* at *10. This action is a dual officer case, not an alter ego case—far from asserting that the Holding Company and Bank were the same entity, one of FDIC's primary arguments is that Mr. Beck, Mr. Kruse, and the other ALCO members subordinated the Bank's interests to that of the Holding Company. Whatever applicability *Western States* has here is further undermined by the disparate facts in the cases—in *Western States*, the only directions given by the holding company to the subsidiary were "general policies . . . consistent with [the defendant's] indirect investor status." *Id.* And in *whiteCryption Corp. v. Arxan Technologies, Inc.*, No. 15-cv-00754-WHO, 2015 WL 3799585 (N.D. Cal. June 18, 2015), the district court dismissed a breach of contract claim against the parent company because, despite alleging the existence of generally applicable policies set by the parent

company, the plaintiff failed to allege facts suggesting "day-to-day control over [plaintiff]'s contractual relationship with [the subsidiary]." *Id.* at *4. These cases have scant applicability to the facts of this case as borne out by the evidence introduced at trial, which established that the Holding Company authorized and directed its own officers and committees to manage the Bank's core business functions in accordance with the Holding Company's policies and procedures.

The Holding Company was not required to direct the Bank's activities in this way. *See* FF ¶¶ 132–138. For example, the Bank could have had a separate asset liability committee charged with the day-to-day management of the Bank's investment portfolio, and there could have been financial metrics and policies that were limited to the Bank instead of the global, enterprise-wide policies the Holding Company put in place. Having chosen to run the affairs of the Bank, however, the Holding Company, like any other principal, is subject to vicarious liability for harm caused by negligent acts of its agents within the scope of their authority. *See* Restatement (Third) of Agency §§ 7.03, 7.04 ("[A principal is liable for its agent's conduct where] the agent's conduct, if that of the principal, would subject the principal to tort liability."). To the extent that the Trust argues that bank holding companies are exempt from liability for the torts of their agents, that is not the law; it is the Trust, not FDIC, that seeks to "extend California law with a novel theory of agency liability" by fashioning a bank holding company exception. Trust FFCL at 82. And imposing liability on the Holding Company for harm arising out of negligent acts of its Chief Financial Officer, Global Treasurer, and Asset Liability Committee, does not—as the Trust contends—improperly penalize the Holding Company for the common practice of operating through dual directors and officers. Instead, FDIC's affirmative defense is based on the actions that the Holding Company authorized and directed.

The cases cited by the Trust are not to the contrary, instead rejecting assertions of vicarious liability against minority shareholders based on the plaintiffs' allegations that they appointed a director who subsequently injured the company. *See* Trust FFCL at 81–82 (citing *Shafi v. Chien*, No. 2023-1157-LWW, 2025 WL 671854, at *16 (Del. Ch. Mar. 3, 2025); *Med. Self Care, Inc. ex rel. Dev. Specialists, Inc. v. Nat'l Broad. Co.*, No. 01-cv-04191-LTS, 2003 WL 1622181, at *7 (S.D.N.Y. Mar. 28, 2003) (applying California law)). In *Shafi*, the chancery court declined "to

extend vicarious liability to [venture capital funds] for actions taken by [funds-appointed] Directors," relying on a prior decision determining that "hold[ing] . . . [a non-fiduciary firm] liable for acts of its purported agent-directors lacked support in Delaware law" because it "'would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors.'" 2025 WL 671854, at *16 (quoting *Khanna v. McMinn*, No. 20545-NC, 2006 WL 1388744, at *28 (Del. Ch. May 9, 2006)). In *Medical Self Care*, the district court "decline[d] to create a new cause of action under California law" imputing a fiduciary duty on a minority investor "by virtue of its designation of a member on [the corporation's] board of directors." 2003 WL 1622181, at *7.

Neither of these cases involves (or even addresses) the issue before the Court here whether the alleged tortfeasor was acting within the scope of its duties as an agent of the defendant shareholder. More fundamentally, there was no suggestion in those cases that the defendant shareholder set policies, managed, or in any way controlled the activities at the injured company when the alleged tortfeasors breached their duties to that company. In contrast, California courts regularly recognize that a principal can be held vicariously liable for its agents' breaches of fiduciary duties owed to a separate entity. *See, e.g.*, *Coley v. Eskaton*, 51 Cal. App. 5th 943, 961 (2020) (imposing vicarious liability for corporation whose officers breached fiduciary duties owed to separate entity for which they served as directors); *Sandler v. Sanchez*, 206 Cal. App. 4th 1431, 1442–43 (2012).

FDIC's theory of agency liability in this case is not complicated. Mr. Beck, Mr. Kruse, and the other ALCO members breached the fiduciary duties of care and loyalty that they owed to the Bank. They did so by departing from the standard of care of an ordinarily prudent banker and by subordinating the interests of the Bank to the interests of the Holding Company (and their own personal financial interests). The Holding Company, which itself does not owe any fiduciary duties to the Bank, is vicariously liable for Mr. Beck, Mr. Kruse, and the other ALCO members' torts because they committed those torts in their capacity as Holding Company Officers. FDIC's affirmative defense does not, as the Trust suggests, require the Court to find that "the Officers were never acting for the Bank," Trust Resp. Br. at 1, a characterization that elides the very

United States District Court
Northern District of California

important distinction between acting for the benefit of the Bank and acting as the Bank. Even setting that aside, the Trust does not identify any authority for its implicit assumption that an act as an agent of the Bank cannot also be an act as an agent of the Holding Company.

The Trust additionally argues that FDIC's agency-law affirmative defense improperly attempts to circumvent its purported evidentiary burden "to present evidence sufficient to satisfy veil-piercing doctrines" and runs afoul of the "liability framework that Congress established for bank holding companies and their affiliates." Trust FFCL at 82–83. The Court disagrees. FDIC does not argue that the Court should disregard the legal separation between the Holding Company and Bank, nor does the Court do so here. And the fact that "Congress [did not] impose derivative liability on bank holding companies for acts of directors and officers serving both the holding company and its bank subsidiary," Trust FFCL at 83, has no bearing on common-law agency liability under California law. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (explaining that federal banking laws do not displace state common-law rules of decision absent a "significant conflict with an identifiable federal policy or interest").

Finally, the Trust accuses FDIC of "ha[ving] done a 180-degree turn" at trial, urging that the "Court must take . . . at face value" FDIC's pretrial arguments as to aiding and abetting that Mr. Beck, Mr. Kruse, and the other ALCO members were acting in their capacities as officers of the Bank when engaged in the challenged conduct. Trust Resp. Br. at 2 (citing *Gospel Missions of Am. v. City of L.A.*, 328 F.3d 548, 557 (9th Cir. 2003)). The Trust is correct that FDIC—in its answer and opposition to the Trust's motion to strike—made statements suggesting that it could prevail on its aiding and abetting affirmative defense by showing that the Holding Company aided and abetted breaches of fiduciary duty by the Bank's Officers and Directors. *See, e.g.*, ECF No. 135 ¶ 123 ("[The Holding Company] also substantially assisted, encouraged, and participated in the breaches of fiduciary duty by [the Bank's] officers and directors."); ECF No. 174 at 24 ("Their shared officers and directors were acting in their Bank capacities in breaching duties to the Bank, and those individuals were acting in their holding-company capacities in substantially assisting and facilitating these breaches.").

That said, as explained above, the evidence at trial established that the Holding Company

through its Officers managed the Bank's investment decisions and risk management. FDIC further established at trial that the Holding Company authorized Mr. Beck, Mr. Kruse, and the other ALCO members to act under enterprise-wide, uniform policies established by the Holding Company in managing the day-to-day operations of the Bank. The Court need not disregard that evidence based on inferences that could be (but need not be) drawn from arguments that FDIC made at the pleadings stage. And the Ninth Circuit's analysis in *Gospel Missions* certainly does not *require* the Court to blind itself to evidence presented at trial. *Cf.* 328 F.3d at 557 ("We have discretion to consider a statement made in briefs to be a judicial admission[.]"). FDIC established at trial that Mr. Beck, Mr. Kruse, and the other ALCO members were acting within the scope of their authority as Holding Company Officers in, inter alia, purchasing long-term, fixed-rate securities while in breach of the Holding Company's risk metrics, imprudently terminating the Hedges, and approving the Dividend. In taking these actions, Mr. Beck, Mr. Kruse, and the other ALCO members breached their separate duties of care and loyalty that they owed to the Bank as Bank Officers.

In sum, the Holding Company is subject to the same common-law agency principles as any other corporate parent. Because FDIC has established that Mr. Beck, Mr. Kruse, and the other ALCO members' investment decisions and risk management were carried out in their capacity as agents of the Holding Company, the Holding Company—and thus the Trust, as its successor—is liable for breaches of fiduciary duties to the Bank.

**E. FDIC Has Established that Mr. Beck, Mr. Kruse, and the other ALCO Members' Breaches of Fiduciary Duty Were a Substantial Factor in Causing Damages**

FDIC argues that the evidence presented at trial establishes that, absent the imprudent purchase of long-duration securities in violation of board-approved risk metrics, termination of the Hedges while retaining the underlying, previously hedged AFS securities, and approval of the Dividend, $4.5 billion in damages for securities mismanagement would have been avoided. FDIC also argues that the Holding Company's encouragement or absence of required effective challenge was a substantial factor in causing the breaches, for the breaches would not have occurred if they had not been encouraged or if they had been effectively challenged. The Trust responds that those

losses "were only incurred because of a bank run, the Bank's closure, and FDIC's sale of those securities: but-for those events, the securities would have been held to maturity, and *no* losses would have been recognized." Trust FFCL at 85 (emphasis in original); *see also id.* ("[T]he losses FDIC asserts were only incurred because the Bank closed after a bank run and ultimately FDIC chose to sell the $32.7 billion in securities in receivership rather than hold them.").

Conduct is a cause of an injury if it is a "substantial factor in bringing about the injury." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997); *see also Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052 (1991). A substantial factor in causing harm is a factor that a reasonable person would consider having contributed to the harm—in other words, it must be more than a remote or trivial cause but need not be the only cause of the harm. *Rutherford*, 16 Cal. 4th at 968–69 (explaining that the "substantial factor" standard "subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact").

Once the injured party establishes that the tortfeasor's conduct is a substantial factor in causing the harm, the tortfeasor is liable regardless of whether some other person, condition, or event was also a substantial factor in causing the harm. *Am. Motorcycle Assn. v. Superior Ct.*, 20 Cal. 3d 578, 586 (1978); *see also Uriell v. Regents of Univ. of Cal.*, 234 Cal. App. 4th 735, 746–47 (2015); *Yanez v. Plummer*, 221 Cal. App. 4th 180, 187 (2013). An alternative intervening cause negates causation only if it constitutes a "superseding cause," i.e., an act of a third person or other force that by its intervention prevents a party from being liable for harm to another where the party's antecedent conduct is a substantial factor in bringing about the harm. *Brewer v. Teano*, 40 Cal. App. 4th 1024, 1031 (1995); *see also* Restatement (Second) of Torts § 440 & cmt. b. A superseding cause is an affirmative defense that the party asserting the superseding cause must plead and prove. *Maupin v. Widling*, 192 Cal. App. 3d 568, 578 (1987).

Whether Mr. Beck, Mr. Kruse, and the other ALCO members' conduct actually and proximately caused damages is a question of fact. *USAir*, 14 F.3d at 1412; *accord Pacheco v. United States*, 21 F.4th 1183, 1187 (9th Cir. 2022). FDIC presented unrebutted expert opinions and testimony of adverse witnesses that the securities losses were real economic losses that reflected a

United States District Court
Northern District of California

diminution in the actual value of the AFS and HTM securities, regardless of their accounting designation. FF ¶¶ 605–650. This economic loss occurred before the Bank's failure, before FDIC was appointed as receiver, and before FDIC disposed of those securities in accordance with its statutory obligations. FF ¶¶ 623–635. The loss in the economic value of the Bank's investment portfolio was the product of the known, foreseeable risk that long-term, fixed-rate securities purchased at a time of historically low interest rates would lose value in the event that interest rates increased. FF ¶¶ 616–622. On these bases, the Court concludes that FDIC has established causation as to both of its affirmative defenses arising out of the breaches of fiduciary duty.

As to the agency defense, the breaches of duty by Holding Company employees or agents acting with actual authority or within the scope of their authority that FDIC proved were all a substantial factor in causing FDIC's damages. Absent the imprudent purchase of long-duration securities in violation of board-approved risk metrics, the Bank would have avoided billions of dollars in losses on those securities. FF ¶¶ 608–636. Absent the termination of hedges against the risk of rising interest rates while retaining the underlying AFS securities, the Bank would have avoided hundreds of millions of dollars in additional losses on securities that were no longer protected. FF ¶¶ 637–640. And absent the approval of the Dividend paid by the Bank to the Holding Company, the Bank would have retained those funds. FF ¶¶ 641–642. Those factual findings establish that Mr. Beck, Mr. Kruse, and the other ALCO members' breaches of fiduciary duty were a substantial factor in causing FDIC's damages.

Similarly, for aiding and abetting, causation is established if a party's substantial assistance or encouragement is a substantial factor in causing the underlying tort or harm. As found above, members of the Finance Committee, Risk Committee, and Compensation Committee, Mr. Becker, and Ms. Izurieta encouraged or failed to discharge their obligations to challenge decisions by Mr. Beck, Mr. Kruse, and the other ALCO members that were negligent and a breach of their fiduciary duties, and that encouragement or absence of required effective challenge was a substantial factor in causing the breaches, for the breaches would not have occurred if they had not been encouraged or if they had been effectively challenged. FF ¶¶ 375–431, 439–442.

The Trust has not established that any other events alone or in combination (i.e., the increase in interest rates, the run on the Bank, the closure of the Bank, FDIC's post-closure sale of securities) caused FDIC's damages (i.e., the loss in value of the securities in the investment portfolio) or broke the chain of causation as a superseding cause. For an intervening act or event to constitute a superseding cause, the act must have produced harm of a "kind and degree" so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold the tortfeasor responsible. *Cal. Med. Assn. v. Aetna Health of Cal. Inc.*, 14 Cal. 5th 1075, 1097 (2023) (citations omitted); *Tung v. Chicago Title Co.*, 63 Cal. App. 5th 734, 745 (2021). Changes in market conditions, changes in interest rates, and the possibility that a bank may suffer a run on its deposits leading to its failure are all fundamental, known, and foreseeable risks in the banking business. The Trust's argument that "it was not foreseeable that one of the largest bank runs in U.S. history would occur two years later following the fastest and largest increase in interest rates in over 40 years," Trust FFCL at 86, purely goes to the *degree* of the risks, not their *kind*. *See, e.g.*, *Van Dellen*, 2012 WL 4815159, at *10; *FDIC v. Varrasso*, No. 11-cv-02628-WBS, 2013 WL 5493402 at *6 n.2 (E.D. Cal. Oct. 1, 2013).

The evidence presented at trial established that the risk of a bank run was not only foreseeable but in fact foreseen. The Officers and Directors were not only aware of the possibility of a sharp increase in rates, but actively worried about this possibility; ALCO was specifically advised in its monthly packets of the consequences of rate increases of as much as 3%. FF ¶¶ 218–222, 232–259. Both Mr. Warman's unrebutted expert testimony and the Holding Company's own records show that the Officers' management of the securities portfolio made the Bank susceptible to a loss of confidence, particularly given the sophistication of the Bank's deposit base and size of its uninsured deposits, which only added to the foreseeable risk of a run. FF ¶¶ 633–635. The risk of a run, resulting in closure by regulators, is a fundamental banking risk that many witnesses acknowledged at trial as a basic and foreseeable banking risk. FF ¶ 634.

Nor is there any factual basis for the Trust's fanciful suggestion that, "[i]f not for the bank run, the Bank would have held the government-backed securities to maturity as the Bank intended when classifying them as HTM, and those securities would have paid in full, erasing any

unrealized losses." Trust Resp. Br. at 13. Regardless of the Bank Officers' subjective intentions to hold those securities when they elected to classify them as HTM, the notion that the Bank could simply carry nearly $100 billion of underwater securities to maturity—years into the future—is facially implausible in light of the Bank's internal stress liquidity test, which revealed a $35 billion 30-day gap driven by the lack of monetization channels for the HTM-designated securities. FF ¶ 333. Several Directors admitted as much at trial, conceding that it was "inevitable" that HTM losses would be realized and that there were already discussions of selling portions of the HTM portfolio. FF ¶ 473. And the fact that other banks also had losses during this time period does not meaningfully alter the analysis, since the Bank was an extreme outlier. FF ¶ 77.

Finally, there is no merit to the Trust's contention that FDIC's conduct in selling securities caused any of its damages. As a preliminary matter, this argument is foreclosed by the Court's summary judgment order precluding the Trust from asserting a mitigation defense. ECF No. 284 at 7–8. The Trust cannot circumvent that order merely by recharacterizing its mitigation argument as an attack on causation. *See, e.g.*, *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316–17 (Fed. Cir. 2005). FDIC presented unrebutted testimony at trial concerning its statutory obligations and construction of a competitive bidding process through which it received fair-market value for the securities. FF ¶¶ 643–650. The notion that FDIC was bound to accept a failed bank's accounting designations and hold underwater securities for more than a decade—while incurring billions of dollars in negative annual carrying costs—is wholly inconsistent with FDIC's statutory obligation to "maximize[] the net present value return from the sale or disposition" of the Bank's assets. 12 U.S.C. § 1821(d)(13)(E).

**F. FDIC Has Not Established that the Trust Has Unclean Hands (Affirmative Defense No. 4)**

The unclean hands doctrine applies when "the party against whom the doctrine is sought to be invoked directly 'infected' the actual cause of action before the court, and is not merely guilty of unrelated improper past conduct." *Pond v. Ins. Co. of N. Am.*, 151 Cal. App. 3d 280, 290 (1984). California courts apply a three-prong test to determine whether the alleged claim is barred

United States District Court
Northern District of California

by the doctrine of unclean hands: "(1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." *Padideh v. Moradi*, 89 Cal. App. 5th 418, 436 (2023). In denying the Trust's motion to strike this defense, the Court explained that unclean hands may be asserted as an affirmative defense to a claim for breach of contract under California law. ECF No. 233 at 28 (citing *Camp v. Jeffer, Mangels, Butler & Marmaro*, 35 Cal. App. 4th 620, 638 (1995)).

FDIC argues that the Trust has unclean hands because the Holding Company disregarded known and obvious risks when the Bank bought long-duration fixed-rate securities, sold hedges, and paid the Dividend, urging that it can recover nothing in this action because the deposit funds that the Trust seeks to recover are the product of that misconduct. The Trust responds that FDIC has failed to prove that "Officers engaged in bad-faith, willful misconduct." Trust Resp. Br. at 15.

The Court agrees with the Trust that FDIC has failed to carry its burden as to both the second and third element of the equitable doctrine of unclean hands. As to the nature of misconduct, FDIC has not presented any evidence—let alone clear and convincing evidence—of a "willful act" by the Officers or Directors that "violates conscience[] or good faith" above the level of "mere negligence." *LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 821 (N.D. Cal. 2019); *see also Pinkette Clothing, Inc. v. Cosm. Warriors Ltd.*, 894 F.3d 1015, 1029 (9th Cir. 2018). While FDIC has established by at least a preponderance of the evidence that the Officers deviated from the standard of care of an ordinarily prudent banker by chasing short-term earnings at the expense of the Bank's interest-rate and liquidity risk profiles, it has not provided any evidence regarding the "essence" of unclean hands: "[b]ad intent." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989); *cf. GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (explaining that the plaintiff's hands need not be "clean as snow"). FDIC has similarly not shown that the Dividend was the product of willful, bad-faith misconduct.

FDIC additionally has not met the doctrine's demanding "direct" nexus requirement by clear and convincing evidence. *See Dollar Sys.*, 890 F.2d at 173. The Court previously declined to strike FDIC's unclean hands defense because FDIC plausibly alleged that the Holding Company caused the Bank to fail and that the Bank's failure necessitated the federal guarantee of

all deposits, including the Holding Company's deposit funds. *See* ECF No. 233 at 28. Since then, FDIC elected not to seek that theory and did not argue it at trial. *See* ECF No. 272 at 14 ("[T]he FDIC-R has not alleged—and need not prove—that the imprudent conduct at issue caused a run on the Bank or the Bank's ultimate failure."). FDIC accordingly has not proven a direct connection between the Holding Company's misconduct and FDIC's post-closure contractual obligation to return the Holding Company's deposit funds by clear and convincing evidence.

**G. FDIC Has Established that the Dividend Was a Voidable Transfer (Affirmative Defense No. 6)**

FDIC argues that the Trust cannot recover in the amount of the $294 million for the Dividend because the payment constituted a constructive voidable transfer, contending that the Bank's securities losses nearly exceeding its equity, material interest-rate-risk breaches, liquidity breaches, loss of depositors as venture-capital activity slowed, and inability to monetize HTM assets all showed that it had unreasonably small assets under the USA Test. The Trust responds that FDIC's damages expert Mr. Malek "applied the wrong test," accusing him of "devis[ing] a different test that relied on the 'liquidation' value of the Bank's securities and ignor[ing] half of its borrowing capacity." Trust Resp. Br. at 15.

Under California's Uniform Voidable Transactions Act,

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . .
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Cal. Civ. Code §§ 3439.04(a)(2).

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer

or obligation.

Cal. Civ. Code § 3439.05(a). As the Trust correctly points out, FDIC did not present expert testimony or evidence that the Bank was insolvent or incurred debts beyond its ability to pay as they became due, so the Court limits its analysis to the USA Test.

Lack of reasonably equivalent value is a question of fact. *GSM Wireless, Inc. v. Honarkar (In re GSM Wireless, Inc.)*, No. 12-AP-01350 RK, 2013 WL 4017123, at *32 (Bankr. C.D. Cal. Apr. 5, 2013). Reasonably equivalent value is not the same as fair market value. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 536 (1994). Rather, the Court must compare the value of the property surrendered (here, the Dividend), with what the debtor received in exchange. *See, e.g.*, *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 578 (Bankr. N.D. Cal. 1994). There is no dispute that the Bank issued the Dividend without receiving anything from the Holding Company. FF ¶ 641.

In determining whether a debtor has "unreasonably small assets," "[c]ourts applying the statute have 'weigh[ed] the raw financial data of the balance sheet against the nature of the entity and its need for capital over time,' or have evaluated the 'debtor's future ability to generate cash and pay its debts as they come due.'" *Intervest Mortg. Inv. Co. v. Skidmore*, 655 F. Supp. 2d 1100, 1105 (E.D. Cal. 2009) (alteration in original) (quoting *Still v. Arakelyan (In re Still* ), 393 B.R. 896, 919 (Bankr. C.D. Cal. 2008)). Ultimately, "[u]nreasonably small assets signify an inability to generate enough cash flow from operations and the sale of assets to remain financially stable." *GSM Wireless*, 2013 WL 4017123, at *30 (citing *Duke Salisbury v. Texas Commerce Bank–Houston, N.A. (In re WCC Holding Corp.),* 171 B.R. 972, 985 (Bankr. N.D. Tex 1994)).

As set forth in the findings of fact, the Court concludes that at the time of the Dividend, the Bank had unreasonably small assets to sustain itself through the ebbs and flows of the business cycle, which included interest-rate fluctuations, deposit outflows, and liquidity stresses according to its own metrics. FF ¶¶ 462–474. As of September 30, 2022, the Bank had a negative equity of $790 million and was carrying more than $17 billion in unrecognized securities losses, 80% of which were locked up as HTM, which it had not secured a reliable way to monetize. FF ¶¶ 464–465. The Bank had been operating in continuous breach of its EVE-at-risk metric for more than a

United States District Court
Northern District of California

year, breached its internal net-liquidity position metric, had been experiencing net deposit outflows since March 2022, forecasted net deposit outflows of $5 billion per quarter in 2023, and was borrowing in excess of its cash position. FF ¶¶ 260, 466–467. The Bank's dire financial condition is underscored by the fact that the Officers and Directors were considering the options set forth in Project Phoenix, which they knew would likely trigger an adverse reaction in the market and generate concerns of a pending sale of portions of the HTM portfolio (and the losses that the Bank would be forced to recognize). FF ¶¶ 79–86, 468. The possibility of sales in the HTM portfolio was hardly out of the question, since the Bank had failed to secure a reliable way to monetize its HTM securities in a bank-specific scenario. FF ¶¶ 338–343.

Each of the foregoing points was established by Mr. Malek's unrebutted expert testimony at trial. Mr. Malek did not, as the Trust baselessly suggests, "apply the wrong test." On the contrary, he persuasively explained at trial why the Trust's analysis was deficient; the Trust did not call an expert witness suggesting otherwise. The Trust asserts that by December 31, 2022, the Bank's fair value positive equity had recovered to a positive balance of $303 million. But Mr. Malek credibly testified that this "sliver" of equity—less than one percent of the balance sheet—was dwarfed by the Bank's enormous risk exposure in the investment portfolio, such that a 1% increase in interest rates would result in more than $5 billion in additional losses. The Court concludes that this positive balance, "'weigh[ed] . . . against the nature of the [Bank] and its need for capital over time,'" was not reasonable capital. *Intervest*, 655 F. Supp. 2d at 1105 (alteration in original) (quoting *Still*, 393 B.R. at 919). Similarly, the borrowing capacity that the Trust identifies—primarily in the securities portfolio—was contingent and collateral-dependent, already being drawn upon, and could not reasonably be deployed on a large scale without signaling distress to the market and triggering additional outflows. Lastly, the Trust's assertion that the Bank's balance sheet looked healthy on paper from a regulatory capital standpoint ignores the fact that regulatory capital ratios exclude the majority of its unrealized losses, which were in the HTM portfolio.

Because FDIC has established that, at the time of the Dividend, the Bank did not receive reasonably equivalent value and had unreasonably small assets, it has established that the Dividend was a voidable transfer.

**H. FDIC Has Established Damages with Reasonable Certainty**

"[T]he amount of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Meister v. Mensinger*, 230 Cal. App. 4th 381, 396–97 (2014) (citation omitted).

Mr. Malek testified without contradiction that the Bank suffered at least $4,521,583,000 in securities losses that would have been avoided if the Officers had complied with the Global Treasury Policy's EVE-at-risk limits and had not imprudently continued to add excessive interest-rate risk in the securities portfolio while in sustained breach. FF ¶¶ 605–615. Mr. Malek's "but for" world is a realistic and appropriate approach to measuring the consequences of the breaches by comparing the Bank's actual losses to those that would have been avoided absent the Officers' tortious conduct and the Directors' encouragement of the Officers. Mr. Malek's calculations also track cash-in and cash-out at the securities level and include other appropriate offsets, making the calculation a conservative and reasonable basis for damages. Mr. Malek also established that, but for the early termination of the Hedges, the Bank would have avoided $636,080,000 in additional damages when it sold its AFS portfolio before its failure. FF ¶¶ 637–640. Finally, there is no dispute that, but for the decisions to approve, pay, and not reverse the dividend, the Bank would have had an additional $294 million in cash. FF ¶¶ 641–642.

It makes no difference that some of the losses claimed by FDIC were allegedly "unrealized" from an accounting perspective before the Bank's failure. As the Court explained *supra* section II.E, evidence at trial established as a matter of fact that all the losses on the Bank's securities—whether "unrealized" from an accounting perspective or not—were real economic losses that existed and predated the Bank's failure.

These losses are all recoverable because the Bank sustained all the losses before its failure. Courts regularly award damages for unrealized losses—that is, reductions in the value of assets

United States District Court
Northern District of California

that have not yet been realized through the sale or other disposition of the asset—finding that such losses constitute legally cognizable damages. *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 621–22 (9th Cir. 1981) (affirming damages award for unrealized losses resulting from improperly purchased stock); *see also SCF Arizona v. Wells Fargo Bank, N.A.*, No. 09-cv-09513-WHP, 2011 WL 3874889, at *7 (S.D.N.Y. Sept. 1, 2011) ("[Plaintiff] does not have to sell or transfer the Note to demonstrate a loss."); *City of St. Petersburg, Fla. v. Wells Fargo Bank, N.A.*, No. 10-cv-693-T-TBM, 2012 WL 12904222, at *2 (M.D. Fla. Aug. 9, 2012) ("[A] plaintiff may recover damages for unrealized but otherwise actual, real losses.").

Selling securities or other assets at a loss was not a prerequisite for the existence of damages in any of these cases, nor was it required here. The Court accordingly finds that FDIC has established damages arising out of its affirmative defenses based on aiding-and-abetting liability and agency liability for Mr. Beck, Mr. Kruse, and the other ALCO members' tortious conduct far greater than the Trust's $1.71 billion claim. These damages provide a complete setoff of the Trust's claim.

## III. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

(1) The Court finds FOR FDIC and AGAINST the Trust as to Count I of the complaint in this action and FOR FDIC as to FDIC's First Affirmative Defense (Setoff for Aiding and Abetting Breaches of Fiduciary Duty), Second Affirmative Defense (Setoff for Holding Company's Liability for Acts of its Agents), and Sixth Affirmative Defense (Voidable Transfer).

(2) The Court finds FOR the Trust and AGAINST FDIC as to FDIC's Fourth Affirmative Defense (Unclean Hands).

(3) Judgment SHALL be entered in favor of FDIC as to its First, Second, and Sixth Affirmative Defenses and against the Trust.

Dated: August 28, 2026

BETH LABSON FREEMAN
United States District Judge